# EXHIBIT 5

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**Cause NO. FSD 92 OF 2014 – AJJ**

**The Hon. Justice Andrew J. Jones QC**
**In Open Court, 13th to 17th April and 26th May 2015**

**IN THE MATTER OF THE COMPANIES LAW (2013 REVISION)**

**AND**

**IN THE MATTER OF INTEGRA GROUP**

**Appearances:** Mr. Mark Phillips, QC instructed by Mr. Nicholas Dunne of Walkers for the Petitioner

Mr. Mac Imrie and Ms Gemma Newell of Maples and Calder for the Respondents

---

**REASONS**

---

## Introduction and general factual background

*Introduction*

1. This a petition presented by Integra Group (which I shall refer to as "the Company" or "Integra") by which the Court is required to determine the fair value of its Class A Common Shares in accordance with the provisions of section 238(11) of the Companies Law (2013 Revision). This is what might be described as a "valuation action" or an "appraisal action".

*The Company*

2. The Company was incorporated in the Cayman Islands on 15 March 2004 and commenced business in the following year as an oil field services provider operating in the Russian market. On 22 February 2007 Integra completed an initial public offering of Regulation S Class A common shares Global

Depository Receipts ("GDRs") listed on the London Stock Exchange ("LSE"). Its market capitalization as at 31 December 2007 was US$2.3 billion, based upon EBITDA of US$180 million. Integra's initial business plan was to grow through strategic acquisitions. By December 2009 it had completed 17 acquisitions making it one of the leading companies in the oil field services and equipment manufacturing sectors of the Russian market. However, from 2010 onwards Integra began to dispose of some of its business segments. By the end of 2012, following the spin-off of a joint venture business by means of an in specie dividend, the Company was operating two reported business segments described as (i) Drilling, Workover and Integrated Project Management and (ii) Technology Services. As at 31 December 2012 the Company had a market capitalization of US$76 million based upon EBITDA of US$33 million.

*The dissenting shareholders*

3. The respondents to the petition are three investment funds, namely East Capital (Lux) Eastern European Fund, East Capital (Lux) Russian Fund and Salink Limited ("the Respondents"). They are managed East Capital International AB ("East Capital") which is an experienced fund manager concentrating on public and private securities in emerging and frontier markets, including Russia. As at October 2014 it had approximately €2.9 billion under management. The Respondents first invested in Integra in the initial public offering in 2007 and held 17.3233% of its issued share capital as at the time of the merger.

*The merger transaction – a management buy-out*

4. In December 2013 the Company's board of directors was informed of the possibility that certain members of its management team ("the MBO Participants") were considering a proposal to purchase all of its shares not already owned by them. The proposal was formally presented to the board of directors at a meeting held in Rome on 9 and 10 December 2013, when the MBO Participants expressed their intention to make an offer to purchase the Company's outstanding shares for US$10 per share (equating to US$20 per GDR). The Board resolved to establish a committee of independent directors having no financial interest in the transaction who were empowered to accept or reject this offer. The Independent Committee comprised Mr Neil Gaskell who had held senior management roles in Royal Dutch Shell Group, Mr Iosif Bakaleynik who was formerly chief financial officer of TNK BP and Mr Dimitri Avdeev who was a former finance director of Integra and had subsequently become Vice President of Finance at Rosneft. On 2 February 2014 the Independent Committee engaged Deutsche Bank AG to produce a "fairness opinion" and Deutsche Bank subsequently opined that the offer price of US$10

per share/US$20 per GDR was fair. On 26 March 2014 an announcement was made to the LSE that the Independent Committee had approved the MBO Participants' offer. The publically listed price immediately before the announcement was US$15 per GDR (equivalent to US$7.50 per share). The offer price represented a premium of approximately 45% over the average market price during the previous 30 days.

5. Commercially, this transaction is a management buy-out, but it was structured as a statutory merger under Part XVI of the Companies Law between the Company and a newly incorporated special purpose vehicle owned and controlled by the MBO Participants ("the SPV"). Section 233(1) provides that two or more companies limited by shares and incorporated under the Companies Law may (subject to any express provisions to the contrary in any of their memoranda or articles of association) merge or consolidate in accordance with the statutory procedure. It is not necessary for present purposes to explain the statutory procedure in detail. Suffice it to say that a plan of merger complying with the statutory requirements was approved by a special resolution of the Company's shareholders passed at an extraordinary general meeting held on 21 May 2014. The merger was duly completed on 23 May 2014 and the Company's shares were de-listed by the LSE on 28 May 2014.

***The rights of dissenting shareholders - Section 238***

6. Dissenting shareholders are not required to accept a merger or consolidation agreement which has been approved by the requisite majority. Instead, they are entitled to dissent and demand payment for the fair value of their shares. Section 238(1) provides that:-

> *A member of a constituent company incorporated under this Law shall be entitled to payment of the fair value of his shares upon dissenting from a merger or consolidation.*

Section 238(2) provides that a shareholder of a constituent company who intends to dissent from a merger or consolidation must give written notice of objection to his company *before* the vote is taken, stating his intention to demand payment for his shares if the merger is authorized. The Respondents gave notice on 20 May 2014, the day before the EGM was held. If the merger or consolidation is authorized, section 238(4) requires that the dissenting shareholder's company must notify him of this fact within the next 20 days. Integra gave the Respondents notice on 6 June 2014. By section 238(5), a dissenting shareholder is then required, within 20 days of receiving that notice, to give his company a

written notice of his decision to dissent and a demand for payment of the fair value of his shares. The Respondents gave notices of dissent (containing the requisite information) on 26 June 2014. Section 238(8) then provides that either the shareholder's company or the merged or consolidated company must make a written offer to the shareholder to purchase his shares for a specified price which it has determined to be the fair value (which could be more or less than the merger consideration). On 2 July 2014 the Company offered to pay US$10 per share (being the same amount as the merger consideration). The legislation contemplates that the parties will then negotiate and attempt to agree upon the price to be paid. If no agreement is reached within a 30 day period, section 238(9) requires that the company must (and the dissenting shareholder may) present a petition to the Court for a judicial determination of the fair value of the shares. Whether or not any actual negotiation took place in this case has not been disclosed to the Court. Suffice it to say that the Company's offer of US$10 per share was not accepted and its petition was duly presented on 20 August 2014.

7. The effect of having given notices of dissent under section 238(5) on 26 June 2014 is that the Respondents ceased to have any of the rights of shareholders except the right to be paid the fair value of their shares and the corresponding right to participate in the proceedings before the Court for the determination of the fair value. They also had the right to commence proceedings to challenge the validity of the transaction. Whilst East Capital has criticised certain of the steps taken by Integra in connection with this transaction, the validity of the merger has never been challenged. The Court is therefore required, in accordance with section 238(11), to determine the fair value of the Respondents' shares and to determine a fair rate of interest, if any, to be paid by the Company upon the amount determined to be payable in respect of the shares.

## The evidence made available to the experts and put before the Court

*The expert witnesses*

8. The principal evidence before the Court is that of the experts retained by the parties. Integra retained Mr Andrew Robinson ("Mr Robinson"), who is a partner of the United Kingdom firm of Deloitte LLP and leads its specialist valuation group in London. The Respondents retained Mr John A. Taylor ("Mr Taylor") who is the managing director of the Financial Advisory Services practice of Houlihan Lokey Financial Advisors, Inc., based in Los Angeles. Both experts were of course supported by a team of professionals whose own credentials were explored in cross-examination of their principals. Mr Robinson and Mr Taylor both have some 25 years' experience as commercial appraisers and both have

acted as expert witnesses on numerous occasions in various different jurisdictions. They have impressive curricula vitae and their expertise is not in question. Having listened to them giving oral evidence over a period of several days, I formed the view that they are both very capable professionals but it was apparent that Mr Taylor had taken a more hands on approach than Mr Robinson and was more conversant with the details of the evidence relied upon in support of his conclusions. I ultimately came to the conclusion that the valuation approach and methodologies used by Mr Taylor are the most appropriate in the circumstances of this case and should be adopted by the Court.

9. Mr Taylor opined that the fair value of the Company was US$125 million as at 23 April 2014 and US$130 million as at 21 May 2014. Following the exchange of expert reports and discussion between the experts, Mr Taylor revised his valuations upwards to US$125 million and US$135 million. Depending upon how the number of shares in issue is calculated, his valuation of US$135 million translates to US$15.04 per share or US$13.36 per share.

10. Mr Robinson did not put a specific value on the Company. He opined that:

> *Overall I am of the opinion that the fair value range for [Integra] at the 23 April 2014 is between US$70 million and US$100 million. I am of the opinion that the value as at 21 May 2014 would have been slightly lower than this given the worsening economic outlook for Russia and the emerging Ukrainian situation.*

Again, depending on how the number of shares in issue is calculated, the low end of the range translates into a price of US$7.80 or US$6.93 and the top end translates to US$11.14 or US$9.89 per share. From the Court's point of view it is not particularly helpful to be given a range of value in this way.

***Establishment of an electronic data room***

11. It goes without saying that the information contained in Integra's own books and records is highly relevant to any appraisal of its fair value as a going concern. The Court's intention was that all the relevant material should be uploaded into an electronic data room where it would be available for inspection by the experts (and those instructing them) subject to giving appropriate confidentiality undertakings. The experts are the best judge of what information is or is not relevant for their purposes. It was the Court's intention, expressed in paragraph 7 of an order for directions made on 27 October 2014, that all documentary information requested by either expert should be uploaded into the data room. This did not happen. A great deal of material was uploaded, but Integra's

management took it upon themselves to control what information would be made available to the experts and refused to upload some of the material requested by Mr Taylor (or did so in a heavily redacted form) on the ground that they considered it to be irrelevant. There is no means of knowing whether material withheld by Integra's management might have affected the experts' judgments in any way.

*The Moscow meetings*

12. The experts and their assistants attended a series of meetings with Integra's senior management for the purpose of gaining a proper understanding of its business and raising questions arising out of their review of the materials uploaded into the electronic data room. These meetings took place at Integra's head office in Moscow on 18 and 19 February 2015.

*Factual affidavit evidence*

13. In addition to the expert reports, each side filed affidavits. Mr Neil Gaskell swore two affidavits on behalf of Integra. He had ceased to be a director of Integra following completion of the merger, but he was retained as a consultant to assist the MBO Participants with this proceeding. Subject to one paragraph in which he commented in a very superficial way upon the directors' earlier attempt to identify potential purchasers for some or all of Integra's business, Mr Gaskell's affidavits set out the factual and procedural history in a non-controversial way. Mr Magnus Lekander swore an affidavit on behalf of the Respondents. He is East Capital's General counsel and his evidence essentially comprises a complaint, made at an early stage of the proceedings, about the failure of Integra's management to disclose material thought to be relevant to the valuation exercise.

**The meaning of "fair value" in section 238 of the Companies Law**

14. Section 238(11) of the Companies Law (2013 Revision) provides that:-

> *At the hearing of a petition, the Court shall determine the fair value of the shares of such dissenting members as it finds are involved, together with a fair rate of interest, if any, to be paid by the company upon the amount determined to be fair value.*

15. This is the first time that the Court has been called upon to value a company's shares in connection with a merger carried out in accordance with the provisions of Part XVI of the Companies Law. Similar statutory remedies have existed in

the State of Delaware and in Canada for many years and both counsel have referred me to decisions of the courts in those jurisdictions as a guide to the way in which section 238 of the Cayman Islands legislation should be interpreted and applied.

16. Mr Imrie referred me to an article published in the Canadian *Annual Review of Civil Litigation* (2011) entitled *Fair Value – A Common Issue With Surprisingly Sparse Canadian Authority* by Clarke Hunter QC and Clarissa Pearce which I found to be helpful in a number of respects. On the question of what is meant by "fair value" in the Canadian legislation[1], which is very similar to section 238, the authors make the following general propositions as being well established by the authorities –

> 1. *Valuation of shares pursuant to a legislative appraisal remedy is a fact-based assessment, which requires "an important element of judgment" by the court.*
>
> 2. *In exercising its judgment, "a court is advised to be prudent – to proceed not on the basis of the most optimistic approach..." Dissenting shareholders are not entitled to a better value than other shareholder simply because they are dissenting. The appraisal remedy is a "safeguard, not a bonus."*
>
> 3. *Neither party bears the burden of proving the fair value of the shares. Although each party who asserts a proposition must prove it on the balance of probabilities, by a preponderance of the evidence, it is the court that must ultimately make the assessment of fair value. While expert evidence is commonly put forward to assist in establishing fair value, the court is not obliged to accept it.*
>
> 4. *Complicating the court's task is the frequently expressed admonition that judges should exercise caution in attempting to mix and match portions of competing expert reports and thereby cast themselves in the role of performing their own valuation. As the trial judge put it in the Brant Investments case:*[2]
>
> > *"In arriving at my valuation I do not propose to go through the exercise followed by the experts, substituting my own conclusions as to the basic ingredients for theirs. The wide disparity exhibited by them in the application of their technique does not inspire me with any confidence in the*

[1] See the Canada Business Corporations Act 1985, section 190.

[2] *Brant Investment Ltd et al v. KeepRite Inc et al* (1987) 60 OR (2d) 737, a decision of the Ontario High Court of Justice.

*result which I would achieve as an amateur in its application."*

5. *Market value "is the highest price expressed in money obtainable in an open and unrestricted market between knowledgeable, prudent, and willing parties dealing at arm's length, who are fully informed and under no compulsion to transact". However, "market value" is not equivalent to "fair value", although, as will be seen, fair market value can be an important part of the fair value determination depending on the circumstances.*

6. *Fair value is a value that is "just and equitable" – one which provides "adequate compensation (indemnity), consistent with the requirements of justice and equity." One important implication of the distinction between market and fair value is that, in general, no minority discount can be applied in determining "fair value", a point discussed further below.*

7. *Generally, neither the parties nor the court may rely on hindsight evidence. Events that were not known as of the valuation date are not relevant to determination of fair value on the valuation date. However, while hindsight is generally excluded, there are some limited but potentially significant exceptions to this principle.*

8. *The characteristics and motivations of the dissenting shareholder are generally irrelevant to a fair value determination, even when the dissenters are engaged in arbitrage.*

9. *The fair value offer which the corporation is required to make pursuant to legislation does not constitute a "minimum" price. The court may set a fair value that is lower than the price offered by the corporation, and has done so in several cases.*

17. The expert witnesses agreed that the definition of "fair value" promulgated in *International Valuation Standards (2013)* published by the International Valuation Standards Council[3] is relevant and informative for the Court's purpose. The chapter entitled *IVS Framework* states as follows –

[3] The International Valuation Standards Council is an independent, not-for-profit, private sector organization established in the United Kingdom, which has a remit to serve the public interest.

> *Fair value*
>
> *38. 'Fair value' is the estimated price for the transfer of an asset or liability between identified knowledgeable and willing parties that reflects the respective interests of those parties.*
>
> *39. ..........*
>
> *40. For purposes other than use in financial statements, 'fair value' can be distinguished from 'market value'. 'Fair value' requires the assessment of the price that is fair between two identified parties taking into account the respective advantages or disadvantages that each will gain from the transaction. It is commonly applied in judicial contexts. In contrast, 'market value' requires any advantages that would not be available to market participants generally to be disregarded.*
>
> *41. 'Fair value' is a broader concept than 'market value'. Although in many cases the price which is fair between two parties will equate to that obtainable in the market, there will be cases where the assessment of 'fair' will involve taking into account matters that have to be disregarded in the assessment of 'market value', such as any element of 'special value' arising because of the combination of interests.*

The experts are agreed about the way in which this definition of fair value is applied. The "identified parties" are Integra on one side and a market participant with an interest in buying the business on the other side. The reference to "market participants" means the whole body of individuals, companies or other entities that are involved in actual transactions or who are contemplating entering into a transaction

18. Mr Robinson also referred to the definition of "fair value" for financial reporting purposes, as stated in the *International Financial Reporting Standards* ("IFRS") which have been adopted by the International Accounting Standards Board. I have to say that I find this analogy unhelpful. As stated in the *IVS Framework* itself (at paragraph 39), the definition of "fair value" in IFRS is different from the IVS definition (stated above) and is generally consistent with the IVS definition of "market value". I accept Mr Taylor's evidence that the IFRS concept of fair value for financial reporting purposes is not relevant or informative for present purposes, in particular because it would imply a minority discount which I consider to be inappropriate, as do both parties in this case.

19. Given his professional background, Mr Taylor is of course very familiar with the meaning of "fair value" in the context of statutory remedies under United States laws, in particular section 262(h) of the Delaware General Corporation Law. He summarised the comparable United States law in the following way (at paragraph 110 of his Report) –

> *Fair value has a number of various meanings within the variety of U.S. courts, and is often referred to for valuations conducted in family law, corporate dissolution and shareholder-initiated appraisal action disputes. The basic concept of fair value is this context typically provides a minority shareholder the economic benefit it would receive were the business sold as a going concern in a hypothetical, arm's length transaction at the valuation date, with the resulting common shareholders' equity value distributed amongst common shareholders on a pari passu basis. Accordingly, it is customary that these valuations are conducted without incorporating minority, non-controlling or marketability and illiquidity discounts into the analysis. Further, for illustrative purposes, in the context of U.S. Delaware appraisal cases, it is my understanding that §262(h) of the Delaware General Corporation Law requires the court to "...determine the fair value of the shares, exclusive of any element of value arising from the accomplishment or expectation of the merger ..." In other words, the fair value analyses should reflect the "operative reality" of the enterprise being examined without the expected impact or structure of the merger.*

I accept this statement as a useful summary of the Delaware jurisprudence, which I think can be relied upon as a helpful guide to the meaning of "fair value" in section 238 of the Cayman Islands Companies Law.

20. Mr Imrie referred me to an article published in *The M&A Lawyer* (2014) entitled *Dissenting Shareholders' Appraisal Rights in Cayman Islands Mergers and Consolidations* by Tony Heaver-Wren and Andrew Jackson. They make the point that the drafting of what is now Part XVI of the Companies Law (2013 Revision) was heavily influenced by the Delaware and Canadian law and suggest that, having regard to the principles established in those jurisdictions, this Court should have little difficulty in accepting the following proposition –

> *1. Fair value is the value to the shareholder of his proportionate share of the business as a going concern, save where it is worth less on a net assets (i.e. liquidated) basis as at the merger date: ex hypothesis the shareholder has bought into the company as a going concern, not in anticipation of*

*participating in a liquidation, and it follows that, when he elects to dissent from a merger or consolidation brought about at the behest of the majority, he is thereafter deprived of his proportionate share of an active enterprise and is entitled to be compensated for it. In determining the measure of such compensation, the Court should be guided by the following considerations:*

*1.1 Fair value does not include any premium for forcible taking (ie. expropriation of the shares).*

*1.2 It is neither appropriate nor permissible to apply a minority discount when making the determination.*

I agree with this proposition.

21. The Canadian courts have emphasised that every appraisal case turns on its own facts and that there is the need to consider all the evidence that might be helpful to the court. Lambert J.A., writing for the majority of the Court of Appeal of British Columbia in *Cyprus Anvil Mining Corp v. Dickson* (1986) 8 B.C.L.R. 145, said –

*It is not necessary for me to analyse those cases or quote from them. The point that they emphasise is that the problem of finding fair value of stock is a special problem in every particular instance. It defies being reduced to a set of rules for selecting a method of valuation, or to a formula or equation which will produce an answer with the illusion of mathematical certainty. Each case must be examined on its own facts, and each presents its own difficulties. Factors which may be critically important in one case may be meaningless in another. Calculations which may be accurate guides for one stock may be entirely flawed when applied to another stock.*

*The one true rule is to consider all the evidence that might be helpful, and to consider the particular factors in the particular case, and to exercise the best judgment that can be brought to bear on all the evidence and all the factors. I emphasize: it is a question of judgment. No apology need be offered for that. Parliament has decreed that fair value be determined by the courts and not by a formula that can be stated in the legislation.*

22. The Companies Law does not specify the date at which the determination of fair value is to be made. The order for directions made on 27 October 2015 identified two potential valuation dates, namely 23 April 2014 (which was the date upon which the Circular containing the merger proposal was sent to shareholders and published to the market) and 21 May 2014 (which was the date upon which the EGM was held). Counsel ultimately agreed that the latter date should be adopted and this is consistent with both the Delaware and Canadian law.

23. Under section 262(h) of the Delaware General Corporations Law dissenting shareholders are entitled to receive their pro rata share of the common stock of the company as it existed as of the merger date, exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation. This equates to the date of the EGM, namely 21 May 2014.

24. Under section 190(3) of the Alberta Companies Act dissenting shareholders are entitled to be paid the fair value for their shares on the last business day before the day on which the resolution from which the shareholder dissents was adopted. This equates to the last date upon which the Respondents could have served their notices of dissent, namely 20 May 2014.

25. The principle underlying the legislative approach in both these jurisdictions is reflected in what was said by Anderson J. in *Re Brant Investments Ltd* (ibid) at page 772 –

> *The basic ground upon which the dissenting shareholders took their position of dissent was objection to the impugned transaction. Because the manner of carrying that transaction forward involves a fundamental change within the meaning of the Act, they were accorded by the Act a right of dissent and a right to be paid "fair value" of their shares. In my view they should have no enhancement in the value of their investment attributable to the transaction which gave rise to their dissent.*

I agree with this proposition and its converse, namely that the dissenting shareholders should not bear any dilution or diminution in the value of their investment resulting from the merger.

26. I agree with counsel that the date upon which merger decision is made, in this case 21 May 2014, is the logical date at which to determine the fair value payable to dissenting shareholders. This means that the fair value should be determined at the point immediately before the merger is agreed, disregarding the effects of the merger, whether it would have had a positive or negative effect

upon the Respondents had they continued to be shareholders of Integra. I use the expression "the Valuation Date" to mean 21 May 2014.

27. In conclusion, the Court is therefore required to determine the fair value of Integra's business as a going concern as at the Valuation Date, meaning at the point immediately before the merger was approved. The fair value of Respondents' shares is their proportionate share of this amount without any minority discount or any premium for the forcible taking of their shares. There is no presumption that the fair value offer made by Integra on 2 July 2014 in accordance with section 238(8) constitutes a minimum price and it is open to the Court to determine that the fair value is less than $10 per share.

**The possible approaches to valuation and valuation methodologies**

*Section 238*

28. Section 238 of the Companies Law (2013 Revision) does not dictate any particular valuation methodology. It is well established in both the Canadian and Delaware jurisprudence that fair value should be proved by any techniques or methods which are generally considered acceptable in the financial community and are otherwise admissible in court. (See the decision of the Delaware Supreme Court in *Weinberger v. UOP Inc* (1983) 457 A.2d 701 at 713). It is generally accepted, and agreed by the expert witnesses in this case, that there are three main approaches to an appraisal exercise of the kind required to be performed by the Court, each of which contains a number of specific valuation methods.

*The market approach*

29. The IVS Framework (paragraph 56) describes the *market approach* as providing an indication of value by comparing the subject asset with identical or similar assets for which price information is available. This approach encompasses a number of possible methodologies, including a valuation based upon the trading prices of a company's own shares and a valuation based upon the trading prices of comparable companies operating in the same market sector.

30. Mr Taylor explains this approach in paragraphs 121 and 122 of his Report in the following way:

> *"The market approach provides value indications for a company through a comparison of the company with guideline public companies or guideline transactions. The market approach entails selecting relevant*

*financial information of the subject company and capitalizing those amounts using valuation multiples that are based on empirical market observations.*

*A valuation multiple is an expression of what investors, in the aggregate, believe to be a reasonable valuation for a particular security relative to a measure of financial information, such as revenues, earnings or cash flows. It incorporates expectations of growth and rests on the implicit assumption that some level of economic earnings will be generated by the enterprise into perpetuity. The most common means of obtaining valuation multiples is through the guideline public company method, in which market-derived measures of value for a set of guideline public companies are compared with selected financial information for each of such companies. This method yields valuation "multiples," which are generally expressed as ratios of the various financial metrics. The multiples are then used as data points for selecting multiples to be used for valuing the subject company. Another common method of obtaining valuation multiples, the guideline transaction method, involves comparing the transaction values for a set of acquired companies to selected financial metrics for each of such companies. The resulting transaction multiples are then used as data points for selecting multiples to be used for valuing the subject company. In both methods, one should choose guideline companies that are similar to the subject company in economic and operational areas that are of major importance to investors."*

***The income approach***

31. The IVS Framework (paragraph 58) describes the income approach as providing an indication of value by converting cash flows to a single current capital value. Each of these approaches to valuation encompasses different methodologies. The income approach includes the *discounted cash flow method* (DCF) which Mr Taylor describes as follows in paragraph 124 of his Report:

*"The discounted cash flow method (DCF) estimates the present value of the projected free cash flows to be generated by the subject company, and theoretically available (though not necessarily paid) to its various capital providers. The discount rate used in the DCF method is intended to reflect all risks associated with realizing the stream of projected free cash flows. It can also be interpreted as the rate of return that would be required by providers of capital to a company to compensate them for the risk-adjusted time value of their money. Unlike a valuation multiple, however, the discount rate contains no implicit expectations of growth for the free*

> *cash flows. Instead, such growth expectations are contained within the projected free cash flows."*

*The Cost (or asset based) approach*

32. For the sake of completeness, I should mention that the third possible valuation approach would be the *cost approach* (or *asset-based approach)* which provides an indication of value using the economic principle that a buyer will pay no more for an asset than the cost to obtain an asset of equal utility, whether by cost or construction. As Mr Taylor explains (in paragraph 127 of his Report) this approach differs from the market and income approaches in two important ways. It focuses on the value of the entity's underlying assets and liabilities rather than the economic earnings generated by the entity as a whole. It may also be applied in situations where liquidation is a reasonable possibility. The experts agree that a cost approach to valuation would not be appropriate in this case.

*The Experts' respective valuation approaches*

33. The experts do not agree upon the valuation methodologies which are most appropriate for determining the fair value of Integra having regard to the factual circumstances existing at the material time. Mr Robinson favours a market value methodology based upon published stock market prices for Integra's GDR's (which were listed on the LSE) as the prime indicator of fair value, to which a control premium is then added. He relies upon a DCF valuation merely as a means of cross-checking the reasonableness of his range of values derived from his consideration of the listed GDR prices, control premium and the merger consideration. Mr Taylor adopted the income approach and conducted a DCF valuation. He also adopted the market approach and carried out a valuation using the guideline public company methodology, which relies upon financial and market information relating to publicly traded securities of comparable companies engaged in the same industry. Mr. Taylor considered the DCF methodology to be three times more reliable than the Guideline Public Company methodology and so his concluded equity valuation is reached by applying a 75%/25% weighting to the results of the two methodologies.

34. In section 7 of his Report Mr. Robinson sought to place some reliance on the proposition that "the Board had unsuccessfully attempted to sell the business". This conclusion was based entirely upon the following statement contained in paragraph 41 of Mr Gaskell's affidavit:

> "41 *In this regard it should also be noted that prior to the merger transaction, starting in mid 2011, the Board had attempted to identify potential purchasers for some or all of the Petitioner and*

> *had instructed MS in connection with this process. However, other than an agreement with Geotech in November 2011 to merge the Petitioner's seismic business with theirs, and notwithstanding continuing efforts assisted by MS, no such party was found, and indeed no formal or informal expression of interest was made other than that which was eventually put forward by the Participants. In light of the failure of this exercise and the absence of any alternative offer following the announcement of the merger proposal, I believe that the MBO Participants were the only prospective purchaser of the Petitioner or any of its material subsidiaries that existed in the marketplace."*

Mr Robinson said in evidence that he produced section 7 of his Report without looking for any evidence to support Mr Gaskell's statement. As it turned out, a review of the material put in the data room did not reveal any evidence that would justify placing reliance upon the notion that an unsuccessful marketing exercise had ever been undertaken. Mr. Taylor found no evidence that Integra had instituted a "go-shop", undertaken any auction process or hired any investment bank to identify potential purchasers or contact potential alternative buyers as part of the MBO transaction.

35. Integra did engage Morgan Stanley in 2011. The engagement letter dated 9 September 2011 was eventually uploaded into the data room after the experts had completed their joint report. It is perfectly clear from the terms of this letter that Morgan Stanley was instructed in connection the potential sale, or some other kind of strategic transaction, in respect of identified parts of Integra's business. It was not instructed to find a buyer for the Company. In the event, Integra decided not to upload into the data room any of the material which would enable the experts to gain a proper understanding of the work actually undertaken by Morgan Stanley and the results of that work.

36. I conclude that the points made by Mr Robinson in section 7 of his Report are not justified by the available evidence.

**The Court's approach to the valuation of Integra**

37. For the reasons which I shall now explain, I have come to the conclusion that Mr Taylor's valuation approach is the most appropriate in the circumstances of Integra and that it should be adopted by the Court.

38. The mere fact that a company's shares are listed on a major stock exchange, in this case the LSE, does not lead to the conclusion that a valuation methodology based upon its publically traded prices is necessarily the most reliable approach towards determining its fair value for the purposes of a section 238 court appraisal. The case law and academic commentary to which I have been referred suggests that this methodology is to be preferred in cases where there is a well informed and liquid market with a large, widely held free float.

39. The Hunter and Pearce article (*ibid*) makes the following observation –

> *The extent to which criticism of the [efficient market hypothesis] and stock market valuation have merit is dependent upon the factual circumstances in which the stock market valuation approach is applied. However, as the trial judge in 'Deer Creek'* [4] *observed, the fact that markets are not perfect is no reason to ignore them altogether. What can be said is that stock market prices become more persuasive of fair value the more the following things can be said:*
>
> 1. *the market is well informed about the company's assets, earnings and future prospects;*
> 2. *the market for the company's stock is liquid, by which is meant that at any time, someone wishing to buy or sell can readily find a counterpart with the opposite objective;*
> 3. *the shares are widely held rather than dominated by a large majority shareholder.*

40. Any tendency for the market to be uninformed or misinformed will diminish the reliability of publically traded share prices as an indicator of a company's (intrinsic) fair value. It is agreed that Integra always complied with its formal reporting requirements. The experts are also agreed that the manner and extent to which a listed company communicates with the market can affect its share price. Mr Robinson concluded (in paragraphs 8.25-8.29 of his Report) that Integra's management communicated regularly with the market, that it was under sufficient scrutiny from market analysts and that lack of information was not a factor affecting liquidity. Mr Taylor considered this issue in a more detailed and nuanced way and I accept his conclusion that, during the most relevant period from mid-2012 onwards, the market was less well informed about Integra compared with CAT Oil AG ("CAT") and Eurasia Drilling Company ("EDC"),

[4] *Deer Creek Energy Limited v. Paulson & Co.* (2008) ABQB 326, a decision of the Court of Queen's Bench of Alberta.

two companies which both experts have identified and used as comparable for various aspects of their valuation work.

41. The relative liquidity of Integra's GDRs has been measured by reference to four commonly used criteria, namely (a) the annual trading volume as a percentage of the 'free float', meaning the number or percentage of a company's shares not held by its management and insiders which are freely tradable on the public market (b) the number of days on which the GDRs were not traded in each year, (c) the median 'bid-ask spread' (meaning the difference between the bid and offered prices in trading on the LSE) over each year and (d) the dollar volume of daily trading.

42. The following table reflects the number of Integra's GDRs traded as a percentage of the free float had declined steadily relative to its peers and was significantly lower in the year before the MBO. There is some doubt about the amount of Integra's free float because it failed to disclose its share register and other relevant information. The MBO Participants held 32.5% of Integra's issued share capital as at the date of the announcement. This does not necessarily mean that the free float is 67.5% because registered shares or GDRs may have been held by members of management and/or other insiders who are not MBO Participants. There is some evidence tending to suggest that this may have been the case[5], but the following table is based upon the assumption that the free float is 67.5% of the issued share capital.

| **Trading volume by year, as a percentage of free float** | | | |
|---|---|---|---|
| Year | Integra | CAT | EDC |
| 2007 | 180% | 39% | 37% |
| 2008 | 162% | 230% | 148% |
| 2009 | 178% | 232% | 93% |
| 2010 | 98% | 135% | 193% |
| 2011 | 106% | 78% | 264% |
| 2012 | 64% | 56% | 95% |
| 2013 | 16% | 212% | 106% |
| 2014 | 9% | 156% | 100% |

Source: Mr Robinson's Table 8.1

[5] Integra's CFO sent Deutsche Bank an analysis of Integra's shareholding structure, as an attachment to an e-mail transmitted on 3 February 2014. This states that the 'JF Group' (a reference to John Fitzgibbons, one of the MBO Participants) held 19.14% and the 'Management Group' held 48.51% of an assumed number of 5,054,000 GDRs (which takes account of additional shares intended to issued or cash paid to directors and employees who held unvested units in a Restricted Stock Unit remuneration plan). In the absence of any explanation from Integra about the composition of these groups, the Respondents inevitably suspect that the free float may have been substantially lower than 67.5% during the most relevant period from 2012 onwards.

43. The following table reflects that the number of days on which Integra's GDRs were not traded increased very significantly from 2012 onwards. In that year it was not traded on 42 out of about 250 trading days (about 17%). In 2013 it rose to 112 (about 45%). During 2014 there was no trading on 52 out of about 100 trading days up to 26 May when its GDRs were de-listed. By this measure Integra's GDRs were very illiquid compared with its peers in the period of about two years leading up to the merger.

| Days of No Trading | | | |
|---|---|---|---|
| Year | Integra | CAT | EDC |
| 2007 | 1 | 0 | 0 |
| 2008 | 1 | 0 | 1 |
| 2009 | 7 | 0 | 37 |
| 2010 | 2 | 0 | 6 |
| 2011 | 2 | 0 | 0 |
| 2012 | 42 | 0 | 0 |
| 2013 | 112 | 0 | 0 |
| 2014 (Jan-May) | 52 | 0 | 0 |
| TOTAL | 219 | 0 | 44 |

Source: Mr Robinson's Table 8.2

44. The following table reflects median bid-ask spreads calculated by Mr Taylor from data sourced from Bloomberg.[6] I accept his conclusion that until 2011 Integra's median bid-ask spread is in line with the other two companies, but it widened significantly and became volatile starting in mid-2012 and then declined notably after the MBO announcement was made on 26 March 2014.

| Median Bid-Ask Spread | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Company | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014(1) |
| Integra | 1.5% | 1.1% | 2.4% | 1.3% | 0.8% | 3.2% | 6.5% | 7.3% |
| EDC | 1.5% | 2.0% | 3.1% | 0.7% | 0.5% | 0.3% | 0.2% | 0.4% |
| CAT Oil AG | 1.5% | 1.9% | 2.0% | 2.0% | 1.9% | 1.5% | 1.3% | 0.8% |

Source: Mr Taylor's Appendix 10.2.3

6 There is an unexplained discrepancy between Mr Robinson's analysis based upon data sourced from Capital IQ and Mr. Taylor's analysis based on data sourced from Bloomberg. Since Capital IQ obtains its data from Bloomberg, I concluded that the Court should rely upon the Bloomberg sourced data.

45. This table reflects the median bid-ask spread expressed as a percentage of the price. Mr Robinson made the point that one should also consider the absolute amount of the spread as well as the percentage amount. In the 90 days prior to the MBO announcement Integra's average market price was US$15.74 per GDR. During this period the median dollar amount of the bid-ask spread was around US$1.15. The relatively high bid-ask spread is indicative of illiquidity.

46. The following table reflects the daily volume of trading of Integra's GDRs during the periods of 180 days, 90 days and 60 days prior to the MBO announcement. Even if the days on which Integra's GDRs were not traded at all are excluded from the analysis, the daily volume is significantly lower than that of its peers - $59,000 compared with $9.563 million for EDC and $4.192 million for CAT over the 180 day period. If the days on which Integra's GDRs were not traded are included and counted as nil, the average trading volume for the 180 day period fall to just $29,000.

**Daily volume of trading**

| | Price | | | Average Amount of Daily Trading Volume (Including no trading days as $nil) | | | Average Amount of Daily Trading Volum (Excluding no trading days) | | |
|---|---|---|---|---|---|---|---|---|---|
| | Integra US$ /GDR | EDC US$/ GDR | CAT AG (Euro/ Share) | Integra (US$ million) | EDC (US$ million) | CATI (Euro million) | Integra (US$ million) | EDC (US$ million) | CAT (Euro million) |
| Closing Price before Announcement date: 3/25/2014 | 15.00 | 23.50 | 13.55 | 0.007 | 7.733 | 4.385 | 0.007 | 7.733 | 4.385 |
| 180-day Average | 13.10 | 38.71 | 17.01 | 0.029 | 9.563 | 4.192 | 0.059 | 9.563 | 4.192 |
| 90-day Average | 15.74 | 36.68 | 19.15 | 0.019 | 9.304 | 6.590 | 0.050 | 9.304 | 6.590 |
| 60-day Average | 14.95 | 33.25 | 18.10 | 0.021 | 11.413 | 5.755 | 0.068 | 11.413 | 5.755 |

Source: Mr. Taylor's Appendix 10.1 (as corrected)

47. By each of these four criteria Integra's GDRs were an illiquid stock from 2012 onwards and the trend was towards increasing illiquidity during this period. Mr. Taylor regards this relative illiquidity as an important factor pointing to the conclusion that a market approach towards the determination of fair value may not be appropriate. In contrast, Mr Robinson's view is that, in spite of the relative illiquidity, a market approach to the determination of fair value is still appropriate because the market was not affected by what he calls "structural illiquidity" as the GDRs were listed on the LSE.

48. Mr Robinson uses the expression "structural illiquidity" to mean illiquidity caused by factors which affect the stock exchange or the particular market as a whole, rather than factors affecting individual securities listed on the exchange. He says that the reason for Integra's relative illiquidity in 2013 and 2014 was

that the market had lost patience with its inability to meet its earnings forecasts. He said that "the key point here is that it had become less liquid because nobody wanted to buy the shares and it was related to the performance rather than a structural defect in the market". For this reason, he concludes that a market approach to valuation is still appropriate. This does appear to be a novel concept in that it is not supported by, or even referred to, in any of the jurisprudence and academic literature to which I have been referred.

49. In answer to a question from the Court, Mr Robinson said this –

> *"THE COURT: And for present purposes, what is the significance of the fact that it was more liquid in the years prior to 2012?*
>
> *THE WITNESS: That it is not structural reason why it became less liquid, it was all to do with the market's perception of the company and its performance and what its future expectations were. So the value of the company had, I think, effectively declined. And that's what I'm trying to point out, that nothing been changed that would say from a structural perspective to say that this company should no longer be illiquid if it was an attractive asset.*
>
> *THE COURT: So are you saying that the shares of any company which meets the criteria necessary to be listed on the London Stock Exchange would not suffer from structural liquidity as you define it?*
>
> *THE WITNESS: Yes, because you have to deal with – the London Stock Exchange does not want structural problems when its market, it wants to have its market and you end up delisting from London if you can't perform."*

50. I am not able to accept Mr Robinson's analysis. He recognises that the market price of a security listed on a major stock exchange such as the LSE may reflect a minority discount, resulting in the need to apply a control premium in order to arrive at a fair value, but he does not appear to recognise that it may also reflect an illiquidity discount. He says (in paragraph 8.6 of his Report): "Ceteris paribus therefore, investors will rationally pay more for an otherwise identical liquid asset than for an illiquid asset." This must be right and I think that it leads to the conclusion that the public traded price of a stock may reflect a liquidity discount even though it is listed on a major exchange such as the LSE.

51. In this regard, I found the observations of Deutsche Bank's research analyst published on the day after the MBO announcement to be instructive. Its company alert document stated –

> *The price offered does not look particularly great to us. The offer price is a 33% premium to the market price as of the yesterday's closing. It is also visibly higher than our estimated target price of USD16/GDR. Note that we derive our fair value of Integra assuming a punitive ROE of 17% to reflect the stock's poor liquidity. Should we assume no special liquidity discount (a 'regular' liquidity risk premium of 2pp rather than 4pp that we currently use in Integra), our target price would be USD24/GDR. Hence, the proposed price does not look great to us.*

52. Deutsche Bank's approach recognises the need to compensate for the illiquidity discount reflected in the traded price of Integra's GDRs in order to arrive at a fair value. Mr Robinson does not recognise that the traded price might reflect any illiquidity discount because Integra's GDRs are listed on the LSE and therefore do not suffer from any 'structural illiquidity'. Deutsche Bank's approach was put to Mr Robinson in cross-examination. His response was unconvincing and certainly did not lead me to conclude that, in the absence of 'structural illiquidity' (as defined by him), a market approach to the valuation of Integra's GDRs based upon its own traded prices should be preferred to a methodology based upon traded prices of comparable stocks or an income approach based upon a DCF calculation or a combination of both. I prefer the more conventional approach which is that illiquidity of the kind identified in this case is an important factor which may lead to the conclusion that the publically traded price is not a reliable indicator of fair value or not sufficiently reliable to exclude some alternative valuation approach or methodology.

53. For these reasons I have come to the overall conclusion that the Court's valuation of Integra should be done in the way recommended by Mr Taylor. He combined an income approach using a DCF methodology with a market approach, using a guideline public company methodology. He places greater weight on the DCF methodology (giving it a 75% weighting) than the guideline public company methodology (giving it a 25% weighting). I turn next to consider various specific criticisms about the way in which he applied these methodologies.

**Criticisms made of Mr Taylor's valuation methodologies**

54. Mr Robinson rightly makes the point that the level of confidence that can be placed in any DCF valuation depends upon the reliability of underlying cash flow models. His review of the forecasts published to the market in the years

2011-2013 by the Company itself and by various independent analysts[7] suggests that both Integra's management and the analysts have been repeatedly over-optimistic about the Company's anticipated performance, although Mr Taylor makes the point that the estimated revenue growth forecast by Integra's management is low relative to the oilfield service sector generally. Mr Robinson also cautions that that a majority of the value derives from cash flows in the later years of the projection period (through to 2018) and that the earnings forecasts are dependent upon Integra having made a substantial capital investment in new drilling rigs (budgeted at US$328 million over the period). The fact that a high proportion of the value reflected in the experts' DCF calculations is derived from the terminal value calculation means that the resulting value is very sensitive to small assumption changes. For these reasons it is particularly important that the cash flow projections/models are subjected to an in depth review and analysis.

55. In the period from 6 December 2013 to 21 February 2014 Integra's management prepared and revised multiple cash flow models for the purposes of the merger transaction. Mr Robinson's Report identifies nine separate models produced in this period.[8] Mr Taylor's Report explains how the model relied upon by Deutsche Bank for the purposes of its fairness opinion (which I shall referred to as "the MBO Projection Model") went through at least eleven revisions by management during the period of about 10 weeks before finally being approved by the Independent Committee on 21 February 2014.[9] Mr Taylor conducted an in depth analysis of these models which were found to have been generated in various different ways, with significantly different levels of detail. In particular, he noted that many of the Excel spread sheets contained "hard coded" numbers inserted by management rather than values generated from the use of clearly identified working formulae. In spite of these difficulties and a certain reluctance on the part of Integra's CFO to explain the methodologies used by her staff, Mr Taylor concluded he had been able to gain a sufficient understanding of the way in which the MBO Projection Model had been generated, such that it could be relied upon for the purposes of a DCF valuation, subject to certain adjustments. Mr Robinson did not devote a similar effort to analysing the models which is understandable bearing in mind that he decided to use his DCF calculation merely for the purpose of cross-checking the valuation produced by a market

[7] Integra was covered by Deutsche Bank, Morgan Stanley, Renaissance Capital., URALSIB and, VTB Capital in the period from 2012 onwards.

[8] Mr Robinson's Report (paragraphs 9.1 to 9.9) identifies nine separate models produced in this period. The first is the long term model dated 6 December 2013 was approved by the board of directors at a meeting on 9 December 2013. The last is the model approved by the Independent Committee and sent to Deutsche Bank on 21 February 2014 and is referred to as "the Business Plan" in its fairness opinion. I have referred to it as "the MBO Projection Model".

[9] Mr Taylor's Report, paragraph 75 and Figure 4.

methodology. Nevertheless, he concluded that the MBO Projection Model presents a "reasonable starting point for a DCF valuation". .

56. Integra's share capital is denominated in US$, but its functional currency is the Russian rouble. For this reason management's various cash flow projections have been generated in roubles and then translated into dollars, for which purpose a flat exchange rate has been used. In preparing its DCF valuation, Deutsche Bank used a forward curve exchange rate which forecast that the rouble would fall against the dollar over the applicable period, thus resulting in a lower valuation. Mr Taylor used the flat exchange rate reflected in the MBO Projection Model. Mr Robinson carried out DCF calculations using both the flat exchange rate and the forward curve forecast, without expressing any preference. I have adopted Mr Taylor's DCF calculations using the flat exchange rate.

57. Mr Robinson does not agree with the way in which Mr Taylor dealt with the working capital requirement in his DCF calculation. They agree that Integra had a working capital deficit of about US$1 million as at 31 December 2013. The working capital requirement over the period ended 2018 was determined to be about US$47.7 million by Deutsche Bank based upon the MBO Projection Model. Mr Robinson and Mr Taylor projected about US$41 million and US$40 million respectively based upon different methodologies. The relevant issue debated by the experts is whether Mr Taylor ought to have made a deduction from his concluded equity value to reflect the working capital deficit. Mr Taylor's methodology relies upon market based working capital assumptions and so his selected multiples already reflect the relative risk of Integra's working capital position as at the Valuation Date. I accept Mr Taylor's judgement that, for this reason, no adjustment should be made because it would result in a form of "double counting."

58. The second issue relates to the amount of the deferred tax asset which ought properly to be included in the model used for any DCF calculation. The Integra Group's audited consolidated financial statements for the year ended 31 December 2013 reflect a net deferred income tax asset of US$22.447 million (2012: US$20.412 million). Note 16 states as follows: "Deferred income tax assets associated with tax losses available for carry-forward are recognised when management believes it is probable that the Group will be able to apply the losses to offset future tax profits". The Note explains how the deferred tax assets (liabilities) of individual group companies have been consolidated and identifies the extent to which Integra's management decided to impair certain tax assets on the basis that it did not believe that such tax losses can be used to reduce taxes on income in the foreseeable future. In other words, Integra's management made a

judgement about the extent to which the gross deferred tax assets should be impaired. These audited financial statements were issued on 16 April 2014. It follows that Integra's management must have been providing financial information simultaneously to Ernst & Young[10] (for purposes of the audit) and to Deutsche Bank (for purposes of the fairness opinion). However, the gross deferred tax asset reflected in the MBO Projection Model prepared for Deutsche Bank is significantly lower than the corresponding amount in the audited financial statements. Mr Taylor sought an explanation for this discrepancy at the Moscow meetings. He was told that a dispute had arisen with the Russian tax authority which is challenging the utilisation of approximately US$36.7 million of the losses but Integra did not explain to Mr Taylor, and has not explained to the Court, how its management felt able to make materially different representations to Ernst & Young and to Deutsche Bank about the extent to which it believed that the gross deferred tax assets should be impaired. It seems to me that Mr Taylor was right to place reliance upon the published statement of management's belief reflected in the audited financial statements.

59. The third adjustment to MBO Projection Model made by Mr Taylor also concerns tax. Integra's audited consolidated financial statements reflect that it has incurred non-tax deductible expenses in 2013 and in the prior year. Integra does not qualify as a 'consolidated group taxpayer' under the applicable Russian law with the result that expenses incurred in one group company (whether it be the parent company or a subsidiary) cannot be set off against income generated in another group company for income tax purposes. The effect of this rule is reflected in Note 16 of Integra's audited consolidated financial statements. At the Moscow meetings Mr Taylor was told that the non-tax deductible expenses in fact comprise overhead expenses incurred at the parent company level. I assume this answer must relate to both historic expenses reflected in the financial statements and projected expenses reflected in the MBO Projection Model. Mr Taylor's research led him to the conclusion that it would be possible for such expenses to be charged to operating subsidiaries in a way which would enable it to be treated as a deducible expense, provided that a bona fide framework of service agreements is established pursuant to which services are actually provided on the basis of arm's length pricing.

60. Even if Mr Taylor's understanding of the applicable Russian tax law is right, it seems to me that he had insufficient evidence (and the Court still has insufficient evidence) to justify adjusting the MBO Projection Model to assume that these expenses will be tax deductible going forward. Integra did in fact incur non-tax

[10] The auditor is the Russian firm of Ernst & Young (CIS) B.V., based in Moscow.

deductible expenses in 2012 and 2013. Why this occurred is unclear. There was no in-depth discussion of the issue at the Moscow meetings. If Integra's management had considered the issue with its auditors and tax advisers at any stage in the past, the relevant material has not been disclosed. All that can be said is that Integra's management and the Independent Committee believe that the Company will continue to incur non-tax deductible expenses. There is no sufficient evidential basis for concluding that their judgment is likely to be wrong and that tax relief is likely to be available going forward. For these reasons I have adjusted Mr Taylor's valuation to reflect that Integra will continue to incur non-tax deductible expenses.

61. After having produced his report, Mr Taylor gave further consideration to the question of the cost savings resulting from "going private". In a case such as the present, where a company is taken private by means of a management buy-out, there is an argument for saying that the anticipated cost saving inherent in de-listing its shares should be reflected in the fair value attributable to the minority who are squeezed out by operation of the statutory provisions. This is an exception to the general principle reflected in the Canadian jurisprudence that synergies resulting from mergers (in the economic sense of combining two existing businesses) should be excluded from the fair value of the dissenters' interest. (*Brant Investments* (ibid) per Romaine J at pages 772-3). The MBO Projection Model includes the cost savings of going private but it has then been eliminated by adding back unidentified expenses of equal amount for which there is no explanation in the model itself. During the Moscow meetings the experts were told by the CFO that the cost saving of going private was expected to be between US$0.5 million and US$1.0 million. However, the experts were also told that Integra was expecting to incur extra expense for some additional services but these have not been identified. In the absence of any explanation about how this extra expense would arise, Mr Taylor decided to adjust the MBO Projection Model to reflect US$0.75 million per annum as the cost saving of going private. This adjustment would result in an increase of US$4,058 million in his concluded equity value.

62. However, I have come to the conclusion that this adjustment should not be made. The cost saving of going private is an inherent result of the transaction from which the Respondents have dissented. In my view dissenting shareholders should not benefit from any enhancement in the value of their shareholding attributable directly to the transaction from which they have dissented.

63. As I have already said, Mr Taylor also adopted a market approach using a guideline public company methodology, the details of which are fully explained

in his Report. He identified three categories of comparable companies engaged in the oil field services industry for the purpose of developing appropriate multiples, namely Russian companies, large international diversified companies and a group of smaller companies. The process by which he formulated his final list of guideline public companies is set out in his report and was carefully explained in re-examination. All the large international diversified companies and three of the Russian companies were eliminated, including Integra itself. [11] The guideline public companies used in the multiples analysis therefore comprised CAT and EDC and five other 'other international diversified oil field services companies'.

64. Counsel for Integra criticised the selection of guideline companies; the way in which Mr Taylor distilled multiplies from the market data; and the way in which he determined the control premium which is necessary to convert the publically traded price (which reflects the value of a minority interest) to a fair value (which reflects the intrinsic value without any minority discount). It seems to me that counsel's broad brush criticism of the Mr Taylor's guideline public company methodology was superficial and not actually supported by any evidence given by Mr Robinson. Mr Taylor explained his methodology in re-examination at length a way which I found persuasive and I am satisfied that his conclusions can be relied upon by the Court.

65. Mr Robinson identified certain adjustments required to EBITDA for the years 2012 and 2013 which is relevant to Mr Taylor's judgment about the multiples to be used. This was one of the points discussed by the experts following exchange of their reports. The result of making this adjustment is to increase Mr Taylor's concluded equity value of the Integra by US$3,045 million. There appears to be no good reason for rejecting this adjustment.

66. I have come to the conclusion that I should adopt Mr Taylor's valuation approach and methodologies and that his judgment can be relied upon by the Court. However, for the reasons which I have explained, I shall adopt his concluded equity value subject to two adjustments in respect of tax and the cost savings of going private. I conclude that the fair value of Integra as at the Valuation Date was US$105 million. The following table reflects Mr Taylor's work and explains how I have adjusted his conclusions to arrive at the Court's valuation (rounded up to the nearest million).

[11] The five Russian publically traded oil field service companies identified by Mr Taylor are C.A.T. Oil AG, Eurasia Drilling Company, HMS Hydraulic Machines & Systems Plc, IG Seismic Services Plc and Integra itself.

| US$000s | 5% TGR 15.625% DR | 7.5% TGR 15.625% DR | Concluded DCF Valuation | Guideline Public Company Valuation | Concluded Equity Value |
|---|---|---|---|---|---|
| Enterprise Value<br>Non-Tax Deductible expenses | 227.5<br>(34.8) | 235.1<br>(40.1) | | | |
| Adjusted enterprise value<br>DCF weighting | 192.7<br>67% | 195.1<br>33% | | | |
| <br>Weighting | 129.109 | 64.383 | 193.492<br>75% | 267.6<br>25% | |
| Weighted enterprise value | | | 145.119 | 66.9 | 212.019 |
| Add cash<br>Add tax asset<br>LMT EBITDA adjustment<br>Deduct debt | | | | | 59.468<br>12.4<br>3.045<br>(182.345) |
| **Concluded equity value** | | | | | **104.587** |

Definitions: Terminal Growth Rate ("TGR") and Discount Rate ("DR").

**Calculation of the fair value of the Respondents' shares**

67. The fair value of the Respondents' shares as at the Valuation Date is their proportionate share of US$105 million without any minority discount or premium for forcible taking. There is a dispute between the parties about the way in which their proportionate share should be calculated.

68. Integra failed to disclose its share register, but the Offering Circular states that the "The Company expects that, on the Voting Record Date, 8,973,473 Shares [12]would be issued and outstanding." At the 2:1 ratio, this equates to 4,486,736.5 GDRs. It is not in dispute that the Respondents collectively owned 1,554,520 shares on the Valuation Date as stated in paragraph 12 of the Petition. It follows that the Respondents owned 17.3233% of Integra's issued share capital as at the Valuation Date. The Respondents argue that I should calculate the fair value of their shares as follows :

Value per share: US$105,000,000 ÷ 8,973,473 shares = $11.70 per share (rounded to the nearest cent).
Amount due to Respondents: 1,554,520 shares x $11.70 = $18,187,884
Alternatively: US$105,000,000 x 17.3233% = US$18,189,465

[12] This is more than the 8,946,531 shares (equivalent to 4,473,265.5 GDRs) issued and outstanding as at 31 December 2013, as reflected in the Company's audited consolidated financial statements.

69. This analysis does not take account of the fact that unvested units awarded by way of deferred remuneration to certain of Integra's directors and employees under its Restricted Stock Unit Plan vested pursuant to Clause 5.4 of the Merger Implementation Agreement, which provides as follows –

> *(a) Prior to the Implementation Date,*[13] *the Integra Board will resolve that, subject only to the Merger being consummated on the Implementation Date, the RSUs under the RSU Plan shall vest immediately on the Implementation Date.*
>
> *(b) Within 10 Business Days of the Implementation Date:*
>
> *(i) Integra Shares shall be issued by Integra to RSU Participants who are MBO Participants in accordance with the terms of the RSU Plan held;*
>
> *(ii) USD $10 shall be paid by Integra to each RSU Participant who is not an MBO Participant instead of each Integra Share to which that RSU Participant would otherwise be entitled in accordance with the terms of the RSU Plan.*

The number of unvested RSU's is not stated in Part 11 of the Circular and there is no affidavit evidence before the Court addressing this issue. The resolution passed by the Integra Board is not in evidence. Therefore, the Court has no direct evidence about the number of new shares issued to MBO Participants and the amount of money paid to other RSU Participants. However, counsel for Integra submits that I can infer from the material given to Deutsche Bank for the purposes of preparing its fairness opinion that the effect of vesting all the outstanding the RSUs is to dilute the Respondents' proportionate interest from 17.3233% as at the Valuation Date to 15.3801% as at the Implementation Date.[14] Counsel for Integra argues (in effect) that I should calculate the fair value of the Respondents' shares as follows:

Value per share: US$105,000,000 ÷ 10,107,344 shares = $10.39 per share (rounded to the nearest cent).
Amount due to Respondents: 1,554,520 shares x $10.39 = $16,151,462.
Alternatively: US$105,000,000 x 15.3801% = $16,149,105.

[13] The Implementation Date was 23 May 2014.

[14] Counsel's submission referred me to the information given to Deutsche Bank described in Footnote [6] above, from which I think that it is possible to infer that Integra's CFO anticipated that the RSU Participants' total entitlement under Clause 5.4 would be 1,113,871 shares. On this basis the total number of shares (hypothetically) in issue on the Implementation Date would be 10,107,344 shares (disregarding the fact that the Respondents' shares would have been cancelled and the fact that some RSU Participants are entitled to receive cash, not shares). It follows that the Respondents' (hypothetical) proportionate interest would have been 15.3801%.

70. For the reason which I have explained in paragraph 61 above, my view is that counsel's submission leads to a result which is wrong in principle and should be rejected. The Respondents have a statutory right to dissent from the merger transaction, as a result of which they cease to have the rights of shareholders and are instead entitled to receive the fair value of their shareholdings. They should not be afforded the benefits of the transaction from which they have dissented. Nor should the burdens of the transaction be imposed upon them. In *Brant Investments* (ibid) Romaine J. said (at page 772) –

*The basic ground upon which the dissenting shareholders took their position of dissent was objection to the impugned transaction. Because the manner of carrying that transaction forward involves a fundamental change within the meaning of the Act, they were accorded by the Act a right of dissent and a right to be paid "fair value" of their shares. In my view they should have no enhancement in the value of their investment attributable to the transaction which gave rise to their dissent.*

I agree with this statement of principle. Its converse is that the dissenting shareholders should not bear any diminution in the value of their investment directly attributable to the transaction from which they were entitled to dissent. As at the Valuation Date they owned 17.3233% of the issued share capital. As a result of the merger transaction being approved and implemented new shares were issued on the Implementation Date with the result that, if the Respondents had still been shareholders, they would have owned only 15.3801% of the Company. In my view, they are entitled to their proportionate share as it existed on the Valuation Date. They should not suffer any diminution of value attributable direct to the transaction from which they dissented. If my approach were held to be wrong, I would include the cost savings of going private into the DCF calculation, thus increasing the equity value by US$4,058 million.

71. For these reasons I adopt the Respondents' method of calculating the amounts due to them.

**The fair rate of interest**

72. By section 238(11) of the Companies Law, the Court is required to determine the fair value "together with a fair rate of interest, if any, to be paid by the company upon the amount determined to be the fair value." This formulation appears to have been reproduced from an earlier version of section 262(h) of the Delaware General Corporations Law which provided that "the Court shall appraise the shares… together with a fair rate of interest, if any, to be paid upon the amount

determined to be the fair value." The Delaware courts interpreted this provision in a way which involves balancing the rate which the surviving corporation would have had to pay to borrow funds and the rate which a prudent investor could have earned on cash or cash equivalents during the relevant period. The 'legal rate' payable on judgment debts was treated as a useful default rate in cases where the parties failed to adduce any relevant evidence. (*Cede & Co., Inc v. Medpoint Healthcare, Inc* 2004 Del. Ch, Lexis 124 at page 21.).

73. The 'legal rate' under Delaware law is the equivalent of the 'prescribed rates' payable on judgment debts under the Judgment Debts (Rates of Interest) Rules in the sense that it is the statutory rate payable on judgment debts, but I have no evidence about the way in which the Delaware rate is fixed. The prescribed rates applicable in this jurisdiction are fixed from time to time by the Rules Committee for a basket of different currencies using the following formula: 3-month LIBOR (or equivalent) rounded to the nearest one eighth per cent plus two percentage points or increased by 125%, whichever is the greater. The prescribed rate for US$ has been fixed at 2.375% since 1 February 2013.

74. It can be said that the Respondents have been kept out of their money since 2 July 2014, the date on which Integra made its written offer to pay fair value of US$10 per share pursuant to section 238(8). For whatever reason, it did not offer to pay this amount (or any lesser amount) on account pending the outcome of the proceedings. It follows that Integra has had the use of the Respondents' money for more than a year.

75. Integra's audited consolidated financial statements reflect that it has Russian rouble denominated loan liabilities and US dollar denominated cash reserves. Note 17 reflects that its cost of borrowing was 10.7% in 2013 and 11.0% in 2012 (being the weighted average fixed and floating rates in respect Russian rouble denominated borrowings due after more than one year). The Circular stated that the merger consideration would be financed by approximately US$34 million of cash held by Integra and the balance from a US$30 million Facility Agreement dated 22 April 2014 and made between OAO "Alfa-Bank" and Foreston Holdings Limited which is a party to the Merger Implementation Agreement. The rate of interest payable under this facility is 9.7% per annum.

76. The Respondents have not adduced any evidence about the effective rate of interest which they actually earned or which a prudent investor could reasonably have expected to earn on cash or cash equivalents during the relevant period. Integra's audited consolidated financial statements reflect that it had the equivalent of US$59,468,000 in cash and cash equivalents as at 31 December

2013 but the notes do not disclose the results of its cash management operations. Integra's counsel's written closing submission says that "The appropriate rate is 0.163% per annum being that which has actually been earned by Integra on the monies during the course of the proceedings" but there is no affidavit evidence explaining this assertion. The written submission contains a footnote which refers to a document reflecting that Integra had an average cash balance of US$20,004,906.02 during a 316 day period from 23 June 2014 to 5 May 2015 on which it earned US$36,547.32, which implies an effective annual rate of interest marginally in excess of 0.2%. The document also states the "Effective interest rate – 0.158%" but I cannot reconcile this rate with the stated interest income. In the absence of any affidavit evidence about the way in which Integra has actually been managing its treasury operation during the period since the merger, I think that it is reasonable to assume that it was generating around 0.2% per annum.

77. Counsel for the Respondents submits that the Court should adopt a mid-rate between the prescribed rate for US$ (2.375%) and Integra's assumed US$ borrowing rate (9.7%), which would be 6.0375% per annum. There is no obvious logic to this submission. The prescribed rate does not reflect the rate which a judgment creditor can expect to earn on cash deposits. The mid-rate between Integra's assumed return on cash (0.2%) and Integra's assumed US$ borrowing rate (9.7%) is 4.95% per annum. I conclude that this is a "fair rate of interest" which should be awarded to the Respondents from 2 July 2014 until payment.

**Conclusion**

78. In conclusion, I declare that the fair value of the Respondents' shares and the fair rate of interest payable on the fair value is as follows:-

| East Capital (Lux) Russia Fund | | |
|---|---|---|
| 730,238 shares at $11.70 per share | = | US$8,543,784.60 |
| Interest for 422 days at $1158.67 per day | = | US$ 488,961.98 |
| **Total** | | **US$9,032,746.58** |

| East Capital (Lux) Eastern European Fund | | |
|---|---|---|
| 193,414 shares at $11.70 per share | = | US$2,262,943.80 |
| Interest for 422 days at $306.89 per day | = | US$ 129,508.59 |
| **Total** | | **US$2,392,452.39** |

| | | |
|---|---|---|
| Salink Limited | | |
| 630,868 shares at $11.70 per share | = | US$7,381,155.60 |
| Interest for 422 days at $1001.06 per day | = | US$ 422,424.57 |
| **Total** | | **US$7,803,580.17** |

**Costs of the proceeding**

79. Section 238(14) provides that:

> *The costs of the proceeding may be determined by the Court and taxed upon the parties as the Court deems equitable in the circumstances;...*

It was agreed between counsel that costs should be reserved pending the exchange of written submissions.

DATED the 28th day of August 2015

**The Hon. Justice Andrew J. Jones, QC**
**JUDGE OF THE GRAND COURT**