# EXHIBIT 12

**In The Supreme Court of Bermuda**

**Civil Jurisdiction 2004 No. 112**

**BETWEEN:**

**NETBANK** Plaintiff

v

**COMMERCIAL MONEY CENTER** Defendant

Dated the 27th October 2004

Mr. N Hargun for the Applicants

Mr. R Horseman for the Plaintiff

**Letter of request – Evidence - Ex parted applications to set aside another ex parte Order – Jurisdiction - Fishing expedition - Discretion**

The following cases were referred to in the judgment:

*Abell v Potomac Insurance* [1986] Bda LR 77
*Golden Eagle Refinery Co Ltd v Associated International Insurance Co* [1998] EWCA Civ 293
*First American Corp v Sheik Zayad bin Sultan Al-Nahyan* [1998] EWCA Cvil 817
*Re Asbestos Insurance Coverage Cases* [1985] 1 All ER 716
*In re Westinghouse* [1978] AC 547
*In re Norway's Application* [1987] 1 QB 433
*Minnesota v Philip Morris* [1997] EWCA Civ 2241

**JUDGMENT of KAWALEY, PUISNE JUDGE**

**Background**

The involvement of Bermuda-based entities in commercial activities resulting in civil and commercial litigation abroad, principally in the United States, makes the need to obtain evidence here for trials elsewhere a frequent occurrence.

Letters of request are issued to this Court by the foreign court concerned, and applications, ex parte in the first instance, are made for an order requiring witnesses located in Bermuda to produce documents and/or attend to give oral evidence before an examiner appointed by the Bermudian Court. Such applications, minor skirmishes surrounding the precise scope of documents to be produced apart, are rarely contested on an inter partes basis.

And while there appears to be no shortage of caselaw on the English Rules of Court from which Bermuda's statutory regime is derived, there appears to be only one, unreported, Bermudian considered judgment on the principles which govern this important area of the law. This was Supreme Court of Bermuda Civil Jurisdiction 1986: No.421, *Abell et al v Potomac Insurance Co. of Illinois et al*, a Judgment of Ephraim Georges, J. (Acting) dated December 3, 1986 on now repealed legislation, which Mr. Hargun for completeness placed before the Court. Accordingly, while I gave my decision at the end of the hearing of an application to discharge orders for the production of documents and oral testimony made by the four Applicants, a large part of the argument being effectively determined by sensible concessions on the Plaintiff's Counsel's part, I indicated that I would give reasons for that decision at a later date.

**THE EX PARTE APPLICATIONS MADE BY AND ORDERS OBTAINED BY THE PLAINTIFF**

The Ex Parte Orders which form the subject of the present application, and the grounds on which they are attacked, were helpfully summarized in Mr. Hargun's written submissions as follows:

> "1. This is an application made on behalf of Timothy McDonald, Andrew Gibbs, Larry Lombardo and Mark Herman ("the Applicants") to set aside one Ex Parte Order of the Supreme Court dated 8 April 2004 and two Ex Parte Orders of the Supreme Court dated 3 June 2004. The application is made by Summons filed on 18 June 2004.
>
> 2. The Ex Parte Order of 8 April 2004 required the Applicants to attend for the purposes of being examined in accordance with the five letters of request issued by Magistrate Judge Nancy A. Vecchiarelli, United States District Court for the Northern District of Ohio, each dated 3 March 2004.
>
> 3. The first Order of 3 June 2004 (Tab 7) required the Applicants to produce the documents described and detailed in the said letters of request.
>
> 4. The second Order of 3 June 2004 (Tab 10) required Larry Lombardo to attend for the purposes of being examined in accordance with the two letters of request issued by Magistrate Judge Vecchiarelli, each dated 28 April 2004. The first letter of request dated 28 April 2004 (Tab 9) in fact requires ACE Bermuda Insurance Limited ("ACE Bermuda") to produce documents. The second letter of request dated 28 April 2004 (Tab 9) requires Intrepid Reinsurance Ltd. ("Intrepid Re") to produce documents.
>
> 5. The grounds set out in the Summons for this application are:-
>
> > a. There was no jurisdiction to make the said Orders and/or the Court should not as a matter of discretion have made the said Orders;
> >
> > b. The five letters of request, each dated 3 March 2004, and the two letters of request, each dated 28 April 2004, which resulted in the three Ex Parte Orders, are requests for discovery and/or are fishing requests and are not requests for evidence for trial;
> >
> > c. Insofar as the letters of request relate to the production of documents, they do not specify individual documents to be produced and as a result, the Court has no jurisdiction to give effect to the letters of request;
> >
> > d. The two letters of request dated 28 April 2004, which resulted in an Ex Parte Order requiring Mr. Lombardo to be examined, did not in fact request that Mr. Lombardo be examined."

The Applicants are all employees of Ace Bermuda Insurance Limited. The Plaintiff is also plaintiff in United States District Court Northern District of Ohio Eastern Division, Case no.:1:02CV 16000/MDL Case No. 1:02-16010, NETBANK, a federal savings bank, Plaintiff -v ILLINOIS UNION INSURANCE COMPANY, an Illinois corporation; SAFECO INSURANCE COMPANY OF AMERICA, a Washington corporation; ROYAL INDEMNITY COMPANY, a New York corporation; and FRONTIER INSURANCE COMPANY, a New York corporation ("the U.S. action").

The application was argued on the basis that the Letter of Request issued in the U.S. action dated March 3, 2004 in respect of Mr. Lombardo was materially the same as the four others. The crucial portions of this Letter of Request provided as follows

> "The United States District Court for the Northern District of Ohio presents its compliments to the appropriate Judicial Authority in Bermuda, and requests international judicial assistance, pursuant to Rule 28 (b) of the Federal Rules of Civil Procedure and by Section 1781 of Title 28 of the United States Code, to issue this Letter Rogatory to obtain evidence to be used in a civil proceeding before this Court in the above captioned matter.
>
> This Court requests the assistance described herein as necessary in the interests of justice. The assistance requested is that the Supreme Court in Bermuda compel the production of documents as well as the appearance of the below named witnesses to give testimony. The Supreme Court is

> respectfully requested to summon Larry Lombardo to produce documents and to appear to give testimony.
>
> Documents:
>
> The documents which the witness is requested to produce are attached hereto.
>
> Questions:
>
> The topics on which the witness is requested to give testimony include: interaction with Custom Risk Solutions, Inc.; understanding of the CMC program; knowledge regarding CMC program; and knowledge regarding the insurance policies and bonds issued to investors in the CMC program.
>
> The Court requests that the Supreme Court permit the following U.S. counsel, representing NetBank, a federal savings bank, that is a party to this lawsuit, to question the witnesses under oath before a person nominated by the Supreme Court:…
>
> The Court also requests that the Supreme Court permit the videotaping of the witnesses testimony so that the testimony may be viewed by a jury in the United States at the time of trial.
>
> Facts:
>
> This is an action where investors and lenders to investors, including NetBank, are seeking recovery under various insurance policies issued by Act/Illinois Union Insurance Company which strictly guaranteed the investors investment in CMC. The testimony of the witness is critical for the purposes of determining Ace's understanding of the CMC program, the purpose of the insurance policy it issued, and how the purpose of this insurance policy was represented to the investors.
>
> Reciprocity:
>
> This Court shall be pleased to provide the Courts of Bermuda with similar judicial assistance, in similar cases.

The document-related requests, in particular, were formulated very widely, explicitly in the form of discovery requests, as opposed to requests for specified documents known to be in the witnesses' possession, as the "INSTRUCTIONS" set out above make clear. A typical request reads: "Produce any and all documents constituting or referring to communications between you and any one of the following entities taking place at any time in the past six years." And there was no contractual relationship between the witnesses' present employer and any parties to the U.S. action alleged, nor was their employer a party to the action.

The Ex parte application pursuant to the five Letters of Request were supported by an affidavit sworn by William Custer on March 25, 2004. The Georgia attorney deposed that:

> "2. That this is an action where investors like NetBank and lenders to investors are seeking recovery under various insurance policies and surety bonds issued by insurance and surety companies including Act/Illinois Union Company, Royal Indemnity Company, and Safeco Insurance Company of America (the "Sureties") which strictly guaranteed the investment made by the investors in a program offered by Commercial Money Center ("CMC"). The Claimants have asserted claims against the Sureties to recovery payment in excess of hundreds of millions of dollars under surety bonds and insurance policies that guaranteed the Claimants' investments relating to pools of equipment leases that were originated by CMC. Each of the Sureties have denied coverage under the policies and the bonds. The crux of their defense is that CMC fraudulently induced them to issue the policies and bonds. The proceedings against the Sureties have been consolidated for pre-trial purposes by the Judicial Panel on Multi-District Litigation before Judge Kathleen O'Malley in the United States District Court for the Northern District of Ohio

> 3. That the testimony of Larry Lombardo, Randi Cigelnik, Mark Herman, Andy Gibbs, and Tim McDonald is critical for the purposes of determining the sureties' understanding of the CMC program, the purposes of the insurance policies and surety bonds they issued, and how the purpose of these insurance policies and bonds were represented to the investors."

On April 8, 2004, the Plaintiff obtained the following Ex Parte Order:

> "1. That Mr. Paul Woolgar of Messrs. Smith & Co., 95 Front Street, Hamilton, Bermuda be appointed examiner herein for the purpose of receiving such evidence and in such manner as is hereinafter provided;
>
> 2. That in accordance with the terms of the five Letters of Request issued herein by the Magistrate Judge Nancy A. Vecchiarelli, United States District Court for the Northern district of Ohio, each dated the 3rd day of March, 2004, the following witnesses be ordered to attend for the purpose of being examined before the said examiner at such time and place as the examiner shall request by notice in writing:-
>
> a) Larry Lombardo;
>
> b) Randy Cigelnik;
>
> c) Mark Herman;
>
> d) Andy Gibbs; and
>
> e) Tim McDonald."

Two similar Order were made with respect Mr. Lombardo and the other four witnesses, respectively, on June 3, 2004 for technical reasons which are for present purposes not material, pursuant to further letters of Request dated April 28, 2004. Documents held by Ace Bermuda Insurance Ltd. and Intrepid Re Ltd. were sought.

Appearances were entered on behalf of only four of the witnesses, the fifth, Randy Cigelnik, reportedly no longer being in Bermuda. The four applied by Summons to set aside the Orders dated April 8, 2004 and June 3, 2004, respectively on the grounds set out above. They also swore affidavits denying any knowledge of the affairs of Illinois Union or the CMC programme, to which the Letters of Request appeared to primarily relate. In response, William Custer in his Affidavit sworn on July 9, 2004 refined the factual basis of the applications on the basis of documents the Plaintiff obtained through another discovery request indicating that Intrepid Re had declined to reinsure another defendant in the U.S. action, Royal Indemnity Company .

**THE APPLICANTS' SUBMISSIONS**

Mr. Horseman astutely conceded, at the beginning of the hearing, that the document requests could not be sustained. So Mr. Hargun focussed his attack on the oral testimony aspects of the Orders. His comprehensive submissions were of assistance to the Court in an area of the law that has rarely been the subject of serious argument.

The Applicants' Counsel advanced two broad grounds for setting aside the Orders. Firstly, as a matter of law, no jurisdiction to compel a witness to give oral evidence by way of discovery existed under Bermuda law. And, secondly, as a matter of discretion, even if evidence was properly sought for the purposes of trial and not discovery, the Court should decline to accede to requests that amounted to mere "fishing" expeditions. One could only summon a witness who was demonstrably likely to be able to give relevant evidence, not summon a witness to discover whether they could give such evidence or not.

Although conceding that the Hague Convention on the Taking Abroad of Evidence in Civil and Commercial Matters of March 18, 1970 had not been extended to Bermuda by the United Kingdom, Counsel referred to the Explanatory Memorandum to the Evidence Amendment Bill 1984 to explain why the Convention did not formally apply. Mr. Hargun also relied, in his written submissions, on the fact that the relevant Bermuda statute law was based on English legislation implementing that Convention:

> "6. The jurisdiction of the Court for giving effect to letters rogatory is exclusively statutory and in Bermuda is found in Part IIC (Sections 27P – 27S) of the Evidence Act 1905 (Tab 1).
>
> 7. The Bermuda statutory provisions are in fact a copy of the English Evidence (Proceedings in Other Jurisdictions) Act 1975.
>
> 8. The English 1970 Act was enacted in order to give effect to the convention obligations assumed by the United Kingdom upon ratifying, on 18 March 1970, the Hague Convention "on the taking of evidence abroad in civil or commercial matters". It is important to note that the United Kingdom Government when ratifying the Convention did so subject to certain conditions. In particular, the United Kingdom Government declared that it would "not execute letters of request issued for the purpose of obtaining pre-trial discovery of documents" and understood letters which required a person:-
>
> > (a) to state that documents relating to the proceedings to which the letter of request relates are or have been in his possession, custody or power; or
> >
> > (b) to produce any documents, other than particular documents specified in the letter of request, as being documents appearing to the requested court to be, or to be likely to be, in his possession, custody or power'.
>
> to be "letters of request issued for the purpose of obtaining pre-trial discovery of documents".
>
> 9. Consistent with the declarations and reservations of the United Kingdom Government, the municipal legislation enacted to give effect to the Convention obligations draws a distinction between pre-trial discovery and the presentation of evidence required for the purposes of presentation at the trial of the action. Pre-trial discovery, whether documentary or oral, is impermissible under the Act."

Counsel proceeded in his written submissions to set out the relevant Bermudian statutory provisions and the English caselaw on the English counterpart provisions on which he relied:

> "(i) Section 27Q(3) of the Evidence Act 1905 (Tab 1) which provides that:-
>
> "an order under this section shall not require any particular steps to be taken unless they are steps which can be required to be taken by way of obtaining evidence for the purposes of civil proceedings in the [Supreme Court of Bermuda]".
>
> This provision ensures, inter alia, that the Supreme Court will not give effect to oral pre-trial discovery.
>
> (ii) Section 27Q (4) of the Evidence Act 1905 (Tab 1) which provides that
>
> '(4) An order under this Section shall not require a person:-
>
> > (a) to state what documents relevant to the proceedings to which the application for the order relates are or have been in his possession, custody or power; or
> >
> > (b) to produce any documents other than particular documents specified in the order as being documents appearing to the Court to be, or to be likely to be, in his possession, custody or power'.
>
> This provision ensures that the Supreme Court will not give effect to pre-trial documentary discovery.
>
> (iii) *In Re Westinghouse Uranium Contract* [1978] AC 549 (Tab 2) and in particular:-

(a) Lord Wilberforce, page 608G – 609D:-

'That case (*Radio Corporation of America v Rauland Corporation* [1956] 1 QB 618)… arose under the Act of 1856, Section 1 of which referred to the obtaining of "testimony". The decision was that there was a distinction between "direct" material immediately relevant to the issue in dispute, as to which testimony could be obtained and "indirect" material by way of discovery, testimony for which could not be obtained.

There is no doubt that this distinction was in the mind of the draftsman of the Act of 1975'.

(b) Viscount Dilhorne, page 619A – G:-

'In the course of the argument, Lord Goddard CJ said at page 641 that the Court had to look at the substance of the matter and regard was had to what was said in the Court in Illinois when the letters rogatory were issued. In his judgment, he said that it was endeavour to get in evidence by examining people who may be able to put the parties in the way of getting evidence. "That", he said, at page 649, "is mainly what we should call a "fishing" proceeding which is never allowed in the English Courts".

...If the Court is not satisfied that the evidence is required, direct evidence for use at a trial as contrasted with information which may lead to the discovery of evidence, however much the Court may be exposed to accede to the request, it has no power to do so. As I see it, is has no discretion in the matter'.

(c) Lord Fraser, at page 641E – 642G:-

'The first question in instant appeals is whether the Court should be satisfied, as required by paragraph (b) of Section 1, that the requests made in the letters rogatory are for "evidence" in the sense in which the word is used in the paragraph or whether they are truly for a wider discovery. Unless the application passes through this filter, no order can be made to give effect to it'.

The distinction between evidence and discovery is recognized in Article 23 of the Hague Convention, and in Section 2(4) of the Act of 1975, and was fully accepted by counsel for Westinghouse who did not dispute that, if the letters rogatory were merely seeking discovery, they ought not to receive effect'.

(iv) *Radio Corporation of America v Rauland Corporation* [1956] 1QB 618 (Tab 3) (Devlin J.):-

'The distinction is not whether what is to be obtained is documentary material or oral material. The distinction is whether it is a process by way of discovery and testimony for that purpose or whether it is testimony for the trial itself" (page 645)

"In that case, the distinction is made plain between discovery or "indirect" material on the one hand, and proof or "direct" material on the other hand, and that is the true distinction with which one must approach the word "testimony" in this Act. Testimony which is in the nature of proof for the purpose of trial is permissible. Testimony, if it can be called "testimony", which consists of mere answers to questions on the discovery proceedings designed to lead a train of enquiry, is not permissible. Into which category does the present fall? It is perhaps enough to say that it is plain from what I have said of the nature of proceedings in the Court of Illinois that they fall into the latter category; they are pre-trial proceedings, proceedings by way of discovery' (Page 646).

(v) *In Re State of Norway's Application* [1987] 1 QB 433 (Tab 4)

(vi) *State of Minnesota v Phillip Morris Inc*. (English Court of Appeal 30th July 1997) (Tab 5):-

'The approach to discovery in jurisdictions such as the United States is sometimes categorized unattractively, and perhaps inappropriately as "fishing" where advocates wish to prevent courts in this country making orders. The meaning of the allegation that an application is a "fishing" application is well known to practitioners, but it is difficult to put into words which adequately describe it… If a court comes to the conclusion in this jurisdiction that an application is a fishing application, then the application will be refused. If, in relation to a Request of a court in a foreign jurisdiction, the conclusion of the court is that an application is fishing, then that has a more significant effect. In my judgment, the consequence is that the Court does not have the power under the 1975 Act to make an order' (per Lord Woolf).

'The fishing point:-

This has two aspects: does the Request itself amount to a request for American style discovery which is not within the scope of the 1975 Act or secondly, is the request one which is, in itself, objectionable, quite apart from the 1975 Act, because it is designed to achieve a fishing style of discovery on behalf of the plaintiffs?' (per Lord Woolf).

(vii) *In Re Asbestos Insurance Coverage Cases* [1985] 1 WLR 331 (Tab 6):-

'The meaning of the expression "particular documents specified in the order" in subsection (iv)(b) was considered by several of the Noble and Learned Lords who took part in the Westinghouse case [1978] AC 547 decision. They were all emphatic that the expression should be given a strict construction. Having regard to the purpose of sub-section (4) which, I have already mentioned is to preclude pre-trial discovery, it is to be construed so as not to permit mere "fishing" expedition.

I do not think that by the words "separately described" Lord Diplock intended to rule out a compendious description of several documents provided that the exact document in each case is clearly indicated. If I may borrow (and slightly amplify) the apt illustration given by Slade LJ in the present case, an order for production of Respondent's "monthly bank statements for the year 1984 relating to his current account" with a named bank would satisfy the requirements of the paragraph, provided that the evidence showed that regular monthly statements had been sent to the Respondent during the year and were likely to be still in his possession. But a general request for "all the Respondent's bank statements for 1984" would, in my view, refer to a class of documents and would not be admissible.

The second test of particular documents is that they must be actual documents, about which there is evidence which has satisfied the judge that they exist, or at least, they did exist, and that they are likely to be in the respondent's possession. Actual documents are to be contrasted with conjectural documents which may, or may not, exist' (per Lord Fraser, page 337D – 338D).

(viii) *Edward C. Abell v Potomac Insurance Company of Illinois* (Civil Jurisdiction 1986 No. 421 (Tab 7))

(ix) The Supreme Court Practice 1999, ¶70/6/6 – 8 (Tab 8)."

Mr. Hargun distilled his exegis on the law into the following three propositions:

"(i) This Court will not give effect to a letter of request if the letter of request is part of the pre-trial discovery process in the foreign court.

(ii) In addition, the Court will not give effect to a foreign request if it is in the nature of a fishing exercise as opposed to the obtaining of direct evidence to be used at the trial of the action.

(iii) In relation to documents, the Court has no jurisdiction to order the production of documents unless the documents have been individually described."

Counsel's submissions on the facts were summarized in paragraphs 20-21 of his Written Submissions as follows:

"20. In his Third Affidavit, Mr. Custer does not seek to refute Mr. Lombardo's and other witnesses evidence that they can give no relevant evidence in relation to Illinois Union pursuant to the stated purpose of the letters of request. However, he now sets out an entirely new basis for examining Mr. Lombardo. Mr. Custer says that one of the other defendants in the Ohio action (Royal) sought reinsurance from Intrepid Re. Mr. Custer now says that Mr. Lombardo is a former president of Intrepid Re and as such has knowledge of the matters which Intrepid Re must have learned in its capacity as a reinsurer. It is not even asserted that Mr. Lombardo has any direct knowledge of what representations Royal would have made to investors, but simply what Mr. Lombardo may have learned about certain matters, as a former officer of Royal's former reinsurer, Intrepid Re.

21. The Court will note that the new basis for examining Mr. Lombardo is not the basis for issuing the letters of request. It is not suggested that even in relation to the new basis, Mr. Lombardo can give any direct evidence as to any representations made by Royal to the investors. This is, in our submission, oral discovery and fishing exercise. It should be noted that Mr. Custer has been unable to identify any issue upon which any of the other witnesses can in fact give evidence. For all these reasons, it is respectfully submitted that the applications for oral depositions are again discovery applications and/or fishing exercises and as such should be rejected."

Finally, Counsel relied on the Supreme Court of Bermuda decision on the substantially similar 1856 Foreign Tribunals (Evidence) Act in *Abell v Potomac Insurance Co. of Illinois* where Justice Georges held[1] : "*As I see it, the request to produce documents and to appear to give oral testimony are so indissolubly linked together that it is impossible to sever the one from the other. They stand or fall together*." However, in reply Mr. Hargun made it clear that he accepted that the Court merely had a discretion to set aside an oral testimony request on the grounds of their inclusion with an improper documentary request.

In the event that the Orders were not discharged, Mr. Hargun contended that at the very least, conditions should be imposed on the examination proceedings to prevent their abuse. This was now common practice in England, as illustrated by the unreported February 19, 1998 *Golden Eagle Refinery Company Limited v Associated International Insurance Company* Court of Appeal decision[2]. Four conditions should be imposed by the Court: (1) any examination by Counsel for the Plaintiff should be by way of examination in chief; (2) any examination should be by the Plaintiff's Counsel only in conformity with the present orders; (3) examination should be explicitly limited to specific issues relevant to the U.S. action; and (4) any evidence obtained should only be used in the U.S. action.

**THE PLAINTIFF'S SUBMISSIONS**

Mr. Horseman, rather than seeking to tear down the conceptual temple erected by his opponent, sought to shed light on this edifice and its true implications for the present case.

---

[1] Supreme Court of Bermuda, Civil Jurisdiction 1986 No. 421 :, Judgment dated December 3, 1986, page 3.
[2] [1998]EWCA Civ 293.

Firstly he pointed out that that fishing, as regards a proposed oral examination, was not a jurisdictional objection. In *First American Corporation v Sheik Zayad Bin Sultan Al-Nahyan et al* [1998] EWCA Civ 817, the Vice-Chancellor Sir Richard Scott pointed out[3] :

> "If oral evidence is being sought for the purpose of use at trial and if there is reason to believe that the intended witness has knowledge of matters in issue at the trial so as to be likely to be able to give evidence relevant to those issues, I do not understand how an application to have the intended witness orally examined can be described as 'fishing'…The question whether, as a matter of discretion, the court would be prepared to make an order pursuant to the letter of request, and if so what order, would be another matter. But there would be no jurisdictional reason why the court should not make the order sought".

The Plaintiff's Counsel submitted that this and other passages in this case showed that while there might be no jurisdiction to obtain documents by reference to a fishing enquiry where it was not known what documents the witness possessed, this test did not apply to oral examination where it was merely not known what answers a witness might give. The crucial test was whether or not a witness was likely to be able to give evidence on issues relevant to the trial.

Secondly, he relied on the same judgment in support of the proposition that for public policy reasons, this Court should seek to cooperate with the foreign Court:

> "it is important that the courts of this country should, if they can properly do so, accede to letters of request issued by foreign courts seeking evidence for use in foreign litigation. This seems to be particularly so where the litigation arises out of a fraud practised on an international scale."[4]

Thirdly, with respect to the conditions Mr. Hargun said should be imposed, if the Court rejected his primary submission that the Orders should be set aside altogether, Mr. Horseman said he had no objections in principle. However, he was concerned about the utility of taking a deposition subject to a blanket prohibition on questioning by parties other than the Plaintiff as this could render the deposition inadmissible at trial. The Plaintiff's Counsel also emphasised that relevance was a matter for the foreign court, not this Court: *Re Asbestos Insurance Coverage Cases* [1985] 1 All ER 716 at 722h-723d.

Mr. Horseman's fourth main point was to argue that even if the requests had a dual purpose, one impermissible as constituting discovery, and one properly trial-related, this Court possessed the jurisdiction to accede to the requests: *Golden Eagle Refinery Co. v Associated International Insurance Co. et al* [1998] EWCA Civ 293[5].

Turning to the evidence, he defended the requests on two broad grounds. Firstly that on their face, evidence was sought for use at trial and references to Royal, not just Illinois Re, had been made at the outset. There was no change of case as suggested by the Applicants' Counsel. Secondly, looking at the fundamental facts on which the oral examination requests were based, Mr. Horseman relied on the so-called "*smoking gun* "email from Lombardo to the other Applicants dated December 5, 2001. This made it clear that Mr. Lombardo, if not the other witnesses, might have relevant evidence to give.

**THE COURT'S JURISDICTION**

As Mr. Hargun correctly pointed out, Bermuda has enacted legislation based on British legislation passed to implement in municipal or domestic law its public international law obligations under the Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters. For reasons that are unclear, this Convention, adopted on March 18, 1970, was not formally extended to Bermuda (or indeed the British Virgin Islands) in the way it was to most other overseas territories.

---

[3] At page 9 of the transcript.
[4] At page 12.
[5] Transcript, at page 4.

What, then, is the significance under Bermuda law of the Convention and the declarations made by the United Kingdom Government as to how it should be interpreted on which the Applicants' Counsel relied? Article 40 of the Convention provides as follows:

> "Any State may, at the time of signature, ratification or accession, declare that the present Convention shall extend to all the territories for the international relations of which it is responsible, or to one or more of them. Such a declaration shall take effect on the date of entry into force of the Convention for the State concerned.
>
> At any time thereafter, such extensions shall be notified to the Ministry of Foreign Affairs of the Netherlands.
>
> The Convention shall enter into force for the territories mentioned in such an extension on the sixtieth day after the notification indicated in the preceding paragraph."

The main significance of the Convention not being extended to Bermuda operates at the public rather than the private international level. If a letter of request issued by the courts of a country which is party to the Convention, such as the United States, were refused by a Bermudian Court, the United States could assert no claim against Her Majesty's Government for breach of the Convention in this regard. Thus the strict position is that as between the United Kingdom and the United States, who respectively ratified the Convention on July 16, 1976 and August 8, 1972, Bermuda is not bound[6].

So even from the Bermuda law perspective, the presumption that Parliament did not intend to legislate inconsistently with Her Majesty's public international legal obligations which extend to Bermuda is not, in any strict sense, engaged in the process of interpreting the relevant provisions of the Evidence Act. Because the international obligations of Her Majesty under the Convention do not extend to Bermuda.

However, it seems clear that Bermuda's Parliament in enacting the amendments in 1984 to the Evidence Act 1905 which implemented the United Kingdom's 1975 legislation did intend to implement those aspects of the Convention which are now reflected in Bermuda law. According to the Evidence Amendment Bill Explanatory Memorandum:

> "The United Kingdom in 1970 became a signatory to the Hague Convention on the taking of Evidence abroad in Civil or Criminal Matters and in 1975 gave effect to the Convention by replacing the Foreign tribunals evidence Act 1856 with the evidence (Proceedings in other Jurisdictions) Act 1975.Bermuda has been asked to become a signatory to the convention but the Government has decided rather than adopt the whole convention to enact legislation giving effect to the majority of its provisions. Part IIC largely follows the United Kingdom enactment." [7]

Accordingly, on the narrower position correctly relied on by the Applicants' Counsel, the declarations made by the United Kingdom Government on ratifying the 1970 Convention and English caselaw are properly an aid to interpreting the United Kingdom legislation, which was indubitably enacted to implement the Convention. And there is no suggestion that Bermuda's legislation was intended to have a different effect than the precedent on which it was based. It must be remembered in this regard, however, that the relevant declaration only explicitly applied to documents which were no longer sought by the Plaintiff:

> "In accordance with Article 23 Her Majesty's Government declare that the United Kingdom will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents. Her Majesty's Government further declare that Her Majesty's Government understand "Letters of Request issued for the purpose of obtaining pre-trial discovery of documents" for the purposes

[6] Hague Conference on International Law: www.hcch.net.
[7] Paragraph (e).

of the foregoing Declaration as including any Letter of Request which requires a person:

a. to state what documents relevant to the proceedings to which the Letter of Request relates are, or have been, in his possession, custody or power; or

b. to produce any documents other than particular documents specified in the Letter of Request as being documents appearing to the requested court to be, or to be likely to be, in his possession, custody or power."[8]

And this declaration has, as Lord Fraser pointed out in the *In re Westinghouse* case[9], been given statutory force in section 2(4) of the Evidence (Proceedings in other Jurisdictions) Act 1975. Sections 1 and 2 of the 1975 Act have been substantially reproduced in sections 27P-27Q of the Evidence Act 1905. Section 27Q (4) provides, like section 2(4) of the 1975 United Kingdom Act:

"An order under this section shall not require a person-

a) to state what documents relevant to the proceedings to which the application for the order relates are or have been in his possession, custody or power; or

b) to produce any documents other than particular documents specified in the order as being documents appearing to the Court to be, or likely to be, in his possession, custody or power."

So the English decisions on identical legislative provisions to our own are highly persuasive as to the proper approach to letters of request under Bermuda law. And these decisions bring with them two broad philosophical goals, which can (depending on one's perspective) be seen to be either complementary or contradictory in nature. Firstly there is the internationalist goal of cooperation between courts in different national jurisdictions, the dominant theme of the 11th Conference on Private International Law, which gave birth to the 1970 Convention itself. Secondly there is the narrower nationalist right of courts receiving requests to define the scope of requests so as to exclude pre-trial discovery, a right equally guaranteed by the Convention.

It is easier to define when as matter of law a documentary request is impermissible than is the case with an oral examination request. Thus, it fairly well understood in the Bermudian context that wide-ranging requests for documents which are not known to be in the possession, custody or power of the witness fall afoul of section 27Q (4). Typically, perhaps, oral examination relates almost exclusively to the requested documents, so if the documents are not properly sought, oral examination falls away. Thus in the *Potomac Insurance Co.* case, this Court did not consider the oral testimony issue in its own right at all.

Two statutory provisions are central to an understanding of the scope of oral examination which may properly be requested. Firstly, section 27P of the Evidence Act provides as follows:

"Where an application is made to the Supreme Court (in this Part referred to as "the Court") for an order for evidence to be obtained in Bermuda, and the Court is satisfied—

(a) that the application is made in pursuance of a request issued by or on behalf of a court or tribunal (hereinafter referred to as the "requesting court") exercising jurisdiction similar to that of the Supreme Court in a country or territory outside Bermuda; and

(b) that the **evidence** to which the application relates is to be obtained for the purposes of civil proceedings which have been instituted before the requesting court,

---

[8] Ibid.

[9] [1978] A.C.547 at 643 G-H.

> **the Court shall on being further satisfied that there is an intention that the proceedings should continue to trial, have the powers conferred on it by the following provisions of this Part." [emphasis added]**

It is a threshold requirement of an application for assistance pursuant to letters of request not just that this Court be satisfied that the foreign proceedings are intended to proceed to trial. As, Lord Fraser observed with respect to the counterpart United Kingdom provisions in the *In re Westinghouse* case: "*The first question…is whether the court should be satisfied, as required by paragraph (b)…,that the requests made in the letters rogatory are for 'evidence' in the sense which that word is used in the paragraph or whether they are truly for a wider discovery*."[10] And secondly, and more specifically, section 27Q (3) provides:

> "**An order under this section shall not require any particular steps to be taken unless they are steps which can be required to be taken by way of obtaining evidence for the purposes of civil proceedings in the Court** (whether or not the proceedings are of the same description as those to which the application for the order relates); but this subsection shall not preclude the making of an order requiring a person to give testimony, either orally or in writing, otherwise than on oath where this is asked for by the requesting court." [emphasis added]

As Mr. Hargun submitted, without dissent from Mr. Horseman, this provision has the effect that a witness can only be compelled to give oral testimony pursuant to an application under section 27P of the 1905 Act to the same extent as is permissable in relation to Bermudian civil proceedings. So the applicable test with respect to a request for oral examination of a witness is whether the witness could be compelled by subpoena to give evidence at trial. No doubt is cast on this conclusion by any of the authorities placed before the Court.

The relevant test for oral examination requests, and the distinction between the Court's jurisdiction and discretion in relation thereto, are best explained in a passage cited by Mr. Horseman from the Vice-Chancellor's Judgment in the *First American Corporation* case[11] :

> "If oral evidence is being sought for the purpose of use at trial and if there is good reason to believe that the intended witness has knowledge of matters in issue at the trial so as to be likely to be able to give evidence relevant to those issues, I do not understand how an application to have the intended witness orally examined can be described as "fishing". It cannot be necessary that it be known in advance what answers to the questions the witness can give. Nor can it be necessary that the answers will be determinative of one or other of the issues in the action. Section 2(2) of the 1975 Act bars the court from making an order for oral testimony to be taken pursuant to a letter of request unless the order is of a type that could have been made for the purpose of obtaining oral testimony for domestic litigation. In the case of a witness who there is reason to believe has relevant evidence to give, a subpoena served on the witness in order to obtain his evidence for trial could not be set aside on the ground that it was `fishing'. In a comparable case, a court would not be deprived by section 2(2) of power to accede to a letter of request. The question whether, as a matter of discretion, the court would be prepared to make an order pursuant to the letter of request, and if so what order, would be another matter. But there would be no jurisdictional reason why the court should not make the order sought."

It was, ultimately, common ground that where a request is motivated by a dual purpose, one to obtain impermissable pre-trial discovery and the other to legitimately seek evidence which may be used at trial, the Court may as a matter of law accede to the permissable aspects of the request and will not lack the jurisdiction to do so. This point is supported by another

---

[10] At page 641H .
[11] At page 9 of the transcript and: *First American Corpn.-v-Zayed* [1999]1WLR 1154 at 1163H-1164B.

judicial authority on which both Counsel relied, Buxton L.J.'s Judgment in the unreported *Golden Eagle Refinery* case[12] .

So this Court can only accede to a request to orally examine a witness who is demonstrated to be likely to be able to give evidence in relation to facts in issue at trial because he possesses knowledge of facts in issue. However as the Vice-Chancellor pointed out later on in the same Judgment[13], citing a case and principle on which the Plaintiff's Counsel relied:

> "The question as to what evidence would and what evidence would not be relevant to an issue in the foreign action is primarily a matter for the foreign court. The House of Lords so held in in *re Asbestos Insurance* [1985] A.C. 331. Lord Fraser said:-
>
> > "It would be quite inappropriate, even if it were possible for this House or any English court to determine in advance the matters relevant to the issues before the Californian courts on which each of these witnesses is in a position to give evidence". (p. 339).
>
> In my opinion, therefore, an English court must look at the issue of the relevance of the requested testimony, if it is raised, in broad terms, leaving to the foreign court, in all but the clearest cases, the decision as to whether particular answers, or answers on particular topics, would constitute relevant admissible evidence."

**DISCRETIONARY FACTORS**

So, in a case as here where it is admitted that the relevant requests contain improper documentary discovery requests combined with proper oral examination requests, the Court has a discretion to exercise in regard to whether the admitted defect should be regarded as invalidating the otherwise lawful oral examination request.

The present application raises two additional issues of judicial discretion, firstly the question of declining a fishing inquiry as opposed to a request for "real" evidence and secondly preventing oppression by imposing conditions on the scope of the inquiry.

The concept of "fishing" as a term of art was considered by Kerr, L.J. in *In re Norway's Application* as follows[14]:

> "although 'fishing' has become a term of art for the purposes of many of our procedural rules dealing with applications for particulars of pleadings, interrogatories and discovery, illustrations of the concept are more easily recognised than defined. It arises in cases where what is sought is not evidence as such. But information which may lead to a line of inquiry which would disclose evidence. It is the search for material in the hope of being able to raise allegations of fact, as opposed to the elicitation of evidence to support allegations of fact, which have been raised bona fide with adequate particularisation."

Although contrary *dicta* exist in the caselaw, I prefer the view that fishing is a discretionary and not a jurisdictional factor. I adopt the dicta of the Vice-chancellor in the *First American Corp.* case on which Mr. Horseman relied[15]. In the context of letters of request issued by American courts at the discovery stage of the relevant U.S. litigation, this discretionary prohibitory rule operates so as to complement the fundamental legal requirement that the request must not be pre-trial discovery and a ought properly to be a request for evidence. It seems to me that the significance of this factor is likely to be greater in the context of a documentary request than in applications restricted to oral testimony alone. Having said that, the present case is probably atypical since most oral examination requests are coupled with documentary requests, only here the latter requests have been abandoned. But it seems to

[12] [1998]EWCA Civ 293.
[13] Transcript page 10; [1999]1WLR 1154 at 1165B-C.
[14] [1987] 1QB 433 at 482.
[15] [1998] EWCA Civ 817, set out in paragraph 22 above.

me difficult in the present context to clearly distinguish an infringement of the jurisdictional requirement that evidence -and not discovery- must be the basis of the request, from an infringement of the discretionary fishing prohibition.

Where there are concerns about the potential breadth of a request for oral examination, the Court can order conditions or accept undertakings to allay these concerns rather than declining to accede to the request altogether. Thus, in the *Golden Eagle Refinery* case, Buxton L.J. felt that an undertaking that the questioning would take place in the form of examination in chief was "*important both to reinforce the limitation to trial testimony and as a provision easily applied by an English examiner*". However, the following dicta in Lord Woolf's Judgment in *Minnesota v Philip Morris* is particularly instructive; the earlier portion was relied upon by Mr. Horseman and the later portion by Mr. Hargun:

> "…the approach of this court and other courts in this jurisdiction will be to seek to assist a foreign court wherever it is appropriate. For that reason the courts will seek to give effect to a Letter of Request wherever this is practical. Comity between jurisdictions demands no different an approach. It is again a matter which was dealt with in the Westinghouse case. I refer to the speech of Lord Wilberforce at page 612 and to the approach of Lord Keith whose words I adopt. He said at page 654:
>
> > 'In the face of a statement in letters rogatory that a certain person is a necessary witness for the applicant, I am of opinion that the court of Request should not be astute to examine the issues in the action and the circumstances of the case with excessive particularity for the purpose of determining in advance whether the evidence of that person will be relevant and admissible. That is essentially a matter for the Requesting court. Should it appear necessary to apply some safeguard against an excessively wide-ranging examination, that can be achieved by making the order for examination subject to a suitably worded limitation.'
>
> Because of the general approach, to which I have drawn attention, when the court has to choose between either giving effect to a Letter of Request or refusing to do so, it will take into account any limitations, corrections or conditions which the party seeking the order is willing for the court to take into account. It will, if appropriate, be prepared to give the Request an amended effect. However, notwithstanding that, it is important to bear in mind that fishing still cannot be permitted as part of a Request. Furthermore, because of the need to hold the balance between the requesting court and the witnesses who are to be examined, if the Request is given effect, the court will not allow uncertain, vague or other objectionable Requests to be implemented. A witness is entitled to know within reasonable limits the matters about which he or she is to be examined. Although there is the possibility, to which I have already referred, of matters coming back to the court for further rulings, in general the court has to take into account that once it makes an order it ceases to have any control of the examination."[16]

So in my view this Court should, in responding to letters of request made under the broader rubric of the 1970 Hague Convention as well as within the narrower domestic law confines of the Evidence Act 1905, seek to avoid declining assistance to a foreign court altogether on non-substantive grounds. This is especially the case where technical and discretionary concerns can be adequately met by imposing conditions on the examination process.

It is also important in this internationalist context of judicial cooperation not to over-emphasise cultural legal differences on superficial grounds. It is undoubtedly the case that the present requests were formulated in the context of pre-trial discovery in the U.S. action. And not only is pre-trial oral discovery not available under Bermuda law; American notions of relevance appear to be far broader than our own, with third parties amenable to discovery

---

[16] [1997]EWCA Civ 2241, transcript, pages 8-9.

there, while only parties are so amenable here. But it is also true that this discovery process has a dual purpose; discovering evidence and collecting evidence for trial. This was made clear by the extracts from the Federal Code of Civil Procedure which were placed before the Court, and by passages in the English authorities to which the Plaintiff's Counsel referred.

It frequently happens that letters of request are drafted by U.S. lawyers in the same form for different U.S. state jurisdictions and Bermuda. While, ideally, a form suited to Bermuda should be used, it is clear that a letter of request must be dealt with on its substantive merits and not just its form when this Court is deciding whether a request is in truth for pre-trial discovery, or evidence for trial. As Lord Wilberforce has observed: "*which it is in fact is not to be determined by the drafting of …lawyers but objectively by the nature o the testimony sought.*"[17]

**FINDINGS: THE PURPOSE OF THE LETTERS OF REQUEST**

The Applicants' Counsel pointed to numerous instances where the wording of the Letters of Request made it clear that their purpose was pre-trial discovery; the Plaintiff's Counsel pointed to a few examples of language making it clear that evidence was also sought for trial.

The form of the Letters of Request clearly suggest that the same form was used for Bermuda as for requests being made to various courts within the United States. Reference the oral testimony request, the most important portion of the Letters identified by Mr. Horseman was the following:

> "The Court also requests that the Supreme Court permit the videotaping of the witnesses testimony so that the testimony may be viewed by a jury in the United States at the time of trial."

An important passage in the Letters identified by Mr. Hargun suggesting an impermissable request for pre-trial oral discovery was the following:

> "The testimony of the witness is critical for the purposes of determining Ace's understanding of the CMC program, the purpose of the insurance policy it issued, and how the purpose of this insurance policy was represented to the investors."

While there was a clear nexus between "*how the purpose of this insurance policy was represented to the investors*" and the substantive claims for misrepresentation in the U.S. action, "*determining Ace's understanding of the CMC program, the purpose of the insurance policy it issued*" at first blush reflects a discovery request. It appears to be exclusively an attempt to obtain, in Lord Devlin's words, "*material which might lead to a line of inquiry which would itself disclose relevant material*"[18]. This is particularly the case when one recalls that while the witnesses may well be employed by a company which has the same parent as the Ace group of companies defendant(s) in the U.S. action, there is no suggestion that they or their current employer were in any direct sense involved in the issuance of the policies which are referred to in the Letters of Request and the U.S. litigation. But when one analyzes the allegations made in the U.S. action, which are considered further below, it becomes clear that the "*understanding*" of the insurers who issued the policies as to their terms and effect seems also likely to be relevant to a cause of action which may well fall to be determined at trial. So the line between evidence and "fishing" is really blurred.

On the face of the Letters of Request, then, their purpose was twofold: firstly to obtain pre-trial oral discovery, and secondly to obtain oral evidence for use at trial. The requests could not be refused, *in limine,* without considering the merits of the request, because it was common ground that this did not deprive the Court of jurisdiction to accede to the requests.. As Burnton, L.J. observed in the *Golden Eagle Refinery Co.* case:

> "In my view, therefore, the Letter of Request had a dual or hybrid purpose. I accept, for the reasons given by Mr Kentridge, that it did and does seek testimony for use at the actual trial. But I also consider that, in the form in which it was created and upheld in California, it was also concerned with

[17] *Rio Tinto Zinc Corp v Westinghouse Electric Corp.*[1978] A.C. 547 at 610C.
[18] *Radio Corporation of America v Rauland Corporation* [1956] 1 Q.B. 618 at 643.

> enquiries as to discovery of a sort that could not be the subject of examination of an unwilling witness in an English court."[19]

**FINDINGS: THE FACTUAL BASIS OF THE REQUEST**

The Orders were attacked on the grounds that an entirely new factual basis for the oral examination was relied upon on the inter partes hearing as opposed to the case originally put. It is implicitly accepted that the U.S. action itself was accurately described. The crucial portions of William Custer's March 25, 2004 Affidavit (reproduced in paragraph 8 above) are worth repeating at this juncture:

> "*2.* **That this is an action where investors like NetBank and lenders to investors are seeking recovery under various insurance policies and surety bonds issued by insurance and surety companies including Act/Illinois Union Company, Royal Indemnity Company, and Safeco Insurance Company of America (the "Sureties") which strictly guaranteed the investment made by the investors in a program offered by Commercial Money Center ("CMC"). The Claimants have asserted claims against the Sureties to recovery payment in excess of hundreds of millions of dollars under surety bonds and insurance policies that guaranteed the Claimants' investments relating to pools of equipment leases that were originated by CMC. Each of the Sureties have denied coverage under the policies and the bonds. The crux of their defense is that CMC fraudulently induced them to issue the policies and bonds**. The proceedings against the Sureties have been consolidated for pre-trial purposes by the Judicial Panel on Multi-District Litigation before Judge Kathleen O'Malley in the United States District Court for the Northern District of Ohio
>
> *3.* **That the testimony of Larry Lombardo, Randi Cigelnik, Mark Herman, Andy Gibbs, and Tim McDonald is critical for the purposes of determining** the sureties' understanding of the CMC program, the purposes of the insurance policies and surety bonds they issued, and **how the purpose of these insurance policies and bonds were represented to the investors**." [emphasis added]

In the Second Amended Complaint exhibited to the First Custer Affidavit, it is alleged that the Plaintiff purchased certain equipment leases in reliance on representations made by insurers including Illinois Union and Royal Indemnity in certain Performance Bonds which they issued. Since CMC's bankruptcy triggered the insurers' liabilities under the Performance Bond, it is alleged in count 9 under paragraph 149 that they "*have breached the implied covenant of good faith and fair dealing by…interpreting the terms and conditions of the performance Bonds in in an unreasonable manner in a blatant effort to avoid providing NetBank with coverage to which it is entitled."*

It is true that the Letters of Request seem to emphasise questioning about policies issued by "Ace/Illinois Union", but they also state an intention to question the witnesses about all policies which form the subject of the Plaintiff's claims in the U.S. action, including policies issued by Royal Indemnity. What is new in the July 9, 2004 Custer Affidavit is a clearer articulation of the factual basis on which it is asserted that the witnesses are likely to be able to give relevant evidence. It is not, in my view, a new basis for the original application at all.

However, since this further evidence was not before the court at the ex parte stage and only served to confirm that the orders should not have been made as against all-save one- of the witnesses, the merit of the "new case" complaint was reflected to some extent in the order made as to costs. But I rejected it as a ground for setting aside or discharging the Orders altogether.

**FINDINGS: CAN THE WITNESSES LIKELY GIVE RELEVANT EVIDENCE AT TRIAL?**

---

[19] [1998]EWCA Civ 293, transcript pages 7-8.

From the Custer July 9, 2004 Affidavit, it emerges that Mr. Lombardo and the other witnesses were at one time officers and/or employees of an insurer, Intrepid Re, which communicated with U.S. defendant Royal Indemnity about possible reinsurance cover for the Performance Bonds in question in the U.S. litigation. The deponent describes Exhibit "WC-14" to his Affidavit as "*the proverbial 'smoking gun'* ". This is an email from Larry Lombardo dated December 5, 2001 to various people (including Randi Cigelnik, Andy Gibbs, Mark Herman and Tim McDonald) in advance of an Intrepid Re board meeting on December 10, 2001. It follows previous email correspondence between Larry Lombardo and, principally, Tonda Hornbeck of Royal about this possible cover between February and July of that year.

It seems clear that at least one telephone conversation took place between Lombardo and Vince Pugliese of Royal on or about June 15, 2001 in relation to Intrepid Re declining and/or being reluctant to provide reinsurance cover in respect of the CMS equipment lease programme and the Performance Bonds issued by Royal. In the "smoking gun" email, Lombardo reports to the Intrepid Re Board on the CMC (Commercial Money Center) issue:

> " This is a credit guarantee deal which we declined at the outset…CMC were established in 1997 to provide funding to clients for leased equipment who are unable to gain normal bank financing. CMC arrange credit insurance on the deals, package them into portfolios and present such to banks as risk free deals…Issues:-…Looks to be a bad deal…"

In my view, and I so found, it is likely that Larry Lombardo can give evidence as to the understanding of Royal Indemnity about how the programme operated and how the the Performance Bonds were represented to investors such as the Plaintiff. This Court has jurisdiction to compel him to submit to an oral examination pursuant to section 27Q (3) of the Evidence Act 1905. In giving my decision on October 5, 2004, I further found that only questions touching upon the representation issue were relevant to the issues in the U.S. action. On reflection, however, having since considered the implications of count 9 on page 36 of the Second Amended Complaint, so narrow a view is not justified and the understanding of Royal as to how the programme operated is also arguably relevant to this particular claim.

However I also found that there is no basis for concluding (on the material presently before the Court) that any witness other than Lombardo is likely to be able to give evidence about these matters. A subpoena would only properly issue against Larry Lombardo under Bermuda law, in this regard, even though those examining him will not know in advance whether he can actually give evidence which will assist their case. I found particularly persuasive in this regard the following dictum of the Vice-Chancellor found in the *First American Corporation* case on which the Plaintiff's Counsel relied:

> "Moreover, it is not always possible to draw a sharp distinction between, on the one hand, questions "designed to establish allegations of fact" and, on the other hand, questions designed to extract "information which may lead to obtaining evidence in support of a party's case". (See [1987] 1 QB at p. 482, per Kerr L.J.). There may be some questions which are obviously one or obviously the other. But a number of questions may, potentially, lead either to an answer which is probative of an allegation of fact or to an answer which prompts a further line of inquiry without being probative, or to both. In framing questions to ask a witness from whom no proof has been taken, the questioner can be expected to ask a number of preliminary questions in order to feel his way in. This is not fishing. It is a normal technique of examination. A topic for legitimate questioning may have merely background significance. I repeat that, in my opinion, if there is sufficient ground for believing that an intended witness may have relevant evidence to give on topics which are relevant to the issues in the action, a letter of request seeking an order for the oral examination of the witness on those topics cannot be denied on the ground of fishing."[20]

**FINDINGS: DISCRETIONARY FACTORS**

---

[20] [1998]EWCA Civ 818, transcript pages 13-14; [1999] 1 WLR 1154 at 1164D-G.

The Court was invited to set aside the Orders as regards documentary discovery on a discretionary basis because (1) the requests contained admittedly impermissable documentary discovery requests and (2) the requests constituted fishing. Alternatively, conditions were sought to properly regulate the examination to prevent oppression.

In my view it would be contrary to the spirit of the Act and the public policy underpinning it to set aside the Orders on technical grounds. This is not a case where the oral examination requests are inextricably intertwined with the oral examination requests; on the contrary, the central documents are already in the possession of the Plaintiff from another source. So, on the facts, I cannot properly say like Justice Ephraim Georges in the *Abell -v- Ptomac Insurance* Company of Illinois case, that "*the request to produce documents and to appear to give oral testimony are so indissolubly linked together that it is impossible to sever the one from the other. They stand or fall together*".

All that setting aside would do would be to compel the Plaintiff to go back to the U.S. court, obtain a fresh letter of request and apply to this Court again. That would be a churlish approach on the part of this Court, which should always be keen to afford judicial assistance to foreign courts pursuant to substantively meritorious letters of request. This principle applies with considerable to American courts, due to the important commercial ties between that country and Bermuda.

If I was wrong to set aside the requests as regards the three witnesses other than Mr. Lombardo as a matter of law pursuant to section 27Q (3) of the Evidence Act 1905, I would have done so as matter of discretion on the grounds that the requests were clearly fishing. I see no evidential basis for concluding that the requests, as far as those witnesses are concerned, amount to more than attempts to discover if they are likely to be able to furnish evidence, and this is not a proper basis for an order for oral examination to be obtained.

As far as conditions are concerned, the Plaintiff's Counsel agreed to all conditions imposed by the Court. Thus the Orders were continued as to oral examination of Larry Lombardo alone subject to the following conditions: (1) the examination is limited to the content of any discussions and communications between the witness and employees and/or agents of Royal Indemnity Company with regard to the assertion that Royal represented the sale of interests in equipment leases as "risk free deals"; (2) only questions which would be allowable in examination in chief are to be asked; (3) unless otherwise agreed or ordered by the Court, only Counsel for NetBank should question the witness; and (4) any documents to be put to the witness should be served 14 days in advance of the examination.

Conditions (1) and (2) are both directed towards preventing fishing. Condition (3) is based on the premise that only the Plaintiff has sought leave to examine the witness and any wider examination should not be imposed on him without his consent. In fact it is desirable that all parties to the U.S. action should, at the very least, have access to the deposition consistent with the process being designed to obtain evidence for trial[21]. Condition (4) is designed to promote fairness and avoid oppression.

When seeking to define the scope of questioning by condition (1), I was consciously departing from the broad approach to relevancy which the requested court should normally adopt, emboldened by the Plaintiff's Counsel's consent. This course in my view is justified by the unusually peripheral involvement of the witness and his employers in the U.S. action. They are neither parties to the action nor any contract or transaction directly involved in the main litigation. In The Plaintiff only managed to preserve a narrow aspect of their original application through reliance on further evidence to supplement the case initially made on the ex parte application. Mr. Horseman was understandably eager to agree to any reasonable conditions which would ensure that he left the battlefield with paltry spoils rather than none at all.

Having considered this condition further, it seems to me that the Defendant should favourably consider any request the Plaintiff might make to broaden the scope of the examination to include questioning as to the understanding the employees and agents of Royal Indemnity had

[21] *Golden Eagle* case, transcript, page 13.

of the nature of the CMC programme- to the extent that this may be gleaned from any of Mr. Lombardo's relevant communications with Royal. And assuming, of course, that this issue still is a live one in the U.S. action.

Ultimately, it must be remembered, what is or is not relevant is properly a question for the U.S. court. In future this Court may well wish to ensure that the Plaintiff's local Counsel has an opportunity to seek instructions from the relevant foreign attorneys before grasping the nettle of imposing conditions touching upon the scope of an oral examination. This Court and local Counsel will rarely be well-equipped to make informed judgments on relevance issues.

**CONCLUSION**

10 For the above reasons, on October 5, 2004 I set aside the ex parte Orders for an oral examination of three of the four Applicants and imposed conditions on the examination of the fourth. The costs of the Application were awarded to the applicants. Had the issue not have been conceded, the Orders for documentary discovery against all Applicants would have been set aside.

I am indebted to both Counsel for their careful argument on important issues which have seemingly not been considered by this Court on a contested basis for nearly 20 years.