# EXHIBIT 15

Neutral Citation Number: [2018] EWHC 2267 (Comm)

Case No: CL-2018-000504

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS**
**OF ENGLAND AND WALES**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 24/08/2018

**Before :**

**MR JUSTICE MALES**

- - - - - - - - - - - - - - - - - - - - -

**Between :**

| | |
|---|---|
| **DREYMOOR FERTILISERS OVERSEAS PTE LIMITED** | **Claimant** |
| **- and -** | |
| **(1) EUROCHEM TRADING GMBH** | |
| **(2) JSC MCC EUROCHEM** | **Defendants** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Catherine Newman QC** (instructed by **Kermans LLP)** for the **Claimant**
**Justin Fenwick QC** and **George Spalton** (instructed by **Sherrards Solicitors LLP**) for the **Defendants**

Hearing date: 21.8.18

- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

.............................

**Mr Justice Males :**

**The application**

1. This is an application by the claimant, Dreymoor Fertilisers Overseas Pte Ltd ("Dreymoor"), to continue an injunction to restrain the defendants from enforcing an order made by a court in the United States requiring Mr Sandeep Chauhan to disclose documents in his possession and to provide evidence by way of deposition. The order was made pursuant to section 1782 of the United States Code and was stated to be made for the purpose of providing evidence in proceedings taking place in the British Virgin Islands and Cyprus. However, the defendants make no secret of the fact that they intend also to use whatever information is obtained pursuant to the order in arbitrations between the parties in London. Dreymoor submits that this would constitute an unconscionable interference with the arbitral process which should be restrained by an injunction. I shall refer to the order of the United States court as "the 1782 Order".

2. An interim injunction was granted by Bryan J at a without notice hearing on 27 July 2018. Dreymoor seeks now to continue that injunction until after the completion of disclosure in the arbitrations so far as production of documents is concerned and until after the conclusion of the evidentiary hearing in the arbitrations so far as the deposition is concerned. Its position is that it will produce as part of its disclosure in the arbitrations any material documents in Mr Chauhan's possession, thereby rendering the order for disclosure by Mr Chauhan unnecessary, and that it intends and expects to be able to produce a witness statement from Mr Chauhan and to make him available for cross-examination at the hearing, thereby rendering his deposition unnecessary.

3. Thus Dreymoor does not seek to prevent enforcement of the 1782 Order for all time. It accepts that the defendants may seek disclosure of documents from Mr Chauhan and may depose him in the future – but only at a time when this will not affect its preparation in the arbitrations and when it will be too late for the defendants to use the fruits of the 1782 Order in the arbitrations.

**The parties**

4. The first defendant, Eurochem Trading GmbH ("ECTG") is a Swiss company. It was a wholly owned subsidiary of the second defendant, JSC MCC EuroChem ("EuroChem"), a Russian company, but as a result of a corporate reorganisation the two companies have become sister companies under common ownership. ECTG and EuroChem sell fertiliser products in a range of countries worldwide.

5. Dreymoor is an international trading company incorporated in Singapore. Its sole shareholder and beneficial owner is Mr Aleksandr Shishkin.

**The parties' contracts**

6. Between 2008 and 2013 ECTG and Dreymoor entered into several hundred contracts for the sale of fertiliser products. For present purposes those contracts fall into two categories.

7. Some were for the supply of fertiliser products to India. It is ECTG's position that, in the case of these contracts, Dreymoor was acting as an agent for ECTG in reselling the goods, and therefore owed it fiduciary obligations. Dreymoor disputes that, saying that it contracted to buy and resell the goods as a principal.

8. Other contracts between the parties were for supply to destinations other than India. These have been referred to as the "rest of the world" or "RoW" contracts. It is common ground that in the case of these contracts the parties were acting as principals.

9. All of the parties' contracts contained arbitration clauses providing for arbitration in London. Most provided for arbitration in accordance with the LCIA Rules although some provided for the ICC Rules.

**ECTG's claims**

10. ECTG's case is that the contracts between the parties were vitiated by very substantial bribes paid by Dreymoor to two former senior employees of ECTG, Mr Valery Rogalskiy and Mr Dimitry Pomytkin. It appears that another counterparty of ECTG, a company called Yara which is independent of Dreymoor, has admitted that it paid such bribes, but Dreymoor disputes this. As a result ECTG has brought proceedings in the British Virgin Islands (where EuroChem is also a claimant) which are concerned with the RoW contracts and in two London arbitrations which are concerned with the Indian contracts. While it asserts a variety of causes of action, they all appear to depend on the allegation of bribery. As explained below, Dreymoor has challenged the jurisdiction of the BVI court but has not (or at any rate has not yet) sought a stay of those proceedings in favour of arbitration.

11. Although the two sets of proceedings are concerned with distinct contracts, and in the London arbitrations there is an issue as to the capacity in which Dreymoor was acting, it appears that the issue of substance in both of them is the same, namely whether Dreymoor paid bribes to Mr Rogalskiy and Mr Pomytkin.

12. Dreymoor accepts that it made payments to Mr Rogalskiy and Mr Pomytkin or at their direction, but denies that these were bribes. The witness statement of its solicitor, Mr Jonathan Evans of Kerman & Co LLP, referring to Dreymoor's Statement of Defence in the arbitrations, described these payments as follows:

> "11.2 Dreymoor denies that it paid 'bribes' to companies controlled by Mr Rogalskiy and Mr Pomytkin. Dreymoor is quite open it made payments under an ad hoc and flexible arrangement to companies nominated by Mr Rogalskiy, which were a part of the profit that Dreymoor made on its worldwide onward sales (and not simply those into the Indian market).
>
> 11.3 Dreymoor alleges that it honestly and reasonably believed that Mr Rogalskiy was acting with the knowledge of and at the direction of the ultimate beneficial owners of EuroChem; that the companies nominated by Mr Rogalskiy were under the control of EuroChem or its ultimate beneficial owners; that it assumed (but did not know) that the purpose of the payments to nominated companies was to reward those ultimate beneficial owners in a way that would reduce the amount of tax that would otherwise be due to the relevant authorities in Russia or

Switzerland; and that this was consistent with the manner in which EuroChem had structured its business historically; and that other international traders conducting business with ECTG [and EuroChem] had arrangements."

13. Mr Evans does not identify the individuals who is (or are) said to have had this honest and reasonable belief, but it appears that he is referring to Mr Shishkin.

14. There is no reason to suppose that the nature of the payments differed as between the Indian and the RoW contracts. The passage from Mr Evans' statement set out above appears to confirm that it did not. The position, therefore, is that either these payments are properly to be characterised as bribes in both cases or in neither.

15. Mr Justin Fenwick QC for ECTG and EuroChem submitted that a company which, acting innocently, had become the means by which a fraud had been perpetrated on its counterparty, might be expected to cooperate in bringing the fraudsters to justice. Whether there is force in that submission is not for me to decide, but at all events that is not the position which Dreymoor has adopted. In these circumstances it does not require much imagination to predict some of the questions which ECTG's lawyers would wish to ask those who were responsible for Dreymoor's trading with ECTG. These include Mr Chauhan, who was until recently a director of ECTG and who was described by Miss Catherine Newman QC for Dreymoor as having been its chief trader at the time of the matters in dispute.

**The BVI proceedings**

16. ECTG and EuroChem brought proceedings in the BVI against 18 defendants including Dreymoor (in fact the 18th defendant) in August 2015. The claim against Dreymoor relates only to the RoW Contracts. Other defendants included Mr Rogalskiy and Mr Pomytkin as well as various offshore companies to which illicit payments are alleged to have been made.

17. Dreymoor and some of the other defendants challenged the jurisdiction of the BVI court, but their challenge was unsuccessful before Wallbank J. Dreymoor and others then appealed to the Eastern Caribbean Court of Appeal. Judgment on those appeals is currently reserved but (according to ECTG) it is hoped that this will be given at the next sitting of the court in October 2018 or, if not, in January 2019. Meanwhile, the proceedings are stayed so far as they concern the defendants whose challenge to the jurisdiction on appeal is outstanding. Some of the other defendants in the BVI proceedings are in liquidation and, in some cases, ETCG and EuroChem have obtained default judgments against them.

18. Dreymoor has admitted that it is funding the defence of the BVI action, including the jurisdictional challenge, by at least some of the other defendants, and that the defendants so funded include Mr Rogalskiy and Mr Pomytkin.

19. In 2018 ECTG and EuroChem brought further proceedings in the BVI against five defendants, including Mr Shishkin, although this second action is at a very early stage and Mr Shishkin has not yet been served. This claim also relates only to the RoW contracts.

**The Cyprus proceedings**

20. EuroChem and ECTG brought proceedings in Cyprus in 2014 relating to what were alleged to have been bribes paid to a company owned by Mr Rogalskiy. The claim was for *Norwich Pharmacal* relief, principally against the Bank of Cyprus. Dreymoor was not a party. An order was obtained on an interim basis without notice, but it was subsequently set aside for failure by ECTG and Eurochem to disclose material facts. They were ordered not to use the information which they had obtained. This first Cyprus action has not proceeded further and I understand that it is unlikely to do so.

21. EuroChem and ECTG commenced a second action in Cyprus in 2016 seeking a disclosure order and a permanent worldwide freezing order over what were alleged to be bribery funds paid to Mr Rogalskiy. Once again, interim without notice relief was obtained but this was subsequently set aside as having been made with the use of information obtained in the first action which EuroChem and ECTG had been ordered not to use. The defendants in this second Cyprus action, which remains in being, have applied to strike out the claims for abuse of process and lack of jurisdiction. There is due to be a hearing of that application on 10 October 2018.

22. Dreymoor is not a party to the second Cyprus action, but one of the defendants is a company called Gianthill Management Ltd. Gianthill is one of the companies to which Dreymoor admits that it made payments at the direction of Mr Rogalskiy. The lawyer acting for Gianthill has made a witness statement in support of Dreymoor's present application. It is not apparent whether Dreymoor is funding Gianthill's defence of Cyprus action in the way that it is funding Mr Rogalskiy, although it is a reasonable inference that it is. At all events, it appears that there is at least an element of cooperation between Dreymoor and Gianthill.

**The London arbitrations**

23. ECTG filed a Request for Arbitration with the LCIA on 9 March 2017. Mr Ali Malek QC was appointed as sole arbitrator by the LCIA on 16 May 2017. Following service of ECTG's Amended Statement of Case on 24 August 2017, Dreymoor challenged Mr Malek's jurisdiction, but Mr Malek dismissed that challenge in a Partial Final Award dated 16 November 2017.

24. ECTG's Request for Arbitration had included contracts which contained both LCIA and ICC arbitration clauses. However, Dreymoor insisted that the contracts with an ICC arbitration clause should be heard by an ICC tribunal of three arbitrators. Accordingly ECTG commenced a second arbitration before the ICC on 24 October 2017 relating to the contracts with an ICC arbitration clause. ECTG appointed Mr Michael Brindle QC as its arbitrator and Dreymoor appointed Mr Alistair Schaff QC. The parties agreed that Mr Malek should be appointed as the third arbitrator and the tribunal was duly constituted by the ICC on 29 January 2018. The LCIA and ICC arbitrations are proceeding together but remain separate arbitrations.

25. Dreymoor challenged Mr Malek's Partial Final Award on jurisdiction under section 67 of the Arbitration Act 1996. It also challenged the ICC tribunal's jurisdiction under section 32 of the Act. Those challenges were dismissed by Butcher J in a judgment dated 11 April 2018 (see [2018] EWHC 909 (Comm)).

26. Statements of Defence and Replies have now been filed in both arbitrations. Both parties have also filed Requests for Further Information. There was a procedural

hearing in the arbitrations on 18 June 2018 at which directions were given for disclosure of documents and service of witness statements and experts reports, leading to a ten day evidentiary hearing scheduled to commence on 25 March 2019. The parties are currently in the course of identifying the documents of which disclosure will be given by the exchange of *Redfern* Schedules. Disclosure is due to be completed by 5 October 2018 and witness statements by 2 November 2018.

**The 1782 Order**

27. Meanwhile on 18 May 2017 EuroChem and ECTG filed an application before the United States District Court for the Middle District of Tennessee under section 1782 of the United States Code. Section 1782 authorises the District Court of the district in which a person resides to order that person to provide testimony and/or documents "for use in a proceeding in a foreign or international tribunal". The application was made against Mr Chauhan who was formerly a director and chief trader of Dreymoor and is currently resident in that district and employed by Dreymoor America LLC.

28. The application by EuroChem and ECTG was stated to be made for the purpose of obtaining evidence and documents for use in (1) the BVI proceedings, (2) the second Cyprus action, and (3) the LCIA arbitration (the ICC arbitration not yet having been commenced). The application drew no distinction between EuroChem and ECTG. Perhaps not surprisingly, both companies were represented by the same lawyers and it is apparent that information obtained from Mr Chauhan was expected to be shared between them. The object of the application was said to be:

> "to obtain evidence from Mr Chauhan to discover the amount and details of all improper payments made by Dreymoor and its affiliates to Mr Rogalskiy and Mr Pomytkin, the profits obtained by Dreymoor, Dreymoor America and other companies within the Dreymoor group which benefited from the bribes paid by Dreymoor, and other evidence to aid in recovery of the bribe money which the BVI court has stated, on a preliminary basis, is held in constructive trust for Applicants.
>
> In addition, Applicants intend to vigorously pursue additional claims against any involved parties … The evidence sought from Mr Chauhan will also be relevant in these Contemplated Proceedings."

29. The application by EuroChem and ECTG was made without notice to Mr Chauhan but he happened to learn of it and was given leave to oppose the application on 23 May 2017. He has done so tenaciously with the support of Dreymoor, which support includes the funding of his legal costs.

30. The result is that while Dreymoor itself has not intervened in the section 1782 proceedings because it does not wish to submit to the jurisdiction of the United States court, it has been in a position to ensure that any arguments which it would have wished to deploy against the making of an order under section 1782 have been put forward. It has in effect been funding and directing the conduct of Mr Chauhan's opposition to the making of the 1782 Order.

31. Mr Chauhan's Memorandum in opposition to the application was dated 6 June 2017. He argued, among other things, that (1) the requirements of section 1782 were not

satisfied because (a) the London arbitration tribunal was not a "foreign or international tribunal" within the meaning of the United States statute, (b) it was premature for evidence to be introduced into the BVI proceedings because of the outstanding appeal on jurisdiction, and (c) the requested information was irrelevant to the Cyprus proceedings; and (2) the application should be refused as a matter of discretion, in part because supply of the documents requested which covered a period of 13 years would be overly burdensome. While Mr Chauhan was clearly resisting the application in its entirety, he made no specific submission as a matter of discretion that an oral deposition would be unduly burdensome to him. The arguments on discretion also included a submission that "granting the Application would thwart the Parties' attempt to reach a speedy and inexpensive resolution in the London Arbitration", a somewhat surprising submission in circumstances where Dreymoor was about to launch a challenge to the arbitrator's jurisdiction.

32. The application was referred to Magistrate Judge Alistair Newbern and an oral hearing was held before him on 23 June 2017. EuroChem and ETCG were represented by Mr Patrick Salisbury of Salisbury & Ryan, the firm acting for ECTG in the arbitration. In the course of argument Mr Salisbury accepted that there was room for argument whether the London arbitration tribunal was a "foreign or international tribunal" within the meaning of section 1782. He submitted that it was unnecessary to determine that issue because the courts in the BVI and Cyprus undoubtedly did qualify. Mr Chauhan was represented by Mr Jonathan Sablone of Nixon Peabody who was also present, apparently as part of the Dreymoor team, at the hearing before me. Mr Sablone explained to the Magistrate Judge that Dreymoor's defence would be that the payments which it made were not bribes but represented "a rogue employee in EuroChem embezzling money from EuroChem". He did not explain that Dreymoor was funding the defence of this rogue employee, Mr Rogalskiy, to EuroChem's claims.

33. The Magistrate Judge gave his decision on 3 November 2017. He did not determine the issue whether the London arbitration tribunal was a qualifying tribunal, but held that the requested discovery from Mr Chauhan would be for use in the BVI and Cyprus proceedings. In particular, he held that EuroChem would be able to use the discovery obtained in the BVI proceedings regardless of the outcome of Dreymoor's jurisdiction appeal. Having found that the statutory requirements under section 1782 were satisfied, the Magistrate Judge considered the various discretionary arguments. He accepted Mr Chauhan's submission that the discovery requested was unduly burdensome, but concluded that this could be dealt with by narrowing the scope of the documents to be provided. He did so by limiting these to the period between 2010 and 2014 and by ordering that only those documents which were in Mr Chauhan's possession, custody or control in the Middle District of Tennessee need be provided. With this limitation, he concluded that the various discretionary factors weighed in favour of making the order.

34. While the disclosure ordered was undoubtedly narrower than that which EuroChem and ECTG had requested, it remains potentially very broad, covering as it does a period of five years, particularly if (as EuroChem and ECTG contend) it extends to documents accessible electronically by Mr Chauhan from a laptop physically situated in the Middle District of Tennessee.

35. It is common ground that although the 1782 Order was made for the purpose of obtaining documents and evidence for use in the BVI and Cyprus proceedings, and not for use in the London arbitrations, ECTG will be free so far as United States law is concerned to use whatever documents and evidence are provided pursuant to the 1782 Order for any purpose, including in the arbitrations. Mr Fenwick accepted, however, that the arbitrators would be able to control to some extent the use made by ECTG of such material, for example by ruling that ECTG was not entitled to use or deploy it in the arbitrations.

36. On 17 November 2017 Mr Chauhan filed a motion to stay the 1782 Order and for its reconsideration. He did so on the grounds that the Magistrate Judge had been misled as to the nature and status of the BVI and Cyprus proceedings. On 22 November 2017 the Magistrate Judge acceded to the application for a stay pending consideration of the motion for reconsideration.

37. Numerous and detailed briefs were filed by both parties addressing the nature and status of the BVI and Cyprus proceedings and the question whether EuroChem and ECTG would be able to use documents and information provided by Mr Chauhan in those proceedings. Eventually, on 3 July 2018, the Magistrate Judge refused Mr Chauhan's motion. He concluded that Mr Chauhan failed to show that the court had proceeded on a mistaken basis, that there was no material change of circumstances which would prevent the evidence from being used in the BVI or Cyprus proceedings, and that EuroChem and ECTG would be able to use the evidence in those proceedings. He went further, finding that EuroChem and ECTG had already been prejudiced by their inability to present evidence from Mr Chauhan in the Cyprus proceedings and that they would be prejudiced further by any additional delay. Accordingly the stay was lifted and the 1782 Order was reinstated.

38. Mr Chauhan then brought a petition for review by a District Judge of the Magistrate Judge's decision. This review was conducted by District Judge Aleta A. Trauger who concluded that Mr Chauhan's objections were without merit and affirmed the Magistrate Judge's orders in a detailed ruling dated 15 August 2018. The ruling dealt once again with the arguments about the nature and status of the BVI and Cyprus proceedings and whether EuroChem and ECTG would be able to use documents and information provided by Mr Chauhan in those proceedings.

39. The position, therefore, is that the United States court has now concluded on three separate occasions that Mr Chauhan should provide testimony and produce documents in his possession or control for use in the BVI and Cyprus proceedings and that EuroChem and ECTG would be in a position to use that material in those proceedings. It has concluded also that EuroChem and ECTG have suffered prejudice by their inability so far to use this material and that further delay is likely to cause further prejudice to them.

40. As I understand it, this is not necessarily the end of the section 1782 proceedings in the United States as the possibility remains of an appeal by Mr Chauhan to the 6th Circuit Court of Appeals. Currently, however, there is no stay of the 1782 Order in place and, subject to the injunction granted by this court, EuroChem and ECTG are in a position to enforce that order.

41. It is apparent that Dreymoor is very anxious to prevent ECTG and EuroChem from obtaining access to whatever documents and information Mr Chauhan is in a position to provide. It must have spent a great deal of money resisting the making of the 1782 Order and seeking its reconsideration and review, at a time moreover when it was not under pressure to prepare for a merits hearing in the arbitrations. Having reached, or almost reached, the end of the road in the United States, it has now spent in addition, according to its Statement of Costs for the present hearing, over £160,000 in seeking an injunction from this court.

**The application to this court**

42. Following the Magistrate Judge's order of 3 July 2018 refusing Mr Chauhan's motion for reconsideration, Dreymoor's solicitors wrote to Salisbury & Ryan requesting the provision of undertakings by EuroChem and ECTG (1) not to require production of documents from Mr Chauhan "until the completion of disclosure (currently directed to be 5 October 2018)" in the arbitrations and (2) not to require Mr Chauhan to submit to a deposition "until the conclusion of the evidentiary hearing (currently listed for 25 March 2019 to 5 April 2019)". They explained that the disclosure and deposition process was "likely to be burdensome for Mr Chauhan at a time when our client would wish to have his energies focused on assisting it in the defence of the London Arbitrations", and that they intended to submit a witness statement from him in the arbitrations. EuroChem and ECTG declined to provide the undertakings requested and accordingly Dreymoor made its application for an injunction to restrain the enforcement of the 1782 Order.

43. An injunction was granted by Bryan J on 27 July 2018 which temporarily restrained both defendants from enforcing the 1782 Order pending a full hearing on a return date. That hearing, in which Dreymoor sought a continuation of the injunction, has now taken place before me.

44. ECTG which is the claimant in the London arbitrations has acknowledged service and submitted to the jurisdiction of this court. EuroChem is not a party to the arbitrations. It has acknowledged service but indicated that it intends to challenge the jurisdiction. At the date of the hearing before me its time for doing so had not yet expired. The question whether this court has jurisdiction over EuroChem raises some potentially complex issues. However, as the claim for an injunction against EuroChem is dependent on the validity of the claim against ECTG (or to put it another way, it was not suggested that there are any circumstances in which an injunction would be granted against EuroChem if the claim against ECTG were to fail) I propose to consider first the claim against ECTG.

45. Before turning to the substance of the application, it is necessary to address some procedural issues.

**Antisuit or anti-enforcement?**

46. Although described by Miss Newman as an antisuit injunction, the relief sought is in reality an injunction to restrain enforcement of an order already made by the United States court following extensive and detailed submissions by both parties, albeit in Dreymoor's case through the mouth of Mr Chauhan, its former director and a current employee of its United States affiliate. Moreover, the 1782 Order does not involve the

determination by the United States court of the merits of the parties' dispute. It is simply an order for the obtaining of documents and evidence from an individual resident in the United States which, on its face, has nothing to do with any proceedings in this country. The injunction sought is therefore unlike the typical antisuit injunction in which it is sought to restrain a party from asking a foreign court to determine the merits of a dispute which are properly to be determined by court or arbitration proceedings in this country.

**Interim or final?**

47. The relief sought in Dreymoor's arbitration claim form, in accordance with the undertakings requested in correspondence, is to restrain the defendants from (1) requiring production of documents "until the completion of disclosure (currently directed to be 5 October 2018)" and (2) requiring Mr Chauhan to submit to a deposition "until the conclusion of the evidentiary hearing (currently listed for 25 March 2019 to 5 April 2019)" in the arbitrations. The application notice seeking continuation of the injunction states that Dreymoor now seeks "final relief" in these terms while its evidence and Miss Newman's submissions make clear that the application is made (primarily at any rate) under section 44 of the Arbitration Act 1996.

48. The question whether the relief sought is interim or final may be regarded by some as procedural nit-picking, but it can make a difference. If the application is for an interim injunction, the court need only consider whether the *American Cyanamid* test is satisfied or (if an order for interim relief is likely in practice to be determinative) whether there is a high probability of success (*Joint Stock Asset Management Company Ingosstrakh-Investments v BNP Paribas SA* [2012] EWCA Civ 644, [2012] 1 Lloyd's Rep 649 at [83] and [84]); the claimant must give an undertaking in damages in case it is later found that the injunction ought not to have been granted; and there must be some mechanism for a final decision whether the claimant is entitled to the relief, either by a further hearing to consider that question or because it will be answered by the decision on the merits of the underlying dispute.

49. On the other hand, if the application is for final relief, the court must reach a concluded view about the claimant's rights (subject only to any subsequent change of circumstances); no undertaking in damages need be given; and there will be no need and no scope for any future consideration whether the claimant is entitled to the relief in question. Moreover, if the application is for a final injunction, section 44 of the Arbitration Act does not apply. That section only enables the court to grant interim injunctions for the purposes of arbitral proceedings. A claim for a final injunction under section 44, which is the primary way in which Dreymoor puts its case, is impossible.

50. The causes of action on which Dreymoor relies are both contractual and equitable. The contractual right which it asserts is a right, as Miss Newman put it, that its dispute with ECTG concerning the Indian contracts should be dealt with by the agreed arbitral process and in no other way. I am prepared to accept that such a contractual right is implicit in an agreement to arbitrate (although it will be necessary to consider the content of that right and, in particular, whether the section 1782 application comprises a breach of it). However, in a case such as the present where the breach alleged concerns the impact of one party's conduct on an arbitration in which both parties are

actively participating, the material content of that contractual right is inherently time limited by reference to the duration of the arbitration. Once the arbitration is concluded, there is nothing left which needs to be protected by an injunction, as Dreymoor accepts. Thus, although in one sense the relief sought by Dreymoor is only temporary, the relief sought is essentially final in nature. An injunction, albeit time limited, would represent a final vindication of Dreymoor's asserted right that the dispute be dealt with by the agreed arbitral process and in no other way. It would ensure that the disclosure of documents and taking of a deposition pursuant to the 1782 Order at some future time could have no effect on the conduct of the arbitrations.

51. The same applies to Dreymoor's equitable claim not to be vexed by unconscionable conduct. The conduct relied upon, that is to say enforcement of the 1782 Order, is only asserted to be unconscionable because of its impact on the arbitration and for so long as it may have such an impact.

52. Moreover, Dreymoor does not suggest that there should be any future hearing at which its claim for an injunction should be finally determined, and this issue would not be determined by the awards on the merits in the arbitrations whichever way the underlying dispute is decided.

53. In principle, therefore, I consider that I should reach a final decision on Dreymoor's claim for an injunction, albeit that this does not in the end affect the conclusion which I shall reach.

**Section 37 or section 44?**

54. It also necessary to consider whether the source of the court's power to grant an injunction is to be found in section 37 of the Senior Courts Act 1981 or in section 44 of the Arbitration Act 1996. Again, this may make a difference. In the present case the arbitrators have not been asked to give and have not given permission for the application to be made. Indeed it appears, somewhat surprisingly, that they have not even been told about it. Accordingly, if the court is required to proceed under section 44, it can only act "if the case is one of urgency" and, even then, only if an order is "necessary for the purpose of preserving evidence or assets" (see subsection (3)). Moreover, and regardless of any permission given by the arbitrators, the court can only make an order if or to the extent that the arbitral tribunal "has no power or is unable for the time being to act effectively" (subsection (5)). Finally, there is no appeal from the grant or refusal of an injunction without the permission of the court which has determined the application (subsection (7)).

55. The court's power to grant an injunction under section 37 of the Senior Courts Act is less constrained. An injunction may be final or interim and may be granted "in all cases in which it appears to the court to be just and convenient to do so", either in support of a legal or equitable right or to prevent unconscionable conduct (*AES Ust-Kamenogorsk Hydropower Plant LLP v Ust-Kamenogorsk Hydropower Plant JSC* [2013] UKSC 35, [2013] 1 WLR 1889 at [20]). In an arbitration case, the considerations set out in section 44 of the 1996 Act may be taken into account so as to inform the exercise of the court's discretion, but are not necessarily decisive. For example, whereas the absence of "urgency" in a case where the arbitrators have not

given permission is necessarily fatal to an application under section 44, it is likely to be a highly relevant consideration under section 37 but is not a jurisdictional bar.

56. In my judgment the source of the court's power in the present case is section 37, just as it is in a typical antisuit injunction case such as *AES*. That is necessarily so if I am right to regard the present application as being for a final injunction, but does not depend on this conclusion. This case is not on all fours with the *AES* case as it can more readily be said here that the injunction is sought "for the purposes of and in relation to arbitral proceedings", but just as in that case the rights asserted here are a negative right inherent in the parties' arbitration clause and an equitable right not to be vexed by foreign proceedings. Nevertheless, the section 44 considerations, including in particular the question of urgency, are highly relevant.

**Dreymoor's case**

57. It is Dreymoor's case that enforcement of the 1782 Order at the present time will interfere with the effective preparation and presentation of its case in the arbitration and therefore constitutes an infringement of its legal and equitable rights in a variety of ways. It points out that the arbitrations are due to be heard in just over seven months, during which time there will be much work to be done; it says that it needs Mr Chauhan to be available to assist it in its preparation and to be focused on doing so rather than on producing documents and preparing for and taking part in a deposition; it says that there is a danger that if Mr Chauhan is required to submit to a deposition, he may then be unwilling to attend as a witness in the arbitrations, so that Dreymoor may be deprived of the benefit of his live evidence in the arbitrations; and that in any event for him to be cross-examined twice, first by way of deposition and then in the arbitration would be oppressive, unfair and one-sided.

**Cases on unconscionability and section 1728 applications**

58. It is convenient to begin with the question of unconscionability.

59. It is clear that, in some circumstances, use by a party of the procedure under section 1782 of the United States Code is capable of constituting (as a matter of English law) unconscionable conduct interfering with the fair disposal of English court or arbitration proceedings which this court will restrain by injunction. Whether it does so in any given case will depend on all the circumstances. That is apparent from three cases.

60. In *South Carolina Insurance Co v Assurantie Maatschappij "De Zeven Provincien" N.V.* [1987] 1 AC 24 the defendants to an English action sought an order for production of documents under section 1782 from a court in the United States. The English claimants sought an injunction to restrain the pursuit of this application which succeeded in this court and in the Court of Appeal, but the injunction thus granted was set aside by the House of Lords. Lord Brandon said that the English court would not in general seek to control the manner in which a party obtained evidence, provided that the means by which it did so were lawful in the country where they were used. Accordingly the use of procedures available in the United States was not an interference with the procedure of the English court, notwithstanding that the United States procedures were significantly different from English procedure. Further, he was not persuaded on the facts of the case that any increased cost or inconvenience was

such as to amount to unconscionable conduct. It is relevant to note that South Carolina was concerned only with production of documents under section 1782. There was no attempt to take evidence by way of deposition.

61. The second case is *Omega Group Holdings Ltd v Kozeny* [2002] CLC 132, a decision of Mr Peter Gross QC sitting as a deputy judge of this court. In this case the section 1782 application was for the pre-trial deposition of witnesses whom the claimant intended to call to give evidence in the English action. Having analysed the *South Carolina* case in some detail Mr Gross summarised its effect as follows:

> "21. In these circumstances, the guidance for the present case which I respectfully derive from *South Carolina* is as follows:
>
> (1) No injunctive relief is to be granted unless the applicant satisfies the threshold test of unconscionability.
>
> (2) In general, the English court leaves it to the parties to obtain the evidence they think necessary for the advancement of their case by the means of their choosing, provided such means are lawful in the country where they are deployed.
>
> (3) The fact that a party to English litigation is able to obtain evidence by means of a right available in a foreign country significantly different from that available in the English system does not, by itself, constitute unconscionable conduct. Essentially, this is a corollary of proposition (2) above.
>
> (4) It follows that there is no blanket ban on a party to English litigation seeking to utilise the US procedure for pre-trial deposition in order to obtain evidence for his case.
>
> (5) That said, I do not read *South Carolina* as constituting authority for the proposition that it can never be unconscionable for a party to English litigation to apply for US pre-trial depositions by way of s. 1782. I do not think that *South Carolina* goes or could go that far, essentially for the following reasons:
>
> (i) The decision in *South Carolina* was confined to documentary disclosure; on the facts as outlined by Lord Brandon, it might be thought that there was a strong case for permitting the retrocessionnaires to obtain such disclosure.
>
> (ii) As noted, the application for pre-trial depositions had been abandoned. While I do not think that it is permissible to read into the decision of the House of Lords the inference that the result would have been different had it not been abandoned, such abandonment was regarded as a factor of note: see, per Lord Brandon, at p. 38E-H. It follows that the decision as such does not address the considerations raised specifically by pre-trial depositions, still less by a s. 1782 application in respect of witnesses whom it is intended to call to give oral evidence in English proceedings.
>
> (iii) In the present context, blanket permissions are, perhaps, inherently unlikely.

(6) Accordingly, it remains open to an applicant to demonstrate on the facts of the case that a particular application for US pre-trial depositions by way of s. 1782 is unconscionable. I am fortified in reaching this conclusion by a consideration of the views expressed, albeit briefly, in *Documentary Evidence. Hollander & Adam* (7th edn.) at pp. 266–267."

62. Applying that guidance, he concluded that in the circumstances of the *Omega* case, it would be unconscionable and would constitute an interference with the due process of the English court for the defendant to pursue the section 1782 application for the deposition of witnesses whom the claimant intended to call to give oral evidence in this country:

"23. I do think that it would be unconscionable, in the sense that it would be oppressive, vexatious and constitute an interference with the due process of this court, for Mr Kozeny to pursue the s. 1782 applications in the US in respect of witnesses, whom it is intended to be called to give oral evidence at the trial in this country. As it seems to me, in the case of such witnesses and as a matter of practical justice and good sense, the hybrid procedure produces the worst of all worlds:

(1) If the relevant witnesses (i) give English witness statements, (ii) are then deposed in the US, (iii) thereafter attend to be cross-examined in the English trial, they will have been subjected to unwarranted double cross-examination and the trial will suffer from unnecessary duplication. I am not persuaded to reach a contrary view by the fact that the witnesses are or may be familiar with US deposition procedures in the context of US litigation. In any event, I accept Mr Mortimore's submission in this regard that, here, oppression must be judged by English standards.

(2) Conversely, accepting as I do that there is a real, if unquantiflable, risk that a witness once deposed in the US may be discouraged from attending the trial in England in order to be cross-examined a second time, the s. 1782 applications pose a risk of interference with the trial itself. It would be most unsatisfactory for the trial court to be left with depositions from witnesses in such circumstances and to be deprived of their live testimony at the trial itself.

(3) For the reasons already discussed, I do not think that *South Carolina* precludes the conclusion which I have reached. In this case and in respect of witnesses who are intended to come and give oral evidence at trial here, depositions are different and unconscionable. I should add that each party addressed me on the apprehended consequences of a ruling adverse to its case; the claimants submitted that if I was against them, the use of pre-trial depositions would become commonplace whenever witnesses were located in the US; for Mr Kozeny, it was argued that an unfavourable decision would render s. 1782 of little use. I am not sure that it is right to view the matter in this way; individual cases ultimately turn on their own facts. So far, however, as a decision of this court, necessarily subject to *South Carolina*, may have wider policy ramifications, then I do not shrink from saying that the use of s.

> 1782 to depose the selfsame witnesses who will give witness statements and attend to give oral evidence here, has, in general, little to commend it. …"

63. I do not read this as a decision that in all circumstances the pre-trial deposition of a witness who is intended to produce a witness statement and give live evidence in proceedings in this country will be unconscionable. Mr Gross was careful to say that this would be unconscionable "in this case" and that "in general" such a procedure had "little to commend it". I respectfully agree, but it remains necessary to consider all the circumstances of the particular case.

64. Having found that the depositions would be unconscionable, which was as he described it "the threshold test", Mr Gross concluded as a matter of discretion that an injunction should be granted, largely for the same reasons but with the protection for the defendant of an undertaking by the claimant to produce witness statements from and to call the relevant witnesses at trial, as well as to notify the defendant should there be reason to believe that this could not be achieved.

65. Finally, in *Benfield Holdings Ltd v Richardson* [2007] EWHC 171 (QB), there were proceedings in London and New York in which the same or similar issues were raised, although the New York proceedings were narrower in scope and related only to the United States aspects of a conspiracy which was alleged to have been orchestrated in England. The claimant sought to depose for the purpose of the New York proceedings (where there was as yet no date for trial) witnesses based in England who were very shortly due to give evidence at the trial of the English proceedings. The English court granted an injunction to restrain the taking of these depositions. It was, therefore, not a section 1782 case, but a case where the United States depositions were sought ostensibly for the purpose of United States proceedings, although it is apparent that Langley J considered that the real object of the depositions was to obtain an advantage in the English action (see [15] and [24] of the judgment).

66. Langley J held, following *South Carolina* and *Omega*, that there was jurisdiction in these circumstances to grant an injunction to restrain unconscionable conduct, that the jurisdiction had to be exercised with caution because of its potential interference with the due processes of the United States court, and that "Each case provides its own features and factors to be taken into consideration in deciding whether or not conduct is unconscionable such as to justify a restraint" (see [19]).

67. Langley J identified at [23] nine features of the case which all pointed in favour of an injunction, at any rate to restrain the taking of the depositions in the short period before the English trial. Conversely, there was nothing pointing the other way. The features which Langley J identified were as follows:

> "(i) These proceedings are the lead proceedings in which the liability disputes between the parties can expect to be resolved. The parties recognise that England is the natural forum for the resolution of those disputes.
>
> (ii) The trial is to take place on an expedited basis in the near future. Whilst 'both' parties are extensively represented there is serious pressure of work for

them to be ready for that trial which should not be disrupted save for compelling reasons.

(iii) There is no reason at all to doubt that the four witnesses in question will provide witness statements and give oral evidence at the trial. They are compellable.

(iv) English procedure provides for documentary disclosure which it has not been suggested is any less extensive than New York procedure.

(v) English procedure provides for witness statements (verified by a statement of truth) which must contain 'the evidence which that person would be allowed to give orally' CPR 32.4 . If the evidence is to be relied upon it must (subject to very limited exceptions) be in the statement. Thus, very shortly, Benfield will know what oral evidence is to be given by the four witnesses at the trial.

(vi) Like any other litigant, Benfield will then be able to prepare what cross-examination is considered appropriate, but in a context in which, as English procedure requires, they have also given documentary disclosure and have also properly performed their own obligation to serve by exchange the witness statements upon which they intend to rely.

(vii) I think Aon has made a compelling case that Benfield do not require the depositions for any immediate or real purpose of the New York proceedings. Moreover, they will have disclosure and witness statements in these proceedings for which, if there is substance in any need to use them in New York, they can apply to this court for an order permitting them to do so.

(viii) It follows that I see no prejudice to Benfield if they are restrained in the limited manner sought by Aon.

(ix) There is a real forensic unfairness both to the witness and to Aon if Benfield is in effect permitted to have a pre-trial cross-examination of witnesses whom Benfield can hardly expect to be helpful to their real cause, when that would not be permitted by English procedures and there is and can be no reciprocity."

68. However, Langley J added at [25] that:

"It is important to note that there are currently no orders of the New York courts which require depositions of any of the four witnesses. The injunction is aimed at Benfield's expressed intention to seek such orders."

69. If this was an important feature of the case, it would appear to follow that if there had been such orders of the New York courts, that would at least have been a factor pointing against an injunction.

**Unconscionability in the present case**

70. Miss Newman submitted that the factors in play in the present case are essentially the same as those relied upon in *Omega* and *Benfield*, in particular the features listed in *Benfield* set out above. I do not agree. In my judgment the position here is materially different.

71. First, in none of the cases referred to above were the documents or evidence sought for use in proceedings in a third country or countries. In the present case the order of the United States court was expressly made to obtain documents and evidence for use in proceedings in the BVI and Cyprus, including use against other parties. The English court has a legitimate interest in granting an injunction to protect the fairness and integrity of its own proceedings and of London arbitration proceedings over which it has a supervisory jurisdiction. It has, however, no legitimate interest in policing a party's attempt to obtain documents or evidence for use in foreign proceedings, let alone in reviewing the decision of the United States court as to whether its procedures should be utilised for that purpose.

72. Second, it follows that in none of the cases referred to had the United States court reached a fully reasoned decision that the documents and evidence were needed for use in the proceedings in the third country or countries, that the applicant for an order under section 1782 had already been prejudiced in those proceedings by the absence of the material in question, and that it would suffer further prejudice if the material was not made available to it. In the present case such a decision has not only been reached but has twice been reaffirmed after exhaustive argument in which Dreymoor (through Mr Chauhan) participated fully. Dreymoor adduced extensive evidence before me, and Miss Newman submitted, that the United States court's conclusions about this were wrong, but this was (with respect) merely a rehash of the submissions already fully developed before and rejected on three occasions by that court.

73. It seems to me that it would be a serious breach of comity for this court to say that the United States court's conclusions were wrong and that, as a result, an injunction should be granted to prevent enforcement of an order for the production of documents and evidence for use in proceedings in the third country concerned made by that court against an individual resident in and subject to its jurisdiction. In any event, I am not persuaded that the United States court's conclusions were wrong. I consider that EuroChem and ECTG have a legitimate interest in obtaining documents and evidence relating (at least) to the RoW contracts which they may wish to use in (at least) the BVI proceedings, not only against Dreymoor but also against other parties. It would be a strong step for this court to prevent them from doing so.

74. Third, I accept that in the absence of an injunction the timing of enforcement of the 1782 Order will have an impact on Dreymoor's preparation for the hearing in the London arbitrations. However, that is entirely a problem of Dreymoor's own making. It is only because of Dreymoor's sustained resistance to the making of the 1782 Order in the United States that the disclosure falls to be provided and the deposition to be taken at a time which will be inconvenient because of the need to prepare for the merits hearing in the arbitrations. The application for the 1782 Order was first made only two days after Mr Malek was appointed as sole arbitrator in the LCIA arbitration, before the ICC arbitration had even been commenced, and when the jurisdictional issues had not even been raised. At that stage a hearing on the merits was a long way in the future. Dreymoor was successful in delaying the final determination of the section 1782 application in the United States for over a year, but having done so can hardly complain that its enforcement would now come at an inconvenient time.

75. Fourth, this application is made at a very late stage. Miss Newman submitted that until the United States court made its order on 3 July 2018 which lifted the stay on

enforcement of the 1782 Order, there was no urgency in seeking relief from this court. That submission is fundamentally misconceived. Dreymoor has been aware of the section 1782 application since May 2017 and of the 1782 Order since it was made on 3 November 2017. Any urgency which now exists is entirely the result of Dreymoor's failure to seek relief from this court at an earlier stage. In those circumstances I would have held that if this had been an application under section 44 of the Arbitration Act 1996, the application was bound to fail because the requirement of urgency in subsection (3) was not satisfied. As it is, this is a powerful factor against the grant of an injunction.

76. Fifth, it cannot in my view be said that the London arbitrations are the "lead proceedings" in which the liability disputes between the parties will be resolved. It may be that they will be the first proceedings in which a hearing on the merits will take place, although that is a point of little weight when it is borne in mind that the delays in the BVI have occurred largely as a result of the (so far unsuccessful) challenges to the jurisdiction of that court by Dreymoor and other parties which it has chosen to fund. However, the London arbitrations can only determine the position as between Dreymoor and ECTG. In the BVI all relevant parties may be present, including not only Dreymoor and ETCG/EuroChem, but also the alleged fraudsters and a number of the companies to which bribes are alleged to have been paid. To the extent that it is relevant to consider which is the lead jurisdiction, the BVI has a strong claim.

77. Sixth, it is clear that the documents to be provided under the 1782 Order are potentially wider than those which Dreymoor is currently prepared to provide in the arbitrations. Under the 1782 Order Mr Chauhan must provide, to the extent that they are in his possession or control in the Middle District of Tennessee, documents which relate to payments made in connection with the RoW contracts as well as the Indian contracts. While Dreymoor has agreed to provide in the arbitrations documents from Dreymoor America LLC and Mr Chauhan himself "that are relevant to the London Arbitrations and material to the outcome", it is apparent from the *Redfern* schedule which it has served in the arbitrations that it proposes to limit such disclosure to the Indian contracts. While the arbitrators have yet to rule on the validity of this limitation, ECTG and EuroChem have an obvious interest in finding out what payments were made in connection with the RoW contracts and, moreover, in doing so as soon as possible. It is therefore not the case, as matters currently stand, that enforcement of the 1782 Order will provide them with nothing in the way of documents that they will not shortly get in the arbitrations.

78. Seventh, ECTG and EuroChem will not be entitled as of right to use documents provided by way of disclosure in the arbitrations or any witness statement by Mr Chauhan (the content of which will be entirely within Dreymoor's control and, if it is typical of witness statements in court and arbitration proceedings, will be carefully drafted with the assistance of lawyers) for the purpose of the BVI or Cyprus proceedings because the arbitrations are confidential. Miss Newman submitted that ECTG could apply for permission to use that material in other proceedings, but she also made clear that Dreymoor reserved the right to resist any such application. I do not doubt that it will do so.

79. Moreover, although ECTG will have an opportunity to cross examine Mr Chauhan at the arbitration hearing if he gives evidence, that cross examination will not take place

for another seven months and, again, ECTG would need to apply for permission to use that evidence in other proceedings. That contrasts with the position in *Benfield* where evidence was to be given in public court proceedings by compellable witnesses within a few weeks.

80. Eighth, I accept that there is a risk that if Mr Chauhan is deposed in the United States and finds the experience uncomfortable, he may be discouraged from giving live evidence in the arbitrations. That is a factor which I take into account. However, Mr Chauhan's own evidence is that he intends to make a witness statement in the arbitrations and to attend for cross examination at the hearing. That is, he says, subject to the caveat that he is "not able to discount wholly the possibility of 'walking away'" if the process causes him undue stress. While this is a risk that cannot be discounted wholly, it seems to me that in view of Mr Chauhan's position within the Dreymoor group it is a relatively small one in the circumstances.

81. Ninth, I accept that there is an element of potential unfairness in the fact that Dreymoor will have the opportunity to cross examine Mr Chauhan twice. This was a factor which weighed heavily in the *Omega* and *Benfield* cases. It is a factor in favour of the grant of an injunction in this case. However, the weight which it carries is affected by three considerations. The first is that Dreymoor accepts before me that Mr Chauhan will eventually have to be deposed pursuant to the 1782 Order. The only question is whether that should happen in advance of the arbitration hearing. Second, the fact that there are proceedings on the merits in both London and the BVI is likely to mean that witnesses on both sides will face double cross examination, so that the absence of reciprocity does not apply to the same extent as it did in *Benfield*. Third, as Mr Fenwick accepted, it will be for the arbitrators to decide whether or to what extent any documents or evidence provided pursuant to the 1782 Order can be used or deployed in the arbitrations. The arbitrators therefore retain control of their procedure, which goes a long way (I accept not the whole way) to mitigate any unfairness caused to Dreymoor.

82. Tenth, I have already referred to the fact that Dreymoor has not sought permission from the arbitrators to bring this application or even told them about it. It was not obliged to do so. However, its failure to do so means that it cannot pray in aid any view from the arbitrators whether enforcement of the 1782 Order would constitute an unjustifiable interference in the arbitral process.

83. Whether enforcement of the 1782 Order would constitute unconscionable conduct requires an overall evaluation. In my judgment, looking at the circumstances of this case as a whole and with particular regard to the factors which I have identified, many of which point strongly against the grant of an injunction, it would not.

**Breach of contract**

84. If, as I conclude, it would not be unconscionable for ECTG to enforce the 1782 Order, the claim based on a breach of a contractual right of Dreymoor that its dispute with ECTG should be dealt with by the agreed arbitral process and in no other way cannot succeed either. The fact is that the dispute concerning the Indian contracts will be dealt with by the agreed arbitral process and this will be so whether or not the 1782 Order is enforced.

85. The only differences which enforcement of the 1782 Order will make are that (1) Dreymoor's preparation of its case may be adversely affected by Mr Chauhan needing to deal with the requirements of that order and (2) additional material provided as a result of his compliance with that order may be available to Dreymoor. However, even leaving aside the self-inflicted nature of the impact on Dreymoor's preparation for the merits hearing in the arbitrations, as to which see [74] above, a party to an arbitration has no right to prepare its case unaffected by outside distractions or the requirements of other proceedings in which it is involved. In my judgment the conduct on which Dreymoor relies cannot be characterised as the breach of any contractual obligation unless it also amounts to unconscionable conduct. Provided that it does not act unconscionably, ECTG is entitled to protect its own interests in proceedings elsewhere. Further, the arbitrators' ability to control the extent if any to which material produced pursuant to the 1782 Order is deployed in the arbitration will ensure that the dispute is decided in accordance with the arbitral process, while leaving ECTG and EuroChem free to use the material for the purpose of the BVI and Cyprus proceedings as the United States court has decided that they are entitled to do.

**Discretion**

86. In view of my conclusions so far it is unnecessary to consider separately the question of discretion. However, an injunction is a discretionary remedy and the factors which I have identified mean that I would if necessary have declined to continue the injunction as a matter of discretion.

**EuroChem**

87. As the claim against ECTG must fail, there is no need to consider whether this court would have jurisdiction to grant an injunction against EuroChem.

**Non-disclosure**

88. Similarly there is no need to consider whether the injunction should be set aside for failure by Dreymoor to make full and frank disclosure of various matters on the without notice application to Bryan J. A number of complaints to this effect were made in ECTG's and EuroChem's evidence, in Mr Fenwick's skeleton argument and in his oral submissions. It may be (I put it no higher) that some of them had force. However, I would have been reluctant to set aside (or refuse to continue) the injunction on this ground, at any rate without giving Dreymoor an opportunity to respond further. It seemed to me that the complaints represented something of a moving target. As I indicated in *National Bank Trust v Yurov* [2016] EWHC 1913 (Comm) at [14], it is important in such cases to have a succinct statement of the grounds of non-disclosure relied upon so that evidence and submissions can be properly focused.

**Conclusion**

89. For the reasons which I have given I decline to continue the injunction to restrain the defendants from enforcing the 1782 Order. The injunction is therefore discharged and the arbitration claim form is dismissed.