# EXHIBIT 16

# In The Supreme Court of Bermuda

**COMMERCIAL JURISDICTION**

**2019 No: 292**

**BETWEEN:**

**(1) APEX FUND SERVICES LTD**
**(2) MR. PETER HUGHES**

Plaintiffs

**And**

**(1) MR. MATTHEW CLINGERMAN**
**(IN HIS CAPACITY AS RECEIVER OF THE SILK FUND ROAD M3 FUND, A SEGREGATED ACCOUNT OF SILK ROAD FUNDS LIMITED)**
**(2) SILK ROAD FUNDS LIMITED**

Defendants

# RULING

*Contested Inter partes application for Interim Anti-Suit Injunction - Parallel Court proceedings in New York and Bermuda - Section 19(c) of the Supreme Court Act 1905 and Inherent Jurisdiction of the Supreme Court- Order 29 of the Rules of the Supreme Court*

*Application for Non-Contractual Anti-Suit Injunction on equitable grounds that the New York Proceedings are vexatious, oppressive and/or unconscionable – Forum Non Conveniens – Whether doctrine of comity applies*

*Application for Contractual Anti-Suit Injunction – Construction of non-exclusive Jurisdiction clause contained in an Administration Agreement - Meaning of contractual term "irrevocably submits to jurisdiction"*

*Whether Applicant has a Statutory Entitlement to Anti-Suit Injunction under sections 97 and 281 of the Companies Act 1981 and under sections* 11(2) and 11(3) *of the Segregated Accounts Companies Act 2000*

**Date of Hearings**: Thursday 29 August 2019 and Friday 11 October 2019
**Date of Decision**: Tuesday 12 November 2019

**Plaintiffs**: Mr. Alex Potts QC and Ms. Laura Williamson (Kennedys Chudleigh Ltd)
**Defendants**: Mr. Jeffrey Elkinson (Conyers Dill & Pearman Limited)

Ruling of Shade Subair Williams J

**<u>Introduction</u>**:

1. On 22 July 2019, the Plaintiffs filed an Originating Summons for a permanent injunction essentially restraining the Defendants from further partaking in legal proceedings commenced by the First Defendant in the Supreme Court of the State of New York ("the New York action" or "the New York proceedings"). The Plaintiffs equally seek an order compelling the First Defendant to summarily end the New York action by dismissal, withdrawal or discontinuance. The Plaintiffs further prayed for declaratory relief as may be just and appropriate and damages and / or equitable compensation to be assessed in addition to indemnity costs.

2. By *ex parte* summons also filed on 22 July with the Originating Summons, the Plaintiffs sought urgent interim injunctive relief in the same terms sought under the originating process. At the 22 July hearing, the Plaintiffs explained that the application was being made on an urgent *ex parte* basis because of an impending 25 July deadline by which it had to file a motion challenging the jurisdiction of the New York Court. The Plaintiffs were also concerned that Mr. Clingerman would take steps to obtain anti-suit injunctive relief from the New York Court against them, if given sufficient notice. Mr. Potts QC informed the Court (on the strength of the affidavit evidence of the Second Plaintiff) that the Defendants intended to file its motion to challenge the New York Court's jurisdiction over the substantive dispute but contended that resolution through the anti-suit injunction route would be less costly to both sides of the litigation.

3. The Plaintiffs were partially successful in that I ordered the Defendants to refrain from prosecuting, pursuing, continuing, or advancing etc. the New York action or any other materially similar legal proceedings in any jurisdiction other than Bermuda, until the trial or further Order of the Court. However, I refused the prayer for the mandatory injunctive relief.

4. Having obtained the interim anti-suit injunction on an *ex parte* basis, the Court directed a *inter partes* hearing to follow. On 29 July 2019, both parties appeared and directions in aid of an *inter partes* hearing on the 22 July summons was made. I also extended the *ex parte* interim injunction, subject to an agreed position between the New York attorneys for a stay or extension for the Defendants' response to the Plaintiffs' motion to dismiss the New York proceedings ("the Directions Order").

5. Under the Directions Order, the *ex parte* summons for the interim anti-suit injunction was listed to be heard *inter partes* on 29 August 2019. This is the application with which I am presently concerned.

6. On 29 August the matter proceeded for a full day hearing and was fixed to continue part-heard on 2 October 2019, based on the mutual availability of the parties and the Court calendar. Having taking ill on 2 October, the matter was relisted to continue on 11 October.

7. At the close of the two-part hearing, having heard from both sides, I reserved my decision and informed the parties that I would also provide these written reasons.

**Summary of Factual Background**

8. In other Court proceedings (Case No. 121 of 2017) for the restoration of the Company to the Register of Companies, an Originating Summons was filed in April 2017 for the appointment of receivers over the M3 Fund ("the M3 Fund" or "the Fund"). The Fund is a segregated account of the Second Defendant ("the Company"). The Company was incorporated in Bermuda on 19 October 2011 under the Segregated Accounts Companies Act 2000 ("the SACA 2000"). The Fund was incorporated on the same date, or closely thereto, with the object of carrying on the business of a mutual fund as defined by section 156A of the Companies Act 1981.

9. On 21 April 2017 Mr. Clingerman, the Managing Director of Krys & Associates (Bermuda) Limited ("KRyS Global"), was appointed by the Court as a joint receiver of the M3 Fund ("the Receivership Order"). Mr. Sven Michael Schulz was the other of the two joint receivers appointed under the Receivership Order. Mr. Schulz was subsequently replaced by Mr. Christopher Smith who resigned from KRyS Global on 18 May 2018 leaving Mr. Clingerman as the sole receiver of the M3 Fund.

10. Paragraph 3 states that the receivers 'may do all such things as may be necessary for the purposes of: *(a) the orderly management, sale, rehabilitation, run-off or termination of the business of, or attributable to, the M3 Fund* and *(b) the distribution of the assets linked to the M3 Fund to those entitled thereto*.' The receiver is bestowed with '*all of the functions and powers of the directors and managers of the Defendant in respect of the business and assets linked to the M3 Fund*' under paragraph 4. Under paragraph 5 a lengthy list follows outlining specific powers given to the receiver without restricting the generality of the powers conferred under paragraph 4.

11. At paragraph 6 of the Receivership Order, powers to partake in legal action is stated as follows:

"*That the Receivers may bring or defend in their name or in the name of the M3 Fund any action or other legal proceedings which relate to the property belonging to the M3 Fund or which it is necessary to bring or defend for the purpose of effectually discharging the purposes set out at paragraph 3 hereof.*"

12. Paragraph 8 contemplates the receiver's recovery of costs on taxation before the Registrar of the Supreme Court:

"*That the Receivers shall be at liberty to submit to the Registrar of the Supreme Court of Bermuda bills of costs for taxation for all costs charges and expenses of those persons or firms employed by them and that such taxation shall be on an indemnity basis with respect to the costs charges and expenses of attorneys and on an equivalent basis for all managers, accountants, auctioneers or other persons.*"

13. Paragraph 9 authorizes the receivers to take the necessary or desirable action to obtain the recognition of their appointment as receivers in any other relevant jurisdiction and to make applications to the courts of such other jurisdiction for that purpose.

14. The facts of this case are currently restricted to the untested affidavit evidence filed by the parties in these proceedings. Mr. Peter Hughes, a director of the First Plaintiff, Apex Fund Services Ltd. ("Apex"), a limited liability company, incorporated and headquartered in Bermuda, has thus far filed two affidavits. Mr. Matthew Clingerman has filed three affidavits[1]. The Court documents filed in the New York proceedings brought by Mr. Clingerman against the Plaintiffs in these proceedings are included in the exhibits before me.

15. It is uncontentious evidence that Apex provided administration services for the Company pursuant to an Administration Agreement entered on 1 November 2011 ("the Administration Agreement" or "the Agreement").

16. On the facts pleaded by Mr. Clingerman in the New York Complaint filed on 5 July 2019, the M3 Fund was established by Mr. Ali in early 2013 with a purported investment strategy to generate long-term returns from investment in securities related to companies listed on the Mongolia Stock Exchange, the Myanmar Stock Exchange and the Mozambique Stock Exchange.

17. In January 2013 Goodwill PTC Limited ("Goodwill"), a trustee of a discretionary trust ("the Prosperity Trust"), purchased the M3 Fund's 10,000 participating shares for $10,000,000.00. In January 2015, Goodwill served a redemption notice in respect of its entire shareholding. However, its shareholding was never redeemed.

18. Mr. Clingerman alleges that at the direction of Mr. Ali, a series of unauthorized and dishonest payments were made by a class of Defendants he describes as the "Transferee Defendants" (a term I adopt hereinafter) namely, Eurasia Capital Ltd ("ECL"); Eurasia Capital Mongolia LLC ("ECML"); Silk Road Management Limited ("SRML"); Silk Road Finance Limited ("SRFL") and Silk Road Finance Inc. ("SRFI").

[1] Mr. Clingerman's third affidavit was filed mid-hearing without leave of the Court but no point of contention arises on its admission.

19. Mr. Clingerman, as the receiver of the Fund, commenced Court proceedings against the same set of Defendants[2] in both Bermuda and New York alleging that the $10,000,000.00 which Goodwill invested in the M3 Fund was mismanaged and misappropriated between around 16 February 2013 and 3 October 2014.

20. The New York Complaint was served on Apex on 5 July 2019 in answer to a Demand for Complaint dated 14 June 2019. The causes of action in the New York suit against the Plaintiffs in these proceedings are for aiding and abetting fraud, breach of fiduciary duty and aiding and abetting the Transferee Defendants' breach of fiduciary duty; negligence and gross negligence. The relief claimed is for actual and punitive damages.

21. In Bermuda, Mr. Clingerman filed a Generally Endorsed Writ (Case No. 64 of 2019) on 15 February 2019 in his own name and capacity as Receiver of the M3 Fund ("the Writ"). Under an Order made by the learned Chief Justice, Mr. Narinder Hargun, on 20 May 2019, leave was granted to Mr. Clingerman to amend the Writ so to join the Company as a second Plaintiff *"(acting by Mathew Clingerman pursuant to Order of the Supreme Court dated 21 April 2017 and section 21 of the Segregated Accounts Companies Act 2000)"*. All of the Transferee Defendants in addition to SRFI and the Plaintiffs in these proceedings are named as Defendants under the Writ. However, as matters currently stand, the Writ has not been served on Mr. Hughes or Apex.

22. The Writ claim against Apex is for damages arising out of 'grossly negligent breaches' of the Administration Agreement and 'grossly negligent breaches of fiduciary and/or statutory duty' owed to the M3 Fund. An alternative claim for damages and/or equitable compensation is made for dishonest assistance. The claims against Mr. Hughes are for damages payable for breach of fiduciary duty and dishonest assistance.

23. Mr. Clingerman says that Mr. Hughes, a Bermuda resident, was at all material times the directing mind and will of Apex. Mr. Hughes was also a director of the Defendant Company together with one Mr. Roderick Forrest (up until about 18 December 2015, according to Mr. Clingerman).

24. On Mr. Clingerman's case, Mr. Ali was at all relevant times not only a beneficial owner and controller of the Transferee Defendants but their agent and corporate alter ego. He was the chief executive officer (CEO) and/or director (or occupying an equivalent position thereto) of ECL and ECML. He was also the sole director and shareholder of SRML; the founder and CEO and/or director (or occupying an equivalent position thereto) of SRFL and the senior advisor to and/or director of SRFI. Mr. Ali's control over the monies deposited by Goodwill was achieved by the appointment of SRML as investment advisor to the Fund pursuant to the Investment Advisory Agreement dated 31 July 2012 ("the Investment Advisory Agreement").

25. In or prior to 2008, Apex is said to have been appointed as administrator, registrar, and transfer agent for an open-ended Bermuda investment company, FMG Special Opportunity

[2] Save that SRFI is a named Defendant in the Bermuda proceedings only.

Fund ("FMG") which invested in other investment companies and limited partnerships and managed accounts. Mr. Hughes was its director. Mr. Clingerman's case is that FMG invested in Cayman incorporated funds which were managed by Mr. Ali. It came to pass, it seems, that these Cayman funds went into voluntary liquidation losing 90% of its value. This led to Mr. Ali commissioning Mr. Hughes of Apex to assist with the liquidation process. Mr. Clingerman cites the winding up of these funds in his criticism that Apex, by the time it entered the Administration Agreement with the Company, knew that Mr. Ali was 'high operational risk' as he had been involved with investment companies which were the subject of regulatory sanctions and liquidation.

26. Mr. Hughes himself comes under scathing attack by Mr. Clingerman for having accepted both the role of a director of the Defendant Company and administrator of the Fund through Apex. Mr. Clingerman referred to internal Apex email exchanges wherein Mr. Hughes was warned against dealings with Mr. Ali who had 'a history of running Fund's [sic] into a mess'. Mr. Clingerman also points to the internal advice given to Mr. Hughes for him to refrain from taking on the role of one of the two directors of the Fund (i.e. the Defendant Company). At the core of a conflict of interest complaint, Mr. Hughes is said to have owed and breached his fiduciary duty to the Fund as one of the directors of the Company since he simultaneously pushed for the premature launch of the Fund for the purpose of generating administration fees for Apex.

27. In an answer to a 23 July 2012 application consisting of a Portfolio Supplement for regulatory approval by the Bermuda Monetary Authority ("the BMA"), DBS Bank (Hong Kong) Limited ("DBS") was appointed as the custodian of the Fund. The Goodwill investment was deposited in DBS. The BMA also approved the appointment of Quam Securities Company Limited ("Quam") as its prime broker.

28. However, in or around March 2013, Mr. Hughes as director of the Company partook in the authorization of the appointment of ECML as a broker of the Fund and prime-broker for a sub-fund called "Mongolia Multi-Asset Fund". Apex assisted in the realization of this appointment which was instigated by SRML. Mr. Clingerman deposed that proceeds of the Goodwill investment were transferred to ECML before its dissipation in a like manner to the funds received by the other Transferee Defendants. Mr. Clingerman explains in his evidence that ECML was never entitled to take custody of the M3 Fund's assets as custody was the sole right of DBS, the custodian. Mr. Clingerman lambastes both Mr. Hughes and Apex for their support of the movement of the assets from the custodian to ECML.

29. The suit against Apex also arises out of allegations of its administrative failure to properly calculate the net asset value of the participating shares of the M3 Fund.

30. In Mr. Hughes' affidavit evidence he states that both he and Apex strongly dispute the allegations made by Mr. Clingerman.

**<u>The Disputed Issues on the Application for the Interim Anti-Suit Injunction</u>**

31. The Plaintiffs seek the continuance of my *ex parte* order made on 22 July 2019 restraining the Defendants from prosecuting, pursuing, continuing, or otherwise advancing the New York action (or any other materially similar legal proceedings in any jurisdiction other than Bermuda), until the trial of this action. As I refused the application for the mandatory injunctive relief on an *ex parte* basis, the Plaintiffs seek to renew their application for an interim mandatory injunction on an *inter partes* order.

32. Mr. Potts QC's primary contention is that the New York proceedings are vexatious and oppressive and that under Bermuda law, the New York Court has no jurisdiction over the Plaintiffs. In Mr. Hughes' affidavit evidence, he also describes the New York action as unconscionable and abusive forum shopping. Mr. Hughes contends that the basis for which the Receiver asserts its jurisdiction is tenuous and is in actual fact an attempt to gain unfair advantage under New York law as it relates to matters of, *inter alia*, costs, discovery, depositions and publicity. Mr. Hughes launched a scathing attack on Mr. Clingerman in deposing that the simultaneous issuance of the New York and Bermuda proceedings was 'with a view to pursuing a vexatious and oppressive 'nuisance' strategy, designed to inflict maximum reputational damage' on Apex and himself 'through the medium of adverse publicity'.

33. Mr. Potts QC also objected to the First Defendant's standing to bring a claim in his own name as the Receiver for a segregated account of the Second Defendant and submitted that the Court's sanction ought to have been obtained before commencing the New York action.

34. Counsel urged a careful construction and application of the Receivership Order, where it provides "*…and to commence all other proceedings outside Bermuda as may be necessary to have their appointment recognized and to protect the assets of the M3 Fund in particular but not limited to applications in the United States of America, Hong Kong, Canada, the Cayman Islands, Uzbekistan or Mongolia…*" Mr. Hughes in his second affidavit emphasized that neither he nor Apex possess or control any M3 Fund assets and that no debt is owed to the Fund. Mr. Hughes further avers that it is unnecessary to commence proceedings outside of Bermuda in order to protect the assets of the Fund, given the Plaintiffs' strong Bermudian connection.

35. The Plaintiffs also reminded the Court of the entitlement they would have in Bermuda proceedings to statutory indemnities from liability under SACA 2000 and the Companies Act 1981. At paragraph 41 of Mr. Potts QC's written submissions he states:

"*In addition, there will be certain defences and counterclaims that are only available to the Plaintiffs (as defendants in the substantive dispute) through the Bermuda Courts, for example, under Bermudian company law (including, for example, pursuant to the statutory provisions under the Companies Act 1981 regarding statutory apportionment and statutory relief from liability, under sections 97 and 281 respectively). The importance of this point should not be overlooked, especially in the case of an individual director such as Mr. Hughes. It has been recognised in a number of reported authorities that the existence of a*

*statutory right in a particular forum (including, for example, rights conferred by employment legislation and by corporate legislation) is a reason for granting an anti-suit injunction against proceedings in another forum, where that statutory right could not otherwise be given full effect. The English Court of Appeal held in Samengo-Turner v J & H Marsh & McLennan (Services) Ltd [2007] 2 CLC 104 (CA), at paragraphs 38 to 43, that a statutory right to litigate in England will justify an anti-suit injunction against foreign proceedings, even if the dispute was otherwise subject to a forum selection clause in favour of the foreign forum. Tuckey LJ (with whom Longmore and Lloyd LLJ agreed) explained that in such circumstances, the Court was faced with a choice between granting an injunction to protect the plaintiff's statutory rights and doing nothing; and that it would not be just to do nothing…*"

36. The Plaintiffs say that the dispute between the parties is overwhelmingly Bermudian in nature and that the damage is alleged to have occurred in Bermuda. In a forceful attempt to lengthen the list of reasons which support the recognition of the Bermuda Courts as a natural forum, Mr. Potts QC submitted that the Company's contractual relationship with both Apex (under the Administration Agreement) and SRML (under the Investment Advisory Agreement) are governed by Bermuda law.

37. Additionally, Mr. Potts QC directed the Court's attention to the jurisdiction of the Bermuda Courts and the applicability of Bermuda law to the Company and to its segregated accounts under the Company's Bye-laws and under the SACA 2000. So not to leave out even the finest of points, Mr. Potts QC added that the former director of the Company, Mr. Forrest, is also a resident of Bermuda.

38. Turning to the jurisdictional governance of Goodwill, Mr. Potts QC highlighted that it is a private trust company which is registered and based in Bermuda and acts as the trustee of a Bermuda law trust. It also has three Bermudian resident directors.

***The Administration Agreement***

39. Both parties agree that the contractual relationship between Apex and the Company is governed by the Administration Agreement. A copy of the Administration Agreement to which the Plaintiff and the Company are party was produced under the first affidavit of Mr. Hughes. A description of the services to be rendered by Apex, in its role as administrator, is recorded in the First Schedule of the Administration Agreement.

40. At clause 2.5 of the Agreement, there is a clause empowering Apex to delegate its powers and duties under the Agreement to its affiliate, Apex Investment Consulting (Shanghai) Co. Ltd ("the sub-Administrator"). It provides:

"*2.5 The Administrator may delegate to Apex Investment Consulting (Shanghai) Co., Ltd. (the "sub-Administrator") all its powers and duties relating to the administration services set-out in this Agreement. Such sub-delegation shall be the object of an Agreement for the delegation of duties to be entered into by the Administrator and the sub-Administrator.*

*Unless otherwise agreed between the Fud, the Administrator and the sub-Administrator, any fees and expenses payable to the sub-Administrator shall be borne by the Administrator, and the Administrator shall remain primarily liable to the Fund for the performance of any duties or functions so delegated by the Administrator*."

41. The provision which splits the rock is at clause 15:

"***Governing Law and Jurisdiction***

*This Agreement shall be construed and the provisions interpreted under and in accordance with the laws of Bermuda and the parties to this Agreement irrevocably submit to the non-exclusive jurisdiction of the Bermuda Courts*."

42. The term *'irrevocably submit to the non-exclusive jurisdiction of the Bermuda Courts'* harnessed a most sizeable portion of the dispute as a matter of construction. Mr. Potts QC accepts that this clause on its own does not confer any exclusive jurisdiction to the Bermuda Courts, but that it should be read as part of a larger puzzle which includes the Bermuda jurisdiction clause in the Investment Advisory Agreement and the Bermuda exclusive jurisdiction clause at 13.2 in the Company's Bye-laws in addition to the relevant Bermuda statutory provisions under SACA 2000 which deem the Bermuda Courts to have exclusive jurisdiction unless otherwise stated by a governing contract.

43. Mr. Elkinson, on the other hand, pressed for this Court not to be distracted by any jurisdiction clauses in agreements to which Apex and the Company were not mutually privy. He submitted that the only relevant jurisdiction clause was the one which was contained in the contractually governing Administration Agreement.

***<u>The Investment Advisory Agreement</u>***

44. The 31 July 2012 Investment Advisory Agreement between SRML and the Company effectively enabled Mr. Ali to assume the role of investment advisor to the Fund.

45. Mr. Hughes points to Clause 25 which reads:

'*This Agreement shall be subject to and construed in accordance with the laws of Bermuda. Disputes arising in connection with this Agreement shall be subject to the non-exclusive jurisdiction of the Courts of Bermuda to which each of the parties hereby submits*'.

***<u>Bye-law 13.2 and the Section 11(2) of the SACA 2000</u>***

46. Under the Company's Bye-laws, an exclusive jurisdiction clause is contained at 13.2:

'*Pursuant to the provisions of Section 11(2) of the [Segregated Accounts Companies] Act, all Account Owners acknowledge that these Bye-laws, as the governing instrument, shall be exclusively governed and interpreted in accordance with the laws of Bermuda and by*

*becoming an Account Owner they irrevocably submit to the jurisdiction of the Courts of Bermuda in respect thereof.'*

47. Section 11(2) and 11(3) of the SACA 2000 contains a deeming provision that the Bermuda Courts will have exclusive jurisdiction over segregated account owners (subject to a governing contract which says otherwise):

***Governing instruments and contracts***

*11 (1) The rights, interests and obligations of account owners in a segregated account shall be evidenced in a governing instrument and the rights, interests and obligations of counterparties shall be evidenced in the form of contracts.*

*(2) The governing instrument in relation to any segregated account shall be deemed to be governed by the laws of Bermuda and the parties thereto shall be deemed to submit to the jurisdiction of the courts of Bermuda and…*

…

*(3) Any contract governing a transaction with a counterparty, including those executed outside Bermuda, shall include the name of the counterparty, and, unless otherwise provided therein, shall include an implied term that the parties select the law of Bermuda as its governing law and submit to the jurisdiction of the courts of Bermuda.*

***Domicile of Parties to the Bermuda and New York Proceedings***

48. Mr. Hughes also flagged the undisputed locations of the parties to the substantive disputes. At paragraph 18 of his first affidavit, the jurisdictional homes are outlined as follows:

*(i) The Receiver – appointed by the Bermudian courts, and resident in Bermuda;*

*(ii) The Company – incorporated and registered in Bermuda;*

*(iii) Goodwill – incorporated and registered in Bermuda (and, indeed, three of its directors, Alec Anderson, Peter Pearman, and Craig MacIntyre, are Bermuda residents, being lawyers with the Bermuda law firm, Conyers Dill & Pearman);*

*(iv) Apex – incorporated and registered in Bermuda;*

*(v) Me- resident in Bermuda, and targeted for my role as director of two different Bermudian-registered entities;*

*(vi) SRML – registered in the Cayman Islands;*

*(vii) SRFL – registered in the Cayman Islands;*

*(viii) ECL - registered in the Cayman Islands;*

*(ix) ECML – registered in Mongolia.*

49. The parties diverge in their evidence as to the country in which Mr. Ali resided during the relevant period. Mr. Hughes says that he only ever knew Mr. Ali to reside in Mongolia or Uzbekistan. On the averments advanced by Mr. Clingerman in his New York Complaint, Mr. Ali maintained a residence in New York from which he materially operated and directed the misappropriation of the M3 Fund assets, including directing the actions of the Transferee Defendants. It is not for me to resolve this controversy at this stage of these proceedings. As such, I will not rehearse the evidence supporting either party's contention on Mr. Ali's domicile in any greater detail.

50. The Plaintiffs argue that if the Court discounts the allegation that Mr. Ali occupied a New York address at the material point, Mr. Clingerman is left only with the assertion that Mr. Ali used New York banks in the course of the impugned transactions. Moreover, the Plaintiffs say that the fact that the transactions were done in US Dollar currency is not only irrelevant but also consistent with the currency used in virtually all international business conducted in Bermuda.

***Mr. Clingerman's conduct in furtherance of the Bermuda Writ Action and whether the Defendants have already irrevocably submitted to jurisdiction of the Bermuda Court***

51. Mr. Potts QC was thorough in his oral submissions to the Court in presenting the overall tone of the correspondence which passed between the parties prior to the filing of the Writ and New York Complaint. Mr. Potts QC, adopting a line by line approach, sought to expose Mr. Clingerman's acknowledgment of Bermuda as the appropriate forum and his intention to negotiate, mediate and /or prosecute his claims in Bermuda, by reference to his two letters before action. These letters (save any without prejudice correspondence) were exhibited in Mr. Hughes' second affidavit.

52. It is of pivotal importance, the Plaintiffs say, that the Writ was filed months prior to the New York Complaint because this establishes that the Defendants in so doing "irrevocably submitted" to the jurisdiction of the Bermuda Courts.

53. The Plaintiffs accused Mr. Clingerman of misleading the Court in suggesting that the Bermuda proceedings consist only of the issuance of a protective writ and they are not being substantively advanced. By illustration, Mr. Hughes points to Mr. Clingerman's application to amend the Writ to add the Company as a second Plaintiff to those proceedings. The amendment was granted by Hargun CJ on 20 May 2019. It is also argued that Mr. Clingerman's participation in the pending application where objections are taken to MJM's legal representation of him and/or the Company demonstrates that the Bermuda proceedings are in fact being actively pursued.

54. Mr. Hughes also turned to Mr. Clingerman's use of US federal statute discovery provisions as proof of his intention to actively pursue the Bermuda proceedings. An application under

section 1782 of title 28 of the United States Code was used by Mr. Clingerman to obtain discovery in furtherance of the Bermuda proceedings. (No dispute turns on the powers conferred on a litigant under §1782 to obtain evidence for use in proceedings outside of the United States.) Mr. Hughes quoted the following from the §1782 application documents:

'*The requested relief is for the purposes of obtaining necessary discovery in aid of a proceeding currently pending in the Supreme Court of Bermuda.... ...The Petitioner seeks to use the documents he requests from the Subpoenaed Entities in the Bermuda and .... Proceedings*.'

…

'*The proceedings giving rise to the Receivership Order remain active and ongoing ("the Bermuda Proceeding"). I have filed this Application under 28 U.S.C. § 1782 to obtain discovery relating to the assets of the M3 Fund, in aid of the Bermuda Proceeding… ... In addition to the Bermuda Proceeding, I intend to use relevant materials obtained through this application in aid of…*'

55. Without the need for a detailed narrative, Mr. Elkinson informed the Court that the use of the section 1782 discovery provision was in aid of Switzerland proceedings separate and distinct from the Bermuda action.

***<u>Whether Apex or the Fund Engaged in Exposure to US jurisdiction prior to NY Action</u>***

56. Mr. Clingerman suggested in his affidavit evidence that Apex demonstrated an '*indifference to actions that may expose them to the United States' jurisdiction*' by reference to a 10 April 2013 letter from Apex to Interactive Brokers LLC in Chicago. The letter, in its material part provides:

***Silk Road Funds Limited – Silk Road M3 Fund ("the Company")***

*We confirm that the Company is a licensed Investments Institution within the jurisdiction of the islands of Bermuda, having its Registered Office at 20 Reid Street, 3rd Floor Williams House, Hamilton HM 11, Bermuda. We further confirm that the Company is regulated by the Bermuda Monetary Authority and is in good standing.*

*Please do not hesitate to contact us if you have any queries or require additional information.*

57. Mr. Hughes in his evidence described this as a mere 'comfort letter' in support of the Company who sought to open an account with Interactive Brokers. The Plaintiffs contend that nothing in this letter can be correctly stated to expose Apex or Mr. Hughes to US jurisdiction. Mr. Hughes further refuted Mr. Clingerman's notion of Apex's indifference to

such exposure by pointing to Apex's corporate structure which he described to be a specific avoidance of US jurisdiction.

58. Mr. Clingerman sought to reveal Apex as a transnational enterprise made up of 24 jurisdictions including New York, citing from the website address www.apexfundservices.com. In describing Apex's corporate structure, Mr. Hughes clarified that Apex belongs to a wider group of companies which has a global presence inclusive of New York. However, Mr. Hughes urged that the wider Apex group of companies not be confused with Apex (Bermuda), the first Plaintiff, which has no presence in New York or direct links with any of the groups US companies. To support his position, Mr. Hughes added that even the New York Apex Complaint was served on Apex in Bermuda. (Mr. Hughes reserves his right in the New York proceedings to challenge the effectiveness of service and whether service was in compliance with provisions of the Hague Convention.)

59. Mr. Hughes explained that Apex is a wholly owned subsidiary of a UK company, which in turn is a wholly owned subsidiary of a Bermuda exempt holding company, Apex Fund Services Holdings Ltd. ("Apex Holdings"). Apex Holdings, as parent company to Apex, had one Mr. Georges Boivin under its employment as General Counsel. Mr. Clingerman alerted to Mr. Boivin's email signature which lists a New York location. Mr. Clingerman described Mr. Boivin as a potential witness and custodian of documents, all relevant to whether the Plaintiffs knew about Mr. Ali's history of fraud. Copies of email exchanges to which Mr. Boivin was party were produced by Mr. Clingerman as a sample illustration of his possible trial value. In rebuttal, Mr. Hughes, however, deposed that having conferred with Mr. Boivin, it is his information that Mr. Boivin had no involvement with Mr. Ali prior to the termination of Apex's role with the M3 Fund and that Mr. Boivin has no recollection of having had any other involvement with the disputed issues until the letter before action was received in August 2018.

60. More than fleeting references were made by Counsel during oral submissions to Apex's ownership of Apex Investment Consulting (Shanghai) Limited ("Apex (Shanghai)"). Mr. Hughes deposed that Apex delegates the day-to-day administration of the M3 Fund to Apex (Shanghai) pursuant to a sub-delegation arrangement. A copy of the sub-delegation agreement was produced by Mr. Clingerman. Mr. Elkinson relied on this structure to challenge Apex's claim to its purely Bermudian nature.

61. There was some contention on the evidence as to whether the Plaintiff, Apex, was involved in litigation in Pennsylvania between SEI Investments Company and a John Lumley. Without the need to rehearse the parties' detailed points, it is sufficient to say that Apex denies ever having been involved in this litigation.

***Convenience and Availability of Evidence at Trial in Bermuda***

62. The Plaintiffs strenuously disputed that a New York forum would be advantageous over Bermuda proceedings from a document production perspective. Mr. Hughes shared that

access to documentary evidence from Apex (Shanghai), much of which is already under the Plaintiffs' possession and control, would be more likely in Bermuda proceedings.

63. As for the relevant witnesses' location, the Plaintiffs criticize Mr. Clingerman for having overstated the value of Mr. Boivin and that of Mr. Ali's wife, to the extent that a spouse cannot generally be compelled to give evidence.

64. Mr. Hughes also referred to the powers of the Supreme Court to issue Letters Rogatory (under section 27Q of the Evidence Act 1905) and to take evidence by video-link. (By way of insert, I note that the Evidence (Audio Visual Link) Act 2018 is not in force. However, there have been some occasions where the Bermuda Courts have previously exercised their discretion in favour of receiving evidence remotely in circumstances where no real contention arose between the parties in so doing.)

## The Relevant Law

### *The Legal Test for Granting an Anti-suit Injunction at the Interlocutory Stage*

65. The general powers of the Court to grant an interlocutory injunction are stated in section 19(c) of the Supreme Court Act 1905.

66. Section 19(c) of the Supreme Court Act 1905 provides:

*"…an injunction may be granted, or a receiver appointed, by an interlocutory order of the court in all cases in which it appears to the Court to be just or convenient that such order should be made; and any such order may be made either unconditionally or upon such terms and conditions as the court thinks just…"*

67. For reasons of comity, which I shall further explore, the Courts have traditionally treaded with great caution when considering whether to grant an anti-suit injunction to restrict or otherwise restrain foreign Court proceedings. Unsurprisingly, the threshold test at the interlocutory stage for determining whether a right to an anti-suit injunction arises is more burdensome than the test applicable to an ordinary interlocutory injunction (i.e. the 'serious issue to be tried test' set by Lord Diplock in *American Cyanamid v Ethicon Ltd [1975] A.C. 396*) or even that which applies to a Mareva interlocutory injunction ("a good arguable case").

68. Mr. Potts QC submitted in his oral submissions that the test for a mandatory injunction compelling a defendant to take a positive step to end or discontinue foreign proceedings is at the higher end of the spectrum (without the precision of a percentage range basis) because of the irremediable consequences which come with such mandatory injunctive relief. He proposed the following question as a restatement of the requisite test: 'Do you feel a sufficiently high degree of comfort or satisfaction that the interim relief is likely to be made permanent at the trial?'

69. I dare say that Mr. Potts QC's phraseology, as temptingly simplistic as it may be, is a nebulous rendition of the correct approach. I am equally anguished to place undue emphasis on the distinction Counsel invited this Court to draw between the test applicable to a mandatory against the relevant test which applies to a prohibitory anti-suit injunction. The effect of both forms of injunctive relief lead to the same result and end point: the refusal of access to foreign court proceedings. In granting an interlocutory anti-suit injunction, the Court must be confident that the probability of the Plaintiff establishing a legal or equitable right to an anti-suit injunction is indeed high. Again, this is a higher burden than that imposed by the 'arguable', 'strongly arguable', or 'good arguable' test associated with other forms of injunctive relief.

70. Mr. Potts QC referred to *In Transfield Shipping Inc v Chiping Xinfa Huayu Alumina [2009] EWHC 3629 (QB) at [53]* where Mr. Justice Christopher Clarke sitting in the Queen's Bench Division of the English High Court imparted a careful analysis and colourful array of previous cases sampling various judicial statements consistent with my findings on how the test is to be applied:

*The test*

*51.The only basis upon which the court could in this case make an anti-suit injunction is on the grounds that there is, probably is, or arguably is between the parties an agreement which binds them to have their disputes decided in London arbitration. That begs the question as to whether at the interlocutory stage what has to be shown is an arguable case, a strongly arguable case, a case with a high probability of success or a case described by some other adjective or description.*

*52.In my judgment, the appropriate test is whether or not the applicant has shown on the material adduced at the interlocutory hearing a high degree of probability that there was such an agreement. It is one thing to enforce a clear agreement to arbitrate or one which on an interlocutory basis can be seen to be highly likely to be established. It is another to restrain a party from litigating in a foreign country where the position is less clear than that. The effect of any such order is likely to be final in the sense that if granted until after an arbitral hearing, it will preclude the enjoined party from contending that there was no such agreement otherwise than before the arbitral tribunal and, if the tribunal rules that there was such an agreement, from disputing its existence.*

*53.Mr O'Sullivan submitted correctly that it is only where the English court can point with confidence to a contractual promise not to litigate elsewhere that it can be justified in interfering with a party's right to bring its claim in such other place as might accept jurisdiction. There is decided authority to that effect.*

*54.In American International Specialty Lines Insurance Co v Abbott Laboratories [2004] Lloyd's Insurance and Reinsurance Reports 815*[3]*, Cresswell J added certain propositions to*

[3] Mr. Potts QC directed the Court's attention to this judgment at page 275 para 8: "…the applicant must show to a high degree of probability that its case is right, and that it is entitled as of right to restrain the foreign proceedings…"

*those set out in the speech of Lord Bingham in Donohue v Armco [2001] UKHL 64 in the following terms:*

> *"6. There is no difference in principle between an injunction to restrain proceedings in breach of an arbitration clause and one to restrain proceedings in breach of an exclusive jurisdiction clause. The justification for the grant of the injunction in both cases is that without it the claimant will be deprived of its contractual rights in a situation in which damages are manifestly an inadequate remedy (see The Angelic Grace, [1995] 1 Lloyds Rep 87 at 96, Millett LJ.)*
>
> *7. It would be inappropriate to grant an interlocutory injunction to restrain foreign proceedings at a time when it is no more than arguable that they were brought in breach of contract, because it could not be said that such proceedings were vexatious or oppressive (see Clarke LJ in National Westminster Bank v Utrecht-America Finance Company [2001] 3 All ER (Comm) 7).*
>
> *8. On an application to restrain foreign proceedings brought in (alleged) breach of an arbitration agreement alleged to be governed by English law, the applicant must show to a high degree of probability that its case is right and that it is entitled as of right to restrain the foreign proceedings (see Coleman J in Bankers Trust CovPT Mayora Indah (20 January 1999, unreported) and Cresswell J in Bankers Trust Co v PT Jakarta International Hotels and Development [1999] All ER (Comm) 785)."*

*55.In Midgulf International Ltd v Groupe Chimique Tunisien [2009] 2 Lloyd's Rep 411, Teare J said: "This is a case where an anti-suit injunction is sought at the interlocutory stage of proceedings. However, if the injunction is granted its effect is likely to be final because it will end the Tunisian proceedings and enable the arbitration proceedings to be completed. In such circumstances this court has required the applicant for an anti-suit injunction to establish 'a high degree of probability' that its case against the respondent is right and that it is indeed entitled as of right to restrain the respondent from taking proceedings abroad."*

*56.Teare J then held that Midgulf's "strongly arguable" case was not sufficient because it ultimately depended on evidence about the content of certain telephone conversations. He said:*

> *"The court is not therefore able to reach the conclusion that Midgulf has established 'a high degree of probability' that its case against GCT, that the July contract included a London arbitration clause, is right and that it is therefore entitled as of right to restrain GCT from taking proceedings in Tunisia. I accept that Midgulf has a strongly arguable case to that effect but that is not sufficient in the present context for the reasons stated in Bankers Trust v Jakarta and American International Speciality Lines Insurance v Abbott Laboratories. That would suggest that the anti-suit injunction granted ex parte on notice by Burton J must be refused."*

*57.Teare J held, however, that on the particular facts of that case there was doubt as to whether the Tunisian court would decide the question as to whether the relevant contract*

*contained a London arbitration clause. The reason the Tunisian was not prepared to decide that question, in a judgment it had given on GTC's application for a declaration that there was no arbitration agreement between the parties, is not entirely clear but appears to have been either on the basis that the arbitral tribunal itself must decide the question or as a result of a provision of the Tunisian Constitution that the court not decide that question in a declaratory action. In those rather unusual circumstances, Teare J held that the appropriate course on case management grounds was to order a speedy trial of the issues as to the terms on which the July contract was agreed and to continue the anti-suit injunction until then.*

*58.In Youell v Kara Mara, Aiken J (as he then was) adopted the good arguable case test, but the matter appears not to have been the subject of any specific argument.*

*59.I accept that Transfield has a good arguable case that there is a binding charter party agreement containing a London arbitration clause, but I am not persuaded that there is a high probability of it establishing that that is so. My reasons for that conclusion are these...*

***<u>The Various Sources of Law which give rise to an Entitlement to an Anti-Suit Injunction</u>***

71. An application for injunctive relief is made under Order 29/1 of the Rules of the Supreme Court 1985 (RSC):

***29/1 Application for injunction***
*1 (1) An application for the grant of an injunction may be made by any party to a cause or matter before or after the trial of the cause or matter, whether or not a claim for the injunction was included in that party's writ, originating summons, counterclaim or third party notice, as the case may be.*

*(2) Where the applicant is the plaintiff and the case is one of urgency such application may be made ex parte on affidavit but, except as aforesaid, such application must be made by motion or summons.*

*(3) The plaintiff may not make such an application before the issue of the writ or originating summons by which the cause or matter is to be begun except where the case is one of urgency, and in that case the injunction applied for may be granted on terms providing for the issue of the writ or summons and such other terms, if any, as the Court thinks fit.*

72. The law on anti-suit injunctions is unique and dichotomous in character. The Bermuda Courts are by no means a stranger to the grant of anti-suit injunctions as a measure of enforcement of arbitration agreements or exclusive jurisdiction clauses under general contract law. However, reported decisions from the Bermuda Courts are far fewer in number where it concerns the Court's equitable jurisdiction in determining an application to injunct a party from suing in foreign proceedings on the grounds that such proceedings are vexatious, oppressive and/or unconscionable. (See Chapter 22 paras 22.33-22.35 on Anti-suit injunctions in Bermuda in Offshore Commercial Law in Bermuda Second Edition Edited by Ian R.C. Kawaley).

73. As a starting point, there is no general protective right which shelters a Bermuda litigant (i.e. a litigant over whom the Bermuda Court has *in personam* jurisdiction) from being sued outside of Bermuda. The barricade against foreign litigation proceedings may arise as a contractual right or a statutory right. Alternatively, an anti-suit injunction may be sought under the principles of equity wherein lie the grounds that to allow the continuation of the litigation in question would give rise to a vexatious, oppressive and/or unconscionable result.

74. Stuart Smith J.A. in delivering the judgment of the Bermuda Court of Appeal in *IPOC International Growth Fund Ltd v OAO "CT-Mobile" LV Finance Group (Civil Appeal number 22 and 23 of 2006, judgment dated 23 March 2007)* assorted between principles governing contractual and non-contractual anti-suit injunctions:

"*It is common ground that there are two categories of anti-suit injunction. The first is where the claimant has no contractual right to have the defendant restrained from pursuing foreign proceedings. This is referred to as the non-contractual type. The second type is where the claimant has a contractual right, founded on an agreement between the parties, that the defendant will not litigate in any state or forum save that agreed. These are commonly exclusive jurisdiction or arbitration agreements, and are referred to as contractual cases.*"

***The Law Applicable to a Non-Contractual Anti-Suit Injunction***

75. In *Glencore International AG v Exter Shipping Ltd QB [2002] CLC 1090 at p. 1103* Rix LJ in delivering the unanimous judgment of the English Court of Appeal helpfully dissected the subject of jurisdiction into four separate components: (i) the question of *in personam* jurisdiction; (ii) a question arising out of legal procedure and invoking the Court's inherent jurisdiction; (iii) the statutory source of the power to grant an anti-suit injunction under section 37(1) of the English Supreme Court Act 1981 and (iv) the jurisdictional conditions precedent which the jurisprudence of the courts has imposed on the use of section 37(1).

76. Section 37(1) enables the English Courts to grant an injunction '*in all cases in which it appears to the court to be just and convenient to do so*'. This test is higher than the test imposed by section 19(c) of the Bermuda Supreme Court Act 1905 which empowers the Court to grant an interlocutory injunction '*in all cases in which it appears to the court to be just or convenient that such order should be made*'.

77. In examining the proper usage of section 37(1) in the context of an anti-suit injunction, Rix LJ held:

"*42. ...However, jurisprudence has limited the conditions under which such an injunction may be regarded as 'just and convenient'. The following conditions are necessary. First the threatened conduct must be 'unconscionable'. It is only such conduct that founds the right, legal or equitable but here equitable, for the protection of which an injunction can be granted. What is unconscionable cannot and should not be defined exhaustively, but it includes conduct which is 'oppressive or vexatious or which interferes with the due process of the court' (per Lord Brandon of Oakbrook, South Carolina at p. 41D). The underlying principle is one of justice in support of the 'ends of justice' (per Lord Goff of Chieveley,*

*Société Aérospatiale at pp. 892A, 893F). It is analogous to 'abuse of process'; it is related to matters which should affect a person's conscience (per Lord Hobhouse of Woodborough, Turner v Grovit at para. 24). Secondly, to reflect the interests of comity and in recognition of the possibility that an injunction, although directed against the respondent personally, may be regarded as an (albeit indirect) interference in the foreign proceedings, an injunction must be necessary to protect the applicant's legitimate interest in English proceedings; he must be a party to a litigation in this country at which the unconscionable conduct of the party to be restrained is directed, and so there must be a clear need to protect existing English proceedings (ibid. at para. 27-28; Airbus v Patel). It follows that the natural forum for the litigation must be in England, but this, while a necessary, is not a sufficient condition.*

*43. While these are the conditions (and in this sense may be said to go to jurisdiction) for the grant of an anti-suit injunction, at a secondary stage, that of the exercise of discretion, these principles will be again respected. Thus, for reasons again of comity, the court will always exercise caution before granting an injunction (but cf. The Angelic Grace [1995] 1 Ll Rep 87 in cases dealing with contractual arbitration and jurisdiction clauses). Moreover, because the court is concerned with the ends of justice, the respondent will always be entitled to show why it would nevertheless be unjust for an injunction to be granted (Société Aérospatiale at pp. 896F-G; Dicey & Morris (30th edn, 2000), at para. 12-064).*

78. The criteria outlined in *Glencore* were approved by Bell J (as he then was) in *Starr Excess Liability Insurance Company Ltd v General Reinsurance Corp [2007] Bda L.R.34.* There emerged a compendious three part test for the granting of an anti-suit injunction:

(i) the defendant must be subject to the jurisdiction of the Bermuda Courts;

(ii) the natural forum for the determination of matters in issue must be Bermuda; and

(iii) The conduct of the defendant which the claimant seeks to restrain must be unconscionable, vexatious or oppressive.

79. In *Star Excess* the Defendant, a Delaware incorporated business void of any presence in Bermuda, applied to set aside an *ex parte* anti-suit injunction granted in favour of the Plaintiffs, one of which was a company licensed to operate and conduct insurance and reinsurance business in Bermuda. The underlying dispute concerned the construction and scope of the Bermuda arbitration clause contained in a Casualty Quota Share Reinsurance Contract which governed the parties. This point arose after the Plaintiff served the Defendant with a notice of arbitration pursuant to the Bermuda International Conciliation and Arbitration Act 1993 ("the 1993 Act"). The Defendant's position was that the 1993 Act did not govern the dispute. While both parties agreed that the dispute itself was governed by New York law, the jurisdictional governance of the procedural law remained contentious.

80. The Defendant commenced proceedings before the Supreme Court of the State of New York one month later for an order declaring the scope and construction of the arbitration clause. It was against these New York proceedings, that the Plaintiff sought anti-suit injunctive relief in the Bermuda Supreme Court.

81. In considering whether the Defendant was subject to the jurisdiction of the Bermuda Courts, Bell J found that the arbitration clause was in fact evidence of the parties' agreement that the arbitration of its dispute (i.e. the dispute about the scope and construction of the clause itself) would take place in Bermuda, thereby giving the Court *in personam* jurisdiction over the Defendant and rendering the Bermuda Court the forum for the dispute. As to the third and final piece of the test, the Court found that the anti-suit injunction arose as a contractual right and referred to the 23 March 2007 *IPOC* judgment where the Court of Appeal rejected the proposition that the principles applicable to non-contractual anti-suit injunctions applied to contractual cases.

82. An assertion of a non-contractual equitable right to an anti-suit injunction must be reconciled with the doctrine of comity because the relationship between these legal beings is clearly prone to confrontation. The origins of the doctrine of comity span nearly two and a half centuries and apply worldwide today. In principle it protects the mutual assistance and recognition of law between courts of different jurisdictions so to protect against intrusion on to the sovereignty of other nations.

83. Lord Mansfield is reported to have first recognized the principles now referred to as 'comity' in *Somerset v Stewart Easter Term, 12 Geo.3,177, K.B. (Easter Term, May 14, 1772)* where he considered a habeas corpus application made by an African slave given the name 'Somerset'. Mr. Somerset had been enslaved in Virginia but was forcibly transported to England by his American slave-master, Mr. Stewart. When the time came to return to the United States, the shackled slave was hauled onto Captain Knowles' vessel for his return to Virginia. However, Mr. Somerset, in all his courage, applied to the Kings Bench Division of the English Court for release from Captain Knowles.

84. Lord Mansfield held that the foreign law permitting the trading of slaves would only be recognized if it arose as a contractual right or was sourced by some other form of 'positive law'. At page 510 of the reported judgment, he stated:

> *"The power of a master over his slave has been extremely different, in different countries. The state of slavery is of such a nature, that it is incapable of being introduced on any reasons, moral or political; but only positive law, which preserves its force long after the reasons, occasion, and time itself from whence it was created, is erased from memory: it's so odious, that nothing can be suffered to support it, but positive law. Whatever inconveniences, therefore, may follow from a decision, I cannot say this case is allowed or approved by the law of England; and therefore the black must be discharged."*

85. A baseline requirement for the granting of an anti-suit injunction is that the jurisdiction of the Court hearing the application is a natural and appropriate forum for the substantive dispute.

86. In *Airbus Industrie G.I.E. v Patel and Others [1999] 1 A.C. 119 (HL)* the Defendants to an anti-suit injunction were representatives of two families of British citizenship and Indian origin who had been killed in Airbus A-320 which crashed at Bangalore (also known as Bengaluru) airport in India on 14 February 1990. A court of inquiry in India found that the cause of the crash was attributable to the error of the two pilots who also died in the ill-fated

crash. The aggrieved Defendants sued the employers of the pilots and the airport authority in India. They further commenced Texas proceedings against Airbus Industrie ("Airbus"), who had designed and assembled the aircraft in Toulouse, France. Later consolidated in the Texas proceedings with the action against Airbus and others was a similar suit made on behalf of three American passengers who also died in the same crash.

87. Although Airbus obtained an anti-suit injunction from the Bangalore Civil Court restraining proceedings against it outside of India, it seems that it was unable to obtain recognition of the Bangalore judgment by the Texan Court. Airbus thence filed an originating summons in the English Court for recognition of the Bangalore Civil Court judgments and for anti-suit injunctive relief restraining the continuation of the proceedings in Texas. At first instance Colman J refused the applications brought by Airbus but the English Court of Appeal reversed him in favour of Airbus. However, in the final tier of the English litigation the House of Lords ruled against Airbus on the basis that the English Court had no interest in the underlying dispute.

88. The submissions made before the House of Lords by Mr. Sydney Kentridge Q.C., Mr. Jeremy Russell Q.C and Ms. Poonam Melwani (now QC) are recorded at page 121 Paras C-H as follows:

"*Both on policy grounds and as a matter of law, an English court should restrain proceedings in one foreign jurisdiction in favour of proceedings in another jurisdiction. As to policy, the twin tests laid down in Société Nationale Industrielle Aérospatiale v Lee Kui Jak [1987] A.C. 871 are linguistically capable of application in the situation where the English court, being neither the, nor even a, natural forum for the dispute, is being asked to adjudicate between two or more competing for a. However, as a matter of comity and public policy the court should not seek to resolve such jurisdictional conflicts but should leave it to the foreign fora to resolve their differences as best they can…*

…

*As to the law, it is a prerequisite to the exercise of the power to issue an anti-suit injunction that the court being requested to do so is the, or at least a, natural forum for the dispute: see the Aérospatiale case, p. 896F-G…*

*This approach is particularly apposite when the underlying facts and the substantive dispute have no connection with England and the English court is simply being asked to act as referee between competing for a. However, inadequate the system of justice may be in the foreign court, the English courts still should not take it on themselves to act as policeman of the world.*

89. Mr. Michael Crane QC and Mr. Akhil Shah (now QC) for the Plaintiffs argued that France would be an appropriate forum for the substantive dispute given the nature of the putative claims and that it would be wrong to deny the English Courts the power to grant an anti-suit injunction where a contract state to the Brussels Convention had jurisdiction. Counsel submitted that the English Courts had personal jurisdiction over the English resident Defendants who were threatening to cause injustice by suing a French domiciliary in an inappropriate jurisdiction. Through their Counsel, the Airbus plaintiffs further argued that

because the Texas Courts had no ability to decline jurisdiction based on the principles of *forum non conveniens* that the English Courts should step in on this exceptional case as the only Court with personal jurisdiction over the Defendants/Texan Plaintiffs, Patel et al. Mr. Crane QC also described a Texan trial as unjust given that Texas had not connection with the alleged tortious conduct, the accident or the damage caused by it. Concerns were also raised as to the governance of Texan law which could expose Airbus to awards of punitive or exemplary damages taking contingency fee arrangements into account.

90. Lord Goff of Chieveley recognized the distinct legal pathways between that which is associated with the civil law of continental Europe on the one hand and the common law world on the other. The purpose of the Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters (1968) ("the Convention") (which was imported into domestic English law) was to avoid clashes between the jurisdictions of member states of the EU Community. The common law, however, restricts access to the different common law jurisdictions through the principles underlying the doctrine of *forum non conveniens,* so that cases will only be brought in a jurisdiction which is appropriate for their resolution. Each common law jurisdiction is treated as an independent sovereign in its own right. By further contrast to the civil law system under the Convention, Lord Goff observed that parallel proceedings in different jurisdictions was not of themselves regarded as unacceptable under the common law approach.

91. In setting out the unanimous holding of their Lordships in *Airbus Industrie G.I.E*., Lord Goff stated at pages 140H-141A-C:

"*…So Airbus is simply relying on the English court's power of itself, without direct reliance on the Indian court's decision, to grant an injunction in this case where unusually, the English jurisdiction has no interest in, or connection with, the matter in question. I am driven to say that such a course is not open to the English courts because, for the reasons I have given, it would be inconsistent with comity. In a world which consists of independent jurisdictions, interference, even indirect interference, by the courts of one jurisdiction with the exercise of the jurisdiction of a foreign court cannot in my opinion be justified by the fact that a third jurisdiction is affected but is powerless to intervene. The basic principle is that only the courts of an interested jurisdiction can act in the matter; and if they are powerless to do so, that will not of itself be enough to justify the courts of another jurisdiction to act in their place. Such are the limits of a system which is dependent on the remedy of an anti-suit injunction to curtail the excesses of a jurisdiction which does not adopt the principle, widely accepted throughout the common law world, of forum non conveniens*."

92. In the judgment of the Privy Council in *Société Nationale Industrielle Aérospatiale v Lee Kui Jak [1987] A.C. 871* Lord Goff reiterated, albeit in *obiter dictum*, that as a general rule, the Court granting the injunction must conclude that it is the natural forum for the trial of the action.

93. Sitting in the Supreme Court of Canada, Sopinka J. stated in *Amchem Products Inc. v British Coloumbia (Workers' Compensation Board) [1993] 1 SCR 897 at p. 931* (which was cited with approval by Lord Goff in the *Airbus Industrie* case at p. 135D):

"*If the foreign court stays or dismisses the action there, the problem is solved. If not, the domestic court must proceed to entertain the application for an injunction but only if it is alleged to be the most appropriate forum and is potentially an appropriate forum.*"

94. In *Airbus Industrie* at p. 134D Lord Goff highlighted the importance of a Defendant's conduct and conjoined the terms 'vexatious' and 'oppressive' with alternative forum cases and the term 'unconscionable' with a single forum case:

"*In alternative forum cases, it has been stated that the jurisdiction will be exercised as the ends of justice require, and in particular where the pursuit of the relevant proceedings is vexatious or oppressive; in single forum cases, it is said that an injunction may be granted to restrain the pursuit of proceedings overseas which is unconscionable. The focus is, therefore, on the character of the defendant's conduct, as befits an equitable remedy such as an injunction.*"

95. At p. 139E in *Airbus Industrie* Lord Goff recited further passages from the Canadian judgment *Amchem Products Inc.* and observed that the below recital would only apply to alternative forum cases:

*"...In a case in which the domestic court concludes that the foreign court assumed jurisdiction on a basis that is inconsistent with principles relating to forum non conveniens and that the foreign court's conclusion could not reasonably have been reached had it applied those principles, it must go then to the second step of the [Aérospatiale] test" – i.e., whether to grant an injunction on the ground that the ends of justice require it.*

96. Counsel also referred me to the decision of Tuckey LJ in Base Metal Trading Ltd v Shamurin (CA) [2005] 1 WLR at p. 1172 where the English Court of Appeal preferred the global overview of the events giving rise to the cause of action when determining the forum at para 46:

"*…The place where the loss occurs is not determinative. When damage has occurred which makes the tort complete the right approach is to look back over the series of events constituting it and ask where in substance the cause of action arose: see Distillers Co (Biochemicals) Ltd v Thompson [1971] AC 458, 468*…"

97. As to the legal position on the personal jurisdiction of a company with subsidiaries carrying on business in various jurisdictions worldwide, the Court was invited to consider the ruling of Ground CJ in *Bacardi Limited v Rente Investments Limited [2005] Bda L.R. 60 at p. 40 para 30*:

"*To establish jurisdiction in the Florida court for these purposes the applicant would have to show that Bacardi was either incorporated there, had established a place of business there, or (possibly) was in fact governed from there.*

*Bacardi is plainly not incorporated in Florida, and it is not argued otherwise. There is no evidence that it, as opposed to its subsidiaries, maintains a place of business or conducts business there. On the other hand it may well be, and I accept for the purposes of this application, that it has trading subsidiaries who do carry on business in Florida. I do not think, however, that the business of the subsidiaries can be treated as that of Bacardi itself. The evidence is that the group is carefully structured to separate the holding company from its various trading subsidiaries throughout the world. There is nothing in the evidence to suggest that those subsidiaries should be regarded as the agents of the parent. It seems to me a classic example of the principles considered in Adams v Cape Industries plc [1990] BCLC 479 at 513 per Slade LJ:*

> "*If a company chooses to arrange the affairs of its group in such a way that the business carried on in a particular foreign country is the business of its subsidiary and not its own, it is, in our judgment, entitled to do so. Neither in this class of case nor in any other class of case is it open to this court to disregard the principle of Salomon v Salomon & Co. Ltd. [1897] AC 22.*" "

***<u>The Law Applicable to a Contractual Anti-suit Injunction</u>***

98. I now turn to the legal position which applies to what is commonly referred to as the contractual anti-suit injunction. The Courts will be less troubled in finding that the test set under section 19(c) of the Supreme Court Act 1905 is satisfied (i.e. it will be just and convenient to grant an anti-suit injunction) where the source of the power to make the order arises as a clear contractual right given to a plaintiff.

99. Mr. Potts QC, in his written submissions, suggests that the criteria set by Rix J in the *Glencore* case apply to all applications for an anti-suit injunction, whether contractual or non-contractual. The third limb of the criteria, as rehearsed by Bell J in the *Star Excess* case holds: "*The conduct of the defendant which the claimant seeks to restrain must be unconscionable, vexatious or oppressive*". However, at paragraphs 28-29 in *Star Excess* Bell J states:

"28. *And Stuart-Smith J.A. in IPOC rejected the argument that the principles applicable to the grant of non-contractual anti-suit injunctions also applied in contractual cases, relying upon the judgment of Millett, L.J. in <u>The Angelic Grace [1995] 1 Lloyd's Law Reports 87 at 96</u> in the following terms:-*

> "*I agree and wish only to add a few observations of my own on the approach which the Court should adopt when asked to exercise its undoubted jurisdiction to restrain a party from taking or continuing proceedings in a foreign court in breach of an agreement to refer the dispute to arbitration.*
>
> *In my judgment the time has come to lay aside the ritual incantation that this is a jurisdiction which should only be exercised sparingly and with great caution. There have been many statements of great authority warning of the danger of given (sic) an appearance of undue interference with the proceedings of a foreign Court. Such*

*sensitivity to the feelings of a foreign Court has much to commend it where the injunction is sought on the ground of forum non conveniens or on the general ground that the foreign proceedings are vexatious or oppressive but where no breach of contract is involved. In the former case, great care may be needed to avoid casting doubt on the fairness or adequacy of the procedures of the foreign Court. In the latter case, the question whether proceedings are vexatious or oppressive is primarily a matter for the Court before which they are pending. But in my judgment there is no good reason for diffidence in granting an injunction to restrain foreign proceedings on the clear and simple ground that the defendant has promised not to bring them.*"

*29. The Chief Justice recently relied upon the judgment quoted above in granting an ex parte interlocutory injunction to restrain defendants from proceeding with an action in the United States in breach of an arbitration clause, saying:-*

*"As to the claim for an injunction, when it comes to enforcing an arbitration clause by anti-suit injunction the courts will act robustly." (ACE Bermuda Insurance Ltd v Continental Casualty Company, Civil Jurisdiction number 41 of 2007, Ruling dated 19 February 2007)." "*

100. In the English Court of Appeal case <u>Sabah Shipyard v Republic of Pakistan [2004] 1 CLC</u>, the claimant, a company incorporated in Pakistan and referred to as "Sabah" entered an implementation agreement ("the IA") with the Government of Pakistan ("the GOP") in 1996. Under the IA, the GOP provided Sabah with a guarantee. Sabah also entered into a contractual agreement with a Pakistan State owned corporation "KESC" under what was termed a Power Purchase Agreement ("the PPA"). It came to pass that KESC drew on letters of credit extended to Sabah under the PPA. Sabah relied on the defence of *force majeure* and instituted arbitral proceedings against both the GOP and KESC. At its conclusion, Sabah obtained a significant award against KESC for breach of contract under the PPA and brought a claim against the GOP in the English High Court for the guarantee under the IA. The guarantee under the IA contained a non-exclusive English Court jurisdiction clause for the resolve of disputes between Sabah and the GOP.

101. The GOP issued parallel proceedings in Pakistan seeking a permanent injunction to restrain Sabah from commencing proceedings in England for a demand under the guarantee. However, the English Court of Appeal upheld the judge's decision to refuse the stay of proceedings and found that he had rightly construed the waiver of sovereign immunity by the GOP in the guarantee as extending to consenting to the grant of an interim injunction restraining the Pakistan proceedings.

102. The English Court of Appeal in construing the non-exclusive jurisdiction clause in the IA considered the intention of the parties and held that parallel proceedings in England and Pakistan could not have been their intention in the absence of exceptional reasons in support thereof. England, of course, was a necessary neutral jurisdiction (as opposed to Pakistan). The Court of Appeal held that the existence of a non-exclusive jurisdiction clause was not sufficient as a ground for granting an injunction. But the terms of the non-exclusive clause would be relevant to whether there was oppression or vexation. The key point in *Sabah*

*Shipyard* was that the Court was moved to consider and determine 'the spirit of the jurisdiction clause agreed'.

103. Mr. Potts QC commended the English Court of Appeal judgment in *Samengo-Turner & Ors v J & H Marsh & McLennan (Services) Ltd & Ors [2007] 2 CLC; EWCA Civ 723* in support of one of his primary arguments that a statutory right to litigate in Bermuda is a sufficient basis for an anti-suit injunction to restrain proceedings outside of Bermuda. Tuckey LJ on behalf of the unanimously agreed Justices of Appeal held at paras 40-44:

*"40. An anti-suit injunction is not a remedy to be dispensed lightly, particularly where the defendants sought to be restrained have brought proceedings in courts of high repute in a friendly foreign state. The injunction of course is directed at the litigating party and not the court. The premise for the remedy is that this party should not be litigating in that court and so the principles of comity are not offended by granting an injunction which does no more than require that party to comply with his legal obligations and ensure for the claimant that he does so. Although this is the correct analysis, one can understand why not everyone would see the situation in quite this way which is why the court should always be cautious before granting such relief.*

*41. We were referred to various English cases which have dealt with these problems in the context of commercial disputes where injunctions have been claimed on the basis of an exclusive jurisdiction clause or forum conveniens. But no case was cited to us where the exclusive jurisdiction of the English court was mandated by statute. Mr. Dunning submitted that where that was so, the case for an injunction was at least as strong as a case based on an exclusive jurisdiction clause. I do not necessarily accept this. In general, if parties agree an exclusive jurisdiction clause they should be kept to their bargain; if, as here, the exclusive jurisdiction of the English courts is imposed by statute it can be said that the case for an injunction is not so strong, particularly where the statute has provided that an agreed exclusive jurisdiction clause is of no effect.*

*42. The converse of this problem arose in OT Africa Line v Magic Sportswear Corp [2005] 1 CLC 923 where a cargo claim under a bill of lading containing an English law and exclusive jurisdiction clause was made in Canada relying on Canadian legislation which allowed such a claim to be made there in spite of the clause. This court granted an anti-suit injunction to restrain the Canadian proceedings on the ground that the parties should be kept to their English law bargain. This is an illustration of the court giving full effect to party autonomy which under Article 23 of the Regulation it is required to do, but under Articles 20 and 21 it cannot. We are in the latter position: we cannot give effect to the exclusive New York jurisdiction clause.*

*43. Doing nothing is not an option in my judgment. The New York court cannot give effect to the Regulation and has already decided in accordance with New York law on conventional grounds that it has exclusive jurisdiction. The only way to give effect to the English claimants' statutory rights is to restrain those proceedings. A multinational business must expect to be subject to the employment laws applicable to those they employ in different jurisdictions. Those employed to work in the MM group in London who are domiciled here*

*are entitled to be sued only in the English courts and to be protected if that right is not respected. There is nothing to prevent MMC and GC or any other company in the MM group from enforcing their rights under the bonus agreements here.*

*44. For these reasons I think we should allow this appeal and grant an anti-suit injunction (the terms of which I hope can be agreed) to restrain the New York proceedings.*
*that a statutory right to litigate in England will justify an anti-suit injunction against foreign proceedings, even if the dispute was otherwise subject to a forum selection clause in favour of the foreign forum. Tuckey LJ (with whom Longmore and Lloyd LLJ agreed) explained that in such circumstances, the Court was faced with a choice between granting an injunction to protect the plaintiff's statutory rights and doing nothing; and that it would not be just to do nothing…*"

104. Both Counsel before me relied on the English High Court decision delivered by Mr. Justice Leggatt in *Dana Gas PJSC v Dana Gas Sukuk Limited et al [2018] EWHC 277 (Comm)* where the Court was faced with competing jurisdiction clauses in a Purchase Undertaking Agreement and Declaration of Trust governed by English law and a Mudarabah Agreement governed by UAE law. The Claimant, "Dana Gas" commenced parallel proceedings in the English High Court ("the English proceedings") and in the Sharjah Court ("the UAE proceedings") for injunctive relief preventing the Defendants from enforcing the Purchase Undertaking. These claims thus presented both Courts the challenge of resolving issues of UAE law as to the validity of the Mudarabah Agreement and the enforceability of the Purchase Undertaking Agreement under English law.

105. Although Dana Gas had decided that the UAE proceedings was the most appropriate forum for the dispute, it sued in England because two of the Defendants (the Trustee concerned with the Declaration of Trust and the Delegate concerned with the Purchase Undertaking Agreement) had not confirmed that they would abide by the injunctive relief granted by the Sharjah Court.

106. Having obtained an interim injunction in both the English and UAE proceedings, Waksman J directed an expedited trial in England and ordered that Dana Gas take all necessary steps to stay the UAE proceedings. Dana Gas all but dragged its feet in bringing the UAE proceedings to a standstill which enabled the Defendants in those proceedings to secure an anti-suit injunction in the UAE Court preventing Dana Gas from further partaking in the English proceedings.

107. The English proceedings continued without the participation of Dana Gas and the English Court, as a preliminary issue, ruled against Dana Gas in finding that the Purchase Undertaking was valid and enforceable as a matter of English law. It is recorded in the judgment that Dana Gas intends to appeal the preliminary ruling and that if it is successful, the English Court would have to resolve the validity of the Purchase Undertaking by applying UAE law.

108. Mr. Gillis QC for Dana Gas argued that the English proceedings should be stayed and that the Court in the UAE is the natural and best forum for questions of its own law and for

matters of public policy in the UAE. Justice Leggatt, although acknowledging that it is generally preferable for questions of law of another country to be decided by the courts of that country, held that it was nevertheless appropriate for the English proceedings to continue. In providing the second of his three main reasons for refusing the stay application, Leggatt J put a marker on the English jurisdiction clause contained in the Declaration of Trust and pointed out clause 9.1 in the Purchase Undertaking Agreement which he rehearsed:

"*The courts of England are to have jurisdiction to settle any disputes which may arise out o or in connection with this Undertaking (and any disputes relating to any non-contractual obligations arising out of or in connection with this Undertaking) (each a 'Dispute') and accordingly any legal action or proceedings arising out of or in connection with this Undertaking… ('Proceedings') may be brought in such courts.*

*The Obligor [Dana Gas] irrevocably submits* (emphasis on the term 'irrevocably submits') *to the jurisdiction of such courts and waives any objection to Proceedings in such courts on the ground of venue, or on the ground that the Proceedings have been brought in an inconvenient forum. These submissions are made for the benefit of the Trustee and the Delegate and shall not affect their rights to take Proceedings in any other court of competent jurisdiction, nor shall the taking of Proceedings in one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction (whether concurrently or not).*"

109. In citing the English Court of Appeal decision of *Continental Bank v Aekos SA [1994] 1 WLR 588*, Leggatt J noted its binding effect and held that clause 9.1 was an exclusive English jurisdiction clause. Mr. Gillis QC did not dispute that the clause in the Purchase Undertaking Agreement conferred exclusive jurisdiction on the English Court for the claims brought by Dana Gas, however, he submitted that the Court could not ignore the non-exclusive UAE jurisdiction clause contained in the Mudarabah Agreement. The English Court noted that the Delegate under the Purchase Undertaking Agreement was not party to the Mudarabah Agreement and that Dana Gas offered an undertaking that it would not pursue any claims in the UAE against the Delegate. This formed part of Leggatt J's reasoning in envisaging that the Delegate's exercise of its entitlement to pursue claims under the Purchase Undertaking Agreement in the English Courts, may lead to the unsatisfactory result where a UAE Court would decide the dispute without regard to the Delegate's claim.

110. Turning his attention to the position on the Trustee, Leggatt J accepted that the existence of the exclusive jurisdiction clause under the Purchase Undertaking Agreement was not necessarily a conclusive factor but noted that it was a '*very strong factor in favour of its claims being dealt with in England*'. Leggatt J further held at paragraphs 32-35 of his ruling, as part of his third main reason for refusing the stay application;

"*32. It is not, in my view, open to a party which brings a claim in this court, which it invites this court to decide, to on the one hand ask the court to give a judgment in its favour but on the other hand to ask the court not to decide certain issues which it is necessary to decide if the claim is to succeed. At all events Judge Waksman took the view that that was an untenable position and put Dana Gas to an election as to whether it wished to have its claim-including the issues of UAE law which had been raised- decided in this court or not. It is*

*clear that Dana Gas chose at that point, if it had not already done so, to invite this court to decide issues of UAE law. It did so by continuing to pursue its claim in this court right up to and with a view to trial, after Judge Waksman had directed that any such trial must include issues of UAE law. If Dana Gas had wished to preserve its right to contend that those issues should more appropriately be decided in a different jurisdiction it should, as it seems to me, have abandoned its claim here once Judge Waksman had made it plain that pursuing its claim here would necessarily involve determination here of the issues of UAE law raised by Dana Gas.*

*33. If anything, the case for those issues being tried here seems to me to be stronger now than it was when Judge Waksman gave directions because the parties have since prepared for a trial of the issues of UAE law. They have served expert evidence and are ready for trial, or at least they were ready for trial in September.*

*34. I also cannot disregard the fact that I have found that Dana Gas bears a significant degree of responsibility for the fact that the trial did not take place as planned in September, and it does not seem to me to be a relevant consideration of justice that Dana Gas should not be permitted to turn the fact that the trial did not then take place to its own procedural advantage.*

*35. For these reasons, I do not consider that the changes in circumstances that have taken place since Judge Waksman's order was made are material or that there is any reason to depart from his decision that all the issues in this case should be tried here.*"

111. Against this background wherein the English Court had found as a preliminary point that England was the appropriate forum for the issues raised before the High Court, Legatt J granted one of the Defendants (BlackRock) its application for an anti-suit injunction restraining Dana Gas from furthering the UAE proceedings on the grounds that it was vexatious and oppressive to advance the same claim at the same time in two different jurisdictions.

112. In *Deutsche Bank AG and another v Highland Crusader Offshore Partners LP and others [2010] 1 WLR 1023*, the English Court of Appeal held that parties would usually be taken to have anticipated and accepted the possibility of parallel proceedings where they agree to a non-exclusive jurisdiction clause without any clear indication prohibiting prior or subsequent (as opposed to simultaneous) proceedings in a non-selected forum.

## Analysis and Reasons for Decision:

113. At this interim stage of the proceedings, I must feel confident, as a pre-requisite to granting the interim relief sought, that the probability of the Plaintiffs establishing an entitlement to an anti-suit injunction, whether it be under the principles of law or equity, is high. Equally, as is the case for any application for an interlocutory injunction, the Plaintiffs must persuade the Court that it would be just *or* convenient to make the order for an anti-suit injunction.

114. The Plaintiffs have asserted a legal and equitable right to an anti-suit injunction. They say that they have a contractual and statutory right for the disputed issues to be adjudicated in this jurisdiction in addition to an equitable entitlement on the grounds that the New York proceedings are unconscionable, vexatious and/or oppressive. I will begin my analysis with reference to the pleaded legal rights.

***Decision on whether there is an entitlement to a Contractual Anti-Suit Injunction***

115. Previous case law of concurrent jurisdiction and binding case law from the Bermuda Court of Appeal promotes that a contractual right to an anti-suit injunction is independent and autonomous from the test on whether proceedings are vexatious or oppressive. Applying the approach of Millett, L.J. in *The Angelic Grace [1995] 1 Lloyd's Law Reports 87 at 96,* as approved by Stuart-Smith JA of the Bermuda Court of Appeal in *IPOC*: If the Plaintiffs could establish a contractual right under the Administration Agreement to an anti-suit injunction, then there would be no good reason for diffidence in granting an injunction to restrain the New York proceedings. However, in this case, the relevant contractual clause is a non-exclusive jurisdiction clause and its construction requires some depth of analysis.

116. Clause 15 on the governing law and jurisdiction of the contract provides that it '*shall be construed and the provisions interpreted under and in accordance with the laws of Bermuda and the parties to this Agreement irrevocably submit to the non-exclusive jurisdiction of the Bermuda Courts'*. How is this to be construed? Mr. Potts QC argued that although this is a non-exclusive jurisdiction clause when considered in isolation, I should find that it can be construed as an exclusive jurisdiction clause in having regard to the Bermuda jurisdiction clause in the Investment Advisory Agreement. He further pointed to the Bermuda exclusive jurisdiction clause at 13.2 in the Company's Bye-laws in addition to the relevant Bermuda statutory provisions under the SACA 2000 which deem the Bermuda Courts to have exclusive jurisdiction unless otherwise stated by a governing contract. Mr. Elkinson, however, protested that the Court should avoid the distraction of contractual and legal provisions that do not mutually govern the parties to this action.

117. It is well established law that extrinsic evidence is admissible as part of the judicial exercise of interpreting ordinary company contracts. The opposite is so when interpreting company bye-laws (see *Arnold v Britton [2016] 1 ALL ER 1 p. 5-6, per* Lord Neuberger PSC; *HSBC Bank Middle East and others v Paul Clarke (as liquidator of the Oracle Fund Limited) and others [2006] UKPC 31*; *McKillen v Misland Cyprus Investments Ltd [2011] EWHC 3466; Kingate Global Fund Ltd (in liquidation) v Kingate Management Ltd [2015] Bda LR 86, per Hellman J* and *Capital Partners Securities Co Ltd v Sturgeon Central Asia Balanced Fund Ltd [2017] Bda LR 78, per Kawaley CJ*). For this reason, I agree with Mr. Potts QC that the Court is entitled to look at the surrounding documents and agreements where to do so would better assist the Court in determining the intention of the contracting parties behind the Administration Agreement clause in question.

118. The Administration Agreement which was made on 1 November 2011 contractually governs the administration services which were provided by the Second Plaintiff, Apex, to

the Second Defendant, the Company. Apex is incorporated and headquartered in Bermuda and the Defendant Company was incorporated in Bermuda under the SACA 2000 just under three weeks prior to the making of the Administration Agreement. Mr. Hughes was a director of both parties to the Administration Agreement. Mr. Clingerman described Mr. Hughes to be the directing mind and will of Apex and co-director of the Company with Mr. Roderick Forrest up until about 18 December 2015.

119. Mr. Hughes, as director of Apex and the Company, is said to have played a role in authorizing the appointment of ECML as a broker of the Fund, where proceeds of the Goodwill investment were transferred. Mr. Ali was the CEO and/or director of ECML. The 31 July 2012 Investment Advisory Agreement governs the investment broker relationship between the Company and ECML, a company registered in Mongolia. Clause 25 of the Investment Advisory agreement is another non-exclusive jurisdiction clause which provides that it '*shall be subject to and construed in accordance with the laws of Bermuda. Disputes arising in connection with this Agreement shall be subject to the non-exclusive jurisdiction of the Courts of Bermuda to which each of the parties hereby submits*'.

120. In construing the parties' intentions behind Clause 15 of the Administration Agreement, I find it striking that both the Administration Agreement and the Investment Advisory Agreement contain non-exclusive Bermuda jurisdiction clauses despite of and in the face of the exclusive Bermuda jurisdiction provision in the SACA 2000. Notably, the exclusive jurisdiction clause in the SACA 2000 is subject to any agreement between the segregated company and another which may contain an alternative jurisdiction clause. The Company Bye-law 13.2 is also expressly made pursuant to the SACA 2000. Hence both sources of law outlining jurisdictional governance subject themselves to the supremacy of a contractual agreement which may provide for a non-exclusive Bermuda jurisdiction clause.

121. I have addressed my mind to the 'the spirit of the jurisdiction clause agreed' as did the English Court of Appeal in the *Sabah Shipyard* case. In my judgment, it is implausible that the Bermuda Plaintiffs and the Bermuda Defendant Company surrendered themselves to the contractual wording *'irrevocably submit to the <u>non-exclusive</u> jurisdiction of the Bermuda Courts'* under the Administration Agreement without having purposefully intended for possible future disputes between themselves to be resolved in and/or outside of Bermuda. For these reasons, having considered the extrinsic evidence before the Court, I reject Mr. Potts QC's invitation for this Court to construe Clause 15 as an exclusive jurisdiction clause.

122. I now move to consider the usage of the contractual phrase '*irrevocably submit'* in the context of a non-exclusive jurisdiction clause. Mr. Potts QC contended that the correct application of the term meant that once the Plaintiff Company in the underlying dispute initiates proceedings in Bermuda, it has irrevocably submitted to the jurisdiction of the Bermuda Courts. Mr. Potts QC went on to highlight the date chronology of the filing of the Writ as against the subsequent filing of the New York Complaint.

123. The portion of the contractual term under review is: *'...<u>in accordance with the laws of Bermuda</u> and <u>the parties</u> to this Agreement irrevocably submit to the non-exclusive jurisdiction of the Bermuda Courts'*.

124. RSC O.10/1 provides:

> *Subject to the provisions of any enactment and these Rules, a writ must be served personally on each defendant by the plaintiff or his agent.*

125. In accordance with the laws of Bermuda, the parties (i.e. the parties jointly as opposed to severally) to the action cannot be said to have submitted to the jurisdiction of the Bermuda Courts before service of the Writ. Conversely, had Mr. Clingerman served Apex with the Writ and had an unconditional appearance been entered on behalf of Apex pursuant to RSC O. 10/1, the parties to the Administration Agreement (i.e. Apex and the Company) would be deemed to have submitted to the jurisdiction of the Bermuda Courts under Clause 15.

126. Although noted, I find that the evidence of Mr. Clingerman's intentions in filing the Writ is less compelling and persuasive as part of my determination as to whether the parties have irrevocably submitted to the jurisdiction of the Bermuda Courts. In this regard, it matters very little, if at all, whether the Writ was filed for protective purposes to avoid being time-barred under the Limitation Act 1980 or not. Mr. Clingerman's jurisdictional intentions during pre-action correspondence are equally irrelevant for the purposes of determining whether the parties irrevocably submitted to the jurisdiction of the Bermuda Courts. However, I will revisit these complaints when I come to deal with the claim for non-contractual injunction.

127. For these reasons I reject Mr. Potts QC's attempt to persuade this Court that Mr. Clingerman has irrevocably submitted to the jurisdiction of the Bermuda Court under Clause 15.

128. Of course, Mr. Hughes, who is personally named as a Defendant in the underlying actions, is not a party to the Administration Agreement in his personal capacity. Thus, in my judgment, he has no prospects of an entitlement to a contractual anti-suit injunction. If I am wrong, then I find in the alternative that he is disentitled to a contractual anti-suit injunction based on the same reasoning applied to the position on Apex.

***<u>Decision on whether there is a Statutory entitlement to an Anti-Suit Injunction</u>***

129. In asserting the Plaintiffs' statutory right to the sought-after injunctive relief, Mr. Potts QC directed the Court's attention to sections of 11(2) and 11(3) of the SACA 2000.

130. While section 11(2) contains a deeming provision that the parties submit to the jurisdiction of the Bermuda Courts, section 11(3) states that a contract subject to the Act shall include an implied term that the parties select the law of Bermuda as its governing law and submit to the jurisdiction of the Bermuda Courts, unless the contract provides otherwise. I have found that the Administration Agreement does provide otherwise, in that the jurisdiction clause is a non-exclusive one.

131. On this basis, I reject any notion that there is an entitlement to an anti-suit injunction as a matter of statutory right which supersedes a contractually agreed position.

***Decision on whether there is a Non-Contractual entitlement to an Anti-Suit Injunction***

132. The Plaintiffs' Counsel hedges his highest bets under this class of anti-suit injunctive relief. Mr. Potts QC held firm to his submission that Bermuda is the only natural and appropriate forum for the resolve of the substantive dispute.

133. As a simple first step, I find that Bermuda is clearly an appropriate forum for the dispute. Mr. Elkinson did not advance any serious argument against this point. Having passed the preliminary hurdle, the merits of the application before me must be measured against the test requiring: (i) the defendant to be subject to the jurisdiction of the Bermuda Courts; (ii) the natural forum for the determination of matters in issue to be Bermuda and (ii) the conduct of the defendant which the claimant seeks to restrain to be unconscionable, vexatious or oppressive.

134. I am not troubled in finding a high likelihood that the Defendants, a Bermuda appointed Receiver and a Bermuda incorporated company, are personally subject to the jurisdiction of the Bermuda Courts. The First Plaintiff is a limited liability company which is incorporated and headquartered in Bermuda. The Second Plaintiff is a Bermuda resident and director of the First Plaintiff.

135. While Mr. Elkinson pointed to clause 2.5 of the Administration Agreement which empowers Apex to delegate its powers and duties under the Agreement to its Shanghai affiliate, as the sub-Administrator, this does not disavow Apex of its Bermuda character. The First Plaintiff, Apex, conducts and maintains its place of business in Bermuda. This is no less true because it has affiliates or subsidiaries which operate outside of Bermuda. I accept and agree that this principle is correctly stated by Ground CJ in *Bacardi Limited v Rente Investments Limited.*

136. Where my consideration calls for a determination on the personal jurisdictional governance of Mr. Ali, I regard it wrong for the Court at an interim stage of the proceedings to prefer any one side of a hotly contested factual issue.

137. The next point for contemplation is whether the Bermuda Court is the natural forum for the determination of the underlying litigation. Under this part of the analysis, it is necessary to examine the alleged events which gave rise to the causes of action and the pleadings under both proceedings.

138. By way of summary, the principle complaint against Mr. Hughes is that he knew that Mr. Ali was a 'high operational risk' before he endorsed his appointment as investment manager to the M3 Fund, which was established by Mr. Ali in early 2013. Apex is being sued for its administrative assistance in the wrongful transfer of the investment proceeds to ECML (as opposed to DBS, the Custodian of the Fund). Mr. Clingerman also founds his claims on an assertion that Mr. Hughes was wrong to have accepted the role of director of the M3 Fund while simultaneously assuming the position of administrator of the Fund in his capacity as

director of Apex. Specifically, Mr. Clingerman refers to email correspondence from Mr. Hughes as a basis for his allegation that Mr. Hughes pushed for the premature launch of the Fund for the purpose of generating administration fees for Apex, thereby breaching his fiduciary duties as director of the Fund. Apex is also being sued based on allegations of its failure as the administrator to properly calculate the net asset value of the participating shares of the M3 Fund.

139. The lion's share of the claims factually center on the actions of the Plaintiffs and Mr. Ali. The case against Mr. Ali and the Transferee Defendants is tied to the New York banking transactions which moved the proceeds of the Fund from one New York bank account to the next. In my judgment, the Plaintiffs have shown it highly likely that they will meet the satisfaction of the second limb of the test requiring Bermuda to be a natural and appropriate forum for the determination of matters in issue. I cannot, however, at this point say that the same is not so in respect of the New York Court which also has a real potential of being found to be a natural and appropriate forum. For example, if it is later found on the facts that Mr. Ali was resident in New York between around 16 February 2013 and 3 October 2014 from where he operated the Transferee Defendants and mismanaged the proceeds of the M3 Fund, a case will likely be made out that New York is also a natural and appropriate forum, as this would go beyond the non-determinative question on where the loss occurred (see *Base* Metal Trading Ltd v Shamurin (CA) [2005] 1 WLR at p. 1172).

140. On the test as to whether the New York proceedings are unconscionable, vexatious or oppressive, I find that the evidence thus far has not even nearly satisfied me in the affirmative. As a matter of construction of the Administration Agreement, I have found that the Defendant Company is not contractually barred from proceeding against the Plaintiffs outside of Bermuda. So, it cannot be said that the New York proceedings are unconscionable, vexatious or oppressive on the grounds that they offend a contractual agreement between the parties on jurisdictional governance. Further, I am unable to rule out the New York proceedings as a natural forum for the dispute in using the three-part test which applies to a non-contractual injunction.

141. I have also considered the powers of the Receiver under his appointment of the Court in Case No.121 of 2017. I am not persuaded that Mr. Clingerman's prosecution of the New York proceedings constitutes a breach or excess of his powers under the Receivership Order, notwithstanding that he did not secure the Court's sanction of the commencement of those proceedings. The New York proceedings are motivated by the loss of the assets in the M3 Fund. Mr. Clingerman's litigious pursuit of actual and punitive damages to be restored to the estate of the Company is clearly a legal proceeding aimed to protect the assets of the M3 Fund. For this reason, I also reject Mr. Potts QC's objection to Mr. Clingerman's standing to commence the New York Proceedings, from a Bermuda law perspective.

142. Mr. Potts QC also urged this Court to consider the unfairness of the exposure which Mr. Hughes would have to personal liability in the New York action where a claim is made for punitive damages. This is contrasted against the Bermuda law position under sections 97-98 and 281 of the Companies Act 1981 where a director has the protection of indemnity provisions against personal liability for losses to a company which do not result from

dishonesty. However, in my judgment, this apparent difference between Bermuda law and New York law is an insufficient basis in this case for finding that the proceedings are unconscionable, vexatious or oppressive. In agreeing to the non-exclusive jurisdiction of the Bermuda Courts over a dispute between Apex and the Company, the Plaintiffs of their own accord exposed themselves to the possibility of a punitive damages claim under New York law. The same reasoning applies to the Plaintiffs' exposure to New York procedural law on costs, discovery, the taking of depositions and any consequential publicity which may follow.

143. For all of these reasons, I do not find that the First Defendant's conduct in bringing the New York proceedings is unconscionable, vexatious or oppressive and I do not find it highly likely or probable that the Plaintiffs will establish a legal or equitable basis for an entitlement to an anti-suit injunction against the New York action. Thus, it follows that it is neither just nor convenient for me to make the order for an anti-suit injunction.

## Conclusion:

144. I have refused the Plaintiffs' application, hard-fought as it was, for an interim anti-suit injunction because it is difficult to envisage their success under the Originating Summons, notwithstanding the narrowly disputed areas of the evidence relevant to issues of jurisdiction.

145. The order of 22 July 2019 granting an interim anti-suit injunction is set aside and the terms prayed in the 22 July *ex parte* summons are refused, having now heard the parties *inter partes*.

146. Unless either party files a Form 31D to be heard on the issue of costs within 14 days of this ruling, I award costs on a standard basis in favour of the Defendants, to be taxed if not agreed.

Tuesday 12 November 2019

**HON. MRS. JUSTICE SHADE SUBAIR WILLIAMS**
**PUISNE JUDGE OF THE SUPREME COURT**