# EXHIBIT 17

**In The Supreme Court of Bermuda**

**Commercial Jurisdiction 2018 No 131**

**BETWEEN:**

**HISCOX SERVICES LTD**

**HISCOX AGENCY LTD**

**HISCOX INSURANCE COMPANY (BERMUDA) LIMITED** Plaintiffs

v

**YUVAL ABRAHAM** Defendant

Dated 5 October 2018

**Stay of civil proceedings pending determination of criminal proceedings - Whether the rule in Smith v Selwyn still applies in Bermuda - Inherent jurisdiction of the court - Whether appropriate to stay an application for summary judgment**

Mr K Robinson and Mr H Tucker for the Plaintiffs

Mr S Froomkin QC for the Defendant

The following cases were referred to in the judgment:

*Todd v Smith* [1993] Bda LR 14
*Capital G Bank v Eve* [2008] Bda LR 60
*Smith v Selwyn* [1914] 3 KB 98
*Panton v Financial Institutions Services Ltd* [2003] UKPC 86
*Jefferson Ltd v Bhetcha* [1979] 1 WLR 898
*Mote v Secretary of State for Pensions* [2007] EWCA 1335
*V v C* [2001] EWCA Civ 1509
*House of Spring Gardens Ltd v Waite* [1985] FSR 173

**JUDGMENT of HARGUN CJ**

**Introductory**

1. By Summons dated 24 August 2018, the Plaintiffs seek summary judgment against the Defendant under Order 14 of the Rules of the Supreme Court 1985 in an amount equivalent to US $1,506,960 and CHF 334, 000. In response the Defendant has applied to stay the Plaintiffs' application for summary judgment until the criminal investigation and any subsequent criminal proceedings, arising out of the same facts, against him have been concluded, or pending an indication from the appropriate authority that the criminal charges would not be pursued.

2. There are a number of other applications made by the parties arising out of and related to the *Mareva* injunction granted by the Court on 25 April 2018. First, the Plaintiffs seek an order that the Defendant file a further and better affidavit of his assets and that such an affidavit should cover the period following the first suspicious transaction, 6 June 2017 to date. Second, the Plaintiffs seek an order that paragraph 10 (1) of the Order dated 25 April 2018, allowing the defendant to spend up to $5000 be varied so as to reduce the amount allowed to $1250 per week. Third, the Defendant seeks an order that he be permitted to obtain from his assets a lump sum of $33,650.98 on account of unpaid living expenses and $50,000 on account of legal advice and representation.

**Background**

3. The Plaintiffs, Hiscox Services Ltd ("HSL"), Hiscox Agency Ltd ("HAL"), Hiscox Insurance Company (Bermuda) Ltd ("HIC"), are three companies incorporated in Bermuda engaged in the business of insurance and are members of the Hiscox Group, listed on the London Stock Exchange. At all material times, Yuval Abraham, the Defendant, was employed in Bermuda as Chief Financial Officer of HSL.

4. It is said by the Plaintiffs that during the period 6 June 2017 to 16 February 2018, the Defendant caused or procured online transfers to be made from the bank accounts of the Plaintiffs with HSBC Bank of Bermuda to Montres Journe New York LLC ("Montres Journe") in the total sum of US$1,506,960 and Kari Voutilainen in the amount of CHF 334,000.

5. The Plaintiffs maintain that the Defendant procured these online transfers by producing false invoices for various fictitious consulting and other business services in the names of "Montres Consulting" (for the payments to Montres Journe) and "KV Brokerage Consulting" (for payments to Kari Voutilainen). It is the Plaintiffs case that there was no sensible business purpose for making these payments. Montres Journe and Kari Voutilainen are manufacturers and/or retailers of luxury timepieces and the payments, the Plaintiffs allege, to Montres Journe and Kari Voutilainen were in fact made in consideration of the purchase of luxury watches by the Defendant.

6. By Writ of Summons dated 25 April 2018 the Plaintiffs commenced proceedings against the Defendant seeking a declaration that the Defendant is liable to account to the Plaintiffs for the sum of US$1,847,960, being funds of the Plaintiffs wrongfully acquired by the Defendant, on the grounds of his breach of fiduciary duty and/or breach of trust.

7. By an Order dated 25 April 2018, Hellman J granted an injunction restraining the Defendant from removing from Bermuda any of his assets which are in Bermuda up to the value of $1,847,960 or in any way dispose of, deal with or diminish the value of any of his assets whether they are in or outside Bermuda up to the same value. By paragraph 8 of that Order, the Defendant was required to disclose to the Plaintiffs all his assets worldwide whether in his own name or not and whether solely or jointly owned, giving the value, location and details of all such assets. Paragraph 8(2) expressly provided that if the provision of any of this information is likely to incriminate the Defendant, he may be entitled to refuse to provide that information to the Plaintiffs.

**Application for Summary Judgment**

8. The Plaintiffs application for summary judgment is made by Summons dated 24 August 2018 and is supported by the Fifth affidavit of Marc Wetherhill dated 14 August 2018 confirming that he verily believes that there is no defense to this action and the Defendant is justly and truly indebted to the Plaintiffs in the amounts particularised in the Writ of Summons. Mr Wetherhill relies upon his four earlier affidavits dated 24 April 2018, 27 April 2018, 12 June 2018 and 9 July 2018.

9. The Defendant has not filed any evidence in response to the application for summary judgment. Instead the defendant has filed a Notice of Motion seeking an order that the summary judgment application be stayed until the criminal investigation and any subsequent criminal proceedings against the Defendant have been concluded. In support of the stay application the Defendant relies upon the Court of Appeal decision in *Todd v Smith* [1993] Bda LR 14 and the decision of Kawaley J in *Capital G Bank v Eve* [2008] Bda LR 60.

10. In the *Todd* case the Court of Appeal confirmed that the common law rule in *Smith v Selwyn* [1914] 3 KB 98 applies in Bermuda. Phillimore LJ in that case stated that: "*It is a well established rule of law that a plaintiff against whom a felony has been alleged by the defendant cannot make that felony the basis of an action unless the defendant has been prosecuted or some good reason has been given why a prosecution has not taken place".*

11. The rule, as applied by the Court of Appeal in the *Todd* case, appears to allow for no discretion on the part of the court. The rule is expressed as a rule of law which must be applied and a stay of the civil proceedings granted if a felony has been alleged against the defendant. The Plaintiffs question whether the rule in *Smith v Selwyn* continues to apply in Bermuda having regard to the Privy Council decision in *Panton v Financial Institutions Services Ltd* [2003] UKPC 86. *Panton* was an appeal from Jamaica where the Privy Council noted that *Smith v Selwyn* was no longer good law in England and that the matter of stay was a matter of discretion of the court which was required to weigh

the competing considerations. The Privy Council concluded that there were no peculiar public policy considerations prevailing in Jamaica which would justify that the common law in Jamaica should develop differently in relation to this issue than the common law in England. The Board noted the move away from the rigid rule in *Smith v Selwyn* in most common law jurisdictions:

> "7. That movement may be briefly traced. The English Court of Appeal in 1979 in *Jefferson Ltd v Bhetcha* [1979] 1 WLR 898, the New South Wales Supreme Court in 1982 in *McMahon v Gould* 7 [1982] ACLR 202, the Federal Court of Australia in 1984 in *Re Cameron's Unit Services Pty Ltd v Kevin R Whelpton and Associates (Australia) Pty Limited and another* [1984] 4 FCR 428 and the Jamaican Court of Appeal in 1994 in *Bank of Jamaica v Dextra Bank & Trust Co Ltd* [1994] 31 JLR 361, have all held that the issue of a stay to prevent civil proceedings when criminal prosecutions arising out of the same events are also pending is a matter of discretion to be exercised by reference to the competing considerations. It is not a matter of rule. *Smith v Selwyn* has been discarded."

12. In light of the Privy Council decision in *Panton,* I conclude that the common law rule in *Smith v Selwyn* is no longer good law in Bermuda. A decision of the Privy Council in relation to the development of common law is binding in Bermuda even though the decision of the Privy Council related to an appeal from another jurisdiction (*Grayken v Grayken* [2011] Bda LR 14, per Zacca P at [18]; and *Medeiros v Island Construction Services Co. Ltd* [2016] Bda LR 130 per Kawaley CJ at [23]). In passing it should be noted that the English Court of Appeal decision in *Jefferson Ltd v Bhetcha* [1979] 1 WLR 898, which discarded the rule in *Smith v Selwyn* in England, was not cited to the Bermuda Court of Appeal in *Todd*. Had that decision been cited in *Todd* it seems unlikely that the Court of Appeal would have concluded that *Smith v Selwyn* represented the common law in Bermuda.

13. In any event even if *Smith v Selwyn* still applied in Bermuda it will not apply in the present situation since its operation is limited to "felonies". As noted by Kawaley CJ in *Capital G Bank v Eve* [2008] Bda 60 at [6 and 7], the classification of offences in Bermuda has changed since the original Criminal Code was enacted in 1907, with section 3(1) providing that "offences are of four kinds, namely, treasons, felonies, misdemeanors, and simple offences". This position was amended by the Criminal Code Amendment (No 2) Act 1905 when the felony designation disappeared from the definition of property related offences. Felonies still exist under the current version of the Criminal Code, such as "treasonable felonies" (section 85). I accept the Plaintiffs' contention that whatever charges may be brought against the Defendant they will not fall within the category of "felonies". Mr Froomkin advised the Court that the Defendant had in fact been charged by the Bermuda authorities but did not contend that the charges were "felonies". Accordingly, as in the *Capital G* case, the specific rule formulated in *Smith v Selwyn* in relation to felonies cannot be relied upon in the present case.

14. It is common ground that even if the rule in *Smith v Selwyn* does not apply the court, exercising its inherent jurisdiction, retains a discretion to stay civil proceedings in the event criminal proceedings, arising from the same facts, are likely or have been instituted. The key consideration is whether continuation of civil proceedings runs a real risk that a fair criminal trial would be prejudiced (Richards LJ in *Mote v Secretary of State for Pensions* [2007] EWCA 1335 at [31]). In exercising its discretion the Court may have regard to, inter alia, the following considerations:

   i. Each case must be judged on its own facts, the burden is on the defendant in the civil action to show that it is just and convenient that the plaintiffs' ordinary rights of having his claim processed and heard and decided should be interfered with (*Jefferson Ltd v Bhetcha* [1979] 1 WLR 898, 905D).

   ii. The protection given to one facing a criminal charge, the so-called "right of silence", does not extend to give the defendant as a matter of right the same protection in contemporaneous civil proceedings. There is no right of silence in

the context of civil proceedings (*Jefferson Ltd v Bhetcha* at 905B; and *V v C* [2001] EWCA Civ 1509).

iii. It is undesirable to attempt to define all the relevant factors which may lead a court to conclude that there is a real danger of causing injustice in the criminal proceedings. By way of example, such factors may include the fact that the civil action would be likely to generate such publicity as might reasonably be expected to reach, and influence persons who are likely to be jurors in the criminal proceedings. It may also include, if it could be shown, that there was a real danger that the disclosure of the defence in the civil action would, or might, lead to a potential miscarriage of justice in the criminal proceedings, by, for example, enabling prosecution witnesses to prepare a fabrication of evidence or by leading to interference with witnesses or in some other way *(Jefferson Ltd v Bhetcha* at 905D – F).

iv. The defence of self-incrimination has limited application in the context of having to plead in civil proceedings. The privilege is against being "compelled" and this means being compelled by lawful authority or compelled on pain of punishment. So far as pleading a defence is concerned there is no "compulsion" to put in a defence. Furthermore, even if a defence is pleaded there is no compulsion to plead anything which provides information to the plaintiff. So far as pre-trial proceedings are concerned, it is only if the claimant seeks to compel discovery and production of documents, or compel an answer to an interrogatory in order to assist this case that the privilege would appear to arise (*V* v *C* per Waller LJ at [11]).

v. It is legitimate to start from the position that a positive defence is likely to exculpate rather than incriminate. It is legitimate to expect an explanation on oath as to the nature of the defence that a defendant has so that a court can see (a) whether there is a reason for a trial in the merits, and (b) whether the way in which having to fight the summary judgment application or the trial may impinge on the fair trial of the defendant in criminal court. But if the plaintiff can establish his case without compelling information or obtaining evidence from the defendant, the only relevant impact on the criminal trial to be considered is what the effect of entering a summary judgment will be. The onus is on the defendant at all stages to demonstrate that the civil process should not proceed and the stronger the case against the defendant in the civil context the higher the onus on the defendant should be (*V v C* per Waller LJ at [39]).

15. In this case the Defendant has not asserted any particular prejudice arising out of the continuation of the summary judgment application. He has elected not to file any evidence in response to the summary judgment application. In argument Mr Froomkin did not advance any particular reason why the court should exercise its discretion to stay the summary judgment proceedings.

16. It seems to me the only prejudice the Defendant may suffer as a result of the proceedings is that the Court may enter a judgment against the Defendant and that judgment would be available to the prosecuting authorities. However, I bear in mind that no reliance can be placed on a civil judgment in the criminal trial so as to prove the guilt of the defendant, and the fact of a judgment does not take the authorities any further than the assertions in the Statement of Claim already on the court file (*V v C* per Waller LJ at [43]). I also bear in mind that in any subsequent criminal proceedings the court is likely to make it clear that the standard of proof in criminal proceedings is different and higher than the standard of proof in civil proceedings.

17. In the circumstances I conclude that the Defendant has not put forward any material before the Court which satisfies the Court that it is either just or convenient that the application for summary judgment should be stayed. I am not satisfied that the continuation of the application for summary judgment runs a real risk that any criminal proceedings against the Defendant would or are likely to be prejudiced. Accordingly, I

refuse the Defendant's application that the summary judgment proceedings be stayed pending the determination of any possible criminal proceedings against him.

18. I now turn to the actual application for summary judgment. The Plaintiffs' causes of action are based upon the breach of duties owed by the Defendant to the Plaintiffs in his capacity as a director and employee. In paragraph 6 and 7 of the Statement of Claim, the Plaintiffs assert that in his capacity as a director of the Plaintiffs' companies, the Defendant owed fiduciary duties to the Plaintiffs including those set out at section 97 of the Companies Act 1981: "*to act honestly and in good faith with a view to the best interests of each company; to exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances"*. Further, as a director of the Plaintiffs and an employee of HSL, the Defendant was a trustee of such of the Plaintiffs' assets and property as were in his possession or under his control. In the Statement of Defence the Defendant admits that these duties were owed by him to the Plaintiffs.

19. The Plaintiffs assert that during the period 6 June 2017 to 16 February 2018, the Defendant caused or procured online transfers to be made from the bank accounts of the Plaintiffs with HSBC Bank of Bermuda to Montres Journe and Kari Voutilainen. It is alleged that the Defendant procured these online transfers by producing false invoices for various fictitious consulting and other business related services in the names of "Montres Consulting" and "KV Brokerage Consulting". In the Statement of Defence the Defendant denies that he produced false invoices for Montres Consulting or for KV Brokerage Consulting. The Defendant denies that the payments set out in the Schedule to the Statement of Claim were made by him. He further denies that he received any luxury watches or other items from Montres Journe or Kari Voutilainen.

20. In support of the application for summary judgment the Plaintiffs have filed the Fifth affidavit of Marc Wetherhill verifying the facts stated in the Writ of Summons and Statement of Claim. Mr Wetherhill also relies on his earlier affidavits and in particular his First and Fourth affidavits. At paragraphs 21 to 32 of his First affidavit, Mr Wetherhill sets out in detail and produces supporting evidence of the six suspicious transactions relating to payments purportedly made to "Montres Consulting", which in fact were made to Montres Journe New York LLC (the New York store of luxury Swiss watches), and the two suspicious transactions relating to the payments purportedly made to "KV Brokerage Consulting", which in fact were made to Kari Voutilainen (a maker of luxury Swiss watches). The exhibits to Mr Wetherhill's First affidavit appear to show that all the eight online transfers were authorised by the Defendant. Each of the eight invoices addressed to HIC, allegedly from Montres Consulting and KV Brokerage Consulting, were authorised by the Defendant for payment. The Defendant appears to have authorised payment for seven invoices by affixing his signature on the invoices and directing payment to be made. In relation to one invoice the Defendant sent an email directing that the payment be made to Montres Consulting.

21. In his Fourth affidavit Mr Wetherhill gives evidence that on 29th of May 2018 the Plaintiffs filed a Petition, under section 1782 of the United States Code, in the United States District Court, Southern District of New York, seeking permission to issue a subpoena requiring discovery from Montres Journe New York of certain documents in connection with the suspicious transactions. Montres Journe provided the requested discovery in June 2018. The documents provided by Montres Journe appear to show that the Defendant as having been invoiced for various luxury watches, accessories, and cufflinks between 15 February 2017 and 3 May 2018 in the sum of $1,285,202. The discovery also produced WhatsApp messages between the Defendant and William Newman of Montres Journe New York, concerning payments to be made to Montres Journe. The discovery provided by Montres Journe appears to show that at least some of the luxury watches purchased by the Defendant were purchased using the funds of the Plaintiffs. In support of this claim Mr Wetherhill relies upon the following evidence set out at paragraph 45 of his Fourth affidavit:

i. WhatsApp correspondence between Mr Newman and the Defendant dated 19 June 2017, where Mr Newman emailed the Defendant the wire instructions for

Montres Journe New York. The Defendant is asked to confirm when the merchant can expect to see the wire and the Defendant states *"Will do, I will sort it out this week".* The Defendant further replies *"I have a quick question. Is the ABA number the same as the Swift number? I don't do too many wire transfers."* On 21 June 2017 the first wire transfer from HSL was made of $259, 9602 to Montres Journe New York.

ii. WhatsApp correspondence between Mr Newman and the Defendant dated 6 July 2017, where the Defendant receives confirmation that *"the wire came in, but it came in for the $201,900."* Mr Newman states *"I can get a cheque for the $1900 cut for you."* The defendant replies *"I saw. I asked for my company to arrange it and they messed up… Also, I think that I forgot that I paid 2 deposits?"* On 6 July 2017 the second wire transfer in the amount of $201,900 was made from HSL.

iii. WhatsApp correspondence between Mr Newman and the Defendant dated 4 August 2017, where the Defendant is advised that a $100,000 deposit is required to show the Geneva watch. The Defendant confirms that Mr Newman will receive the wire by the end of the week. Mr Newman confirms that the price for the Geneva is CHF 714,000. Subsequently, on 8 August 2017, the Defendant informed Mr Newman that he set up a wire for the deposit on the Geneva but missed cut-off period and reassured him that Montres Journe New York would receive $100,000. The following day on 8 August 2017 a wire transfer in the amount of $100,000 was made from HSL.

iv. WhatsApp correspondence between Mr Newman and the Defendant dated 6 October 2017, where the Defendant confirms that he has transferred $251,800 in payment of the *"TB-$173,900"* and the *"QP-$77,000"* and request confirmation of receipt. Mr Newman subsequently confirms that the transfer was received. On 6 October 2017 a transfer from HAL was made for $251,800.

v. WhatsApp correspondence between Newman and the Defendant dated 11 December 2017, where the Defendant confirms that the price of the H&H is $46,200 less the $2,900 equalling $43,300. On 20 December 2017, the Defendant advises Mr Newman *"I just wanted to let you know that I have transferred the money for the H&H but I missed the cut off time so you should get it tomorrow".* The Defendant confirmed if he can pick the H&H on Tuesday. Mr Newman confirmed and asked *"what was the wire amount sent. I want to let Pierre know".* The defendant confirmed that he wired *"$43,300, $46,200-$2900".* On 30 December 2017 a transfer was made from HAL for $43,300.

vi. WhatsApp correspondence between Mr Newman and the Defendant dated 21 February 2018, where Mr Newman informs the Defendant that he has spoken to Halimi and asks if the Defendant is *"waiting to pay in USD as before directly to him or in CHF directly to Geneva. In CHF it is 596, 150. If you decide to pay Pierre he will purchase through AMEX when you say so and he can buy at their best rate. They are charging 20 pips. What would you like to do?"* The Defendant states *"Thanks. I will transfer USD".* On 27 February 2018, Mr Newman states to the Defendant *"we will cut you a cheque for the balance owed to for the GS. $7,708 (GS & Cufflinks total was $642,292). We only need $20K ($10 each) for the deposit on the TN & LN but you can send whatever you like."* On 23 February 2018 a transfer from HSL was made in the amount of $650, 000 (i.e. $7,708 and $642,292).

vii. WhatsApp correspondence between Mr Newman and Defendant dated 6 March 2018, where Mr Newman asks the defendant *"what is your home address we just need to put it down on the invoice on our side."* The Defendant confirmed *"The Waterfront 9A, 9 Waterloo Lane, Pembroke, HM08, Bermuda."*

22. The Defendant has elected not to file any evidence in opposition to the application for summary judgment. In particular, he has elected not to respond to the detailed evidence of transfers made at his instructions from the bank accounts of HSL and HAL to Montres

Journe in New York and Kari Voutilainen.The Defendant has not responded to detailed evidence of transfers set out at paragraphs 21 to 32 of Mr Wetherhill's First affidavit or paragraphs 15 to 19 and 41 to 45 of Mr Wetherhill's Fourth affidavit. The Defendant has not sought to explain the documents which appear to contain instructions, in his handwriting and under his signature, to transfer monies from bank accounts of HSL and HAL to Montres Journe and Kari Voutilainen. The Defendant has also elected not explain how the invoices from Montres Consulting and KV Brokerage Consulting, which appear to be forgeries, came into his possession.

23. As noted above, the Defendant has filed Statement of Defence in which he makes general denials that he was party to producing forged invoices or that he was party to the online transfer of monies from bank accounts of HSL or HAL to Montres Journe or Kari Voutilainen. He also makes general denials of receiving any luxury watches from either Montres Journes or Kari Voutilainen. However, in my judgment, general denials in the context of this application are wholly inadequate in light of the detailed allegations of transfers made by the Plaintiffs and in light of the documents produced showing the Defendant's participation in the wrongdoing. As noted in the 1999 Supreme Court commentary at 14/4/5, a defendant's affidavit "*… must "condescend upon particulars", and should, as far as possible, deal specifically with the plaintiff's claim and affidavit, and state clearly and concisely what the defence is, and what facts are relied on support it. It should also state whether the defence goes to the whole or part of the claim, and in the latter case it should specify the part".*

24. In conclusion the Plaintiffs have clearly made out, on the standard applicable in civil proceedings, the claims pleaded in the Writ of Summons and the Statement of Claim. Leaving aside the general denials, the Defendant has not sought to answer the detailed claims and evidence against him. The Defendant has not raised any legal or factual issue which would be an answer to the claims made by the Plaintiffs or which would otherwise warrant this matter proceeding to a trial. In the circumstances, I give leave to the Plaintiffs to enter judgment against the Defendant in an amount equivalent to US$ 1,506,960 and CHF 334,000 together with interest at the statutory rate of 3.5% running from the date of the relevant payment to the date of the judgment. I give leave to the parties to address the Court in relation to the form of the Order, if required.

**Application for a Further and Better Affidavit**

25. The Order dated 25 April 2018 restrained the Defendant from removing from this jurisdiction any of his assets up to the value of $1, 847,960 and restrained him from disposing of, dealing with or diminishing the value of any of his assets whether they are in or outside Bermuda up to the same value. Paragraph 8 of the order required the Defendant to disclose to the Plaintiffs' attorneys all his assets worldwide whether in his own name or not and whether solely or jointly owned by him. Paragraph 8 (2) of the Order expressly provided that if the provision of any of this information was likely to incriminate the Defendant ,he should take legal advice before refusing to provide this information. Paragraph 8(2) recognised that if the provision of certain information was likely to incriminate the Defendant, he would be entitled to refuse to disclose that information to the Plaintiffs' attorneys.

26. In compliance with paragraph 8 (1) the Defendant filed an affidavit dated 3 May 2018 disclosing that, other than pension funds of modest value, the Defendant had assets of less than $100,000. The Defendant makes the categorical statement under oath that "*I own no other property real or personal directly or indirectly anywhere else in the world."* The Plaintiffs complain that this disclosure is manifestly inadequate and point out that: (a) during the course of his employment with the Plaintiffs the Defendant was paid more than $1.1 million; (b) in a US Investment Suitability Questionnaire, the Defendant had claimed that he had "*Liquid Net Worth"* of more than $1,000,000; (c) in a further document relating to an Investor Visa, the Defendant had claimed that he had a total net worth of $3,500,000 with $3,000,000 of this sum being in checking and saving accounts; and (d) paragraphs 21 to 32 of Mr Wetherhill's First affidavit and paragraphs 15 to 19 and 41 to 45 of Mr Wetherhill's Fourth affidavit (and the exhibits produced) appear to show that the Defendant received from Montres Journe and Kari Voutilainen

luxury watches valued at excess of $1,800,000 and that these luxury watches were purchased by the Defendant using the Plaintiffs' funds. The Defendant has made no mention of any of these assets in his affidavit dated 3 May 2018.

27. It is clear that full and frank disclosure by the Defendant is essential for the proper enforcement of the *Mareva* order granted by the Court on 25 April 2018. It appears from Mr Wetherhill's Second and Fourth affidavits that the Defendant may not have disclosed a number of his assets. The Defendant has elected not to respond to the criticisms made in Mr Whetherhill'sWetherhill's affidavits concerning the inadequacy of the disclosure of assets made by the Defendant. This is in circumstances where the Plaintiffs maintain a proprietary claim to the luxury watches allegedly purchased by the Defendant using the Plaintiffs' funds.

28. The court has the jurisdiction to order that the Defendant file a further and better affidavit and in particular dealing with the criticisms relating to disclosure made by the Plaintiffs. In *House of Spring Gardens Ltd v Waite* [1985] FSR 173 Cumming-Bruce LJ noted at 183:

> "The authorities, and in particular the judgments in the *Bekhor* case, make it quite plain that the Mareva injunction jurisdiction is in many respects anomalous. The court has the power (and, I would add, the duty) to take such steps as are practicable upon an application of the plaintiff to procure that where an order has been made that the defendants identify their assets and disclose their whereabouts, such steps are taken as will enable the order to have effect as completely and successfully as the powers of the court can procure. It may be that there are situations in which the circumstances demonstrate that it is more sensible, if only for reasons of speed and urgency, not to order further affidavit order to fill the vacuum alleged to exist in the affidavits filed pursuant to the original order, but to proceed at once order that the defendants attend for cross examination upon their affidavits the purpose of the cross examination would be to elicit with greater particularity the extent and the whereabouts of the defendant's assets. The background of applications Mareva injunctions is often a situation in which it is urgently necessary for the court to intervene in order to assist the plaintiff to prevent the defendant frustrating object of the proceedings".

29. Having regard to the deficiencies in the disclosure highlighted by the Plaintiffs, I consider it just and appropriate that the Defendant be ordered to file a further and better affidavit relating to his assets. The affidavit should deal with the deficiencies referred to in the affidavits of Mr Wetherhill. If the Defendant receives legal advice to the effect that disclosure of a particular item may expose him to self-incrimination the defendant may refuse to make that disclosure of that particular item on the ground of self-incrimination. Such an affidavit should be filed and served upon the Plaintiffs within the next 14 days.

**Application for Reduction in Living Expenses**

30. Paragraph 10(1) of the Order of 25 April 2018 expressly provided that the order does not prohibit the Defendant from spending $5,000 a week toward his ordinary living expenses. Mr Wetherhill explains that the figure of $5,000 was inserted in the draft order on the basis that the Defendant had very high rental obligations in Bermuda. It was known that he was being paid $13,000 per month in 2017, on account of accommodation, as part of his employment remuneration.

31. The Defendant no longer resides in Bermuda and does not have to meet the very high rental obligations. It is understood that the Defendant is living in Israel and the Plaintiffs have introduced evidence in relation to the cost of living in that country in the form of an affidavit filed by Oded Nesher. Mr Nesher says that, according to the Israeli Central Bureau of Statistics, rental price of housing in Tel Aviv in the first three quarters of 2018 ranges between US dollar 1,535 to $2,403 per month and on these figures producing an average of approximately $2,000 per month. He further gives evidence that the total average consumption in Tel Aviv in 2016 is about $4,697 per month. There is no evidence as to the current consumption expense in 2018 but it seems reasonable that

it is unlikely to exceed $6,000 per month. Accordingly, Mr Nesher says that the average living expense in Tel Aviv in 2018 would be around $8,000 per month or approximately $2,000 per week.

32. The Defendant has also filed an affidavit setting out his current living expenses as follows:

| | |
|---|---|
| Rent | $10,000 |
| Taxes and rates on rent | $2,500 |
| Food | $3,000 |
| Medical | $4,000 |
| Transportation | $2,000 |
| Electricity, water, gas, phone | $3,000 |
| Insurance | $1,000 |

As can be seen the figures produced by the Defendant are rounded figures without any supporting evidence. He has not produced any contemporaneous documentation which supports any of the items referred to. In considering the provision of living expenses in the context of a *Mareva* injunction it is important to keep in mind that normally the allowance for living expenses is fixed at a modest level. The court is not concerned with providing the defendant with all the monies necessary to maintain the defendant's usual standard of living (*House of Spring Gardens v Waite* [1984] FSR 277 at 285). In the circumstances I consider that the allowance for living expenses in the Order 25 April 2018 should be reduced to $2,000 per week and I so order. In the event that this variation causes undue hardship to the Defendant, I give leave to the Defendant to seek a further variation of the Order in respect of living expenses provided that such application is supported by contemporaneous documentation evidencing the expenses actually being incurred.

**Application for a Lump Sum**

33. By Summons filed on 29 June 2018, the Defendant seeks an order that he be permitted to obtain from his assets the sum of $33,650.98. This claim is made by the Defendant on the basis that he was unable to drawdown the entirety of $5,000 per week during a period of nine weeks. He says that during this period he was only able to drawdown $6,349.02 and he is owed $38,650.98.

34. I accept the Plaintiffs' submission that this claim for a lump sum is based on a false premise and a misreading of the Order 25 April 2018. The effect of paragraph 10 was to exempt up to $5,000 per week on account of living expenses. If the amount drawn down on account of living expenses in any given month was less than $5,000, the Order does not contemplate that the balance can be carried forward and claimed as a lump sum. Accordingly, I dismiss the Defendant's claim for this lump sum as presently framed.

35. I understand the Defendant to be contending that for various reasons he was unable to access his own assets during this period and had to borrow money from family and friends to support his living expenses. If this is indeed the case and the Defendant is being pressed for repayment of those loans, it may be that he can make an application to the Court so as to enable him to discharge these obligations. Any such application will have to be supported by contemporaneous documentation evidencing the existence of such indebtedness.

**Application for Additional Legal Expenses**

36. The Summons filed on 29 June 2018 also sought an order that the Defendant be permitted to obtain the sum of $50,000 for legal advice and representation. I understand

that Plaintiffs have already agreed to allow some funds to be used on account of legal costs of the Defendant. During argument Mr Froomkin represented that the Defendant was looking to receive an additional $30,000 from his assets on account of legal costs. The Plaintiffs do not object to the Defendant having access to his assets on account of legal costs and do not object to the suggested figure of $30,000.

37. In the circumstances, I order that the Order of 25 April 2018 be varied so as to allow the Defendant to have access to his assets to the extent of $30,000 on account of legal costs. I also order that the Plaintiffs should take all necessary steps in their power to allow the Defendant to have access to his assets on account of legal costs to the extent of $30,000 and for this purpose the Defendant's assets include the Bermuda Sharesave Scheme, Hiscox Shares and Hiscox Pension referred to in Paragraph 2(iv), (v) and (vi) of the Defendant's Second affidavit dated 28 June 2018.

**Summary**

38. The Plaintiffs are granted summary judgment in an amount equivalent to US $1,506,960 and CHF 334,000 together with interest at the statutory rate of 3.5% running from the date of the relevant payment to the date of judgment.

39. The Defendant is ordered to file a further and better affidavit relating to his assets and that further affidavit is to be filed and served on the Plaintiffs within the next 14 days.

40. The Order dated 25 April 2018 is varied so as to reduce the exemption for living expenses from $5,000 to $2,000 per week.

41. The Defendant's application for a lump sum in the amount of $38,650.98 is dismissed.

42. The Defendant's application that he should have access to his assets, on account of legal costs, to the extent of $30,000 is granted.

43. Unless either party applies by letter to the Registrar within the next 14 days to be heard as to costs, the costs of all the applications (other than the application in respect of legal costs) are awarded to the Plaintiffs to be taxed if not agreed on the standard basis.