# EXHIBIT 19

Digitally signed by Advance Performance Exponents Inc.
Date: 2023.05.04 12:24:01 -05:00
Reason: Apex Certified
Location: Apex


**IN THE COURT OF APPEAL OF THE CAYMAN ISLANDS**
**ON APPEAL FROM THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CICA (Civil) Appeal No. 009 of 2021**
**(Formerly Cause No. FSD 92 of 2017 (NSJ))**

**IN THE MATTER OF THE COMPANIES ACT (2016 REVISION)**

**AND IN THE MATTER OF TRINA SOLAR LIMITED**

**BETWEEN**

**(1) MASO CAPITAL INVESTMENTS LIMITED**

**(2) BLACKWELL PARTNERS LLC – SERIES A**

**APPELLANTS**

**-AND-**

**TRINA SOLAR LIMITED**

**RESPONDENT**

| | |
|---|---|
| **Before:** | The Hon Sir Richard Field, Justice of Appeal<br>The Hon Sir Michael Birt, Justice of Appeal<br>The Rt Hon Sir Jack Beatson, Justice of Appeal |
| **Appearances:** | Simon Salzedo KC, instructed by Rupert Bell, Niall Hanna and Patrick McConvey of Walkers for the Appellants<br><br>Philip Jones KC instructed by Katie Pearson, Rhiannon Zanetic and Moesha Ramsay-Howell of Harney, Westwood & Riegels for the Respondent |
| **Heard:** | 3, 4 and 5 May 2022 |
| **Draft circulated:** | 24 March 2023 |
| **Judgment delivered:** | 4 May 2023 |



CACV009/2021 Page 1 of 155 2023-05-04

## Table of Contents

| | | | Paragraph |
|---|---|---|---|
| Background | | | 2 |
| Proceedings before the judge in outline | | | 12 |
| The judge's decision | | | 20 |
| Approach on appeal | | | 23 |
| Meaning of fair value | | | 34 |
| Grounds of appeal | | | 38 |
| Ground 1- Market Price | | | 40 |
| (i) | Semi-strong efficient market | | |
| | (a) | Introduction | 41 |
| | (b) | The evidence | 51 |
| | (c) | The judge's decision | 61 |
| | (d) | Dissenting Shareholders' submissions | 63 |
| | (e) | Discussion | 65 |
| (ii) | MNPI – the 9,000 MW point | | |
| | (a) | Introduction | 67 |
| | (b) | The evidence | 71 |
| | (c) | The judge's decision | 81 |
| | (d) | Dissenting Shareholders' submissions | 82 |
| | (e) | The Company's submissions | 88 |
| | (f) | Discussion | 89 |
| (iii) | Relevance of analysts' reports | | 93 |
| Ground 2- Merger Price | | | |
| (i) | Introduction | | 109 |
| (ii) | The judge's decision | | 113 |
| (iii) | Submissions on appeal | | 116 |
| (iv) | Discussion | | 123 |
| | (a) | Fairness Opinion | 124 |
| | (b) | The Norcraft point | 132 |

| | | | |
|---|---|---|---|
| | (c) | The remaining points | 138 |
| Ground 3 – Management Projections | | | 150 |
| (i) | Test for departing from the Management Projections | | 151 |
| (ii) | The 9,000 MW point | | 161 |
| (iii) | Module selling prices | | |
| | (a) | Introduction | 162 |
| | (b) | The evidence | 164 |
| | (c) | The judge's decision | 169 |
| | (d) | Submissions on appeal | 170 |
| | (e) | Discussion | 172 |
| (iv) | Capacity factors | | |
| | (a) | Introduction | 178 |
| | (b) | The evidence | 181 |
| | (c) | The judge's decision | 187 |
| | (d) | Discussion | 188 |
| Ground 4 – The DCF discount | | | 193 |
| (i) | Country risk premium | | |
| | (a) | The evidence | 195 |
| | (b) | The judge's decision | 201 |
| | (c) | Submissions on appeal | 202 |
| | (d) | Discussion | 204 |
| (ii) | Size premium | | |
| | (a) | Introduction | 207 |
| | (b) | The evidence | 210 |
| | (c) | The judge's decision | 216 |
| | (d) | Dissenting Shareholders' submissions | 218 |
| | (e) | Discussion | 221 |
| (iii) | Cost of debt | | |
| | (a) | Introduction | 227 |
| | (b) | The evidence | 229 |

(c) The judge's decision 232
(d) Discussion 233

Ground 5

(i) Weighting 239
(ii) Approach to evidence and uncertainty 251

Summary of conclusions 263

**JUDGMENT**

**Birt, JA**

**1.** This is an appeal by the Appellants ("the Dissenting Shareholders") against a judgment of Segal J ("the judge") dated 23 September 2020 ("the Judgment") in which he determined the fair value of the shares which the Dissenting Shareholders held in the Respondent ("the Company") pursuant to section 238 of the Companies Act (2016 Revision). The Dissenting Shareholders submit that the judge erred in a number of respects and that the fair value of their shares in the Company is materially higher than he determined.

**Background**

**2.** Changzhou Trina Solar Energy Co Limited ("Trina China") was incorporated in China in 1997. It was founded by Mr Jifan Gao ("Mr Gao") who has been chairman of Trina China since its incorporation.

**3.** The Company was incorporated as an exempted limited company in the Cayman Islands in March 2006 for use as a listing vehicle to take Trina China public. Trina China became a wholly owned subsidiary of the Company and Mr Gao became chairman and chief executive officer of the Company, which positions he continued to hold at the time of the merger referred to below. Together with his wife and his holding company, he owned 5.6% of the Company's shares. From December 2006, the Company's American Depositary Shares ("ADS") were listed on the New York Stock Exchange.

**4.** There are two segments to the Company's business, namely the upstream and the downstream segments. In its upstream business, the Company manufactures and sells solar photovoltaic ("PV") modules (also known as solar panels) for residential and commercial use. The upstream business accounts for the majority of the Company's revenue (over 90% in 2015). In its downstream business, the Company develops, designs, manages and sells or operates solar power projects.

Historically the downstream business has been focused on China, but in recent years it has expanded into other markets.

**5.** The Company has now been taken private following acquisition by a group of investors ("the Buyer Group") which includes Mr Gao. The acquisition proceeded as follows.

**6.** On 12 December 2015 ("the Proposal Date"), the Buyer Group made an offer to acquire all the shares in the Company (except the 5.6% already owned by Mr Gao) at a price of US$11.60 per ADS ("the Merger Price"). All references hereafter to $ are to USD.

**7.** Following receipt of the Buyer Group's offer, the Company appointed a Special Committee on 13 December 2015 to evaluate the proposal. The members of the Special Committee were two directors of the Company, Mr Quian Zhao ("Mr Zhao") and Mr Sean Shao ("Mr Shao"). Mr Zhao gave evidence at the trial but Mr Shao did not. The Special Committee appointed Kirkland and Ellis LLP as its US legal adviser and Citigroup Global Markets Inc ("Citi") as financial adviser.

**8.** The Special Committee asked Citi to perform a market check in order to identify any other potential buyers. This involved contacting other potential buyers. Citi was also asked to produce a fairness analysis, in which Citi produced its own valuation of the Company's ADS. Citi concluded on the basis of that analysis (and subject to various qualifications, including that Citi had assumed the Company's management forecasts of future performance ("the Management Projections") to be correct) that the Merger Price was fair ("the Fairness Opinion").

**9.** On 1 August 2016 ("the Acceptance Date"), the Special Committee approved and recommended the offer to the shareholders at the Merger Price.

**10.** An EGM of the Company was held on 16 December 2016 ("the Valuation Date") to consider the Buyer Group's offer. At the EGM, 2.2% of shares were voted

against the merger, 40.6% were not directly voted, but their owners were deemed to have given their proxy to the Company's management pursuant to a term of the ADS Depository Agreement, and thus were deemed to have voted for the merger; and 57.2% were voted in favour of the merger. Accordingly the resolution approving the merger was passed with 97.8% of shares voted or deemed to have been voted in its favour.

**11.** The merger completed on 13 March 2017, at which point the Company's ADS ceased trading on the New York Stock Exchange. The former shareholders were paid the Merger Price save for the Dissenting Shareholders who exercised their right under section 238 to have the fair value of their shares determined by the Grand Court.

**The proceedings before the judge in outline**

**12.** The evidence before the judge consisted of the following:

(i) two witnesses of fact, namely Mr Zhao who was a director of the Company and a member of the Special Committee and Mr Chan, who was the Company's Vice President of Legal Affairs;

(ii) two experts on the solar industry, namely Dr Shalom Goffri for the Company and Mr Christopher Russo for the Dissenting Shareholders; and

(iii) two valuation experts, namely Ms Susan Glass for the Company and Mr Richard Edwards for the Dissenting Shareholders.

There was also evidence in writing from two experts on the law of Delaware but they were not called to give oral evidence.

**13.** In cases concerning fair value under section 238, there are three main valuation methodologies which fall for consideration. The first is the adjusted trading price. This is the price at which the shares were trading on the relevant stock market but subject to an estimate of what the price of those shares would have been as at the

Valuation Date in the absence of any proposed merger. In other words an adjustment is made to try and strip out the effect on the trading price of the fact that an offer to acquire the shares has been made at a known price. When speaking in general terms, I shall refer to this as "the adjusted trading price" or "the market price".

**14.** Secondly, there is the price which has been offered by the acquiring entity and which has been accepted by the shareholders other than those who are dissenting. When speaking in general terms, I shall refer to this price as the 'merger price'.

**15.** Finally, there is a Discounted Cash Flow ("DCF") valuation. This was summarised by this Court in the case of *In Re Shanda Games Limited* [2018] (1) CILR 352 at [61] in the following terms:

> ***"As its name indicates, a DCF analysis contains two main elements: a prediction of future cash flows, and the application to those cash flows of a discount rate so as to translate the future cash flows into a present capital value. In effect, the exercise is designed to identify how much it would have cost at the valuation date to buy an investment with a rate of return and a risk profile equivalent to that of the company's business."***

**16.** There were many issues before the judge, a number of which are no longer disputed and therefore it is not necessary to mention them. So far as is relevant for this appeal, the position of the parties before the judge was as follows.

**17.** The Company's primary submission was that the fair value should be determined by reference to the adjusted trading price; alternatively, the fair value should be ascertained by reference only to market-based methodologies, ie the adjusted trading price and the Merger Price. If this was not accepted, the fair price should be ascertained by a weighting of the different methodologies in accordance with

the evidence of Ms Glass, who advised a weighting of 40% to each of the adjusted trading price and the Merger Price and 20% to a DCF valuation.

**18.** The Dissenting Shareholders, on the other hand, submitted that there were weaknesses in both the adjusted trading price and the Merger Price such that weight could not properly be placed upon them. They submitted therefore that the fair value should be calculated solely by reference to a DCF valuation.

**19.** In relation to the DCF valuation, the parties disagreed on many of the projections and assumptions which were to be used in such a valuation.

**The judge's decision**

**20.** The Dissenting Shareholders are only appealing certain of the judge's findings. I shall describe the judge's decision on those points in more detail when I come to the individual grounds of appeal. For this introduction a very broad summary will suffice.

**21.** The judge rejected the Company's submission that he should only have regard to the adjusted trading price and its alternative submission that he should only place weight on the market placed methodologies, namely the adjusted trading price and the Merger Price. He also rejected the Dissenting Shareholders' submission that the adjusted trading price and the Merger Price should be rejected in favour of an assessment based entirely on a DCF valuation. He acknowledged certain weaknesses in both the adjusted trading price and the Merger Price and accordingly held that there should be a weighted average of all three methodologies. Whereas Ms Glass had proposed a weighting of 40% adjusted trading price, 40% Merger Price and 20% DCF valuation, he opted for 30% adjusted trading price, 45% Merger Price and 25% DCF valuation. He accepted the evidence of Ms Glass to the effect that the adjusted trading price was $7.26 per ADS and of course the Merger Price was $11.60 per ADS.

**22.** As to the DCF valuation, the judge determined the various matters in dispute as to how this should be calculated both in the judgment and in a post-judgment decision dated 18 December 2020. The parties then agreed the calculation of the DCF valuation based upon the judge's decisions. This came to $17.81 (after a 2% minority discount determined by the judge and which is not challenged). Using the weightings determined by the judge, the fair value came to $11.75 per ADS.

**Approach on appeal**

**23.** There was limited dispute between the parties as to the correct approach of this Court but it is important to recall the applicable principles.

**24.** The approach to the review on appeal of findings of fact by a first instance court was authoritatively summarised by the UK Supreme Court in *Henderson v Foxworth Investments Limited* [2014] 1 WLR 2600. I would quote the following two paragraphs from the judgment of Lord Reed (which was agreed by all the other justices) as encapsulating the correct position in the Cayman Islands:

> ***"62. Given that the Extra Division correctly identified that an appellate court can interfere where it is satisfied that the trial judge has gone 'plainly wrong', and considered that that criterion was met in the present case, there may be some value in considering the meaning of that phrase. There is a risk that it may be misunderstood. The adverb 'plainly' does not refer to the degree of confidence felt by the appellate court that it would not have reached the same conclusion as the trial judge. It does not matter, with whatever degree of certainty, that the appellate court considers that it would have reached a different conclusion. <u>What matters is whether the decision under appeal is one that no reasonable judge could have reached</u>.***
>
> **…..**

***66. These dicta are couched in different language, but they are to the same general effect, and assist in understanding what Lord Macmillan is likely to have intended when he said that the trial judge might be shown 'otherwise to have gone plainly wrong'. Consistently with the approach adopted by Lord Thankerton in particular, the phrase can be understood as signifying that the decision of the trial judge cannot reasonably be explained or justified.***

***67. It follows that, in the absence of some other identifiable error, such as (without attempting an exhaustive account) a material error of law, or the making of a critical finding of fact which has no basis in the evidence, or a demonstrable misunderstanding of relevant evidence, or a demonstrable failure to consider relevant evidence, an appellate court will interfere with the findings of fact made by a trial judge <u>only if it is satisfied that his decision cannot reasonably be explained or justified</u>."***

**25.** In *JSC BTA Bank v Ablyazov* [2018] EWCA Civ 1176; [2019] B.C.C. 96, Leggatt LJ (with the agreement of Gloster and Coulson LJJ), having referred to the passage emphasised above in [62] of Lord Reed's judgment, said:

***"Another formulation of the test, which has also been approved at the highest level, is that the appellate court ought not to interfere 'unless it is satisfied that the judge's conclusion lay outside the bounds within which reasonable disagreement is possible'…"***

**26.** A vivid explanation of one of the reasons why an appellate court exercises restraint in appeals against factual findings is to be found in the judgment of

Lewison LJ in *Fage UK Limited v Chobani UK Limited* [2014] E.T.M.R at [114] where he said:

> ***"In making his decisions the trial judge will have regard to the whole of the sea of evidence presented to him, whereas an appellate court will only be island hopping."***

**27.** As well as primary findings of fact, determination of fair value is likely to involve evaluative findings. In this respect, the approach of an appellate court was helpfully summarised by Clarke LJ in *Assicurazioni Generali SpA v Arab Insurance Group* [2003] 1 WLR 577 at [16] where he said:

> ***"16. Some conclusions of fact are, however, not conclusions of primary fact of the kind to which I have just referred. They involve an assessment of a number of different factors which have to be weighed against each other. This is sometimes called an evaluation of the facts and is often a matter of degree upon which different judges can legitimately differ. Such cases may be closely analogous to the exercise of a discretion and, in my opinion, appellate courts should approach them in a similar way."***

**28.** In similar vein, in *Ablyazov* Leggatt LJ said as follows at [40]-[41]:

> ***"40. It is convenient to distinguish – although the difference is really one of degree – between findings of primary fact and factual findings which involve evaluating and drawing inferences from such primary facts. The reasons for the reluctance of appellate courts to interfere with findings of fact made following a trial apply in both cases: indeed, the reasons for restraint are often stronger where the finding involves an evaluation of primary facts.***

> ***41. Those reasons are by no means limited to the advantage enjoyed by the trial judge in a case in which oral testimony plays a significant part of having seen and heard the witnesses give evidence. The reasons also include recognition that the judge who presides over the trial is immersed in the evidence in a way that an appeal court cannot replicate…"***

**29.** In relation to expert evidence, Mr Salzedo submitted that an appellate court should be less reluctant to interfere with a trial judge's finding based on his assessment of contested expert evidence. Thus he referred to the judgment of the Inner House of Court of Session in *Ted Jacob Engineering Group Inc v Morrison* [2009] CSIH 22, 2020 SLT 14, where at [10] the Inner House said:

> ***"Expert evidence is not evidence of primary facts, but is rather an expression of opinion about the analysis of those facts according to the specialist knowledge and skill of the expert; as such, it should be treated as inferential in nature, and an appellate court is fully entitled to assess such evidence and if so advised to come to a different conclusion from the judge at first instance."***

He also referred to *Stephen v Scottish Boat Owners Mutual Assurance Association* [1989] 1 Lloyd's Rep 535 at 539.

**30.** This Court had occasion to review the approach to expert evidence (albeit in that case expert evidence as to foreign law, which has been described as a question of fact *'of a peculiar kind'*) in *Perry v Lopag Trust Reg CICA (Civil) Appeal No. 16 of 2020,* 19 November 2021 where Beatson JA said at [81]:

> ***"[81] …but it is well recognised that, although it is less likely in the case of an expert witness that questions of credibility will arise, the demeanour of such a witness and his or her response to***

***questioning may be important factors in deciding whether the evidence is reliable or not; MCC Proceeds Inc v Bishopsgate Investment Trust Plc at [11]. In Joyce v Yeomans [1981] 1 WLR 549 at 556 Brandon LJ stated:***

> ***'… even when dealing with expert witnesses, a trial judge has an advantage over an appellate court in assessing the value, the reliability and the impressiveness of the evidence of the experts called on either side. There are various aspects of such evidence in respect of which the trial judge can get the 'feeling' of a case in a way in which an appellate court, reading the transcript, cannot. Sometimes expert witnesses display signs of partisanship in a witness box or lack of objectivity. This may or may not be obvious from the transcript, yet it may be quite plain to the trial judge. Sometimes an expert witness may refuse to make what a more wise witness would make, namely, proper concessions to the viewpoint of the other side. Here again this may or may not be apparent from the transcript'."***

**31.** Some of the matters referred to by Beatson JA were found by the judge to have arisen in the present case. Although he considered particular aspects of the expert evidence in addressing specific topics, the judge gave an overall summary of his impression of the experts at [12] and [13] of the Judgment. At [12], he commented on the solar industry experts as follows:

> ***"…I comment in detail later in this judgment on the reliability and credibility of Dr Goffri and Mr Russo by reference to their evidence on particular issues. But at this stage I would say this. I find both Dr Goffri and Mr Russo to be extremely knowledgeable with extensive expertise in the solar energy field. Dr Goffri struggled at times during his cross-examination, particularly in the early stages (but I put most of this down to inexperience rather than weaknesses in his knowledge). His written reports were clear***

> ***and cogent but a little light on detail. Mr Russo gave his evidence in a clear and careful manner and his written reports were detailed and thorough. He demonstrated a mastery of the evidence and issues and that he had considered carefully the various issues raised about his reports by both Dr Goffri and Ms Glass. But I found Mr Russo's evidence generally to be overly optimistic and formed the view that he was not prepared to take a balanced view when the evidence suggested that this was needed."***

**32.** At [13] he gave his overall impression of the valuation witnesses in the following terms:

> ***"….Once again, I comment in detail later in this judgment on the reliability and credibility of Ms Glass and Mr Edwards by reference to their evidence on particular issues. But at this stage I would say the following. Once again, both Ms Glass and Mr Edwards demonstrated that they had both substantial experience and expertise in valuation matters and a good knowledge of the solar industry and energy sector. They both gave their evidence in a clear and careful manner and their written reports were excellent – clear, cogent, detailed and thorough. As is apparent though from the summary of my conclusions above and will become clear from the rest of this judgment, I have generally found Ms Glass' evidence to be more balanced, realistic and reliable."***

**33.** In my judgment, whilst an appellate court may be marginally more inclined to intervene when it is a question of evaluating expert evidence rather than assessing purely factual evidence, the approach remains the same. As Leggatt LJ said in *Abylazov* (echoing Lewison LJ's observation about the *'sea of evidence'*), the trial judge is immersed in the evidence in a way that an appellate court cannot replicate. The trial judge has seen and heard the relevant expert witnesses and has

had the opportunity of assessing the coherence and reliability of that evidence as described by Beatson JA in *Perry*. After making modest allowance for the fact that the appeal is in respect of the evaluation of expert evidence rather than purely factual evidence, the approach remains that, in the absence of any of the other features listed by Lord Reed at [67] in *Henderson*, an appellate court may only intervene if the decision of the trial judge is *'plainly wrong'*, *'cannot reasonably be explained or justified'*, *'is one which no reasonable judge could have reached'* or *'is outside the bounds within which reasonable disagreement is possible'*; all of which expressions mean the same thing.

**The meaning of fair value**

**34.** Although there was dispute before the judge as to what was meant by '*fair value'* for the purposes of section 238 and the judge rejected the submissions of the Company on this aspect, there was no challenge by either party on this appeal to the judge's summary of what was meant by fair value which he set out at [91] – [97] of the Judgment. The key paragraph is at [91] where he said:

> ***"In ascertaining fair value, the Court must assess and determine a monetary amount which in the circumstances represents (its best estimate of) the worth, the true worth, of the dissenting shareholders' shares (true worth meaning the actual value to the shareholder of the financial benefits derived and available to him from his shares and by being a shareholder). The reference to fair requires in my view inter alia that the manner and method of that assessment and determination is fair to the dissenting shareholder by ensuring that all relevant facts and matters are considered and that the sums selected properly reflects the true monetary worth to the shareholder of what he has lost, undistorted by the limitations and flaws of particular valuation methodologies and fairly***

***balancing, where appropriate, the competing, reasonably reliable alternative approaches to valuation relied on by the parties."***

**35.** Other points to emerge from the judge's above summary can be summarised as follows (drawing in part on the summary contained at [6] of the Dissenting Shareholders' skeleton argument, which I regard as fairly reflecting the Judgment in these respects):

(i) The *'true worth'* of a share can in an appropriate case be assessed by assuming an immediate sale under certain conditions (ie a *'market-based'* approach using the adjusted trading price and/or merger price as a measure of fair value). This will often be the most reliable method of capturing the full monetary worth of the share. But *'true worth'* can also, in an appropriate case, be assessed by assuming that the shareholder retains the share and obtains the financial benefits of doing so. This is sometimes referred to as the '*intrinsic value'* i.e. establishing a monetary value for the shareholder's bundle of rights by reference to the financial benefits flowing from the right to participate in profits and obtain distributions in a winding up.

(ii) A DCF valuation of the Company can assist and be relied upon on either approach; either (directly) as a model of what the shareholder will receive if the share is retained or (indirectly) as an estimate of what a purchaser would be likely to pay for the share if it is sold.

(iii) Apart from the fact that market perceptions may affect the market price, the worth of a share is not, as a matter of principle, the same as or limited to its market price, but can also be assessed by reference to the financial benefits which can be derived from retention of the share. As this Court said in *Shanda Games* at [22]…. *'fair value is not necessarily the same as the merger price or the price at which the shares were trading'*.

(iv) The selection of valuation methodology (or methodologies) is a fact sensitive issue. In some cases it would be appropriate to give particular weight to market based indicia of value and use a DCF valuation as a means of testing those other valuation methodologies. Thus, where the adjusted trading price and merger price may be seen as reliable, they may probably be used as the starting point of the valuation subject to testing by reference to a DCF valuation.

(v) Although the judge did not specifically say this, it is implicit in what he says – and I would hold it to be correct – that in other cases it will be appropriate to estimate fair value exclusively or primarily using a DCF valuation.

**36.** What is clear is that, although it will undoubtedly look to expert evidence in order to assist it, the court must reach its own decision as to fair value and the constituent elements which go to make up that fair value. It must not simply plump for one expert over another. As Vice-Chancellor Strine said in *Andaloro v PFPC Worldwide Inc*, Court of Chancery, Delaware, New Castle 2005 Del, Ch. Lexus 125 at [34] (in a passage approved by Kawaley J in *Re Nord Anglia Education, Inc* (Unreported, Grand Court, 17 March 2020) at [70]):

> ***"In making the fair value determination, the court may look to the opinions advanced by the parties' experts, select one party's expert opinion as a framework, fashion its own framework, or adopt piecemeal, some portion of an expert's model methodology or mathematical calculations. But, the court may not adopt an 'either-or' approach and must use its judgment and an independent valuation exercise to reach its conclusion."***

**37.** The need for the court to reach its own decision was also emphasised by this Court in *Re Shanda Games Limited* where Martin JA said at [22]:

> ***"...Since the fair value is not necessarily the same as the merger price or the price at which shares were trading before the market in them was affected by knowledge of the merger, it is inevitable that the determination will involve an assessment of a substantial quantity of information relating to the financial affairs of the company whose shares are to valued. It is unlikely in the extreme that the court will be able to make that assessment without expert assistance. In the ordinary case, as in this one, both the company and any dissenting shareholders will appoint experts; but even in a case where no dissenting shareholder is prepared to participate in the litigation, the company, and perhaps also the court itself, will instruct an expert. In every case, the court's task will be to assess the utility of the expert evidence to the determination of fair value. Carrying out that task in the context of s.238 proceedings is no different in nature from carrying it out in ordinary inter partes litigation. In ordinary litigation, and in s.238 proceedings, the court will determine generally, or on an issue-by-issue basis, whether an expert's evidence is to be accepted in whole or in part and how conflicts are to be resolved. If necessary, the court is entitled to substitute its own view for that of the experts."***
> [Emphasis added]

**Grounds of appeal**

**38.** With that introduction, I turn to consider the grounds of appeal. The Dissenting Shareholders raise five main grounds of appeal although there are a number of sub-issues which fall for consideration in relation to several of the grounds. In very brief summary, the five main grounds of appeal are as follows:

(1) The judge erred in giving any, alternatively excessive, weight to the adjusted trading price of the Company's ADS ("the Market Price").

(2) The judge erred in giving any, alternatively excessive, weight to the Merger Price.

(3) The judge erred in a number of respects in essentially accepting the management projections prepared by the Company's management ("the Management Projections") for the purpose of assessing fair value.

(4) The judge erred in three respects when determining the projections and assumptions to be used in the DCF valuation.

(5) The judge erred in giving weight to all three valuation methodologies (Market Price, Merger Price and DCF) and should have attributed 100% weight (alternatively more than 25%) to the DCF valuation.

**39.** I turn to consider each of these five grounds (and their various sub-issues) in turn.

**(1) Ground 1 - Market Price**

**40.** The Dissenting Shareholders contend that the judge erred in three respects in relation to the Market Price, namely he wrongly found (i) that the market in the Company's ADS was semi-strong efficient, (ii) that there was no material non-public information as at the Valuation Date, and (iii) that it was reasonable for Ms Glass to place weight on the reports of analysts. I shall consider each of these three matters in turn.

**(i) Semi-strong form efficiency**

**(a) Introduction**

**41.** The judge correctly accepted that, if weight was to be placed on the adjusted trading place of the ADS when determining fair value, there must be a semi-strong efficient market in those ADS. Thus at [131] he said:

> ***"As regards [the efficient market hypothesis] the Dissenting Shareholders' core proposition is that it could not be assumed that in a given market for a given asset the trading price will approximate fair value, that considerable care has to be used before relying on the trading price and it was wrong to assume that markets get it right all the time. These propositions are unobjectionable but, as a general matter, I am not persuaded that it is inappropriate for the Court to place reliance on the market price where there is sufficient evidence demonstrating that the requirements for a semi-strong version of the efficient market hypothesis are satisfied."***

**42.** A similar approach was adopted by Kawaley J in *Nord Anglia* at [6].

**43.** In this respect, as he said at [128], the judge was adopting the approach followed by the courts of Delaware, particularly in the cases *of Dell Inc v Magnetar Global Event Driven Master Fund Limited*, 177 A. 3d 1 (2017) and *DFC Global Corporation v Muirfield Value Partners LP*, 172 A. 3d 346 (2017), both decisions of the Delaware Supreme Court.

**44.** In *Dell*, the Court of Chancery had decided that no weight should be given to the trading price or the merger price and that fair value should be assessed solely by reference to a DCF valuation. The Supreme Court held that, on the facts of that case, this approach was wrong and remitted the case to the Court of Chancery for decision, albeit making clear its view that, on the facts, the merger price should

carry very substantial, if not exclusive, weight. In the course of reaching its conclusion, the Supreme Court said this at p 24:

> ***"Further, the Court of Chancery's analysis ignored the efficient market hypothesis long endorsed by this Court. It teaches that the price produced by an efficient market is generally a more reliable assessment of fair value than the view of a single analyst, especially an expert witness who caters her valuation to the litigation imperatives of a well-heeled client."***

**45.** As to what is meant by a *'semi-strong form efficient market'*, Kawaley J summarised the position concisely in *Nord Anglia* at [58] in the following terms:

> ***"It was agreed that the stock market is not generally considered to be 'strong-form efficient' i.e. with market prices reflecting both public and private information. A market is 'semi-strong form efficient' if the market fully reflects all <u>public</u> information*** [emphasis added]***. It was agreed that in a semi-strong efficient market:***
>
> ***(a) stock prices respond to and rapidly incorporate new value-relevant publicly available information (market-industry and/or company-specific); and***
>
> ***(b) no <u>significant</u> changes in stock price would be expected on days when there was no new value-relevant information."*** [original emphasis]

**46.** The judge expressed the matter as follows at [111]:

> ***"The Company submitted that, as was clear from DFC and Dell, the Delaware courts subscribed to the semi-strong version of the efficient market hypothesis… This is that well-traded stocks in a***

***mature market, such as the US, are semi-strong efficient, which means the prices reflect all publicly-available information regarding the stock, the company, the industry, the economy but not private information."***

**47.** The most detailed and helpful summary of the relevant factors when assessing whether a market is semi-strong efficient is to be found in *Dell*. Thus at pages 7-8, the Delaware Supreme Court said this:

> ***"Dell had a deep public float and was actively traded as more than 5% of Dell's shares were traded each week. The stock had a bid-ask spread of approximately 0.08%. It was also widely covered by equity analysts and its share price quickly reflected the market's view on breaking developments. Based on these metrics, the record suggests the market for Dell's stock was semi-strong efficient, meaning that the market's digestion and assessment of all publicly available information concerning Dell was quickly impounded into the Company's stock price."***

**48.** Later, at page 28, the Supreme Court said this:

> ***"A market is more likely efficient, or semi-strong efficient, if it has many stockholders; no controlling stockholder; 'highly active trading'; and information about the company is widely available and easily disseminated to the market. In such circumstances, a company's stock price 'reflects the judgments of many stockholders about the company's future prospects, based on public filings, industry information, and research conducted by equity analysts'. In these circumstances, a mass of investors quickly digest all publicly available information about a company,***

***and in trading the company's stock, recalibrates its price to reflect the market's adjusted, consensus valuation of the company."***

In agreement with the judge, I consider that these observations of the Delaware Supreme Court are equally applicable when courts in this jurisdiction have to determine whether a market in a company's shares is semi-strong efficient for the purposes of deciding whether weight should be placed on the adjusted trading price in assessing fair value.

**49.** The Dissenting Shareholders submit on this appeal that the judge was wrong to find that there was a semi-strong efficient market in the Company's ADS.

**(b) The evidence**

**50.** The Dissenting Shareholders complaint in relation to this ground of appeal relates entirely to the evidence of Ms Glass and accordingly I propose to concentrate on that evidence. Drawing partly on the judge's summary at [115] and partly on the content of her first report (Glass 1) I would summarise the relevant parts of her evidence as follows:

(i) The Company's ADS were liquid. Ms Glass had conducted liquidity analyses and confirmed that the Company's shares were liquid. She also noted that prices moved upon announcements being made and that the Company was valued by quality analysts.

(ii) At or around the Proposal Date, the Company's ADS price appeared to have been influenced by factors other than fundamentals and therefore might have been understated.

(iii) That situation had changed by the Acceptance Date, at which point share price movements were consistent with company fundamentals and analyst expectations.

(iv) After the announcement of the approval of the merger by the Company's board on the Acceptance Date, ADS trading was driven, at least in part, by the expected Merger Price, as opposed to company fundamentals or intrinsic value.

(v) In these circumstances Ms Glass took the trading price on 29 July 2016 (being the last trading day before the Acceptance Date) of $8.25 (the ADS traded between approximately $7 and $13 between December 2014 and December 2016). She then considered the interim factors that would have influenced values between 29 July 2016 and the Valuation Date of 16 December 2016. She compared the trading prices of the Company's peers in that period and concluded that all of their share prices had declined significantly even though the movement in the S&P 500 and the NYSE showed a small increase. In her view, a 12% reduction during that period would be a conservative estimate and accordingly she came up with a Market Price (i.e. an adjusted trading price) as at 16 December 2016 of $7.26.

**51.** She dealt specifically with the criteria for a semi-strong efficient market set out in *Dell* at [216] of Glass 1 in the following terms:

> ***"216. The criteria referred to by the Supreme Court of Delaware in the Dell Decision is set out below:***
>
> ***(a) The Dell stock had a bid-ask spread of approximately 0.08%***

***Trina's median bid-ask spread was comparable at 0.10% (2016), 0.10% (2015) and 0.08% (2014), as is later summarized in this Section.***

***(b) Dell had a deep public float and was actively traded as more than 5% of Dell's shares were traded each week.***

***In all years prior to receipts*** (sic) ***of the Proposal on 12 December 2015, more than 5% of Trina's ADS was traded each week, as is later summarised. Moreover, Trina's free float at the Acceptance Date was 80.8, or – 87% of outstanding ADS. As such, Trina had a deep public float. Moreover, no individual shareholder (or shareholder group) held a controlling interest or was in a position of significant influence.***

***(c) Dell's market capitalization of more than $20 billion ranked it in the top third of the S&P 500.***

***Trina is smaller than Dell, with a market capitalisation of slightly less than 1 billion at the relevant time. Although smaller than Dell, Trina is nonetheless a substantial company.***

***(d) Dell's share price quickly reflected the market's view on breaking developments.***

***This comment applies equally to Trina. As discussed later in this Section, the ADS price reacted swiftly to news about***

***the Proposal and the signing of the Merger Agreement, along with Trina's quarterly earnings announcements."***

**52.** Having commented on the application of the *Dell* criteria to the Company, Ms Glass concluded that this suggested that the market for the Company's ADS was a semi-strong efficient market. Thus at [217] she said:

> ***"Based on these metrics, I agree with the comments made in the Dell Decision: the data suggests that the market for Trina stock was semi-strong efficient, meaning that the market's digestion and assessment of all publicly-available information concerning Trina was quickly impounded into the Company's stock price."***

**53.** In a passage quoted by the judge at [116(b)], Ms Glass said at [322] of Glass 1:

> ***"322. <u>Market Trading Price</u>: I am of the view that the Market Trading Price also provides strong evidence as to the fair value of the ADS, considering:***
>
> ***(a) <u>The overall liquidity of the ADS</u>, as indicated by all of the tests summarised in Section 6. Over all periods reviewed, the Trina ADS had a low bid-ask spread, a deep public float, and were actively traded. In addition, the share price reacted quickly to news about the Company.***
>
> ***(b) <u>The high number of trades per day</u>, which further strengthens our ability to rely on the trading price. Over the period reviewed, the market price of the Trina ADS reflected the combined opinions and market activity of an average of 8,680 investors each day. In my view, those combined opinions should not be dismissed or ignored.***

> ***(c)*** ***The experience and qualifications of many of Trina's larger public shareholders, which included respected institutional investors with substantial stakes, such as Franklin Resources, Platinum Investment Management, Oaktree Funds, Goldman Sachs, Morgan Stanley, Deutsche Bank, State Street, Citadel Advisors and Bank of America Corp.***
>
> ***(d)*** ***The relatively wide analyst and investor following, together with the views of many respected analysts at or shortly prior to the Valuation Date. For the most part, analysts believed the shares were fairly priced – as illustrated by the high proportion of hold recommendations.***
>
> ***(e)*** ***The lack of strategic premiums. Unlike the Merger Price, the trading price does not include any strategic or similar premiums that must be removed."***

**54.** Ms Glass gave additional reasons in Glass 1 in support of her conclusion that the Company's traded ADS price represented a reliable measure of fair value which she summarised in the Joint Memorandum of the Valuation Experts dated 18 March 2019, namely:

> ***"..(e) an analysis of Trina's ADS price trends, which showed that the ADS price at and around the Acceptance Date was consistent with Company fundamentals and industry expectations;***
> ***(f) an analysis of peer company trading multiples."***

**55.** Ms Glass went on at [323] of Glass 1 to accept that the key negative arising from the market trading approach was the subjectivity surrounding the likely share

price movements between the Acceptance Date and the Valuation Date, although she believed her estimate of a 12% decline was fair.

**56.** The present ground of appeal is based upon certain things which Ms Glass said during the course of her cross-examination by Mr Salzedo. It is necessary therefore to set out the relevant extracts.

**57.** On Day 9/17-18 of the transcript, the following is recorded:

***"Q. [Mr Edwards' first criticism] is he says that you have not established that the ADS price represented intrinsic value at the start of the analysis period. That's right, isn't it?***

***A. I didn't go back and do a valuation two years prior, that's correct.***

***Q. Right.***

***A. So I've assumed that, because the various… (a) because it was well traded, liquid, (b) because the multiples were in line with the peers and (c) because my analysis of the trends accorded with not the buy/sell hold, but the comments made by the [analysts] that, you know, that the intrinsic value or the value of the shares approximated to market trading price."***

**58.** Then at pages 20-23 on the same day, Ms Glass said as follows:

***"Q. ... The second of Mr Edwards' points at sub-paragraph 2 on page 16, is the point that you express the view that the market price at or around the Proposal Date undervalued Trina and the point he makes from that is that you've not established by your analysis whether, when or how that negative impact of undervaluation was ever reversed and again that's right, isn't it?***

*A.* *Well, there again, the way I've noted that the ADS price back at the …. I think it says June here but, in any event, at the proposal date, why I thought it was negative, was influenced by the trends and by the comments of the analysts and, similarly, my conclusion at the acceptance date was influenced by the same things, so I am not quite sure how I haven't done the same. I appreciate – and I have always said – that I cannot say that at either date that market price might not have been out 10, 20, 25 per cent. But I just find it incredible to assume that it was, you know, five/six times or, you know, 20 times.*

*Q.* *No one is asking you to assume anything, are they?*

*A.* *He is talking scale. So if the scale we are talking about here is, you know, 10 or 15/20 per cent -- then we are in agreement.*

*Q.* *What I'm actually asking you to address… is whether the market price is a reliable indicator of fair value, okay, Ms Glass? I'm not asking you to address the question whether if the market price is understated that proves fair value is five, six, ten times as much. Do you mind if we deal with that question?*

*A.* *No, I am happy to deal with that question.*

*Q.* *I think what you are saying is that you accept that, on any view, your analysis doesn't show that the market price might not have been understated by, was it 10, 15, 20 per cent?*

*A.* *I would agree with that.*

***Q.*** ***Right.***

***A.*** ***That's why I only gave a 40 per cent weighting. I felt that we went over this yesterday with the efficient market hypothesis. I totally agree that, you know, it's not an absolute perfect test and it might be out.***

***Q.*** ***What's your explanation for why the shares were undervalued at the Proposal Date?***

***A.*** ***I don't have an explanation as to why. It just appeared to me that they were. Why? You know, because – even if you accept the efficient market hypothesis, it does not say every single day is going to be right. It says it might be above or below, so….***

***Q.*** ***But if, in all of this analysis and reading all the analysts' reports, you have not identified a reason, then you can't have any confidence that the undervaluation has been reversed later, can you?***

***A.*** ***Yes, I can, based on everything I have said."***

**59.** At Day 9/28-29, the following exchange took place in relation to event studies:

***"Q.*** ***…. Do you also accept that what you've done is not an event study?***

***A.*** ***Yes, I accept that.***

***Q.*** ***You accept that. Thank you. That's very helpful. You are aware that the word 'event study' has a particular meaning in academic finance.***

***A.*** ***I am aware of the word 'event study' and it's not an event study.***

***Q.*** ***It's not what you've done. Okay, thank you. I'm afraid there is still one more question about event studies, which is this: an event study actually would have been the standard and proper way to try to reach a view on the matters you've tried to reach with your graph, wouldn't it?***

***A.*** ***No, an event study is something that one might do in order to try and prove or disprove the efficient market hypothesis, which is not what I'm trying to do.***

***Q.*** ***Well, you're absolutely right, Ms Glass, about what event studies are used for in a sense but what an event study is used for is to prove or disprove over a given period in relation to a given share or event and so on and what I'm suggesting to you is that's exactly what you've said you've done in your graph but you haven't done it the right way. You are trying to prove that the efficient market hypothesis holds for this period in relation to the share, aren't you? I know you're not doing it in academic terms but that's the effect of it?***

***A.*** ***No, I'm not trying to prove anything about the efficient market hypothesis."*** [Emphasis added]

**(c) The judge's decision**

**60.** Before the judge, the Dissenting Shareholders raised a number of arguments in support of their submission that no weight should be given to the Market Price. For present purposes, the relevant submission was that Ms Glass's response (in the passages emphasised in the preceding paragraph) that she was not trying to prove anything about the efficient market hypothesis and that that was why she had not done an event study was fatal to any suggestion that her work supported the reliability of the Market Price in this case.

**61.** The judge gave his conclusion on this aspect at [135]-[139]. In view of Mr Salzedo's submissions on appeal, it is necessary to set out those paragraphs in full:

> ***"135. It seems to me that Ms Glass accepted during her cross-examination the limitations of her valuation methodology based on the traded price of the Company's shares. She accepted that her market price valuation was only accurate within a range, and a fairly broad range ('It's not an absolutely perfect test and it might be out'). She accepted that the market price might be understated by as much as 20%. She also accepted that in essence she had undertaken a 'trend analysis'…. But it was because of these limitations that she considered that the weight to be given to her adjusted market price should be discounted and only given a 40% weighting. I note that this explanation for the reduced weighting to be given to the adjusted market price provided during cross-examination was rather different from that set out in her written evidence in Glass 1 at [323], quoted above (which identified the 'key negative arising from a market trading approach' as being difficulties in accurately accounting for and calculating share price movements between the Acceptance Date and the Valuation Date).***
>
> ***136. Ms Glass also accepted that she had not done an event study but denied that one was necessary as part of the methodology she had adopted or to support her conclusions. I note that she did prepare an event study in <u>Qunar</u>… and it was not explained in this case why an event study was appropriate there but not here. Ms Glass denied that she was 'trying to prove anything about the efficient market hypothesis' but the Company is seeking to rely on her evidence to show that all the tests set out in <u>Dell</u> and***

***the requirements for a semi-strong version of the efficient market hypothesis were satisfied in the present case.***

*137.* ***I consider that the absence of an event study is not determinative and does not wholly undermine the value of Ms Glass' analysis as to why the adjusted market price should be given significant weight in the determination of the value of the Dissenting Shareholders' shares. The absence of such a study is consistent with the limited nature of Ms Glass' analysis, but, in my view, within and subject to these limitations, Ms Glass' analysis is cogent and reasonable. While she resisted the suggestion that she was addressing herself to issues relating to the efficacy of the efficient market hypothesis, her analysis did consider and apply the assumptions underlying (and indeed she referred to) that hypothesis when coming to a view as to why the market trading price provided strong evidence as to the fair value of the Dissenting Shareholders' shares. As she said at Glass 1 at [206]-[207]:***

> ***"206. Because market prices reflect the impact of supply and demand, including market speculation and noise, a company's market trading price on any given day might be somewhat higher or lower than intrinsic fair value. Nonetheless, but for unusual market events (such as a market crash), it is generally held that the share price of a well traded, liquid security that trades on a well-functioning and well-informed stock exchange provides a reasonable approximation of the fair value of the security.***

> ***207 My comments are consistent with the recent decision [in Dell] in which it is stated that "[the] Court of Chancery's analysis ignored the efficient market hypothesis long endorsed by this Court. It teaches that the price produced by an efficient market is generally a more reliable assessment of fair value than the view of a single analyst, especially an expert witness who caters her valuation to the litigation imperatives of a well-heeled client."***

***138. So she was seeking to demonstrate that the conditions identified in Dell for reliance on the market price were satisfied in this case. While less than clear and not entirely satisfactory (particularly her failure to explain the absence of an event study), I take her answers in cross-examination to be a rebuttal of the proposition that her focus was on testing in a general way the validity of the efficient market hypothesis and to emphasise that she was testing by a trend based analysis the extent to which the Company's market price could be relied on for the purpose of the fair value determination. And in my view her analysis does support the conclusion that the requirements for a semi-strong version of the efficient market hypothesis were satisfied in the present case: see the points made in Glass 1 at [322] set out above. I accept her responses to the criticisms made by Mr Edwards, which as I have said, included an acknowledgement that some of the criticism was justified as demonstrating the limitations of her approach.***

> ***139. In my view, her methodology for assessing the unaffected and adjusted price is reasonable and I reject the Dissenting Shareholders' criticism of her approach."*** [Emphasis added]

**(d) The Dissenting Shareholders' submissions**

**62.** The Dissenting Shareholders submit that the judge's conclusion that Ms Glass' evidence supported the conclusion that the requirements for a semi-strong version of the efficient markets hypothesis were satisfied was one which was not reasonably open to him; the only conclusion reasonably open to him was that the Company had failed to prove that the market for the Company's ADS was semi-strong efficient.

**63.** I would summarise Mr Salzedo's key submissions as follows:

(i) As set out at [41] above, the judge concluded correctly at [131] that, if reliance is to be placed on the trading price of a share, there must be *'sufficient evidence'* demonstrating that the requirements for a semi-strong version of the efficient market hypothesis are satisfied.

(ii) In view of Ms Glass' specific statement in cross-examination in the emphasised passages quoted at [60] above, that she did not do an event study because she was not trying to prove anything about the efficient market hypothesis, it was not reasonably open to the judge to find that her evidence did support the existence of a semi-strong efficient market in the Company's ADS and that the requirement for *'sufficient evidence'* was satisfied.

(iii) The two paragraphs from Glass 1 quoted by the judge at [137] and referred to above at [62] did not support his conclusion as he thought. In those two paragraphs, Ms Glass was speaking in general terms about well-functioning stock exchanges and was not engaged in any analysis of the specific conditions in the specific market for the Company's ADS.

(iv) At [138], the judge sought to explain Ms Glass' comment about not trying to prove anything about the efficient market hypothesis by saying that he took her answers to be a rebuttal of the proposition that her focus was on testing in a general way the validity of the efficient market hypothesis. That was a misunderstanding of what she said, as the issue of whether a market is efficient or semi-strong efficient can always only be measured in relation to a particular share. Thus, in this case, the issue was whether the market in the Company's ADS was semi-strong efficient. Ms Glass' response could only properly be understood as saying that she was not trying to prove anything about the efficient market hypothesis in relation to the Company's ADS and therefore could only mean that she was not trying to prove anything in relation to whether there was an efficient market in relation to the Company's ADS.

(v) In addition to the key point summarised in the preceding sub-paragraphs about what Ms Glass said in cross-examination, Mr Salzedo also relied on the following matters in support of his assertion that no weight should be placed on the Market Price in this case:

(a) Ms Glass asserted that, as at the Proposal Date, the trading price in the Company's ADS may have understated the true value of the Company but the judge did not give any reason for thinking that this admitted undervaluation was subsequently corrected.

(b) As the judge pointed out at [135], Ms Glass accepted in cross-examination that the trading price (from which she calculated the Market Price) might be understated by as much as 20%. This meant that no reliance could properly be placed on the Market Price.

**(e) Discussion**

**64.** In my judgment, the judge's decision was one which was reasonably open to him. This ground of appeal is a classic example of *'island hopping'* in that it invites this Court to concentrate on one comment of Ms Glass during the course of four days of evidence without taking account of the other evidence before the judge. I would summarise my reasons for this conclusion as follows:

(i) Ms Glass' evidence in chief consisted of her reports. In Glass 1, she stated that she was considering the conditions described in *Dell* (see the passage quoted at [52] above). As pointed out earlier, the Delaware Supreme Court had indicated that satisfaction of those conditions meant it was likely that the market in a share was semi-strong efficient. She addressed the various conditions in relation to the Company. Having done so, she concluded at [217] of Glass 1 (quoted at [53] above) that, based on the criteria in *Dell*, the market for the Company's ADS was semi-strong efficient.

(ii) We have not been referred to any part of Ms Glass' cross-examination in which she said anything to suggest she was retreating from this conclusion other than the remark referred to earlier, namely her answer, in response to questions about why she had not done an event study, to the effect that she was not trying to prove anything about the efficient market hypothesis.

(iii) Like the judge at [138], I have to say that I find this comment to be less than clear and it was not followed up in cross-examination to clarify exactly what she meant. I also accept that the judge's explanation of what he thought she meant, contained in the second sentence of [138], is not entirely convincing and that the two paragraphs from Glass 1 quoted by the judge at [137] do not really support his decision as they are addressing the question of markets in very general terms.

(iv) However, I do not think that this matters. The judge's overall conclusion was clear. Having referred in the first sentence of [138] to the fact that Ms Glass was seeking to demonstrate that the conditions identified in *Dell* for reliance on the market price were satisfied in this case, he then held in the

third sentence that her analysis supported the conclusion that the requirements for a semi-strong version of the efficient market hypothesis were satisfied.

(v) In my judgment, that conclusion was one which was reasonably open to him. Glass 1 could hardly be clearer in stating that Ms Glass had investigated the criteria set out in *Dell* and had found them to be satisfied in relation to the Company's ADS so that, applying the *Dell* criteria, there was a semi-strong efficient market in the Company's ADS. Apart from her delphic observation relied upon by Mr Salzedo, we were not referred to any passage in her lengthy cross-examination where she qualified or retreated from this clearly expressed conclusion. The judge was perfectly entitled to conclude that, whatever she may have meant by the observation relied upon by Mr Salzedo, she was not resiling from the conclusion in her reports, which constituted her evidence in chief.

(vi) The ambiguous observation was given in the response to questions about why Ms Glass did not carry out an event study, but Mr Salzedo confirmed in his reply submissions (Day 3/101) that he had not argued and was not arguing that market efficiency could only be proved or disproved by an event study. Thus, whilst the judge referred to and took into account the absence of an event study, it did not of itself invalidate the conclusions which Ms Glass had reached in her evidence by reference to the *Dell* criteria.

**65.** As to the additional points made by Mr Salzedo as summarised at [64(v)] above, when determining the weight to be given to the Market Price, the judge expressly took into account the fact that Ms Glass had accepted that the trading price might have been understated by 20%. I do not accept that this of itself means that no weight could be placed on the Market Price. In the passage referred to earlier, Ms Glass is talking about markets generally and the fact that prices may be out (as compared with fair value) by up to 20% (or indeed 25%). Despite this possibility

generally, it is nevertheless the case that a court may place some weight on the adjusted trading price if satisfied that there is a semi-strong efficient market and no material non-public information. Whether it will be right to do so in any particular case is a matter of evaluation having regard to the particular circumstances.

**(ii) MNPI – the 9,000 MW point**

**(a) Introduction**

**66.** In *Nord Anglia*, Kawaley J at [6(a)] said that it was common ground that it would only be appropriate to use the adjusted trading price if (i) the market was semi-strong efficient and (ii) there was no material non-public information ("MNPI") about the value of the shares. The judge broadly endorsed this approach at [128] by reference to a further observation by Kawaley J in *Nord Anglia* where he stated at [110]: *"the relevant threshold question pertinent to deciding whether a DCF valuation should be pursued is whether the existence of MNPI and the possibility that the Shares were undervalued by the market justifies looking beyond the Market Price with a view to arriving at a more reliable conclusion as to fair value"*.

**67.** Before the judge, the Dissenting Shareholders contended that there was MNPI in this case in that, although the Company, in its Management Projections which were published in July 2016, predicted sales of PV modules for 2017 of 7,220 MW, the Company knew or ought to have known as at the Valuation Date (16 December 2016) that the Company was likely in fact to supply 9,000 MW of modules in 2017. The judge rejected that contention and held that there was no MNPI in this respect.

**68.** The Dissenting Shareholders appeal against that finding. It is an important point because, not only is it relevant to the issue of whether there was any MNPI (which

is relevant to the weight to be placed on Market Price), but, if the point is right, it is also relevant to the weight to be placed on the Merger Price and to the DCF calculation, because it would change the figures in the Management Projections upon which the estimated cashflows for the DCF calculation were based.

**69.** Again, because this is an attack on a factual finding of the judge, it is necessary to set out some of the relevant evidence in order that the parties' arguments can be understood.

**(b) The evidence**

**70.** Certain key events are not in dispute. Thus:

(i) There was a forecast produced internally by the Company on 22 January 2016 which projected module sales for 2017 of 9,000 MW.

(ii) On 2 February 2016, this forecast was reduced to 7,500 MW but no explanation has ever been given by the Company for this reduction.

(iii) The Management Projections were produced in July 2016 and they further reduced the projected sales figure for 2017 to 7,220 MW.

(iv) The forecasts of 22 January and 2 February 2016 were purely internal but the figure of 7,220 in the July Management Projections was released to the market. This was the last forecast released to the market before the Valuation Date.

(v) The module sales for 2017 turned out in fact to be some 9,000 MW, with approximately 4,400 MW of sales in the first half of the year.

**71.** Mr Russo, the Dissenting Shareholders' solar expert, was of the opinion that the Company would have been in a position as at the Valuation Date to forecast that it would achieve 9,000 MW of module sales in 2017. He noted that forecasts prepared in July 2016 in respect of the Company's module sales for 2016 were

very accurate. At [223] of his first report dated 25 October 2018 ('Russo 1') he said:

> ***"I believe it is reasonable that Trina's management would have been able to form a reasonably accurate estimate of sales in December of 2016, and should not have relied upon a then-stale sales estimate… The actual 2016 sales match up very closely with the internal forecasts from July of 2016, indicating that Trina had good visibility into its future sales. Trina's management knew of positive market trends (among them growth in India…) and should have had high confidence in their 2017 sales with only a few weeks left in 2016. Given the accuracy with which Trina's management was able to forecast their actual 2016 sales midway through the year, I would have expected actual 2017 sales to have been better-predicted than management's projections suggested."***

**72.** In his oral evidence he stated that module sales typically had a lead time of 6-12 months and that therefore, as at the Valuation Date, the Company would have had a reasonable estimate of its sales 6-12 months out. He further said that this was consistent with what the Company had said in its Form 20-F filed with the New York Stock Exchange in April 2016 where it stated (Tab 42/46):

> ***"We conduct our PV module sales typically through short-term and medium-term contracts with terms of one year or less or, to a lesser extent, long-term sales or framework agreements with terms of generally one to two years. Our short-term and medium-term contracts provide for an agreed sales volume at a fixed price. Our long-term sales or framework agreements provide for a fixed sales volume or a fixed range of sales volume to be determined generally two to three quarters before scheduled shipment date. Prices for long-term sales or framework agreements are generally determined***

***one month prior to the start of the quarter of the scheduled shipment date. Compared to short-term and medium-term contracts, we believe our long-term sales or framework agreements not only provide us with better visibility into future revenues, but also will help us to enhance our relationships with our customers."***

**73.** Dr Goffri, the Company's solar industry expert, did not address the issue of the volume of sales for 2017 in his report but was cross-examined on the topic. He agreed (Day 3/147/9-12) that there would normally be a lead time for module sales measured in months. There then followed this exchange at 147.13-148.3:

***"Q: So by 16 December 2016, Trina would have a pretty good idea what module sales it was going to make in the first half of 2017, wouldn't it?***

***A: Probably. According to – I mean – yes. I don't know how – yes. I guess that's true.***

***Q: … assume that… Trina shipped about 4.4 [megawatts] in the first half of 2017. Just assume that. On that basis, if Trina, someone with all Trina's knowledge, had been making a projection on 16 December 2016, which they weren't, but if they were, then they would probably be able to estimate their 2017 sales to be in the region of 9,000, wouldn't they?***

***A: If all you're saying is right, they would have had the estimate sales around that number, I guess, yes."***

**74.** Ms Glass, the Company's valuation expert, was asked about the evidence of Dr Goffri and responded as follows (Day 6/129-130):

***"Q: … What you now have is the unanimous view of both the industry experts, based on the documents and the facts, that as at 16 December***

*2016, Trina, had it been making any estimate of its future sales, would have estimated 2017 at around 9,000, don't you?*

*A:* *Well, I'm seeing lots of 'probably' and 'I guess so's' but – no, I disagree with both of them – they are industry experts, I recognise that, but not necessarily experts in forecasting. So, yes, I disagree.*

*Q:* *And I have to suggest to you that it's an incredibly partisan position to take up that you disagree with the industry experts on a point like that of industry expertise as to what Trina could have predicted given the facts at 16 December 2016.*

*A:* *I disagree with you. I mean, this is not a full – I mean, you know, Dr Goffri was under cross- examination for the first time. He, I guess, I don't know what was going through his mind. This is not something he thought about ahead of time or – you know, I don't understand. Just because – it's entirely possible that Trina would have thought that their module sales would be 7,200 but they end up being 9,000. Because even though they have short-term and long-term and medium-term contracts, if their order book, or whatever you call it, was, let's say, around 7,000 at December 31st, it's entirely possible that they sold more. If a customer came along and wanted more, Trina is going to obviously sell more.*

*And I don't know when that happened and I'm saying there is nothing to presume that – we don't have any sort of information as at December 31st. What we do have is market information and what you are presuming, that Trina knew at December 16th that they would increase their market share from, you know, whatever, 9 to 12.5 and that they would increase their sales by 43 per cent in the face of industry increases of around 10 per cent. I would need to understand why that is*

***and I have not – that's where the industry experts come in providing a reason as to why it's reasonable to expect that Trina would have expected 43 per cent growth even though the rest of the industry was predicting 8 to 10 per cent and I have not heard anything from either industry expert or from anybody along those lines, so the only thing I've heard is they actually sold 9,000 megawatts and that's hindsight."***

**75.** Ms Glass subsequently agreed in cross-examination (Day 6/133-134) that the Company would have had a good idea on the Valuation Date of the volume of sales for the first half of 2017. The exchange went as follows:

***"Q: Do you accept that as a matter of industry expertise, it is in fact the normal position for there to be a lead time for several months on module sales?***

***A: Yes, you don't order your modules on Monday and start the job on Tuesday. I'll agree with you on that.***

***Q: So Dr Goffri must be right, mustn't he, that on 16 December 2016 you would have a good idea of your sales for the next half year?***

***A: Well, possibly but that's not to say things don't happen that you don't expect. Things don't happen – you are implying that nothing unexpected can happen.***

***Q: Ms Glass, you know very well that there is no such implication in my question. This whole exercise is about coming up with the best, most reasonable forecast. You know that, don't you?***

***A: I agree with you.***

*Q:* ***Good. And you have to accept, don't you, on the facts from what you have just accepted, that as a module manufacturer, on 16 December in a given year, you would have a good idea of the most likely sales you are going to make in the next half year.***

*A:* ***I agree with that fact. What I don't agree with is that you somehow know that's going to be 9,000. But I agree, you will have – you should have a reasonably good estimate, which might prove wrong but you have a reasonably good estimate."***

**76.** It was then put to her that, on the assumption that the fact that the 2017 sales figure turned out to be 9,000 was admissible evidence as to what the Company might reasonably have forecast for sales as at the Valuation Date, 9,000 was the most reasonable forecast. She agreed in the following terms at Day 6/137-138:

*"Q:* ***… The assumption I am asking you to make…is that the fact that 2017 module shipments turned out to be 9,000 megawatts is admissible as part of the exercise of working out what Trina's management might reasonably have concluded based on the circumstances existing at the Valuation Date.***

*A:* ***Okay.***

*Q:* ***That's the only assumption. On that basis, do you accept that the most reasonable forecast for 2017 shipments was 9,000 megawatts?***

*A:* ***I guess my answer is yes. It's an artificial situation because you're taking volumes, ignoring price, and the two go together but if that's the way you see things, then if we are supposed to be…consider the hindsight evidence on value and ignore all other hindsight evidence, then, yes, I guess I'm where you are, but..***

*Q: Ms Glass….*

*A: … It's an odd way to do things.*

*Q: I have not asked you to make any assumptions about price, do you understand that?*

*A: Okay, so price might be very different from what I currently have, fair enough.*

*Q: If you say so later, Ms Glass you can say so. I'm only asking you to make one assumption.*

*A: Yes.*

*Q: The one assumption is that the fact that module shipments did turn out to be 9,000 is admissible as part of the issue of working out what Trina's management might reasonably have concluded based on the circumstances at the Valuation Date. It's the only assumption. Got that?*

*A: Yes.*

*Q: On that basis, do you accept that the most reasonable forecast for 2017 shipments was 9,000 megawatts?*

*A: For 2017?*

*Q: Yes.*

*A: I can't see any objection under the hypothetical assumption you have given to me.*

*Q: Is that similar to saying yes?*

*A: For 2017.*

*Q: Yes."*

**77.** At the end of her evidence, Ms Glass was asked certain questions by the judge. The relevant parts read (Day 9/164-166):

*"Justice Segal: The first question relates to the hindsight issue that you have been debating with Mr Salzedo. Let me put the question to you in this way*

*…*

*Justice Segal: … my question was really focused on when considering what Mr Russo had said… about using the 9,000 figure, were you focusing on what, in all the circumstances as at the valuation date, a reasonably diligent management team putting projections together should have done or did you not consider that issue?*

*A: I was certainly considering that. I don't see how a reasonably competent management in December 2016, based on the information available to me, could have predicted 9,000.*

*Justice Segal: In light of the circumstances that existed at as the Valuation Date?*

***A:*** ***Exactly, in light of the circumstances that existed at the Valuation Date.***

***Justice Segal:*** ***Thank you very much. That's clear."***

**78.** In briefest outline, the Dissenting Shareholders submitted to the judge that, in effect, all three experts were agreed (Mr Edwards not having given evidence on this point). All accepted that there was a lead time of several months in respect of module sales and that accordingly the Company would have a good idea as at the Valuation Date of 16 December 2016 of its order book for, at any rate, the first half of 2017. Mr Russo was clear that, given the actual sales achieved in 2017 of 9,000 MW, this was the most reasonable forecast as at the Valuation Date. Dr Goffri agreed with this in cross-examination. Ms Glass felt that this was all a matter of hindsight but agreed that, on the assumption that the figure for actual sales for 2017 was admissible evidence on the issue of what the Company would have predicted as at the Valuation Date, 9,000 MW was the most reasonable forecast, although she appeared to retreat from that in her answer to the judge's questions.

**79.** The Company submitted that the average selling price for modules had fallen more than expected and as a result sales were greater than expected. A forecast of 9,000 MW would have involved a substantial increase not only in actual sales but in the Company's market share and this was unlikely. It essentially relied on Ms Glass' evidence.

### (c) The judge's decision

**80.** As already stated, the judge found in favour of the Company. Given the importance of this point generally for the appeal and the criticisms made of the

judge's reasoning by the Dissenting Shareholders on appeal, I think it is necessary to set out the judge's reasons in some detail. They are contained at [141] of the Judgment as follows:

> ***"141. I accept the Company's submissions, and Ms Glass' evidence, with respect to reasonableness of the forecast at 2017 PV module sales contained in the Management Projections, subject to one qualification. Mr Russo's analysis, while detailed and based on documents prepared or statements made by the Company, was in my view ultimately speculative and unsubstantiated:***
>
> ***(a)…***
>
> ***(b)…***
>
> ***(c) Mr Russo's core conclusion was that the Company's management would have been able to form a reasonably accurate estimate of 2017 sales by the Valuation Date on 16 December 2016 and that such an estimate would have been 9,000 MW. He put forward a number of reasons as to why that <u>might</u> have been possible but, in my view, insufficient evidence to demonstrate that it <u>would have been</u> or was <u>likely to have been</u> possible or that management should have concluded that their own forecast was unreasonable or out of date such that the market needed an update. The documents and other materials needed to make good Mr Russo's conclusions were not in evidence. There is an insufficient documentary foundation for inferring that the Company expected or should have expected at the Valuation Date to ship the substantially increased volume that Mr Russo's forecast projects. None of the justifications put forward by Mr Russo provided a basis for***

***such an inference. It also seems to me that Mr Russo's view that when viewed from the perspective of the Valuation Date at the end of 2016, the likelihood of significant market growth was sufficiently high and predictable so that projections of significantly increased sales were reasonable and required was, on the evidence presented, an overly optimistic view that minimalised the downside risks and uncertainties. As the Company submitted, the sources relied on by both industry experts produced around the Valuation Date did not predict the growth in the solar market which in fact took place in 2017 (and Ms Glass' analysis of market size, discussed below, supported this view). Nor do I accept that the actual sales figures for 2017 justify Mr Russo's revised forecast. While I do not ignore them…they are of only limited weight for the purpose of assessing what management at the Valuation Date expected and should reasonably have expected, particularly in circumstances where there are reasonable explanations as to why the actual 2017 sales were unanticipated. The basis of the challenge to the 2017 forecast of module sales was fundamentally one of, or at least heavily dependent on, factual questions. I accept that Mr Russo used his industry expertise to form an expert opinion on what was a reasonable forecast but in my view, for the reasons I have given, he had insufficient basis for and there were insufficient grounds to justify his forecast. I do not consider that the evidence given by Dr Goffri during cross-examination affects that conclusion."*** [Original emphasis]

*(d) I appreciate that Mr Russo complained about the Company's failure to provide adequate responses to his questions and that the Company failed to bring forward a witness who was directly involved in the preparation of the forecasts. While I regard this as unhelpful and the latter failure as affecting the weight to be given to the Management Projections, I do not consider that I can or should rely on these failures to reach conclusions by inference that the evidence otherwise does not permit me to reach. Furthermore, the preparation of this particular forecast was dependant on a detailed knowledge of the Company's contracts and customer relationships, albeit informed by a view of the prospects for growth in the industry and overall customer demand, and therefore not a matter on which Mr Russo's industry expertise had a significant bearing (as Ms Glass noted during her cross-examination, forecasting was also not a matter for industry expertise). Ms Glass' expertise was with respect to the preparation of valuations and the review of forecasts was just as relevant if not more so. In addition, I accept the Company's submission that the evidence does not show that any revised projections (reasonably and properly in December 2016 for 2017 and adopting Mr Russo's sale forecasts) would have been likely to have projected a better 2017 than that projected in the Management Projections because of the need to consider and potentially adjust the forecasts to take account of lower selling prices. This does not mean that had management been in possession of information that reasonably justified, or if properly informed management acting reasonably would have*

*concluded that it was necessary to prepare, a revised sales forecast of the magnitude proposed by Mr Russo that there would be no MNPI just because the prices' forecast also needed downward adjustment. The increased sales forecast would have been material in itself. But it does strongly suggest that any revised overall forecast would probably not have had a material impact on market expectation.*

*(e) The Dissenting Shareholders pointed to the fact that the reduction in the Company's forecast for 2017 PV module sales down to 7,220 MW took place in stages and the timing and reasons for the reduction were unexplained. The latest forecast that showed 9,000 MW for 2017 was the January forecast dated 22 January 2016. The forecast showing 7,500 MW was dated 2 February 2016. The question arose as to what explained the big change between 22 January and 2 February 2016. Ms Glass was cross-examined on this issue and admitted that she had not been aware of the timing of this change and was unable to comment on the reasons for the precise timing of the change in the forecast:*

*"Q: Okay. So that is a fairly significant negative, isn't it, on the reliability of the merger projections – and I know you did all your other work and you agree with the results but in terms of the test you set out at the outset, do you agree it's a pretty significant negative that it turns out there was a completely unexplained change between 22 January and 2 February?*

> ***A:*** ***All I can answer there is had I been aware of that change, I would have asked a question about it.***
>
> ***Q:*** ***Yes.***
>
> ***A:*** ***But I can't comment on what I would, if anything, have done without knowing the answer."***
>
> ***(f)*** ***I accept that the absence of a proper explanation of the <u>timing</u> of the amendments is unhelpful and weakens the Company's case, and Ms Glass' opinion, that the reduced forecast in the Management Projections of 2017 PV module sales was reasonable. But these deficiencies do not undermine the credibility or soundness of the Company's explanation or Ms Glass' evidence that the reduction to the forecast needed to be made <u>at some point</u> during the period up to and in any event for the purpose of the Management Projections, and why reliance in July 2016 on the forecast in the Management Projections was ultimately justified and reasonable. These deficiencies also do not, to state the obvious, assist Mr Russo in overcoming the evidential difficulties to which I have referred."*** [Original emphasis]

**(d) The Dissenting Shareholders' submissions**

**81.** The Dissenting Shareholders submitted that the judge's conclusion on this point was plainly wrong.

**82.** They repeated their submission that all the experts were agreed that there was a lead time measured in months for module sales and that, as at the Valuation Date of 16 December 2016, the Company would have had a good idea of its order

book, particularly for the first six months of 2017. As Mr Russo said, this was entirely consistent with the fact that they had accurately predicted the outcome for 2016 at a point halfway through the year. This forecast had been accurate both as to volume and price.

**83.** The fact that the Company would have good visibility of its order book was also consistent with what the Company had said in Form 20-F. To the extent that the order book as at the Valuation Date consisted of short and medium term contracts, the Company would have known both the volume and the price of the sales; to the (lesser) extent that the order book consisted of long term contracts, the Company would have known the volumes for at least the first two to three quarters of 2017, but only the prices for the first quarter.

**84.** The judge had found - and it was not disputed on appeal - that the actual sales figure in 2017 was admissible as a factor in determining what would have been the reasonable forecast as at the Valuation Date. In those circumstances, all three experts had effectively agreed that 9,000 MW was the most reasonable forecast as at the Valuation Date. Mr Russo was clearly of this opinion in both his report and oral evidence, Dr Goffri had accepted that this was so in cross-examination and Ms Glass had also accepted it on the assumption that the actual sales figure for 2017 was admissible evidence on the issue of the most reasonable forecast as at the Valuation Date.

**85.** It was true that Ms Glass in the rest of her evidence had maintained that the Management Projection figure of 7,220 was reasonable but she had based this on her reluctance to take account of hindsight evidence. She had also placed weight on the fact that there was an unexpected and substantial increase in overall market sales of modules because of the unexpected fall in prices and this was the explanation for the substantial increase in sales to the 9,000 figure. It was therefore not reasonable to predict this level of sales. However, this took no account of her admission that, if the actual sales figure was admissible evidence, the most reasonable estimate as at the Valuation Date <u>was</u> 9,000 MW and it was

notable that the judge had failed to mention this concession in his reasons at [141].

**86.** The judge had also erred in his approach to the lack of documentary evidence, particularly in relation to the contracts in existence as at the Valuation Date. There had been an order for discovery of all documents relevant to valuation and it would have been perfectly obvious that the contractual position as at the Valuation Date was an important aspect and that the documents relevant to the contractual position should have been disclosed. It was true that Mr Russo had not specifically asked for contracts but he had asked for all relevant documents and the Company should have disclosed the contractual position as a result of the disclosure order. The judge had wrongly held the lack of documentary evidence against the Dissenting Shareholders whereas he should have drawn adverse inferences against the Company for its failure. To reason as the judge did would be to encourage companies to withhold relevant documentary evidence in future.

**(e) The Company's submissions**

**87.** In his skeleton argument, Mr Jones referred us on a number of occasions to the contents of his closing written submissions before the judge. Drawing on those submissions as well as his written and oral submissions before us, I would summarise the key submissions for the Company as follows:

(i) This issue was pre-eminently a matter for the judge to make a factual finding on the basis of all the evidence before him. He had the advantage of seeing and hearing the witnesses give evidence over a lengthy period – in the case of Ms Glass some four days. It could not be said that his decision was outside the band of reasonable decisions open to him.

(ii) The key evidence in support of the figure of 9,000 MW was that of Mr Russo. Essentially, he had relied on two matters. First, that the Management Projections for 2016 prepared in July 2016 were accurate;

and secondly, that there was a lead time of some 6-12 months for module sales contracts and that therefore the Company would have had good visibility of its order book as at the Valuation Date. However, these two aspects did not point to any particular figure for sales. It was only the fact that sales turned out to be 9,000 MW in 2017 that led him to conclude that 9,000 MW would have been the reasonable projection as at the Valuation Date. Mr Russo's projection involved an increase in the Company's share of the overall market from 9.5% in 2016 to 12.5% in 2017 (based upon Mr Russo's estimate of the overall market for 2017) (Judgment at [196]-[201]). This was not a prudent or reasonable projection as there was no reason as at the Valuation Date for thinking that the Company could increase its market share by such a large amount.

(iii) The reason for the increase of actual sales to 9,000 MW was not hard to find. It was because of the unexpected fall in prices in 2017 – see the evidence of Dr Goffri in cross-examination on Day 4/46-47. This had led to an unexpected increase in world sales of modules. Thus, drawing on industry sources as they were at the time, Mr Russo said a reasonable prediction of overall module sales for 2017 would be 72,033 MW, Dr Goffri said 61,077 MW and the Company had predicted a market of 67,000 MW. Ms Glass carried out her own calculation by reference to the sources used by Mr Russo and Dr Goffri and some additional material and came up with a figure of 67,300 MW ([194(c)]. of the Judgment). In fact, it was common ground before the judge that world sales for 2017 turned out to be 98,000 MW, which was substantially in excess of any of the estimates by the experts.

(iv) The fall in price was unexpected. Again, by reference to industry sources at the time, Dr Goffri predicted an average selling price (ASP) for 2017 of $0.40 per watt, Mr Russo $0.47 and the Company $0.465 (joint report of industry experts / tab 5/11). Ms Glass again carried out her own calculation. She noted that the Company's projection had been prepared

in July 2016 and took no account of the fact that prices had dropped in the second half of 2016. She therefore came up with a figure of $0.436 (Glass 1/Appendix F/50-51). Thus the predictions of ASP for 2017 ranged from $0.40 to $0.47. In fact, the ASP of the Company for 2017 turned out to be $0.33. (I should add that it is not clear to me what the source of this figure was, but the judge quoted it at [125(h)] and it was common ground on appeal; see Dissenting Shareholders' skeleton at [51] and the Company's skeleton at [97]). There was therefore, a very substantial fall in price as compared with the prices forecast by the experts and by the Company. This explained why sales were in fact as high as 9,000 MW in 2017. In the light of that explanation, the fact that sales turned out to be 9,000 MW did not support a finding that that was the figure which ought to have been forecast by the Company as at the Valuation Date.

(v) A sales figure of 9,000 MW involved a 43% increase over the actual 2016 sales figure of the Company of 6,258 MW. There was no valid reason to predict such a substantial increase in sales. The Company's own figure of 7,220 MW involved an increase in sales of only 15%, which was reasonable.

(vi) It was true that the Company had not disclosed documents relating to the contractual position as at the Valuation Date, so that evidence was not available to the Court. However, the significance of the contractual position did not become obvious until during the course of the hearing when reference was made to the statement in Form 20-F and Mr Russo had never specifically requested such information; he had merely asked generally for information in support of the Management Projections which were prepared in July 2016.

(vii) It was clear even from the transcript that Dr Goffri's agreement in cross-examination to the figure of 9,000 MW as being a reasonable forecast as at the Valuation Date was somewhat hesitant and equivocal. The judge was

in a much better position than this Court to assess the weight to be placed on this particular answer in the context of the evidence as a whole.

(viii) Similarly, whilst Ms Glass did at one stage accept the reasonableness of a forecast of 9,000 MW if one took account of hindsight in the form of the actual sales in 2017, the rest of her evidence made clear her opinion that hindsight was not a satisfactory basis for deciding what was a reasonable forecast as at the Valuation Date. For the reasons she gave relating to market size, the Company's market share and the forecast ASP, she remained of the view that the Management Projections were reasonable projections in relation to the volume of module sales for 2017.

(ix) If hindsight evidence was admissible to determine the reasonable prediction as at the Valuation Date of the volume of sales for 2017, it was equally admissible in relation to price, given that the short and medium term contracts in existence at the Valuation Date would have fixed both volume and price and that prices in respect of long term contracts would also have been known for the first quarter. The actual ASP for 2017 was \$0.33 and sales of 9,000 MW at this price would produce significantly less revenue than 7,220 MW at a price of \$0.465.

**(f) Discussion**

**88.** Despite Mr Salzedo's persuasive advocacy, I consider that the judge's conclusion was one which was reasonably open to him and cannot be said to be a decision which no reasonable judge could have reached. I would summarise my reasons as follows:

(i) As already mentioned, this was a case where the judge heard lengthy oral evidence from the experts and was in a good position to form a view as to the cogency of their evidence. Conversely, we have again been engaged in an exercise of *'island hopping'* and cannot have the overall feel for the case that the judge would have had.

(ii) It is a vital part of the Dissenting Shareholders' submission that, in the extracts which we have quoted, both Dr Goffri and Ms Glass agreed that 9,000 MW was the most reasonable projection for 2017. However, Dr Goffri could be said to have been somewhat hesitant and uncertain in his agreement with the proposition which was being put to him and at [12] the judge had accepted that Dr Goffri struggled at times during his cross-examination, but that the judge put most of this down to inexperience. It was therefore open to the judge to take a view on the weight to be attached to Dr Goffri's admission. Similarly, in relation to Ms Glass, whilst she accepted the proposition being put to her on the hypothetical basis she was being asked to assume (although she was clearly not happy about using hindsight evidence for volume but not price), the judge was entitled to conclude that elsewhere in her evidence she had maintained her view that the projections in the Management Projections were the most reasonable. In effect he was left with conflicting passages in her evidence which it was ultimately up to him to assess.

(iii) Stripped to its essentials, the Dissenting Shareholders' case is that the 9,000 MW figure was the most reasonable forecast as at the Valuation Date because (i) the experts agreed that the Company would have had good visibility of its order book because of the lead times measured in months and this was consistent with the statement in Form 20-F, (ii) the Company's projections for 2016 had been very accurate and (iii) the actual 2017 sales figure turned out to be 9,000 MW. In the absence of knowing the actual outcome for 2017, there would be no reason because of (i) and (ii) to have projected a figure of 9,000 MW. Considerable weight is therefore placed by the Dissenting Shareholders on the actual sales figure for 2017 as showing what the Company would have projected as at the Valuation Date.

(iv) However, the evidence of the degree of visibility was not very specific. Form 20-F showed that the Company would have known the volumes and

prices of the short and medium term contracts (up to one year), which formed the larger part of its business, although we were not referred to any evidence of the percentage. There was no evidence as to how many such contracts were in existence as at the Valuation Date, what the length of such contracts was and how many contracts were entered into after the Valuation Date for shipment in 2017. Similarly, in relation to the long term contracts, the volumes would largely only be known for two to three quarters out.

(v) As against the reliance on the visibility of its order book coupled with what actually happened, there were a number of factors to suggest that it was highly unlikely that the Company would have projected sales of 9,000 MW as at the Valuation Date. In the first place, sales of this figure would have involved a 43% increase over the sales for 2016. That would be a substantial increase but no reason has been put forward as to why the Company would have anticipated such a large increase.

(vi) Secondly, on the basis of Mr Russo's prediction as to the world market in 2017, sales of 9,000 MW would have increased the Company's market share from 9.5% in 2016 to 12.5% in 2017. Again, no objective reason for the Company to have projected such a large increase in market share has been put forward. Both Dr Goffri and the Company predicted world sales for 2017 at a lower figure than Mr Russo, from which it follows that predicted sales of 9,000 MW would have involved an even larger increase in the Company's market share than that suggested by Mr Russo.

(vii) Thirdly, it was clearly strongly arguable that the most likely explanation for the fact that the actual sales in 2017 turned out as high as 9,000 MW was that there was an unexpected drop in the ASP as Dr Goffri explained. The fact that the ASP was unexpected is supported by the fact that, when considering the Management Projections, none of the experts considered that the reasonable prediction of ASP for 2017 would have been $0.33, as it turned out to be. Thus Mr Russo said that the prediction would be

$0.47, Dr Goffri $0.40 and Ms Glass $0.435. They all reached their conclusions by having regard to industry sources etc at the time. There was therefore strong evidence before the judge to support the contention that the price fall was unexpected given that none of the three experts or the Company (the Management Projections predicted an ASP of $0.465) predicted a figure anywhere near $0.33.

(viii) Fourthly, there was also evidence before the judge that the increase in the world market for 2017 was unexpected. Thus Dr Goffri had given a prediction of 61,137 MW for 2017 and Mr Russo 72,033 MW. In fact, the world market for 2017 was 98,000 MW. Because of this increase in the world market, the Company's actual sales for 2017 of 9,000 MW gave it a market share of 9.18% which was broadly consistent with its market share for 2016.

(ix) There was therefore evidence upon which the judge could properly find that there was an unexpected price fall in 2017 which led to an unexpected increase in the world market. It was therefore open for him to find that this was the most likely explanation for the Company's increased sales to 9,000 MW and that no objective ground had been put forward as to why the Company, not knowing of these unexpected developments, would have projected such a large increase in sales for 2017 as compared with 2016. It was similarly open to him to find that the Company's projection of sales of 7,220 MW was much more consistent with the objective market factors known at the time involving, as it did, an increase of only 15% over the 2016 sales figure rather than the 43% increase which the Dissenting Shareholders say should have been predicted.

(x) This was not a third party merger where an unrelated company makes a bid; it was a management buy-out in that Mr Gao was part of the Buyer Group whilst at the same time being the founder, chairman and CEO of the Company. The Buyer Group was therefore in a position to know all the detailed financial and commercial information about the Company

regardless of whether such information was in the public domain. In such circumstances, and in order to ensure that the Court is in a proper position to assess the fair value of the shares, it is of fundamental importance that a company should be open with the Court. This means that it must disclose all relevant documentary material and must produce a witness who can speak to the management projections and other relevant aspects of the company's business.

(xi) The Company did neither of these things in this case. First, despite a general order for discovery made on 15 November 2017 that the Company should disclose and upload to the Data Room *"…all documents… and communications… and other materials… which are relevant to the determination of the fair value of the shares in [the Company] as at the Valuation Date"*, no information or documents about the contracts in existence as at the Valuation Date were disclosed. This was despite Mr Jones accepting in oral argument before us that *"…the critical issue was to look at what contracts were extant at the 16th of December 2016. Because that would have given you an idea of what the price is worth of these contracts that have been entered into, or how far forward they've gone"* (Day 2/90). Mr Jones explained that the significance of the contractual position had only become clear during the trial when emphasis was placed on the extract from Form 20-F referred to above and that was why there was no disclosure about the contractual position. I cannot accept that as an excuse. Form 20-F was the Company's own published document of which it was, or should have been, aware. Furthermore, even in the absence of such a document, the relevance of the contractual position as at the Valuation Date should have been obvious at all times and details of the contractual position should have been disclosed pursuant to the order. Furthermore, although Mr Russo did not specifically ask for details of the contracts, he did ask for supporting documentation in relation to the quantity of sales projected in the Management Projections. The Company

should have supplied details of the contractual position as being obviously relevant to the matters which Mr Russo was considering and which the Court would have to consider in due course.

(xii) Secondly, as already mentioned, the Company did not produce any witness who could speak to the Management Projections and why the Company projected sales of 7,220 MW rather than 9,000 MW and also as to why the 2017 projection of 9,000 MW on 22 January 2016 was made and then was reduced so quickly to 7,500 MW.

(xiii) Despite at [141(e)] describing the Company's above failures as *'unhelpful'*, the judge did not weigh these failures in the balance as a factor against the Company. In my judgment, where a company (particularly in circumstances of a management buyout) fails to provide proper disclosure or cooperate sensibly with questions asked or produce a witness who can speak with knowledge to the management projections, a court should normally weigh such matters in the balance against the company.

(xiv) However, in this case even if, as I think he should had done, the judge had weighed the Company's disclosure and evidential failures against it, I cannot say, in the light of the matters mentioned in the preceding sub-paragraphs, that the judge's decision was one which no reasonable judge could reach. Ultimately, there was powerful evidence before him as to why actual sales in 2017 of 9,000 MW were unexpected and no evidence of any objective factor which could have led the Company as at the Valuation Date to anticipate sales of 9,000 MW. Accordingly, I would not overturn his decision that there was no MNPI in respect of the 9,000 MW point.

**89.** I would add that, had I been persuaded that the only reasonable decision of the judge, with the benefit of hindsight evidence (in the form of the actual sales for 2017), was to find that 9,000 MW was the reasonable prediction for sales volume

in 2017, I can see no answer to Mr Jones' submission that hindsight evidence in relation to price would be similarly admissible and that that this would lead to a predicted price of $0.33, which in turn would lead to a reduction in projected income.

**90.** A decision that 9,000 MW was the most reasonable sales forecast would be based on the visibility of the Company's contracts as at the Valuation Date. Form 20-F states that the (unspecified) majority of the Company's contracts are short or medium term (less than twelve months) and that in such contracts the volume and price are fixed. Thus, to the extent the order book as at the Valuation Date consisted of short or medium term contracts, the Company would know both volume and price. The minority of contracts are long term where, according to Form 20-F, the volume is known two to three quarters ahead (or perhaps more) but the price is only fixed one month before the beginning of the quarter in which shipment occurs. Thus, as at the Valuation Date, in relation to its long term contracts, the Company would know the volume and price for the first quarter of 2017, but only volumes thereafter. Thus the only difference in visibility as at the Valuation Date between volume and price would be in relation to the (minority) long term contracts and then only for the period after the first quarter. In all other respects, there would be no difference in visibility between volume and price both for short and medium term contracts and long term contracts. I do not see that this comparatively limited difference in visibility between price and volume means that the Court should not accept the Management Projections on volume and instead take account of the actual 2017 volumes to fix on the correct figure, but should accept their projection on price of $0.465 and ignore the actual figure of $0.33.

**91.** However, this issue does not arise in view of my conclusion that the judge's decision was not one which no reasonable judge could reach.

**(iii) Relevance of analysts' reports**

**92.** The Dissenting Shareholders submit that the judge erred in finding that the market analysts' reports relied on by Ms Glass supported the reliability of the Market Price.

**93.** The background to this submission is that, in Glass 1, when considering whether the trading price of the Company's ADS at the Proposal Date and the Acceptance Date was a reasonable reflection of intrinsic value, Ms Glass placed some reliance on what market analysts were saying at the relevant time. She summarised the position at [241] of Glass 1 as follows:

> ***"As a result of overall market concerns, it is possible that the prevailing market price at or around the Proposal Date might have understated the fair value of the Trina ADS – that is, the price appears to have been influenced by factors in addition to the Company fundamentals. As discussed below, my conclusion is consistent with the comments and conclusions of most analysts at the time. However, as is also discussed later in this Section, even though the market price of the Trina ADS might have understated fair value at the Proposal Date, such was not the case at or around the Acceptance Date – which conclusion is also consistent with the later comments and conclusions of most analysts."*** [Emphasis added]

**94.** She went on at [242]-[249] to summarise what analysts were saying at these two dates. In particular, at Table 7.8, she listed ten analysts whose views she noted in relation to the Acceptance Date.

**95.** At [98]-[100] of Glass 2, Ms Glass also explained in some detail what research and analysis would be undertaken by quality analysts. At Table 3.2 she listed

those quality analysts who followed the affairs of the Company. She also explained at footnote 41 to [100] of Glass 2 that some analysts did not perform the detailed research and analysis which she had described and that they were not included in Table 3.2.

**96.** At [244] of Glass 1, Ms Glass had said that the analysts' reports which she was considering contained each analyst's *'target price'* and went on:

> ***"I note that a target price most often equals the price that the analyst would expect a company's shares to rise to in the ensuing 12 month period…"***

**97.** Ms Glass accepted at Day 8/175 that, of the ten analysts listed in Table 7.8 to which she had had regard when considering the trading price as at the Acceptance Date, only five appeared in Table 3.2 as quality analysts. She therefore accepted in the same passage of cross-examination that it was only those five quality analysts who were the ones who mattered in relation to the question of whether their target prices supported the fairness of the trading price. Ms Glass was taken in cross-examination through the reports of each of those five analysts and there then followed this passage in cross-examination (Day 9/11-12), upon which the Dissenting Shareholders placed reliance before the judge and similarly do so before this Court:

***"Q: And every single one of them values at least the modules part of the business on a straightforward earnings multiple, one figure multiplied by another figure.***

***A: They use a multiples approach. That's not, you know, just pick one figure, pick another figure, do the multiplication, is not the way I would describe that approach but I do agree that they use a multiples approach.***

*Q: Every single one of them state that their rating is intended to be a prediction of how they expect the stock to perform over the next 12 months, save that one of them says 12 to 18 months.*

*A: I agree with that.*

*Q: None of them contains any suggestion that they are seeking to assess the intrinsic value of the shares. Do you accept that?*

*A: Well, I agree with that but just to point out that when you value a company using multiples of peer companies, that is an attempt to get to intrinsic value. It's not…*

*Q: None of these reports do that, though, do they?*

*A: Pardon me?*

*Q: None of these reports do what you've just suggested, which is checking against multiples of other companies?*

*A: How do you know? As I say, they don't just throw a dart against the board and that looks like six. When they are coming up with six or seven or whatever multiple they are using, they are doing some analysis to support that.*

*Q: And what they're aiming for, as we have seen, is to try and form a view on how this share might move over the next 12 months isn't it? That's their real aim?*

*A: Yes."*

**98.** Given that, except for a DCF valuation by Morgan Stanley of the downstream business and a DCF valuation by Credit Suisse of one small part of the business, each of the analysts had calculated its target price for the Company's ADS as at the Acceptance Date as a multiple of earnings for a single year, the Dissenting Shareholders submitted that the views of such analysts were concerned only with expectations of short-term market prices rather than intrinsic value. It was therefore wrong to rely upon them, as Ms Glass did, to support an assertion that, as at the Acceptance Date, the trading price could be regarded as a fair reflection of intrinsic value.

**99.** The judge dealt with this submission at [140] in the following terms:

> ***"I also consider that it was reasonable to rely on and give weight to analysts' reports. I am not persuaded that the approach and methodology used by the analysts relied on by Ms Glass made them unreliable. The Dissenting Shareholders argued that it was unsatisfactory to rely on analyst reports since they were concerned with predicting market prices and focused on short run market prices rather than intrinsic value. I was persuaded by the Company's submissions on and thorough review of the analysts' reports which showed that they were detailed and comprehensive and that at least in some cases they considered intrinsic value and relied on a DCF valuation. For example, Morningstar (which had been following the Company since July 2015) in its report dated 12 December 2016 carried out a DCF valuation and a detailed comparable company analysis and noted that:***
>
> > ***'Morningstar, Inc and its affiliates…believes that a company's intrinsic worth results from the future cash flows it can generate. The Morningstar Rating for stock identifies stocks trading at discount or premium to their intrinsic worth – or fair value estimate, in Morningstar***

> ***terminology. Five-star stock sell for the biggest risk-adjusted discount to their fair values, whereas 1-star stocks trade at premiums to their intrinsic worth'."***

**100.** The Dissenting Shareholders submit that in this paragraph the judge erred in two respects. First, in the passage quoted above, Ms Glass had accepted that the five analysts which she had relied on were seeking to predict how they expected the share price to perform over the next twelve months or in one case twelve to eighteen months. This was consistent with the evidence of Mr Edwards, the Dissenting Shareholders' valuation expert. A prediction as to share price over the next twelve months or so was not the same as determining intrinsic value.

**101.** Secondly, the only analyst the judge referred to specifically was Morningstar. This was not one of the five quality analysts relied upon by Ms Glass. The judge said that, at least in some cases analysts considered intrinsic value and relied on a DCF valuation but, save for DCF valuations of a small part of the business of the Company by Morgan Stanley and Credit Suisse, all of the valuations by the five quality analysts relied upon by Ms Glass were based on multiples of the expected earnings over the next twelve months and this was not the same as assessing intrinsic value. There was therefore no evidence before the judge that any of the five quality analysts relied upon by Ms Glass were assessing intrinsic value.

**102.** I accept that the reference by the judge to Morningstar was not relevant because they were not one of the five quality analysts relied upon by Ms Glass. I also accept that the judge did not explain, if it is the case, why he considered that any of the five quality analysts relied upon by Ms Glass could be seen to have considered intrinsic value.

**103.** Mr Jones pointed out that, in the extract from the transcript quoted above, Ms Glass does seem to indicate that the use of multiples by reference to the multiples of peer companies is an attempt to get to intrinsic value and that, even if there is no specific mention of peer companies, the analysts must be doing some analysis

to support their multiples. He also pointed out that, in the passages from *Dell* quoted at [47] and [48] above, the Delaware Courts clearly anticipate that research conducted by equity analysts will be a relevant factor to consider when deciding whether weight can be placed on the trading price.

**104.** In my judgment, it may well be relevant, as *Dell* implies, to have regard to what quality analysts have to say. However, the extent to which such views will assist when the Court is considering intrinsic value, must depend on the circumstances, including in particular the nature and level of any research undertaken by those analysts with a view to assessing intrinsic value. For example, Morningstar undoubtedly carried out research with such an objective, and if they had been one of the five analysts relied upon by Ms Glass, their views could properly be taken to support her conclusions.

**105.** However, I have to say that I find the evidence as to what the five analysts in question were assessing in this case not to be very satisfactory. The judge does not make any specific finding about those five analysts and Ms Glass' comment about multiples mentioned by Mr Jones was not relied upon or referred to by the judge and is in any event not very clear.

**106.** In the circumstances, it seems to me that the Dissenting Shareholders' criticisms are, to some extent, fair. We were not referred to any satisfactory evidence which would entitle the judge to find that the five quality analysts relied upon by Ms Glass were considering intrinsic value as at the Acceptance Date rather than target prices.

**107.** However, I do not think this leads to the conclusion that no reliance can be placed on the Market Price given the other matters found by the judge in connection with the nature of the market in the Company's ADS and given the general assistance to be derived from analysts' reports as stated in *Dell*. In my view, it simply means that there is a minor additional factor, which was not considered by the

judge, to be taken into account when considering the weighting given by the judge to the Market Price. I consider the effect of this at [244] below.

**(2) Ground 2 – Merger Price**

**(i) Introduction**

**108.** Before the judge, the Company submitted that, if its primary case that the Market Price should be given sole weight was rejected, the judge should give exclusive or substantial weight to the Merger Price. The judge dealt with this topic at [145]-[181].

**109.** It is to be recalled that, following receipt of the offer from the Buyer Group, the Company appointed a Special Committee comprising two directors, namely Mr Zhao and Mr Shao. Mr Zhao gave evidence but Mr Shao did not. The Special Committee appointed Citi as financial adviser.

**110.** Citi carried out a market check. They prepared a list of twenty-two parties to contact. However the list only included one of the five main competitors of the Company and that was the smallest one, Motech. No alternative bids were forthcoming. Citi also prepared a Fairness Opinion which concluded that the Merger Price was fair. This was made available to shareholders.

**111.** Before the judge, the Dissenting Shareholders were critical of the performance of the Special Committee. They submitted that the market check did not meet the requirements established in the Delaware jurisprudence, which have been adopted in this jurisdiction. A robust market check was a prerequisite for placing reliance on a merger price. They also submitted that the influence and position of Mr Gao discouraged potential buyers from coming forward, as Mr Gao was part of the Buyer Group and his continued involvement would be seen as essential to the Company's future. Furthermore, they submitted that Citi's Fairness Opinion was

defective in a number of respects. They raised additional points but this Court does not need to consider them as they are not pursued on appeal.

**(ii) The judge's decision**

**112.** The judge began by summarising what was required in order for weight to be placed on a merger price. He said this at [156]:

> ***"In my view, the merger price can be evidence of fair value where the transaction process was properly conducted so as to ensure that the market was adequately tested and there is sufficient evidence that market conditions were such as to facilitate an arm's length transaction with all potentially interested parties. The summary given in <u>Dell</u>, and referred to by the Company, seems to me to be a good one with some minor modification – where there is sufficient evidence of 'market efficiency, fair play, low barriers to entry, outreach to all logical buyers' and a well-designed sales process, the merger price should be given weight in the fair value determination. The precise weight will depend on the evidence as to how good and robust the process was, whether there were any market inefficiencies or problems that limited the participation of interested parties or other difficulties that affected the company's ability to find a purchaser at the best price and the weight to be given to other valuation methodologies. I accept that in a strong case where the evidence demonstrates that the factors identified in <u>Dell</u> were satisfied then it can be appropriate to give the merger price 'heavy weight'. But I do not accept the Dissenting Shareholders' argument that there is an enhanced burden on the Company to provide additional ('fulsome') discovery on this issue. As with other issues in the fair value determination, the Company needs to produce sufficient evidence to show that the conditions***

> ***justifying reliance on the merger price were satisfied. If the Company decides to limit its documented discovery and not to produce as witnesses those who were directly involved in the transaction process or the production of management projections, then it risks failing to satisfy the evidential burden. This approach seems to me to be consistent with the approach adopted by Kawaley J in Nord Anglia and Parker J in Qunar."***

**113.** I would summarise certain key factual key findings of the judge as follows (the numbers in square brackets are the paragraphs of the Judgment where these findings are made):

(i) He found Mr Zhao to be an unsatisfactory witness. Mr Zhao only had a limited knowledge or recollection of key matters and gave the impression that he did not apply his own mind to what action was required as part of a proper process to ensure that potential competing bidders were encouraged and given an adequate opportunity to participate. [161]

(ii) Mr Zhao failed carefully to review the treatment of strategic buyers or test in any way the adequacy of the steps proposed and taken by Citi to obtain competing interest and bids and was content to leave all important decisions to Mr Shao, who did not give evidence. Mr Zhao had been unable to provide a satisfactory explanation for the positive decision by the Special Committee to exclude the Company's main competitors from the list of potential buyers who were to be approached. [161] and [152(c)(xv)].

(iii) Although there were minutes of meetings of the Special Committee, there were significant gaps in the documents and they did not explain the Special Committee's thinking with respect to the selection of the parties to

approach, the assessment of the progress and outcome of the market check and the adequacy of the Merger Price. [162]

(iv) The reasons and justifications for the selection of parties to approach, in particular which strategic buyers should be contacted, was *'unclear'*. There was no record of why the Company's major competitors were not included in the market check and there was no record of any questions being asked by the Special Committee to test the adequacy of the list. A reason was given in the proxy statement, including the potential risk of competitive harm to the Company if strategic buyers conducted due diligence but a transaction did not occur, but Mr Zhao had no recollection of this or of the Special Committee having formed the views set out in the proxy statement. [163]

(v) The Special Committee failed to deal with the treatment of major competitors with the requisite care but the judge did not conclude that such competitors were deliberately excluded to protect the Buyer Group or so as to prevent any serious competing bid from emerging. [164]

(vi) Despite these findings, the judge concluded that the evidence as to the impact of the exclusion of the main competitors was sketchy and speculative. He did not consider that it had been shown that such competitors were shut out from coming forward had they desired to do so. He thought it likely that, had such competitors had a real interest in making a bid, they would have had sufficient information about the fact that the Company was on the market to allow them to contact the Company or Citi and express their interest (the Company had been on the market for some twelve months by the time of the EGM). Accordingly the judge did not regard the process as having had the clear effect of shutting out major competitors and of precluding a significant section of potential

bidders from expressing their interest. While some doubts remained about whether major competitors would have come forward had they been included in the list of buyers and approached, they were not so great as to undermine substantially the effectiveness of the process overall. [163(g)]

(vii) The Special Committee was not proactive in seeking reasons from Citi as to why parties who had expressed an interest had withdrawn, but there was insufficient evidence that any steps could have been taken to secure another bid. [164]

(viii) He accepted that the failure of the Special Committee to put IFC (which had expressed interest as a financial buyer) in contact with Hanwha or Motech and acceding too readily to requests from interested parties to be put in touch with the Buyer Group raised an issue as to whether more could have been done with the interest that was expressed in order to generate a consortium that might make a competing bid. But there was insufficient evidence that Hanwha or Motech needed finance or were sufficiently interested or otherwise prepared to work with IFC or that any such steps would have resulted in a bid or even a realistic chance of a competing bid. [164]

(ix) As to the impact of Mr Gao, his position created a material risk – that is one that could not be ignored as too remote – that the merger process would fail to produce an independent competing bid because other bidders would have found it difficult to compete with the Buyer Group or would have needed to discount their bid because of the impact of losing Mr Gao. But he did not consider that the evidence supported the conclusion that this was the reason for the absence of a competing bid or that the risk of this prevented reliance on the Merger Price. [177]

(x) The connections between the members of the Special Committee and Mr Gao raised concerns as to the members' independence and their willingness to act adversely to Mr Gao and aggressively and proactively seek out competing bidders. Mr Zhao's oral evidence did not remove or ameliorate those concerns. [178]

(xi) The written and documentary evidence together with Mr Zhao's oral evidence raised concerns as to whether the Special Committee took sufficient steps to ensure that discussions between the Buyer Group and the Company's management were properly restricted or supervised to ensure that management were not being improperly influenced by Mr Gao. [179]

(xii) These concerns extended to the process for approving the Management Projections which had ultimately been reviewed and confirmed by Ms Xu, who had been Mr Gao's personal strategy assistant until May 2016, when Mr Gao had appointed her as chief financial officer. The Company had failed to produce evidence that demonstrated that the Special Committee was aware of the detail of the process by which the Management Projections were prepared or exercised any adequate oversight of the process for their preparation. [180] and [152(v)(C)]

(xiii) The judge rejected the Dissenting Shareholders' criticisms of the Fairness Opinion.

(xiv) Pulling these and other findings together, the judge summarised his overall conclusion at [181] in the following terms:

> ***"For the reasons I have given, I consider that the performance of the Special Committee was deficient in a number of material***

***respects. These deficiencies affected the governance and effectiveness of the merger process and weaken the Company's argument that the process ensured that all interested parties were given a full and fair opportunity to come forward and that full value offers from competing bidders could have been made in fair competition with the Buyer Group. There were weaknesses in the Citi Market Check process with respect to the involvement of the Company's main competitors; the Special Committee could and should have done more to ensure the independence and separation of the team preparing the Management Projections from Mr Gao's influence and Mr Gao's position may have chilled the interest of some potential bidders and reduced the chance of bidders being prepared to make full value bids (without a Mr Gao discount) in competition with the Buyer Group. But, as I have said, there are a number of significant factors that support reliance on the Merger Price. The problems with the merger process which I have found to exist need to be taken into account when deciding what weight to give the Merger Price in the Court's fair value determination. They are not sufficient to, and do not, preclude any reliance on the Merger Price. I consider that the Court of Chancery's approach in <u>Norcraft</u> was right, namely that the court can take into account the merger price even though it considered that there were flaws in the company's deal process. I discuss below the precise weight to be attached to the Merger Price and the appropriate weight to be given to the adjusted share price and the preferred DCF valuation."***

**114.** Subsequently, at [330]-[340], the judge considered the weight to be given to the three methodologies and concluded that a 45% weighting should be attributed to the Merger Price.

**(iii) Submissions on appeal**

**115.** The Dissenting Shareholders' primary submission is that, having correctly summarised the requirements for reliance upon merger price at [156], the judge failed to comply with his self-direction. In the light of his factual findings, he should have concluded that the Company had failed to prove that the process followed in this case satisfied the conditions which he had articulated and that accordingly weight should not be placed on the Merger Price. This was particularly so as the flaws in the process would tend to skew the Merger Price to the downside and not merely make it unreliable in the sense that it could be either higher or lower than fair value. The flaws would tend to reduce the likelihood of a competing bidder coming forward to bid up the price, and hence would tend to increase the likelihood that the Buyer Group secured the Company for a price below fair value.

**116.** The judge's findings relied upon by the Dissenting Shareholders included (i) the failure to reach out to all the logical buyers by excluding the main competitors from the market check, (ii) the failure to follow up withdrawals or lack of responses by potential bidders, (iii) the failure to put parties who had expressed interest in touch with other such parties and instead to agree to parties getting in touch with the Buyer Group, and (iv) the material risk of the chilling effect of Mr Gao's position and the Special Committee's failures in respect of his potential influence. Furthermore, the judge had effectively penalised the Dissenting Shareholders for the lack of evidence as to whether other bidders would have come forward if they had been approached, when it was for the Company to provide sufficient evidence to show that the conditions for reliance on the Merger Price were satisfied, as the judge himself had stated at [156].

**117.** There were two additional grounds relied upon by the Dissenting Shareholders. The first related to the standstill provision in the non-disclosure agreement ('NDA') that any potential competing bidder would have been required to sign. The NDA signed by Hanwha was in evidence at the trial. This provided that, for a period of two years, the potential buyer was not permitted to acquire or agree, offer, seek or propose to acquire any shares in the Company or even to seek permission to do so; the potential buyer simply had to wait for an unsolicited invitation from the Special Committee. Similarly, the potential buyer could not provide financing to any other party to buy shares in the Company, or discuss or negotiate a joint bid with any other potential buyer. The Dissenting Shareholders submitted that this went far beyond an agreement relating to the non-disclosure of information, which was all that was required. They submitted at trial that the standstill provisions would have had a chilling effect on competitive bids and meant that there were not '*low barriers to entry*' as required by the criteria set out by the judge at [156]. They pointed out that the judge made no reference to this point in his judgment. He had therefore erred by failing to take into account a relevant consideration.

**118.** Secondly, the Dissenting Shareholders submitted that the judge was wrong to reject their criticism of the Fairness Opinion and should have held that it was flawed.

**119.** Finally, the Dissenting Shareholders submitted that the judge misunderstood the decision of the Delaware Court of Chancery in *Blueblade Capital Opportunities LP v Norcraft Inc* [2018] WL 3602940 (27 July 2018) when he said in [181] that *Norcraft* had stated that the court can take into account the merger price even though it considered that there were flaws in the company's deal process.

**120.** In response, the Company submitted that the judge's decision was an evaluative matter for him and his decision could not possibly be said to be one which was not reasonably open to him. He had identified the various flaws but had concluded that they did not undermine the reliability of the Merger Price. It was

not every defect in process which resulted in a lack of reliance on a merger price. Furthermore, as he was entitled to do, the judge had balanced the effect of any flaws against the factors which he found were supportive of the reliability of the Merger Price. In this respect, he had pointed at [157] to the small percentage of votes held by the Buyer Group, the substantial vote in favour of acceptance by shareholders who included a large number of institutional investors, the fact that the bid was not made at a particularly opportune moment so as to take advantage of a particularly low share price or some other factor, and the fact that the Company had effectively been on the market for a year following the Proposal Date before the date of the EGM in circumstances where the merger proposal had been well publicised.

**121.** As to the lack of documents, the Dissenting Shareholders could always have brought an application for specific discovery but had not done so. Furthermore, the Company did not have access to documents held by Citi, which was out of the jurisdiction and not amenable to any order for discovery.

**(iv) Discussion**

**122.** I propose to deal with the points concerning the Fairness Opinion and *Norcraft* before turning to consider the balance of the submissions.

**(a) Fairness Opinion**

**123.** When carrying out its DCF valuation for the purposes of the Fairness Opinion, Citi took a cost of debt figure of 13%, although there was no explanation of how they had arrived at this figure. In relation to the DCF valuation to be carried out by the Court, Mr Edwards took a cost of debt figure of 4.9% and Ms Glass a figure of 5.5%. The judge agreed with Ms Glass and held that 5.5% was the correct cost of debt figure to be included in the DCF valuation.

**124.** Before the judge, Mr Edwards said that the figure of 13% taken by Citi was too high. Ms Glass also accepted that it was high but said that there might be some justification for it. In the absence of access to Citi's model or discussion with them, it was not possible to conclude that it represented an error which undermined the reliability of the Fairness Opinion.

**125.** Having set out the respective positions of Mr Edwards and Ms Glass in the first part of [170], the judge gave his conclusion at [170(c)] in the following terms:

> ***"(c) In my view, the figure used by Citi is <u>hard to justify</u>. As I note below, Ms Glass' view for the purpose of her DCF valuation is that 5.5%... is the appropriate figure…In view of the figures used by Mr Edwards and Ms Glass, 13% <u>seems very high</u>. But I accept Ms Glass' view that it is not possible, and only speculation, to form a view as to whether a review of Citi's model would show that the high cost of debt figure was based on justifiable assumptions and did not, when the model is viewed in the round, result in a material undervaluation."***
> [Emphasis added]

**126.** The Dissenting Shareholders submit that this was a conclusion which was plainly wrong. The Company submits that it was a conclusion which the judge was entitled to reach and was based on the evidence of Ms Glass to the effect that there might have been some justifiable reason for the 13% figure but that it was not possible to determine this in the absence of access to Citi's model or discussion with them.

**127.** In my judgment, essentially for the reason put forward by the Dissenting Shareholders, this was a conclusion which was plainly wrong. One starts from the position that the judge found that 5.5% was the correct cost of debt figure for a DCF valuation. That decision was reached after hearing competing expert evidence about the appropriate figure based on analyses of the actual cost of

borrowing figures for the Company, with Mr Edwards opting for 4.9% and Ms Glass 5.5%.

**128.** In these circumstances, it is not surprising that the judge found Citi's figure *'hard to justify'* and *'seems very high'*. The natural conclusion from his finding as to the correct cost of debt must be that, on the balance of probabilities, the 13% figure was too high.

**129.** The judge took the view, based on Ms Glass' evidence, that, given the absence of access to the Citi model, there might be a justifiable reason for the figure. But, as the judge himself said, it was merely speculation that this high figure would turn out to have some justifiable assumption underlying it. It did not begin to constitute evidence that there was a justifiable assumption reason for the figure. Set against the evidence that 5.5% was the correct figure, speculation that there might be some reason for Citi taking a 13% figure does not constitute evidence that the figure was justifiable. On the balance of probabilities, there can only be one answer to the question as to whether 13% (a figure more than double the figure which the judge held to be correct) was reasonable; and that is that it was not.

**130.** Furthermore, as the Dissenting Shareholders submit, by allowing the 13% figure to stand, the judge was departing from his self-direction at [156]. It was the Company which was seeking to rely on the Merger Price and to use the Fairness Opinion as one of the pillars of support for the reliability of the Merger Price as indicating fair value. It was therefore for the Company to produce any necessary evidence to support the Fairness Opinion. The consequence of the judge's decision is that, in the absence of any evidence to support the figure, he has in effect found that the figure was justified.

**(b) The Norcraft point**

**131.** This is a short point. As quoted above, at [181] the judge said that the Court of Chancery approach in *Norcraft* was right, namely that the court can take into account the merger price even though it considered that there were flaws in the company's deal process. The judge went on to say that he would discuss later the precise weight to be attached to the Merger Price.

**132.** The Dissenting Shareholders submit that the judge misunderstood the decision in *Norcraft*. I agree. The judge quoted extracts from *Norcraft* at [148(d)] but it suffices for present purposes to quote only the following extract from the judgment of the Vice-Chancellor at pp 2-3:

> ***"Having concluded that flaws in the sales process leading to the Merger undermine reliability of the Merger Price as an indicator of fair value….I have turned to a 'traditional valuation methodology', a discounted cashflow ('DCF') analysis, to calculate the fair value of Norcraft as of the Merger date. In my view, given the evidence in this record, a DCF-based valuation provides the most reliable means by which to discharge the Court's statutorily mandated function to appraise <u>Norcraft</u>."***

**133.** The fact that the Vice-Chancellor was placing no weight on the deal price is stated specifically at p27 where he said:

> ***"Accordingly, I do not accord any weight to the deal price in my fair value calculus."***

**134.** What he does do is, having reached a DCF valuation, carry out a *'reality check'* before finally confirming the DCF valuation. Thus at p3 he said:

> ***"In so far as <u>Dell</u> and <u>DFC</u> require that the trial court carefully consider deal price before disregarding it altogether, I have returned to the Merger Price as a 'reality check' before locking in***

> ***my DCF valuation as the last word on fair value. Having done so, I am satisfied that the $0.66 per share delta between the Merger Price and my DCF valuation of Norcraft is a product of the identified flaws in Norcraft's deal process.”***

**135.** In my view, the Vice-Chancellor was clearly not stating that, even though there were flaws in the process, the merger price could be given weight in the valuation. On the contrary, he had said specifically that he was not giving it any weight. He had decided to ascertain fair value entirely on the basis of a DCF valuation and had then merely looked back at the merger price as a *‘reality check’* before definitively fixing fair value by reference to his DCF valuation.

**136.** However, as stated below, I do not consider that the judge’s statement of principle was wrong, even if it could not properly be based on what was said in Norcraft. The mere fact that there are flaws in the deal process does not of itself mean that the merger price cannot be given weight. It all depends on the gravity and nature of the flaws, although clearly the existence of any flaws raises a serious issue as to whether weight can still be placed on the merger price.

**(c) The remaining points**

**137.** Subject to the qualification in [146] below, I consider that the judge accurately summarised at [156] the circumstances in which weight can be placed on the merger price as evidence of fair value (see [113] above).

**138.** As the judge made clear, his formulation drew upon the decision of the Delaware Supreme Court in *Dell*. The other leading case in Delaware is the decision of the Supreme Court in *DFC*. In the latter case, the Court emphasised the need for a *‘robust market check’* (at 366) and went on to place reliance on the fact that the financial adviser engaged by the company had approached *‘every logical buyer’* (at 376).

**139.** In my judgment, a helpful summary of some of the features to be looked for when considering whether weight should be placed on a merger price is to be found in *Re Solera Holdings Inc* [2018] WL 3625644 (30 July 2018), where Bouchard C said at P17:

> ***"I now turn to my own independent determination of the fair value of Solera's shares with the guidance from DFC and Dell in mind. Those decisions teach that deal price is "the best evidence of fair value" when there was an "open process," meaning that the process is characterised by "objective indicia of reliability." Such "indicia" include but, consistent with the mandate of the appraisal statute to consider "all relevant factors," are not limited to:***
>
> - ***"[R]obust public information," comprised of the stock price of a company with "a deep base of public shareholders, and highly active trading," and the views of "equity analysts, equity buyers, debt analysts, debt providers and others."***
> - ***"[E]asy access to deeper, non-public information" where there is no discrimination between potential buyers and cooperation from management helps address any information asymmetries between potential buyers.***
> - ***"[M]any parties with an incentive to make a profit had a chance to bid," meaning that there was a "robust market check" with "outreach to all logical buyers" and a go-shop characterised by "low barriers to entry" such that there is a realistic possibility of a topping bid.***
> - ***[A] special committee "composed of independent, experienced directors and armed with that*** (sic) ***power to say 'no'," which is advised by competent legal and financial advisors.***

- ***"[N]o conflicts related to the transactions," with the company purchased by a third party in an arm's length sale and "no hint of self-interest.""***

**140.** In relation to the last bullet point, I do not consider that the existence of any conflict of interest precludes absolutely any reliance on a merger price, but it certainly militates against such reliance. The present case is in effect a management buyout in that Mr Gao, as founder, chairman and chief executive of the Company, was also part of the Buyer Group. In such circumstances, there must, in my judgment, be heightened scrutiny in order to ensure that there is a realistic and fair opportunity for alternative bidders. Inevitably, in a management buyout, there is considerable scope for management to acquire the company on the cheap because of their detailed knowledge of the company as compared with the knowledge of ordinary shareholders and other potential bidders.

**141.** Examples of the sort measures which have been considered as a *'robust market check'* can be found in some of the cases:

(i) The situation in *Dell* was not wholly dissimilar to the present case in that Mr Dell, as founder and CEO of Dell, held 15.4% of the shares and it was considered important that he should continue with the company. To that end, he had agreed to explore in good faith the possibility of working with any potential buyer and to vote his shares in proportion to the unaffiliated shares. The special committee of independent directors did not carry out a market check before signing a merger agreement with a company called Silver Lake. However, there was then a well publicised go-shop period of forty-five days in which the committee had the opportunity to find a better offer. During the go-shop period, the financial advisers to the committee approached some 67 parties, including 20 potential strategic buyers and 17 financial companies. Amongst the potential strategic buyers was *Dell's* closest competitor. The Supreme Court reviewed the process which had been followed in considerable detail and concluded that the Court of

Chancery below had been wrong not to place weight on the merger price because there was compelling evidence of *'market efficiency, fair play, low barriers to entry, outreach to all logical buyers, and the chance for any topping bidder to have the support of Mr Dell's own votes'*.

(ii) In *DFC*, the Delaware Supreme Court overturned the decision of the Court of Chancery to give only one-third weighting to the deal price and remitted it to the lower court with clear guidance to give considerable and possibly exclusive weighting to the deal price. This was in circumstances where:

(a) the proposed purchaser was a third party acting at arm's length,

(b) the financial adviser to the company had approached every logical buyer (41 financial buyers and 3 strategic buyers) over a two year period before the deal, and

(c) there was no hint of self-interest that compromised the market check. The deal did not involve the potential conflicts of interest in a management buyout or negotiations to retain existing management.

(iii) In *Nord Anglia*, Kawaley J agreed with the need for a robust sales process as described in *Dell* and said at [86]:

> ***"In <u>Re Appraisal of Petsmart, Inc</u> is also instructive as regards illustrating what type of auction process has been judicially viewed as robust. The merger process was initiated by an "activist hedge fund" which had acquired a 9.9% stake in the company, not by a controlling shareholder. 27 potential bidders were identified between August 2014 and October 2014, and 15 potential bidders signed non-disclosure agreements. A data room including non-public information was made available to***

***the potential bidders and management made presentations to them. Five bids were received by October 31, 2014; on November 3, 2014, four were allowed to continue further with their bids. The Board in early December were still considering alternatives to a sale. Final bids were considered on December 10, 2014. There were three separate competing bidding groups, and one group expanded its membership near the end of the auction process to increase its bidding capacity. The highest bid was ultimately accepted. The merger was approved by over 77% of all shareholders and over 99% of those who voted. The dissenters did not challenge the efficacy of the <u>process</u>*** [Original Emphasis] ***as such. The valuation process deployed by the Ad Hoc Committee's advisers were subject to apparently strong criticism, as was their impartiality; it was also argued, inter alia, that market conditions limited the range of participants in the auction process, such that the Board did not make a properly informed decision. The Vice-Chancellor crucially concluded:***

***"Importantly, the evidence reveals that the private equity bidders did not know who they were bidding against and whether or not they were competing with strategic bidders. They had every incentive to put their best offer on the table…***

***Respondent has <u>carried its burden</u> of demonstrating that the Merger Price of $83 per share was the result of a 'proper transactional process' comprised of a robust pre-signing auction in which adequately informed bidders were given every incentive to make their best offer in the midst of a 'well-functioning market'."*** [Emphasis added]

**142.** Although, as stated above, the judge misunderstood the decision in *Norcraft*, I reject Mr Salzedo's submission, which was effectively that no or minimal weight must be given to the merger price if any of the conditions listed in [156] are found not to be satisfied. It seems to me that this must depend upon the manner and extent to which the conditions are not satisfied. If there are fairly minor breaches, this may well enable weight still to be given to the merger price on the basis that it can still be regarded as a reliable indicator of fair value; see for example *Nord Anglia* where Kawaley J found that the sale process, although an arm's length process, was not as robust as it might have been but concluded that the merger price still provided a reasonable indicator of fair value and gave it a weighting of 60% with 40% being attributed to a DCF valuation. However, if the breaches are substantial, this is likely to mean that the merger price is not reliable as an indicator of fair value and that accordingly little or no weight should be given to the merger price when assessing fair value.

**143.** In this connection, Mr Jones submitted that the case of *Solera* supported the judge's decision in the present case to give weight to the Merger Price despite the defects which he had identified in the sale process. However, the facts of *Solera* were very different. Bouchard C summarised the position as follows on p 1:

> ***"As discussed below, the record reflects that Solera was sold in an open process that, <u>although not perfect</u>, was characterised by many objective indicia of reliability. The merger was the product of a two-month outreach to large private equity firms followed by a six-week auction conducted by an independent and fully authorised special committee of the board, which contacted eleven financial and seven strategic firms. Public disclosures made clear to the market that the company was for sale. The special committee had competent legal and financial advisors and the power to say no to an under-priced bid, which it did twice, without the safety net of another bid. The merger price of $55.85 proved to be a market-***

***clearing price through a 28-day go-shop that the special committee secured as a condition of the deal with Vista, one which afforded favourable terms to allow a key strategic competitor of Solera to continue to bid for the company."*** [Emphasis added]

**144.** The reference to *'although not perfect'* would appear to be a reference to two matters. The first was the court's finding on p22 that the board of *Solera* could have done a better job of monitoring the CEO and his interaction with potential buyers, particularly after the special committee was in place. However, the court also found that those interactions did not compromise the integrity or effectiveness of the sale process. The second was that two potential buyers were excluded from the sale process. However, the judge found (at 19) that, when they contacted Solera's financial adviser, there was no indication of their ability to pay and their introductory emails were perfunctory. They did not express any further interest either before or during the go-shop period and the judge concluded that they were just *'kicking the tires'*. These were therefore clearly very minor imperfections in the process and it is not surprising that the Chancellor still felt able to place sole weight upon the merger price. Apart from confirming that minor imperfections in the process will not necessarily prevent significant or exclusive weight being placed on the merger price (with which I agree), I do not think this case assists Mr Jones because the facts were so different; in this case the deficiencies in the market check and in the conduct of the Special Committee were very much more serious.

**145.** Whilst it is always important not to treat words in a judgment as if they were in a statute, I agree with the decisions in the Grand Court that the guidance in *Dell* and *DFC* as to the need for a market check and the circumstances in which a merger price may be relied upon is equally applicable in this jurisdiction. The possible qualification referred to at [138] above relates to the sentence in [156] where the judge says *'but I do not accept the Dissenting Shareholders' argument that there is an enhanced burden on the Company to provide additional ('fulsome')*

*discovery on this issue'*. I agree that the reference to an *'enhanced burden'* and to *'additional'* discovery is not necessarily appropriate but, in my view, it is of fundamental importance, particularly in a management buyout, that companies give full disclosure of all documents relating to the sale process (including the market check) and the relevant communications with the financial advisers. In a management buyout, the buyer holds all the cards because of its detailed knowledge of the company's position and there is a need to ensure a fair process, which requires the company to be entirely open. The most effective way in which this can be ensured is if the company knows that inferences are likely to be drawn against it if it fails to be entirely open and transparent.

**146.** Turning to apply these principles to the present case, I conclude that the judge's decision that the Merger Price should be given a 45% weighting (i.e. nearly half) despite the defects in the process was not one which was reasonably open to him. I would summarise my reasons for this conclusion as follows:

(i) In coming to his decision on weighting, the judge took Ms Glass' suggested weighting as a starting point and then considered the extent to which he agreed with or proposed to depart from her weighting. He held at [338(f)] and [340(d)] that, in coming to her decision as to the weighting to be given to the Merger Price, Ms Glass had not taken account of any of the problems with the merger process which he had identified, but which she had not. He held therefore that a small additional discount needed to be given beyond that which she had allowed. However, despite that statement, he in fact reduced the discount from that of Ms Glass and increased the weighting given to the Merger Price. Thus Ms Glass had proposed a 40% weighting (i.e. a 60% discount) which the judge increased to 45% (i.e. a 55% discount). That decision was wholly inconsistent with what he said in [340(d)] and he did not explain this inconsistency.

(ii) Mr Jones sought to uphold this aspect of the judge's decision on the basis that he had reduced the overall weighting given to market methodologies (i.e. the Market Price and the Merger Price) from Ms Glass' figure of 80% to one of 75% (45% Merger Price and 30% Market Price). But this does not answer the point that, having said that the weight to be given to the Merger Price should be reduced because of the deficiencies in the sale process which he had identified, the judge nevertheless in fact increased the weight.

(iii) The Company failed to provide a witness who could explain the actions of the Special Committee and why they took such actions. The judge found Mr Zhao to be an unsatisfactory witness who was unable to answer many of the questions posed to him. He did not know why many of the decisions had been taken. The evidential position therefore was that there was no satisfactory explanation for many of the decisions taken by the Special Committee. The Company should have called evidence from Mr Shao (assuming he was a position to explain the actions of the Special Committee) and/or from Citi. The lack of any satisfactory witness was exacerbated by the fact that very few documents in relation to the sale process were available. As stated above, particularly where one is concerned with a management buyout, the Company can hardly complain if an adverse decision is reached on the weight to be placed on the Merger Price if it fails to produce evidence to show that the conditions justifying reliance on the Merger Price were satisfied.

(iv) There were serious defects in the market check carried out by the Special Committee. Thus:

(a) The Company's main competitors were not approached. It is of course possible that the Special Committee had a justifiable reason for not doing so but, in the absence of any evidence from Mr Zhao

or from Citi as to what this reason was, the Company has failed to show that there was good reason. Mr Zhao had no recollection of the alleged reason given in the proxy statement. The failure to approach competitors would clearly reduce the prospect of an alternative bid, which is the key purpose of a robust market check. Mr Jones emphasised the judge's finding at [163(f)] that the Special Committee did not deliberately exclude serious competitors in order to protect the Buyer Group and prevent any serious competing bid from emerging. However, that is beside the point. It is the effect of the decision not to approach serious competitors which is important and the effect would be to reduce the chances of an alternative bid. The Special Committee clearly failed the requirement in *Dell* (as adopted by the judge) that there be *'outreach to all logical buyers'*.

(b) One potential financial buyer, IFC, expressed interest and asked whether there might be an opportunity to form a consortium with strategic buyers. By this time two potential strategic bidders had expressed interest. Yet, the Special Committee did not do the obvious thing and put the interested parties in touch with each other. This again reduced the chances of a competing bid.

(c) There were twenty-two potential bidders to be approached on the list approved by the Special Committee. There was no response from nine and one could not be contacted. Mr Zhao did not ask what effort (if any) Citi had made to get a response from these potential bidders whereas a proactive Special Committee keen to secure an alternative bid would have pressed its financial adviser so as to try and secure an alternative bid.

(d) Of the twelve potential bidders that did respond, four of them expressed an interest in circumstances where they would have been aware of the offer from the Buyer Group. Nevertheless, as already noted, the Special Committee failed to inform the interested parties of each other's interest (despite the specific request from IFC referred to above). Instead, three of the four interested parties were directed to contact the Buyer Group. This had the effect of reducing the prospect of an alternative bid rather than increasing it.

(e) As discussed above, the wording of the NDA was so tight that it prevented an interested party from making or being associated with a bid unless invited to do so by the Special Committee. I accept Mr Jones' point that the existence of this provision did not prevent a potential bidder from coming forward in the first place; it would only operate as a disincentive once an interested party had got to the stage of being asked to sign the NDA. However, it would be an obstacle to the likelihood of competitive bids at that stage. Its relevance therefore is that it is further evidence that the Special Committee was not fulfilling its key task of proactively seeking out a competitive bid. If it were genuinely focused on that task, it is hard to see how it could have approved such a term.

(f) There were *'significant gaps'* in the documentary evidence to explain the actions of the Special Committee. At [340(i)], the judge was critical of the Dissenting Shareholders' failure to seek specific discovery, but in my judgment the correct target for criticism and for the potential drawing of inferences was the Company, which had failed to produce the relevant evidence in the first place despite the existence of an order for discovery relating, inter alia, to the contacts with Citi and any document relevant to

the determination of the fair value of the ADS. It became evident during the trial that the Company's efforts in relation to discovery had been lamentable. Thus, on Day 2/116-117, Mr Chan confirmed that he oversaw the discovery process but that he had not asked Mr Gao, either member of the Special Committee, Citi or Kirkland and Ellis if they had any relevant documents.

(v) The judge held at [163(g)] that the failures in the market check were not significant because it had not been shown that competitors were shut out as, if they had a real interest in making a bid, they would have known that the Company was on the market and could therefore have contacted the Company or Citi. Mr Jones submitted that the judge was entitled to reach this view. I consider that the judge erred in this respect for two reasons:

(a) It was inconsistent with the judge's own self-direction at [156] and with the Delaware jurisprudence which, correctly in my view, emphasises the need for a robust market check and *'outreach to all logical buyers'*. No doubt it will usually be the case that the fact that a company is in play will be public knowledge and will be known to potential bidders. If that fact alone were held to be sufficient, there would be no need for a market check. But there is, in my judgment, a considerable difference between knowing that a company is for sale on the one hand and, on the other, being approached by the financial adviser to a company using all its skill to persuade a potential buyer that it would be advantageous for it to bid for the company. I would therefore disagree that the suggestion that potential buyers could have come forward even though they were not on the list to be approached by Citi was a reason to ignore the deficiencies in the market check procedure.

(b) The judge at [163(g)] found that it had not been shown that the failure to include competitors in the market check resulted in such competitors being shut out from participating in the process or from coming forward to express their interest had they desired to do so. As Mr Salzedo submitted, this was in effect to place the burden on the Dissenting Shareholders to show that competitors were prevented from coming forward. But this is something which dissenting shareholders will virtually never be in a position to prove. How can they have been expected to show what would have happened if the company had carried out the market check which it should have? As the judge correctly stated at [156], the evidential burden is on the company to show that the conditions justifying reliance on the merger price are satisfied. Thus in this case it was for the Company to show that the market check carried out by the Special Committee was adequate to ensure that all potential bidders were approached and given an opportunity to bid. The judge's decision effectively to place the burden on the Dissenting Shareholders was inconsistent with what he had correctly stated at [156] and was, in my opinion, wrong in law. The whole point of requiring a robust market check is to avoid the need to speculate on what potential bidders would have done if they had been approached.

(vi) To the above concerns over the inadequacies of the Special Committee's performance in relation to the market check must be added the judge's concerns about the impact of Mr Gao's dual role in both the Company and the Buyer Group. Thus:

(a) At [177] the judge found that Mr Gao's position *'…. may have killed interest and made it more difficult for bidders to succeed in competition with the Buyer Group'*. He found that there was no

evidence that it did (although this is something which I think dissenting shareholders will hardly ever have evidence of) and again wrongly placed an evidential burden on the Dissenting Shareholders. The judge went on to say at the conclusion of [177]:

> ***"On balance, it seems to me right to say that Mr Gao's position created a material risk – that is one that cannot be ignored as too remote – that the merger process would fail to produce an independent competing bid because other bidders would have found it difficult to compete with the Buyer Group or would have needed to discount their bid because of the impact of losing Mr Gao. But I do not consider that the evidence supports the conclusion that this is the reason for the absence of a competing bid or that the risk prevents reliance on the Merger Price."***

(b) I accept that the judge was entitled to find that there was no evidence to show that Mr Gao's position <u>was</u> the reason for the absence of a competing bid, but to my mind the important point was that there was a material risk that this was so and the existence of that risk, which was not addressed by the Special Committee, was clearly relevant to whether weight could properly be placed on the Merger Price, particularly when considered in conjunction with the deficiencies in the market check.

(c) The judge went on to say at [178] and [179] that there were concerns as to the Special Committee's independence from Mr Gao including:

(1) *'The members' independence and their willingness to act adversely to Mr Gao and aggressively and proactively seek out competing bidders'* and that Mr Zhao's oral evidence *'did not remove or ameliorate these concerns'*.

(2) There were *'serious concerns'* as to whether the Special Committee took sufficient steps to ensure that discussions between the Buyer Group and the Company's management were properly restricted or supervised to ensure that management were not being improperly influenced by Mr Gao.

(3) Those concerns extended to the process for approving the Management Projections where the judge found at [180] that the Company had *'failed to produce evidence that demonstrates that the Special Committee was aware of the detail of the process by which the Management Projections were prepared or exercised any or adequate oversight of the process so as to satisfy themselves that it was being properly conducted'*; *'The Special Committee failed to ensure that procedures were in place to manage Mr Gao's conflict of interest'*; and that the Management Projections were ultimately reviewed and confirmed by Ms Xu, who had previously been Mr Gao's personal strategy assistant.

As stated in *Solera* in the passage quoted at [140] above, it is an important indicia of reliability that a special committee be composed of independent experienced directors. On the judge's findings stated above, there were concerns about this aspect.

(vii) At [181] the judge referred to the fact that there was a number of significant factors that supported reliance on the Merger Price. This was a reference back to what he had said at [157]. The significant factors which he listed were (i) that the Buyer Group held only 5.6% of the shares in the Company at the time of the vote, (ii) that the merger was approved by 94.4% of the shareholders who were independent of the Buyer Group, including a large number of institutional investors, (iii) that the market in the Company's shares was liquid, moved with announcements and was followed by analysts and (iv) that the Buyer Group's proposal was not timed at a particularly bad time for the Company so as to take advantage of a particularly low share price or some large investment that had not yet shown fruit.

(viii) It seems to me that, although the majority vote may not always be so large, these are all features which are likely to be present in many, if not most cases. They do not diminish the need for a robust market check as required by the authorities, so as to maximise the prospects of a competing bid and minimise the chances (particularly in the case of a management buyout) that the Company is being purchased on the cheap because of the greater knowledge of the buyers. Accordingly, I do not see that the existence of the factors listed by the judge can possibly balance or outweigh the deficiencies in the market check process and the concerns about the impact of Mr Gao's position.

(ix) As stated above, in relation to its DCF valuation Citi took a cost of debt figure which, on the evidence before the judge, was not justifiable. Special committees invariably obtain fairness opinions from independent financial advisers so as to assist both the special committee and the shareholders in deciding whether or not to accept the merger price which has been offered. It must be assumed that such opinions carry some

influence albeit that they will not of course necessarily be decisive. According to Mr Salzedo – and this was not challenged by Mr Jones – the evidence before the judge was to the effect that if Citi had taken Mr Edwards' cost of debt figure of 4.9% rather than their figure of 13%, that alone would have doubled Citi's estimate (on a DCF valuation) of the fair value of the Company's ADS and yielded a valuation that was more than double the Merger Price. It was therefore a significant error. This does not of course necessarily mean that the Merger Price cannot be relied upon, but it is yet another matter which raises a question over whether the Merger Price is a reliable indicator of fair value, given that there must be some likelihood of some shareholders having voted differently if the Fairness Opinion had reflected a justifiable cost of debt figure and therefore produced a DCF valuation which was well in excess of the Merger Price.

**147.** If the judge's decision to give a 45% weighting to the Merger Price cannot reasonably be justified for the reasons I have just given, the question then arises as to what weighting should be given. Technically, the issue arises under Ground 5 of the grounds of appeal, which deals with the overall weighting. But I think it preferable to address the issue at this stage when the issue of the defects in the sale process are being considered.

**148.** On the facts of this case, given (i) the significant deficiencies in the market check process, (ii) that this was a management buyout with all the potential difficulties and conflicts of interest which this brings, (iii) the material risk that Mr Gao's position had a chilling effect on prospective bidders, (iv) the deficiencies in the Fairness Opinion, (iv) the concerns about the independence of the members of the Special Committee and whether they were willing to act adversely to Mr Gao's interests, and (v) the complete failure of the Company to produce relevant evidence, I do not see that any reliance can safely be placed on the Merger Price. The whole point of the protections and processes which have been developed in

the Delaware jurisprudence and adopted in this jurisdiction is to give the court comfort that the merger price can be probative of fair value. When, in circumstances of a management buyout, the Company has failed to produce any witness or sufficient documentary evidence to explain and justify the deficiencies and concerns identified, I do not see how it can be considered as safe to rely upon the Merger Price as a reliable indicator of fair value. Furthermore, if despite the deficiencies identified and the failure of the Company to engage properly in the process by producing suitable evidence in the form of witnesses and documents, weight can still be placed on the Merger Price, there is a substantial risk that companies in future will behave in a similar manner and not be open and transparent about all relevant evidence. I therefore consider that the only reasonable decision in the present case was to give the Merger Price zero weighting.

**(3) Ground 3 – Management Projections**

**149.** Ground 3 is concerned with the Management Projections and the corresponding effect of these on any DCF calculation because of the need to estimate future cashflow for the purpose of any such calculation. The Dissenting Shareholders raise four matters under Ground 3 and contend that the judge erred in:

(i) adopting too high a test for departing from the Management Projections;

(ii) failing to adopt the figure of 9,000 MW rather than 7,220 MW for module sales in 2017 (with corresponding adjustments for later years);

(iii) failing to make any adjustment to the projections for future module selling prices; and

(iv) failing to make any upward adjustment to the Management Projections for downstream capacity factors.

I shall consider each of these in turn.

**(i) Test for departing from the Management Projections**

**150.** The judge dealt with this topic at [186]-[188]. Having at [186] noted certain observations of Parker J in *Re Qunar Cayman Islands Limited* (Grand Court, 13 May 2019) at [179]-[182] and of Kawaley J in *Nord Anglia* at [150]-[153], he summarised his approach as follows at [188] in the following terms:

> ***"Accordingly, while each case depends on its facts and there are no rigid rules to be mechanically applied, the approach to be followed can be summarised as follows:***
>
> ***(a) the Court's task is to determine the most realistic forecast of the Company's future performance for the purposes of the DCF valuation. As I said in <u>Shanda</u>, the Court is aiming to find projections that are reasonable and reliable in the circumstances (a case in which I was prepared to require adjustments to be made to the management projections).***
>
> ***(b) the starting point is the general reliability test – have the management projections been prepared in good faith by a competent management team which understands the business and is capable of making informed judgements about future performance?***
>
> ***(c) if the management projections satisfy this test, in the absence of some contemporaneous challenge to management's projections suggesting some serious failure in management's general approach to the preparation of projections, the Court must consider whether they have been shown to be obviously wrong, careless or tainted by an improper purpose (such as***

*bias). There needs to be serious and material doubts as the reasonableness and reliability of such projections.*

*(d) this is because the Court should be cautious about allowing expert witnesses to substitute their judgments about the company's future business prospects for the judgments of those with intimate inside business knowledge – although the level of caution will depend on and vary with the issue in question and challenges made. Where the disputed adjustments are primarily dependent on questions of insider business judgment then the Court will be slow to displace management's assessment and forecast. Where the issues in dispute involve questions of expert valuation methodology, then the Court may be less deferential to management's approach.*

*(e) where there are competing valuation methodologies, the Court may give reduced weight to a DCF valuation based on management projections if it has serious concerns as to the reasonableness and reliability of those projections (either generally or in material respects).*

*(f) where the Court is considering particular items to be included in the DCF valuation (relating to a particular input to the DCF valuation based on an item in or aspect of a forecast) the Court can limit the weight to be attached to the item derived from the management projections if there are serious and material doubts as to the reasonableness and reliability of that item or aspect.*

> ***(g) management projections produced for the purpose of or in connection with the merger rather than being produced in the ordinary course of the company's operations, will need to be carefully scrutinised to ensure that they have not been influenced by, and constructed so as to facilitate, the merger."***

**151.** Mr Salzedo submitted that the observation in (c) above to the effect that the Court may only intervene if the projections have been shown to be *'obviously wrong, careless or tainted by an improper purpose (such as bias)'* was inconsistent with the judge's assertion at (a) above that the Court's task is *'…to determine the most realistic forecast of the Company's future performance…'*. The judge should, therefore, have approached this issue on the basis that his task was to determine the best forecast, as at the Valuation Date, on the basis of all available evidence including, but not limited to, the Management Projections; and if, weighing all of that evidence, the best forecast was something other than as stated in the Management Projections, the judge should have adopted that alternative figure without requiring a demonstration that the Management Projections were *'obviously wrong, careless or tainted by an improper purpose'*.

**152.** Mr Jones, on the other hand, emphasised that management projections have the advantage of being prepared at the relevant time by those with knowledge and experience of a company's business. It was therefore correct for the judge to hold that, if the Court is satisfied that the general reliability test which the judge articulated at [188(b)] is satisfied, the evidential burden falls on the dissenting shareholders to show that the projections are obviously wrong, careless or tainted by improper purpose.

**153.** In my judgment, the judge articulated the test for departing from a forecast in management projections in terms which are too high, with its reference to only interfering if the forecast is shown to be *'…obviously wrong, careless or tainted by an improper purpose'*.

**154.** I accept that the judge adopted this expression from the judgment of Parker J in *Qunar* at [181]. However, I do not consider that Parker J was seeking to lay down a general test which should invariably be applied; he was also considering the matter in a case where there were no industry expert witnesses.

**155.** I agree with the judge that the starting point is to consider the general reliability test as stated at [188(b)]. Clearly, if that is not satisfied, the Court should be very cautious about placing too much weight on management projections. But, even if the general reliability test is satisfied, the Court's duty, as the judge correctly stated at [188(a)] is to determine the most realistic forecast of the company's future performance. That means that the Court must reach its own decision pursuant to its obligation to determine fair value.

**156.** I find helpful an observation of Kawaley J from *Nord Anglia* at [153] as follows:

> ***"But, it bears repeating, this*** **[satisfaction of the general reliability test]** ***does not exclude the need in the context of a judicial appraisal proceeding to test the accuracy of the estimates and make appropriate adjustments with a view to determining the most realistic forecast of the Company's future performance."***

**157.** There must, of course, be <u>some</u> evidence before the Court to raise an issue as to the appropriateness of one or more assumptions or forecasts in the management projections before any question of departing from such projections arises. But once there is such evidence, the Court's duty is to reach its own decision. In doing so, it will of course give due weight to the knowledge and experience which the management team has of the company's business, but it must consider the evidence of both parties and reach its own decision on the most realistic forecast. It is wrong to say that the Court can only vary a forecast in management projections if it concludes that that forecast is obviously wrong, careless or tainted by an improper purpose. The Court may simply conclude that, even after making allowance for the knowledge and expertise of the management team and bearing

in mind the cautionary words quoted above about allowing expert witnesses to substitute their views for those of management, an expert witness's views are to be preferred and that the best forecast is that put forward by the expert witness or lies somewhere between the management projections and that of the expert witness. If the Court reaches this conclusion, it must give effect to that conclusion when assessing fair value.

**158.** Apart from sub-paragraph (c) of [188], the Dissenting Shareholders did not criticise the judge's summary in [188] and, for my part, I consider it to be a useful summary of the Court's approach.

**159.** Having decided that the judge adopted too high a threshold for departing from the Management Projections, I shall consider whether this error affects his conclusions when I turn to the remaining points under Ground 3.

**(ii) The 9,000 MW point**

**160.** The Dissenting Shareholders submit that the judge should have adopted the figure of 9,000 MW for module sales in 2017 (with corresponding adjustment for later years) rather than adopting the figure of 7,220 MW contained in the Management Projections. It was common ground between the parties that this point stood or fell according to our decision on the same point when considering the Market Price and accordingly I need say no more about it.

**(iii) Module selling prices**

**(a) Introduction**

**161.** As part of the Management Projections, the Company predicted the average selling prices ("ASP") for solar modules for the next seven years, namely 2017–

2023. The Management Projections were prepared in July 2016 but the judge's duty was to consider what the most reasonable projections would have been as at the Valuation Date. He dealt with this topic at [207]-[217].

**162.** This was an aspect which was heavily dependent on the selection of data contained in third party sources relating to the solar market as a whole rather than information specific to the Company. It was common ground between the experts and the Company before the judge that, as at the Valuation Date, module prices had fallen and were expected to continue to fall. The issue between the parties was therefore as to the extent and rate of any future decline, as this would determine the projections for the future revenue of the Company.

**(b) The evidence**

**163.** Given the absence of any witness from the Company who could speak to the Management Projections, the judge found at [217(a)] that, once again, this was an issue where the Management Projections were inadequately explained or supported by independent data and sources. Indeed, when Mr Russo had requested clarification of the sources relied upon in the Management Projections, the Company denied that it relied upon a particular named solar research firm specified by Mr Russo but did not identify the source(s) from which or the methods by which the Management Projections on this aspect were derived. However, the judge concluded that the evidence of Dr Goffri and Mr Russo, as reviewed and analysed by Ms Glass, provided the basis for testing the reasonableness of the Management Projections.

**164.** Mr Russo relied on price predictions from six sources. He calculated the average price decline from those six sources and then applied that to the Company's actual ASP in 2016. His analysis resulted in a lower decline (and therefore higher future prices) than the Management Projections.

**165.** Dr Goffri had a number of concerns about the sources relied on by Mr Russo. Thus four of them were prepared in 2015/early 2016 and were therefore somewhat out of date. Of the two remaining sources, one did not project a price but instead projected costs, which Mr Russo had then translated into price estimates using various assumptions. The one remaining source, IRENA, the International Renewable Energy Agency, did not provide price projections throughout the period but only a projection range for 2015 and 2025. Mr Russo used linear extrapolation to calculate IRENA's prediction for the intermediate years.

**166.** Dr Goffri relied on prices from only three sources. However none of these sources predicted prices after 2020. Accordingly he extrapolated prices for the years after 2020 based on the average price decline of each source up to that point. He then averaged the three prices in order to reach his estimate of future ASP. His calculations resulted in a steeper decline (and therefore lower prices) than the Management Projections. Mr Russo was concerned with the fact that the sources only covered the period till 2020 and that thereafter Dr Goffri's predictions were based on a simple extrapolation.

**167.** Ms Glass agreed with Mr Russo's criticisms of Dr Goffri's report and with Dr Goffri's criticisms of Mr Russo's report. She therefore prepared her own analysis as reflected in Table F-13 of Glass 1 at page 97. This included IRENA (as adjusted by Dr Goffri) from Mr Russo's sources together with the three sources relied upon by Dr Goffri. She added one source of her own called SunShot. This was not a primary source in that it did not prepare its own predictions; it contained price predictions calculated by reference to a number of other sources including three industry sources and two investment banks. SunShot's figures showed a greater decline in prices than the other four sources, particularly in 2019 and 2020. Like Mr Russo, she started with the actual selling price of the Company for 2016 and then applied the average annual decline of her sources until 2020. The only source which contained predictions after that period was

IRENA but, in view of the fact that IRENA predicted lower declines than the other sources in all years, she decided to take the average decline for 2020 of her sources (6.8%) and then applied that figure on a linear basis for the remaining three years. The result of her analysis produced a greater decline (and therefore lower prices) than the Management Projections. She considered that this was not surprising because the Management Projections were prepared in July 2016, which was prior to the significant price declines that arose in the latter half of that year.

**(c) The judge's decision**

**168.** Before the judge, the Company supported the approach of Ms Glass, whereas the Dissenting Shareholders submitted that Mr Russo's projections should be adopted. The judge accepted the criticisms of both Mr Russo and Dr Goffri and therefore felt unable to rely on either of their reports. Having then described at [217(d)] what Ms Glass had done in respect of her analysis, the judge summarised his conclusion at [217(e)] in the following terms:

> ***"In my view Ms Glass, in her evaluation and analysis of the evidence of Dr Goffri and Mr Russo, adopted a reasonable methodology. I do not accept, with one possible exception, the Dissenting Shareholders' criticism that Ms Glass was inappropriately offering evidence on matters beyond her expertise and improperly seeking to challenge Mr Russo's industry expertise based on her own different and inadequate expertise. She provided an evaluation of the industry experts' evidence and sought to use it for the purpose of testing the reasonableness of the Management Projections. She based her departure from Mr Russo's approach on Dr Goffri's evidence and criticisms and her departure from Dr Goffri's approach on Mr Russo's evidence and criticisms of Dr Goffri. Her evaluation is of assistance to the Court in forming its***

*own view on the industry experts' evidence and weighing that evidence against the Management Projections. I was concerned however, at her use of and reliance on a data source that had not been used or commented on by either of the industry experts. This concern was reinforced by the fact that, as I have noted, her additional source included relatively high price declines. But on balance I am satisfied that Ms Glass' analysis and support for the reasonableness of the forecasts in the Management Projections remains good. Even if average selling prices are calculated using the four sources which meet the reliability test applied by Ms Glass (which as I have said seems to me to be reasonable) but excluding Ms Glass's new source, SunShot, and using only the IRENA forecast for 2021-2023, the average selling price (on my calculations) for each year is still below Mr Russo's forecast for each year (and is even lower if the average 4.5% reduction for 2021-2023 forecast by SunShot is used as a constant rate for that period). Furthermore, it is below the Management Projections for 2017 (0.447 compared with 0.465) and 2018 (0.412 compared with 0.425) and almost identical with Management Projections in 2019 (0.398 as compared with 0.390). Excluding the SunShot data does therefore suggest that the forecast in the Management Projections might have been too low for 2020-2023 but in my view the various alternative methodologies establish a range of potentially reasonable approaches and forecasts but do not demonstrate that the Management Projections were clearly or likely to have been in error."*

**(d) Submissions on appeal**

**169.** I would summarise Mr Salzedo's key submissions as follows:

(i) Properly understood, the judge held, in the passage quoted above, that in one respect, namely the use of SunShot as a source which had not been used or commented by either of the industry experts, Ms Glass was inappropriately offering evidence on matters beyond her expertise, particularly bearing in mind that SunShot included relatively high price declines. If the judge did not in fact so hold, he was plainly wrong not to do so.

(ii) This was particularly so in circumstances where, as stated in Glass 1/p 89, Ms Glass had described the views of one of the sources relied upon by SunShot as *'bizarre'*. The judge had not referred to this submission which had been made on behalf of the Dissenting Shareholders.

(iii) The judge held that, if SunShot was excluded from Ms Glass' analysis, then whilst the resulting ASP for 2017 and 2018 would be below the Management Projection's figures and would be almost identical for 2019, the figures in the Management Projections for 2020-2023 *'might have been too low'*.

(iv) Despite this, the judge upheld the Management Projections on the basis that the various alternative methodologies '*do not demonstrate that the Management Projections were clearly or likely to have been in error'*. This was to adopt the erroneous approach referred to under Ground 3(i) above. The judge's duty was to form his own view as to the most appropriate figure when assessing a fair price, not simply decide whether the Dissenting Shareholders had shown that the figures in the Management Projections were obviously wrong. This was particularly so in circumstances where the judge had found that the Management Projections were *'inadequately explained or supported by independent data and sources'*.

(v) In response to Mr Jones' submission that the Management Projections were a reasonable way forward on the basis that some years might be a bit higher and some a bit lower but they would probably balance out, Mr

Salzedo emphasised that much of the value on a DCF calculation is in the terminal value and this figure would be much affected by the prices at the end of the seven year period rather than earlier in that period. There would therefore not be a *'balancing out'* as Mr Jones suggested.

(vi) In the circumstances, the judge's decision was plainly wrong. Although no alternative was suggested in the Dissenting Shareholders' skeleton argument, Mr Salzedo submitted in oral argument that the right course, if the Court agreed with him, was to depart from the judge's decision to the minimum extent necessary and therefore to proceed in accordance with Ms Glass' analysis but excluding the SunShot figures.

(vii) Mr Salzedo also made a further unrelated point. From 2017 to 2021, the Management Projections forecast that prices would fall at a declining rate. For 2022 and 2023, a fixed linear percentage rate of decline of 7% was taken. Ms Glass also took a linear rate of decline from 2021 onwards in the absence of any predictions after that date from the sources which she used (other than IRENA). As summarised at [216(c)] of the Judgment, the Dissenting Shareholders had submitted that this was inconsistent with the evidence of both Mr Russo and Dr Goffri who had said that the rate of decline in module prices was expected to slow. The judge had not addressed this point when agreeing to proceed on the basis of the Management Projections with their linear rate of decline.

**170.** In response, Mr Jones submitted as follows:

(i) This was an issue upon which the solar experts did not give their own views; they simply referred to the views of others and put these together. Ms Glass was therefore in as good a position as the two solar experts to analyse the data from the different sources.

(ii) The judge's key conclusion in [217(e)] was clear, namely that '*on balance I am satisfied that Ms Glass' analysis and support for the reasonableness of the forecasts in the Management Projections remains good'*. This was

a conclusion which was reasonably open to him having had the advantage of seeing and hearing Ms Glass give her evidence. The fact that he went on thereafter to comment on the position if SunShot was excluded from Ms Glass' analysis did not alter this key conclusion.

(iii) In relation to the part of [217(e)] where the judge considered the position if SunShot was excluded, Mr Jones submitted that the evidence showed that forecasting ASP so far ahead was clearly a very inexact science with widely differing views expressed by different sources. In those circumstances, the judge was entitled to conclude that the Management Projections were reasonable, given the fact that excluding the SunShot figures from Ms Glass' analysis gave rise to prices which were slightly below those in the Management Projections in the early years, almost identical in 2019 and above in the later years. The judge was entitled to take the view that these matters balanced out and that it was reasonable for him to adopt the Management Projections.

**(e) Discussion**

**171.** I have concluded that the judge's decision to proceed on the basis of the selling prices in the Management Projections is outside the band of decisions reasonably open to him for the following reasons:

(i) There is no criticism on appeal of the judge's finding that the reports of both Mr Russo and Dr Goffri suffered from defects which meant that he could not rely on them. He was therefore entitled to look at Ms Glass' report in respect of the choice of the different sources used by Mr Russo and Dr Goffri.

(ii) Ms Glass' analysis (including the SunShot figures) came up with figures for selling prices which were lower than those in the Management Projections. In those circumstances, I do not see how her report (including

SunShot) could be said to have provided support for the Management Projections. The task of the judge was to determine what the best prediction was for prices. Given that Ms Glass' figures (including SunShot) were materially different from those in the Management Projections, the judge had to determine whether to proceed on Ms Glass' figures, the Management Projections or somewhere in between, but it was not reasonable to say that Ms Glass' (different) figures gave support to the Management Projections. I therefore cannot accept Mr Jones' submission that Ms Glass' analysis of itself provided support for the reasonableness of the forecast in the Management Projections.

(iii) In my judgment, it is clear from a fair reading of [217(e)] as a whole that the judge was of the opinion that the SunShot figure should be excluded. Having expressed concern about its conclusion and expressed heightened concern because the SunShot figures showed higher declines in prices than the other sources (i.e. it was outlier), he concluded that, if one excluded SunShot, Ms Glass' figures were not very different from the Management Projections and therefore he accepted the Management Projections. The only sensible construction of this passage is that the judge thought that SunShot should be excluded and that, once SunShot was excluded, Ms Glass' calculations were the most reasonable and provided support for the reasonableness of the Management Projections.

(iv) However, I accept Mr Salzedo's submission that it was not reasonably open to the judge to conclude that the Glass projections (without SunShot) supported the reasonableness of the Management Projections. The judge seems to have been of the view that it was swings and roundabouts and the fact that the Glass projections were a little lower in the earlier years, similar in the middle, and higher in the later years meant that on a rough and ready basis the Management Projections could be accepted. This was to ignore the extra effect on a DCF valuation of the later figures. In circumstances where the Glass projections (without Sunshot) pointed

towards these later figures in the Management Projections being too low, the adoption of the Management Projections was not a fair decision as to the most reasonable projections.

(v) This was particularly so in circumstances where there was simply nothing to explain or justify the figures in the Management Projections. The Company had called no witness who could speak to the Management Projections and, as the judge said at [217(a)] that this was an issue where the Management Projections were inadequately explained or supported. In circumstances where he had accepted the general validity of Ms Glass' analysis but had qualified this by also finding (by necessary implication) that the SunShot figure should be excluded, the judge needed to explain why he had chosen the Management Projections over Ms Glass' figures (excluding SunShot), but he did not do so. In the absence of any evidence from the Company about the preparation of Management Projections or of the reasons for his choice from the judge, it was in my judgment plainly wrong for the judge to prefer the Management Projections over the Glass figures (excluding SunShot). To do so was also to adopt the erroneous approach discussed earlier of accepting the Management Projections unless they were shown to be obviously wrong.

(vi) For these reasons, I consider that the only reasonable conclusion for the judge to reach was that, as submitted by Mr Salzedo, the selling prices should be calculated in accordance with the evidence of Ms Glass but adjusted to exclude the SunShot figures.

**172.** That is subject to one qualification following the Dissenting Shareholders' submission about the rate of decline in the latter part of the seven year period.

**173.** In her analysis, Ms Glass assumed a linear rate of decline in prices from 2021 onwards, as did the Management Projections. The Dissenting Shareholders submitted before the judge that this was inappropriate in view of the evidence of both solar experts to the effect that the rate of decline in prices was expected to

slow. The judge appeared to accept this point because at [217(b)], he said *'this* [i.e. the evidence of a slowing of the rate of decline] *does suggest that adopting a linear rate of decline fails fully to accommodate this aspect of the data'*.

**174.** Despite this finding, the judge accepted the Management Projections which applied a linear rate of decline for 2022 and 2023. In my judgment, having accepted in the above passage that a linear rate of decline did not accommodate the evidence of a slowing in the rate of decline, the judge was plainly wrong to accept, for use in the DCF valuation, projections which included a linear rate of decline. The same approach must apply in respect of Ms Glass' analysis, which also adopted a linear approach for the years after the figures given by the three sources relied upon by Dr Goffri, i.e. 2021-23.

**175.** Although the Dissenting Shareholders made this point from the outset of this appeal, they did not suggest how it was to be addressed should the Court accede to it. The only specific proposal was contained in the two page document handed up by Mr Salzedo during his reply submissions on Day 3. That document suggests taking the IRENA rate of decline for 2021 of 4.5% (rather than Ms Glass' figure of 6.8%) and then reducing it to 4% in 2022 and 3.5% in 2023. However, we have not received any explanation of these figures and, given the stage of the appeal at which they were produced, the Company has not commented on them.

**176.** In these circumstances, I think that the best way forward is as follows. The Court's decision is that the figures in the Glass report (excluding SunShot) need to be further adjusted in respect of 2021-23 by replacing her linear extrapolation for those three years with a rate of decline which reduces from the figure of 6.8% for 2020. However, the Court is not in a position to determine what the rates of decline should be. I would therefore invite the parties, on receipt of a draft of this judgment in the usual way, to see if they can agree upon the figures for those three years. If they can, the Court could adopt the agreed figures in its final order.

If the figures cannot be agreed, the matter would have to be referred to the Grand Court for resolution.

**(iv) Capacity Factors**

**(a) Introduction**

**177.** This ground relates to the downstream part of the Company's business. The capacity factor of an energy generating resource is its actual output as a proportion of its theoretical maximum output. As the judge described it at [240]:

> ***"A high capacity factor indicates high utilisation levels of installed generating capability whilst a low capacity factor indicates that a plant is running below its capability for a large part of the time. Higher capacity factors are more desirable, particularly for renewable generators like solar facilities that have no incremental costs associated with the energy production, because they indicate increased production of sellable electricity for the same level of capital investment."***

**178.** It follows that the capacity factor of the Company's energy generating solar plants was a key aspect of the revenue which would be generated by its downstream power sales business. It was therefore a relevant figure when forecasting future cashflows for the purposes of a DCF valuation.

**179.** The Management Projections forecast a steady capacity factor of 13.7% throughout the seven year period from 2017 to 2023, whereas the Dissenting Shareholders argued that the figure should be higher. The judge held at [249] that the forecast in the Management Projections was reasonable and should be accepted for the purpose of undertaking the DCF valuation. The Dissenting

Shareholders submit that this was a conclusion which was not reasonably open to him on the evidence which he heard and it should accordingly be overturned.

**(b) The evidence**

**180.** As just noted, the Management Projections forecast a capacity factor of 13.7% which would be maintained on a steady basis throughout the period.

**181.** The judge summarised Mr Russo's evidence at [244] and for present purposes it suffices to say that, amongst other factors, Mr Russo noted evidence which suggested that most regions of China in which the Company was expected to build power plants or sell power had capacity factors well in excess of 13.7%. Furthermore, there was considerable scope for increasing capacity factors above historic levels by use of tracking technology. Whereas solar modules are traditionally fixed, tracking technology enables them to tilt or move so as to maintain a better angle in relation to the sun and therefore better capture the available solar radiation. He considered that the best prediction was that the Company's capacity factor would increase to 17.5% by 2023. Starting with the Company's actual capacity factor of 14.5% for 2015, he prepared a table showing a broadly linear increase from that figure to 17.5% by 2023. Mr Russo had sought information from the Company about the Management Projections for future sales volume and cost of sales as they were not supported by any documentation but he had received no response.

**182.** In his reports, which constituted his evidence in chief, Dr Goffri considered that Mr Russo's forecasts in relation to capacity factor were too high. He emphasised the importance of location and orientation of the plant. Furthermore, capacity factors were inherent for specific technology and did not change over time or with changes in module efficiency and performance but rather with location. In his opinion, without details regarding the location of all the built and proposed systems as well as the site specific information, the Company's capacity factor

estimates were to be considered as appropriate, especially given the movement of the Chinese solar market towards more distributed systems.

**183.** However, in cross-examination Dr Goffri modified his position somewhat. He accepted (Day 3/169-172) that the use of trackers (tracking technology) was expected to grow in China and that the use of trackers increased the capacity factor, at any rate for utility scale. He accepted that hitherto, almost all the Company's downstream business had been utility scale and he accepted that, going forward, 70% utility scale would be a reasonable assumption. On Day 4/21-24, he accepted that, by reason of the above matters, as at the Valuation Date a reasonable forecaster would have anticipated that the Company's capacity factor would increase in the next few years, although he was not able to say by how much on the basis of the information which he had. He did not agree that it would increase by 2023 to as much as 17.5% as postulated by Mr Russo.

**184.** In Glass 1, Ms Glass said that she had carried out her own research from various sources in order to assess the reasonableness of the Management Projections and Mr Russo's projections. She considered that the Company's estimate of a flat rate of 13.7% was reasonable, although potentially towards the low end of a reasonable range. She considered that Mr Russo's figures were too high.

**185.** In cross-examination, she accepted that she had assumed that capacity factors in future would not be materially higher than they had been historically and that she had relied on Dr Goffri's report in making that assumption (albeit it confirmed her own expectations). But she accepted that she did not have any independent expertise as to what capacity factors might be in future. Having been taken to passages in Mr Russo's reports and in the transcript of Dr Goffri's oral evidence, she accepted the unanimous view of the two industry experts that the use of trackers was likely to increase in China and further accepted that, if trackers were to be used more often by the Company, one might end up with a higher capacity factor. Ultimately, in a passage quoted by the judge at [248(c)] she said as follows:

***"Q: You have given your evidence on that very clearly and at the moment I just want to get a straight answer to the first part of the question, which is now I've shown you the evidence of both experts, do you accept that 13.7 flat is actually below a reasonable forecast for capacity factors up to 2023?***

***A: It looks like it could be, yes.***

***Q: Is that 'yes, it could be' or 'yes, it is'?***

***A: So, yes, but how much below I can't say, maybe that's a better answer."***

**(c) The judge's decision**

**186.** The judge explained his decision and the reasons for that decision at [249] in the following terms:

> ***"I find this to be a difficult issue. The competing analyses are detailed, based in part on empirical data collected in third party studies whose assumptions were unclear and contested, there is an admitted lack of historical patterns, there is an absence of important data (for example, the location of all the Company's built and proposed solar PV systems and the site specific information, the orientation of its portfolio of solar PV systems and regional sales and investment strategies) and explanations from the Company together with speculation about how anticipated market trends (for example relating to the increased use of trackers) would impact the Company.***

***While it appears that the capacity factor estimate in the Management Projections (13.7%) was probably below a reasonable forecast*, (as Ms Glass accepted during her cross-examination), it is unclear what, and in my view the evidence does not establish what, a reliable and reasonable higher estimate should be (and therefore what alternative estimate the Court can properly use). While I consider the information gaps to be regrettable, the Court can only reach a decision based on the evidence adduced (I do not consider that I can or should draw adverse inferences on this issue from the Company's failure to produce further information in response to Mr Russo's requests). In my view, on balance, I find Dr Goffri's evidence as supported by Ms Glass' reasonableness tests, to be preferable to Mr Russo's analysis and Ms Glass' analysis and explanations be convincing. I therefore conclude that the forecast in the Management Projections should be accepted."** [Emphasis added]

**(d) Discussion**

**187.** The Dissenting Shareholders submitted that, in view of his finding that the capacity factor estimate in the Management Projections was probably below a reasonable forecast, it was not open to him then to accept that figure. The Company, on the other hand, submitted that, having rejected Mr Russo's figures and in the absence of any evidence as to an appropriate alternative figure, it was within the judge's area of discretion to accept the Management Projections as the least bad option. That was preferable to plucking a figure out of the air. As to whether the judge should have drawn an adverse inference from the information gaps, this was a matter for him and he was entitled to conclude that the Company had not been deliberately difficult. In any event, the correspondence with Mr Russo had ended in August 2018, which was some nine months before the trial in

May 2018. There was therefore ample time for the Dissenting Shareholders to bring any summons to obtain further information or documents but they had not done so. The judge correctly recognised this in the judgment at [340(i)].

**188.** In my judgment, the judge's decision on this point was plainly wrong. I would summarise my reasons, which are essentially those put forward on behalf of the Dissenting Shareholders, as follows:

(i) As summarised above and by the judge at [248], by the conclusion of the oral evidence, there was agreement between the industry experts that, as of the Valuation Date, a reasonable forecaster would have anticipated that the Company's capacity factor would increase over the period because of the increasing use of trackers. Furthermore, Ms Glass had also accepted that the 13.7% flat rate in the Management Projections was below a reasonable forecast.

(ii) In the circumstances, it is hardly surprising – indeed it was inevitable – that the judge found the 13.7% flat estimate in the Management Projections was *'probably below a reasonable forecast'*. Given the standard of proof in civil cases, a finding that the figure in the Management Projections was *'probably'* below a reasonable forecast is a finding that, for the purposes of the hearing, the forecast in the Management Projections was below a reasonable forecast.

(iii) Despite this, in the concluding part of [249], the judge said that he found Dr Goffri's evidence, supported by Ms Glass' reasonableness tests, to be preferable to Mr Russo's analysis and Ms Glass' analysis and explanations to be convincing. This led him to accept the figures in the Management Projections. However, by then, the evidence of Dr Goffri and Ms Glass was that the figures in the Management Projections were too low and the judge had already found this to be the case earlier in the paragraph. In

those circumstances it was plainly wrong to conclude that the evidence of Dr Goffri and Ms Glass supported the reasonableness of the Management Projections and entitled him to accept them.

(iv) I accept that the judge found himself in a difficult position. He was not willing to accept Mr Russo's figures, but had concluded that the figures in the Management Projections were too low. What was he to do in those circumstances? He had no figures other than Mr Russo's because both Dr Goffri and Ms Glass had felt unable to put forward any figures other than to say that Mr Russo's projections were too high and the Management Projections were too low. Nevertheless, as already stated, the court's duty in section 238 applications is to form its own view as to fair value and this involves reaching its own view on any figures which go to make up any calculation of fair value. Having decided that the figures in the Management Projections were too low, the judge had simply to do his best on the evidence to reach his own figure. It was not open to him to say that, because no other figures were available, he would accept the Management Projections despite his finding that they were too low.

**189.** Having decided that the judge was not entitled to accept the capacity factor figure in the Management Projections, the question arises of how this Court should proceed. Mr Salzedo invited us to reach our own decision, as we were in as good a position as the judge to do so on this particular matter. The alternative would be to remit the matter to the Grand Court. I do not think the latter course would be proportionate. Accordingly, I propose that this Court should reach its own decision.

**190.** The actual capacity factor for 2015 was 14.3% (see Glass at G27(h)). We were not referred to any reason for taking a lower figure thereafter and of course there was no evidence from any representative of the Company who could speak to the Management Projections and why a lower figure was appropriate.

**191.** In the circumstances, I consider that the most reasonable starting point as at the Valuation Date would have been to take the actual figure from 2015 and assume that this did not change in 2016. Thereafter, to reflect the agreed evidence of all three experts that one could expect an increase in capacity factor over the seven year period because of the increasing use of trackers, but giving weight to the judge's conclusion that Mr Russo's projections were too high, I would project an increase of 0.05% every year (starting therefore with 14.35% for 2017) increasing to 14.65% by 2023.

**(4) Ground 4 – the DCF discount**

**192.** As stated earlier, Ground 3 is concerned with identifying the most reasonable prediction for future cashflows as at the Valuation Date. Ground 4 is concerned with the discount rate which has to be applied to the future cashflows so as to translate the future cashflows into a present capital value.

**193.** Before the judge, there were a substantial number of matters of dispute between the Dissenting Shareholders and the Company as to the various factors which go into calculating the discount rate. The judge reached a decision on each of these and the Dissenting Shareholders now appeal against three of his decisions. They submit that the judge erred in:

(i) failing to make any reduction to the country risk premium in respect of China;

(ii) including a size premium; and

(iii) adopting the pre-tax cost of debt figure advocated by the Company.

I shall consider each of these in turn.

**(i) Country risk premium**

**(a) The evidence**

**194.** The discount rate is calculated using the Weighted Average Cost of Capital ("WACC"), being a weighted average of the cost of equity and the cost of debt. One of the matters which arises in connection with the cost of equity is whether there should be a country risk premium ("CRP"). A CRP reflects the fact that it is riskier to invest in some countries than in others, and so a premium attaches to investments in higher-risk countries to compensate for that additional risk.

**195.** It was common ground between the valuation experts, Mr Edwards and Ms Glass that a CRP should be included in the calculation of the Company's cost of equity to reflect the fact that China is a higher-risk market. They also agreed that it was appropriate to use the China CRP calculated by Professor Damodaran, a leading academic in the field of company valuation.

**196.** The only point of difference between them (following agreement during the trial as to the date by reference to which the relevant China CRP should be taken) related to whether the full China CRP should be included or only 50%. The judge summarised their respective views and reasoning at [287]-[289].

**197.** Mr Edwards noted that more than half of the Company's upstream sales were made to the low risk countries of the US, Japan and Europe. Europe and the US would not normally have any CRP at all and Japan had a lower CRP than China. He considered therefore that, to reflect this sales position, only 50% of the China CRP should be included.

**198.** Ms Glass did not agree. She agreed the distribution of upstream sales figures between countries as stated by Mr Edwards but considered that the full China CRP should nevertheless be used for the following reasons:

(i) Only 40% of the upstream sales were made to countries without any CRP (i.e. the US, the UK and Germany). More significantly, the CRP was used in calculations about the future and the likelihood was that the Company's

future sales would be less focused on Europe and other traditional markets and more focused on new emerging markets. These emerging markets would carry risk premiums equal to or higher than those applicable to China.

(ii) The Company was subject to greater risks than the risks faced by its competitors based in the US or Europe, including volume and pricing risks relating to duties and tariffs imposed on the Company because it was based in China.

(iii) The majority of the Company's production facilities and solar plants, and its management team, were based in China. Thus, although 40% of the Company's sales were derived from lower-risk markets (albeit probably much less than 40% in the future), the vast majority of the Company's facilities (and thus its costs, profits and cashflows) related to China.

(iv) Ms Glass was calculating a CRP for the whole business whereas Mr Edwards' CRP was limited to the upstream segment only. The downstream segment was heavily focused on China and was likely to be so for the foreseeable future.

**199.** Before the judge, the Dissenting Shareholders contended that Mr Edwards was correct whereas the Company said that Ms Glass' approach was to be preferred.

**(b) The judge's decision**

**200.** The judge's decision on the point at issue was set out at [291]. Because of the nature of the Dissenting Shareholders' appeal, I think it helpful to set out the relevant part of the judge's decision in full:

***"291… It seems to me that Mr Edwards' 50% reduction is somewhat crude and unsupportable. It is based just on sales data (as Ms Glass pointed out, selecting a CRP without regard for the location of the Company's production facilities, solar plants and management is too narrow an approach and fails adequately to take account of the risks associated with that connection), and historical sales data (although the information regarding the location of future sales was not entirely clear, I accept Ms Glass' view that there was sufficient evidence of potentially significant growth into emerging markets, particularly India and that Mr Edwards' approach gave insufficient weight to those risks). The Company's connections with China strongly suggest that the country risk rating for China should be given substantial and possibly exclusive weight in calculating the CRP. On balance, I find Ms Glass' approach and her decision not to make an adjustment to the country risk rating for China to be reasonable. While I can see that Mr Edwards' argument that there should be <u>some</u> adjustment by reference to other connecting factors with other countries with different risk ratings has some force, as I have said, I find his 50% reduction to be unreasonable and an assessment of an alternative reduction by me would be based on speculation on my part and could not justify a departure from Ms Glass' generally reasonable approach."*** [Original emphasis]

**(c) Submissions on appeal**

**201.** Mr Salzedo submitted that this was another example of the judge feeling that he must choose one expert or another and failing to reach his own decision. The natural reading of the judge's acceptance that Mr Edwards' suggestion that there be <u>some</u> reduction *'had some force'* was that he accepted that this was so. On that

basis he should have gone on to determine the quantum of what that reduction should be and should, on the basis of his own findings, have identified a number that was less than 50% but more than zero. Instead, the judge had made no reduction because it would be '*based on speculation*'.

**202.** Mr Jones, on the other hand, submitted that the judge was fully aware that he was not restricted to choosing between the views of the opposing experts but could reach a decision of his own which was different from both experts. Thus, in relation to MRP (another aspect of the cost of equity) the judge at [280] had split the difference between Mr Edwards and Ms Glass and had taken a figure midway between their respective figures. Similarly, at [284] in relation to 'risk-free rate', he had again taken a figure midway between those of Mr Edwards and Ms Glass. It was clear from his reasoning that the judge accepted the views of Ms Glass on the present point and this was a decision which was well within the area of reasonable decisions open to him.

**(d) Discussion**

**203.** During the course of the hearing, Mr Salzedo accepted that, if in [291] the judge had omitted the last sentence and ended the paragraph after holding that Ms Glass' decision not to make any adjustment to the China CRP was reasonable, the judge's decision would have been un-appealable (Day 2/8). I would agree. Up to that point, the judge was essentially accepting Ms Glass' evidence and her reasons for making no adjustment.

**204.** The question is whether the last sentence undoes what had gone before and leads to the conclusion that the judge erred in his approach. I accept that the language which he uses is not as happily expressed as it might have been, but the judge only refers to Mr Edwards' point having *'some force'*. Judges are often faced with competing submissions both of which have some force but one of which is rejected. A comment that a submission has some force is not necessarily an acceptance of the submission. The judge's language here is very different from

that discussed above in Ground 3(i), where he found that something was probably so but then went on to ignore it. I do not find the judge's language is such as to lead to the conclusion that, as submitted by Mr Salzedo, the judge was accepting Mr Edwards' argument.

**205.** Ultimately the judge fairly summarised the competing arguments and clearly preferred the evidence and reasoning of Ms Glass. I do not consider that the language in the last sentence (with its reference only to *'some force'*) is sufficient to conclude that the judge erred in his approach or reached a decision which was plainly wrong. I would therefore reject Ground 3(ii).

**(ii) Size premium**

**(a) Introduction**

**206.** A size premium – also referred to as a small stock risk premium ("SSRP") – is sometimes included in the discount rate for smaller companies to capture what are said to be additional risks associated with such companies as a result of their size. The reference to 'additional' risks is because smaller companies tend to have higher betas – as the judge explained at [301], a beta is a figure which seeks to measure the relative market risk that a particular company has compared to the overall market, with a beta of 1 indicating that the security has a similar risk to the market as a whole, and a higher beta indicating higher volatility relative to the market. A size premium is therefore a further premium reflecting additional risk on top of the risk captured by a higher beta.

**207.** Before the judge, the Company, basing itself on the evidence of Ms Glass, submitted that a size premium should be included in the Company's cost of equity whereas the Dissenting Shareholders, basing themselves on the evidence of Mr Edwards, argued that it should not.

**208.** The judge preferred the approach of Ms Glass and held that the size premium which she had put forward (2.04%) should be adopted. The Dissenting Shareholders appeal against that decision on the ground that the judge erred in reaching it.

**(b) The evidence**

**209.** Both experts dealt with this topic in considerable detail in their reports. Thus Mr Edwards discussed the position in Edwards 1 at [A18.1] – [A18.30] and in Edwards 2 at [5.57]-[5.77] and Ms Glass dealt with it in Glass 1 at [160]-[167] and in Glass 2 at [261]-[278].

**210.** It was common ground before the judge that there was considerable controversy amongst academics as to whether or not a size premium should ever be included. The judge described this at [295] in the following terms:

> ***"Ms Glass noted that academic support for the inclusion or exclusion of a size premium was mixed and that various papers had been published that supported or rejected the use of a SSRP. In general, those who argue against the use of a SSRP claim, and provide studies to show, that market data does not support the theory. In contrast, those who argue for the SSRP claim, and provide studies to show, that market data does support the theory (and in Glass 2 she referred to various studies to this effect which she considered to be more reliable than those referred to in Glass 1)."***

**211.** Mr Edwards considered that it was not appropriate to include a size premium because the original study identifying the size premium back in 1981 had considered that there was no theoretical basis for its existence and studies using post 1981 data did not find statistically significant evidence that it exists.

**212.** The judge summarised Ms Glass' reasons for including a size premium at [294] and, because of the nature of the ground of appeal on this aspect, I think it helpful to set out that paragraph and [298] which summarises the Dissenting Shareholders' criticism of Ms Glass' approach.

**213.** At [294] the judge said:

> ***"Ms Glass included a SSRP for four main reasons:***
>
> ***(a) in her experience, the inclusion of a size premium was consistent with industry practice, for virtually all investments excluding infrastructure assets.***
>
> ***(b) size, along with growth, risk and margins, were commonly referred to as the key drivers of public company trading multiples and trading prices. All else being equal, lower size was believed to lead to lower multiples and lower pricing.***
>
> ***(c) although the academic community debated the issue, size was viewed as a risk factor by the professional community.***
>
> ***(d) size premiums were accepted by the legal community. She referred to my judgment in <u>Shanda</u> and the approach taken in Delaware relying on the following dicta:***
>
> ***(i) in <u>Orchard Enterprise</u> (2012) Justice Shrine*** **[sic]** ***stated that 'a size premium is an accepted part of CAPM because there is evidence in empirical returns that investors demand a premium for the extra risk of smaller companies'.***
>
> ***(ii) in <u>Just Care</u> (2012), Justice Parsons noted that 'in addition to the equity risk premium, an equity size premium generally is added to the company's cost of equity in the valuation of smaller companies to account for the higher rate of return demanded by investors to compensate for the greater risk associated with small company equity'."***

**214.** The response of the Dissenting Shareholders before the judge to these points was summarised at [298] in the following terms:

> ***"The Dissenting Shareholders criticise Ms Glass' approach on the following basis:***
>
> ***(a) the basis for her assertion that the inclusion of a size premium was consistent with industry practice was her own experience but she does not cite any independent evidence as to what industry practice in fact is.***
>
> ***(b) Mr Edwards did cite such evidence, and it showed that industry practice is not to include any SSRP. A study of four hundred CFOs in North American firms found that two-thirds made no adjustments for size, and other surveys were to similar effect. Also, notably, none of the analysts who covered the Company in 2015 or 2016 applied a size premium.***
>
> ***(c) Ms Glass had argued that lower size was believed to lead to lower multiples and lower pricing and that size was viewed as a risk factor by the professional community. But the relevant question was whether smaller companies faced higher risks even after their higher betas are taken into account. Ms Glass had referred to a D&P study to support her application of a SSRP to the Company but during cross-examination she confirmed that she did not know whether D&P had adjusted their returns for beta. She had been taken to the author's description of their methodology which made clear that they did not adjust for beta.***
>
> ***(d) Her references to the Delaware (and Cayman) case law did not support her evidence on valuation issues and was not a matter of valuation expertise."***

**(c) The judge's decision**

**215.** The judge gave his decision at [300]. I am only going to quote the first part as the second part was concerned with how Ms Glass had derived the actual figure by reference to the Duff & Phelps Valuation Handbook and is not relevant to the point taken on appeal:

> ***"In my view, Ms Glass' approach on this issue is to be preferred. First, I consider that it is appropriate to apply a SSRP. While I do not treat his decision as binding and have taken into account the different evidence relied on by the Dissenting Shareholders in this case, I agree with the conclusions and approach taken by Parker J in Qunar. I am not satisfied that the more recent studies, in particular the Alquist et al study, are sufficient to justify omitting a SSRP. I note that Kawaley J in Nord Anglia concluded that a case for a SSRP had not been made out (see [206]), but his view was based on expert evidence adduced in that case. He said that the Company's expert had made no real attempt during cross examination to persuade the Court that a SSRP was required in that case. The position here, in view of Ms Glass' evidence, is very different..."***

**216.** The reference to the conclusions and approach taken by Parker J in *Re Qunar Cayman Islands Limited* (Unreported, Grand Court, 29 March 2021), was to the fact that Parker J had accepted that a size premium should be applied and had said as follows at [342]:

> ***"Notwithstanding the submissions and the debate back and forth on this issue, I have concluded that on balance it is appropriate to factor in a size premium of 1.0% as suggested by Ms Glass. I have done so primarily because I accept Ms Glass' opinion that it is widespread industry practice and that professional valuations***

***routinely accept the use of size premiums. Her view, based on valuation principles, is that risk adjusted returns for the Company over time would be larger than the CAPM would predict without a size premium and that the size premium recommended by D&P for the Company is reasonable. I also note that a size premium was applied in Shanda, in principle, as a common ground between the experts."***

**(d) The Dissenting Shareholders' submissions**

**217.** Mr Salzedo submitted that the judge did not address the points made by the Dissenting Shareholders as summarised by the judge at [298]. The Dissenting Shareholders' submissions had provided answers to all the grounds relied upon by Ms Glass but the judge had not identified any answer to those submissions. Thus, in respect of the submission that Ms Glass had not cited any independent evidence as to what industry practice was whereas Mr Edwards had, the judge did not identify any answer to the point or explain why he considered that Ms Glass' opinion on industry practice should be accepted in spite of it. Similarly, in relation to the point dealt with at [298(c)], he did not identify any answer to it or explain why he nevertheless accepted Ms Glass' opinion on the point.

**218.** In the circumstances, the judge erred, in that he took into account irrelevant considerations (on the basis of Ms Glass' opinions on the above two points which had been rebutted and were therefore irrelevant); and/or failed to take into account relevant considerations, i.e. the Dissenting Shareholders' answers to those points, to which the judge identified no response. In any event, his conclusion was one which was not reasonably open to him on the basis of the evidence.

**219.** A further point made by Mr Salzedo was that the judge did not refer to the Dissenting Shareholders' further submission in relation to the Duff & Phelps study upon which Ms Glass relied, namely that the data in that study from 1982

onwards showed that the excess returns for small stocks over large stocks was no more than implied by their higher betas, so that there was no size premium at all.

**(e) Discussion**

**220.** I accept that the judge's explanation of why he was rejecting the Dissenting Shareholders' submissions was very sparse. The bulk of the extract from [300] is concerned with the fact that, although the judge does not treat the decision as binding and he has taken into account the different evidence in the present case, he agrees with the conclusion and approach taken by Parker J in Qunar and with his noting of the fact that Kawaley J in Nord Anglia had rejected a size premium, but that the evidence in that case had been different, particularly bearing in mind Ms Glass' evidence in the present case.

**221.** That discussion does not give reasons for his conclusion and, shorn of those passages, the only reasons given by the judge were in the first sentence, where he said that Ms Glass' approach was to be preferred, and in the fourth sentence where he said that he was not satisfied that the more recent studies, in particular the Alquist et al study, were sufficient to justify omitting a size premium.

**222.** The judge had to deal with many points of issue in what was, naturally, a very long judgment and I can well understand the need to be relatively concise. Furthermore, it is well established that a judge does not have to deal with every argument addressed to him. Nevertheless, I accept that the judge did not explain why he was rejecting the submissions made by the Dissenting Shareholders and that he should have given some reasons for doing so, however brief.

**223.** However, I do not think that this is sufficient to overturn his decision. He had before him the detailed explanations in the reports of the two experts as to why there should, or should not, be a size premium; he had had the advantage of hearing both witnesses being tested by cross-examination; and he had accurately

recorded the key submissions in the judgment and must be taken therefore to have had them well in mind as he reached his decision.

**224.** Ultimately, he has preferred the evidence and reasoning of Ms Glass to that of Mr Edwards, who opposed size premiums as a matter of principle. In circumstances where (i) there is clearly great controversy about whether a size premium should or should not be included; (ii) even on Mr Edwards' evidence, one-third of valuers do include a size premium (see [298(b)] and Mr Salzedo in oral argument at Day 2/19); (iii) Ms Glass was of the clear opinion that a size premium should be included for the reasons which she gave; and (iv) other judges in Cayman and Delaware have included a size premium, I do not consider that, whilst inadequately reasoned, the judge's conclusion can be categorised as one which no reasonable judge could have reached. Ultimately, he accepted the expert evidence of Ms Glass in preference to that of Mr Edwards. That conclusion is not altered by Mr Salzedo's further submission (see [220] above) that the judge did not deal specifically with his point about the Duff & Phelps study. The judge was not obliged to mention every single argument addressed to him.

**225.** I would therefore reject this ground of appeal.

### (iii) Cost of debt

### (a) Introduction

**226.** One of the factors which goes into the calculation of the discount rate for the purposes of a DCF valuation is the estimate of the future cost of debt of the relevant company.

**227.** In the present case, Mr Edwards used a pre-tax cost of debt of 4.9%. This was expressed as being for the upstream segment but Mr Edwards explained that it was calculated by reference to the USD cost of borrowing for the Company as a

whole. Ms Glass, on the other hand, estimated the cost of debt at 5.5%. The judge accepted Ms Glass' figure and the Dissenting Shareholders contend he was wrong to do so.

**(b) The evidence**

**228.** A key reason for the different rates chosen by the experts was that the Company borrowed both in USD and in Chinese currency (RMB). The interest rates on the RMB borrowings were higher than those on the USD borrowings. Ms Glass estimated her cost of debt so as to take into account the higher rates paid on the RMB borrowing, whereas Mr Edwards calculated his figures by reference only to USD rates.

**229.** Mr Edwards explained his position in Edwards 2 at [5.79] in the following terms:

> ***"As I explain in my First Report, Trina has loans denominated in RMB and in USD. However, the cost of debt that I adopt in my calculations should represent a USD cost of borrowing, as I apply my cost of capital to discount USD denominated cash flows. Ms Glass also applies her cost of capital to USD denominated cash flows. As a consequence the cost of debt that Ms Glass adopts in her calculations should also reflect a USD cost of borrowing. As Professor Damodaran notes:***
>
> > ***'The key rule here is that your cash flows have to be in the same currency as your discount rate'; and***
> >
> > ***'As a final note, the cost of debt should be in the same currency that you estimate the cost of equity in and this is true no matter what currency the company actually borrows in.'"***

**230.** Ms Glass accepted in evidence that the point which Mr Edwards made was correct in theory but not necessarily in practice. In view of the nature of the Dissenting Shareholders' appeal on this point, I think it helpful to set out exactly what Ms Glass said in cross-examination which was at Day 8/10-14:

***"Q: Okay. Pre-tax cost of debt.***

***A: Yes.***

***Q: If we pick up Mr Edwards' second report. In relation to the cost of debt, at paragraph 5.79 Mr Edwards quotes from Professor Damodaran on the subject matter that cashflow should be in the same currency; the discount rate and the cost of debt should be in the currency in which you estimate the cost of equity…. Do you accept Professor Damodaran is right about that?***

***A: Just give me a second to find out where you are reading from.***

***Q: I'm sorry, 5.79.***

***A: 5.79, okay. I agree with the comment that Damodaran is making about the same currency as the discount rate, yes.***

***Q: Okay, do you agree that, applying his principle, the cost of debt to be used in the WACC in this case is the US dollar cost of debt?***

***A: In theory, yes, I do.***

***Q: Right, and do you disagree in practice? Is there a difference between theory and practice?***

*A: Well, in this case it's not 100 per cent clear to me how we got the projections in the first place so…I mean, they are in US dollars but, for example, most of the operating expenses would be incurred in RMB in actual fact so how they got translated is a bit up in the air but subject to that comment, yes, I agree, in theory, in practice.*

*Q: Right. Does the comment affect the answer? Can you just be clear please: is it your view that the cost of debt should be calculated as a US dollar cost of debt in this case, given the way you've done your projections or not?*

*A: I don't know how to give you a better answer than technically speaking, yes.*

*Q: I'm afraid I would just like to understand….*

*A: Yes.*

*Q: … whether you accept that in this case…*

*A: Yes, yes.*

*Q: You do?*

*A: I do in theory – yes, I do.*

*Q: Right, thank you. Okay. Maybe we can shortcut this. You know Mr Edwards says that in effect you've included some higher rates of interest on debt by including Chinese currency borrowings. Do you accept that's right or do we need to look at it?*

A: *Well, I do accept that I looked at all of the company's actual borrowings and based my 4.6 per cent on that and some of the rates were US dollar borrowings and some of the rates were Chinese rates, borrowings from Chinese banks. So, yes, I accept that.*

Q: *So Mr Edwards' rate of debt is actually – his 4.6 is actually a better rate than your 4.2 – sorry, his 4.2 is a better rate than your 4.6 on that point?*

A: *There is a difference, which I pointed out in my report, between my 4.6 and Mr Edwards' 4.2, if I've got the numbers right here – I'm having trouble following his report – because mine is combined upstream / downstream and his rate is solely upstream and when he looks at the downstream, he effectively adopts, in his analysis of the rates, 6.1 per cent cost of debt on the downstream and I pointed that out. So…*

Q: *Okay…*

A: *I didn't see much difference between our cost of debt on a consolidated basis.*

Q: *All right, but you accept that your 4.6 must be too high because you include some renminbi debt but you haven't calculated how much?*

A: *It's possible you might have to back out a slight inflation concept from that but the fact of the matter is there is also the practical aspect to consider that you are not going to find US dollar financing, for example, to finance solar projects that are being….*

*Q: My question is capable of a yes or no answer, if you answered it no, then obviously, your reasons would follow but if you could answer the question, we can make progress.*

*A: Okay, no, no.*

*Q: Right, so you do not agree that your 4.6 is too high despite agreeing that you have wrongly included Chinese rates of borrowing date?*

*A: That's correct.*

*Q: Right, okay. Well I suggest to you that you change your position to suit your argument, Ms Glass and let me just explain why and you can respond. The reason is you set out in your report, you calculate a rate of debt at 4.6 and you calculate it on the basis of certain debts. When it's pointed out to you that some of those are in the wrong currency, you say, oh yes, it is the wrong currency but there is some other adjustment we can make which gets it back to the level it was before. That, I suggest to you, is not independent expert evidence?*

*A: I'm going to leave it to others to determine what is and is not independent expert evidence but I am not talking about other adjustments. I'm talking about, you know, it's correct in theory on the one hand and then there is practical considerations on the other. The fact of the matter is that the Company only borrows in China for its downstream operations, it is not going to be able to obtain US debt. The US banks are not going to likely finance a downstream project and so my rating is a blend between the US debt and the Chinese debt, most of which is on the downstream operations and my consolidated rate is in the same ballpark as Mr Edwards when you take the two together."*

It is clear that post-tax (rather than pre-tax) figures are being used during this exchange.

**(c) The judge's decision**

**231.** Mr Salzedo's ground of appeal on this point focuses on the exact wording of the judge's decision and accordingly it is necessary to set it out:

> ***"314. The Dissenting Shareholders supported Mr Edwards' analysis and submitted that his 4.9% was to be preferred although in their closing submissions they only made one point. They submitted that the main reason for the difference between Ms Glass and Mr Edwards was because the Company borrows in both RMB and USD, and Ms Glass had included the RMB cost of borrowing in her calculations. They argue that since both Ms Glass and Mr Edwards applied their WACC to USD-denominated cash flows, their discount rates (including cost of debt) should also be denominated in USD. In my view the Dissenting Shareholders are right on this point.*** [Emphasis added]
>
> ***315. I consider that Ms Glass' approach is reasonable and to be preferred. I find nothing wrong or unreasonable with her analysis (see Glass 1 [176] to [183]). Since I have concluded that the WACC should be calculated on a consolidated basis as Ms Glass proposed, I also consider that it is preferable to use her cost of debt calculated on the same basis. I note the Dissenting Shareholders' reliance on Ms Glass's answers during her cross-examination in which she said that 'in theory' the cost of debt to be used in the WACC in this case***

***should be the US dollar cost of debt. But I do not take that as an acceptance that her analysis in Glass 1 was fundamentally flawed because she had regard to the RMB cost of debt. Nor do I accept that where a company borrows in USD and other currencies it can be right just to ignore the higher cost of the non-USD debt for these purposes and apply the cost of the US debt across total borrowings. Therefore, I shall adopt a pre-tax cost of debt for the whole Company on a consolidated basis of 5.5% (and 4.6% after tax).”***

**(d) Discussion**

**232.** Mr Salzedo’s submission was simple. He pointed out that, in the emphasised passage at [314], the judge unambiguously stated that the Dissenting Shareholders were right in their submission that the discount rate (including the cost of debt) should be denominated in USD because both experts were applying the WACC to US denominated cashflows. Despite this, the judge had gone on to accept Ms Glass’ figures which were not prepared on that basis. It was impossible to reconcile his conclusion in [315] with what he had found in the emphasised passage at [314]. The judge’s conclusion was therefore wrong in principle and was an unsupported finding.

**233.** Mr Jones conceded that there was some infelicity of language and that perhaps the judge should have begun [315] with a word such as *‘However’* so as to make it clear that he was qualifying to some extent what was said in [314]. However, the judge’s overall conclusion was clear and was supported by reasons. He accepted the evidence of Ms Glass that, whatever the theoretical position, it was appropriate in practice in this case to make allowance for the fact that the borrowings in RMB carried a higher cost and he agreed with her that it could not be right just to ignore the higher cost of the non-USD debt for these purposes.

**234.** I accept that, on the face of it, the judge's conclusion in the emphasised passage in [314] is inconsistent with his conclusion in [315] that he would adopt Ms Glass' figure for cost of debt, in that it was not based wholly on USD rates. Given his conclusion in [315], the judge should, with respect, have made clear that his acceptance in [314] was subject to qualification as thereafter set out.

**235.** However, I bear in mind Lord Hoffmann's observation in *Piglowska v Piglowska* [1999] 1 WLR 1360 at 1372D-H as follows:

> ***"…The exigencies of daily court room life are such that reasons for judgment will always be capable of having been better expressed. This is particularly true of an unreserved judgment such as the judge gave in this case but also of a reserved judgment based upon notes, such as was given by the district judge. These reasons should be read on the assumption that, unless he has demonstrated the contrary, the judge knew how he should perform his functions and which matters he should take into account…. An appellate court should resist the temptation to subvert the principle that they should not substitute their own discretion for that of the judge by a narrow textual analysis which enables them to claim that he misdirected himself."***

**236.** Even though it is apparently inconsistent with what he said in [314], the judge's reasons emerge with reasonable clarity from [315]. He refers to Ms Glass' acceptance that *'in theory'* the cost of debt should be the USD cost of debt but explains that he does not consider this to have amounted to a retraction of her analysis that the RMB cost of debt should also be considered. In my view, that is a perfectly reasonable understanding of what Ms Glass said in the passage of evidence quoted above. She accepted that the point made by Mr Edwards was correct in theory but went on to say that, given that the Company could only borrow in China for its downstream projects because US banks would not lend for

such activities, one had to take a practical position and take note of the existence of RMB borrowings, with their higher rates, when estimating the Company's future cost of debt.

**237.** The judge clearly agreed with this point as he states in [315]. It was a matter for him as to whether he found Ms Glass or Mr Edwards more persuasive on this narrow point and I do not see that a decision to prefer the evidence of Ms Glass can be categorised as plainly wrong. The fact that his acceptance of her evidence was apparently inconsistent with what he had said in [314] is unfortunate, but I do not think that it enables us to substitute what he said in [314] for the decision which he actually reached as expressed in [315]. I would therefore reject this ground of appeal.

**(5) Ground 5**

**(i) Weighting**

**238.** In the light of my view that no weight can properly be attached to the Merger Price, the question then arises as to the weight that should be given to the Market Price and DCF valuation respectively.

**239.** Mr Salzedo submitted that no weight should be given to the Market Price. However, the key basis of his argument was that there was not a semi-strong efficient market in the ADS (Ground 1(i) above) and the 9,000 MW point (Ground 1(ii) above). As described earlier, I have rejected both of these grounds of appeal.

**240.** The question therefore is whether there are any grounds for interfering with the judge's weighting of 30% for the Market Price in the absence of success on the semi-strong efficient market and 9,000 MW points.

**241.** In my view there are not. The judge took into account the subjectivity of the assessment of the share price movement between the Acceptance Date and the Valuation Date, the limitations in Ms Glass' methodology for testing the reliability of the Market Price and her acceptance that the Market Price might be understated by as much as 20% (see [335(c)] and [338(g)].

**242.** Having rejected the arguments on appeal in relation to the semi-strong efficient market point and the 9,000 MW point, the only aspect of the judge's findings in relation to the Market Price from which this Court has differed to some extent is in relation to the position of analysts (Ground 1(iii)).

**243.** I do not consider that this is sufficient to interfere with the judge's conclusion as to the weight to be given to the Market Price. As just stated, he was well aware of the limitations in respect of the Market Price and, in particular, Ms Glass' acceptance that it could be understated by 20%. I do not consider that the point concerning analysts adds materially to the uncertainties surrounding the Market Price.

**244.** There is no suggestion from any party that the weighting given to the Market Price should be increased and, in any event, I would not think it right to do so in the light of the various limitations and uncertainties just mentioned. In my judgment, a weighting of 30% was well within the range of decisions reasonably open to the judge on such an evaluative matter and I see no grounds upon which we could properly interfere with that weighting either on the basis that it was plainly wrong or that this Court's finding in relation to analysts is sufficient to vary it.

**245.** Given my view that no weight can properly be placed on the Merger Price for the reasons set out earlier in relation to Ground 2, it follows that a 70% weighting should be given to the DCF valuation. I see no difficulty in this. The Company submitted before the judge and before this Court that a DCF valuation is inherently subjective because of the need to estimate future cashflows, the matters

making up WACC etc and that opinions on such topics can reasonably differ. However, once experts from each side have given their views and those views have been subject to rigorous testing in cross-examination, the Court is in a good position to determine the best forecasts and assumptions, as the judge did in this case.

**246.** As the Delaware jurisprudence makes clear, where there is a semi-strong efficient market and where the transaction process has been robustly carried out, the merger price is likely to be a (and possibly the most) reliable indicator of fair value. However, where, as in this case, the sale process has not been robustly carried out and that there are other deficiencies as described earlier such that no weight is to be placed on the merger price, a DCF valuation is a very appropriate methodology (subject of course to any weight which may be attributed to the adjusted trading price).

**247.** Given my view that no weight should be placed on the Merger Price, I do not need to address Mr Salzedo's submission that it is wrong in principle to give weight to both the merger price and the adjusted trading price when there have been defects in the sale process which are likely to have skewed the merger price to the downside and where the adjusted trading price is lower (as it will almost invariably be) than the merger price. To do so is to skew matters even further to the downside.

**248.** Suffice to say that, as at present advised, I see the force of that argument and I note the judge's observation at [340(c)] that he was not aware of any case in either Delaware or this jurisdiction where weight had been given to both the adjusted trading price and to the merger price.

**249.** I would add for the sake of completeness that I do not see that the same argument supports the suggestion that we should give no weight to the Market Price in this case simply because we are giving no weight to the Merger Price as a result of deficiencies in the sale process. If there is a semi-strong efficient market and no

MNPI, the authorities are clear that some weight <u>can</u> be placed on the adjusted trading price as an indicator of fair value and this must still be so even if no weight is being placed on the merger price. Whether it will be appropriate to do so and, if so, the comparative weighting which should be placed on the adjusted trading price and the DCF valuation will depend upon the particular circumstances.

**(ii) Approach to evidence and uncertainty**

**250.** Although, in view of the above decision, it is not strictly necessary to deal with a further point raised by the Dissenting Shareholders, I propose to do so in case it is of assistance in future cases.

**251.** At [340(i)] the judge said as follows:

> ***"In conducting the weighting exercise, I have had regard to the evidential weaknesses in the Company's case, which I have explained above. <u>I note that the Dissenting Shareholders, in reliance on the Delaware approach and the evidence of Mr Montejo</u>*** <u>[expert on Delaware law]</u> ***<u>argued that in order to be able to rely on the Merger Price the company needed to provide substantial discovery (much more than the Company has provided here) and that those with knowledge of the process by which the company was sold and those with knowledge of the future performance of the company would be expected to give evidence and be available for cross-examination (including the company's financial advisers) – and that a failure to provide the full set of documents or witnesses can result in adverse inferences at trial</u>. But it seems to me that the litigation culture and procedural rules affecting discovery are different in Delaware so the Delaware jurisprudence is not directly relevant. In this jurisdiction,***

***discovery is dealt with pursuant to the procedural directions given by the Court in the early stages of the proceedings and as the case law of this Court makes clear the underlying principle in this jurisdiction, as in Delaware, is that the Company is in possession of the critical documents and personnel and should provide sufficient discovery and proffer the appropriate witnesses, to enable the experts and through them the Court to be able to form a view on fair value…. As the Company pointed out, in our system, if dissenting shareholders and their experts are not satisfied with the documentary evidence produced they can apply for directions or specific discovery and can seek an order that the Company file and serve evidence from particular witnesses. The Dissenting Shareholders took none of these steps in this case. It would have assisted had they done so. In the absence of such action, the Court must deal with evidence before it drawing such inferences as are appropriate. I have explained my approach to the evidential deficiencies in this case when discussing particular issues in the body of this judgment. Having said that, I should say that I regard it as unfortunate that the Company was economical with its evidence in this case and would hope that its approach will not be followed in future cases."*** [Emphasis added]

**252.** Mr Salzedo submitted that the judge erred in the latter part of this passage when discussing the issue of specific discovery and the suggestion of securing that a particular witness give evidence. It seems to me that this latter passage raises issues both of fact and of principle.

**253.** Dealing first with the facts in relation to the issue of discovery, a wide ranging order for discovery was made in this case as described at [89(xi)] above. As Mr Salzedo pointed out in his oral submissions, when the Dissenting Shareholders queried the lack of documents and/or Mr Russo sought further documents in

connection with the Management Projections, they were informed that there was nothing further to disclose. In those circumstances it was not really open to the Dissenting Shareholders to make an application for specific discovery. In fact, as summarised at [147(iv)(f)] above, it transpired that the Company had not fulfilled its discovery obligations because Mr Chan had failed to ask any of the relevant personnel or entities whether they had any relevant documents. While it may in some cases be appropriate for dissenting shareholders to make application to the court where they are dissatisfied with discovery, it is not clear to me that the judge's criticism of the Dissenting Shareholders in this case was justified.

**254.** Similarly, in relation to the question of witnesses, the Company did call a witness who, on the face of it, would be able to give appropriate evidence about the Management Projections and the sale process, namely Mr Zhao, who was both a member of the Special Committee and a director of the Company. There was at that stage therefore no reason for the Dissenting Shareholders to think it necessary to apply for any witness to give evidence. It was only when Mr Zhao gave evidence that it transpired that he knew very little about any of the relevant issues and that accordingly there were substantial evidential gaps. It follows that again, I would depart from the judge's criticism of the Dissenting Shareholders for not having made an application in this case.

**255.** However, the issues of principle raised in the passage are rather more important. The court's duty on section 238 applications is to determine the fair value of the shares in question. In order to determine fair value, the court needs to have all the relevant information. This will include, amongst other matters, the projections for future revenues, the matters relevant to a DCF calculation, whether there is any MNPI and the measures taken in the sale process including what was done as a market check and generally all communications with the financial advisers employed by the special committee.

**256.** All of this information will primarily be in the hands of the company and its financial advisers; dissenting shareholders are unlikely to have much information

other than that in the public domain. It is therefore the duty of the company to provide the court with all this information so that the court can fulfil the duty imposed on it under section 238.

**257.** It follows that the court should make wide ranging orders for discovery as was done in this case. The company must comply fully with such an order and must also produce a witness or witnesses who can speak with knowledge about all the relevant matters for assessing fair value, including those mentioned above.

**258.** Whilst there is always the possibility of dissenting shareholders applying for specific or further discovery, this should not normally be necessary. The obligation to make all relevant documents available to the court (and therefore the dissenting shareholders) rests upon the company and it is the company which should take the consequences if it fails in this obligation.

**259.** As to the issue of witnesses, whilst I would accept that, particularly given the court's duty to reach its own decision on fair value rather than simply choosing between competing suggestions, the court has an inherent jurisdiction to call a witness to give evidence, this would be a most unsatisfactory method of proceeding and should be a measure of the very last resort. The obligation rests on the company to produce a suitable witness or witnesses who can speak with knowledge to the relevant matters.

**260.** In my judgment, the position is accurately summarised in the emphasised passage in [340(i)] quoted at [252] above. Unlike the judge, I consider that this is the position in the Cayman Islands as well as in Delaware. If the company does not fulfil its obligation, not only may it face orders for costs or other orders at the court's disposal, but it should also expect adverse inferences to be drawn where appropriate as a result of its failures. It could be said that in the present case the Company escaped very lightly in that respect.

**261.** It is clear from the last sentence of paragraph [340(i)] quoted above that the judge was not happy with the way the Company had conducted the case. Fortunately, it

appears to be something of an outlier and I note that in both *Qunar* and *Nord Anglia*, there appears to have been full discovery and evidence was called from an officer of the company who could speak with knowledge about all the relevant matters and therefore give the court the assistance to which it was entitled. Should a company in future provide as little documentary and evidential assistance as the Company provided in this case, it should realise that it will run a real risk of adverse inferences being drawn against it and therefore the amount which it has to pay dissenting shareholders being somewhat higher than it would contend.

**Summary of conclusions**

**262.** I would summarise my conclusions as follows:

(i) The fair value of the Company's ADS should be calculated with a weighting of 30% Market Value and 70% DCF valuation.

(ii) The DCF valuation should be calculated by reference to the figures determined by the judge subject only to the following amendments:

(a) In relation to Ground 3(iii), the Management Projections should be amended by adopting the figures for future average selling prices in Glass 1 (excluding Sunshot) but amended further in accordance with [177] above so as to include a reducing rate of decline for 2021-23 as agreed between the parties or, in default of agreement, as determined by the Grand Court.

(b) In relation to Ground 3(iv), the Management Projections should be amended by taking a capacity factor of 14.35% for 2017 and increasing this by 0.05% every year until achieving a figure of 14.65% for 2023.

**263.** I would invite the parties to seek to agree the figure for fair value calculated in accordance with the previous paragraph. In relation to the weighting at (i) and the capacity factor at (ii)(b), this should be a purely mathematical calculation. I accept that the figures for the rates of decline for 2021-23 are not yet known and will first have to be ascertained. I would invite the parties to agree a sensible compromise in this respect.

**264.** If the rates of decline can be agreed, the parties are invited to agree the resulting DCF valuation and, consequently, the fair value figure. If it is agreed, the order of the Court will state the new fair value. If the rates of decline for 2021-23 cannot be agreed, that issue will have to be referred back to the Grand Court for determination, together with the final determination of fair value in accordance with the decisions of this Court and the decision of the Grand Court as to the rates of decline.

**265.** In the circumstances, the Court proposes to allow four weeks for the usual review of the draft judgment and the parties should seek to agree the figure for fair value within that period, failing which the Court will refer the final calculation back to the Grand Court as described above.

**266.** Pursuant to the preceding paragraph, the parties having failed to agree the figure for fair value within the stipulated period, the matter is referred back to the Grand Court as described. I would therefore allow the appeal to this extent.

**Beatson, JA**

**267.** I agree with both judgments.

**Field, JA**

**268.** I also agree.

**269.** In particular, I would emphasise the points made at [89(x)], [149] and [254] – [262] in the judgment of Birt, JA. In cases such as this, it is important that companies produce a witness or witnesses who can speak with knowledge about the management projections, the sale process and other matters relevant to fair value and that they also give full disclosure of all documents and relevant communications in connection with the sale process and the assessment of fair value. It is also important that courts are willing to draw inferences against a company for evidential and disclosure failings such as those identified in the above-mentioned paragraphs.


CACV009/2021 Page 155 of 155 2023-05-04