# EXHIBIT 20

Neutral Citation Number: [2023] EWHC 262 (KB)

Case No: QB-2020-002450

**IN THE HIGH COURT OF JUSTICE**
**KING'S BENCH DIVISION**
**MEDIA AND COMMUNICATIONS LIST**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 10 February 2023

**Before :**

**THE HONOURABLE MR JUSTICE MURRAY**

- - - - - - - - - - - - - - - - - - - - -

**Between :**

| | |
|---|---|
| **WALTER TZVI SORIANO** | **Applicant/ Claimant** |
| **- and -** | |
| **(1) FORENSIC NEWS LLC** <br> **(2) SCOTT STEDMAN** | **Respondents/ 1st & 2nd Defendants** |
| **(3) ERIC LEVAI** | **3rd Defendant** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Mr Andrew Fulton KC** and **Mr Ben Hamer** (instructed by **Rechtschaffen Law**) for the **Applicant**
**The Lord Falconer of Thoroton** and **Mr Jonathan Price** (instructed by **Gibson, Dunn & Crutcher UK LLP**) for the **Respondents**

Hearing date: 6 February 2023

- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

This judgment was handed down remotely by circulation to the parties' representatives by email and release to The National Archives. The date and time for hand-down are deemed to be 10 February 2023 at 10:30 am.

**Mr Justice Murray :**

1. This is an application by the claimant, Mr Walter Soriano, for an anti-suit injunction under section 37(1) of the Senior Courts Act 1981 against the first and second defendants, Forensic News LLC and Mr Scott Stedman, to restrain an application made in a court in the United States of America ("the US") by the first and second defendants under 28 US Code §1782 ("the 1782 Application").

2. 28 US Code §1782 is a provision of the US Code under which a US court has the power to provide assistance to the applicant in gathering evidence in support of legal proceedings in a court or tribunal outside the US. Between January and November 2022, the defendants made three previous applications under 28 US Code §1782 seeking evidence from three individual witnesses. Mr Soriano has not formally objected to those applications, although he has raised objections to them in correspondence.

3. The 1782 Application was made on 6 December 2022 by the first and second defendants. Under the 1782 Application, they seek the permission of the US District Court in the Southern District of New York to issue a subpoena for the production of documents against HSBC Bank USA, N.A. ("HSBC USA").

4. HSBC USA is a US subsidiary of the HSBC international banking group. Mr Soriano and the company of which he is the Chief Executive Officer (CEO), USG Security Limited ("USG") have bank accounts with HSBC in London ("HSBC UK"). Mr Soriano asserts that neither he nor USG holds any account with HSBC USA, but he understands that US dollar payments to or from his and/or USG's bank accounts with HSBC UK will have cleared through HSBC USA as a correspondent bank. He expects that this will have generated records, but he has no idea of their nature and extent.

5. The third defendant is not a party to the 1782 application. There were a further three defendants to this claim by Mr Soriano, each of whom has since reached a settlement with Mr Soriano. In the remainder of this judgment, I will simply refer to the first and second defendants, who are the only respondents to Mr Soriano's application for injunctive relief.

6. The background to this litigation is set out in the Court of Appeal's decision on jurisdiction in these proceedings: neutral citation [2021] EWCA Civ 1952 at [2]-[10] ("*Soriano v Forensic News LLC (CA)*"). For present purposes, it is sufficient to say the following:

    i) Mr Soriano is a businessman with dual British and Israeli nationality.

    ii) The first respondent is a Californian corporation that owns and operates *Forensic News*, a publication that features investigative journalism, which operates via a website, a Twitter account, a Facebook page, and podcasts.

    iii) The second respondent is a journalist and founder of *Forensic News*. He is domiciled in the US.

    iv) On 14 July 2020, Mr Soriano issued proceedings against the respondents (and, as already noted, others), for various causes of action in libel, misuse of private information, data protection, malicious falsehood, and harassment.

v) The claim concerned eight publications (namely, six journalistic reports, one podcast, and a published transcript of that podcast) that appeared on *Forensic News* outlets between 5 June 2019 and 16 June 2020 which, in the words of the Court of Appeal, "referred to the claimant in unflattering terms".

vi) Given that all the defendants to the claim were domiciled in the US, Mr Soriano sought permission to serve the claim on the defendants outside the jurisdiction. On 15 January 2021, Jay J granted permission to Mr Soriano to serve outside the jurisdiction with respect to part of his claim only. Following an appeal by the defendants and cross-appeal by Mr Soriano, on 21 December 2021, the Court of Appeal in *Soriano v Forensic News LLC (CA)* dismissed the defendants' appeal and granted Mr Soriano's cross-appeal in part, the effect being that Mr Soriano had permission to serve the defendants in the US with his claims for libel, misuse of private information with respect to four photographs, and violation of his data protection rights.

7. On or around 10 and 11 January 2022, Mr Soriano served the respondents with a Re-Amended Claim Form and Particulars of Claim. The respondents filed their Defence on 16 March 2022.

8. In June 2022, Mr Soriano applied to the High Court for (i) a trial of preliminary issue in relation to the "natural and ordinary meaning(s)" of the alleged defamatory publications and whether the meanings found were defamatory at common law and (ii) an order striking out certain paragraphs of the Defence as unsupported, including their truth defence ("the Strike-out Application"). The current position is that the preliminary issue trial and the hearing of the Strike-out Application are listed together for 2 March 2023 with a time estimate of two days. Following this, it is expected that there will be a case management conference to determine directions, including timetable, to bring the matter to trial on the merits.

*The 1782 Application*

9. In support of the 1782 Application, the respondents filed a Declaration dated 6 December 2022 of Mr Patrick Doris, who is a solicitor and partner of the law firm, Gibson, Dunn & Crutcher UK LLP ("GDC-UK"), the respondents' solicitors. In the Declaration, Mr Doris stated that the documents the respondents are seeking from HSBC USA are potentially relevant to their defence of the libel claim in that they may corroborate the truth and/or accuracy of the disputed publications. This would support a truth defence and, in relation to accuracy, the respondents' defence to the data protection claim. Mr Doris also stated that the evidence sought was potentially relevant to Mr Soriano's credibility to the extent that he denies the truth of the disputed statements.

10. Mr Soriano complains that he was given no prior notice of the 1782 Application nor was he notified once it was made. He discovered that it had been made from an online source.

11. On 20 January 2023, the day after filing this application, Mr Soriano filed with the New York court a motion to intervene or stay, in opposition to the 1782 Application. His principal arguments in support of that motion are that: (i) the subpoena requests are unduly burdensome, (ii) the same information may be obtained from Mr Soriano

himself, (iii) the 1782 Application is an attempt to "circumvent foreign proof gathering restrictions" of the English court because of the sheer breadth of the disclosure sought, which resembles a fishing expedition, and (iv) because any relevant information would be available through the normal disclosure process in the English proceedings. In relation to the 1782 Application, Mr Soriano is represented by the US law firm, Brown Rudnick LLP.

12. On 3 February 2023, the respondents filed with the New York court a reply brief in further support of the 1782 Application and in opposition to Mr Soriano's motion to intervene or stay.

*The claimant's injunction application and the evidence filed by the parties*

13. Mr Soriano applies to restrain by injunction the 1782 Application on the basis that the US proceedings initiated by that application would be unconscionable if they were allowed to proceed.

14. In support of his application, Mr Soriano has filed the sixth witness statement dated 19 January 2023 of Mr Shlomo Rechtschaffen, his solicitor, to which various documents are exhibited.

15. In support of their opposition to the application, the respondents have filed:

    i) the fourth witness statement dated 1 February 2023 of Mr Doris, to which various documents are exhibited; and

    ii) a witness statement dated 5 February 2023 of Ms Anne Marie Champion, to which various documents are exhibited.

16. Ms Champion is a partner in the law firm of Gibson, Dunn & Crutcher LLP ("GDC-US"). GDC-US represents the respondents in the US in relation to the 1782 Application. Her witness statement was provided to me during the hearing. I had the opportunity to read it during a short adjournment. In her witness statement, Ms Champion sets out the US legal context for the 1782 Application, describing the basic procedure, including as to scope of "discovery", means of challenge of the scope of the subpoena sought under the 1782 Application, availability of a protective order to protect confidentiality of documents that may be produced by discovery, and other relevant points.

*Relevant legal principles*

17. *Dreymoor Fertilisers Overseas PTE Limited v Eurochem Trading GmbH* [2018] EWHC 2267 (Comm) at [59]-[69] is authority for the proposition that the jurisdiction to restrain a 1782 Application by injunction is well-established. That is common ground. The relevant test is unconscionability.

18. In *South Carolina Insurance Co v Assurantie Maatschappij "De Zeven Provincien" NV* [1987] 1 AC 24 (HL) at 41C-D, Lord Brandon of Oakbrook described "unconscionable conduct" for this purpose as "conduct which is oppressive or vexatious or which interferes with the due process of the court". Although Lord Brandon stressed that this was not intended to be an exhaustive definition, it has proved to be sufficient in subsequent English cases considering injunctive relief against applications under 28

US Code §1782, and neither party has suggested that I should apply some other standard.

19. Mr Andrew Fulton KC, counsel for Mr Soriano, placed great reliance in his submissions on the following passage set out in the judgment of Lindley LJ in *Yorkshire Provident Life Assurance Co v Gilbert* [1895] 2 QB 148, 152:

> "The defendant's right … is to have discovery of all matters relating to the questions in issue as narrowed by the particulars. I do not think in a libel action he is entitled to get anything more. … I think it would be a very bad precedent to suggest that a person can simply by libelling another obtain access to all his books and see whether he can justify what he has said or not. I think it would be very lamentable if we should say when a person has libelled another and has justified and given particulars, that he is entitled to more than discovery of that which relates to those particulars."

20. Mr Fulton noted that this principle was described by Eady J as being "as sound today as it was at that time" in *Taranissi v BBC* [2008] EWHC 2486 (QB) at [13]-[14]. It does not appear to be disputed by the respondents.

21. Lord Falconer of Thoroton KC, counsel for the respondents, relied on the *South Carolina Insurance* case for the proposition that an application under 28 USC §1782 is not vexatious or oppressive, whether or not the applicant could have applied to an English court for the same relief: *South Carolina Insurance* at 42E-G:

> "… I cannot see that the re-re-insurers, by seeking to exercise a right potentially available to them under the Federal law of the United States, have in any way departed from, or interfered with, the procedure of the English court. All they have done is what any party preparing his case in the High Court here is entitled to do, namely to try to obtain in a foreign country, by means lawful in that country, documentary evidence which they believe that they need in order to prepare and present their case. It was said that the re-re-insurers could have applied to the High Court under R.S.C., Ord. 39, r. 2, for letters of request to issue to the proper judicial authorities in the United States. But 28 United States Code, section 1782, allows an application to be made either indirectly by the foreign court concerned or directly by an interested party, and I can see no good reason why the re-re-insurers should not have chosen whichever of these two alternatives they preferred."

22. Lord Falconer set out the following additional propositions in his skeleton argument:

i) it is a fundamental principle of English proceedings that the English courts do not, in general, exercise any control over the manner in which a party obtains the evidence which he needs to support his case: *South Carolina* at 41G-42C, *Royal Bank of Scotland v Hicks* [2011] EWHC 287 (Ch) at [95];

ii) seeking to exercise a right available under US law is not a departure or interference with the procedure of the English court, even if the procedure in the US court is significantly different from that of the English courts: *South Carolina Insurance* at 42D-H;

iii) an application in what may prove a just cause should not be considered an abuse of the court's process solely on the basis that it occasions extra costs and convenience: *South Carolina Insurance* at 43G; and

iv) the ability to make an application for a subpoena under 28 US Code §1782 in aid of its proceedings in this country is a facility available to any litigant: *RBS v Hicks* at [96].

23. I do not understand Mr Fulton to disagree with any of these propositions.

24. Both parties accept that there have been cases where the English courts have restrained an application under 28 USC §1782, two such cases being *Bankers Trust International Plc v PT Dharmala Sakti Sejahtera* [1996] CLC 252 and *Omega Group Holdings Ltd v Kozeny* [2002] CLC 132.

25. In relation to these, Lord Falconer submitted that the facts were materially different. In the former case, the trial had already ended, and the court concluded that permitting what was a wide-ranging application under 28 US Code §1782 would, in effect, amount to the trial being reopened: *PT Dharmala* at 263-264. In the latter case, the court concluded that a witness from whom evidence was sought under the relevant application under 28 US Code §1782 would have been subjected to unwarranted double cross-examination, and the trial would have suffered from unnecessary duplication: *Omega Group Holdings* at [23]. In contrast to those cases, Lord Falconer submitted that there appeared to be no case where an English court had granted an injunction to restrain an application under 28 US Code §1782 where all that was sought were documents, as in the *South Carolina Insurance* case and as in this case.

26. It is common ground that a case such as this must turn on its specific facts.

*Submissions*

27. Mr Fulton characterised Mr Soriano's case for injunctive relief as overwhelming. His three principal submissions were:

i) the respondents' stated purpose for the 1782 Application is impermissible, given the principle in the *Yorkshire Provident Life Assurance* case that a party's right to disclosure is limited to documents relevant to the pleaded case, rendering the 1782 Application an interference with the due process of the court;

ii) a number of features of the 1782 Application, including the impermissible purpose, but also the timing, breadth, potential impact on non-parties, and manner in which the application was made, as well as other factors, render the 1782 Application oppressive or abusive, particularly when these features of the 1782 Application and the other factors are viewed cumulatively; and

iii) one of the other factors, namely, the fact that the respondents owe Mr Soriano outstanding costs of £85,000 (not including VAT) following their failed appeal on jurisdiction, is on its own sufficient to justify the injunction sought.

28. Mr Fulton submitted that it was not until Mr Doris's fourth witness statement was served that Mr Soriano received an explanation of the rationale for the 1782 Application. He submitted that it is clear from Mr Doris's evidence and from the reply brief filed by the respondents with the New York court on 3 February 2023 that the respondents are seeking documents to support an additional and/or improved defence of the claim. This is an impermissible purpose, he submitted, given the principle in the *Yorkshire Provident Life Assurance* case on which he relied. That principle is not merely a matter of procedure but a substantive principle of libel law, which the respondents are seeking to circumvent by means of the 1782 Application. It is clearly abusive, he submitted, for the respondents to seek from the New York court disclosure that they would have been denied in London having regard to the current state of the pleadings.

29. Mr Fulton drew my attention to *Flood v Times Newspapers Ltd* [2009] EWHC 411 (QB), [2009] EMLR 18, in which Eady J considered an application by the defendant for disclosure against third parties under CPR r 31.17. In that case, Eady J considered at [22]-[37] various principles applicable to third party disclosure. Mr Fulton underlined Eady J's emphasis on the scope of disclosure being referable to the pleadings and the importance (underlined at [48]) of not permitting the applicant to go "fishing" for evidence to support a case not yet pleaded. In relation to documents sought by class or category (as in the 1782 Application), Eady J had regard to the observations of the Court of Appeal in *Three Rivers District Council v Bank of England (Disclosure) (No 4)* [2002] EWCA Civ 1182, [2003] 1 WLR 210 (CA) at [36] that the court has no power to make an order under CPR r 31.17 in respect of a class of documents where it is established that there are documents within the class that do not satisfy the necessary "relevance" threshold. Mr Fulton submitted that this authority illustrated the principles governing, and limitations on, the availability of disclosure sought from third parties in English proceedings. The "extraordinary breadth" of the 1782 Application could not be squared with these principles. This provided support for the submission that the respondents should not be permitted to obtain from a US court disclosure from a third party to which they would not be entitled in England.

30. Mr Fulton submitted that, if the court did not accept the submission that the *Yorkshire Provident Life Assurance* principle was determinative of the injunction application, it should be taken into account along with a number of other features of the 1782 Application and other relevant factors, which demonstrated that the 1782 Application was oppressive, abusive and/or otherwise unconscionable.

31. Mr Fulton made various criticisms of the 1782 Application, including the reasons given to the New York court by the respondents in their reply brief filed on 3 February 2023. During the hearing, Mr Fulton directed my attention to various statements made by the respondents in the reply brief seeking to characterise Mr Soriano as a "libel tourist" and/or accusing him of "forum-shopping" and "gamesmanship" in bringing his claim in England. This was profoundly objectionable, he submitted, particularly having regard to the clear statement of the Court of Appeal in *Soriano v Forensic News LLC (CA)* at [37], endorsing the statement of the first instance judge, Jay J, that Mr Soriano "was not a libel tourist".

32. In addition to the impermissible purpose of the 1782 Application, Mr Fulton highlighted a number of other issues, such as the confidential and potentially sensitive nature of the information sought, the breadth of categories of documents sought, the temporal breadth of the request (covering 16 years), the potential impact on non-parties, the absence of notification to Mr Soriano that the 1782 Application would be made (either in advance or at all), and the procedural prematurity of the 1782 Application given that the scope of disclosure will be properly a matter for the CMC.

33. As to the breadth of the documents sought, Mr Fulton said that the 1782 Application was a classic "fishing expedition", the respondents having failed, in their documents filed in support of the 1782 Application, to justify their requests by reference to specific transactions or specific contested facts in the proceedings. They simply justified the request by reference to their proposed defences to the libel and data protection claims and on the basis that the documents sought would also be relevant to Mr Soriano's credibility.

34. Mr Fulton further submitted that there was no conceivable justification to seek US-located records of HSBC USA about payments that will also be reflected in records in England with HSBC UK. He accused the respondents of misleading the New York court by claiming that the 1782 Application was urgent due to the imminence of the hearing on 2-3 March 2023, when the disclosure sought through the 1782 Application was not relevant to that hearing given its narrow focus (namely, determination of meaning and defamatory (or otherwise) nature of the alleged defamatory statements and whether defences, as they currently stand, should be struck out in light of the meanings determined).

35. Mr Fulton submitted that only after the future shape of the case is clarified by the preliminary issues trial and determination of the Strike-out Application will there be a CMC at which the proper scope of any documentary disclosure can be debated. That is the appropriate point at which to seek any banking records that the respondents contend are necessary for the fair disposal of any identified issue. The English court can then weigh the factors and decide whether and, if so, to what extent it is appropriate to intrude into a confidential bank/customer relationship.

36. In addition to the features of the 1782 Application and other factors that I have already mentioned, Mr Fulton relied on the 1782 Application amounting to unwarranted interference with efficient case management in London and resulting in duplication of effort on either side of the Atlantic.

37. Mr Fulton laid particular stress on the costs point. The respondents are spending, he submitted, substantial amounts pursuing various applications under 28 US Code §1782, the 1782 Application that is the subject of this application being the fourth (as I have already noted). The respondents have done this despite their failure to pay the costs orders currently outstanding against them as a result of their failed appeal on jurisdiction, which amount to £85,000 not including VAT. Had they made an application for disclosure in this jurisdiction, that application would most likely have been met by an application by Mr Soriano for a limited debarring order preventing the respondents' application from being heard until the outstanding costs were paid. By making the 1782 Application, they are avoiding this, leaving the accrued costs unpaid, and forcing Mr Soriano to incur costs in both this jurisdiction and in the US.

38. Finally, Mr Fulton noted that, according to Mr Doris's fourth witness statement, lawyers at GDC-US and GDC-UK had seen certain "records" of HSBC USA, in circumstances described only in the vaguest terms and which they have not disclosed in either jurisdiction. This is unacceptable "murkiness", particularly as it cannot be ruled out that a record has been hacked, leaked or forged and is now sought to be used as a platform for open-ended disclosure from HSBC USA. Mr Fulton submitted that this consideration alone is serious enough to grant the injunction application pending more satisfactory explanations by the respondents and GDC-UK if and when they come to issue a disclosure application in London.

39. In response, Lord Falconer of Thoroton KC submitted that the 1782 Application was not vexatious or oppressive simply because the respondents could have applied to the English courts for the same relief or because the respondents are able to obtain from a foreign court relief that the English court would not grant. That is clear from decision of the House of Lords in the *South Carolina Insurance* case.

40. Lord Falconer submitted that none of the individual criticisms of the 1782 Application, the reasoning supporting it put forward by the respondents to the New York court, or the manner in which it was made and none of the other factors highlighted by Mr Fulton, such as the costs point, either individually or cumulatively meant that the 1782 Application was unconscionable. Mr Soriano's injunction application therefore failed to surmount the necessary threshold of unconscionability in order to justify its being granted.

41. Lord Falconer submitted that many of the specific criticisms raised by Mr Soriano, for example, as to the scope of the 1782 Application in relation to documents sought and/or timeframe, could be resolved by discussion between the parties and/or by the New York court. The evidence of Ms Champion showed that the New York court had various powers to deal with the legitimate objections raised by Mr Soriano and/or any affected third party.

42. In relation to the costs point, Lord Falconer submitted that Mr Soriano could seek a remedy in the English court should he wish to do so, namely, a limited debarring order. He had failed, so far, to do that. The position was that the respondents had limited financial means and were therefore not in a position presently to pay the outstanding costs awarded against them. However, that should not prevent their seeking assistance from a court in the country where they were resident where such assistance was legitimately available to them in order to defend themselves from Mr Soriano's claim.

43. Finally, in relation to the "murkiness" point, it was clear from the fourth witness statement of Mr Doris and the witness statement of Ms Champion that each had seen relevant records of HSBC USA that appeared to show payments from USG to a company in Saint Vincent and the Grenadines associated with a convicted Israeli hacker and therefore potentially relevant to the respondents' Defence as currently pleaded and also to possible amendments to the Defence that might be sought if justified by further evidence. In other words, this was not a "fishing expedition". There were proper grounds to seek the disclosure sought. As to the provenance of the records concerned, the court could be satisfied, given that the relevant records had been seen by GDC-US and GDC-UK, that there was a legitimate basis for the 1782 Application having regard to those records. If the breadth of the 1782 Application remained an issue, that could be resolved by discussion between the parties and/or by the US court, which could be

trusted to deal fairly with the issue according to its own rules, as outlined by Ms Champion in her evidence.

*Discussion and analysis*

44. In relation to the *Yorkshire Provident Life Assurance* principle, whether considered as purely a matter of procedure or as a substantive principle of the law of libel, I am satisfied that it is not a bar to the 1782 Application. That principle simply means that an English court, in relation to a libel claim, will not order disclosure of documents not relevant to the case as then pleaded. That is compatible with the principle that the party should otherwise be free to gather evidence in any other way that is legitimately available to it. It simply cannot invoke the intrusive power of the English court to do so.

45. The *South Carolina* case, in my view, confirms that it is legitimate to seek the assistance of a foreign court, such as the federal District Court in New York, where that court has power to provide such assistance. That court will be concerned only with evidence over which it has jurisdiction. As a matter of comity, that court can and should be trusted to deal with issues of substantive and procedural fairness that may be raised by any application for its assistance. It follows from this that I do not accept Mr Fulton's submission that the respondents misled the New York court by failing to bring to its attention the principle in *Yorkshire Provident Life Assurance* on which he relies.

46. This is supported by the passage in the speech of Lord Brandon of Oakbrook in *South Carolina Assurance* at 42D-H, which I have quoted at [21] above.

47. In a similar vein, the 1782 Application is not unconscionable simply because the relevant US principles relating to third party disclosure may vary from the principles applicable to a request made to an English court for third party disclosure under CPR r 31.17, as discussed by Eady J in the *Flood* case.

48. I, of course, do not mean that an application under 28 US Code §1782 can never be unconscionable. I have already referred to the *PT Dharmala* and *Omega Group Holdings* cases where, for the reasons given in each case, such an application was found to be unconscionable and injunctive relief was granted. But neither of those cases relied on the *Yorkshire Provident Life Assurance* principle or any incompatibility of the US proceedings with English rules relating to third party disclosure.

49. Turning to the various individual criticisms of the 1782 Application, including its breadth as to scope of documents and timeframe and the confidential and potentially sensitive nature of the financial disclosure sought, those are matters for the New York court at this stage. The evidence of Ms Champion demonstrates how the process ensures that proper objections can be raised and would be addressed by the New York court. At this stage, there is no basis in such objections for ordering injunctive relief. It is relevant, it seems to me, that what is sought by the 1782 Application are documents only. Also, we are still at a relatively early stage of the substantive proceedings in the English claim. There are no issues of the type that troubled the court in the *PT Dharmala* and *Omega Group Holdings* cases, which were quite different on their respective facts from this case.

50. I am not satisfied that any of the statements made on behalf of the respondents in the Declaration of Mr Doris dated 6 December 2022 or in the reply brief filed by the respondents with the New York court on 3 February 2023 is materially misleading. Also, I consider that some allowance should be made for the fact that each of these documents (in particular, the reply brief) was drafted according to a US style of pleading. The fact that Jay J considered that Mr Soriano was not a libel tourist and that the Court of Appeal agreed with him does not mean that the respondents are debarred from making such an argument before a different court in a different legal system, where different principles, policies and cultural norms apply.

51. Other issues such as procedural prematurity and the potential availability in the English proceedings at a later stage of disclosure are not a bar to making the 1782 Application at this stage. That much is clear having regard to *South Carolina Assurance* at 42D-H.

52. I do not consider that the 1782 Application involves any unwarranted interference with efficient case management of the English proceedings. There is no reason, in my view, why the court cannot proceed with the hearing on 2-3 March 2023 as currently intended. Of course, it is possible (although it seems unlikely) that the 1782 Application may result in relevant evidence becoming available to the respondents before that hearing. That might justify an application by the respondents to vacate the hearing. But that would be a matter for the judge allocated to determine the application to vacate. It is a slight risk and, in my view, is not comparable to the sorts of issues that have arisen in cases where injunctive relief against an application under 28 USC §1782 has been granted.

53. Turning then to the costs point, I accept the submission of Lord Falconer that it is not, on its own, a reason to prevent the respondents seeking, via legitimate means, evidence to assist their defence, whether as it is currently pleaded or as it might in the future be pleaded should the respondents be permitted, at some future stage, to amend their defence.

54. As to the "murkiness" point, I have no reason at this stage to go behind the evidence of Mr Doris and Ms Champion, each of whom is subject to professional obligations. I accept the submissions of Lord Falconer on this point, which I have briefly summarised above.

55. I accept that the US proceedings initiated by the 1782 Application have already involved Mr Soriano in some degree of cost against a background where, in the US system, he does not have the same protection on costs that he would have in the English proceedings in the event of a successful outcome. Given, however, that the respondents are pursuing a legitimate means of obtaining evidence, which is sanctioned by the House of Lords decision in the *South Carolina Insurance* case, the fact that Mr Soriano will incur further costs if injunctive relief is not granted does not mean that the US proceedings are unconscionable.

*Conclusion*

56. In summary, I am not persuaded that the US proceedings initiated by the 1782 Application are oppressive, vexatious, or otherwise unconscionable. I am not persuaded that any of the factors relied upon by Mr Soriano, individually or in any combination, should lead me to grant the injunction application. Nor am I persuaded, at this stage,

that there is a realistic prospect of the US proceedings initiated by the 1782 Application interfering with the due progress of the English proceedings by, for example, causing the 2-3 March 2023 hearing to have to be vacated, by leading to material duplication, or by otherwise interfering with the efficient case management of Mr Soriano's claim.

57. Accordingly, for the reasons I have given, I refuse Mr Soriano's application for an injunction to restrain the respondents' proceedings in relation to the 1782 Application.