# EXHIBIT 22

[2023] SC (Bda) 67 Civ. (25 August 2023)

# In The Supreme Court of Bermuda

**CIVIL JURISDICTION**

**COMMERCIAL COURT**

**2023: Nos. 62 & 63**

**IN THE MATTER OF THE AGREEMENT AND PLAN OF MERGER BY AND AMONG MYOVANT SCIENCES LTD., SUMITOVANT BIOPHARMA LTD., ZEUS SCIENCES LTD., AND SUMITOMO PHARMA CO., LTD. DATED AS OF 23 OCTOBER 2022**
**AND IN THE MATTER OF A PROPOSED STATUTORY MERGER AGREEMENT BY AND AMONG MYOVANT SCIENCES LTD., SUMITOVANT BIOPHARMA LTD., ZEUS SCIENCES LTD., AND SUMITOMO PHARMA CO., LTD.**
**AND IN THE MATTER OF SECTION 106 OF THE COMPANIES ACT 1981**

**BETWEEN:**

**APS HOLDING CORPORATION** **PLAINTIFF (NO. 62)**

**AND**

**ALPINE PARTNERS (BVI), L.P.** **PLAINTIFF (NO. 63)**
**(ACTING THROUGH ITS GENERAL PARTNER ALPINE GLOBAL MANAGEMENT, LLC)**

**V**

**MYOVANT SCIENCES LTD.** **DEDENDANT**

**Before:** **The Honourable Chief Justice Hargun**

**Appearances:** **Richard Millett KC of Essex Court Chambers, Mark Chudleigh and Michele Gavin-Rizzuto of Kennedys Chudleigh Limited for the Plaintiffs**

**Martin Moore KC of Erskine Chambers and John Wasty of Appleby (Bermuda) Limited for the Defendant**

**Date of Hearing:** **18-19 July 2023**
**Date of Judgment:** **25 August 2023**

**JUDGMENT**

*Whether appropriate to require the company to provide general discovery in an appraisal action under section 106 of the Companies Act 1981: whether appropriate to require the dissenting shareholders to file Statement of Grounds explaining why they consider that the price proposed by the company is "unfair"*

**<u>HARGUN CJ</u>**

**Introduction**

1. At the hearing on 18 and 19 July 2023 the Court heard submissions from Counsel for the Plaintiffs and the Defendant (the "**Company**") in relation to appropriate directions for the

proper case management of the present proceedings, which were instituted by the Plaintiffs under section 106 of the Companies Act 1981 (the "**Act**" and "**section 106 proceedings**") seeking an appraisal of the fair value of their shares.

2. The main point of contention between the parties is as to the scope of discovery to be ordered at this stage of the proceedings. The Company opposes that the Court should make any order requiring the Company to provide general discovery in relation to documents which may be relevant to the issue of the fair valuation of the shares. The Company contends that such an exercise is unnecessary. Instead, it proposes an expert-led process under which the experts review all relevant publicly available information and other transactional material which the Company may be prepared to provide to the experts. Thereafter, the experts request from the Company and/or the Plaintiffs such further documents as they reasonably require.

3. The other significant dispute relates to the Company's contention that the Plaintiffs be under an obligation to set out the grounds explaining why they claim that they have not been offered fair value for its shares. The Company seeks a direction that within 240 days of the date of the Directions Order, the Plaintiffs shall serve on the Company and file at Court a statement setting out the grounds which explain why they claim that they have not been offered fair value for their shares in the Company ("**Statement of Grounds**"). It is said that such a document should include in summary form any material facts and valuation methodologies and principles on which the Plaintiffs rely and identify any key documentary evidence relied upon which should be appended to it.

**Factual Background**

4. The uncontroversial factual background is taken from the written submissions filed on behalf of the Plaintiffs. The Plaintiffs are former shareholders of the Company, whose shares were acquired pursuant to an Agreement and Plan of Merger and a related

Statutory Merger Agreement, formally proposed on 23 January 2023 and coming into effect on 10 March 2023 (the "**Merger**"), and who have exercised their right to have the fair value of their shares determined by the Supreme Court of Bermuda by way of section 106 proceedings.

5. As a consequence of the Merger, the Company is now wholly owned by the Bermudian entity Sumitovant Biopharma Ltd. ("**Sumitovant**")[1], such that the Merger constitutes a "*going-private*" transaction under the SEC rules.

6. The Merger involved the issuing of a definitive proxy statement pursuant to section 14(a) of the Securities Exchange Act of 1934, in the usual way, dated 23 January 2023 (the "**Proxy**"). As the Proxy explains, the Sumitomo Group formed a strategic alliance with the Company in 2019, by which SMP was to acquire the interests of Roivant Sciences Ltd. ("**Roivant**") in certain pharmaceutical companies, and subsequently in October 2022 announced a definitive agreement to acquire all outstanding shares of the Company not already owned by Sumitomo Group for an all cash price of USD27.00 per share, financed by Sumitomo Mitsui Banking Corporation.

7. At the date of Merger, Sumitomo Group already owned over 52% of the issued and outstanding shares, and the purchase of the remaining shares, following subsequent approvals in March 2023, formalised the complete takeover by Sumitomo Group.

8. Prior to and in preparation for the Merger, SMP and Roivant (and certain of their affiliates) entered into a definitive transaction agreement (the "**Roivant Transaction Agreement**") pursuant to the above-mentioned strategic alliance. Pursuant to the terms of the Roivant Transaction Agreement, Roivant transferred all of its Myovant shares to Sumitovant to ensure that SMP indirectly owned and controlled a majority of Myovant's shares upon closing of the Roivant Transaction Agreement.

---

[1] Following the conventions stated on page 1 of the Proxy, in the paragraphs below: **(i)** Sumitomo Pharma Co., Ltd. is referred to as "**SMP**"; **(ii)** Sumitovant Biopharma Ltd. as "**Sumitovant**" (see above).

9. Prior to the closing of the Roivant Transaction Agreement, SMP, Sumitovant and Myovant entered into an Investor Rights Agreement that inter alia gave SMP (and its controlled affiliates, including Sumitovant) the right to appoint three directors to Myovant's board of directors.

10. The Plaintiffs contend that the going-private transaction effected by the Merger was therefore a 'management buy-out' / ‘minority squeeze-out’ ("**MBO**”), in which the purchaser was both the majority shareholder and also intimately involved in Myovant's business (and therefore held considerable insider knowledge about the Company and its operations). This characterisation of the transaction as an MBO is disputed by the Company.

11. In terms of procedural background, the Plaintiffs’ respective originating summonses seeking relief under section 106(6) of the Act (i.e. the present proceedings) were filed on 27 February 2023. On 14 April 2023, the Plaintiffs filed summonses for directions which were then set down for a first hearing on 25 May 2023.

12. On 12 May 2023, the Plaintiffs sent the Defendant a copy of the Plaintiffs’ Draft Directions with a view to agreeing or narrowing, the scope of issues in dispute at the directions hearing in advance of the mention hearing. The Draft Directions included Appendix 2 which set out various items of the discovery which would ordinarily be included in the discovery provided by the Company in section 106 proceedings. The discovery sought in Appendix 2 was supported by the expert opinion evidence from Mr Gwynn Hopkins addressing a number of features of the parties’ respective positions in relation to discovery, in particular (i) the need for the Company to give general discovery at an early stage; and (ii) the importance and utility of the various items of Defendant’s discovery set out in Appendix 2 to the Plaintiffs’ Draft Directions.

13. The Company took the position that if the expert evidence of Mr Hopkins was to be admitted then the Company reserved the right to adduce its own expert evidence and in the circumstances the hearing fixed for the directions on 18/19 July 2023 would have to be adjourned. In the end the Plaintiffs took the position that, in the interest of conserving

the existing listing for the directions hearing they were content for the leave application to adduce expert evidence to be adjourned *sine die*, on the basis that at the forthcoming directions hearing they would not press for Appendix 2 of their Draft Directions. The Plaintiffs say that they took this pragmatic position on the footing that the categories of document set out in Appendix 2 were to be encompassed in any event by the Company's general discovery obligation under the sweep up provision in their Draft Directions. The end result is that the Plaintiffs are seeking that the Company provide general discovery in relation to the issue of fair valuation of their shares, but the Draft Directions proposed by them do not include the customary Appendix 2 setting out the various items of discovery which would ordinarily be included in section 106 proceedings.

**Issue of General Discovery to be provided by the Company**

14. The issue of whether the Company should be under a general obligation to provide discovery of all documents which are relevant to the issue of fair value of the shares is an issue of fundamental importance in relation to section 106 proceedings. The Plaintiffs and the Company take differing positions and in the circumstances the Court must decide this issue as a matter of principle and in order to clarify the position going forward.

15. Mr Moore KC, on behalf of the Company, contends that the Company should disclose to the Plaintiffs the documents it initially proposes to disclose, and then the discovery process should be led by the experts, not the parties. The Company proposes an expert-led process pursuant to which:

(1) Following their appointment, the experts should review all relevant publicly available information, including the SEC filings, and be provided with the Sumitovant due diligence materials, the Goldman Sachs materials and the Board, Audit & Special Committee materials.

(2) Thereafter, the duly appointed experts, with their overriding duties to the Court, professional objectivity and impartiality, should request from the Company and/or the Plaintiffs such further documents as *they* (that is to say, both of them) reasonably require.

(3) The parties shall respond promptly to any expert request addressed to them and in any event within 90 days. If a party is unwilling or unable to provide the documents sought by the expert's request, that party shall explain its position in writing to the experts and other parties (but not be under any obligation to provide the documents sought).

(4) Any disputes as to the documentation should be resolved by the Court with the benefit of evidence from the independent experts in the case on an application for specific discovery.

16. Mr Moore KC contends that the Plaintiffs' application for general discovery should be dismissed. He says that there is no reason to suppose that general discovery will assist the experts in opining on fair value. To the extent that the experts require documents beyond those publicly available and made available by way of initial disclosure, they can and should make targeted requests. Mr Moore KC argues that the Plaintiffs' approach amounts to a fishing expedition and is both unworkable, unfair and oppressive to the Company as well as unnecessary, disproportionate and premature. In this regard Mr Moore KC relies upon the following contentions:

(1) It is well-established in this jurisdiction (relying upon *Jardine Strategic Holdings* [2021] Bda LR 94) and in England and Wales that, absent allegations of fraud or wrongdoing, it is not necessary or appropriate to order general discovery of all documents potentially relevant to value in order for the court to be able to ascertain the fair value of a plaintiff's shares. General discovery as sought by the Plaintiffs is no more than a fishing expedition. But there is no reason to believe

that there is any material non-public information indicating that the US$ 27 merger price was unfairly low. As part of the merger proposal, and under SEC rules, the Company was required to disclose material (as yet) non-public information relevant to value. Still less is there reason to believe that, if there were such information, it will be elicited by general discovery but not by expert-led discovery. Whilst general discovery is highly unlikely to throw up material non-public information, it is likely to result in the discovery of vast amounts of irrelevant material which will not be deployed by the experts.

(2) It is unworkable because the exercise of identifying documents "*relevant to the determination of fair value*" involves a judgement call requiring the expertise of a valuation expert. The Company together with its legal advisers and a consulting expert valuer cannot determine all documents that the Plaintiffs think are documents which may be relevant to the determination of fair value of the Plaintiffs' shares as of the valuation date because the Plaintiffs have refused to disclose nearly anything about their theory of the case.

(3) Given that the issues have not yet been identified, it is in any case impossible for the Company (or anyone else) to comprehensively identify what documents might in due course be relevant to the Court's determination of fair value. Depending on the expert's views, approach to valuation and lines of enquiry, practically *all* documents *could* be relevant. However, on that assumption, general discovery is plainly oppressive to the Company.

(4) It follows that the inevitable consequence of an order for general discovery is discovery of a huge number of documents the vast majority of which will in the end *not* be relied upon in the expert valuation reports or by the court. That risk was vividly illustrated in *Re FGL Holdings* (19 April 2023) in the Cayman Islands where a wide-ranging discovery order led to the company having to review and produce over 3 million documents, which fell within the ambit of disclosure, but the dissenter's expert only referred to 125 documents from the Company's

discovery. General discovery is both disproportionate and not necessary for disposing fairly of the causes.

(5) Furthermore, before making an order for general discovery, the Court must identify both the necessity for and the proportionality of such an order. As the parties both seeking the order and bringing the claim, it is incumbent upon the Plaintiffs to put before the Court the material which would enable it to evaluate the necessity for and proportionality of such an order (relying upon RSC O. 28, r. 4(2) and O. 24, rr. 3(1) and 13). The Plaintiffs have not come close to doing so. Not only have they failed to give any indication as to what they consider to be fair value (or why) but they have failed so far to demonstrate the number of shares if any properly the subject of the action. Alpine in particular has given no indication in these proceedings as to how many shares it seeks appraisal for.

17. Mr Moore KC submits that directions of the kind sought by the Plaintiffs are not routinely (or, possibly, ever) sought or granted in other litigation. They can only be premised on the notion that the Court's role under section 106(6) of the Act is to conduct a root and branch forensic investigation into the affairs of the Company. He contends that is fundamentally the wrong approach since there is nothing uniquely special about determining the value of shares. Nor is there any reason why the valuation exercise under section 106(6) should be different from that which is conducted in other areas of the law.

18. Mr Moore KC contends that in appraisal proceedings under section 106 in *Re Jardine Strategic Holdings* this Court declined the dissenters' invitation to follow the "*settled approach of the Cayman Islands*" and did not order discovery of wide-ranging categories of documents together with general discovery. Instead, the Court ordered initial discovery of the valuation opinion of the financial advisers to the transaction committee together with any materials provided to them followed by expert-led disclosure. Mr Moore KC submits that the key reason why the Court considered wide-ranging discovery unnecessary in *Jardine Strategic Holdings* was because there were no credible allegations of wrongdoing or fraud.

19. The Court is unable to accept the general approach to discovery in relation to section 106 applications advanced by Mr Moore KC. In considering whether it is appropriate to require the Company to provide general discovery in relation to section 106 proceedings the Court has to take into account the relevant considerations which are peculiar to section 106 proceedings. These considerations include: (i) section 106 imposes upon the Court a statutory duty "*to appraise the fair value of [the dissenting shareholder's] shares*", which is necessarily a quasi-inquisitorial process, as opposed to an adversarial process where one party must prove a case and the other party only resist that case; (ii) the appraisal right given to dissenting shareholders in section 106 is granted by the legislature as the *quid pro quo* for the Company's ability to compulsorily acquire their shares; (iii) in order to determine fair value, the court needs to have all relevant information (which will include, amongst other matters, the projections of future revenues, the matters relevant to a DCF calculation, whether there is any material non-public information (MNPI) and the measures taken in the sale process including what was done as a market check and generally all communications with the financial advisers employed by the special committee); (iv) all this information will primarily be in the hands of the Company and its financial advisers; and (v) neither the Court nor the dissenting shareholders or the experts appointed by them, will know precisely what relevant information is in the possession of the Company which is required to be disclosed by the Company in order to allow the Court to properly discharge its statutory duty in relation to section 106 proceedings.

20. In considering whether it is appropriate to require the Company to provide general discovery the Court is required to keep firmly in mind the above considerations relating to section 106 proceedings. In the ordinary case, the above considerations in relation to section 106 proceedings will require that the Company should provide general discovery of all relevant information in its possession in relation to the issue of the fair valuation of the shares. This is consistent with the approach taken by the Cayman courts in relation to appraisal actions under section 238 of the Companies Law (2016 revision).

21. This Court did not hold in *Re Jardine Strategic Limited* that it is *only* appropriate to require the Company to provide general discovery in relation to section 106 proceedings where the Court is satisfied that there is a credible suggestion of wrongdoing and the forensic audit is warranted to uncover that wrongdoing. In *Jardine Strategic* the Court referred to the Cayman authorities in *FGL Holding* (FSD 184 of 2020), Parker J, *JA Solar Holding Co Ltd* (FSD 153 of 2018), Smellie CJ, *Qihoo Technology Co Ltd* (2) CILR 585, Martin JA, and the *Practice Direction* in relation to appraisal actions, all emphasising the necessity of requiring the Company to provide general discovery of all relevant documents in relation to the issue of the "*fair value*" of the shares. In relation to the Cayman authorities the Court stated at [64]:

> *"The Cayman authorities relied upon by Mr Levy QC, provide valuable insight in relation to the effective management of appraisal actions. These authorities emphasise that in assisting the expert valuers to give their opinion on fair value it is necessary for the Court to ensure that the expert valuers are provided with all the necessary relevant documentation and information. The Cayman authorities recognise the crucial importance of providing and the fact that this information inevitably will be in the possession of the company."*

22. The Court declined to make a general discovery order in *Jardine Strategic* on the basis that it was a wholly exceptional case. The Court so held at [74]-[76]:

> *"74. In considering the discovery issue the Court is bound to keep firmly in mind that this is a wholly exceptional business enterprise in terms of its size and the complexity of the structure. As noted earlier, the Group comprises 7 principal subsidiaries (5 of which are publicly listed companies) with over 400,000 employees. The consolidated revenues for the Group for the year ended 31 December 2020 were US$ 32 billion and its market capitalization is approximately US$ 38 billion.*
>
> *75. The Company itself is merely an intermediate holding Company, holding shares in publicly listed companies. The Company does not itself operate any business and has no employees.*

> *76. The valuation exercise in this case does not relate to a single silo operating company. As noted earlier, the Group's structure is a series of pyramids within a larger overall pyramid, with Jardine Matheson at the top. There are approximately 1,150 companies within the Group."*

23. In *Glendina Pty Limited v NKWE Platinum Ltd* [2022] SC (Bda) (31 March 2022) the Court made it clear that in the ordinary case in relation to section 106 proceedings the company can be expected to provide discovery of "*all documents relevant and potentially relevant to assessing its value*." At [44] the Court held:

> *"In relation to the reliance upon "very extensive discovery", the Court accepts Ms Tildesley's submission that it would or should have been known to the Company at the time of the agreement to the existing security that they would need to give discovery and that, as is the norm in appraisal actions, that discovery would be significant and would include all documents relevant and potentially relevant to assessing its value.*

24. In considering the Cayman authorities the Court notes that there is no material difference between Cayman section 238 and the Bermuda section 106 in relation to the Court's duty to appraise fair value. Section 238(11) of the Cayman Companies Act provides that "*the Court shall determine the fair value of the shares of such dissenting members…*". Section 106(6) of the Bermuda Companies Act allows for dissenting shareholders to "*apply to the Court to appraise the fair value of his shares*" (emphasis added). The Court agrees with Mr Millett KC that there can be no substantive distinction between the words "*the Court shall determine*" and "*the Court to appraise*": both formulations clearly impose the burden on the Court to make the determination/appraisal of fair value.

25. The approach to discovery in the Cayman authorities is clearly strongly influenced by the particular considerations which apply to appraisal actions. Thus, in *Re Quanar Cayman Islands Limited* (20 July 2017) Parker J emphasised that the dissenting shareholders are essentially outsiders and, in the circumstances, it is appropriate that the company, which

has the documents and information, should be under a general obligation to provide discovery of all relevant documents. At [22]-[28] Parker J held:

> *"22. The Company should give discovery by uploading all documents that are relevant to fair value, after having first uploaded to the data room the specific classes of documents which came into being in the course of the take private process, which it should have readily available. This is the usual order and I can see no good reason to depart from it in this case.*
>
> *...*
>
> *25. This seems to me to be in keeping with the Court's approach in these types of cases. I do not think the Company should be made to do so only if an expert requires further documents and asks for them, rather it should be a general obligation of the Company to search for and produce all documents relevant to fair value.*
>
> *26. I bear in mind that the Company will know what documents it has, whilst the dissenting shareholders will not. They are essentially outsiders and if the Company is to be properly valued as a going concern they must have access to the information that the Company has, both with regard to its existing business and future projections.*
>
> *27. Whilst the question of relevance is primarily one for the experts, the Company should have a general obligation to produce information and documents of relevance to value based upon which the experts can, if they deem it necessary, ask for further specific information.*
>
> *28. It is not appropriate therefore to limit the Company's discovery to the documents listed in schedule A of the Company's draft order and then to rely on only searching for and producing further documents relevant to valuation on the basis that they are asked for. In addition and as is well known, discove1y is an ongoing obligation.*"

26. In the Cayman Court of Appeal in *Re Qunar* [2018 (1) CILR 199 (CICA)], Rix JA considered at [45] that the company must know what documents are relevant since it has put forward the merger price:

> *"45…It is the Company itself which has put forward a price for the merger buy-out of its shares, and it has done that on the basis of its own internal assessment*

*of its business and its prospects. For these purposes it knows better than anyone else the documentary material which is relevant to its assessment."*

27. The recent decision of the Cayman Court of Appeal in *Re Trina Solar Limited* (unreported, 4 May 2023) restates many of the points made in the earlier cases and emphasises the critical importance of the company giving general discovery of all relevant material in relation to the issue of the fair value:

> *"255…The court's duty on section 238 applications is to determine the fair value of the shares in question. In order to determine fair value, the court needs to have all the relevant information. This will include, amongst other matters, the projections for future revenues, the matters relevant to a DCF calculation, whether there is any MNPI and the measures taken in the sale process including what was done as a market check and generally all communications with the financial advisers employed by the special committee.*
>
> *256. All of this information will primarily be in the hands of the company and its financial advisers; dissenting shareholders are unlikely to have much information other than that in the public domain. It is therefore the duty of the company to provide the court with all this information so that the court can fulfil the duty imposed on it under section 238.*
>
> *257. It follows that the court should make wide ranging orders for discovery as was done in this case. The company must comply fully with such an order and must also produce a witness or witnesses who can speak with knowledge about all the relevant matters for assessing fair value, including those mentioned above.*
>
> *258. Whilst there is always the possibility of dissenting shareholders applying for specific or further discovery, this should not normally be necessary. The obligation to make all relevant documents available to the court (and therefore the dissenting shareholders) rests upon the company and it is the company which should take the consequences if it fails in this obligation."*

28. The Cayman cases have consistently held, and the Court agrees that the information requests made by the experts are not an appropriate substitute for general discovery. Thus, in *FGL Holdings* (18 December 2020) Parker J held:

> *"18. The company is also seeking to shift the burden of disclosure to the Information Request phase where the experts, if they identify material relevant to their task, can ask further questions about it and call for further documents which will refine further the particular scope. To that extent a question of not only proportionality but also principle arises.*
>
> *19. The company's discovery obligations are usually addressed by the established practice for categories to be identified of the documents that the company possesses that are likely to contain relevant material. That is what has happened in this case as well.*
>
> *20. This practice should not in principle be put over to the Information Request process, which is designed to elicit specific information and answers based upon the experts' prior and ongoing review of the relevant discovery."*

29. In the circumstances, the Court is satisfied that the considerations which apply to section 106 proceedings as set out at paragraph 19 above, necessitate that the company, as a general rule, should be required to provide general discovery of all documents and information which are relevant to the issue of the fair value. There is no evidence before the Court which would lead it to conclude that the general rule should not apply in this case. Accordingly, the Court orders that the Company shall upload to the Data Room, within 180 days of the date of the Order, all Documents (as defined in the draft orders) within the Company's possession, custody or power created since October 2019 which are relevant to the determination of the fair value of the Plaintiffs' shares in the Company as at the valuation date. The Court has noted that the Plaintiffs may make a further application to extend the look-back period beyond October 2019, if it becomes necessary to do so.

30. As a guide to complying with its obligation to give general discovery, the Company should seek to comply with the requests set out in Appendix 2 to the previous draft of the Directions Order provided by the Plaintiffs. In the event the parties are unable to agree in relation to a particular provision of Appendix 2 they are at liberty to make an application to the Court.

**Statement of Grounds**

31. Mr Moore KC submits that the Court should make an order requiring the Plaintiffs, following the initial discovery, to provide Statement of Grounds setting out the grounds explaining why they claim that they have not been offered fair value for their shares in the Company. The Company contends that Statement of Grounds should (i) include in summary form any material facts and valuation methodologies and principles on which the Plaintiffs rely and (ii) identify and append any key documentary evidence relied upon.

32. Mr Moore KC contends that there are good reasons for ordering the Plaintiffs to provide Statement of Grounds:

(1) First, whilst neither party bears the legal burden of proof, appraisal proceedings are plainly adversarial, not inquisitorial, proceedings. Each side will run a positive case at trial as to why the merger consideration was "*fair*" or "*unfair*". Any suggestion by the Plaintiffs to the contrary is wholly unrealistic. A party will bear the evidential burden of proof in respect of any positive case on the facts.

(2) Second, it follows that, as a matter of procedural fairness, the Company should know what the Plaintiffs' case at trial will be. The Company (and its expert) have to understand the issues in dispute before factual and expert evidence is prepared or filed. The proposal for a Statement of Grounds is intended to ensure effective case management and preparation.

(3) Third, a requirement that the Plaintiffs set out the grounds on which they contend the merger price was "*unfair*", together with the key facts and reasons supporting those grounds, does not impose a legal or persuasive burden on the Plaintiffs.

(4) Fourth, the Plaintiffs are naturally first in line to provide their positive case. They must explain why they are "*not satisfied*" that they have been offered fair value for their shares. The Plaintiffs' "*dissatisfaction*" is part of the conditions to standing under section 106 (in addition to the condition that a shareholder "*did not vote in favour of the amalgamation or merger*").

33. Mr Moore KC urges the Court to order the Statement of Grounds on the basis that it would allow identification of the issues in dispute in the case the Company has to meet at the trial *before* factual and expert evidence is due. He adds that the Company does not seek to suggest that the Statement of Grounds is set in stone and incapable of modification. However, as with pleadings, any amendments should either be by consent or subject to the court's overview. That approach, he says, ensures that the Company is not unfairly prejudiced in its case preparations.

34. The Court does not accept Mr Moore KC's submission that to require the Plaintiffs to file Statement of Grounds will assist the Court in the discharge of its statutory duty in section 106 proceedings. First, the submission wrongly assumes that it is for the Plaintiff to explain to the Court and to the Company why they think the price offered by the Company is "*unfair*". There is no such obligation upon the dissenting shareholders under section 106. As noted earlier, the Court's statutory duty is not to rule on whether one party or another has made good its particular case as to what that "*fair value*" is or is not. As explained by Parker J in *RE Qunar* [2019] (1) CILR 611at [55]:

> "*The court will use its usual methods of resolving disputed questions of fact and expert evidence. Neither party bears the burden of proving the fair value of the shares. The proper approach to the resolution of the various matters in dispute is that the onus is upon each party to adduce evidence establishing, on the balance of probabilities, the correctness of any contention relied upon.* ***There is no burden generally on dissenters to show that the value offered by the company is unfair, or on the company to show that it was fair.*** *In fact in this case the*

*Company argues that the Merger Consideration offered was more than fair*" (emphasis added).

35. The Court accepts Mr Millett KC's submission that the correct way to think about section 106 of the Act is as a statutory safeguard for dissenting shareholders whose shares have, by statutory power, been expropriated from them against their will in circumstances where they have no power to block the merger (as they might in schemes of arrangement). That statutory safeguard operates by devolving to the Court, through the statutory appraisal process, the power and duty of establishing the fair (i.e. "*true*") value of those shares. The Court accepts that if a dissenting shareholder had to identify some basis for disputing the merger price offered by the company, the section loses much of its safeguarding character and would tilt the field in favour of the company. Indeed, in many cases the dissenting shareholders may not be in a position, prior to the receipt of the expert report, to articulate by way of Statement of Grounds why they contend that the price offered by the company is "*unfair*". It is also noted that, according to Mr Moore KC, the Statement of Grounds can only be amended by the dissenting shareholders either with the consent of the company or by way of a contested application to this Court. Having regard to these considerations the Court is satisfied that to require the Plaintiffs to file Statement of Grounds would not assist the court in discharging its statutory duty under section 106. The Court accordingly declines to give a direction in the terms suggested by paragraph 11 of the Company's Draft Directions.

**The Plaintiffs' Discovery**

36. In relation to the Plaintiffs' discovery the Court directs as follows by reference to paragraph 6 of the proposed Order by the Company (Tab 15.1).

37. The Court orders in terms of Paragraph 6.1 which provides: "*The Plaintiffs shall upload to the Data Room within 45 days of this order: All Documents indicating the history of*

*the Plaintiffs' dealings in shares in the Company between 27 October 2016 and 10 March 2023, including documents which specify the date(s) and price(s) of all trades and the name, including any broker or street name, in which such shares were held*".

38. The Court orders paragraph 6.2 which provides: "*All documents related to the ownership of and voting instructions given in relation to the 8,425,084 shares in respect of which the Plaintiffs claim appraisal rights*", but discovery is limited to the documents which are in the *possession* of the Plaintiffs. The Court makes this limited order given that Mr Moore KC contends that this documentation may show whether any instructions were given by the Plaintiffs in relation to their beneficial ownership of the shares and his contention that this may be relevant to the Plaintiffs' standing in relation to these section 106 proceedings.

39. The Court makes an order in terms of paragraph 6.3, as agreed by the parties: "*All documents within the Plaintiffs' possession, custody or power reflecting or relating to any valuations, or similar analysis, of the Company or the Company's shares that the Plaintiffs prepared, reviewed or considered*."

40. The Court declines to make an order in terms of paragraph 6.4 ("*All other documents touching (whether expressly or not) on the Plaintiffs' consideration as to the value of the shares in the Company*"), as the Court is not persuaded that paragraph 6.4 adds anything of substance to the terms of previous paragraph 6.3.

**Non-Disclosure and Confidentiality Agreement**

41. The Plaintiffs and the Company are directed to agree and sign a non-disclosure and confidentiality agreement within 7 days of the date of the Order made by this Court, failing which any party may make an application to the Court for appropriate relief.

**The Company's Obligation to Upload Documents to the Data Room**

42. The Company shall upload to the Data Room, within 30 days of the date of this Court's Order (regardless of whether the non-disclosure and confidentiality agreement has been signed by the parties), all documents within the Company's possession, custody or power, listed in paragraph 5.1, 5.2.1, 5.2.2 and 5.2.3 of the Company's Draft Directions Order.

43. The Company shall upload to the Data Room, within 180 days of the date of the Order, all documents within the Company's possession, custody or power, which are otherwise relevant to the issue of fair value of the Company's shares.

**Information Requests by the Experts**

44. The Court has reviewed the respective position of the Plaintiffs and the Company and directs that the party receiving the request is obliged to comply with it within 28 days of its receipt and that if a party fails to comply with the request, it is the obligation of that party to make the necessary application to the Court. Accordingly, the Court orders that: "*If either party is unable or unwilling to provide the documents and/or information that is the subject of an Information Request within 28 days of the request, that party shall apply to the Court to be relieved of the obligation to comply with the request and/or to extend the time for complying with the request…"*

**Discovery Completion Date**

45. Given that discovery in section 106 proceedings is an ongoing obligation the Court does not consider it appropriate to require that "*The parties shall use their best endeavours to agree the date when discovery has been completed pursuant to paragraph 19…, Failing which any party may apply to the Court for further directions."*

**Factual Evidence**

46. The Court directs that the Company should file its factual evidence first followed by the factual evidence to be filed by the Plaintiffs. The Company shall have the right to file reply factual evidence.

47. The Court does not consider it appropriate at this stage to give a direction that the parties be at liberty to file further factual evidence after the exchange of supplemental experts' reports as provided for at paragraph 14 of the Company's Draft Directions. This issue was considered by Parker J in *EHI Car Services Limited* (FSD 115 of 2019) where at [58] he held to file factual evidence after the experts' reports served no useful purpose:

> *"The factual evidence,…, will not be likely to comment on fair value questions, but will be important in relation to decisions made in the commercial reality in which the company operated and was projected to operate. It is important for the experts to consider such evidence when they're themselves reviewing the disclosure materials and they can then have an opportunity to ask questions arising out of the factual evidence reviewed as a whole. It does not seem to me to be necessary or appropriate for the company to provide factual witness evidence "in reply" at the stage when the experts will not be able to properly comment on it or interrogate it by making further information requests. I do not consider that it is necessary for the company to put forward factual evidence at the end of the information request process to deny or explain issues: see also Mangatal J at para 23 and 24 of Homeinns 2017 (1) CILR 206 reaching the same conclusion and the Chief Justice in JA Solar at para 78 (c)."*

48. Following the filing of the reply factual evidence, any party who wishes to adduce additional expert evidence shall advise the other parties within 28 days and thereafter make the necessary application to the Court for leave to adduce further expert evidence.

**Expert Evidence**

49. The Court makes an order in terms of paragraphs 15 and 16 of the Company's Draft Directions except that the time limited for the appointment of the valuation experts is reduced from 45 days to 28 days.

50. The Court directs that the expert reports be exchanged simultaneously by the Plaintiffs and the Company.

51. The Court further directs in terms of paragraph 21 of the Plaintiffs' Draft Directions that the valuation experts shall meet at a mutually convenient time, but no later than 28 days after the exchange of the expert reports, to discuss the differences between their respective reports with a view to narrowing the issues between them and producing the Joint Memorandum.

**Data Room Access**

52. The Court directs that the Company will initially bear the cost of 4 user accounts per Plaintiff (such costs ultimately to be costs in the proceedings). The Plaintiff shall initially bear the cost of any additional user accounts they may require and the Company will arrange for such costs to be charged by the Data Room provider to the Plaintiffs directly (such costs ultimately to be the costs in the proceedings).The Court encourages the parties to come to an accommodation in relation to bulk downloads - at least in relation to documents which are not highly sensitive.

**Management Meetings**

53. The Court defers the consideration of the issue whether the valuation experts shall be entitled to meet with the Company's management, for the purpose of obtaining information relevant to the preparation of the Valuation Reports, to a later date when the Court is in a position to appreciate the scope of the information sought by the experts from the management of the Company.

54. The Court will hear the parties in relation to the issue of costs, if required and any other outstanding issue in relation to directions.

Dated this 25th day of August 2023

NARINDER K HARGUN

CHIEF JUSTICE