# Exhibit 3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Application of<br><br>FourWorld Global Opportunities Fund, Ltd., FourWorld Event Opportunities, LP, FourWorld Special Opportunities Fund, LLC, FW Deep Value Opportunities Fund I, LLC, Corbin ERISA Opportunity Fund, Ltd. and Harspring Capital, LP,<br><br>Petitioners, for an Order pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in Foreign Proceedings. | Index No.  1:25-mc-00075 |

### DECLARATION OF DELROY B. DUNCAN KC IN SUPPORT OF THE APPLICATION FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C.

I, Delroy B. Duncan KC, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      Trott & Duncan represents FourWorld Global Opportunities Fund, Ltd., FourWorld Event Opportunities, LP, FourWorld Special Opportunities Fund, LLC, FW Deep Value Opportunities Fund I, LLC and Corbin ERISA Opportunity Fund, Ltd. ("**FourWorld**") and Harspring Capital, LP ("**Harspring**", and together with FourWorld, "**Petitioners**"), the plaintiffs in the appraisal proceedings 2024: Nos. 333 and 334 (the "**Appraisal Proceedings**") before the Supreme Court of Bermuda (the "**Bermuda Supreme Court**") brought by Petitioners to determine the fair value of their shareholdings of Enstar Group Limited ("**Enstar**" or the "**Company**") pursuant to Section 106(6) of the Bermuda Companies Act of 1981 (the "**Companies Act**").

2.      I am a Director and Founding Partner of the law firm Trott & Duncan, a Bermuda Law firm.  By submitting this declaration, I express my opinion on matters of Bermuda law in support of the Petitioners' application pursuant to 28 U.S.C. § 1782 ("**Section 1782**") to obtain

1

discovery for use in the Appraisal Proceedings (the "**Application**") from Barclays Bank PLC ("**Barclays**" or the "**Respondent**").

3.      To the extent the contents of this declaration are within my personal knowledge, they are true and accurate.  To the extent the contents are not within my personal knowledge, they are true to the best of my current knowledge, information and belief.

*My academic qualifications and professional work experience*

4.      I am a barrister and attorney and have been licensed to practice law in Bermuda since 1989.  I was called to the Bar of England and Wales in London in 1984. In March 2020, I was appointed Queen's Counsel in England (now King's Counsel).

5.      I was educated at the London Metropolitan University and the London School of Economics and Political Science.  In January 2016, I was appointed as an Assistance Justice of the Bermuda Supreme Court.  I have appeared in over a hundred reported cases in the Bermuda Supreme Court, the Court of Appeal of Bermuda, the Court of Appeal of the United Kingdom and His Majesty's Privy Council.

6.      At Trott & Duncan, my practice focuses on litigation arising out of company and commercial disputes, public law and constitutional law cases and human rights issues.

7.      I have appeared in appraisal proceedings under sections 103 and 106 of the Companies Act before the Supreme Court of Bermuda and the Court of Appeal of Bermuda. These cases included contested directions applications, contested stay of proceedings applications, various interlocutory applications seeking declarations and disclosure of documents, and the trial of a fair value appraisal application.

8.    I have provided expert written testimony on Bermuda law for the courts of the United States, Hong Kong, Singapore and the United Kingdom across various legal areas and issues concerning appraisal proceedings, commercial law, company law and insolvency law.

9.    In addition to my full-time practice as an attorney, I have been a Fellow of the Chartered Institute of Arbitrators since 1997 and sit on local and international arbitrations both as a sole arbitrator and as a member of a panel of arbitrators.  I am a certified as a trained mediator (Notre Dame Law School, Indiana, 2008), Social Justice Mediator (Social Justice Mediation Institute, Bermuda 2013) and Human Rights mediator.  I have acted for the Bermuda Human Rights Commission in various cases and been appointed as a Human Rights mediator.  From 2011 to 2013, I served as the President of the Bermuda Bar Association.  I am also an Associate Member of Cloisters Chamber and a Member of the Honourable Society of Gray's Inn.

### *Exhibits to this declaration*

10.    I refer to the following filings in the Appraisal Proceedings, true and correct copies of which are appended as Exhibits 1 and 2:

  a.  FourWorld's Originating Summons in Action 2024: No. 333 before the Supreme Court of Bermuda (**Exhibit 1**); and

  b.  Harspring's Originating Summons in in Action 2024: No. 334 before the Supreme Court of Bermuda (**Exhibit 2**).

11.    Throughout the course of my declaration, I also refer to several judgments of the Bermuda, Cayman Islands and English courts, as well as the Rules of the Bermuda Supreme Court ("**RSC**"), true and correct copies of which are appended as Exhibits 3 to 26:

  a.  *Golar LNG Limited v. World Nordic SE*, [2011] Bda L.R. 9 (**Exhibit 3**);

  b.  *Qihoo 360 Technology Co. Ltd*., 2017 (2) CILR 585 (**Exhibit 4**);

3

c. *In the Matter of Integra*, FSD 92 of 2014 (Unreported 28 August 2015) (**Exhibit 5**);

d. *Qunar Cayman Islands Limited v. Athos Asia Event Driven Master Fund et al.*, 2018 (1) CILR 199 (**Exhibit 6**);

e. *Re Nord Anglia Education, Inc.*, CICA 24 of 2017 (Unreported, 17 March 2020) (**Exhibit 7**);

f. *Re Trina Solar Limited,* FSD 92 of 2017 (Unreported, 23 September 2020) (**Exhibit 8**);

g. RSC Order 24, rules 1, 3 and 7 (**Exhibit 9**);

h. RSC Order 32 rule 7 (**Exhibit 10**);

i. *Panayiotou v. Sony Music Entertainment (UK) Ltd.*, [1994] Ch. 142 (1993) (**Exhibit 11**);

j. *NetBank v. Commercial Money Centre*, [2004] Bda L.R. 46 (**Exhibit 12**);

k. *The Patriot Group, LLC v. Hilco Financial*, LLC and others, [2015] Bda L.R. 46 (**Exhibit 13**);

l. *South Carolina Insurance Co. v. Assurantie Maatschappij*, [1987] A.C. 24 (**Exhibit 14**);

m. *Dreymoor Fertilisers Overseas Pte Limited v. Eurochem Trading Gmbh & Ors*, [2018] EWCH 2267 (Comm) (**Exhibit 15**);

n. *Apex Fund Services Ltd. and anor. v. Matthew Clingerman and anor*, [2019] SC (Bda) 74 Com (**Exhibit 16**);

o. *Hiscox v. Yuval Abraham*, (2018) Bda L.R. 88 (**Exhibit 17**);

p. *Lyxor Asset Management S.A. v. Phoenix Meridian Equity Limited*, [2009] CILR 553 (**Exhibit 18**);

q. *Re Trina Solar Limited*, CICA (Civil) Appeal No. 009 of 2021, dated May 4, 2023 (**Exhibit 19**);

r. *Walter Tzvi Soriano v (1) Forensic News LLC (2) Scott Stedman* [2023] EWHC 262 (KB) (**Exhibit 20**);

s. *Compagnie Financière et Commerciale du Pacifique v Peruvian Guano Co* (1882) 11 QBD 55 (**Exhibit 21**);

t. *In the Matter of Myovant Sciences Ltd.* (August 25, 2023) (**Exhibit 22**).

u. *Walsh and Taal v Horizon Bank International Ltd.*, BM 2008 SC 4 (**Exhibit 23**);

v. *Modulable et Al v Butterfield Trust (Bermuda) Ltd.*, BM 2013 SC 45 (**Exhibit 24**);

w. *Terceira v Terceira et Al,* BM 2010 SC 58 (**Exhibit 25**);

x. Notes to RSC Order 24, r.1(1) in the 1999 "White Book" (**Exhibit 26**); and

y. *Glendina Pty Ltd. & Others v. NKWE Platinum Ltd.* (February 4, 2025) (**Exhibit 27**).

## I.    The Transaction

12.    The Petitioners are shareholders of the Company and the only dissenting shareholders who have initiated appraisal proceedings against the Company.  FourWorld, a series of investment funds managed by SEC registered adviser FourWorld Capital, LLC, holds 208,100 ordinary shares in the Company. Ex. 1, ¶ 1.  Harspring, an investment fund managed by New York-based Harspring Capital Management, LLC, holds 62,000 ordinary shares in the Company. Ex. 2, ¶ 1.1.

5

13.     Enstar is an exempted company limited by shares under the laws of Bermuda, with executive offices at A.S. Cooper Building, 4th Floor, 26 Reid Street, Hamilton, HM 11, Bermuda. Founded in 1993, Enstar is a leading global (re)insurance group that offers innovative capital release solutions through its network of group companies in Bermuda, the US, the UK, Continental Europe, and Australia.  Its core focus is acquiring and managing (re)insurance companies and portfolios of (re)insurance businesses in run-off.  Since 2007, Enstar's shares have been, and still are, listed on the NASDAQ Stock Market under the ticker symbol "ESGR."

14.     On October 11, 2024, the Company filed a proxy statement with the SEC (the "**Proxy Statement**") along with the Agreement and Plan of Merger, dated as of July 29, 2024, by and among the Parent, Elk Merger Sub Limited, Enstar, Deer Ltd. and Deer Merger Sub Ltd., pursuant to which the Company, certain wholly owned subsidiaries of the Company and a wholly owned subsidiary of the Parent intend to effect a series of mergers, with the Company surviving such mergers as a wholly owned subsidiary of Parent ("**Merger Agreement**").  The Proxy Statement is attached to the Declaration of Damian Vallejo (the "**Vallejo Decl.**") as Exhibit 2. Sixth Street Partners, LLC ("**Sixth Street**" or the "**Buyer**"), a global investment firm, has provided or will provide equity finance to its affiliates Elk Merger Sub Limited and Parent in the amount of $3.512 billion for executing the Merger. Vallejo Decl., Ex. 2, p. 99 (Financing of the Mergers – Equity Financing).

15.     Once the mergers contemplated by the Merger Agreement are finalized, each holder of Enstar's ordinary shares (with par value $1.00 per share) will be entitled to receive a total of $338 in cash per share, without interest. *Id.*, p. 9 (Merger Consideration).

16.     Following the Proxy Statement's filing, a special general meeting was held with certain Enstar shareholders voting to approve the merger.

6

## II.    Barclays and its Role *vis-à-vis* the Transaction

17.    Barclays is a multinational universal bank.  Barclays has committed to providing debt financing to Parent, consisting of a senior secured term loan facility in an aggregate principal amount of up to $950 million to finance the Mergers and the payment of related fees and expenses (the "**Term Loan Facility**"). (*Id.,* p. 18.)  Barclays has also agreed to provide a senior secured backstop revolving credit facility in an aggregate principal amount of up to $2.2 billion that would be available to Parent and used to replace commitments and/or cash collateralize obligations outstanding under certain existing debt agreements of the Company and its subsidiaries, in each case (the "**Backstop Revolving Facility**"). *Id.*

18.    In addition to being the debt-financing provider, Barclays has also acted as financial advisor to the acquirer, Sixth Street. (*Id.*, Ex. 3, p. 2.)

## III.    Status of the Appraisal Proceedings

19.    On November 8, 2024, Petitioners exercised their appraisal rights and filed Originating Summonses in the Bermuda Supreme Court against the Company seeking a determination of the fair value of their ordinary shares in the Company under Section 106(6) of the Companies Act. Exs. 1 and 2.

20.    Following the filing of the Originating Summonses, and absent agreement on directions, the next procedural step for the Appraisal Proceedings will be for the parties to attend a "directions hearing," which will result in a ruling and order that will set the parameters for discovery vis-à-vis Petitioners and the Company, and the general schedule for the case.  The listing of that directions hearing will be subject to the availability of the Court.

## IV.     The Scope of Discovery in the Appraisal Proceedings

21.     Shareholder appraisal proceedings in the compulsory purchase context in Bermuda have, historically, been less common than in other jurisdictions, such as the Cayman Islands and Delaware.  For that reason, Bermuda case law surrounding appraisal proceedings is comparatively less developed.  However, because the Cayman Islands is, like Bermuda, an offshore financial centre and British Overseas Territory (sharing the same ultimate court of appeal, the Judicial Committee of the Privy Council based in London, and also some common judges), the Bermuda Supreme Court will look to Cayman Islands law as persuasive authority in the absence of Bermudian or English precedents on a particular issue of law.  *See Glendina Pty Ltd. & Others v. NKWE Platinum Ltd.* (February 4, 2025), Ex. 27, ¶ 290 ("In this case, the Court is guided by the approach taken in one case in Bermuda under section 103 of the Companies Act 1981 and in the Cayman Islands under similar legislation.").  Decisions of the Privy Council are binding on the lower Bermuda courts.

22.     English law—from which Bermuda derives its common law system—is considered highly persuasive.  Furthermore, decisions of the Supreme Court of the United Kingdom ("**UKSC**," formerly known as the House of Lords) are generally considered to be *de facto* binding on the Bermuda Supreme Court and are thus likely to be followed, given the statute of the UKSC and as the judges that sit on the UKSC concurrently sit on the "Judicial Committee" of the Privy Council, the highest appellate court for Bermuda, the Cayman Islands, and other British Overseas Territories.  However, as England does not have a statutory provision similar to Section 106(6) of the Companies Act, the Bermuda Supreme Court is more likely to take into account decisions of the Cayman Islands in relation to shareholder appraisal proceedings (in the compulsory purchase context) as the Cayman Islands has a similar statutory provision in the form of Section 238 of the

8

Cayman Islands Companies Act with developed jurisprudence in the determination of such cases. This can be seen from the decision of the Bermuda Supreme Court *In the Matter of Myovant Science Ltd.* (August 25, 2023) (Ex. 22) and *Glendina Pty Ltd. & Others v. NKWE Platinum Ltd.* (February 4, 2025) (Ex. 27), where the reasoning of many Cayman Islands decisions was adopted.

23.     The RSC govern various aspects of court procedures in civil matters in Bermuda. The rules applicable to discovery in Bermuda civil proceedings are set out in RSC Order 24.  Under RSC Order 24, rule 3(1) (Ex. 9), unless the Court orders otherwise, parties to Bermuda proceedings are obliged to what is known in Bermuda as "general discovery."  This means providing discovery of all "*documents which are or have been in [a party's] possession, custody or power relating to any matter in question in the action*."  Parties are not obliged to produce documents from third parties that are not otherwise in their own "*possession, custody or power.*"

24.     The requirement for extensive disclosure is reinforced by the "*train of enquiry*" principle, which stems from a long-standing and well-regarded decision of the English Court of Appeal in *Compagnie Financière et Commerciale du Pacifique v Peruvian Guano Co* (1882) 11 QBD 55 (Ex. 21) (generally referred to by lawyers and judges as "*Peruvian Guano*") which has been approved and followed in several Bermuda cases.[1]  In *Peruvian Guano*, Lord Justice Brett held as follows:

> "I think it obvious from the use of these terms ["a document relating to any matter in question in the action"] that the documents to be produced are not confined to those, which would be evidence either to prove or to disprove any matter in question in the action ... The doctrine seems to me to go

---

[1]     *See Walsh and Taal v Horizon Bank International Ltd.*, BM 2008 SC 4 (Ex. 23); *Modulable et Al v Butterfield Trust (Bermuda)* Ltd. BM 2013 SC 45 (Ex. 24); *Terceira v Terceira et Al* BM 2010 SC 58 (Ex. 25) and the notes to RSC Order 24, r.1(1) in the 1999 "White Book" (Ex. 26). (The commentary in the 1999 White Book is often referred to in Bermuda as in practice it is the most "recent" commentary on the RSC. The RSC are derived from the English Rules of the Supreme Court which were replaced in England by the Civil Procedure Rules in 1999.)

farther than that … It seems to me that every document relates to the matters in question in the action, which not only would be evidence upon any issue, but also which, it is reasonable to suppose, contains information which may – not which must – either directly or indirectly enable the party … either to advance his own case or to damage the case of his adversary.  I have put in the words "either directly or indirectly", because, as it seems to me, **a document can properly be said to contain information which may enable the party requiring the affidavit either to advance his own case or to damage the case of his adversary, if it is a document which may fairly lead him to a train of inquiry, which may have either of these two consequences**" (Ex. 21, pp. 62 to 63) (emphasis added).

25.     In addition to general discovery, RSC Order 24, rule 7 provides that parties may seek "specific discovery" to supplement general discovery. Ex. 9.

26.     In the decision of the Bermuda Supreme Court of *In the Matter of Myovant Sciences Ltd.* (Ex. 22), the company argued that general discovery should not be ordered, and that rather the discovery process should instead be expert-led and respond only to targeted requests.  The Bermuda Supreme Court rejected this and reaffirmed, consistent with the Cayman Islands authorities, that general discovery is the default position in appraisal proceedings.  The Bermuda Supreme Court's reasoning at ¶¶ 19-29 is instructive as to the necessity of the Bermuda Court having before it all the relevant information to appraise the fair value of shares.  For example, at ¶ 19, the Bermuda Supreme Court held that:

> In considering whether it is appropriate to require the Company to provide general discovery in relation to section 106 proceedings the Court has to take into account the relevant considerations which are peculiar to section 106 proceedings.  These considerations include: (i) section 106 imposed upon the Court a statutory duty "*to appraise the fair value of [the dissenting shareholder's] shares*", which is necessarily a quasi-inquisitorial process, as opposed to an adversarial process where one party must prove a case and the other party only resist that case; (ii) the appraisal right given to dissenting shareholders in section 106 is granted by the legislature as the quid pro quo for the Company's ability to compulsorily acquire their shares; (iii) in order to determine fair value, the court needs to have all relevant information (which will include, amongst other matters, the projections of future revenues, the matters relevant to a DCF calculation, whether there is

any material non-public information (MNPI) and the measures taken in the sale process including what was done as a market check and generally all communications with the financial advisers employed by the special committee); (iv) all this information will primarily be in the hands of the Company and its financial advisers; and (v) neither the Court nor the dissenting shareholders or the experts appointed by them, will know precisely what relevant information is in the possession of the Company which is required to be disclosed by the Company in order to allow the Court to properly discharged its statutory duty in relation to Section 106 proceedings.

27.    In *Myovant Sciences Limited*, the Court referred to the Cayman Islands Court of Appeal ("**CICA**") decisions in *Re Trina Solar Limited*, CICA (Civil) Appeal No. 009 of 2021, dated May 4, 2023 (Ex. 19), which "restates many of the points made in the earlier cases and emphasizes the critical importance of the company giving general discovery of all relevant material in relation to the issue of the fair evaluation" and inter alia quoted that "the court should make wide ranging orders for discovery as was done in this case.  The company must comply fully with such an order and must also produce a witness or witnesses who can speak with knowledge about all the relevant matters for assessing fair value, including those mentioned above." *In the Matter of Myovant Sciences Ltd.*, Ex. 22, ¶ 27.

28.    A Bermuda judge will not consider himself or herself to be an expert in share valuation.  Instead, the judge will be guided by the valuation experts appointed by the Company and by the Petitioners (acting as dissenting shareholders in the Appraisal Proceedings), who will provide their expert opinions and testimony on the fair value of the Petitioners' shares. *See*, e.g., *Golar LNG Limited v. World Nordic SE* [2011] Bda L.R. 9, Ex. 3, ¶¶ 8 – 9 (which concerned a fair value appraisal under Section 103 of the Act, relating to short-form mergers).  The *Golar* court observed that it should consider "all the relevant information that is put before it" regarding valuation. *Id.*, ¶ 5.

29.     Similarly, the Cayman Islands courts—whose procedural rules are very similar to those of the Bermuda courts—have repeatedly emphasized that "[t]he sole task of the Court is to determine the fair value of the dissenters' shares.  To do that, it needs full information." *Qihoo 360 Technology Co. Ltd.*, 2017 (2) CILR 585, Ex. 4, ¶ 19.   Indeed, the Cayman Islands court in *In the Matter of Integra*, FSD 92 of 2014 (Unreported 28 August 2015), Ex. 5, ¶ 21, held that "the one true rule is to consider all of the evidence that might be helpful, and to consider the particular factors in the particular case, and to exercise the best judgment that can be brought to bear on all of the evidence and all the factors."

30.     The CICA in  *Re Trina Solar Limited*, CICA (Civil) Appeal No. 009 of 2021, dated May 4, 2023 (Ex. 19), also emphasized the importance of "ensuring all relevant facts and matters are considered" in the determination of fair value:

> In ascertaining fair value, the Court must assess and determine a monetary amount which in the circumstances represents (its best estimate of) the worth, the true worth of the dissenting shareholders' shares (true worth meaning the actual value to the shareholder of the financial benefits derived and available to him from his shares and by being a shareholder).  The reference to fair requires in my view inter alia that the manner and method of assessment and determination is fair to the dissenting shareholder by ensuring that all relevant facts and matters are considered and that the sums selected properly reflects the true monetary worth to the shareholder of what he has lost, undistorted by the limitations and flaws of particular valuation methodologies and fairly balancing, where appropriate, the competing, reasonably reliable alternative approaches to valuation relied on by the parties.

This reasoning was cited by the Bermuda Supreme Court in *Glendina Pty Ltd. & Others v. NKWE Platinum Ltd.* (February 4, 2025), Ex. 27, ¶ 310.

31.     In addition, the Cayman Islands courts have recognized that documents in the hands of persons other than the company are very often relevant to the question of fair value.  *See, e.g.*,

*Qunar Cayman Islands Limited v. Athos Asia Event Driven Master Fund et al.*, 2018 (1) CILR 199, Ex. 6, ¶¶ 65, 74 – 75.

32.     Therefore, in assessing the fair value of Petitioners' shares, the Bermuda Supreme Court will consider all the evidence submitted by the parties concerning their competing views on the fair value of the Company's shares, which I believe would include but is not limited to evidence relating to the fairness (or lack thereof) of the process that led to the deal price.   I am aware that the "deal process" is often considered by Cayman Islands courts when determining fair value.   For example, such an analysis was undertaken by the Cayman Islands court in *Re Nord Anglia Education, Inc.*, CICA 24 of 2017 (Unreported, 17 March 2020), Ex. 7.   In *Nord*, the Cayman Islands court considered several conduct-related factors when considering the reliability of the deal price as a guide to the fair value of the dissenting shareholders' shares, including: (a) whether the transaction process "had been carried out in good faith" (¶¶ 114(a) and 125); (b) the motivations of the 'Baring Funds' who had interests on both the buy and sell sides of the transaction (¶ 114(b)); (c) the manner in which conflicts were managed (¶ 126); (d) the influence that the existence of a controlling shareholder had on the special committee's negotiating stance (¶¶ 118 and 124); and (e) the fact that attempts were made to find other bidders (¶ 120(a)).

33.     Similarly, in *Re Trina Solar Limited,* FSD 92 of 2017 (Unreported, 23 September 2020), Ex. 8, the Grand Court of the Cayman Islands, in determining fair value by only assigning a 45% weighting to deal price (reduced to 0% on appeal),[2] considered conduct-related factors such as: (a) a member of the Special Committee: (i) having not applied his mind "to what action was required as part of a proper process to ensure that potential competing bidders were encouraged

---

[2]     *See Re Trina Solar Limited* (Ex. 19), ¶¶ 147 – 48, 262(a).

and given an adequate opportunity to participate," and (ii) having "failed carefully to review the treatment of strategic buyers or test in any way the adequacy of the steps proposed and taken by Citi to obtain competing interest and bids and was content to leave all important decisions" to someone else (*Id.*, ¶ 161); (b) the infrequency of Special Committee meetings and the Special Committee's poor record-keeping (*Id.*, ¶¶ 162 and 163(f)); (c) the Special Committee's failure to conduct a comprehensive pre-market signing check by failing to properly consider and/or by excluding the company's major competitors as potential strategic buyers, or at least to take advice on the issue (*Id.*, ¶ 163); (d) the Special Committee's conduct in negotiating and signing-off on the deal price with the buyer group (*Id.*, ¶¶ 164 to 165); and (e) the manner in which conflicts were managed (*Id.*, ¶¶ 178 to 180).   Having considered such conduct and process related factors, the Grand Court of the Cayman Islands concluded that "the performance of the Special Committee was deficient in a number of material respects… The problems with the merger process which I have found to exist need to be taken into account when deciding what weight to give the Merger Price in the Court's fair value determination…" (*Id.*, ¶ 181).

34.    A number of important points arise from the CICA's decision *Re Trina Solar Limited*, CICA (Civil) Appeal No. 009 of 2021, dated May 4, 2023 (Ex. 19).   *First*, the CICA emphasized the importance of broad-ranging discovery in a merger appraisal case.   In particular, it held that:

> In order to determine fair value, the court needs to have all the relevant information. This will include, amongst other matters, ... generally all communications with the financial advisers employed by the special committee. . . All of this information will primarily be in the hands of the company and its financial advisers.

*Id.*, ¶¶ 255–56; *see also id.*, ¶ 145 (noting that it is "of fundamental importance … that companies give full disclosure of … the relevant communications with the financial advisers.")   *Second*,

14

the Decision supports Petitioners' position that discovery as to deal process is highly relevant to the Bermuda Supreme Court's determination of fair value in the Appraisal Proceedings.   As I mentioned above, the Grand Court of the Cayman Islands in *Re Trina Solar* relied on deal process related factors when assessing what weight to give the company's merger price when determining fair value.   The CICA upheld the Grand Court of the Cayman Islands' reliance on deal process evidence and emphasised that an analysis of deal process is necessary to determine "which weight can be placed on the merger price as evidence of fair value."   The CICA concluded that no weight should be assigned to the merger price in Trina. *Id.*, ¶ 137.   In his concurring judgment, Birt JA reiterates that "[i]n cases such as this, it is important that companies produce a witness or witnesses who can speak with knowledge about the management projections, the sale process and other matters relevant to fair value and that they also give full disclosure of all documents and relevant communications in connection with the sale process and the assessment of fair value."

35.     Therefore, I believe that the Bermuda Supreme Court must be given insight into the basis of the financial and other advice provided to Sixth Street by Barclays, as well as Barclays' own process for assessing and committing to providing the debt finance portion of the transaction.

36.     As explained below, the categories of discovery sought by Petitioners from Barclays are thus highly relevant to the Bermuda Supreme Court's determination of fair value.

## V.   Barclays is Not a Party to the Appraisal Proceedings

37.     The Bermuda Supreme Court can only compel a non-party to produce evidence or testify at trial (through a *subpoena duces tecum* or a *subpoena ad testificandum*, respectively) if the non-party is within its jurisdiction.   RSC Order 32 rule 7 (Ex. 10).   Enstar is only required to produce documents in the Appraisal Proceedings to the extent they are within its possession,

15

custody, or power. The Bermuda Supreme Court does not have the authority to compel non-parties who are not subject to its jurisdiction to produce evidence or discovery. Here, Barclays is not party to the Appraisal Proceedings. Further, I understand that Barclays resides or is found in New York. Accordingly, the Respondent is outside the jurisdiction of the Bermuda Supreme Court. In the absence of jurisdiction, the Bermuda Supreme Court is powerless to direct Barclays to produce evidence or discovery in the Appraisal Proceedings. Therefore, absent assistance from this Court via Section 1782, Petitioners will not have a practicable pathway to obtain any discovery directly from Barclays in a timely manner.

38.     For the sake of completeness, the Bermuda Supreme Court is permitted to issue a letter of request or "Letter Rogatory" to compel evidence from a non-party out of its jurisdiction under a procedure akin to that under the Hague Convention of March 18, 1970, on the Taking of Evidence Abroad in Civil or Commercial Matters. However, such applications are of limited utility in practice. The process is cumbersome, time-consuming, and unduly restrictive. For example, the party making the application is not entitled to discovery as permitted under Section 1782 but instead restricted to seeking specific and identifiable evidence for use at trial. As one English case put it, "the letter of request must be confined to particular documents, although these may be described compendiously ...." *See Panayiotou v. Sony Music Entertainment (UK) Ltd.*, [1994] Ch. 142 (1993). (Ex. 11, p. 153.)

39.     Most litigants, like Petitioners, do not have sufficient knowledge about the discovery in the possession of a target to formulate a request with the required specificity. Two cases from the Bermuda Supreme Court have also made it clear that the "Letter Rogatory" process is not for the purpose of obtaining discovery. *See NetBank v. Commercial Money Centre* [2004] Bda L.R. 46 (Ex. 12), and *The Patriot Group, LLC v. Hilco Financial, LLC and others* [2015] Bda

16

L.R. 46 (Ex. 13).  A similar process exists in the Cayman Islands, yet I understand that Cayman Islands litigants who seek to obtain evidence in the United States do not usually follow that route, and they instead generally use Section 1782.  Just like in the Cayman Islands, there is no requirement under Bermuda law that a litigant must resort to a Letter Rogatory process before filing a Section 1782 application with a court in the United States.  In my experience, it is more common for litigants in Bermuda to use Section 1782 to obtain evidence located in the United States.  This is a route that is often used by liquidators of Bermuda companies, where the promoters, managers, and other service providers are located in the United States.  Therefore, the availability of a Letter Rogatory procedure does not bar Petitioner from filing this Application.

## VI.     Bermuda Courts are Receptive to Evidence Obtained Through Section 1782

40.     Based on my professional experience as a Bermudian lawyer, I believe that the Bermuda Supreme Court will be receptive to evidence obtained through Section 1782.  The Bermuda Supreme Court expects the parties to proceedings to obtain the evidence they believe is necessary to prosecute their case.  Thus, there is no requirement to obtain permission from the Bermuda Supreme Court before seeking relevant non-party evidence abroad, including through Section 1782.

41.     For example, in 1987, the House of Lords (then the highest court in the United Kingdom, subsequently replaced by the UKSC), expressly considered in *South Carolina Insurance Co. v. Assurantie Maatschappij* [1987] A.C. 24 (Ex. 14), whether a litigant in an English legal proceeding could seek evidence located in the United States pursuant to Section 1782.   In that case, two defendants to English court proceedings had applied under Section 1782 in the United States District Court for the Western District of Washington, seeking discovery of documents from two non-parties to support their defence in those English proceedings.  Lord Brandon, delivering a

17

unanimous judgment for the House of Lords, rejected the plaintiffs' suggestion that the defendants had acted improperly or that the English court should issue an injunction prohibiting defendants from pursuing the Section 1782 discovery:

> I cannot see that the [defendants], by seeking to exercise a right potentially available to them under the Federal law of the United States, have in any way departed from, or interfered with, the procedure of the English court. All they have done is what any party preparing his case in the High Court here is entitled to do, namely to try to obtain in a foreign country, by means lawful in that country, documentary evidence which they believe that they need in order to prepare and present their case. (Ex. 14, p. 42).

42. The English rule, articulated in *South Carolina Insurance Co*., granting litigants in English legal proceedings the freedom to seek evidence from outside the country, including under Section 1782, has been consistently applied by later English decisions. For example, in 2018, the English High Court, citing *South Carolina Insurance Co.*, reaffirmed that "[i]n general, the English court leaves it to the parties to obtain the evidence they think necessary for the advancement of their case by the means of their choosing, provided such means are lawful in the country where they are deployed." *Dreymoor Fertilisers Overseas Pte Limited v. Eurochem Trading Gmbh & Ors* [2018] EWCH 2267 (Comm) (Ex. 15, ¶ 61(2)). A more recent decision of an English Court in relation to a Section 1782 application is *Walter Tzvi Soriano v (1) Forensic News LLC (2) Scott Stedman* [2023] EWHC 262 (KB) (Ex. 20) which, again, concerned an application for an anti-suit injunction to restrain a Section 1782 application. In dismissing the application for the anti-suit injunction, the Court held that there was nothing in the Section 1782 application that was "oppressive, vexatious, or otherwise unconscionable" and nor was there any prospect of "the 1782 Application interfering with the due progress of the English proceedings." (Ex. 20, ¶ 56). As explained above, decisions of the House of Lords are generally considered to be de facto binding on the Bermuda Supreme Court and thus are followed.

18

43.     I accordingly believe the Bermuda Supreme Court would agree with and adopt the approach of the English Courts concerning Section 1782 discovery, as articulated in the *South Carolina Insurance Co* and *Dreymoor Fertilisers* cases.  Further, while the Bermuda Supreme Court has never directly ruled on the issue, it has in at least one instance noted the practice of litigants in Bermuda seeking discovery in the United States under Section 1782, and in another, has admitted evidence obtained under Section 1782.  First, in the case of *Apex Fund Services Ltd. and anor. v Matthew Clingerman and anor* [2019] SC (Bda) 74 Corn (Ex. 16, ¶ 54), the Bermuda Supreme Court expressly noted that "[n]o dispute turns on the powers conferred on a litigant under §1782 to obtain evidence for use in proceedings outside of the United States."  Second, in *Hiscox v. Yuval Abraham,* (2018) Bda L.R. 88 (Ex. 17), the Bermuda Supreme Court accepted into evidence documents that had been obtained from a non-party based in the United States, pursuant to a Section 1782 application granted by the Southern District of New York.  These authorities are consistent with my understanding that courts in Bermuda will follow English precedents and be receptive to evidence that Petitioner is seeking through this Application.

44.     I furthermore understand that Cayman Islands courts also have accepted evidence obtained in the United States under Section 1782, both generally and in appraisal cases.  Indeed, the CICA in *Lyxor Asset Management S.A. v. Phoenix Meridian Equity Limited,* [2009] CILR 553 (Ex. 18), expressly affirmed a party's right to obtain full discovery, including both pre-trial deposition testimony and documents, through Section 1782.  Importantly, the CICA in *Lyxor* cited to and relied on the House of Lords' decision in *South Carolina.* (Ex. 14), as discussed above.  The *South Carolina* decision is de facto binding in the Cayman Islands for the same reasons (discussed in paragraph **41** and **42** above) that it is in Bermuda.  According to the CICA in *Lyxor* (Ex. 18, ¶ 57), the right to seek discovery under Section 1782 "is a right conferred by US law—it is not a

19

right conferred by, or to be withheld under, Cayman law." The CICA ruled that because a party has a right to avail itself of a legitimate foreign evidence-gathering process, such as Section 1782, a compelling reason (for example, when a party is acting oppressively) is required to deny the party the right to pursue discovery by those means.

45.     As a corollary, I am aware of no Bermudian law or court ruling prohibiting a party in Bermudian legal proceedings from acquiring or using evidence obtained via Section 1782. Any evidence obtained by Section 1782 is not inadmissible as a result of the manner in which it has been obtained. The Bermuda Supreme Court will make a final admissibility determination at trial based upon generally applicable rules governing admissibility irrespective of the source of the evidence. It follows that the Bermuda courts are, as a general proposition, receptive to the judicial assistance offered by the application of Section 1782, and I believe the Bermuda Supreme Court will be in the present case where the requested discovery sought in the Application pertains to the financial analyses and valuations conducted by Barclays, as well as the financial advice it provided to Sixth Street as the Company's buyer.

## VII.   Admissibility of Evidence

46.     As regards to deposition testimony, the Bermuda Supreme Court's approach is the same as that of the Cayman Islands courts as stated in *Lyxor*. The Cayman Islands court observed there that the ultimate admissibility of transcripts of depositions taken under United States law was irrelevant to determining whether to allow the deposition to proceed. Instead, the *Lyxor* court explained that admissibility would be a question for a later date:

> The use to which the transcripts of depositions taken in New York may be put in the Cayman proceedings is, of course, a matter for the Grand Court…
> no transcript of deposition would be admissible as evidence at trial without an order of the Grand Court. In deciding what order to make in this respect, it will be open to the Grand Court to restrict the use which can be made of

the deposition transcripts in the course of any cross-examination of Mr.
Rosenberg and Mr. Phlipponneau at the trial. (Ex. 18, ¶ 47).

47.     Here, Petitioners seek to depose a corporate representative of Barclays.  The
resulting deposition transcripts may be admissible as hearsay statements under Bermuda law
although notices may be required under the applicable provisions of Part IIA of the Evidence Act
1905.  In short, consistent with Bermudian law and the persuasive value of *Lyxor*, the Bermuda
Supreme Court is receptive to entertaining a transcript of a deposition taken under Section 1782
just as it is in relation to a transcript of testimony from another forum.

## VIII.   Overview of Petitioners Requests

48.     Petitioners seek tailored discovery from Barclays, on issues relevant to the
Appraisal Proceedings.  These include, *inter alia*: (a) the negotiations of the Merger and the Merger
price, including any advice or presentations given to Sixth Street; (b) financial analyses prepared
by Barclays as a financial advisor to the Buyer; (c) documents concerning the Term Loan Facility
and the Backstop Revolving Facility; (d) documents pertaining to the Company's valuation,
including any material non-public information, valuations, models, and any forecasts of the
Company's future performance ("**Requested Discovery**").

49.     The Requested Discovery from Barclays targets key information about both the
price and the process through which the price was considered, negotiated, and ultimately agreed
upon between Enstar and Sixth Street.  This information is directly relevant to the issues that will
be considered by the Bermuda Supreme Court in the Appraisal Proceedings.

Executed in Hamilton, Bermuda, this 24 of February, 2025.

_____
Delroy B. Duncan KC