# Exhibit 5

[2025] SC (Bda) 15 civ. (4 Feb 2025)



# In The Supreme Court of Bermuda

## CIVIL JURISDICTION

## 2018: No. 347

**BETWEEN:**

### GLENDINA PTY LIMITED and OTHERS

<u>Plaintiffs</u>

### -AND-

### NKWE PLATINUM LTD

<u>Defendant</u>

_____

## JUDGMENT

_____

| | |
|---|---|
| **Date of Hearing**: | 5, 6, 9, 10, 11, 12, 13 December 2024 |
| **Date of Judgment**: | 4 February 2025 |

**Appearances:**   *Tom Lowe KC* and *Theodora Hand* and *Luisa Olander* of Appleby (Bermuda) Limited for the Plaintiffs

*David Chivers KC* and *Jonathan O' Mahoney* of Conyers Dill & Pearman Limited for the Defendant

**JUDGEMENT of Martin, J**

**Introduction**

1. This is the judgment in an appraisal action brought by the plaintiffs pursuant to section 106 (6) of the Bermuda Companies Act 1981 following the amalgamation of NKWE Platinum Ltd ("NKWE") and Gold Mountains (Bermuda) Investment Limited ("Gold Mountains") as a result of which all the outstanding common shares of NKWE that were not already held by the majority shareholder were compulsorily acquired by Gold Mountains at a price of A$0.10 cents per share (the "Offer Price").

2. Gold Mountains is a wholly owned subsidiary of Gold Mountains (H.K.) International Mining Company Limited which is in turn owned by Zijin Mining Group Co. Limited ("Zijin") which owned 60.47% of the shares of NKWE before the amalgamation through another wholly owned subsidiary called Jin Jiang Mining Limited ("Jin Jiang"). The shares owned by Zijin through Jin Jiang were excluded from the amalgamation. The purpose of the amalgamation was for Zijin to acquire all the remaining shares of NKWE (39.53%) held by the minority shareholders to become the (ultimate) 100% holder of all the common shares of NKWE.

3. Under NKWE's bye laws as they stood before the amalgamation, the statutory majority of 75% approval for an amalgamation could be reduced to a bare majority of shareholders, provided that the Board had approved the amalgamation[1]. In the circumstances that are examined in greater detail below, the two independent directors who formed NKWE's Board for this purpose (i.e, those who had no affiliation with Jin Jinag or Zijin) approved the amalgamation, including the Offer Price, relying upon a Fairness Opinion that was commissioned by NKWE from RSM Australia Pty Ltd ("RSM")[2]. This meant that in reality Jin Jiang (and Zijin) had the power to control the outcome of the shareholder vote at the special general meeting that was convened to consider the amalgamation, and therefore to compel the acquisition of the shares of the minority shareholders at the Offer Price.

---

[1] This was common ground between the parties, although the company's old bye laws were not produced in evidence.
[2] Trial Bundle Bundle A tab 3 at page 170 (references to the Trial Bundle hereafter follow the convention e.g. A/3/170)

4. The resolutions approving the amalgamation and the Amalgamation Agreement dated 16 August 2018 were passed by a majority of the shareholders at the special general meeting on 24 October 2018. It is recorded that 22.47% of the shareholders voted against the Scheme[3]. Under the terms of the Amalgamation Agreement 24 October 2018 was the Effective Date of the amalgamation and the Valuation Date for the shares.

5. The plaintiffs owned 201,399,396 ordinary shares of NKWE representing just over 20% of the shares that were acquired by NKWE and represent 456 separate shareholders, each of whom held a small number of shares, none more than 0.8% of the total. The plaintiffs were dissatisfied with the offer price and either voted against or did not vote in favour of the amalgamation. On 11 October 2018 they exercised their statutory rights to seek an appraisal of the value of their shares by the court as "dissenting" shareholders. In this judgment the plaintiffs are collectively referred to as the "Dissenters".

6. On 12 July 2019 the Dissenters were paid[4] their respective entitlements to the Offer Price. The Dissenters claim that this does not represent the fair value of the shares at the Valuation Date and seek payment of the difference between the Offer Price and the fair value of the shares. The principal question for the Court to determine on this application is what was the fair value[5] of the NKWE shares on the Valuation Date?

7. The Court has been provided with expert evidence from expert witnesses called by each side to assist the Court in making a determination of the fair value of the shares. For the reasons explained in the judgment, this has not been an easy task in this case.

8. Normally a valuation of the shares in a company would be appraised by reference primarily to the evidence of expert valuers who would provide a financial analysis of the underlying data to support their conclusions. However, the uncertainties surrounding the prediction of future income streams from a proposed mining development project which comprises the most valuable asset of

---

[3] It is not clear if there were some shareholders who did not vote at all or if the remainder all voted in favour of the amalgamation i.e. the remaining 77.53% or if there was some other figure representing the majority by which the vote was passed. This may have some significance.

[4] A$19,700,642.20

[5] Section 106(6) provides that the court is to appraise the "value" of the shares, and this has been interpreted by the court as the "fair value", the meaning of which is discussed in more detail in the judgment. A number of additional questions arise upon the determination of the fair value which are also examined and determined in the judgment.

NKWE have in given rise to considerable uncertainties over the likely range of values for the shares in NKWE. The alternative valuation methods based on market price suffer from the lack of comparable transactions involving mining projects that are truly comparable to the Garatau Project, which is NKWE's principal asset.

9. For the reasons given in the analysis of the evidence, a number of flaws emerged in the experts' opinions which leave the Court in the very unsatisfactory position of not having a clear evidential basis upon which to base its appraisal of the fair value of the shares. The Court has therefore had to reach its own conclusion, based on the most reliable available evidence. These deficiencies are explained in the evidence in the body of this judgment. The Court has not felt able to fill in gaps in the evidence by making assumptions as to value or deriving "implied" real values from the absence of clear evidence that comes up to the standard of real likelihood (i.e. on a balance of probability). The Court is not able to speculate or take a 'wild guess'.

**Summary of Disposition and Appraisal**

*Appraisal*

10. The Court has appraised the discounted fair value of the Dissenters' shares in NKWE at A$0.13 per share at the Valuation Date. This value is not the value put forward by any of the expert witnesses in their evidence presented to the Court. For that reason, I shall here briefly explain how and why the Court has arrived at that value, but the reasons underpinning this conclusion are set out in full in the body of the judgment below. In short, the Court's appraisal is based on the original valuation that supported the draft RSM Fairness Opinion[6] at the time of the amalgamation in 2018.

11. This unusual position has come to pass because Court has had to reject the important parts of each of the valuation analyses subsequently done by the independent mineralogy experts and the financial valuations prepared by the financial experts. There follows a brief summary of the principal reasons why the Court has reached this result.

---

[6] C/8/225

*Rejection of expert evidence*

12. On the one hand the Court has rejected the Dissenters' experts reports, not because of any fault in their expertise or the quality of the work that they have done, but because (i) the mining and technical assessment valuation is premised on a mistaken assumption that a mineral reserve[7] had been declared in 2012 and (ii) NKWE's financial projections which were used as inputs to the discounted cash flow (DCF) model that was prepared in support of the Dissenters' valuation expert's opinion are based on the assumption that a mineral reserve was declared in 2012.

13. NKWE's projections of capital expenditure, operating costs, projected recovery of minerals and income projections was based were updated in 2017 to take account of "optimizations" which addressed the matters that were outstanding and NKWE's resulting life of mine plan. This is referred to as the "Garatau Model".

14. The details of the assumed reserves are also reflected in two reports by Venmyn Deloitte in 2017 and an updated opinion letter in early 2018, which value the mineral assets on the basis that a mineral reserve has either been declared or will be declared.

15. The Dissenters' financial valuation expert relied upon the Garatau Model[8] as the basis of developing her own model (with amendments and corrections) but the underlying material it is based on incorporates cash flows that assume a mineral reserve had been declared.

16. Mineral reserves are more valuable than mineral resources because the assumption behind a declared mineral reserve is that a Competent Person has conducted a study and concluded that it is technically feasible to extract the minerals at an economic cost. The inclusion of reserves in the financial model when they should be classified as resources therefore overstates the value of the mineral assets both as to the value per ounce of the minerals and the number of ounces that can be extracted.[9].

---

[7] This is also referred to as an Ore Reserve but for consistency the Court has used the term 'mineral' reserve.

[8] D/2/28 at paragraph 3.2.25 and D/2/59 at paragraph 6.3.9

[9] On the evidence, it is not clear how many ounces have been included as reserves in the Garatau Model, but it appears from the Venmyn Deloitte mineral valuation (which seems to have also been based on the Garatau Model) that the figure of 6.06 million ounces (Moz) was used: F3/1/3.  Mr. Van Zyl says that this figure might be 6.4Moz or as much as 8.12Moz: E/2/24. Ms. Wright used the 6.06Moz figure: D/2/26.

17. In this case, the valuation using a DCF methodology using inputs that have not been officially declared as reserves substantially increases the value of the project and generates a positive net present value[10] for the project as a whole. The DCF valuation approach taken by the Dissenters' expert witness is therefore not reliable as an estimate of the value of the Garatau Project[11].

18. The Court notes that the Dissenters' experts' mistaken assumption was based on plausible evidence, and the Dissenters' experts are not to be faulted for reasonably believing that a Mineral Reserve had been declared in 2012. However, in my judgment, the evidence is clear that no such Mineral Reserve had ever been declared and it is not possible (for the reasons explained below) for the Dissenters to treat the steps taken by NKWE as adopting it as a "*de facto* mineral reserve" to justify using the DCF valuation methodology proposed by the Dissenters' valuation expert.

19. On the other hand, NKWE's mining and technical expert's reports that were used to support the Fairness Opinion, and the subsequent valuation reports by RSM, were premised on an assessment of the value of comparable transactions. Although there were originally 11 transactions in the comparison set, these were ultimately reduced to two transactions that were considered to be comparable to the size and stage of the Garatau Project. The experts each accepted that two transactions is not a satisfactory sample range, but the ultimate valuation report relied upon by NKWE (based upon the revised second expert's report) does not appear to reflect any adjustment to take account of this much smaller set of comparable transactions. This leaves the Court with a recommendation which is very thinly supported by the expert evidence to assist the Court in its appraisal task.

*Independent Directors misunderstood their duties and role*

20. For the reasons also explained in this judgment, the Court has concluded that the process by which the independent directors engaged in assessing the fairness of the Offer Price was unsatisfactory. The original range of fair value was estimated to be between A$0.8 and A$0.19.

---

[10] The term net present value is discussed in more detail below. It is not a value *per se*, but it is a judgment by a competent person that it is "technically achievable and economically viable" to extract the minerals: JOPRC Code: F/7/6/16.

[11] It appears to have been agreed between the valuation experts that if there was no declared Mineral Reserve, then the value of the Mineral Resources results in a negative present value (i.e. that it is not possible to extract the minerals at a profit that is economically realistic or "viable") then a discounted cash flow for valuation is not an appropriate model.

Although the independent directors thought that the appropriate position to take on fair value was the midpoint in the range or A$0.135[12], they failed to take that position. Instead, they saw their role as to see if the Offer Price could be improved and sought to negotiate it upwards. When they "achieved" an increase in the offer price from A$0.8 to A$0.10 they considered their job was done and proceeded to pass a resolution to approve the amalgamation and confirm that the transaction was at fair value. The passing of this resolution had the effect of reducing the statutory shareholder majority vote requirement for the amalgamation from 75% to a bare majority under NKWE's bye laws. The independent directors' resolution therefore enabled the majority shareholder (i.e. the bidder) to control the special general meeting at which the amalgamation was put to a vote.

21. The independent directors approved the fairness of the transaction because they took the view that, as long as the offer price fell *within the range* of fair values supported by an independent opinion, they had done enough. For the reasons given in the analysis below, the Court does not consider this to be the proper approach for independent directors to take in this situation. Their duty was to ensure that the Offer Price reflected what they independently considered to be the fair value of the shares, and they ought to have had the courage of their convictions to insist that they would not approve the transaction unless they were so satisfied.

22. It is clear that at the time they approved the amalgamation the independent directors considered that the fair value fell within the mid-point of the range originally proposed by RSM i.e. A$0.135. In the Court's judgment it was not their function to try to negotiate on behalf of the Dissenters or to accept a proposal that they did not consider was fair in order to save the transaction because they thought that some shareholders might prefer to cash out of their investment at a premium to historic trading values. Because the independent directors did not insist on achieving the fair value and accepted a figure at the low end of the range, they (in effect) gave away the protection that the bye laws afforded the minority shareholders against an acquisition of their shares at less than fair value.

---

[12] This was the value in the draft Fairness Opinion which was the fair value as things stood when the independent directors passed the resolution approving the amalgamation and executing the Amalgamation Agreement. C/8/225.

23. It was only after they had held the directors' meeting to approve the amalgamation and signed the Amalgamation Agreement that the final Fairness Opinion was released. The final version of the RSM Fairness Opinion *reduced* the range of fair values to between A$0.08 to A$0.148 with a mid-point of A$0.114. The circumstances in which this occurred are discussed in detail in the judgment below. Here it is sufficient to note that the independent directors did not question the reasons for the change but said their reaction was "*positive*" because the Offer Price fell closer to (but still under) the revised middle of the range of fair value. The Court finds this reaction inexplicable for reasons developed later in this judgment.

*Preponderance of evidence*

24. The integrity of the judicial appraisal function would be completely undermined if the Court proceeded to make its own assessment of the fair value in the absence of any admissible evidence to support it.

25. The Court considered whether to determine the matter simply on the basis that the Dissenters had failed to discharge the evidential burden of proving the contentions they put forward as to value. The Court acknowledges that there is no burden of proof on either party as to the valuation of the shares, but all sides acknowledge that if a party advances a proposition, that party must adduce evidence to support it.

26. NKWE's experts had put forward some evidence of value based on comparable transactions which (albeit unsatisfactory in many respects) was at least admissible and the value range proposed was agreed between the technical experts.

27. However, the Court felt that to take this approach would be abnegate the responsibility of the Court under section 106 (6) to make its own appraisal of the fair value of the shares. Therefore, the Court reviewed the reliable evidence to arrive at a fair value of the shares that can be supported and credibly represents the position as to fair value as matters stood in October 2018.

28. The only analysis that the Court feels it can rely upon as expressing the fair value of the shares is the original work done by RSM and CSA Global Pty Ltd ("CSA Global") in support of the draft Fairness Opinion because it was (a) contemporaneous with the offer and reflected what the experts considered fair at the time using an overall approach that was consistent with the approach taken by all other experts who had looked at the project up to that point (b) it was untainted by any pressure to justify the range of values against the objections put forward by the Dissenters and (c) it was the value the independent directors considered was the mid-point of the range of fair value when they (i) approved the amalgamation and (ii) executed the Amalgamation Agreement.

29. The Court has weighed a number of factors that seem to the Court to be of significance in determining where on the range of fair value originally given by RSM that the Dissenters' shares could reasonably be said to lie.

30. These factors included (i) the grant of the authorisation for the power grid for the Garatau Project in 2016 (ii) the lifting of the suspension of the mining right in 2016, (iii) the grant of the water use licence in 2017 (iv) the completion of the additional work on the 2012 DRA Mining Feasibility Study in late 2017, (v) the commencement of the Early Works Programme in early 2018, and most importantly (vi) the registration of NKWE's mining right in April 2018.

31. The Court has also taken into account the factors that militate against reaching a higher value, in particular, (i) the need for further studies to determine (and if necessary adjust) the predicted recovery rate, (ii) to improve the clarity on implementation of the mine plan and (iii) the need to raise substantial capital to fund the development of the project.

32. It is not possible to give a weighting to each of these factors that empirically adds or removes a separate quantifiable and incremental sum to the assessment of "fair value". The Court has taken a view of the combined effect of the pros and cons of both positive and negative factors.

*Fair value*

33. Taking all the relevant factors into account (and for the reasons given below), the Court's appraisal is that the fair value of the shares was A$0.135 per share as at the Valuation Date.

This was the mid-point of the range of fair values at the time the directors entered into the Amalgamation Agreement (i.e. A$0.135) based on the draft Fairness Opinion issued by RSM. This value is also within the range proposed by the final Fairness Opinion (i.e. between A$0.08 and A$0.148) and slightly above the mid-point of the range proposed by RSM in its final expert report (A$0.09 and A$0.158).

*Minority discount*

34. Argument was addressed as to whether the Court should apply a minority discount, and the Court was referred to numerous cases that are discussed in the judgment below. The Court concluded that a minority discount should be applied, following the principles set out in **Shanda Games Ltd v Maso Capital Investments and Others**[13] in the opinion of the Board of the Judicial Committee of the Privy Council.

35. The Court found the analysis and recommendation of discount rates based on a review of companies listed on the Australian Stock Exchange compiled in the 2017 RSM Control Premium Study to be inappropriate to the circumstances of this case.

36. The Court considered that it was appropriate to apply a 3.7% discount in line with range of minority discount values applied in recent cases in Cayman Islands (under the equivalent provisions of the Cayman law) which appear to be compatible with the present case. Therefore, in my judgment, the fair value figure of A$0.135 per share is to be discounted to **A$0.13** per share as at the Valuation Date.

---

[13] [2020] 1 BCLC 577, 593-5

*Interest*

37. Argument was also addressed on the question of interest. The date from which interest on the unpaid portion of the sum was agreed as commencing on the effective date of the amalgamation. The Court considered the arguments made in support of the compounding of interest but, for the reasons given below, and came to the conclusion that simple interest should run at the usual rate of 3.5% (ie the Bermuda interest rate on a judgment debt) from 24 October 2018.

*Costs*

38. It follows from these conclusions that the Dissenters are also entitled to their costs of the proceedings on the standard scale, certified for two counsel for the trial[14], an Order for which shall take effect unless either of the parties seek a hearing on costs within 14 days of the date of this Judgment.

**General Background**

39. NKWE is a Bermuda exempted company and at the time of the amalgamation it was listed on the Australian Stock Exchange (ASX). NKWE owns a 74% interest in a mining right over three 5300 hectares located in the eastern limb of the Bushveld igneous complex near Steelpoort in the Sekhukhune district all of the Limpopo province in South Africa and is referred to as the "Garatau Project". In strict terms, this interest was held indirectly through a subsidiary called NKWE Platinum (South Africa) Pty Ltd in which NKWE owns a 70% interest, and its black empowerment partner Genorah Resources Pty Ltd ("Genorah") owned the remaining 30% interest, but this minority interest was later acquired by Jiun Jiang[15]. For the purposes of these proceedings, it is common ground that the ownership interest that represents the principal asset of NKWE is a 74% interest in the Garatau Project, which is the subject of the expert valuation evidence. For ease of expression, the references to the ownership of the mining right in relation to the Garatau Project is expressed as being the mining right of NKWE.

---

[14] The ordinary taxation of costs in Bermuda commercial cases will apply to the pre-trial work done by the respective firms of Bermuda attorneys, but the certification is for only two counsel for the trial. The costs order is to include the fees, costs and expenses of the Dissenters' expert witnesses.
[15] This acquisition took place in July 2015 (see chronology below).

40. The mining right relates to the extraction of chrome, copper, nickel, gold and the platinum group of metals in three individual but contiguous farms referred to as Garatouw 282 KT, Hoepakrantz 291 KT and De Kom 252 KT.

41. The area in which the Garatau Project is located is in a well-established mining region which is active in the production of platinum and chrome and is served by an extensive road and railway network with well-developed industrial and social infrastructure.

42. The Project sits on the eastern edge of the geological 'horizon' referred to as the Merensky Reef which spans hundreds of kilometres and hosts the largest deposits of the platinum group metals (PGMs) in the world. The area has been extensively studied by geological experts and the geology of the region is well understood in general terms. The area is underlain by Critical Zone rocks[16] and Main Zone rocks[17] with the Critical Zone hosting the Merensky Reef and UG2 Chromitite layer. In the project area the Merensky Reef is present at depths between 280m and 1500m below the surface and the UG2 Reef is located between 290m and 370m below the Merensky Reef. The characteristics of the Reef and the UG2 layer are consistent with and similar to those reported for other operating mines adjacent to the Garatau Project[18].

43. In 2009 a study was commissioned in conjunction with Xstrata South Africa with a view to developing two mines in which NKWE had an interest, one at the Garatau Project area in the north of the Bushveld and another at Tubatse Project[19] area in the south. The study was conducted by TWP Projects ("TWP") which produced a Bankable Feasibility Study in June 2010, which was reviewed by a third party which identified no "fatal flaws" for the Garatau Project[20].

44. Following the completion of a "final optimization" of the Bankable Feasibility Study carried out by DRA Mining Consultants ("DRA") in June 2012, NKWE decided that the development of the farms at Hoepakrantz and de Kom should be deferred so that NKWE's resources could be

---

[16] Comprising a thin "veneer" at the earth's surface where water, rocks and gases interact chemically.
[17] Igneous, sedimentary and metamorphic rocks
[18] See generally the summaries given by CSA Global at Trial Bundle E/4/5
[19] The Tubatse Project is not relevant to these proceedings because NKWE's rights to explore and develop that site were subsequently revoked.
[20] See witness statement of Scott Li at paragraphs 8-24 C/5/3-10

concentrated on the development of the farm at Garatouw and to concentrate on the resources on the Merensky Reef[21]. The UG2 Reef was to be preserved and was to be separately developed as a large mining project in the future.

45. Therefore, the mining right at the Garatouw farm site is the primary asset with which these valuation proceedings are concerned, as these rights make up the most valuable part of the assets owned by NKWE, which in turn drives the assessment of the value of the NKWE's shares. The following summary of the events frames the context in which the Court must appraise the shares. These facts are not themselves disputed, although the conclusions that the Court has been asked to draw from the facts are of course contested.

46. A mine plan was developed by NKWE based on the 2012 Feasibility Study using NKWE's projections of capital and operating expense as well as projected revenues based on the inputs. This mine plan was later updated in 2017 following implementation of the optimizations recommended by DRA. The updated 2017 financial model formed NKWE's financial model for the project, and is referred to as the Garatau Model.

47. In order to put the events that are the subject of the Court's appraisal in context it is helpful to set out a chronology of the history of events that relate to the development of the Garatau Project. This is an abbreviated version of the full history and sets out the events that the Court considers most relevant or necessary to understand the context of the events that occurred leading up to the bid from Zijin.

**Abbreviated chronology of relevant events**[22]

  *2008*

      In 2008 NKWE initially entered into a joint venture with Xstrata South Africa for the development of a number of properties including Garatouw, Hoepakrantz and De Kom in return for an option to acquire 50% in the properties.

---

[21] See Scott Li Witness statement at paragraphs 23-4 C/5/9
[22] This chronology has been adapted from the chronology agreed between the parties, to which the Court has added a number of items which represent significant events for the purposes of these proceedings

13

**2009**

> In 2009 NKWE commissioned a "bankable" feasibility study ("BFS") for the Garritau Project by TWP.

**2010**

> In the last quarter of the year an independent third-party review of the Garatau Project was conducted. In November NKWE announced the initial findings of the study and thereafter raised initial capital of USD 36 million by the end of 2010. However, at about the same time, the South African constitutional court set aside the prospecting rights for two of three farms in another project at Tubatse in which NKWE had an interest. As a result, trading in NKWE's shares on the ASX was again suspended.

**2011**

> A further feasibility study ("FS") was undertaken in January and in March the suspension of the shares on the ASX was lifted, but trading was later halted in November pending a dispute as to the ownership of certain other farms controlled by NKWE and Genorah.

**2012**

> In January Caracle Creek International Consulting ("CCIC") prepared a resource update for the Merensky Reef.

> In February NKWE announced that it had been granted a mining right[23] over the Garatau Project.

> In June NKWE announced the results of the final optimization of the Garatau Project BFS carried out by DRA.

> In August the 2011 FS was updated by DRA.

**2013**

> In April NKWE announced its strategic partnership with Zijin. In July NKWE's shareholders approve the issue of convertible bonds to Jin Jiang. In September NKWE announced the Jin Jiang transaction was to proceed in two phases (i) A$7 million in convertible bonds and (ii) A$13 million in convertible bonds.

> In December NKWE announced the first tranche of A$7 million had been issued and the second would be issue before year end. It was also announced that Zijin had entered into a conditional share sale agreement to acquire 145,880,907 ordinary shares from Genorah for A$18,364,518 or A$0.08 per share. It was also announced that Zijin would make a further investment in NKWE through an

---

[23] The mining right does not become effective until registration.

immediate placement of 19,000,000 fully paid ordinary shares to Jin Jiang to accelerate the development of the Garatau Project.

*2014*

In May NKWE issued Jin Jiang 202,576,000 shares in satisfaction of the conversion of the bonds.

*2015*

In October Jin Jiang completed its purchase of Genorah's shares for a cash consideration of A$30,583,312 or A$0.10 per share.

*2016*

In May environmental authorization was granted by the Department of Environmental Affairs for the Garatau grid power project.

In October NKWE announced the potential cancellation of its mining right due to failure to comply with requirements of the relevant legislation (the "section 47 Notice").

*2017*

On 31 March Venmyn Deloitte issues its interim Independent Mineral Asset Valuation on NKWE's mineral assets to NKWE for the purposes of an impairment review for the financial year ending 31/12/16 as part of the audit conducted by Ernst & Young. This report put the valuation range of the mineral assets represented by the Garatau Project at between USD105m and USD157m for the resources and USD 211m and 273M for the reserves and taking an average of both valuations producing an averaged value of the mineral assets at USD186 million. (This report assumes that a mineral Ore Reserve had been declared by NKWE following the 2012 DRA FS based on a reserve statement in CCIC's report).

In May the 2012 FS was revised by DRA.

In October NKWE was granted a water use licence.

In November NKWE announced the lifting of the section 47 Notice.

On 20 December Venmyn Deloitte issued a subsequent Independent Mineral Asset Valuation report for the purposes of a potential capital raise for NKWE which put the fair value of NKWE mineral assets at USD166 million. (This report also assumed that a declaration of a mineral Ore Reserve had been made by NKWE in 2012).

*2018*

In early 2018 NKWE commenced an Early Works Programme before commencement of "project execution".

15

On 19 March, NKWE announced that it had received an indicative non-binding bid for the acquisition of the minority shares in NKWE from Zijin for a price of A$0.08 per share. At about the same time Mr. Scott Li who was serving as the chief financial officer for NKWE contacted Mr. Richard O'Shannassy to ask him to serve as an independent director on the Board of NKWE in relation to the offer made by Zijin. At about the same time, Mr. O'Shannassy contacted Mr. Eric Bergin to serve with him in the capacity as independent director.

On 29 March the appointments of Messrs. O'Shannassy and Bergin as independent directors of NKWE are announced.

On 5 April the NKWE mining right for the Garatau Project is registered.

On 11 April NKWE announced that RSM and CSA Global have been appointed as NKWE's independent experts, and that the mining right has been registered.

In April Rothschild issued a confidential report (the "Dyson" model) to Jin Jiang/Zijin providing an indicative range of values to be expected from the independent valuer which estimated the range of likely values of the shares between A$0.06 and A$0.14 per share.

On 15 May Venmyn Deloitte updated the December 2017 report to NKWE and confirmed its prior valuation at USD166 million had not changed (based on the same assumptions).

On 29 May CSA Global released a draft of its Independent Technical Assessment of the Garatau Project and Valuation of the other exploration assets of NKWE 'outside' the mine plan of USD84 million.

On 18 June Messrs. O'Shannassy and Bergin are re-elected as directors at NKWE's AGM.

On 28 June RSM issues a draft Fairness Opinion based upon draft report of CSA Global with a valuation range between A$0.086 and A$0.19 with a midpoint of A$0.135 per share.

On 16 August Zijin announced an increase in the offer price to A$0.10 per share. On the same day Messrs. O'Shannassy and Bergin passed a Board resolution to approve the amalgamation and NKWE announced that it had entered into the Amalgamation Agreement.

On 11 September RSM issued a final Fairness Opinion report with a valuation range between A$0.08 and A$ 0.148 with a midpoint of A$0.114 with a supporting report from CSA Global on valuation of resources 'outside' the mine plan.

On 12 September RSM and CSA Global re-issued their reports in the same terms as to valuation.

On 11 October SRK Consulting issued a letter of opinion to the Dissenters supporting a valuation of between A$0.12 and A$0.263 with a midpoint of A$0.192. On the same day, the Dissenters issue proceedings for an appraisal of the fair value of the shares by the Court.

On 24 October the Special General Meeting was held at which the majority of NKWE's shareholders approved the transaction and 22.47% of the shareholders cast their votes against the transaction.

**2019**

On 28 March the Dissenters issued proceedings to obtain payment of their Offer Price entitlement.

On 12 July the Dissenters received their respective entitlements to the Offer Price.

## Factual evidence

48.  There was limited factual evidence adduced by the parties. The Dissenters called one fact witness, Mr. Luke Mathews[24], and NKWE called two fact witnesses, Mr. Scott Li[25] and Mr. Richard O' Shannassy[26].

49. Counsel for the Dissenters suggested that it was surprising that there was no evidence from the directors representing Zijin's interests on the Board of NKWE (through its ownership of Jin Jiang). The Dissenters suggest that the Court should draw negative inferences from the absence of this evidence. The Court observes here that it is up to the parties to decide whom to call as witnesses, and the same rules of procedure apply to the compulsion of witnesses to testify, and their cross-examination, in appraisal proceedings as in any other.

50. I shall deal with Mr. Mathews' and Mr. Li's evidence very briefly. Their evidence did not go to the central issues in the case, and so nothing turns on their credibility or lack of it. However, the Court will address a few matters which are relevant.

---

[24] C2/1/1
[25] C2/5/1
[26] C2/7/1

**Mr. Luke Mathews**

51. Mr. Mathews is the principal of the first plaintiff Glendina Pty Ltd which is his own investment vehicle. Mr. Mathews is also the authorised representative of all the other Dissenters and is an investment adviser and stockbroker by profession[27]. He gave a brief summary of the background to the Dissenters' opposition to the amalgamation and explained that he and many of the other Dissenters had held their positions in NKWE through "*the last few years of uncertainty*" in the dogged belief that the intrinsic value of the shares would one day justify their investment[28]. His witness statement was in effect a summary of the principal arguments that the Dissenters intended to make in relation to the valuation materials, and their criticisms of the independent directors' mindset, namely a predisposition in favour of the transaction[29]. He also annexed the documents to support the appraisal claim. The written evidence was cogent and well presented.

52. One matter which undermined Mr. Mathews' overall credibility was his statement that he could not recall what he thought the fair value of the shares was in October 2018 and he could not recall what he had advised his clients what the fair value of the shares was for the purposes of deciding how to vote at the amalgamation meeting or at the settlement meeting which he attended[30].

53. In the Court's view it was not plausible that Mr. Mathews did not know what he thought the shares were worth. He was an investment adviser and stockbroker who had had close involvement with NKWE's previous capital placements over many years. The Court thinks he knew very well what he thought the shares were worth and what he would have advised his clients what he thought they were worth for the purposes of voting for or against the amalgamation and the price that would have been accepted. Although it may be understandable that Mr. Mathews did not wish to give anything away that might suggest that the valuation proposed by the Dissenters' valuation experts was over-stated, the Court noted a lack of candour on this issue.

---

[27] Day 1 Transcript pages 139 to 144.
[28] Paragraph 29 of Mr. Mathews' first witness statement ("Mathews WS 1") A/2/6
[29] Paragraphs 34 to 40 Mathews WS A/2/7-8
[30] Day 1 Transcript pages 154 and 159.

**Mr. Scott Li**

54. Mr. Scott Li was the chief financial officer of NKWE at the time when the offer was made by Zijin. Mr. Li's evidence was primarily concerned with setting out the history of the Garatau Project, most of which was not controversial, and was required to set the background to the project and the steps that led to the offer being made by Zijin. Mr. Li's role after the offer was made was scrutinized closely in cross examination, particularly the circumstances in which he approached the independent directors on behalf of NKWE and the role he played (or did not play) in supplying information to the independent directors. Mr. Li was not a member of the Board.

55. No allegation of bad faith was made against Mr. Li. While there were some unconvincing explanations given by Mr. Li about when, how and why he contacted Mr. O' Shannassy to serve as an independent director for the purpose of the considering the fair value of the offer, nothing really turns on those explanations. The other main thrust of his cross examination was the suggestion that all the relevant information was not supplied to the independent directors.

56. Mr. Li said that he contacted Mr. O' Shannassy on his own without direction or authorisation from the Board of NKWE to ask if he (and Mr. Bergin) would be prepared to serve as independent directors[31]. He says he then reported back to the Board who accepted his recommendation.

57. It seems to the Court that it is unlikely that Mr. Li took it upon himself to make this contact without authorisation from someone on the Board. This is because (i) Mr. Li also said he had little involvement at board meetings and only attended when requested and for limited purposes[32] and (ii) he had not attended the Board meeting at which the Board considered Zijin's offer[33]. This point has more significance than it first appears because Mr. Li later attended the meetings between the independent directors and, although he said he had a "*passive role*", he was privy to all their

---

[31] Day 3 Transcript page 24-5 "*I approached Mr. O' Shannassy asking whether he can be acting as an independent director for NKWE Platinum, is purely triggered by the letter from Zijin Mining when they expressed interest to have full takeover of NKWE Platinum....Noone gave me such authority or the instruction to speak to any particular person. Mr. Bergin was recommended by Mr. O' Shannassy*" The email sent at the time on 8 March 2019 said: *"Hi Richard, Given NKWE does not any independent directors sitting in its board, **we want** to appoint two independent directors for this coming takeover process. **Are you and your friend Neville Bergin** interested in the role? Scott"* C/8/2 (emphasis added).

[32] Day 3 Transcript pages12 and 28.

[33] Mr. Li said that, prior to his appointment as full time CFO after the transaction was effective, he only spent 8 to 9 hours a week on work for NKWE and that he did not attend any board meetings in March or April 2018: Day 3 Transcript pages 7 and 27.

discussions, and he attended the meetings between NKWE's advisors and the independent directors[34].

58. It seemed to the Court that Mr. Li did not give a clear explanation of the role he played as an intermediary between the Board and the independent directors in the process of supervising the process of obtaining the independent Fairness Opinion. As discussed below, this was a matter for Mr. O' Shannassy and Mr. Bergin to address, but it suggests an inappropriate involvement by a representative of the Board in the independent directors' discussions. The explanation given by Mr. Li was that he was only there to act as a *"bridge"* between the Board and the independent directors. The Court takes this explanation with a pinch of salt.

59. In general Mr. Li was not always straightforward in his answers and the Court gained the impression that his memory of events was selective, but (apart from the points made above) no purpose would be served in analysing these aspects of his evidence in detail because they do not affect the main issue the Court has to decide.

**Mr. Richard O' Shannassy**

60. Mr. O' Shannassy provided a witness statement explaining his role as independent director. He was cross-examined on a number of aspects of his involvement. No allegation of bad faith was made against him. In the context of the events that have occurred, the Court considers that his evidence is important in several respects and needs to be examined carefully and in some detail.

61. Mr. O' Shannassy was asked to serve as an independent director by Mr. Li. This was by email introduction on 19 March 2018, followed by a telephone call later that day. Mr. O' Shannassy's recollection of the details of the call was surprisingly vague. Mr. Li knew Mr. O' Shannassy because they used to work in the same building in the past and had formed a professional friendship over periodic coffee meetings some years in the past when they worked in neighbouring office space. Mr. O'Shannassy is a sole practitioner and is a corporate lawyer by training and has had

---

[34] Although Mr. Li says he was *"often"* at the meetings at which he says he played a passive role (paragraph 47 Li WS 1 C/5/17), Mr. O' Shannassy records his presence at significant meetings in his witness statement: paragraphs 15 and 32. Mr. O' Shannassy also says he continued to have private discussions with Mr. Bergin.

legal experience in Australian mining matters and has served as a non-executive director on the board of two mining companies, and is presently a non-executive director of Focus Minerals Ltd.

62. Mr. O' Shannassy then approached his former colleague Mr. Eric Bergin, who had extensive experience in mining engineering, to serve as an additional independent director. Mr. O'Shannassy said he recommended Mr. Bergin based on his prior experience as an employee at Minemakers Limited (now called Avenira Ltd), an Australian mining company when Mr. O' Shannassy had served on its board as a non-executive director. Mr. O'Shannassy said that Mr. Bergin was a highly regarded mining engineer who has sat on the boards of publicly listed companies[35]. Mr. Bergin agreed to serve as an independent director on NKWE's Board as well. Mr. Bergin did not himself give evidence, and Mr. O' Shannassy speaks for both of them in his descriptions of what they both decided[36].

63. The first important point to have regard to is the purpose for which Mr. O' Shannassy (and by implication Mr. Bergin) understood their appointments to have been intended to achieve. He says that he understood the role was "*to oversee*" the Zijin proposal[37] and that he understood the independent directors were (i) to apply the fairness test to the proposal and (ii) that he had a fiduciary duty to act in the interests of NKWE's minority shareholders and (iii) were to thereby try to get the minority shareholders the "*best offer"* they could. He said that this latter aspect of the role was transactional and involved "*an element of bargaining*"[38]. By applying the "fairness test", Mr. O' Shannassy said he understood that to mean that he had to "*have regard to*" the experts' valuation of the shares that were the subject of the proposed amalgamation transaction.

64. Mr. O' Shannassy then gave a summary of the steps that he and Mr. Bergin took after accepting their appointments as independent directors. He began his explanation by saying that he and Mr. Bergin spent "*some months*" considering the proposal and justified their support for the transaction by saying:

---

[35] These are described in paragraph 9 of O' Shannassy WS C/7/4.
[36] See paragraphs 4-6 of O'Shannassy WS C/7/2-3.
[37] Paragraph 8 of O' Shannassy WS C/7/4.
[38] Paragraphs 21 and 29 O' Shannassy WS C/7/8 and 10

"*If the transaction completed, NKWE's shareholders would receive all cash consideration of A$0.10 per share, representing a 25% increase to the A$0.08 originally proposed by Zijin.*"[39]

65. The independent directors had an introductory meeting on 12 April 2018 with a Mr. Selby of Argonaut Securities Limited ("Argonaut") which had been appointed as corporate adviser to NKWE. Mr. Selby told them that the purchase consideration of A$0.08 was "*fixed*", and Mr. Selby referred to a report that Zijin had commissioned from Rothschild in April 2018 which attributed a likely value on the shares at between A$0.06 to A$0.148, which the independent directors asked to see. They were provided with a copy[40]. The independent directors were also made aware that NKWE had already appointed RSM to provide an independent Fairness Opinion to support the transaction.

66. Shortly after this meeting Mr. O' Shannassy said that he and Mr. Bergin made it clear that they did not support NKWE entering into the amalgamation agreement unless they were comfortable that the offer price was within the range considered by RSM to be fair. It is not clear if this statement was made to the rest of NKWE's Board or Zijin, but it was made at least to NKWE's Australian attorneys[41].

67. In May 2018 the independent directors met with Mr. Gilmore and Mr. Rowe of RSM in Perth. At that meeting the independent directors told Messrs Gilmore and Rowe that that they did not seek to influence RSM's views but that they wanted to see a final draft of the valuation so that they could (in conjunction with Argonaut and NKWE's Australian attorneys) raise any questions they might have. They also explained that they required an opinion as to whether the offered price was considered fair from the perspective of NKWE's minority shareholders.

68. Later in May 2018, NKWE received a letter from the Dissenters' Australian lawyers setting out their objections to the proposed Offer Price of A$0.08 per share. The independent directors provided a copy of that letter to RSM because they did not feel that this would compromise RSM's

---

[39] Paragraph 10 O' Shannassy WS C/7/4.
[40] Paragraphs 12-14 of O' Shannassy WS C/7/5-6.
[41] Paragraph 16 of O' Shannassy WS C/7/6.

independence, and that it would give RSM the opportunity to consider the points which the minority shareholders had raised in forming their view of the fair value of the shares.

69. Pending the receipt of the final draft Fairness Opinion, the independent directors agreed that the provisional price of A$0.08 should be retained in the draft amalgamation agreement on the basis that this could be amended. The independent directors remained of the view that the offer price at a dollar A$0.08 per share was at the low end of the scale of fairness, particularly having regard to the price of a dollar A$0.10 per share which had been paid to Genorah for its NKW shares in October 2015.

70. The independent directors attended the annual general meeting in June 2018 at which they were re-elected as independent directors. At that meeting the minority shareholders put forward a number of written questions to the Board in relation to the proposal. One question related to the fair value of the Offer. The Board gave the following response:

> "The A$0.08 per share offer represents a significant premium to NKWE's share price before Zijin's proposal. For this reason, the board of NKWE decided to engage with Zijin."

71. On 28 June 2018 RSM sent a first draft of the Fairness Opinion[42] to Mr. Li, Mr. Selby, Mr. Bergin and Mr. O' Shannassy. The draft RSM Opinion provided a valuation range of between A$0.086 to A$0.19 per NKWE share, with a midpoint of A$0.135.

72. Following receipt of the draft RSM Fairness Opinion, Mr. Selby arranged a telephone call with the independent directors to discuss the real action from Zijin which had been communicated to Mr. Selby. The upshot of the conversation was that Zijin had indicated that it could go to A$0.09 per share. The independent directors responded that there should be a greater increase to around the midpoint value in the draft valuation report of A$0.135 per share.

---

[42] The final document is titled as Independent Fairness Opinion Report, but to distinguish it from the later RSM Reports in these proceedings I have referred to it as the "Fairness Opinion" for the purposes of the approval of the transaction.

73. This was followed by a telephone call with Mr. Fang of Zijin. Before the call the independent directors had agreed between themselves at A$0.08 per share was too low and that A$0.135 was appropriate, namely the midpoint of the value range in RSM's draft Fairness Opinion. However, Mr. Fang did not agree to make any changes to the offer but said that he would consider what the independent directors had said and get back to them.

74. In the meantime, the independent directors continued to have discussions amongst themselves, but did not think that the offer would be increased to A$0.135. The independent directors decided that they would push for a minimum offer of A$0.10 provided that this value fell within the range of values in the fairness opinion. Mr. O' Shannassy said that he and Mr. Bergen did not genuinely consider that Zijin would improve its offer to A$0.135 but, as the midpoint in the draft range of fairness, it seemed to them to be the obvious "starting point".

75. The first reason given by the independent directors for this view was that the price of A$0.10 represented a premium over the weighted average price of the NKWE shares over the 12 months preceding the offer. Other reasons included Zijin's reluctance to improve the offer, the absence of an alternative superior proposal, the avoidance of risks associated with the project. Of particular importance to the independent directors was that if the proposed vote was not put to the NKWE shareholders, they would lose the opportunity to be compensated at a fair value with the prospect that the NKWE share price would fall if the amalgamation transaction did not proceed. The independent directors were also mindful of the right of a dissenting shareholder to apply to the court for an appraisal of the value of the shares.

76. On 1 August 2018 there was a follow up meeting at Argonaut's offices at which Mr. Selby informed the independent directors that he had had a telephone conversation with Mr. McGee of Rothschild who had indicated that Zijin's final best offer was A$0.09 per share. After some discussion, the independent directors indicated to Mr. Selby that unless Zijin increased its offer to 0.10 per share the transaction would not proceed. They also indicated that if Zijin increased its offer price to A$0.10, then the independent directors would agree to Zijin having a termination right under the amalgamation agreement if 10% of the registered shareholders voted against the transaction.

77. On 10 August 2018 the independent directors were advised by Mr. Selby by telephone that Rothschild had informed him that Zijin had agreed to increase its offer price to A$0.10 per share. There was discussion about whether Zijin would consider increasing that offer further but the independent directors were informed that A$0.10 was Zijin's final offer. Mr. Selby indicated that the offer of A$0.10 was Zijin's best and final offer. In the light of this, the independent directors determined that NKWE should proceed with the transaction for the reasons given in paragraph 75 above[43]. As a result, the independent directors decided to approve the Amalgamation Agreement.

78. On 16 August 2018 the independent directors had a formal meeting at which they (acting alone without any other board members present) resolved on behalf of NKWE to enter into the Amalgamation Agreement. Immediately following that board meeting, the two independent directors executed the Amalgamation Agreement and later the same day NKWE released an announcement to the ASX reporting the execution of the Amalgamation Agreement. These steps were taken *before* RSM had released its final Fairness Opinion.

79. The legal significance of the passing of this resolution was that NKWE's bye laws provided that an amalgamation agreement must be approved by 75% of the shareholders unless the Board approves the amalgamation, in which event the percentage of votes is reduced to a bare majority. This meant that once the announcement had been made that the amalgamation had been approved by the Board, all the shareholders knew that Zijin was in a position to control the shareholders meeting at which the Amalgamation Agreement was to be considered and voted upon.

80. On 11 September 2018, RSM issued its final Fairness Opinion. The Fairness Opinion provided for an assessment of the fair value of the NKWE shares in the range of A$0.80 to A$0.148 with a midpoint of A$0.114, which was a significant narrowing of the range of values. Mr. O' Shannassy said he understood the reason for the reduction in the range was because further technical evaluation undertaken by CSA Global was considered by RSM in its final valuation[44], thereby "*reducing the spread*".

---

[43] This is a summary of the key elements of O' Shannassy WS in paragraphs 28 to 45 C/7/10-17.
[44] This is considered in more detail below.

81. Mr. O' Shannassy defended the independent directors' decision to approve the transaction on the basis that Zijin had improved its offer from A$0.08 to A$0.10. He said that had Zijin not improved its offer to A$0.10 they would not have signed the Amalgamation Agreement. He also said the independent directors took advice from NKWE's lawyers and financial advisers and ultimately conditioned their recommendation to shareholders to the shareholders that they approve the amalgamation *"subject to the reputable and competent independent valuation expert concluding that the offer price was fair"*.[45]

82. Mr. O' Shannassy was cross-examined on a number of key points of his evidence. The main topics related to (i) Mr. O' Shannassy's failure to request copies of prior valuations of NKWE's assets which had been referred to in the audited financial statements and in particular the Deloitte Valuations to inform himself of the range of pre-existing views that had been expressed as to the value of NKWE's mineral assets[46] and (ii) the internal discussions between Zijin, management and CSA Global in the preparation of the supporting technical study for RSM's Fairness Opinion[47] (iii) the constitutional significance of the independent directors' approval of the amalgamation for the voting requirements to approve the transaction[48], and (iv) the failure of the independent directors to pursue a "go-shop" transaction to test the fair value of the Offer Price[49].

83. The substance of Mr. O' Shannassy's evidence in response to these areas of questioning was (i) he did not request any of these other materials because he assumed that RSM would have access to all these materials and would include them or address their significance in the Fairness Opinion (ii) he was unaware of discussions between management and CSA but it would not have surprised him if there were technical discussion because NKWE's management had control of the data (iii) he understood the constitutional significance of the resolution the independent passed approving the transaction and (iv) it did not occur to him to engage in a go-shop bidding process to test the Offer Price in the market.

---

[45] Paragraphs 49-50 of O' Shannassy WS C/7/17-8.
[46] Day 2 Transcript pages 19, 29, 30, 39.
[47] Day 2 Transcript pages 27, 28, 34-36
[48] Day 2 Transcript pages 46-7
[49] Day 2 Transcript pages 42-44

84. No allegations of bad faith have been made against Mr. O' Shannassy or Mr. Bergin in the way they approached their task. But both Mr. O' Shannassy's evidence and chief and his cross-examination left the Court with the strong impression that Mr. O' Shannassy and Mr. Bergin were ill-equipped to perform the functions they were appointed to carry out, or they misunderstood what they were required to do. The reasons for the Court's assessment are set out below.

**Assessment of the evidence of the independent directors**

85. There are a number of areas where the Court feels that it is necessary to make some comments on Mr. O'' Shannassy's evidence, particularly in the independent directors' understanding of their duties and the performance of their role as independent directors in this situation. This is because there are few if any Bermuda cases in which the Court has considered the duties of directors in this situation, and may serve as a useful illustration of some of the issues that independent directors face when accepting an appointment to serve in this capacity.

86. Although there may be arguments to support the view that the independent directors owe a fiduciary duty to the minority shareholders (as expressed by Mr. O' Shannassy) the legal position is more nuanced. However, for the purposes of this case, I do not propose to depart from the conventional view under Bermuda law that a director in this situation owes his or her duty to the company that he or she serves.

87. That duty includes a duty to take into account the interests of the minority shareholders when faced with a bid to compulsorily acquire the shares of the minority. Some of the minority shareholders may favour the bid, and some may oppose it. The independent directors in this case (as in many cases) did not know one way or the other how the minority shareholders would vote. Therefore, it was vitally important that the directors should act as objectively and transparently as possible, without forming any view of whether the proposal should or should not proceed because of subjective factors (such as, for example as in this case, the possible desire of some shareholders to exit at a higher price than the historic traded market price, or the possible desire of others not to sell at all).

88. These gentlemen were appointed for the limited purpose of acting as the guardians of the independence of the process by which the independent Fairness Opinion was obtained, and subsequently presenting their unbiased recommendation to the shareholders in the information memorandum or letter to shareholders that the directors sent out with the special general meeting materials to consider the proposed amalgamation. They also had the important legal function of approving the amalgamation (which is considered below).   There are a number of general observations the Court needs to make to make about their approach to the task they undertook.

*Relevance of the illiquid market for the shares*

89. It is readily apparent that the independent directors saw the Offer Price as representing a premium over the volume weighted average traded price of the shares and thus an opportunity for shareholders to cash out of their investment[50]. However, all the valuation experts made it clear that where there is a history of thin trading and an illiquid market for the shares of a company, the market price is not a true guide to the fair value of the shares[51]. The comparison to the historic average share price premium was therefore not the relevant approach for the directors to take when considering fair value in this case. The independent directors did not seek separate independent legal or financial advice on how they should approach the question of fair value in this situation. In my view this is regrettable.

*No independent Bermuda counsel appointed*

90. In this case, the independent directors expressly say they relied *exclusively* upon NKWE's Australian and Bermuda lawyers and NKWE's Australian financial advisers[52]. In my view, they should have at least instructed independent Bermuda attorneys to advise them on the scope and extent of their duties under Bermuda law (as they were, after all, performing their duties as directors of a Bermuda company) and how they should seek to discharge those duties to the required standard.

---

[50] See also the NKWE response to shareholders at the AGM quoted above.
[51] See D/12/10 at paragraph (d).
[52] O' Shannassy WS 1 paragraph 50 C/7/17-8.

*No independent financial advice obtained*

91. This may (and in my view probably would) have led them to seek financial advice independently from NKWE's financial advisers[53] as to how to interpret and, if necessary, to interrogate the information provided by RSM. The independent directors not unreasonably assumed that the starting point was the middle of the range[54]. They could and should have sought independent financial advice on RSM's assessment of value and (more importantly) sought assistance in interrogating and interpreting the reasons why RSM substantially reduced the "spread" in their final version of the Fairness Opinion.

*Inappropriate sharing of information*

92. The independent directors decided to share the Dissenters' views on the Offer Price with RSM[55]. The explanation for this is difficult to understand. If the independent directors did not intend to influence the views of RSM (as Mr. O' Shannassy suggests) then it would have been more appropriate not to share the objections until after RSM had provided their Fairness Opinion. The appearance that is created by sharing the letter of objections is that RSM were being given a forewarning of issues that the Dissenters were going to raise so that RSM could deal with those objections in the Fairness Opinion[56]. It is also strange that the independent directors wanted to see the Fairness Opinion in draft to ask questions about it in conjunction with NKWE's financial advisers and not (at least) separately from NKWE's financial advisers. It is not surprising that these steps gave the impression to the Dissenters that the independent directors were predisposed in favour of the transaction.

93. Mr. Li attended many of these meetings, but the independent directors say that he remained "*passive*". The description of Mr. Li acting as a "*bridge*" to the Board is not convincing: the independent directors were full directors and did not need Mr. Li to act as a go-between between

---

[53] This is for the obvious reason that Zijin controlled NKWE and the financial advisers were in a position of conflict of interest (actual or apparent) which prevented them from advising the independent directors objectively. It is apparent from Mr. O' Shannassy's account of the meetings with Argonaut that Mr. Selby was acting in NKWE's interest, and not the interests of disinterested shareholders.
[54] C2/7/14 paragraph 38
[55] C2/7/8 paragraph 23
[56] Mr. O' Shannassy uses the word "*alert*".

them and the Board. The impression this "bridge" arrangement gives is that Mr. Li was keeping the Board apprised of the thinking of the independent directors, although this is, of course, speculation. It would have been preferable had Mr. Li not been involved at all to avoid the possibility of creating a misimpression to the minority shareholders. In my view, directors serving in the delicate position of these independent directors should not have allowed Mr. Li to attend the meetings. He had no role to play.

*No records kept*

94. Neither Mr. O' Shannassy nor Mr. Bergin kept any notes whatsoever of any of the meetings or the issues discussed, not even for their own purposes as an *aide memoire*. This is also more than a regrettable lapse. It is to be expected that brief notes should be kept demonstrating the performance of their fiduciary responsibilities to an appropriate standard: but there were none kept by the independent directors[57].

*Directors' independent view of fair value*

95. In the Court's view, the independent directors did not focus on their duty to determine what was in their view the fair value of the shares. Mr. O' Shannassy says in his witness statement that he and Mr. Bergin really thought that the fair value of the shares should lie at the mid-point of the range of fairness[58], namely A$0.135 as set out in the draft Fairness Opinion. However, they agreed to support the Offer Price because they thought that Zijin would not increase their bid based on what Mr. Selby told them in a telephone meeting on 10 August 2018. Mr. O' Shannassy said *"Given this response Mr. Bergin and I determined that NKWE should proceed with the transaction for the reasons previously expressed in paragraph 39"* of his witness statement. None of those reasons was because they thought the fair value of the shares was A$0.10.

---

[57] Mr. O' Shannassy says he sent follow up emails which recorded the substance of the meetings. Most of these were not in evidence. In any event, this is not in the Court's view as satisfactory method of recording the actions of the independent directors in this context.

[58] C2/7/13 at paragraph 33: *"I indicated to Mr. Shelby that Mr. Bergin and I considered there should be a greater increase to around the midpoint value reached by RSM in its draft valuation report of A$A0.135 per NKWE share."* Paragraph 34: *"Mr. Bergin and I had a discussion at which we agreed on a collective approach to Zijin that A$0.08 per share was too low and that A$0.135 was appropriate being the midpoint value reached by RSM in its draft valuation report"*

30

*The independent directors acted prematurely*

96. On 16 August 2018 Messrs. O' Shannassy and Bergin convened a meeting of the directors and passed the resolution approving the amalgamation and resolved on behalf of NKWE to enter into the Amalgamation Agreement. Immediately following the meeting, they executed the Amalgamation Agreement, which announced to the ASX was the same day. These steps were taken *before* RSM issued its final Fairness Opinion.

97. The final Fairness Opinion was not released until 11 September 2018. The value range in the final Fairness Opinion was between A$0.08 and A$0.148 with a mid point of A$0.114[59], which represented a significant narrowing of the range. Mr. O' Shannassy says that his understanding was that CSA Global provided *"updated information"*[60] which had influenced RSM's view of the value range.

*No follow up to question why the fair value range changed*

98. The independent directors did not question what this further technical evaluation was or why it affected the value range. Mr. O' Shannassy said that his reaction was positive because it put the A$0.10 closer to the middle of the range. This is a surprising reaction. The Court considers that his reaction was positive because this made it easier for him to justify agreeing to support the transaction at less than the midpoint of the range of fair value. In the Court's view, that was not the appropriate reaction at all.

99. In evidence later considered in this judgment, it emerged that in reality nothing had changed in CSA Global's report and there was no "updated information"[61]. The independent directors may

---

[59] Mr. O' Shannassy expresses what appears to be relief that the narrower range of values in the final version made the Offer Price look closer to the mid point of the range: see paragraph 47. But he did not explore why the range had been narrowed; he just accepted the rather opaque explanation he was given.

[60] C2/7/17 paragraph 47

[61] Day 4 Transcript G Jeffress pages 85-7 "*I decided there was no need to make any changes. We were just repackaging the content for a different purpose*" p 107-8 and *"The work and opinion in those reports was the same piece of work so regardless of the presentation (inaudible) reports. Yes. Mr. Naidoo undertook the analysis and we sat side by side in front of the computer and went through his conclusions and I made comments, feedback, suggestions and we reached an agreed position on the numbers which were the ones included in the report."* There was no reference to any *"further technical evaluation"* which changed the value range in RSM's draft Opinion to a narrower range in RSM's final Opinion. Mr. Jeffress' evidence was that there was *no* change to the CSA Global report between May 2018 and the final report in September 2018.

not have known this at the time, but they made no effort to find out the reason behind the change. They may have thought that it was too late because they had *already* approved the amalgamation on the basis of the values in the draft Fairness Opinion and they had already entered into the Amalgamation Agreement and announced it to the market.  The speed with which the independent directors approved the transaction before receiving the final Fairness Opinion fosters the strong impression that they proceeded with 'unseemly haste'.

*The independent directors did not 'stick to their guns'*

100. The independent directors did not stick to their view that fair value fell at the mid-point of the range of values, but accepted a lower value because (i) the bidder refused to increase the Offer Price at the meeting with Mr. Fang (ii) NKWE's advisers indicated that no increase was likely to be made (iii) the independent directors did not wish for the proposal to fail because this would deprive shareholders who wished to sell from realising value from the shares that represented a premium on the trading price and (iv) they took the view that if any shareholders who did not like the price could exercise their right to have the shares appraised.

101. In the Court's assessment, none of these factors ought to have influenced the view of the directors as to the fair value of the shares. Moreover, leaving it to a shareholder to seek an appraisal if they did not like the Offer Price is to put the burden in the wrong place. It was for the independent directors to take an objective view as to the fair value of the shares and not simply to pass the burden of the time and substantial cost of seeking an appraisal to a shareholder who is dissatisfied. This is particularly acute in the case of a listed company where the bulk of the minority shareholders are small investors who are not likely to have the resources to pursue an appraisal proceeding on the far side of the world[62].

102. It is also apparent that the independent directors saw it as their job to try to negotiate the offer price on behalf of the minority shareholders.  Had the independent directors stuck to their guns and said that in their view the fair value fell in the middle of the range, then to that extent the

---

[62] The majority of the 400 or so minority shareholders live in Australia and for the most part own small numbers of shares each.

directors would have been right to "negotiate". However, in the Court's assessment, the independent directors ought not to have compromised on their view of fair value because (i) the bidder declined to increase the offer to what the independent directors really considered to be the fair value and/or (ii) the independent directors wanted to save the deal so that some shareholders could cash out if they wanted to. The independent directors had no knowledge of how the minority shareholders (even those who favoured the transaction) viewed the Offer Price. As the colloquial saying goes, they had 'one job': to satisfy themselves independently of the main Board of NKWE as to what was the fair value of the shares before approving the amalgamation or recommending it to the shareholders[63].

103. When the Offer Price was increased to A$0.10 the independent directors considered that their job was done and felt satisfied that they had managed to increase the Offer Price by A$0.02 per share, a fact which they declared to be significant in their letter to the shareholders, namely a 25% increase in the Offer Price. The amount of percentage increase obviously has nothing to do with an objective assessment of the fair value of the shares.

*The reduction of the supermajority requirement*

104. The independent directors held the keys to unlock the requirement for a super-majority vote to approve the amalgamation and to reduce the voting threshold to a bare majority under the bye laws. This was an important responsibility. Once the voting threshold was reduced, the bidder controlled the process by which the approval of the transaction would be achieved, and this is likely to have affected the way in which shareholders would approach the voting process. The disinterested minority shareholders were, in my view, entitled to expect that the independent directors would not approve the transaction unless they were satisfied that the Offer Price represented fair value for the shares. Although the value was within the range of fairness, it was not at the midpoint, which the independent directors believed was the "starting point" for the discussion on fair value (i.e. A$0.135).

---

[63] The Court of course recognizes that there are other elements to their role which are also important and uses the colloquial expression to emphasize the importance of this aspect of their role. This is not to imply that there were no other important aspects to the performance of their duties, including the duty to act even-handedly with the majority. However, it is notable in this context that the conventional view is that a company has no legal interest in the value of its shares: **Pilmer v Duke Group Ltd (in liq)** [2001] HCA 31.

105. It is of course true that on the day the vote passed by more than 75%, and it may be said that no harm was done, because the vote would have passed in any event even if the threshold had not been lowered to a bare majority. However, there is no way to know if some of the minority shareholders voted in favour of the amalgamation simply because they saw the outcome as predetermined because the bidder now had the right to control the outcome of the meeting and that the result was a *fait accompli*.

*Inadequate explanation of the independent directors' view on fair value*

106. The independent directors issued a letter saying that they were satisfied that the Offer Price was fair[64], when it is apparent that they actually thought it should have been higher. Some more detailed explanation ought to have been given for the reasons why the directors considered the Offer Price to be "fair value" in those circumstances (i.e. the bidder was unwilling to go higher and the Offer Price gives those shareholders who wish to cash out at a premium to the historic trading value).

*Lack of a superior bid*

107. The independent directors' reference in their letter to the shareholders of a lack of a superior alternative proposal was also inapt, since no attempt had been made to seek another bidder or stalking horse for the bid. Whilst it may not be appropriate to "go-shop" or seek alternative bids in every case (which will depend on the exercise of judgment by the independent directors in the particular circumstances) it is not appropriate to give the impression that there is no superior bid (which implies some action on the part of the company to solicit competing offers) when the reality is that the  transaction is a compulsory acquisition by the majority shareholder which controls the Board and the shareholder vote. The question for the independent directors was whether the Offer Price represented, in their independent opinion, the fair value of the shares.

---

[64] A/3/88 "*The Amalgamation Consideration to be received by the Shareholders (other than Zijin or any of its subsidiaries) of A$0.10 sits within the value range as assessed by the independent Financial Expert **and constitutes fair value** for each Share.*" (Emphasis added).

108. In summary, in the Court's view, the independent directors ought to have (i) instructed independent Bermuda counsel to advise them on how best to perform their duties as independent directors of the Board in the context of the proposed amalgamation (ii) instructed independent financial advisers[65] to assist them in assessing the information that was presented to them in the draft and final reports from RSM (iii) they ought not to have provided the objections from the Dissenters to RSM until after the draft Report had been prepared and they ought to have kept records of their meetings (which should not have included anyone whom might be seen as providing information to the Board indirectly) (iv) they ought to have interrogated RSM on the reasons for the change in CSA Global's technical assessment at the last minute and (v) they should not have approved the amalgamation before the final Fairness Opinion had been released and they had checked the reasons for the change and most importantly, (vi) they ought to have stuck to their own independent view of what fair value represented, based on the information they had assessed, rather than being influenced by the bidder's lack of appetite to pay that price.

109. It is disappointing that the independent directors did not bring to bear the experience they have had in other contexts to the discharge of their duties as independent directors in relation to the amalgamation in this case. The minority disinterested shareholders (whether they favoured the transaction or not) were, in my view, entitled to expect a higher degree of professionalism from Messrs. O' Shannassy and Bergin.

**Expert evidence on the mining and technical assessment of the Garatau Project**

*The Fairness Opinion*

110. As already explained, NKWE approached RSM to provide the independent Fairness Opinion in late March or early April 2018, shortly before the independent directors were approached by Mr. Li. The engagement letter was signed on 15 April 2018. The director responsible for compiling the valuation analysis and producing the RSM Fairness Opinion was Ms. Nadine Marke. RSM issued a draft Fairness Opinion on 28 June 2018 and then issued a revised Fairness Opinion on 11

---

[65] RSM and CSA Global were appointed before the independent directors were appointed, so the independent directors had no involvement in setting the parameters of the instructions or managing the process. The independent directors took advice from Argonaut who had been appointed as the NKWE's financial advisers but who looked to the main Board for their instruction, not the independent directors.

September 2018, and republished it date 12 September 2018. This Opinion was substantially the work of Ms. Marke[66].

111. RSM also relied heavily upon the technical assessment of the Garatau Project originally produced by CSA Global in May 2018[67] in producing its draft Fairness Opinion. At the same time, CSA Global re-issued its technical assessment report on 11 September 2018 and re-issued it again on 12 September 2018. As has been noted earlier, each of the CSA Global reports produced in 2018 is expressed in the same terms (save for some immaterial changes to format). The person responsible for compiling the valuation analysis and producing the final 2018 CSA Global Report (and its earlier versions) was Mr. Graham Jeffress.

*The Experts' Reports*

112. NKWE's Bermuda attorneys instructed Mr. Jeffress of CSA Global[68] to provide an expert report on the technical assessment and valuation of NKWE's mineral assets to support the expert report on valuation of RSM (Ms. Marke). These were the same individuals who had provided the Fairness Opinion referred to above.

113. CSA Global is based in Perth in Western Australia. The selection of CSA Global as an expert was made because NKWE is a mining company listed on the ASX and NKWE has an office in West Perth (although NKWE also has an office in South Africa). Mr. Jeffress qualified in applied geology and has had 35 years' experience in mineral exploration geology, principally in Australia.

114. The Dissenters relied upon a report[69] prepared by Mr. Andrew Van Zyl of SRK Consulting (South Africa) (Pty) Ltd. Mr. Van Zyl was also originally instructed to provide his comments on the Fairness Opinion in 2018[70]. Mr. Van Zyl has direct experience of mining in South Africa and has personal familiarity with the region in which the Garatau Project is situated. Mr. Van Zyl is

---

[66] Her review partner was Mr. Glynn Yates, and she reviewed the work of the previous partners who had been involved but who had either retired or left RSM by the time the Fairness Opinion was issued: D/5/4.
[67] The RSM Fairness Opinion records that *"RSM instructed CSA to act as independent specialist and provide valuations of the Company's Garatouw Farm 'outside' of the current mine plan and the Hoepakrantz and De Kom exploration assets."* F2/5/36
[68] E/4/3
[69] E/2/1 and his reply E/3/1.
[70] C/2/288

qualified in Financial Economics and Econometrics, and Chemical with Mineral Processing and has had over 25 years' experience in mine and project valuation.

115. The expert evidence on the mining and technical assessment was central to the process of assessing the value of the mining right owned by NKWE because the value of the mineral assets comprising the Garatau Project were the most important "inputs" for the calculation of the financial experts to conduct their valuation analysis.

*Background to the approach to valuation of the mineral assets*

116. There were several separate mineral assets that needed to be valued by the geological experts. It will be recalled that following the 2012 DRA Feasibility Study, the decision had been taken by NKWE to divide the Garatau Project into to two separate stages. The first stage was to develop the Garatauow farm first, and then later develop the Hoepakrantz and De Kom farms.  This decision meant that for the present purposes, the Garatouw farm assets were the most important for the purposes of the mineral valuation exercise. The valuations of the mineral assets on the two other farms were not really in dispute.

117. The Garatouw farm is comprised of the mineral assets within the mine plan (i.e. the area considered to be the most capable of economic development due to location and access to infrastructure including labour supply, power, water and road and rail networks) and the area which was not as easily accessible and therefore not within the (initial) mine plan.

118. The mineral asset valuation therefore was divided into separate parts comprising (i) the value of mineral assets within the mine plan at Garatouw farm (ii) the value of the mineral assets 'outside' the mine plan at Garatouw farm (iii) the value of the mineral assets at Hoepakrantz farm (iv) the value of the mineral assets at De Kom farm. Each of those farms comprise mineral assets that fall within (a) the 4E group of minerals (platinum, palladium, rhodium and gold) which are present within the mineral deposits in the Merensky Reef and (b) the Upper Group 2 Chromitite (UG2) layer (situated below the Merensky Reef).

119. In developing its business plan following the optimization of the earlier Bankable Feasibility Study in 2009, the updated DRA Feasibility Study in 2012, NKWE had developed its own discounted cash flow financial model for the assets within the mine plan. This model was the subject of separate financial evaluation by RSM in its study in the preparation of the Fairness Opinion, which will be considered separately below.  However, the cash flow model did not include the assets 'outside' the mine plan. In 2018 CSA Global's Report in support of the RSM Fairness Opinion therefore addressed only the range of values that were to be associated with the assets that were not subject to NKWE's financial model for the development of the mine at Garatouw farm. The conclusions drawn by CSA Global did not change between their first report dated 29 May 2018 compared with the final report dated 12 September 2018[71].

120.  In addition to the valuation of the mineral assets 'outside' the mine plan, CSA Global also made some general observations on the cash flow model for the assets within the mine plan. These observations included (i) downgrading the metallurgical assumptions by 3% in the financial model (ii) adding an additional capital expenditure allowance for owners' costs and sustaining capital (iii) conducting locked cycle tests to determine 4E grade and recovery to the precious metals concentrate[72] and (iv) to clarify the execution strategy (although this was not explained). In CSA Global's view the optimised and updated DRA 2012 Study did not reach a Class 3 level of a Definitive Feasibility Study for the Project. These points are mentioned here because (i) they address matters falling *within* the mine plan and (ii) they are relevant to the financial analysis undertaken by RSM considered below when the financial valuation analysis is examined.

121.  On 11 October 2018 Mr. Van Zyl produced an opinion[73] on behalf of the Dissenters in which he set out his views on the analysis by CSA Global. This was the basis upon which the Dissenters put forward their challenge to the fair value of the shares compared to the Offer Price and was the evidential foundation of the launch of application to this Court for an appraisal.

122. The main points of difference between Mr. Van Zyl and Mr. Jeffress (and his team) were that in Mr. Van Zyl's opinion (i) the value of mineral assets in the RSM report (based on CSA Global's

---

[71] See F2/1/6 and F2/4/6.
[72] i.e. to test the quality of metal recovered from the ore and its relationship to the amount of solvent required to extract it.
[73] A/3/349: I have used the term 'opinion' here to distinguish it from his Report to the Court discussed below.

input) for the assets within the mine plan were understated because they were valued by CSA Global as "Mineral Resources" and not "Mineral Reserves" [74] (ii) the beta discount rate applied by RSM on the weighted average cost of capital ("WACC") was excessive and produced a negative net present value ("NPV")[75] for the Garatau Project.

123. Applying his own analysis in his opinion in October 2018, Mr. Van Zyl reached a range of values between A\$108 million and A\$236 million for the Garatau Project as a whole, with a mid-point of A\$172 million, which translated to a fair value of A\$0.192 per share.

124. These points remained as key areas of difference between the experts when they exchanged their experts' reports in these proceedings. I will take the evidence they each gave in the sequence it was given.

## Mr. Andrew Van Zyl

125. Mr. Van Zyl submitted a first report dated 29 March 2024[76], followed by a second Report dated 5 July 2024[77] in response to CSA Global's expert mineral valuation report and RSM's expert Valuation Report. Mr. Van Zyl then submitted a Joint Report with Mr. Jeffress dated 21 August 2024[78] after the meeting of experts which 39ptimized39 the areas of agreement and disagreement between the technical experts. It is convenient to set out the key points on which Mr. Van Zyl and Mr. Jeffress were agreed[79] before turning to the points on which they differed and considering Mr. Van Zyl's oral testimony in more detail.

---

[74] The term "**mineral resource**" denotes *"a concentration or occurrence of solid material of economic interest...in such form, grade...and quantity that there are reasonable prospects for eventual economic extraction"*. The term "**mineral reserve"** denotes *"the economically mineable part of a measured and/or indicated mineral resource...which may occur when the mineral is mined or extracted mineral deposit and is defined by studies at pre-feasibility or feasibility level as appropriate that include the application of Modifying Factors. Such (sic) studies demonstrate that, at the time of reporting, extraction could be reasonably be justified."* JORC Code (2012) F7/6/11 and 16.

[75] This term does not refer to a specified value but is a term of art which means that the project is not technically achievable at an economic cost: it is *"the measure of the difference between the discounted revenues, or inflows, and the costs, outflows in a discounted cash flow analysis"*: F17/14/71 International Valuation Standards (6th Ed).

[76] E/2/1

[77] E/3/1

[78] E/6/1

[79] Only the material points of agreement are here set out.

*Agreed matters*

126. It was agreed between Mr. Van Zyl and Mr. Jeffress that:

(i)      a positive net present value is required before a Mineral Reserve is declared;

(ii)      the typical outcome of a positive pre-Feasibility Study is the decision to progress to a Feasibility Study and the declaration of a Mineral Reserve;

(iii)      progressing with an early Works Programme would not usually happen on a negative NPV;

(iv)      a Feasibility Study with a positive NPV and with all permitting in place (sic) would typically have an or reserve statement reported in accordance with a recognized public reporting code such as the JSOC code;

(v)      the DRA work was done by qualified engineers and signed off by a competent person;

(vi)      the Deloitte work was done and signed by geologists and engineers able to act as competent persons for Bushveld PG E assets, or as valuation practitioners;

(vii)      the outcome of evaluation according to the code, when done by a Competent Person, should not differ—whether it is for funding purposes or as a Competent Person's Report;

(viii)      there is no such thing as a *de facto* Mineral Reserve in CRIRSCO family of reporting codes;

(ix)      they agreed the comparable transactions and multiples and used the same transactions, as there are limited transactions that could be considered comparable and relevant;

(x)      the valuation of the Hoepakrantz and De Kom ounces was generally agreed upon.

*Matters not agreed*

127. The following matters were not agreed:

(i)      Whether the net present value was positive or negative

(ii)      Whether the Garatouw Project was at a pre-development stage or an exploration stage

(iii)      Whether the ounces measure in the life of mine plan ('inside' ounces) should b e valued as if they were reserves or as resources

(iv)      The discount of the resource value by 3% based on the measured 4E recovery rates

(v)      Whether operating costs should be adjusted based on the discount rate applied in (iv)

128. Mr. Van Zyl's first expert report[80] was based upon two related assumptions of fact which affected his approach to the valuation he was asked to carry out. The first was that NKWE had declared a Mineral Reserve following the DRA updated Feasibility Study in 2012, although none had been produced in disclosure in the proceedings, and he had not seen the supporting techno-economic model (TEM) on which the declaration of a Mineral Reserve was based. Mr. Van Zyl relied for this assumption upon two reports which had been produced by Venmyn Deloitte in South Africa in 2017, and an update produced in 2018, which referred to a "*Reserve Statement per CCIC, May 2012 DRA Feasibility Study*" and "*Reserve Statement per TWP as at January 2011*"[81] to underpin their valuations in two separate Independent Mineral Asset Valuations of the mineral assets of NKWE. He also relied upon a Resource and Reserve Statement signed by Mr. Tinus Lotz of DRA Mining Consultants which had been disclosed in discovery in the proceedings[82].

129. Based on these references in the reports commissioned and adopted by NKWE, Mr. Van Zyl said that the only logical conclusion was that the mineral resources referred to in the Fairness Opinion and the subsequent expert valuation reports produced by RSM and CSA Global had substantially undervalued the mineral resources, which ought to have been 41ptimized41i as mineral reserves, thereby increasing the value of the assets and producing a positive net present value of the Garatau Project.

130.   This led Mr. Van Zyl to value the mineral reserves using a market value approach. He valued the life of mine resources as "Reserves" and applied a market value to them based on comparable transaction values derived from other mines.

---

[80] E/2/1

[81] F3/1/3

[82] F4/21/2 This statement was dated in March 2017 (5 years after the 2012 DRA FS) apparently in response to requests made by Venmyn Deloitte for the relevant support in the belief that the original Reserve Statement had been lost:. Day 4 Transcript page 35 Mr. Van Zyl: "*I have stated quite clearly that I have not been able to follow a clear path through to a normal reserve declaration. I have stated quite clearly there are a number of indications that a reserve exists but it is not possible to say which reserve was declared by who on what basis with an NPV positive financial model attached to it.*"

131. The second assumption made by Mr. Van Zyl was that a substantial percentage of the Resources recorded in the Deloitte Reports could be re-classified as Reserves, but that there was a proportion of those Resources that would not be likely to be able to be declared as Reserves. Mr. Van Zyl was unable to say what that proportion was because he did not have access to the supporting materials, and could not trace the declaration of the reserve, but he estimated that 8.12 million ounces of 4E metals was a reasonable assumption[83]. He accepted that the figures in the DRA 2012 Feasibility Study and CCIC report were not reserves[84]. He also accepted that the declaration of Tinus Lotz in 2017 was not likely to be reliable[85].

132. The underlying premise of his valuation was that in general a declared reserve ounce is worth considerably more than a mineral resource ounce, based upon the fact that before a mineral reserve can be declared a Competent Person must have issued a report explaining the justification for the declaration of a mineral reserve[86]. The studies had been conducted by consultants who had such competent persons working on the studies, so it was (he said) a reasonable inference to draw.

133. In answer to the criticism by CSA Global that no reserve had in fact been declared, Mr. Van Zyl said that the absence of a declaration does not mean that the Reserve did not exist, and pointed to a number of facts which he said supported the declaration of what he called a *de facto* reserve. NKWE had continued to progress the project in the same way that they would have done had there been a declaration of a reserve. Mr. Van Zyl said that it was to be inferred from this that NKWE believed that the development of the mine was technically achievable and economically viable, otherwise it would not have continued invest substantial sums into the development of the mine.

134. Other factors included the Feasibility Study which led to an optimization plan and further updated models for the mine plan, the grant of 42ptimized42ion for the power project for Garatau, the grant of water the license, the commencement of the Early Works Programme and the

---

[83] E/2/16-17 Day 3 Transcript page 164-5
[84] Day 3 Transcript page 171 Mr. Van Zyl: "*Well, I mean it looks like a reserve declaration, but it isn't, if you like.*" Day 4 Transcript page 11-12 referring to F4/6/18: Q: no mention of it? Mr. Van Zyl: "*Certainly not on page 18.*" Q:...Anywhere else? Mr. Van Zyl: "*I couldn't tell you.*" Mr. Van Zyl accepted that he relied on the statements in the Venmyn Deloitte reports as to the declaration of reserves without checking the original reports on which those statements were based. Day 4 Transcript at page 14.
[85] Day 3 Transcript page 171: Mr. Van Zyl: "*I would be reluctant to declare a reserve on something which you haven't done work on since 2011.*"
[86] "Competent Person" is defined in JORC Code para11 at F7/6/7. A company may not declare a reserve unless it has been approved by a Competent Person who has applied the relevant modifying factors to the declaration: JORC Code paragraph 9 F7/6/6-7.

registration of the mining right. Mr. Van Zyl suggested that none of these things would have progressed unless NKWE believed that there were mineable reserves. This meant that NKWE had in effect declared the reserves to exist, and therefore there had been a *de facto* declaration of a Mineral Reserve. Mr. Lowe KC also suggested that the investment made by Zijin in 2013 suggested that Zijin thought that the mine was feasible and the acquisition of the minority's shares contemporaneously with the registration of the mining right was strong corroboration of the belief that the mine was technically achievable and economically viable.

135. Mr. Van Zyl's second expert report[87] addressed specific points that were raised in Mr. Jeffress' expert report for CSA Global. These points were responses which it is not necessary to describe in detail because they are dealt with in the evaluation of the main points discussed below. However, Mr. Van Zyl did acknowledge that further work needed to be done to update the technical assumptions that underpin the conclusions of the 43ptimized feasibility study[88].

*No declaration of a mineral reserve had in fact been made*

136. In a searching cross-examination by Mr. Chivers KC, Mr. Van Zyl stuck to the fundamental premise of his analysis. However, Mr. Chivers carefully retraced the origins for the Venmyn Deloitte's references to the declarations of a mineral reserve by DRA and CCIC, and it became very clear that no such declarations had ever been made[89]. Mr. Van Zyl candidly accepted that he had been unable to trace it, but he relied upon the fact that Venmyn Deloitte had received the information from NKWE[90]. Mr. Van Zyl agreed that he had based his assumption of a declaration of a mineral reserve on the Venmyn Deloitte Reports without checking the source materials[91].

137. But there is no evidence that such a declaration was ever made by reviewing the relevant reports by CCIC and DRA that are said to be the sources of the statement in the Venmyn Deloitte Reports on which this assumption of fact depends. As to Mr. Lotz's declaration, Mr. Van Zyl

---

[87] E/3/1

[88] E/3/12 at paragraph 3.7

[89] Day 4 Transcript pages 22 to 26 Mr. Van Zyl accepted that the CCIC Report and the Turgis (incorporating the study done by the Mineral Corporation) concluded that there were fatal flaws in the prefeasibility study which needed to be addressed before any declaration of a mineral reserve could be made. At page 34 Mr. Van Zyl agreed there was no reserve statement and that any suggestion of a revised mineral resource statement and mineral reserve statement was dropped from the report.

[90] Day 3 Transcript page 165.

[91] Day 4 Transcript page 14.

accepted that it is not sufficient for a competent person simply to sign a mineral reserve statement without the necessary supporting materials in terms of reports and studies and analysis[92].

*No "de facto" declaration of mineral reserve is permissible*

138. The Court cannot infer that a *de facto* reserve had been declared in the face of the clear evidence that a declaration had not been made and based solely upon steps that were taken to progress the project. There are numerous possible reasons why NKWE might not have declared a reserve in 2012, because it was clear that further work needed to be done before the project could proceed[93], or the fact that NKWE had not (yet) obtained registration of its mining right, or the absence of financing[94]. The commencement of the Early Works Programme[95] does not of itself provide a basis for treating the mineral resources as "reserves". Even the registration of the mining right does not provide a sufficient basis for determining that there is a sufficient basis for the declaration of a reserve. Mr. Van Zyl accepted that only a Competent Person can make that declaration in accordance with the requirements of the relevant Code, and he accepted that there was no such declaration based upon any study that he had seen.

139. The JORC[96] and VALMIN[97] Codes do not allow for *de facto* declarations, as Mr. Van Zyl rightly accepts. It seems most likely that the Resource and Reserve Statement signed by Mr. Lotz five years after the DRA FS was signed in the mistaken belief that such a declaration had been made but had not been documented properly. It was therefore a mistake. Its existence, however, not unreasonably gave additional traction to Mr. Van Zyl's belief that such a reserve statement had naturally followed the 2012 DRA updated Feasibility Study.

140. In my view, contrary to the position advanced by Mr. Van Zyl, the Court cannot infer a declared Mineral Reserve from the steps that the owner of a mining right might take to develop the project. That would defeat the purpose for which the Valuation Codes were put in place:

---

[92] Day 4 Transcript page 35.
[93] Day 4 Transcript pages 22, 24, 43 and 44.
[94] Day 4 Transcript page 4 Mr. Van Zyl: *"I'm.... working through whether it matters if something is financeable by this company. Yes, it could be one of the concerns."*
[95] Day 3 Transcript page 178 Mr. Van Zyl: *"I guess it depends on your definition of an early works programme, but in and of itself it doesn't mean you are proceeding."*
[96] Joint Ore Reserves Committee (2012 Edition) F7/6/1 ("JORC")
[97] VALMIN Code (2015 Edition) F7/4/1

namely, to ensure that investors are not misled into believing that there is a mineral reserve purely on the basis of the subjective actions taken by the owner of the mining right, who obviously has an interest in promoting the value of the project.

141. The very substantial change in the valuations produced by treating the resources as reserves that is contained in Mr. Van Zyl's own analysis makes this point very clear—it raised the value from A\$97.5 million (the midpoint value in RSM's final Fairness Opinion in September 2018) to A\$141 million (the midpoint value in Mr. Van Zyl's report).

142. The Court cannot infer an implied value without direct admissible evidence that supports it.

*No reliable valuation is supported by Mr. Van Zyl's analysis*

143. The result of not having a declaration of a reserve fundamentally undermines the whole premise upon which Mr. Van Zyl's technical valuation analysis was based, namely that the Garatau Project had a positive net present value on the Valuation Date. If the net present value was negative, this means that the DCF calculation of value was not appropriate for the purposes of estimating the value of the mining interests.

144. Mr. Van Zyl did not put forward an alternative basis for valuation if the life of mine (i.e. the 'inside' ounces) because he was convinced that a declaration of a mineral reserve must have been declared. It is not possible to support an alternative valuation based upon his analysis and report. Any proposed estimate would be no more than an educated guess, which is not sufficient for the Court to base its appraisal on. The Court cannot plump for a figure of possible implied value.

*The comparative transactions point*

145.   In trying to assess the value based on market value and calculate a resource multiple to use to determine the value of the mineral assets at Garatouw farm, Mr. Van Zyl identified ten transactions that were relevant, and then eliminated those that were not comparable in terms of size of stage of development. This resulted in two comparable transactions. He accepted that this

sample size was too small to be of any real value to the Court in assessing value.[98] This is an important point which is examined again in relation to Mr. Jeffress' and Ms. Marke's evidence.

*The 4E discount point*

146. In addition, Mr. Van Zyl criticised Mr. Jeffress' approach to the adoption of a high discount rate for the recovery of the minerals. This arose because Mr. Van Zyl did not agree that it was appropriate for Mr. Jeffress to reduce the percentage recovery of the metal at the approved quality or grade. He also complained that Mr. Jeffress did not make the adjustment in the lower production cost that would result from such a reduction. Mr. Jeffress justified his discount on the wisdom of his experience and judgment, and although the level of discount may be debatable, Mr. Van Zyl accepted that there was room for debate as to the metal grades produced based on the limited sampling that had been done, and that more sampling was required to reach a greater level of certainty[99]. Mr. Jeffress, however, was shown to be wrong in the presentation of the information of the information that supported this point in his report (see below) but the 4E recovery point does not produce a positive net present value without the declaration of a mineral reserve.

*The WACC point*

147. This was a point Mr. Van Zyl directed at the RSM expert report, rather than at Mr. Jeffress' report on technical matters. Mr. Van Zyl made two points on this. He made the assumption that the debt-to-equity ration for the financing of the Garatau Project would be more likely to fall in the range of 30% debt to 70% equity. He did not explain why, except to say he though this would be a more 'typical' ratio. He said that RSM's assumption of 90% equity and 10% debt was not a typical ratio and had the effect of increasing the discount rate. In addition, he disagreed with RSM's *beta* factor (industry risk) in RSM's was too high, given the known conditions. His conclusion was that RSM's WACC calculation of 9.75% was much higher that was justified. Mr. Van Zyl estimated the factor to be 8.43%. However, he accepted that there was uncertainty over the discount rate[100].

---

[98] Day 3 Transcript pages 136-8 Q: you haven't explained why these two companies are suitable to use as the high and low end of a valuation…?  Mr. Van Zyl: *"It appears not."*
[99] E/2/32 and Day 3 Transcript pages 151-3.
[100] E/2/32

148. Mr. Van Zyl is obviously a highly skilled and experienced in this field and made a good presentation of the arguments that supported the inference that a mineral reserve had been declared. He gave his evidence in a professional and forthright manner, and the Court found his evidence to be credible, although the conclusions he reached over-reached the evidence he had to support them, and the conclusions he sought to infer were not capable of verification.

149. Mr. Van Zyl did not follow the evidence back to the source, and if he had done so, he would have accepted (as he ultimately did in cross examination) that there had never been a mineral reserve declaration and that he would not have declared a reserve without the supporting material that is required for a Competent Person to declare a reserve under the relevant Codes.

150. In the end, the evidence given by Mr. Van Zyl did not discharge the evidential burden of satisfying the Court that the technical assessment justified a net present value for the Garatau Project at the Valuation Date. This means that there is no positive evidence that the Court can draw from his analysis to support a valuation of the shares based on a discounted cash flow forecast.

**Mr. Graham Jeffress**

151. Having identified the key points of difference between the two mining and technology experts, I will not set out in detail the whole of Mr. Jeffress' evidence.

152. The essential points made in Mr. Jeffress' evidence in his first expert Report to the Court repeated the analysis CSA Global had given in the report supporting the Fairness Opinion. In summary, these were that (i) there was no mineral reserve declared[101] and (ii) the value of the mineral resources in the life of mine plan (the 'inside' ounces) were to be valued on the same basis as the mineral resources 'outside' the life of mine plan (the 'outside' ounces) which generated a negative net present value (ie there was no definitive feasibility study which supported the development of the plan that was technically achievable at an economic cost) and therefore the proper approach to the valuation of the assets was by way of comparative market value rather than

---

[101] E/4/87

by way of a discounted cash flow projection, which accordingly reduced the valuation of the mineral assets substantially.

153. The main points of difference between Mr. Jeffress and Mr. Van Zyl have been mentioned, namely that Mr. Jeffress and his team had reservations about the grade of the ore that would be recovered on the basis of the plan adopted by NKWE which resulted in a further discounting of the 4E recovery which also had a dramatic effect on the valuation[102]. Mr. Jeffress' report put the (preferred) value of the mineral assets at the Garatau Project at US$106 million[103]. It was this analysis that informed the financial valuation performed by RSM (which will be considered separately below).

154. There are a number of difficulties with Mr. Jeffress' evidence on which the Court feels it necessary and appropriate to make some comments. I have set these concerns out under two broad headings below.

*Expert testimony*

155. The first aspect of the evidence presented in his first expert report to the Court that requires comment is that Mr. Jeffress performed none of the underlying analysis himself[104]. Whilst it is normal for an expert witness to delegate tasks to members of his team to assist him (or her) in the preparation of the expert report, Mr. Jeffress' role was more of a co-ordinator of other experts rather than the principal expert giving the evidence.

156. Most of the matters on which the first expert report turned were therefore in fact prepared by persons other than Mr. Jeffress (and persons not employed by CSA Global). He did not supervise these external experts or review their underlying working or data. He did not assess their

---

[102] E/4/77

[103] E/4/6

[104] Day 4 Transcript page 73 Mr. Jeffress: *"No, the process would have been that the different authors in the different disciplines would have reviewed this work, they would prepare the drafts, and populate that in an assessment report. The value, Triv Naidoo at that stage, is the one who would have checked and compiled these. I came into the process at the per review stage. So here is our draft document."* Page 75 Mr. Jeffress: *"The work that was done was I worked with my colleague Triv Naidoo who...did the original valuation work back in 2018 and we had a look at the past report, and had a look at what –whether we needed to change anything to meet the requirements that we were asked from the legal team..."*; page 84: *"Q: You didn't write any of it. Let's get our definitions straight. Okay? You're the responsible person who accepts responsibility for the report. That's why you sign it. Correct?"* Mr. Jeffress: *"Yes."*

calculations or the data they sued to draw their conclusions. He says the finished product and the conclusions that the other experts had reached were presented in the report, but he was himself not in a position to speak to any of the underlying technical work that went into preparing the report[105].

157. He had subcontracted all of the technical work out to independent sub-contractors who prepared the different parts of the report which were then inserted into a standard form template. Mr. Jeffress then said he reviewed those reports (even in respect of areas which were not his area of expertise) and checked the spelling and presentation for jargon and "sense checked"[106] their conclusions[107]. He then signed off on the report[108].

158. However, this weakens the report in a number of respects because when pressed in various respects, Mr. Jeffress was unable to answer questions directly based on his own analysis or understanding of the issues.

159. In the Court's view this falls far short of ideal. It is one thing for a busy practitioner who is the expert to delegate tasks to subordinates on his team over whom he (or she) has direct supervision, and in areas where the supervising expert has relevant expertise, which are then reported back to the expert and reviewed and then adopted and included in the report. It is quite another thing if the testifying expert has played no part in the preparation of the constituent parts of the report but has simply reviewed them and "sense-checked" them, including matters which fall outside his (or her) expertise.

160. For example, Mr. Jeffress is not a metallurgist, and yet he offered expert evidence on the reduction of recovery of minerals and the exercise of judgment in discounting the likely cost and rates of 4E recovery (discussed above)[109]. The weakness in his evidence became evident when Mr.

---

[105] In fact, the only discussion he appears to have had were with Dr Naidoo was in June 2018: Day 4 Transcript page 139: Mr. Jeffress: *"The work and opinion in these reports is the same piece of work so regardless of the presentation ...reports, yes, Mr. Naidoo undertook the analysis and we sat side by side in front of the computer and went through his conclusions and I made comments, feedback, suggestions, and we reached an agreed position on the numbers, which were the ones recorded in the report."*

[106] Day 4 Transcript page 87.

[107] Day 4 Transcript page 72 Dr. Belinda Van Lente: resource geologist; page 75 Trivendren (Triv) Naidoo: Valuer; page 76; page 77 Dr. Gary Patrick: metallurgist; page 79 Dr. Limpitlaw: hydrogeologist.

[108] Day 4 Transcript page 98 Mr. Jeffress: "I had a very good team who did the work for me."

[109] Day 4 Transcript page 145 Mr. Jeffress: *"It is a recommendation for an adjustment to the financial model based on the technical review that he [Dr. Patrick] did, so he looked at a range of different aspects and said "Having had a look at that, I*

49

Jeffress was cross-examined on different aspects of the underlying data relied upon in the report that were undeniably wrong[110] and where the report misstated the results of the data on which some of the opinions were based.

161. This point was not pivotal to the determination of fair value, and so the deficiency in his evidence does not go to the fundamental basis of the valuation evidence. However, it gives the Court reason to approach Mr. Jeffress' evidence very cautiously. It also illustrates the point made above that the testifying expert should be the person who is able to testify directly as to the underlying data on which the substance of the expert opinion is based, even if that means that more than one expert has to testify at the trial on different aspects which fall within different professional disciplines.

*No change between June and September 2018 in CSA Global's technical assessment*

162. From the summary given above and the supporting references in the transcript, it can be seen that Mr. Jeffress also accepted that there were in fact no material changes between the original draft report in May 2018 and the subsequent drafts which led to the final CSA Global Report dated 12 September 2018[111]. The content was simply "repackaged". This point has been made already in relation to the revision of RSM's valuation range in the final version of the Fairness Opinion in September 2018.

163. Importantly, there was no evidence from Mr. Jeffress (either from his own work or based on the information provided to him by CSA Global's subcontracted experts) that there was "*updated information*" provided to RSM by CSA Global between the date of the draft Fairness Opinion produced by RSM to support RSM's reduction in the range of fair value from A$0.086 and A$0.19 with a midpoint of A$0.135 per share (in the draft) to A$0.08 and A$ 0.148 with a midpoint of A$0.114 (in the final). This means that Mr. O' Shannassy was given an explanation for the reason for the change which was not true. We do not know by whom Mr. O' Shannassy was given the

---

believe a reduction of about 3% is appropriate." At page 147 Mr. Jeffress was referred to the charts produced in the report, which were then shown to be wrong.: pages 152 and 155 and 160.

[110] Day 4 Transcript pages 152, 159-60, 163-4.

[111] Day 4 Transcript at page 64, 65 and 86-7 Mr. Jeffress: *"I don't think I changed much at all because I was happy with the content….we were just re-packaging the content."*

explanation. But this fact casts more than a shadow of doubt on the reason behind the reduction in the range by RSM, which was not otherwise explained.

164. Overall, the Court found Mr. Jeffress' evidence to be very 'patchy'. On the one hand, the Court has accepted the analysis of the evidence to show there was no mineral reserve, and that the valuation of the minerals within the mine plan should be valued as mineral resources, in accordance with the evidence he gave. On the other hand, the Court has made it clear that he should only have given evidence on matters within his own sphere of expertise, and it was unsatisfactory for the Court to receive second hand the evidence of the other experts on whom Mr. Jeffress relied in compiling the CSA Global reports. The exercise of judgment in deciding to apply a 3% discount on account of the metal grade was in fact Dr. Patrick's judgment, with which Mr. Jeffress said he agreed.

## Assessment of the technical experts' evidence

### Mr. Van Zyl's evidence

165. For the reasons set out above, the Court has rejected Mr. Van Zyl's conclusions on (i) the declaration of a mineral reserve and (ii) the use of a *de facto* reserve to justify the use of a DCF valuation methodology. Mr. Van Zyl's assessment of the likely extent of the reserves is also too uncertain for the Court to come to a conclusion on their value. The Court has also rejected the use of two comparable transactions as a basis on which to value mineral assets and thereby derive the fair value of the shares at the Valuation Date.

166. Therefore, the Court (with all respect to Mr. Van Zyl's sincere presentation of his opinions) cannot adopt the conclusions he has suggested that the Court should draw from the evidence.

### Mr. Jeffress' evidence

167. The Court has numerous reservations about the weight to attach to Mr. Jeffress' evidence. He does not give much evidence of his own.

168. The Court has accepted, on the basis of Mr. Chivers KC's careful review of the documentary history, that no mineral reserve was declared in respect of the Garatouw farm 'inside' ounces, a point that Mr. Van Zyl reluctantly had to accept.

169. The Court has also accepted Dr. Patrick's metallurgical opinion[112] (the Mr. Jeffress expressed on Dr. Patrick's recommendation) that a 3% discount needed to be made on the recovery of the 4E metals on the basis of the testing that had been done up to the point of the Fairness Opinion. Even though Mr. Jeffress made significant errors in his presentation of the relevant evidence in the CSA Global reports, there is no dispute that the recommendation by Dr. Patrick was for a 3% discount on the 4E recovery.

170. The point that Mr. Van Zyl made that such a discount also implied a reduction in costs is noted, but for the purposes of assessing valuation, the cost reduction is not of a sufficient magnitude to affect the overall assessment of value.

171. This aspect of the technical evidence is relevant for the assessment of Ms. Wright's evidence (which is considered below), because she approached the 4E discount point on the basis that she did not know if account had already been taken of this discount in the Garatau Model and the Dyson Model, and therefore left it out of account[113]. It seems to me to be more probable than not that this discount had not been taken into account in the Garatau Model because if it had been taken into account, the effect of the discount would have had a material impact on the financial model.

172. Mr. Jeffress' evidence on comparable transactions suffers from the same criticism that was levelled at Mr. Van Zyl, namely it is too small a sample of comparative transactions from which to draw a reliable conclusion with confidence. The eventual evidence on comparative transactions comes down to only 8 lines in his report[114]. The Court derives little assistance from the evidence

---

[112] Dr Patrick is listed as a Competent Person in the CSA Global reports and there is no challenge to his expertise by the Dissenters: e.g. F2/4/13.

[113] D/2/60 paragraph 6.3.18

[114] Most of the examples in his report were accepted not to be comparable to Garataouw. Mr. Jeffress accepted that the only two that were comparable were Waterberg and Krudfontein: Day 4 Transcript page 167. These examples were not in fact compiled by Mr. Jeffress but Mr. Naidoo: Day 4 Transcript page 128.

on this aspect of the valuation methodology, which turns out to be the most important evidential feature of the case. But that is all there is to go on.

**Financial valuation experts**

173. The Dissenters called Ms. Dawna Wright as an independent expert witness to provide expert valuation evidence on the fair value of the shares. Ms. Wright is a highly qualified and experienced valuer who is a Chartered Accountant and Senior Managing Director of FTI Consulting in Melbourne Australia. She leads the Australia team in the Forensic and Consulting practice at FTI Consulting. Ms. Wright has over 30 years of training and experience and is a highly experienced valuer.

174. Ms. Wright gave two expert reports, the first dated 1 April 2024[115] and the second dated 5 July 2024[116] in response to the First Report of Ms. Nadine Marke of RSM. Thereafter Ms. Wright produced a Joint Report with Ms. Marke dated 22 August 2024[117], and at the trial made a slide presentation covering the main themes of her analysis.

175. NKWE called Ms. Nadine Marke of RSM as its financial valuation expert. Ms. Marke was the same person who was responsible for the preparation of the Fairness Opinion. Ms. Marke also produced two reports, the first dated 28 March 2024[118] and a second report dated 4 July 2024[119] in response to Ms. Wright's first report. They prepared a Joint Report dated 22 August 2024[120], and each prepared slide presentations summarising their evidence.

176. Ms. Marke also gave two expert reports, the first dated 28 March 2024[121], and a second report (in response to Ms. Wright's first report) dated 4 July 2024[122] in which she also responded to points made by Mr. Van Zyl, as well as the Joint Report referred to above. Ms. Marke also sent a letter

---

[115] D/2/1
[116] D/4/1
[117] D/12/1
[118] D/5/1
[119] D/11/1
[120] D/12/1
[121] D/5/1
[122] D/11/1

dated 16 May 2024[123] in which she said that on receipt of Ms. Wright's first report she had identified some inconsistencies and calculation errors which required to her to update her life of mine model.

177. Ms. Marke is also highly qualified and experienced financial analyst and chartered accountant. She is the head of Corporate Finance at RSM and leads her firm's Australian national practice in business sales, mergers and IPO support services. Her experience includes the provision of commercial valuation and expert reports. She has over 25 years' experience in corporate advisory services and is an accredited business valuation specialist.

*Fair Value*

178. Ms. Wright defined the concept of "fair value" by reference to the cases decided in Bermuda and the Cayman Islands and by reference to International Valuation Standards[124].

179. Ms. Wright referred to the Cayman cases[125] and extracted several elements that go into the assessment of fair value including:

(a) The best estimate of the true worth of the dissenting shareholders' shares is the actual value to the shareholder of the financial benefits derived and available to them by being a shareholder;

(b) The company should be valued as a going concern (that is operations are expected to continue and not be subject to a winding up);

(c) Fair value is not necessarily the same as the transaction price or the market price. The courts have found that such market indicators are unreliable in cases of an inefficient market for the particular share in question, illiquid markets or badly informed markets;

---

[123] D/8/1

[124] D/2/38-9

[125] **Re Trina Solar Limited [**2023] 1 CILR 569, **FGL Holdings Limited** FSD 184/2020 (unreported), **Re Qunar Cayman Islands Limited** [2019] CILR 611, **Re Nord Anglia Inc** [2019] FSD 235/2017 (unreported).

(d) Subject to the circumstances of the case, the true worth of the shares may be assessed by assuming an immediate sale and certain conditions within which the sale is assumed to take place, or, the financial worth of a share can also be assesses on the assumption that the shareholder retains that share and obtains the financial benefits of so doing (sometimes referred to as the fundamental value or intrinsic value);

(e) Excluded from fair value are the benefits and burdens of the merger transaction.

(f) Minority shareholdings are to be valued subject to the particular rights and liabilities attaching to the shares.

180. Ms. Wright considered that these statements were consistent with the concept of "equitable value" (renamed from 'fair value' since 2013) in the International Valuation Standards ("IVS") 2025.

181. Equitable value is defined in IVS 2025 as:

A30.01 *"the estimated price for the transfer of an asset or liability between identified knowledgeable and willing parties that reflects the respective interests of those parties.*

*A30.02: Equitable value requires the assessment of the price that is fair between two specific, identified parties considering the respective advantages or disadvantages that each will gain from the transaction. In contrast, market value requires any advantages or disadvantage that would not be available to or incurred by market participants generally to be disregarded.*

*A30.03: Equitable value is a broader concept than market value. Although in many cases the price that is fair between two parties will equate to that obtainable in the*

55

*market, there will be cases where the assessment of equitable value will involve taking into account matters that have to be disregarded in the assessment of market value, such as certain elements of synergistic value arising because the combination of the interests."*

182. Ms. Wright also referred to the Bermuda case of **In re Jardine Strategic Holdings Limited** [2012] SC (Bda) 27 in which Hargun CJ held that:

*"The assessment to be carried out under section 106 (6) is an objective assessment, in the sense that it seeks to determine an objective "fair value" of the shares that is independent of the particular shareholder's character or motivations or factors such as the original timing or motivation of their investments or attitude to risk or investment strategy or negotiating ability. That is the only sensible and workable approach."*

183. In the Court's view, there is a degree of tension between Hargun CJ's *dictum* and the statement of "equitable" value in the definition in the IVS paragraphs A30.02 and A30.03. This is because the synergies that benefit the acquirer in a compulsory acquisition must be left out of the valuation assessment, and the disadvantage of having the shares acquired compulsorily is not taken into account—for example, the fact that a shareholder wished to keep the investment for the long term. These concepts conflict with Hargun CJ's *dictum* that the particular character or motivations of the shareholder (or the acquirer) should not be a factor in the assessment of value.

184. Ms. Marke approached the question of fair value[126] as "*the amount which shares would be expected to change hands between a knowledgeable and willing but not anxious buyer and a willing but not anxious seller, acting at arm's length.*" No reference is given for this definition[127].

185. Applying the *dictum* of Hargun CJ cited above, it seems that the valuer (and the Court) must therefore take into account the setting in which the transaction is occurring to determine which

---

[126] D/5/27

[127] See the definition adopted by the Court based upon the *dictum* of Jones J in In re Integra (below).

approach will result in achieving the best estimation of the fair value, when looked at objectively, leaving out of account the specific motivations of the acquirer and the party whose shares are being compulsorily acquired.

186.  It is also the case that while market price of a share in an illiquid market will not be an indicator of fair value, in the case of a highly liquid market, it may well be[128]. In this case, the experts agreed that the historic market value of the shares quoted on the ASX is not a reliable guide for the fair value of the shares because the market for the shares of NKWE was illiquid and so the trading price did not reflect the true value of the shares[129]. Therefore, the experts agreed that the appropriate way to approach the valuation was to value NKWE's mineral assets, the other assets and cash or cash equivalents, and derive a net value which would form the basis of calculating a fair value per share[130].

*Sum-of-the-parts*

187. In this case, both experts considered that fair value was to be achieved by breaking out each of the main components of value, valuing them separately, and then aggregating those values to achieve a total value of the "sum-of-the-parts" of the underlying value of the assets owned by NKWE.

188. This is because there are two separate elements to the Garatau Project comprised by (i) the life of mine or 'inside' ounces which have been prioritised for development and (ii) the 'outside' ounces which may be developed at a later stage, perhaps after the farm at Garatouw has become operational, and is generating sufficient profits to enable the development of the other farms.  From this exercise of valuing the component parts of the business, the experts derive a value for the equity and a *pro rata* value per share and apply any relevant discounts to calculate a final "fair value" per share.

---

[128] **Golar LNG Limited v World Nordic SE** [2011] Bda LR 9 at paragraph 12 per Ground CJ.
[129] Ms. Wright said that the historic weighted average price reflected that the market undervalued the shares: Day 5 Transcript page 105. Ms. Marke said it would be of "limited value: D/5/29 and in the agreed statement: D/12/10 point (d).
[130] It should be recognized that as a matter of company law theory, shareholders do not legally own a *pro rata* share of the assets of the company. However, this method is a way of approximating the total net value of the assets to approximate a value for the company and thereby calculate an estimated fair value per share.

*Valuation methodology*

189. The experts agreed that there are four primary methods of approaching a valuation of mineral assets[131].

190. The first is an "income approach": this method estimates the present value of the entity by predicting the value of the future cash flow of its business, taking into account projected capital expenses, operating expenses measured against predicted revenue streams, which are discounted by various elements and risk factors (expressed in percentages). These discounts try to predict the net value of the business over time and estimate the present-day value of the business. This method is referred to as the discounted cash flow (DCF) approach. It is a complicated valuation process, which is necessarily based upon the expert's judgment as to how much weight to apply to each factor.

191. The second is a "market approach". This approach derives the value of the assets from (i) a capitalised value of future earnings (ii) comparable transactions in which the assets of a similar kind and nature have been traded between other parties in the same market.

192. The third is an "asset approach" which is used to value the net realisable value of the assets, often in a liquidation or near liquidation situation.

193. To avoid confusion between the terms used by the experts[132], in this judgment I shall refer to the "comparable transactions approach" instead of the "market approach" (to distinguish it from the traded market value of the shares).

194. The experts agreed that the two most relevant approaches in this case were (i) the DCF or income approach and (ii) the comparable transactions approach. They also agreed that these approaches would provide the best comparative way of assessing the value and would inform the Court of the most appropriate valuation method overall[133].

---

[131] D/2/40 and D/5/28
[132] Ms Wright refers to "comparable transactions" and Ms Marke refers to a "cost/assets approach".
[133] D/12/10 point (c)

195. The experts agreed that the most appropriate way to value the 'outside' ounces (ie those mineral resources that were outside the mine plan) was by the comparable transactions approach. The details of the differences of opinion between the two financial experts will be examined in more detail below, but by way of introduction, the most significant disagreement between them related to the appropriate method of approaching the valuation process for the 'inside' ounces (i.e. the minerals that were within the mine plan at Garatouw farm).

196. Ms. Wright used the DCF or income approach as her primary method on the basis that the Garatau Project was a pre-development stage[134], and that the VALMIN and SAMVAL Codes permit the use of DCF or projected income-based valuations in some cases. Ms. Wright took the view that this was the appropriate method in part because NKWE appeared to be on the verge of commencing the project, in part based on the updated 2017 DRA feasibility Study, the commencement of the Early Works Programme and the registration of the mining right, and the statements in NKWE's June 2018 accounts to the effect that the project was proceeding. Ms. Wright also considered that there was insufficient information about the values of the sale of comparable projects in the past on which to make a valuation based on market values.

197. Ms. Marke took the view that a DCF approach was inappropriate because (i) the report from CSA Global suggested that there were a number of technical issues that needed to be resolved before the project was realistically going to be able to proceed, and had made several significant discounts to value to account for this (in particular the metal grade discount factor of 3%) and the absence of a declared mineral reserve (ii) the reduction in the market price in platinum since the original 2012 DRA Feasibility Study, on which much of the later work was based (albeit updated) (iii) the changes in the exchange rate and the projected exchange rates between US dollars and South African Rand. Ms. Marke's calculations based on these data inputs resulted in a negative net present value market.

198. Therefore, she considered that the DCF or income approach was not appropriate for this situation and conducted her primary valuation on the basis of comparable transaction values. Ms. Marke also had numerous differences of opinion with Ms. Wright on the elements that go into the

---

[134] D/2/42 at paragraph 4.5.9. This was based on the half year report of the board of NKWE in June 2018 at F1/11/5.

DCF model for calculating value, the most significant of which are discussed (to the extent necessary) below.

199. Ms. Marke preferred the comparable transactions approach to valuation because the DCF valuation approach (in her view) generated a negative net present value for the Garatau Project overall.

*Agreed matters*

200. Ms. Wright and Ms. Marke agreed[135] that:

(i)      a sum-of-the-parts valuation was the appropriate method to value the assets of NKWE and from the total of those parts to derive a "fair value" per share;

(ii)     the fair value should be assessed on a going concern basis;

(iii)     the quoted share price for NKWE's shares prior to the Valuation Datre did not represent a reliable indicator of fair value;

(iv)     in applying the DCF method of valuation, the experts agreed various assumptions, the most relevant of which were that they agreed that no further adjustment was required to the working capital already included in the life of mine models and they both relied on the cash flows assumed in the Dyson Model to Zijin/NKWE which had been prepared by management[136];

(v)      They also agreed the WACC method of calculating a market discount rate was appropriate and that discount fell between 5% and 5.5%, and the adoption of a 'beta' discount in the range of 1.00 to 1.20 in the WACC calculation. They agreed an assumed debt to enterprise value of 10% to 18.4% in the WACC determination;

---

[135] The matters listed are only those points the Court considered to be most relevant to the main issues.

[136] The Dyson Model was the framework which Zijin commissioned from Rothschild Australia Limited ("Rothschilds") in April 2018 to prepare to inform Zijin (and later shared with NKWE) of the likely approach that the independent valuer (RSM) would take to value the shares and to give an indicative range of likely values for the shares. The Dyson model assumed that the valuer would use Garatouw life of mine plan (including the predicted cash flows derived therefrom): see F3/5/4.

(vi)    They also agreed that (a) the 'outside' mine ounces were worth A$81 million (at the midpoint) (b) NKWE's surplus assets were worth A$1.2 million and (c) the cash assets had nil value.

*Matters not agreed*

201. It has been explained that the main point of disagreement was the proper approach for valuation, namely whether it should be based on discounted future cash flows or on a market value approach. Although both Ms. Wright and Ms. Marke agreed that one of the assumptions that needed to be factored into the DCF valuation method was future foreign exchange rates, they disagreed as to the rates against real and nominal cash flows. They also agreed that forecast commodity rates had to be factored in as well, but they had a very big difference of opinion about the way those forecast prices and cash flows should be adjusted to take account of future exchange rate fluctuations and increases over time. This will be discussed below.

202. Apart from a general disagreement on the overall reasonableness of each other's opinions, the matters not agreed in relation to the DCF calculation were:

    a.  4E recovery rates

    b.  Timing of the commencement of the operations

    c.  The ability to carry forward tax losses

    d.  Discount rate in relation to currency and cash flows

    e.  Whether a development risk premium (an additional discount rate or 'alpha') should be applied in addition to the beta risk in the WACC formula

    f.  Shareholder dilution for additional capital raise or funding of operations

    g.  whether a minority discount should be applied (and if so at what rate)

*Range of "fair value" for the shares*

203. Before turning to the details of the evidence in respect of the valuations conducted for the purposes these proceedings it is relevant to look at the range of values that had been proposed by

each of the different valuations that were conducted between March 2017 and the amalgamation in 2018 and compare them side by side with the valuations proposed by the experts.

204. There is set out below in tabulated form a summary of the results of the various valuation exercises. It is important to note that the midpoint of the range of values has been used. In relation to the Venmyn Deloitte values, these are the values per share implied by their valuation of the mineral assets. It should be noted that these values *exclude* the application of a minority discount and the potential tax loss carry-forward value, which will each be considered separately later.

| Valuation | Date | Reference | Midpoint of value range (A$) fair value per share |
|---|---|---|---|
| Venmyn Deloitte 1 | March 2017 | F3/1/4 | 0.207 (averaged Asset and DCF) |
| Venmyn Deloitte 2 | December 2017 | F3/2/4 | 0.146 (Asset) 0.269 (DCF) 0.185 (averaged Asset and DCF) |
| Rothschild | April 2018 | F3/5/15 | 0.10 |
| RSM Fairness Opinion (draft) | June 2018 | C1/225 | 0.135 (Asset) |
| RSM Fairness Opinion (final) | September 2018 | A3/172 | 0.114 (Asset) |
| Nadine Marke RSM Expert Report 1 | March 2024 | D/5/6 | 0.126 (Asset) |
| Nadine Marke RSM Expert Report 2 | July 2024 | D/11/6 | 0.126 (Asset) |
| Nadine Marke Revised RSM Expert Report | August 2024 | D/12/9 | 0.125 (Asset) |
| Dawna Wright FTI Consulting Report 1 | March 2024 | D/2/17 | 0.245 (DCF) |
| Dawna Wright FTI Consulting Report 2 | August 2024 | D/4/11 | 0.285 (DCF) |

205. The range of midpoint values is between 0.10 and 0.285. This is a surprisingly wide range, given the short period of time in which all these valuations were prepared (i.e 18 months) and all based upon the same mineral assets.

**Ms. Dawna Wright**

206. Ms. Wright's primary choice of the DCF methodology for valuation was based upon a number of factors:

(i)     NKWE's own statement in the half year accounts to June 2018 that the Garatouw Project was at a predevelopment stage, relying on the Definitive Feasibility Study which it said had "*demonstrated technical feasibility and commercial viability of extracting the mineral resources on Garatouw Farm*", and had embarked upon an Early Works Programme to "*prepare....the operational unit for safe and optimal production output during the transition from engineering and design to capital project implementation*"[137];

(ii)    the VALMIN and SAMVAL Codes which allow for the use of DCF valuation methodology in predevelopment projects "*in some cases*"[138];

(iii)   the availability of a 33-year forecast allowing future cash flows to be discounted back to their present value;

(iv)    the DCF approach is consistent with the 'intrinsic' value that a shareholder expects to receive from holding their interest;

(v)     the DCF approach was consistent with the RSM Fairness Opinion for the life of mine ounces[139].

207. Ms. Wright thoroughly reviewed the prior valuations that had been conducted and identified a number of mistakes and errors and corrected them, and then went on to produce her own financial

---

[137] F1/11/5
[138] D/2/42 paragraph 4.5.5
[139] A/3/189 at paragraph 7.16

model (the FTI Consulting Model)[140] which was based on a corrected version of NKWE's Garatau Model (2017) which in turn was based on the DRA 2012 model. The Garatau 2017 Model was also adopted or used for the production of the 2017 Venmyn Deloitte reports, although Ms. Wright noted that not all of the data in the Venmyn Deloitte reports could be reconciled to an original source[141].

208. Ms. Wright's analysis included a WACC calculation which used a discount rate of 9.25% and a 'beta' factor representing market risk of between 1.0% and 1.2%.

209. The result of Ms. Wright's analysis produced a fair value range of Between A$0.22 to A$0.27 if there was no ability to carry forward tax losses (to be applied against future profits) or between A$0.24 and A$0.29 if a carry-forward tax allowance was permissible[142]. She did not suggest the midpoint as being the "fair value". The Court inferred that she thought there may be factors which might influence the Court's judgment as to where on that range the fair value fell, although all the other experts seem to have approached the fair value (or "preferred" value) as being the midpoint value of the range.

210. Ms. Wright also considered using a range of comparable transactions to test the value achieved by her primary method but concluded that there was insufficient information for her to use a comparable transactions approach to value the mineral assets at the Garatouw farm[143]. Ms. Wright did approach the valuation of the 'outside' ounces by reference to the CSA Global report and after normalisation of the spot price came to the view that the value was slightly less than the value arrived at by RSM[144]. The value of the surplus assets and cash was not in dispute.

211. Ms. Wright did not consider that there was any basis on which to apply a minority shareholder's discount[145] to the fair value of the shares because discounts for minority interests are the inverse of control premiums. As the main drivers for applying a control premium (change of

---

[140] D/2/121 (electronic version)
[141] D/2/47-50 paragraphs 5.2.1- 5.63
[142] D/2/74
[143] D/2/68 paragraph 7.2.16
[144] D/2/70
[145] See D2/122-8

management, business synergies, profit opportunity at expense of minority) in this case were absent or of minimal relevance, no discount should be applied. Alternatively, in publicly listed companies it is not appropriate to apply a minority discount because the premium for control is small or negligible. In this case the acquiring shareholder already has control and so a premium and therefore its inverse, a discount, is not appropriate. Her views were supported by a number of leading academic studies based on a comparative review of US listed companies.

212. Ms. Wright said that the DCF methodology usually reflects the price at which the company's shares should trade, so that a minority stake is implicitly not worth less than any other shares.

*Increase in the fair value range*

Ms. Wright's second report adjusted her proposed range of fair values upwards because after having reviewed Ms. Marke's first report, she noted that the exchange rates in the RSM model used for the Fairness Opinion were based on August 2018 exchange rates, when October 2018 exchange rates would have been more appropriate. Similarly, the forecast commodity prices in the RSM report were based on rates in September 2018 not October 2018. Having adjusted for those changes, this had the effect of increasing the value range to between A\$0.26 and A\$0.31 for the position if tax losses could not be carried forward and A\$0.28 and A\$0.34 if they could not[146]. Ms. Wright's revised analysis produced a positive net present value for NKWE's interest in the Garatouw farm 'inside' ounces of A\$137.7 million[147], and a midpoint value of the ''outside'' ounces of A\$80.8 million and surplus assets of A\$1.2 million and cash of A\$0.00. This raised the midpoint value of the fair value per share to A\$A0.25[148].

213. Ms. Wright also made a number of criticisms of Ms. Marke's first report. The most significant of these were (in summary) (i) an unexplained change of currency conversion methodology from ZAR to US\$ (ii) an unexplained increase in the discount rate applied to the DCF model in the RSM Fairness Opinion (iii) an unexplained changed in the unlevered 'beta' (industry risk) factor 6% to 6.5% (iv) an unsupported decision to add a development risk premium of to reflect the risk

---

[146] D/4/11
[147] Annexure F F.2 LOM to Ms Wright's second report (electronic spreadsheet).
[148] Annexure F.1 Summary to Ms. Wright's second report (electronic spreadsheet).

associated with the particular project at Garatouw (as opposed to the general development risk associated with the industry reflected by the 'beta' factor)[149].

214. Ms. Wright also made several other important criticisms of Ms. Marke's analysis. These included (i) the 3% discount for the recovery of 4E metals (ii) the fact that Ms. Marke did not take account of what was likely to be the start date for the project (ie a delayed start) (iii) certain working capital adjustments and (iv) adjustments for errors in the Dyson and Garatau financial models that underpinned the RSM report[150]. Ms. Wright's view was that it was unclear if the Garatau Model (on which both she and Ms. Marke had based their own models) had already incorporated this discount, and she did not feel it would be appropriate to make a reduction which would potentially reproduce a discount that had already been taken into account[151].

215. Ms. Wright said that the effect of Ms. Marke's unexplained adjustments to the RSM Fairness Opinion model increased the discount rate from ZAR rate 9.75% to a US$ rate of 12.1% which produced a negative net present value of -A$7.4 million[152].

216. When Ms. Wright adjusted the revisions to Ms. Marke's report in line with what she considered to be appropriate, she recalculated Ms. Marke's net present value to be A$85.6 million[153]. This she said made it clear that a positive net present value existed to justify the use of the DCF model for the calculation of fair value.

217. Ms. Wright's written evidence was comprehensive and highly polished. This is a highly technical field, and the presentation of her evidence was easy to follow, and her command of the subject was evident. In the witness box, Ms. Wright kept her focus under cross examination and her evidence under pressure was highly professional.

---

[149] D/4/37 at paragraphs 5.3.3
[150] D/4/27
[151] D/2/60 paragraph 6.3.18
[152] D.4.39 at 5.3.14
[153] D/4/39 at paragraph 5.3.16

**Ms. Nadine Marke**

218. Ms. Marke took the position that the Garatau Project was not at the pre-development stage[154] and that the Garatouw farm had a negative net present value, therefore the DCF methodology was not appropriate. She relied on the technical assessment given by CSA Global (summarised above) for the technical inputs into her calculations.

219. Ms. Marke relied on the market value approach as her primary valuation methodology, but also made a DCF calculation by way of comparison, which she concluded produced a negative net present value[155]. The value of the mineral assets was calculated on the basis that no mineral reserve had been declared and that the value attributable to the life of mine ounces (the 'inside' ounces) should be the same as the 'outside' ounces, because there was nothing to distinguish their value from the general value of mineral resources[156].

220. Ms. Marke's calculation resulted in a lower valuation than presented by CSA Global, and lower than the range of fair values presented in RSM's Fairness Opinion. The key elements in her report were that when she performed her DSCF analysis, she concluded that the net present value was negative, and she therefore concluded that the preferred method of valuation would be by way of market value comparisons.

221. The primary reasons Ms. Marke gave for her assessment were that:

    (i)    no mineral reserve had ben declared on Garatouw farm, so the value of the mineral assets had to be assessed on the basis that there was only a *"moderate degree of confidence in the quality and presence of minerals on the Garaatouw farm"* [157];

    (ii)    the Garatouw farm mine plan was at a pre-feasibility study stage, not a pre-development stage based on CSA Global's statement that (a) the Feasibility study supporting the mine plan had not achieved the discipline of a Class 3 estimate and

---

[154] D/5//30 at paragraph 7.12
[155] D/5/39 paragraph 7.40
[156] D/5/12 paragraph 4.21
[157] D/5/12 paragraph 4.24

(b) there remained a lack of clarity as to the execution strategy[158];

(iii)   The future predictions of cash flows in the Garatouw Model were outdated and did not reflect updated predictions on the demand for platinum group metals (PGMs)[159];

(iv)    the mine plan would commence in 2021[160];

(v)     the recovery rate of 4E metals should be discounted by 3% on the recommendation of CSA Global's technical assessment[161].

222. Applying these assumptions, Ms. Marke adopted a discount rate in her DCF calculation of 12.10% which in her view produced a negative net present value in half of the scenarios she modelled, which led her to conclude that the DCF valuation methodology was not appropriate for the "fair value" valuation of NKWE's shares at the Valuation Date[162].

223. Ms. Marke then approached the valuation using a market-based approach, by comparing similar transactions to gauge where the range of values fell for a project of a similar type. Ms. Marke used 10 comparable transactions provided by CSA Global and relied upon CSA Global's judgments on the appropriate US$/oz resource multiple to apply across each of the three farms at the Garatau Project[163].

224. Ms. Marke's first report calculated the range of fair value for the shares (based on the market value approach) to be between A$0.071 and A$0.118 with a mid point value of A$0.095[164]. This range of values included a minority discount of 24.7% based on an unrelated study by RSM of 463

---

[158] D/5/30 paragraphs 7.12-4
[159] D/5/32 paragraphs 7.25-6
[160] D/5/35 paragraph 7.30
[161] D/5/37 paragraph 7.35
[162] D/5/38-9 paragraphs 7.36-46
[163] D/5/42 paragraph 7.57
[164] D/5/46 paragraph 7.80

takeover transactions and schemes of arrangement of companies listed on the ASX (the "2017 RSM Control Premium Study")[165].

225. Ms. Marke's second report responded to the criticism made by Ms. Wright. In particular, she noted that Ms. Wright had not included any development risk premium in her WACC calculation, despite the fact that Ms. Wright had based her discount on comparable companies[166] which were at a later stage of development. Ms. Marke said that had she done so, then the relative value of the DCF calculation would have decreased by A\$141.76, and would have produced a negative net present value, so that she should have concluded that the DCF valuation basis was not appropriate[167].

226. Ms. Marke supported her analysis by saying[168] that:

(i)     if Ms. Wright had applied a 3% discount on the mineral recovery rate, this would have brought Ms. Wright's valuation down by A\$39.85 million;

(ii)    if Ms. Wright had applied Ms. Marke's development risk premium it would have reduced Ms. Wright's value of the Garatouw farm 'inside' ounces by A\$66.95 million;

(iii)   applying these discounts, this would reduce Ms. Wright's assessed value of the Garatouw 'inside' ounces to A\$30.95 million;

(iv)    if Ms. Wright had used a US\$ denominated discount rate to predicted cash flows, this would have reduced her value of the Garatouw 'inside' ounces by another A\$61.6 million;

---

[165] D/5/44 at paragraph 7.65 and Appendix G to her first report.
[166] These companies were for the purposes of capturing the risk factor rather than for the valuation on a comparative transaction basis.
[167] D/11/8 paragraphs 2.5-8
[168] D/11/12-4 paragraph 3.8

(v)     if Ms. Wright had used spot rate assumptions for the conversion of US$ on the Valuation date this would have increased her value by A$14.41 million;

(vi)    if Ms. Wright had adjusted the timing of the development to 2018, this would have reduced the value by another A$7.36 million;

(vii)   if Ms. Wright had used Ms. Marke's depreciation factor on royalty rates, Ms. Wright's valuation of the Garatouw 'inside' ounces would decline by A$12.79 million; and

(viii)  Ms. Marke's positive adjustments to Ms. Wright's assumptions on commodity prices, on movements of working capital, tax, and discount periods would have increased Ms. Wright's assessment by A$28.56 million.

227. Ms. Marke stood by the 3% reduction in recovery rates and her minority discount rate.

228. The most notable feature of the second report was that Ms. Marke had recalculated the RSM DCF model that she had used in relation to the Fairness Opinion and her first expert report using a different method to the future value of cash flows.

229. Following the exchange of reports, Ms. Marke and Ms. Wright met to confer to see what matters could be agreed and what matters remained in dispute. This later generated a Join Experts' Report, but before that was prepared, Ms. Marke adjusted her position on the DCF calculation method in a fundamental respect.

230.  The clearest explanation of the background to this issue was given in her statement in oral evidence.  Ms. Marke said[169]:

   *"What Ms. Wright brought to my attention during the response expert report was that in fact when she made that adjustment [to the exchange rate] in my model, it didn't come out*

---

[169] Day 5 Transcript 124-6.

*with the same figure. And so that obviously caused me to dig into the assumptions because clearly something was wrong. There was a fundamental error in one of the assumptions and what we found, by then asking Consensus Economics to confirm the basis of a number of assumptions, was in fact the exchange rates which are not stated in the pdf documents provided by Consensus Economics to be nominal are in fact nominal.*

*So, once that had been established, I had the model updated at my end and actually put through the same adjustment that we applied to the commodity price, taking them from nominal to real, made the same adjustment to the exchange rates, and once that was adjusted in the model, the conversion between US dollar cash flow and US dollar discount rate and a Rand cash flow and Rand discount rate, it comes out at the same value.....So we can see that the error has been corrected through applying consistent real exchange rates with our real commodity rates, our real cash flows and real discount rate.*

*So, it's a very simple economics of you must apply consistent inputs with the model you're building...it really boils down to the consistency of the application between real and nominal."*

231.  Ms. Marke's position was that the forward exchange rates for conversion of ZAR to US$ and the forward spot rate for platinum had to be adjusted for inflation and that Ms. Wright's reliance on the nominal rates quoted by Consensus Economics was flawed because no adjustment for inflation was included in the nominal rates, and the future spot prices of platinum had not been adjusted to reflect changes in foreign currency exchange rates between the US$ and ZAR. The effect of this was to change the DCF analysis substantially, because it altered the net present value figure in Ms. Marke's DCF model to negative A$250 million and the value assessed by Ms. Wright in her second report to negative A$132.4 million[170].

232. The result of this revision was that it emphasised Ms. Marke's view that the DCF method of valuation was not appropriate, and she said that this flaw undermined the validity of Ms. Wright's DCF valuation model.

---

[170] D/12/21 Ms. Marke's comments in Joint Report in respect of Issue 7.

233. Ms. Wright's response to this new analysis was (i) that this was a new method of valuation which had not been applied by any of the prior valuations, including the Dyson Model, the Garatau Model, the two Deloitte valuations and the RSM Fairness Opinion and (ii) she did not have access to Ms. Marke's model so she was unable to make any detailed analysis of how Ms. Marke arrived at the figures she did.

*Comparable transactions approach*

234. Ms. Marke had concluded in her first expert report (and in the Fairness Opinion) that the net present value of the Garatau Project was negative, and therefore she maintained that the appropriate approach to valuation was to assess value based on prior comparable transactions involving projects of a similar scale and size.

235. In the Fairness Opinion, Ms. Marke relied upon a list of 11 comparative transactions identified by CSA Global[171]. In her first expert report, Ms. Marke adopted the same list of comparable transactions. Ms. Marke acknowledged that the list of transactions included projects that were at varying stages of development and said that CSA Global had applied their professional judgment to assess an appropriate US$/oz resource multiple to apply to the three farms at Garatau[172]. Ms. Marke said CSA Global presented their view based on the VALMIN Code[173], with a preferred value identified.

236. Ms. Marke expressed no opinion herself on the comparable transactions put forward by CSA Global but relied upon CSA Global's assessment exclusively[174].

237. It will also be recalled that out of an initial list of ten, Mr. Van Zyl's reduced his list of comparable transactions to two[175], which he accepted as being an insufficient sample from which

[171] A/3/202 incorporating CSA Global's list at A/3/335-7 of which RSM also used some as comparable companies for the assessment of beta risk at A/3/220-2.
[172] D/5/42 at paragraph 7.56-7
[173] It is unclear how this was done, and whether a Competent Person declaration was relied upon by CSA Global.
[174] In her second report, in response to Mr. Van Zyl's criticisms, Ms Marke seems to have accepted that five of the 11 were noted as being of a very different capitalisation and therefore inappropriate for direct comparison to NKWE for the assessment of the beta factor risk in Ms Marke's WACC calculation. This consideration of 'comparable' companies was a different exercise.
[175] E/2/33

to derive an appropriate range of values[176]. Mr. Jeffress' first and second reports listed the same 11 comparable transactions as had been set out in CSA Global's report in support of the Fairness Opinion[177]. However, after receiving the criticisms made by Mr. Van Zyl, Mr. Jeffress and Mr. Van Zyl reached the conclusion in their Joint Report that "*there are limited transactions that could be considered comparable and relevant*".[178] In the end they considered only three transactions, of which one was eliminated[179].

238. In her evidence, Ms. Marke said that although there were 11 transactions originally in support of the Fairness Opinion, eventually there were only four that she and Ms. Wright looked at and that none of those were in the original set of transactions used for the Fairness Opinion and her expert reports[180]. It is clear that the focus of the discussion between Ms. Wright and Ms. Marke about comparable companies in the conference between the financial experts was not for the purpose of gauging their utility as a guide to value on a comparable transaction basis, but whether the four comparable companies were comparable for the purposes of assessing mining industry risk as a whole, in the context of a debate over the beta factor in the WACC formula for the DCF valuation model[181].

239. The focus of the debate between the financial experts was over whether the net present value was positive or negative and the DCF valuation analysis. Ms. Wright said that she did not have sufficient information, and it was outside her field of expertise, to address a valuation based on comparable transactions[182].

240. The Court is therefore left with little additional evidential material on which to assess the reliability of the original 'exercise of judgment' by CSA Global as to the appropriate range of values which Ms. Marke adopted for the range of fair value expressed in her expert report, and which remained unchanged throughout her process of using a comparable transaction method of valuation.

---

[176] E/4/97 (the reference should be to table 49 not 47)
[177] F6/20/271
[178] E/6/7 point (t)
[179] Day 4 Transcript pages 166-70
[180] Day 6 Transcript page 78
[181] D/12/17
[182] D/2/68 paragraph 7.2.16

**Assessment of the financial valuation expert evidence**

241. In the light of the differing approaches taken by each of the financial valuation experts, the Court has a number of separate issues to come to a view on. The Court does not propose to analyse each line item of the valuation exercise undertaken by each of the experts but will concentrate on what appear to be the pivotal points on which the main issues turn.

242. The Court has broken them down as follows:

(A)     Which primary valuation methodology is appropriate to adopt: the DCF valuation methodology favoured by Ms. Wright or the asset based 'comparable transactions' methodology favoured by Ms. Marke?

(i)     In considering the DCF model, should the Court adopt the 'nominal' forecast rates for conversion between US$ and ZAR and the forecast platinum spot prices or make Ms. Marke's adjustment to convert the nominal rates into 'real' rates?

(ii)     In the DCF model what adjustment is to be made in relation to the 4E recovery discount?

(iii)     In the DCF model should an additional Development Risk Premium be included?

(iv)     Is it appropriate to include the carry-forward tax losses?

(B)     Is the comparable transactions provided by CSA Global and adopted by Ms. Marke sufficiently robust for the Court to draw a reliable valuation from them?

(C)     Should the Court apply a minority discount applied to the resulting fair value per share?

243. I shall deal with each of these in turn.

*Is a DCF and income valuation approach appropriate?*

244. Ms. Wright based her decision to conduct the valuation on the DCF basis on several key matters which informed her opinion. Ms. Wright did not rely upon Mr. Van Zyl's opinion about the existence of a mineral reserve in determining that it was appropriate to take a DCF approach.

245. Ms. Wright relied (at least primarily) on the representations in NKWE's half year financial statements to June 2018 that (i) the Garatau Project was at a pre-development stage (ii) that a 2017 Definitive Feasibility Study had demonstrated the technical feasibility and commercial viability[183] of extracting the mineral resources on Garatouw Farm (iii) it had commenced an Early Works Programme before commencement of project execution (iv) it had finalised an operational readiness plan to prepare the company and the operational unit for safe and optimal production output during the transition from engineering and design to capital project implementation.

246. The VALMIN and SAMVAL Codes allow for the use of DCF valuation methodology in predevelopment projects "*in some cases*", and therefore (given the representations made in the financial statements referred to above) Ms. Wright considered it was reasonable to take NKWE at its word that it was about to commence development of the projection an operational basis.

247. Ms. Wright was provided with the cash flow models generated by NKWE for the 2017 updated Feasibility Study (the 'Garatau Model'). This model was relied upon by Venmyn Deloitte (but Ms. Wright did not get the model prepared by Venmyn Deloitte). The Garatau Model was prepared at the time of the 2017 Feasibility Study, based and was itself based upon the 2012 Feasibility Study. The Garatau Model set out the income and expense calculations for the life of mine plan, including a forecast production profile and key assumptions on concentrator recoveries, forecast commodity prices and other inputs to calculate income and expenses.  Ms. Wright also received a copy of the Dyson model used to prepare the Rothschild Report, which on comparison she said was identical to the Garatau Model[184].

---

[183] These are the requirements for the declaration of a mineral reserve.
[184] D/2/47 paragraphs 5.2.1 to 5.2.7

248. Having reviewed these models Ms. Wright created her own model (the FTI Consulting Model) which corrected the various errors she had identified. However, she relied upon the inputs from the Garatau Model (that had been provided by NKWE) which were predicated on the assumptions that the mineral reserves had been declared (as reflected in the Deloitte Reports)[185].

249. Although Ms. Wright did not rely on the Venmyn Deloitte Reports in and of themselves, she relied upon NKWE's cash flow models in the updated 2017 Feasibility Study (i.e. the Garatau Model[186]) that were reflected in the figures that were set out in Venmyn Deloitte reports, and which were also the basis of NKWE's financial statements in the half year report in June 2018. These are all premised on the basis that there are mineral reserves, and therefore the values of those reserves are reflected in the cash flow projections, which form the basis of the DCF valuation model Ms. Wright prepared.

*The VALMIN, SAMVAL and JORC Codes*

250. The purpose of the VALMIN Code (2015 Edition) is *"to provide a set of fundamental principles, minimum requirements and supporting recommendations to assist in the preparation of relevant Public Reports on Mineral Assets."[187]* The VALMIN Code is broadly consistent with relevant international codes including the South African Code for the Reporting of Mineral Asset Valuation (SAMVAL).

251. The requirements for a Public Report of a mineral reserve under the VALMIN Code **must**[188] (i) be clear and concise (ii) contain the relevant information on which to base an informed decision (iii) state the relevant sources of information on which it is based (iv) be supported by a specialist's report which accepts responsibility for its content (v) include relevant graphs, maps diagrams and show explorations results. The valuation of mineral resources and reserves must be considered in a technical assessment or valuation, and must use two valuation approaches, and comment on the results of each approach, and the reasons for selecting the approach that was preferred[189].

---

[185] D/2/57 at paragraphs 6.2.2, 6.3.1, 6.3.2 and 6.3.9
[186] D/2/28 at paragraph 3.2.25
[187] F7/4/6 principle 1.1
[188] Emphasis added.
[189] F7/4/30 principles 8.1-8.4

252. The SAMVAL Code requires a Competent Mineral Asset Valuator (CV) to adopt two valuation approaches and is responsible for assessing the technical data and information, technical interpretations and conclusions, forecasts, and the parameters used in the valuation approach and setting out the reasons for the judgment used by the CV, and the quality of the inputs into the valuation[190].

253. The JORC Code[191] makes similar provisions and cross-refers to the requirements set out above and uses the term Competent Person. A 'reserve' is defined as the economically mineable part of a measured or indicated resource. In reporting reserves, the reporting company must support the declaration with information and documentation prepared by a Competent Person who must be professionally qualified and have a minimum of 5years' experience in relation to the particular mineral which is being reported[192].

*Non-compliance with the Reporting Codes*

254. The Court has found from the analysis of the evidence above, that as a matter of fact, a mineral reserve was never declared in 2012 in respect of Garatouw farm, and no report that complies with the VALMIN and SAMVAL Codes was issued by a Competent Person, Competent Valuator or Technical Expert in relation to the reserves at Garatouw farm. The references in the two Venmyn Deloitte mineral valuation reports in 2017 are based on an inclusion of declared reserves. This means that the reliance upon those inputs cannot be used to support a valuation without a supporting valuation report and declaration based upon the principles in the VALMIN[193] and SAMVAL[194] Codes, and which Ms. Wright seeks to apply in her valuation[195].

255. As a matter of fact, there was no declaration by a Competent Person (or Specialist or Technical Expert) which was supported by a detailed report to validate the declaration of a mineral reserve. The Court has also concluded (for the same reasons) that it is not possible to use the

---

[190] F7/3/10 principles under paragraph 3.5
[191] F7/6/7 principle 11
[192] F&/6/6 principles 9 and 11.
[193] F7/4/1 principles 1.3, 2.1 and 5.5
[194] F7/3/14 principle 4.3
[195] D/2/41 at paragraph 4.5.3

actions taken by NKWE to commence an Early Works Programme as amounting to a *de facto* declaration of a mineral reserve to support the use of a DCF valuation approach.

256. Whatever stage the Garatau Project may be described as being in different documents, the Court takes the view that it was not at a pre-operational stage at the Valuation Date. There are two reasons for taking this view. These are (1) without a declaration of a mineral reserve, it seems clear that the valuation of the mineral assets within the life of mine plan could only properly be valued (at that stage) as mineral resources, in accordance with the valuation rules set out in the JORC, VALMIN and SAMREC and SAMVAL Codes and (2) no plan for the capital required for the development of the mine had been established. This seems to the Court to be a significant fact, and although the assumption of some form of capital raise has been included in the financial analyses, operations could not commence until either (i) a substantial additional debt was incurred which NKWE was not in a position to service or (ii) a substantial injection of new capital (perhaps as much as ZAR500,000,000) would need to be made.

257. The absence of the declaration of a mineral reserve means that the life of mine ('inside') ounces must be valued as mineral resources. As a result, the income or cash flow from the mine is not yet capable of being accurately forecast because no Competent Person has declared that it is technically achievable and economically viable to extract the minerals. It follows that the cash flows predicted by the DCF analysis are thereby rendered unreliable.

258. It therefore seems to the Court that it follows that the project had not established a sufficient level of feasibility to justify a treating it as an appropriate case in which to apply a DCF valuation. The VALMIN and SAMVAL Codes say that DCF in pre-development projects is only justified "*in some cases*". The reason for this must be that it is only when the project has reached the point of being able to launch that the DCF approach can be safely employed to value a pre-development stage project.

259. Therefore, it seems to me that it must follow that a DCF valuation of the mineral assets in this case (on the principles described by Ms. Wright[196]) is not appropriate because it (at least in

---

[196] D/2/40 paragraph 4.5.1

part) reflects the value of mineral assets at an inflated value, because the mineral reserves are treated as being inherently more valuable than mineral resources. To the extent that Ms. Wright's FTI Consulting Model uses the Garatau Model for the cash flow projections (which are reflected in the Venmyn Deloitte reports) they overstate the values in two respects (i) the number of ounces included as 'reserves' and (ii) the value of those ounces. Ms. Wright's approach assumed 6.06 Moz were reserve ounces when the estimates reported according to the JORC Code showed measured resources of 2.9 Moz[197].

260. To the extent that the Codes permit the use of a DCF valuation methodology for pre-development projects "*in some cases*", it seems reasonably clear that a DCF valuation method is only appropriate where there is sufficient clarity over what Mineral Reserves are technically feasible and economically viable to extract. Without a formal Mineral Reserve declaration, this is not possible.

**Assessment of the statements made by NKWE in the June 2018 financial statements.**

261. The Court has carefully considered the submission that NKWE should not be allowed to resile from the statements it made in its financial statements which were reported to the ASX (i.e. that NKWE was ready to proceed with the development of the mine). The effect of these statements amounted to a misstatement of the true position and may very well have overstated the value of NKWE's assets at the time (bearing in mind that the basis for the statements was the Venmyn Deloitte impairment review report). The Court has analysed the legal position briefly as follows.

262. First, it is not alleged that the Dissenters relied upon the June 2018 financial statements in purchasing their shares, nor that there was a material change of position on their part as a result of the statements made by the directors, nor is there any allegation of bad faith against them. It seems to me therefore that there is no legal basis upon which NKWE is to be held legally bound to the truth of the statements made in the 2018 accounts. No doubt the directors would (not unreasonably) say they relied on the Venmyn Deloitte impairment report in the good faith belief that what was in the June accounts was accurate.

---

[197] D/2/25 : It is noted that these two figures may not be direct comparisons.

263. Second, the Dissenters' submission can be tested by supposing that instead of over-stating the position, the directors had inadvertently understated the position, and that in truth the mineral assets were worth a great deal more that the directors had recorded in the financial statements. On an appraisal, on those facts, the Court would appraise the value of the shares at their true fair value (i.e. the higher value), and not their wrongly supposed lower value. The converse must also hold true.

264. It is true that the statements made by the directors go beyond the value of the assets and represent that NKWE is in the process of starting the operational stage of development, but that in my view does not change the position so far as an appraisal of the shares is concerned. On the surface it does appear to be wrong for the directors to say one thing for the purposes of the financial statements and then take a diametrically opposite position when it comes to an appraisal, but the Court is still bound to appraise the value of the shares at their true and objective fair value.

265. Strictly, this conclusion makes it unnecessary to consider the issues that were in dispute between the experts on the analysis of the DCF methodology. But for the sake of completeness, I shall briefly express the Court's views on the main points.

*Forecast rates for ZAR to US$ conversion and forecast prices of platinum*

266. Ms. Wright concluded that it was the use of a US$ denominated discount rate to UD$ based cash flows had the effect of reducing Ms. Marke's net present value calculation by US$93 million. It was the issue of the conversion of all income and expenses to US$ and converting them back to ZAR at the end of the calculation which produced what Ms. Wright considered to be an anomalous result. In her view, the conversion should not have produced this large variation in the value calculation[198].

267. Ms. Wright, in common with all the other valuers who had looked at the Garatau Project, used ZAR to calculate the expenses that would be incurred in developing the project because that is the currency in which the expenses would be incurred (eg all capital expenditure costs and salaries). She then calculated the income in US$ on the premise that this is the currency in which

---

[198] Day 5 Transcript page 32 and D/4/38 paragraph 5.3.7

NKWE would generate its revenues from the sale of platinum, on the basis that NKWE would convert the US$ into ZAR to meet costs and capital expenditure as and when needed[199]. In order to take account of the effect of inflation, Ms. Wright applied the "Fisher equation" to achieve a "risk-free" rate. Ms. Wright said that was the standard way that valuers approach the question of adjustment for inflation.

268. By contrast, Ms. Marke had converted all the expenses into US$ and then converted the payment of expenses from US$ into ZAR as the project proceeded over the life of mine period, and this produced a very large difference because of the impact of the forecast rates of (i) the conversion rate between ZAR and US$ and (ii) the forecast prices of price of platinum (also expressed in US$). This issue separated the approach that the experts took more than any other in terms of the impact on the financial analysis. The effect of converting all the operating costs and capital expenses into US$ over the course of the life of the mine, and converting them in ZAR over the same period, when the currency conversion rates were adjusted for inflation

269. Although it is true that Ms. Marke had previously taken the conventional approach that Ms. Wright and all the other experts who had performed a DCF analysis by applying the nominal rates quoted by Consensus Economics or Oxfrod Economics, the purpose of the DCF analysis is to get to as realistic a figure as possible which represents the present-day value. If I had needed to come to a firm conclusion on this point, I would have preferred Ms. Marke's analysis.

*4E recovery 3% discount*

270. As summarised above, on this point I would have agreed that the discount is appropriate because (a) there was no evidence to contradict Dr. Patrick's assessment (b) Ms. Wright was not in a position to challenge the discount and (c) it seemed to the Court most probable that it had not been included in the Garatau Model on which the previous valuations had been conducted (for example, it does not feature in the Venmyn Deloitte or the Dyson reports).

---

[199] Day 5 Transcript pages 15-16 and 23-28.

*Development Risk Premium*

271. On this point, I would have preferred Ms. Wright's view that the development risk premium was adequately covered by the 'beta' in the WACC calculation. It does not seem to the court that NKWE is in any different position than any other mining development company in South Africa and there seems to be no justification for saying that this particular project is exposed to any additional risks that are specific to it.

272. Here Ms. Marke seems to be going too far to justify her opinion in the DCF valuation analysis. In support of that impression, the Court notes (i) Ms. Marke had not mentioned this before in her Fairness Opinion or her first expert report[200] and (ii) it is not mentioned by any other of the many expert valuers who looked at the DCF valuation. It would have reduced Ms. Wright's DCF calculation by A\$66.95 million, which would have been a material consideration for the other valuers to have taken into account.

*Carried forward tax losses*

273. On this point there is no evidence of the tax position in South Africa. References were made to the E&Y Audit Report[201] in support of the proposition that it is possible to do so. The Court does not consider it to be appropriate to include an allowance which adds significantly to a present day value when (i) the availability of the tax allowance depends on the tax code remaining the same for an unspecified period in the future, and when it is likely that changes will be made to taxation on an ongoing basis (ii) the note on which the claim is based qualified by unknown factors and (iii) there is no expert evidence from a tax specialist to support it. The Court would have taken a conservative view and would not have allowed this item to have been included in the valuation calculation.

**Comparable Transactions**

274. As the Court has already described, the basis of the calculation of the comparable transaction value is opaque. It was originally based upon 11 transactions listed in CSA Global's first technical report in support of RSM's Fairness Opinion, which were ultimately reduced to two. Even the

---

[200] The first reference is in her second expert report at D/11/12 point (b).
[201] F1/8/39

discussion of these in CSA Global's second report is limited. CSA Global exercised professional judgement on setting the price of minerals at Garatouw on the basis that (i) the project at Waterberg was a shallower resource and therefore more easily accessible and so would generate a higher price than Garatouw (ii) the project at Krudfontein was deeper than Garatouw and so would be likely to fetch a lower price[202].

275. Mr. Jeffress said that he and Mr. Van Zyl had agreed the comparable prices generated, but this is a very thin range of comparable values and the Court has some hesitation in relying on these 'comparables'. It seems to the Court that they are not very comparable: allowing for the fact that no two sites will be exactly the same in their characteristics, the two comparable sites each lie at a higher or lower level than Garatouw and also have different features. The experts are guessing as to what a purchaser might be prepared to pay for the resources at Garatouw on the strength of the prices paid respectively for these other sites. The set of two comparables are a very small "sample" on which to make a judgment.

276. Ms. Marke has simply applied the values supplied by Mr. Jeffress in her calculation of the comparable transaction value. It is not apparent that the original comparable transaction values have been updated to reflect Mr. Jeffress' and Mr. Van Zyl's consensus in Ms. Marke's comparable transaction calculation[203].

277. In the absence of being able to rely upon a DCF method valuation, the Court is left with a very thinly supported comparable transaction values on which to rely to make an appraisal of fair value of NKWE's shares.

278. It is a curious feature of Ms. Marke's valuation work that she reached 4 different recommended fair values based upon the very same data set of comparable transactions, which had not changed throughout the process. In her draft Fairness Opinion, she recommended A$0.135 as the mid-point. In her final Farness Opinion, the mid-point was reduced to A$0.114 (with no

---

[202] E/4/101 at paragraph 447.
[203] D/11/6 "Market Approach: Jeffress recommended inputs".

additional information on comparable transactions). In her first expert report the mid-point was A$0.126. In her revised report the mid-point was A$0.125. This is baffling.

**Minority Discount**

279. Ms. Wright explained that the reasons she did not apply a minority discount was that she considered that the modern academic view is that a minority discount should not be applied in a takeover situation in a publicly listed company where there was no change in control. Ms. Wright referred to a number of academic studies and articles based on US experience[204].

280. Ms. Wright's premise is that a minority discount is the inverse of a control premium[205]. Where there is no change of control (as in this case) there is no room for a control premium, nor its inverse, a minority discount. In the absence of a change in control, there seems to be no logical reason why the share of one shareholder should be worth less than another in a publicly held company simply depending on whether he or she is the owner of a majority of the shares.

281. However, the Court is bound by Privy Council authority to apply a minority discount in a compulsory acquisition under a "squeeze out" amalgamation transaction under provisions equivalent to section 106 (6) of the Bermuda Companies Act 1981 (in the absence of special or unusual circumstances). In **Shanda Games Ltd v Maso Capital Investments and Others**[206] the opinion of the Board was delivered by Lady Arden JSC in the following terms:

> *"[42] In the opinion of the Board, it is a general principle of share valuation that (unless there is some indication to the contrary) the court should value the actual shareholding which the shareholder has to sell and not some hypothetical share. This is because in a merger, the offeror does not acquire control from any individual minority shareholder. Accordingly, in the absence of some indication to the contrary, or special circumstances,*

---

[204] D/2/126: The market value of control in publicly traded corporations Lease McConnell and Mikkelson Journal of Financial Economics March 1981; Control premiums and minority interest discounts in private companies Nath, Business Valuation Review June 1990; Private Benefits of Control-An international comparison 2004 Dyck and Gonzales; Misuse of control premiums in Delaware appraisals, Matthews, Business Valuation Review July 2008; The market value of corporate votes theory and evidence from option prices Kalay, Karakas and Pant, Journal of Finance April 2013.

[205] Ms. Marke agrees: D/5/44 and D/11/19: she applied the inverse of the control premium in the RSM Study.

[206] [2020] 1 BCLC 577, 593-5. The relevant provisions which were being considered under section 238 of the Cayman Companies Law under are to all intents identical to the provisions of section 106 (6) of the Bermuda Companies Act 1981.

*the minority shareholder's shares should be valued as a minority shareholding and not on a pro rata basis."*

282. Accordingly, the Court must give consideration to what level of minority discount should be applied.

283. Ms. Marke has produced a study conducted by her firm of takeovers in Australia, with particular emphasis in mining and development companies, and on the basis of that study she has put forward a proposed minority discount of 24.7% in this case. This is based on the RSM Control Premium Study (2017) and on the theory that because a control premium is the inverse of a minority discount it must follow that the same percentage of premium must be applied to a minority discount.

284. The Court is not convinced by this reasoning. While it may be true that a control premium is the inverse of a minority discount, it does not follow (in my view) that the same percentage must apply each way. There may be many reasons why shares command a control premium (synergies, replacement of management, and board control). The Court has reservations about whether the measure of the control premium (which reflects a process of bargained premium) equals the measure of a minority discount.

285. There are a number of other reasons why the Court is not prepared to accede to the proposed discount rate based upon the 2017 RSM Control Premium Study.

286. First, one quarter of the value of the share (in the Court's view) is a very heavy discount to apply to a compulsory acquisition of a minority shareholder's interest where there are no special circumstances that would justify applying a large discount, other than for the sake of recognising that it is a minority share that does not connote control. If the share were sold on the exchange, there would be no such discount, and it seems odd to penalise a shareholder so heavily for having the misfortune of having his or her shares acquired compulsorily.

287. Second, such a heavy discount (if applied) would be a powerful disincentive to a minority shareholder to exercise the right of appraisal. This would seem to me to give an undue (additional) advantage to a bidder and would unfairly tilt the scales against a minority shareholder who had genuine misgivings about the fairness of the Offer Price. It seems to me that creating such an advantage would not serve the commercial policy behind the legislation to produce an objectively fair result.

288. Third, Ms. Marke confirmed that there are different protections and limitations in Australian company law for minorities, and this may have relevance to why such heavy discounts are applied there. Only two of the companies in Ms. Marke's study involved a South African PGM company[207].

289. In my judgment, the fact that NKWE is listed on the ASX is not determinative of how the Court should approach the question of minority discounts: it may be a factor to be taken into account, but it is in the end a matter for the Court to determine.

290. In this case, the Court is guided by the approach taken in one case in Bermuda under section 103 of the Companies Act 1981 and in the Cayman Islands under similar legislation.

291. In **Golar LNG Ltd v World Nordic SE**[208] Ground CJ recognised that a minority discount was appropriate to be included on the range of NAV of the assets (which was the method of valuation the Court accepted in that case) and found that allowing a discount of about 10% brought the price of the shares down to the Offer Price, which he then found to have been fair value.

292. In **Re Qunar**[209] Parker J applied a 0% minority discount because the shares were well-traded and rejected the submission that a discount should be applied because the majority controlled the decisions to declare dividends, which was held not to be a meaningful distinction.

---

[207] Day 6 Transcript page 107
[208] **Golar LNG v World Nordic SE** [2011] Bda LR 9 at paragraphs 22-24 per Ground CJ
[209] **Re Qunar Ltd** (2019) 1 CILR 611at paragraphs 410 and 406 per Parker J

293. In **Re FGL Holdings**[210] Parker J Court considered that no discount (or a 0% discount) was appropriate because there was no element of transfer of control and the Transfer Price represented fair value, so a minority discount was not appropriate.

294. In **Re Nord Anglia Education Inc.** Kawaley J also applied a 0% discount, but adding that if authority required a discount, he would have applied a 2% discount[211]. This was on the basis that the DCF valuation basis which was applied in that case already take account of the minority position of the shares[212].

295. In **Re Trina Solar Ltd**[213] Segal J applied a 2% minority discount on the basis of the value of control *per se*.

296. In **Re Xingxuan Technology Ltd** [214]Kawaley J has held that a minority discount of 5% was appropriate to take account of a combination of (i) no control and (primarily) (ii) illiquidity[215].

297. The Court is reluctant to apply a discount rate of 0% in the light of the broad statement of principle by the Privy Council in **Shanda Games Ltd v Maso Capital Investments Ltd** where there are no 'special' circumstances to displace the application of the principle. However, the Court considers that such a discount should normally be a small discount. Here, on the basis that the shares in NKWE were illiquid, the Court adopts the guidance of Kawaley J In **Xingxuan Technology** in applying a small discount to reflect this feature. The Court has therefore assessed the appropriate minority discount to be applied in this case to be 3.7%[216].

---

[210] **FGL Holdings** [2020] FSD 92/2107 at paragraph 604 per Parker J
[211] **In re Nord Anglia Education Inc.** [2020] FSD 235/2017 at paragraphs 249-252
[212] At paragraphs 243-4 relying on Professor Gompers' evidence.
[213] **In Re Trina Solar Ltd** [2023] 1 CILR 569 at paragraphs 344 and 352.
[214] **In Re Xingxuan Technology Ltd** [2017] FSD 227/2017
[215] It should be noted that Kawaley J also added a further 5% to reflect the ability of the minority to dispose of other Series A shares privately. This factor does not apply in this case.
[216] The reason for this discount rate will become apparent.

**Summary of the analysis of the evidence as to fair value**

*Market value based on historic weighted average of trading*

298. The experts on both sides agree that the historic market price is not a reliable guide to the fair value of the shares, principally because the market for the shares is illiquid and the trading history has been thin. Therefore, this method of testing the fair value of the shares against the other methods is of no assistance and is rejected by the Court.

*DCF method of value*

299. It follows from the analysis above that the Court has had to reject the analysis of Ms. Wright, and there is no alternative basis for a DCF valuation because Ms. Marke's report puts the value at a negative net present value.

*Comparable transaction value*

300. The Court has only therefore the comparable transaction valuation of the mineral assets at Garatau Project as a whole contained in Ms. Marke's reports to go on to support its appraisal of the fair value of shares.

301. The Court has noted a number of reservations about the quality of that evidence, and the extent to which the comparables actually offer a reliable guide to the valuation of the mineral assets at the Garatouw farm.

302. In particular, it is unclear from Mr. Jeffress' evidence who made the original comparison. He did not make the original contributions to the CSA Global Report, although he did later have the meeting with Mr. Van Zyl at which they agreed the range of values, based on a very limited relevant sample of two transactions. RSM's report does not record any adjustment being made to the valuation of the assets following that meeting, and so it appears that the original input of values into Ms. Marke's expert Fairness Opinion and her two expert reports remains unaltered.

*Yardstick value*

303. All the experts agree that a 'yardstick' method of valuation is not a reliable primary method of valuation but may have a limited use as a comparative "sense-check" of a valuation derived from one of the conventionally accepted methods[217].

*'Blended' values*

304. In this case there is no room for a 'blended' method of valuation as has been adopted in some other cases, because (a) the DCF methodology is made unreliable due to the absence of reliable data as the input for cash flow values and (b) the DCF methodology is incompatible with the comparable transaction valuation methodology: they are alternatives to each other. It is therefore not possible for the Court to *'pick 'n mix'* between these two alternative methods.

**Court's determination of Fair Value**

305. The inability to rely on the evidence of Ms. Wright and Mr. Van Zyl, and the reservations the Court has expressed about the evidence of CSA Global on the range of values achieved by such a small selection of not very comparable transactions leaves the Court in something of a quandary as to how best to achieve an appraisal that reflects the fair value of the shares.

306. The Court's job is nonetheless to appraise the fair value of the shares at the Valuation Date. While the Court is guided by the evidence of the experts, the Court is not bound to adopt the evidence of either of them, and may select some parts but not others, and may come to its own view[218].

307. The term "fair value" has not been defined in the statutory provisions but has been considered in case law in Bermuda[219] and the Cayman Islands. Section 238 of the Cayman Companies Law is to all intents and purposes the equivalent to section 106 (6) of the Bermuda Companies Act 1981.

---

[217] F2/4/105 "This method is best used as a non-corroborative check on the order of magnitude of values using other valuation methods that are likely to better reflect project-specific criteria."
[218] **In re Shanda Games Ltd** (2028) CILR 352 at paragraph 22.
[219] See Hargun CJ **In Re Jardine Strategic Holdings Ltd** quoted above.

308. In construing section 238 in **In re Integra Group**[220] Jones J held that

> *"the fair value of the shares of a dissenting shareholder was the value to it of its proportionate share of the business if it were sold as a going concern in a hypothetical arm's length transaction. It was the estimated price for the transfer of an asset between identified, knowledgeable and willing parties that reflected the interests of those parties."*

309. This Court respectfully adopts Jones' J's meaning of fair value and the relevant date for valuation (and calculation of any interest due on any unpaid value) for the purposes of these proceedings.

310. In **Re Trina Solar Ltd** (also decided under section 238 of the Cayman Companies Law) Segal J held that the reference to "fair" in the phrase "fair value"

> *"requires...inter alia that the manner and the method of that assessment and determination is fair to the dissenting shareholder by ensuring that all relevant facts and matters are considered and that the sum selected properly reflects the true monetary worth to the shareholder of what he has lost, undistorted by the limitations and flaws of particular valuation methodologies and fairly balancing, where appropriate, the competing, reasonably reliable alternative approaches to valuation relied upon by the parties."*

311. In **Re Qunar Ltd** (another case under section 238) Segal J held that

> *"The court will use its usual methods of resolving disputed questions of fact and expert evidence. Neither party bears the burden of proving the fair value of the shares. The proper approach to the resolution of the various matters in dispute is that the onus is on each part to adduce evidence establishing, on the balance of probabilities, the correctness of any contention relied upon."[221]*

---

[220] (2016) CILR 192
[221] (2019) CILR 611 at paragraph 55.

312. The Court has these principles in mind when turning to the present exercise.

313. Having been unable to place reliance on Ms. Wright's report, it might be tempting simply to default to the conclusions in Ms. Marke's first and/or second and/or third reports as to fair value in the absence of any other reliable evidence, on the basis that the Dissenters had failed to prove their contentions to the required standard. However, the Court considers that this would not do justice to the Dissenters' case, nor to the proper evaluation of the evidence, and would not fulfil the Court's ultimate duty to appraise fair value of NKWE's shares.

314. The Dissenters complained that full disclosure was not made by NKWE and that witnesses were not called which impeded the process of getting at the true position that lay under the surface, as to Zijin's knowledge or motives, or the reasons why the mining right was 'magically' registered after the non-binding bid was announced. The Dissenters sought to invite the Court to draw adverse inferences (albeit the Dissenters did not allege bad faith) from the absence of evidence. The Dissenters explained that the costs of the appraisal process meant that applications for specific discovery that could have been made were not, on the basis of both the time and the cost that these would involve.

315. The Court cannot pick a figure out of the air that 'seems' fair: it must be related to and supported by admissible and cogent evidence. The Court observes that this is litigation like any other, and the same rules as to disclosure and challenging the absence of disclosure apply. Nor can the Court draw specific inferences from the absence of witnesses from NKWE's main board or Zijin.

316. The Court has nevertheless reviewed the evidence for any other clues that may assist in deriving a value that is fair both as to process and result and which are based on admissible evidence.

317. It has been noted that the draft Fairness Opinion that was circulated to the independent directors in June 2018 posited a range of fair values between A$0.08 and A$0.19 with a midpoint

in the range of A\$0.135.[222] It has also been noted that the drop in the value range in the final version was justified on the basis that a "updated information" had been provided by CSA Global which (for reasons unexplained and unexplored) caused a narrowing of the range to A\$0.08 to A\$0.148 with a mid-point of A\$0.114.

318. Following the cross-examination of Mr. Jeffress, it is clear this was not true: no updated information was provided to RSM by CSA Global between the draft and the final reports, and there is no material difference between the CSA Global reports that suggests that there was a need to narrow the range of fair value.

319. The Court is very skeptical about the true reasons that lie behind this, but whatever the explanation for the change, there is no justification in the evidence for the narrowing of the range. Mr. O' Shannassy's reaction at the effect of the change was that it made the Offer Price look closer to the mid-point of the range is telling.

320. If the independent directors had had the gumption to stick to their guns that the fair value meant the mid-point of the range (i.e. A\$0.135) and/or had interrogated the reasons behind the narrowing of the range before they had approved the amalgamation, then the result in this case may have been very different.

321. In the absence of any evidence that there was anything new that supported the narrowing of the range, the Court is inclined to accept that the fair value lies (at least) at the mid-point of the original range in the draft Fairness Opinion.

322. The Court says "at least" because it seems that there are a number of factors that could militate in favour of the fair value being at a higher point in the range.

323. These factors include (i) the grant of the authorization for the power grid for the Garatau Project in 2016 (ii) the lifting of the suspension of the mining right in 2016, (iii) the grant of the water use licence in 2017 (iv) the completion of the additional work on the 2012 DRA Mining

---

[222] C/8/225

Feasibility Study in late 2017, (v) the commencement of the Early Works Programme in early 2018, and most importantly (vi) the registration of NKWE's mining right in April 2018.

324. It is not possible to give a weighting to these factors that each empirically adds a separate quantifiable and incremental sum to the assessment of "fair value", but when taken together, they suggest that the probability of a successful funding of the project and increase the likelihood of a launch of the project.

325. Of course, in making this assessment, the Court does not leave out of account that further work still needed to be done to improve the planning and execution of the plan, and further testing on the recovery rates of the minerals needed to be addressed. Moreover, the lack of evidence concerning funding of the project and the potential impact on costs or dilution needs to be factored in.

326. Ms. Marke's final view was that the fair value range (leaving aside the minority discount) fell between A$0.070 and A$0.158, with a mid-point of A$ A$0.125[223]. It seems to the Court that when allowance is made for the factors mentioned above, there is more than a reasonable argument that the fair value falls above the mid-point of Ms. Marke's ultimate range of fair value. The value in the draft Fairness Opinion of A$ 0.135 also falls comfortably within the range of A$0.070 and A$0.158.

327. There is also something of a gravitational pull towards the value of A$0.135 when it is recalled that Venmyn Deloitte valued the assets at a value that would translate to a per share value of A$0.145 and the top of the range of the Rothschild pre-valuation study came out at A$0.14[224]. This is of course merely impressionistic rather than based on an application of valuation principles.

---

[223] Ms. Marke applied her large minority discount to reduce the mid-point of the range of fair value in her report. The considers that this was inappropriate. First it obscures the comparison of 'apples with apples, and (no doubt innocently) conveys the impression that the mid-point of the fair value range was much lower than it actually was. The question of a minority discount is primarily a matter for the Court. If a valuer considers that a minority discount should be applied, then that element should be separately reflected in the report.

[224] The values proposed by Ms Wright and Rothschild are based on DCF calculations not comparable values of the assets. The final RSM Fairness Opinion is omitted also because the reduction in the range of values was unexplained and unsupported.

**Conclusion on Fair Value**

328. In the end, the Court has decided that a conclusion on fair value at A$0.135 is appropriate because it is the original value proposed before the transaction and before the views of those concerned were influenced (unconsciously or otherwise) by the objections of the Dissenters and/or any desire to support the successful outcome of the amalgamation that NKWE's main board desired. It is also the value that the independent directors thought was the appropriate value, but lacked the courage to stand their ground.

329. The Court must apply the minority discount to this figure as required by the **Shanda Games** case. I have already noted that the minority discount should be (in my view) a small one to reflect the notional difference in the shares having less value than the rest of the shares, even though a change of control was not effected by the transaction in this case. In view of the illiquidity of the shares[225] the Court has decided to apply a minority discount to reduce the fair value to **A$0.13** per share (representing a 3.7% discount) as at the Valuation Date.

**Interest**

330. The Dissenters argued that the appropriate rate of interest that the Court should apply to the difference between the Offer Price and the fair value should carry interest on a compounded basis, primarily on the theory that interest is to compensate a party for the lack of use of money owed[226].

331. The Court has carefully considered the authorities that have been submitted on the point but has come to the conclusion that in this case it is appropriate to award simple interest on the amount owed from 24 October 2018 until payment in full. This is on the grounds that this appraisal now represents a debt declared to be owed, but which until now was entirely inchoate, contingent and unquantifiable in amount.

---

[225] See Kawaley J in **Xingxuan Technology** (above).
[226] Dissenters' closing submissions and **Sempra Metals v IRC** [2007] UKHL 34.

332. The Court is not inclined to accept the submission that the appraisal process under section 106 (6) gives rise to any equitable claim for compound interest. It is a judgment debt created by operation of the Court's statutory appraisal process.

## Summary and Order

333. Therefore, for the reasons given above, the Dissenters' respective appraisal applications succeed. The Court hereby appraises the discounted fair value of each dissenter's share in NKWE to be A$0.13 per share as at the 24 October 2018 and orders that the Dissenters are entitled to be paid the difference between the Offer Price and A$0.13 (namely an additional A$0.03 per share owned)[227].

334. The Court orders that in addition to the difference in fair value and the Offer Price, the Dissenters are entitled to interest on the unpaid sum calculated at the rate of 3.5 per cent per annum commencing from 24 October 2018 until payment in full in accordance with section 10 of the Interest and Credit Charges Act 1975[228].

335. The Court will leave it to the parties to calculate and agree the exact sums required to discharge these obligations. In the event that agreement on the figures cannot for some reason be reached, the parties are granted liberty to apply.

## Costs

336. The normal rule is that costs will follow the event.

337. Unless either party applies within 14 days of the date of this Judgment for a hearing on costs, the Court orders that the Dissenters shall have the costs of the proceedings on a standard basis, with a certificate for two counsel for the trial.

---

[227] The cumulative total would result in approximately A$5,910,192.66 but this is to be confirmed by the parties.
[228] The Court has calculated the amount to be approximately A$206,856.74 per annum or A$566.73 per day but this is also to be confirmed by the parties.

338. This means that the normal rules for taxing costs of the attorneys will be followed in relation to the conduct of the proceedings up to the trial, but that the Dissenters' trial costs shall be certified for two counsel. For the avoidance of any doubt, the allowed costs will also include the fees, costs and expenses of the Dissenters'experts up to and including the trial. The costs are to be taxed if not agreed.

**Order**

339. Counsel are to prepare an Order in agreed form for entry on the Court Record.

Dated this 4th February 2025



_____

**THE HON. ANDREW MARTIN**

**PUISNE JUDGE**