# Exhibit 11



**VIA EMAIL ONLY**

Our Ref: DBDKC-22644-001

15 March 2025

Conyers Dill & Pearman Limited
Clarendon House
2 Church Street
Hamilton, HM11

**Attention: Rhys Williams**

Dear Counsel

**In the Matter of Enstar Group Limited (Company)**
**Supreme Court of Bermuda Cause Nos. 333/2024 and 334/2024 (Proceedings)**

1    We refer to your letter dated 13 March 2025 and write further to our letter dated 7 March 2025.

2    Please see **enclosed**:

    (a)    by way of service, the sealed copy of our clients' Summons for Directions, dated 7 March 2025 (**Summons**). The Summons has been listed for mention at 11am on Thursday, 27 March 2025; and

    (b)    our clients' proposed directions for the Summons.

3    We would be grateful if you would please provide, by **4pm on Monday, 24 March 2025**, your:

    (a)    client's leading counsel's availability for a remote two-day hearing of the Summons, before 4 July 2025.  To the extent that (any) matters in dispute on the Summons are sufficiently narrowed, it may be that the parties can agree to vacate a portion of this estimated time; and

    (b)    confirmation that the enclosed directions are agreed.

4    We look forward to receiving your client's agreement to, or otherwise comments on, the draft directions order annexed to the Summons, first provided to you on 7 March 2025.

5    Our clients' rights are reserved.

Yours faithfully
**TROTT & DUNCAN LIMITED**

*Trott & Duncan Limited*

Delroy B Duncan KC

Enc

TEL 441.295.7444    FAX 441.295.6600    EMAIL info@td.bm    WEB www.td.bm
17A Brunswick Street, Hamilton HM 10, Bermuda    MAIL TO P.O. Box HM 2094, Hamilton HM HX, Bermuda

IN THE SUPREME COURT OF BERMUDA
CIVIL JURISDICTION
COMMERCIAL COURT
2024 : Nos. 333 and 334

IN THE MATTER OF THE AGREEMENT AND PLAN OF MERGER BY AND AMONG ENSTAR GROUP LIMITED, ELK BIDO LIMITED, ELK MERGER SUB LIMITED, DEER LTD. AND DEER MERGER SUB LTD. DATED AS OF 29 JULY 2024

AND IN THE MATTER OF A PROPOSES STATUTORY MERGER AGREEMENT BY AND AMONG DEER LTD., DEER MERGER SUB LTD. AND ENSTAR GROUP LIMITED

AND IN THE MATTER OF A PROPOSED STATUTORY MERGER AGREEMENT BY AND AMONG DEER LTD. AND ENSTAR GROUP LIMITED

AND IN THE MATTER OF A PROPOSED STATUTORY MERGER AGREEMEMT BY AND AMONG ELK BIDCO LIMITED, ELK MERGER SUB LIMITED AND ENSTAR GROUP LIMITED

AND IN THE MATTER OF SECTION 106 OF THE COMPANIES ACT 1981

BETWEEN:

(1) FOURWORLD GLOBAL OPPORTUNITIES FUND, LTD
(2) FOURWORLD EVENT OPPORTUNITIES, LP
(acting through its general partner FOURWORLD CAPITAL, LLC)
(3) FOURWORLD SPECIAL OPPORTUNITIES FUNDS, LLC
(4) FW DEEP VALUE OPPORTUNITIES FUND I, LLC
(5) CORBIN ERISA OPPORTUNITY FUND, LTD.

<u>Plaintiffs (No. 333)</u>

HARSPRING CAPITAL, LP
(acting through its general partner HARSPRING CAPITAL ADVISORS, LLC)

<u>Plaintiff (No. 334)</u>

and

ENSTAR GROUP LIMITED

<u>Defendant</u>

---

**SUMMONS FOR DIRECTIONS**

---

**LET ALL PARTIES** concerned attend before one of His Majesty's Judges sitting in Chambers at the Supreme Court, Civil Jurisdiction (Commercial Court), 30 Parliament Street, Hamilton in the Islands of Bermuda on _Thurs_-day, the _27_ day of _March_ 2025 at _11_ o'clock in the _forenoon_ or so soon thereafter as Counsel may be heard on the hearing of an application on the part of the Plaintiffs in Actions 2024 Nos 333 and 334 for an Order:

1. In the terms of the Draft Order for Directions and Appendices attached to this Summons for Directions in respect of the Originating Summonses filed in these proceedings by the said Plaintiffs;

2. Such further or other directions or orders as the court deems appropriate; and

3. That the costs of this application be paid by the Defendant, such costs to be taxed if not agreed.

DATED this _13_ day of _march_ 2025.

_for the_ **ACTING REGISTRAR**

IN THE SUPREME COURT OF BERMUDA
CIVIL JURISDICTION
COMMERCIAL COURT
2024: Nos. 333 & 334

IN THE MATTER OF THE AGREEMENT AND PLAN OF MERGER BY AND AMONG
ENSTAR GROUP LIMITED, ELK BIDCO LIMITED, ELK MERGER SUB LIMITED, DEER
LTD. AND DEER MERGER SUB LTD. DATED AS OF 29 JULY 2024

AND IN THE MATTER OF A PROPOSED STATUTORY MERGER AGREEMENT BY AND
AMONG DEER LTD., DEER MERGER SUB LTD. AND ENSTAR GROUP LIMITED

AND IN THE MATTER OF A PROPOSED STATUTORY MERGER AGREEMENT BY AND
AMONG DEER LTD. AND ENSTAR GROUP LIMITED

AND IN THE MATTER OF A PROPOSED STATUTORY MERGER AGREEMENT BY AND
AMONG ELK BIDCO LIMITED, ELK MERGER SUB LIMITED AND ENSTAR GROUP
LIMITED

AND IN THE MATTER OF SECTION 106 OF THE COMPANIES ACT 1981

BETWEEN:

(1) FOURWORLD GLOBAL OPPORTUNITIES FUND, LTD.
(2) FOURWORLD EVENT OPPORTUNITIES, LP
(acting through its general partner FOURWORLD CAPITAL, LLC)
(3) FOURWORLD SPECIAL OPPORTUNITIES FUND, LLC
(4) FW DEEP VALUE OPPORTUNITIES FUND I, LLC
(5) CORBIN ERISA OPPORTUNITY FUND, LTD.

Plaintiffs (No. 333)

HARSPRING CAPITAL, LP
(acting through its general partner HARSPRING CAPITAL ADVISORS, LLC)

Plaintiff (No. 334)

and

ENSTAR GROUP LIMITED

Defendant

---

**[DRAFT] ORDER FOR DIRECTIONS**

---

1

**UPON** the Originating Summonses of the Plaintiffs (the **"Proceedings"**)

**AND UPON** the Originating Summonses being listed together for a first return hearing (which was treated as a directions hearing) on [●] 2025

**AND UPON** hearing Leading Counsel for the Plaintiffs and Leading Counsel for the Defendant

**IT IS HEREBY ORDERED THAT**:

**A.    Electronic Data Room and Defendant's Discovery**

1    Within **7 days** from the date of this Order, the Defendant shall instruct a data room service provider to open an electronic data room (the **"Data Room"**) and provide access to:

    1.1    the Valuation Experts (as defined below);

    1.2    any Additional Experts (as defined below) (if appointed);

    1.3    each person whom the Valuation Experts or any Additional Experts appoint to assist them with any work relating to the proceedings;

    1.4    the Plaintiffs (including their respective investment managers); and

    1.5    the Parties' agents, advisers, sub-advisers, representatives, affiliates, service providers and their respective legal advisors (**"Representatives"**);

provided always that, before access is provided, the Defendant and the Plaintiffs shall first have entered into the non-disclosure and confidentiality agreement (**"NDA"**) at **Appendix 1**.

2    The Defendant shall upload to the Data Room all Documents (as defined in **Appendix 2**), within the Defendant's possession, custody or power, as follows:

    2.1    At the same time the data room is opened, the Defendant shall disclose and produce all Documents that were made available by or on behalf of the Defendant to any actual or potential buyers, counterparties, interested parties, Reinvesting Shareholders, or their affiliates, agents and advisers, in connection with or as part of their due diligence investigations into the Defendant, including but not limited to the Buyer Parties, Party A, Sixth Street, the Sixth Street Filing Parties, or CEO Filing Party (or any of their

2

constituent members), or any other person (including as described and defined in the Defendant's definitive proxy statement filed with the United States Securities and Exchange Commission and dated 11 October 2024 (the **"Proxy"**));

2.2    within **30 days** of the date of this Order, all Documents set out in **Appendix 3** of this Order which were prepared, created, sent or received in the 5-year period ending on the Valuation Date (as defined below); and

2.3    within **60 days** of the date of this Order, all other Documents prepared, created, sent or received in the 5-year period ending on the Valuation Date which are relevant or potentially relevant to the determination of the fair value of the Plaintiffs' shares in the Defendant as at the Valuation Date.

3      All parties who have been given access to the Data Room shall be given full access rights to the Documents therein whilst the Proceedings (and any appeal therefrom) are extant, save that no party will have the ability to modify Documents in-situ within the Data Room; however, all such Documents shall be in a form which the Parties can download to their own systems either individually or (upon request to, and facilitated by, the Data Room service provider) as a bulk download and, in turn, modify outside of the Data Room. For the avoidance of doubt, the establishment by the Plaintiffs of any alternative data room shall not in any way limit their rights under this Directions Order to access to the Data Room.

4      The reasonable costs of and associated with the establishment and maintenance of the Data Room, including the Data Room provider's costs of (i) uploading, processing and hosting the Documents added to the Data Room, (ii) producing indexes in the form provided for in paragraph 11 and 12 below and any updated versions thereof, (iii) technical support, including the costs of facilitating any bulk export or download of Documents and (iv) persons seeking access to the Data Room in accordance with this Order, shall be borne initially by the Defendant on an ongoing basis but shall ultimately be costs in the Proceedings.

5      The Defendant shall, on an ongoing basis whilst the Proceedings are extant, bear the costs of 10 access codes for the Plaintiffs, and as many access codes as the Valuation Experts or any Additional Experts may require, to facilitate access to the Data Room (such costs ultimately to be costs in the Proceedings). Should any Plaintiff require additional access to the Data

Room, such Plaintiff shall bear the specific costs of such access, and the Defendant will arrange for such costs to be charged by the Data Room provider to the Plaintiff directly.

6    No Data Room usage report, or any other analysis of any Party's usage of the Data Room, shall be run by any Party on the usage of another Party, its Representatives, or its appointed Valuation Expert, or any Additional Expert, or Appointees without that Party's express written consent or order of the Court.

**B. Plaintiffs' Discovery**

7    The Plaintiffs shall upload to the Data Room (or, at the Plaintiffs' election, to an alternative data room) within **60 days** of this Order, Documents in their possession, custody or power falling within the categories of Documents identified at **Appendix 4** of this Order which were prepared and created in the 2-year period ending on the Valuation Date and which are relevant to the determination of the fair value of the shares in the Defendant as at the Valuation Date.

8    The costs of hosting such Documents in the Data Room (but not in any alternative data room, which costs shall be borne initially by the Plaintiffs on an ongoing basis, but shall ultimately be costs in the Proceedings) shall be borne initially by the Defendant on an ongoing basis but shall ultimately be costs in the Proceeding.

9    Each Plaintiff's disclosure shall be made available to the Defendant and the Experts but not to any other Plaintiff.

**C. Disclosure Protocol**

10    The Parties shall comply with the disclosure protocol at **Appendix 2** hereto when disclosing and producing Documents (by way of upload to the Data Room or any alternative data room). In relation to Documents that have been redacted pursuant to **Appendix 2**, upon request, Documents shall be provided in their native format manually amended by way of deletion of redacted information.

**D. Lists of Documents**

11    The Parties shall ensure that all Documents they upload to the Data Room are appropriately indexed in an electronically searchable form pursuant to **Appendix 2** (**"Data Room Index"**), which shall be compiled in a manner which complies with the requirements of the *Rules of*

*the Supreme Court 1985* ("**RSC**") O.24, r.5. The Data Room Indices shall be provided (and thereafter updated) at the same time as any Documents are disclosed and uploaded to the Data Room. Any such changes in the content of the Data Room shall be clearly identified at the same time they are made.

12    In relation to the Documents which are to be disclosed pursuant to this Order, the Parties shall, on the respective dates for compliance specified in paragraph 2 and 7, and at any other time when disclosure is provided, produce (or update) their respective Data Room Index in accordance with **Appendix 2** and RSC O.24, r.5. So long as the Data Room Index has been compiled and provided in a manner which complies with the requirements of RSC O.24, r.5, it shall be treated as Part 1 of Schedule 1 of the respective Party's list of documents in accordance with RSC O.24, r.5(1).

13    Where a Party withholds Documents, or redacts information contained within Documents, in accordance with the **Appendix 2**, it shall provide an itemized list of any such documents ("**Privilege Log**"). The Privilege Log shall include the data described at paragraph 18 of Appendix 2, and a summary of the basis for the privilege claimed. Nothing in this Order or in Appendix 2 hereto shall derogate from each Party's implied obligation not to use the Documents obtained thereby for any improper or collateral purpose.

## E.  Fact Witness Evidence

14    Within **28 days** following the date of this order, the Defendant shall file and serve evidence confirming that it has made appropriate financial provision to fund these proceedings and meet any subsequent fair value award and award of interest made by the Court, with such evidence to exhibit appropriate supporting financial material (including, but not limited to, the Defendant's most contemporaneous audited financial reports and quarterly financial statements; documentation containing information that would otherwise be contained in its income statement, balance sheet and cash flow statement; and documentation containing information which illustrates its performance against its key performance indicators (the "**Provision Confirmation**")). Thereafter the Defendant will provide an updated Provision Confirmation every **90 days** until judgment is received or the Proceedings conclude at an earlier date.

15  Any factual witness evidence to be relied upon at trial by the Defendant shall be filed and served within **28 days** of the date referred to at paragraph 2.3 above.

16  The Plaintiffs shall file and serve any factual witness evidence by no later than **28 days** thereafter.

17  The Defendant shall file and serve any factual witness evidence in reply to the Plaintiffs' factual witness evidence by no later than **14 days** thereafter.

18  Leave is hereby granted to the Parties to cross-examine any fact witness on their evidence and any such witness shall attend for cross-examination.  Any Party that intends to cross-examine a fact witness shall give the other Party's attorneys notice of that fact at least **28 days** before the witness is required to attend for cross-examination.

## F.  Experts

19  The Parties shall have leave to instruct and to call as a witness at trial one expert witness each in the field of valuation (each a **"Valuation Expert"** and together the **"Valuation Experts"**) to opine upon the fair value of the Plaintiffs' shares in the Defendant as at 6 November 2024 (the **"Valuation Date"**).

20  The Valuation Experts shall be appointed and the Parties shall advise each other of the identities and contact details of the respective Valuation Experts so appointed by no later than **60 days** from this Order.

21  The Parties shall have leave to instruct and call, at a hearing following the Court's determination of fair value (the **"Interest Hearing"**), one expert witness each to opine on the fair rate of interest to be paid by the Defendant upon the amount determined to be the fair value of the Plaintiffs' shares in the Defendants (together, the **"Interest Experts"**).  For the avoidance of doubt, the same individual may be instructed and called as both a Valuation Expert and an Interest Expert.  If the Parties, or either of them, consider an Interest Hearing necessary, the Interest Experts shall be appointed within **14 days** of the date of the Order made upon the Court's determination of fair value of the Plaintiffs' shares in the Defendant, and on that date the Parties shall each advise the other in writing of the identities and contact details including email addresses of the respective Interest Experts so appointed.  Absent agreement between the Parties, and notwithstanding the provisions of any other direction herein, any

Party shall have liberty to apply for further directions regarding the exchange of reports and supplemental reports from, and production of a joint memorandum by, the Interest Experts, and in relation to any other matters connected with determining the fair rate of interest.

22    No later than **21 days** after the date for the Defendant to file and serve factual evidence in reply pursuant to paragraph 17, the Parties shall notify each other of any additional expert evidence they wish to seek leave to adduce (including as to deal process or specific industry sectors) (**"Additional Expert(s)"**) and proposed directions for evidence of any Additional Expert. The Parties shall then confer as soon as practicable with the view to determining whether agreement can be reached, subject to the grant of leave, to adduce evidence of any Additional Expert(s) and, if so, directions in respect of such evidence including as to the making of Information Requests.

23    In the event of agreement the Parties shall as soon as practicable file a Consent Order with the Court seeking leave to adduce evidence of any Additional Expert(s) and directions for such expert evidence that are agreed. To the extent of any disagreement over whether leave should be granted to adduce evidence of any Additional Expert(s), or in relation to directions for such expert evidence, any application to the Court to resolve such disagreement shall be made no later than **21 days** of the date that the notification was provided pursuant to paragraph 22.

## G. Experts' Information Requests

24    The Valuation Experts shall be entitled to make written requests of the Defendant for (a) the provision of Documents and/or (b) the provision of information (**"Information Requests"**). Such requests may be made from the date on which the Valuation Experts are appointed, pursuant to paragraph 20. For the avoidance of doubt, the Valuation Experts shall be entitled to make Information Requests for Documents and information that came into existence before or after the Valuation Date.

25    The Defendant shall respond promptly and in writing to each Information Request and in any event by no later than **21 days** from the date of the Information Request. If the Defendant is unable or unwilling to provide the Documents and/or information that is subject to an Information Request, it shall, within **21 days** of the request: (i) provide all responses it is able to provide (including requested or responsive documents), and (ii) apply to Court to be relieved of the obligation to comply with the balance of the request and/or to extend the time for complying with the request (if agreement cannot be reached between the Parties).

26      The Defendant will in all cases disclose with and cite in its responses any Document(s) that support its answers to an Information Request.  Where no such Document(s) exist, the Defendant will confirm this as part of its answer to the Information Request.  The Defendant shall disclose and produce (by way of upload to the Data Room) all responses and Documents provided in response to an Information Request in accordance with the disclosure protocol at **Appendix 2**.

27      Any Information Requests and any responses from the Defendant thereto shall be copied simultaneously by email to the Valuation Experts and the Plaintiffs' attorneys.  For the avoidance of doubt, all communications between a Valuation Expert or their Appointees and the Defendant concerning an Information Request (including in relation to the answers to be given thereto), shall be in written form and shall be copied to the Parties' attorneys and the Valuation Expert for the opposing Party.

28      Unless otherwise agreed amongst the Parties, the cut-off date for the submission of the final Information Request to the Defendant is **28 days** before the date fixed for the exchange of Expert Reports (as provided for at paragraph 29.2 below).

## H.  Valuation Expert Reports and Valuation Experts' Joint Memorandum

29      Signed reports (the "**Valuation Expert Reports**") of each of the Valuation Experts shall be:

  29.1    confined to the issue of the fair value of the Plaintiffs' shares as at the Valuation Date;

  29.2    filed and exchanged simultaneously within **120 days** of the date for the Defendant to file and serve factual evidence in reply pursuant to paragraph 17; and

  29.3    stated to be prepared in compliance with the Rules of the Supreme Court 1985 and the duties of an expert identified at paragraph 48 of the Supreme Court of Bermuda decision, *A. Brewster et al. v The Premier of Bermuda et al.* [2021] SC (Bda) 45 Civ (9 June 2021).

30      The Valuation Experts shall meet at a mutually convenient time, whether in person, by telephone call or video link or howsoever they shall decide (the "**Valuation Experts' Meeting**"), but no later than **14 days** after the exchange of the Valuation Expert Reports, to

discuss the differences between their respective reports with a view to narrowing the issues between them and producing the Joint Memorandum required by paragraph 31.

31    A joint memorandum of the Valuation Experts (the "**Valuation Experts' Joint Memorandum**") recording:

    31.1    the fact that they have met;

    31.2    when and where they met, and that they discussed the issues of expert evidence;

    31.3    the issues on which they agree;

    31.4    the issues on which they disagree; and

    31.5    a brief summary of the reasons for any such disagreement,

shall be completed and issued to the Parties by the Valuation Experts by no later than **14 days** following the Valuation Experts' Meeting.

32    Any supplemental Valuation Expert Reports (the "**Supplemental Valuation Expert Reports**") shall be exchanged simultaneously by no later than **28 days** following the issuance of the Valuation Experts' Joint Memorandum.

33    The Parties shall be at liberty to cross-examine the opposing Party's Valuation Expert and any Additional Experts on their report(s) at trial.

**I.  Case Management, Case Management Conference and Trial Date**

34    Unless the Parties otherwise agree, a case management conference shall be held on the earliest date convenient to the Court and the Parties' counsel no less than **14 days** after the deadline for exchange of any Supplemental Valuation Expert Reports in accordance with paragraph 32.

35    The Parties shall, on an ongoing basis while the proceedings are extant, pay the costs of the recording and transcription of any hearings (such costs to be allocated 50% to the Plaintiffs and 50% to the Defendant in the first instance, but ultimately to be costs in the proceedings), subject to the Parties agreeing on the supplier and fee quote prior to each hearing or to dispense with recording and/or transcription.

36      Liberty for any Party to apply to modify this Order or for further directions in respect of the matters addressed in this Order.

37      No sooner than **140 days** from the date of this Order, the Parties shall seek to agree and thereafter provide the Court with a provisional estimate together with mutually available dates of Counsel for the trial to be fixed.  In the absence of agreement, any Party may apply for further directions in relation to the listing of the trial.

38      Originating Summons 2024: No. 333 and Originating Summons 2024: No. 334 shall be consolidated, case manged and tried together.

39      Costs in the cause.


Dated this        day of [●] 2025



                                    _____
                                    **CHIEF JUSTICE/PUISNE JUDGE**

10

# APPENDIX 1

## Non-Disclosure and Confidentiality Agreement pursuant to paragraph 1 of this Order

This Confidentiality and Non-Disclosure Agreement (the **"Agreement"**), effective [*date*] (the **"Effective Date"**), is entered into

**BETWEEN**

**Enstar Group Limited (the "Company")** a company incorporated under the laws of the Bermuda and having its registered office address at c/o Conyers Dill & Pearman, Clarendon House, 2 Church Street, Hamilton, Pembroke HM11, Bermuda (the **"Company"**)

**AND**

[*NAME*], a company incorporated under the laws of [*jurisdiction*] and having its registered office address at [*address*],

(each herein referred to individually as a **"Party"**, and collectively as the **"Parties"**).

**WHEREAS**

(A)     On 6 November 2024, at a special meeting of shareholders, the members of the Company passed a resolution approving three mergers which resulted in the merger between the Company and Elk Merger Sub Limited ("**Parent Merger Sub**"), (the **"Merger"**). As a result of the Merger and upon completion thereof, the Company will cease to be a publicly traded company and certain shareholders' shares in the Company will be cancelled in exchange for the right receive a payment of US$338 per share.

(B)     Certain shareholders of the Company (each a **"Plaintiff"**, and collectively the **"Plaintiffs"**) commenced proceedings in the Supreme Court of Bermuda on 8 November 2024 to have the fair value of their shares determined by the court pursuant to section 106 of the Companies Act 1981. The proceedings were issued with cause numbers 333 and 334 of 2024 (collectively the **"Proceedings"**).

(C)     Pursuant to an order for directions in the Proceedings dated [●] (the **"Directions Order"**), the Company is to establish an electronic data room (the **"Data Room"**) to which discovered documents are to be uploaded for the purposes of the Proceedings.

(D)     The Parties are engaged in proprietary and confidential business activities, and could be prejudiced if Confidential Information (as defined herein) is disclosed publicly or to third parties, or used by the

1

Recipient, its Expert, Representatives and/or Appointees (as defined herein) for purposes not reasonably related to the Proceedings.

**NOW, THEREFORE,** in consideration of the promises and the mutual agreements and covenants hereinafter set forth, and intending to be legally bound, the Parties hereby agree as follows:

**1      DEFINITIONS AND INTERPRETATION**

1.1     In this Agreement the following words and expressions shall have the following meanings:

(i)     **"Affiliates"** means a corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent or sibling corporation.

(ii)    **"Appointee"** means each person whom an Expert appoints to assist them in any work relating to the Proceedings, including the preparation of the Expert Reports and the Joint Expert Memorandum (such other terms as defined in the Directions Order) and any other preparations in relation to the Proceedings.

(iii)   **"Discloser"** means any Party who discloses Confidential Information (as defined below) in accordance with the Directions Order.

(iv)    **"Expert"** means the respective expert witnesses appointed by the Company and the Plaintiffs in relation to the Proceedings.

(v)     **"Recipient"** means any person who, in accordance with the Directions Order and subject to the provisions of this agreement, is entitled to receive, access, download or review Confidential Information.

(vi)    **"Representatives"** means, with respect to a Recipient, its Affiliates, agents, advisers, sub-advisers, representatives, legal advisors, service providers and consultants.

1.2     References to recitals and clauses are references to the recitals to and clauses of this Agreement.

1.3     Headings to clauses and the use of bold type are for convenience only and shall not affect the interpretation or construction of this Agreement.

1.4     Words in the singular include the plural and vice versa.

2

## 2    CONFIDENTIAL INFORMATION

2.1    **"Confidential Information"** means:

    (i)    Any information disclosed by the Discloser to the Recipient, its Representatives and/or Appointees either directly or indirectly, in writing or orally, related to: trade secrets; business, commercial, or financial information; financial statements; financial or business plans and strategies; financial models and advices; projections or analyses for future or prior periods; tax data; business and marketing plans and strategies; assets and liabilities; proposed strategic transactions or acquisitions, strategic alternatives, or business combinations; or other personally or commercially sensitive or proprietary information of the Discloser and its subsidiaries; and

    (ii)    Any notes, analyses, compilations, studies, interpretations, documents or records containing, referring to, relating to, based upon or derived from, such Confidential Information, in whole or in part, created by the Recipient, its Representatives and/or Appointees.

2.2    Confidential Information shall not, however, include any information that:

    (i)    Was publicly known or made generally available to the public without a duty of confidentiality prior to the time of disclosure to the Recipient by the Discloser;

    (ii)    Has become publicly known or made generally available to the public without a duty of confidentiality, after disclosure to the Recipient by the Discloser, through or as a consequence of no action or inaction of the Recipient in breach of this Agreement; or

    (iii)    Is in the rightful possession of the Recipient without confidentiality obligations at the time of disclosure by the Discloser to the Recipient as shown by the Recipient's then contemporaneous written files and records kept in the ordinary course of business.

2.3    If the Recipient or its Representative becomes compelled by applicable law, rule or regulation or request of governmental or regulatory authority to disclose any Confidential Information, the Recipient will, insofar as it is permitted to do so by applicable law, rule or regulation and other than in the case of routine regulatory investigations, provide the Discloser with a written notice at least seven (7) days in advance of such disclosure, where practicable, and will

3

provide such reasonable assistance to the Discloser, as the Discloser may require at the Discloser's sole expense, in seeking a protective order or other appropriate remedy.

2.4    If the Discloser waives the Recipient's compliance with this Agreement or fails to obtain a protective order or other appropriate remedy, the Recipient will furnish only that portion of the Confidential Information that it is required to disclose by applicable law, rule or regulation provided that any Confidential Information so disclosed shall maintain its confidentiality protection for all purposes other than such disclosure compelled by applicable law, rule or regulation.

## 3    MAINTENANCE OF CONFIDENTIALITY

3.1    Except as may otherwise be agreed in writing by the Discloser or ordered by the courts of Bermuda by way of relief from the implied undertaking or otherwise, all Confidential Information and its contents received by the Recipient, its Expert, Representatives and/or Appointees shall be:

(i)    Maintained as set forth in this Agreement;

(ii)    Disclosed only to such persons and in such manner as permitted by this Agreement; and

(iii)    Used solely for the purposes of or related to the Proceedings, consistent with the implied undertaking.

3.2    Prior to its Representatives, Experts and/or Appointees being granted access to the Data Room and/or receiving the Confidential Information, the Recipient shall

(i)    Ensure that its Representatives, Expert and Appointees expressly agree to comply with the confidentiality terms imposed by this Agreement or are otherwise bound by confidentiality obligations no less restrictive than those contained herein; and

(ii)    If requested by the Discloser, confirm that the agreements in clause 3.2(i) above have been obtained or obligations of confidentiality (as contemplated by clause 3.2(i) above) are otherwise in place.

3.3     The Recipient, its Representatives, Expert and Appointees shall keep the Confidential Information confidential and shall not, unless for a purpose of or related to these Proceedings (at all times consistent with the implied undertaking):

    (i)     Disclose any Confidential Information or permit any Confidential Information to be disclosed, either directly or indirectly, to any third party (other than other Representatives or Appointees or Recipients who have complied with the terms of this agreement) without the Discloser's prior written consent; or

    (ii)    Use the Confidential Information for any purpose other than as set out at Clause 3.1 above or exploit the Confidential Information in any way in communications with any competitor or competitors of the Discloser or its subsidiaries or affiliates.

3.4     The Recipient shall take necessary measures to protect the confidentiality, and to avoid disclosure and unauthorised use, of Confidential Information. Without limiting the foregoing, the Recipient shall take at least those same measures it employs to protect its own confidential information.

3.5     The Recipient shall reproduce the Discloser's proprietary rights notices on any copies of documents, in the same manner in which such notices were set forth in or on the original.

# 4     BREACH OF CONFIDENTIALITY

4.1     The Recipient shall notify the Discloser of:

    (i)     Any unauthorised use or disclosure, or suspected unauthorised use or disclosure, of Confidential Information by the Recipient, its Representatives, Expert and/or Appointees as soon as reasonably practicable upon becoming aware of such use or disclosure; and

    (ii)    Any actions by the Recipient, its Representatives, Expert and/or Appointees which are in breach of their respective obligations under this Agreement as soon as reasonably practicable upon becoming aware of such use or disclosure.

4.2     In the event of a breach of this Agreement that requires a notice under Clause 4.1 above, the Recipient shall reasonably cooperate with any and all efforts of the Discloser to help the Discloser regain possession of Confidential Information and/or prevent its further unauthorised use or dissemination.

4.3 The Recipient agrees to be responsible for any breach of this Agreement by any of its Representatives, Expert and/or Appointees that have received or obtained Confidential Information.

4.4 Nothing in this Agreement shall prejudice in any way the rights of the Discloser to file an application with the Bermuda court for a protective order relating to any Confidential Information.

## 5 DESTRUCTION OF MATERIALS

5.1 Upon the earlier of (i) the final determination of the Proceedings (including all appeals therefrom), or (ii) a legally binding agreement having been executed between the Company and the Plaintiff(s) as to the amount payable to it/them as a result of the Merger, and payment having been duly received by the Plaintiff(s) (the **"Final Determination"**) the Recipient shall, upon request by the Discloser following the Final Determination, take all reasonable and proportionate steps to:

 (i) subject to clause 5.2, destroy any materials that are in writing or other tangible medium and permanently erase any materials that are in an electronic or other non-tangible medium (to the extent technologically feasible) that constitute Confidential Information obtained or possessed by the Recipient;

 (ii) procure that all of its Representatives, Expert and/or Appointees destroy any materials that are in writing or other tangible medium and permanently erase any materials that are in an electronic or other non-tangible medium (to the extent technologically feasible) that constitute Confidential Information obtained or possessed by the Recipient's Representatives, Expert and/or Appointees; and

 (iii) certify in writing to the Discloser that the Recipient has complied with the requirements of this Clause 5.

5.2 Notwithstanding the foregoing, the Recipient and its attorneys may each retain one copy of the Confidential Information to the extent necessary to comply with applicable law or regulation, provided that copies so retained shall continue to be treated as confidential in accordance with the provisions of this Agreement.

5.3     Notwithstanding the destruction or erasure of Confidential Information pursuant to this Clause 5, the Recipient and its Representatives, Expert and Appointees shall continue to be bound by their confidentiality obligations and other obligations under this Agreement.

# 6    INDEMNITY

The Recipient shall indemnify the Discloser against all liabilities, costs, expenses, damages and losses suffered or reasonably incurred arising out of or in connection with any breach of this Agreement by the Recipient, its Representatives, Expert and/or Appointees.

# 7    INADEQUACY OF DAMAGES

The Recipient agrees that any violation of this Agreement may cause irreparable injury to the Discloser which cannot be adequately remedied in monetary terms or other damages, and accordingly the Discloser may seek and be entitled to obtain relief including specific performance and/or any other equitable relief in addition to all other legal remedies concerning any threatened or actual breach of any of the provisions of this Agreement.

# 8    TERM

8.1     The obligations of the Recipient under this Agreement shall survive until 24 months following compliance with Clause 5 above.  Notwithstanding the foregoing, the Recipient's duty to hold in confidence any Confidential Information that was disclosed by the Discloser during the term of this Agreement shall remain in effect for five years from the date the Confidential Information was disclosed, or until the final determination of the Proceedings including any appeals (whichever is later).

8.2     The termination of this Agreement shall not affect any accrued rights or remedies to which the Discloser is entitled.

# 9    NO WARRANTY

The Discloser makes no warranties, express, implied or otherwise, with respect to non-infringement or other violation of any intellectual property rights of a third party or of the Recipient.

**10    NO LICENSE**

This Agreement shall not be construed as creating, conveying, transferring, granting or conferring upon the Recipient any rights, license or authority in or to the Confidential Information except as expressly set forth in this Agreement. Title to the Confidential Information will vest solely with the Discloser.

**11    MISCELLANEOUS**

11.1    This Agreement shall bind and inure to the benefit of the Parties and their respective successors and permitted assigns. The Recipient hereby represents and warrants that the person executing this Agreement on its behalf has express authority to do so, and, in so doing, to bind the Party thereto.

11.2    This Agreement contains the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior written and oral agreements between the Parties regarding such subject matter.

11.3    If any provision herein shall be determined to be void or unenforceable in whole or in part for any reason whatsoever such invalidity or unenforceability shall not affect the remaining provisions or any part thereof contained within this Agreement and such void or unenforceable provisions shall be deemed to be severable from any other provision or part thereof herein contained.

11.4    No provision of this Agreement may be waived except by a written instrument executed by the Party against whom the waiver is to be effective. A Party's failure to enforce any provision of this Agreement shall neither be construed as a waiver of the provision nor prevent the Party from enforcing any other provisions of this Agreement. No provision of this Agreement may be amended or otherwise modified except by a written instrument signed by the Parties to this Agreement.

11.5    The Parties may execute this Agreement in one or more counterparts, each of which is deemed an original, but all of which together constitute one and the same agreement. This Agreement may be delivered by email or facsimile transmission, and email or facsimile copies of executed signature pages shall be binding as originals.

8

**12      GOVERNING LAW AND JURISDICTION**

12.1      This Agreement and any dispute, claim, suit, action or proceeding of whatever nature (including non-contractual disputes or claims) arising out of or in connection with it or its subject matter or formation shall be governed by and construed in accordance with the laws of Bermuda.

12.2      Each Party irrevocably agrees to submit to the exclusive jurisdiction of the courts of Bermuda over any claim or matter arising under or in connection with this Agreement or the legal relationship established by this Agreement.

**IN WITNESS WHEREOF,** the Parties acknowledge that they have read and understood this Agreement and have executed this Agreement as of the Effective Date.

**Signed for and on behalf of
ENSTAR GROUP LTD**

_____

**Name:**

**Title/position:**

**Date:**

**In the presence of:**

**Name:**

**Signed for and on behalf of
Plaintiff:**

_____

9

**Name:**

**Title/position:**

**Date:**


**In the presence of:**

**Name:**

## APPENDIX 2

### Disclosure Protocol pursuant to paragraph 10 of this Order

### A.     Definitions

1.     **Document** means original, draft and non-identical copies of all written, typed or printed items and electronically or digitally stored information (which for the avoidance of doubt includes all forms of communications, including any written, or electronic transmission of information (in the form of facts, ideas, inquiries, or otherwise), all meetings, discussions, dialogues, conversations, telephone calls, interviews, negotiations, cablegrams, mailgrams, telegrams, telexes, cables, correspondence, facsimiles, emails, text messages, oral/voice recordings, voice mails, voice notes, chat messages (including, but not limited to, Bloomberg messages, Instant Bloomberg chats, WeChat messages, Signal messages, WeCom messages, QQ messages, Microsoft Teams, Slack and WhatsApp messages), or any other forms of written interchange, however transmitted, including reports, models, spreadsheets, notes, memoranda, lists, agenda, proposals, opinions, messages, video tapes, and other documents or records of communication.

2.     **Custodians** means those persons likely to have discoverable Documents in their possession, custody or power.

3.     **Metadata** means data about data. In the case of an electronic Document, metadata is typically embedded information about the Document that is not readily accessible once the native electronic Document has been converted into an electronic image or paper Document, for example, the date on which the Document was last printed or amended. Metadata may be created automatically by a computer system (system metadata) or may be created manually by a user (application metadata).

4.     **MD5 Hash Value** means the Message Digest algorithm 5 which is used to provide a 128-bit hash or "digital signature" for electronic Documents and is generated upon the basis of the binary data of a file; where two or more items have the same MD5 Hash Value they are deemed to be duplicates.

5.     **Native File Format** means an electronic Document stored in the original form in which it was created by a computer software program.

6.   **Non-Custodial Data Sources** means those data sources (such as shared drives, servers, etc.) likely to contain electronically stored information that would be subject to disclosure.

7.   **Parent Document** means a Document with one or more attachments and/or embedded and/or linked or otherwise connected files.  For example, an email is a parent Document and any Documents attached to and/or embedded within the email are its attachments.  A parent Document and its attachments are family-inclusive, or family Documents.

### B.     Preservation of Documents

8.   The Parties will preserve all potentially discoverable Documents, including the metadata of such Documents, and ensure no metadata is altered during the preservation, collection, review or disclosure process.

### C.     De-duplication

9.   Stand-alone electronic Documents or entire Document families with the same MD5 Hash Value will be identified and any duplicates removed, except:

9.1.   where duplicates are added to a List of Documents because they are family members of other Documents which are also disclosed.  Duplicates which are part of a family are not to be removed, unless the whole of the family is in fact a duplicate of another family; and

9.2.   scanned hard copy Documents.

10.  A deNIST filter will be applied to the Documents during processing to identify and remove files that are generally created by operating systems or applications and contain no user-generated information or data.

11.  Subject to the rest of this protocol, every email in a chain shall be provided in its original, native format as a separate document, together with its attachments (if any).  Email chains shall not be 'threaded' or otherwise disclosed in any other format than their original format (subject to Section D below).

### D.    Format

12.    Electronic Documents are to be provided in their Native File Format, with all functionality, such as formulae and computations intact and enabled, and without watermarking or hardcoding subject to:

    12.1.    Documents, other than excel spreadsheets, that have been redacted in accordance with this protocol, which Documents will be produced in Tagged Image File Format ("**TIFF**") with the relevant .opt file and Document ID coding;

    12.2.    Excel spreadsheets, that have been redacted in accordance with this protocol, which Documents will be produced in a Native Format or near Native Format by using a software solution that retains the full functionality of the excel spreadsheet while applying redactions, such as Milyli, Evolver, or Redact Assistant. For the avoidance of doubt, documents disclosed in this way will not be hardcoded and will be disclosed containing (or, where that is not possible, together with) all native formulae and computations; and

    12.3.    For the avoidance of doubt, any documents redacted and not produced in their Native File Format in accordance with this paragraph 12, shall be produced with all required metadata.

13.    All PDF and TIFF Documents will be provided with corresponding Document level OCR text files where possible.  All PDF and TIFF Documents will also be bates stamped with the Document ID.

14.    The Parties will ensure Documents are decrypted, or that passwords are supplied. To the extent encryption for Documents cannot be successfully processed despite reasonable efforts, a slip sheet stating that the Documents cannot be decrypted shall be inserted in its place, including the metadata required, to the extent it can be reasonably extracted from the file in its encrypted form.

15.    Unless otherwise agreed or ordered by the Court, Parties should not place any restrictions on Documents that prevent opposing Parties from accessing them.

16. Family-inclusive Documents will be produced with metadata load files containing the family attachment range and parent Document with all Documents from the same family linked. Subject to any claim to privilege or irrelevance and confidentiality, all family Documents are to be disclosed where only one (or more) member(s) of a family of Documents is identified as relevant.

17. The following applies in relation to attachments to Documents:

    17.1. Attachments must be listed as separate Documents;

    17.2. Attachments will be linked to their Parent documents (and vice versa) in the Data Room; and

    17.3. In general, attachments will appear immediately after the Parent Document in any Data Room Index and Privilege Log.

E.    **Document Coding**

18. The Parties shall provide the following metadata detail for each Document, where such detail is reasonably available:

    18.1. Document ID: The document ID must be a unique reference and should be 8 digits in length following the arty indicator, utilising zeros if necessary, e.g. ESGR-00001234, FWCM-00001234 or HARS-00001234. The Document ID shall appear as a bates stamp on each Document uploaded to the Data Room when the Document is viewed in image format and the bates stamping shall be visible when the document is downloaded or printed.

    18.2. Parent Document ID: If there is no parent document, leave this field blank.

    18.3. Last Modified Date: This should be the date and time last modified, or the manually coded date in the format DD/MM/YYYY, 00:00:00.

    18.4. Date Created: This should be the original date and time a file was created and may be the same as the Last Modified Date.

18.5.  Sent Date: The date and time that the Document was sent in the case of an email or other form of message and may be the same as the Date Created.

18.6.  File Name/Subject/Description: This may be the file name or subject line of an email or other form of message or chat, or other descriptor.

18.7.  Document Title: The extracted title of the Document.

18.8.  Document Type: A descriptor enabling the specific file type to be identified (e.g., .pdf, .xls, .msg, etc.).

18.9.  Sender/Author: The name of the author of a Document or sender of an email or other form of message.

18.10.  CC: The name of the recipient(s) of the Document in a CC. Use a semi-colon (;) symbol as the multi-value separator.

18.11.  BCC: The name of the recipient(s) of the Document in a BCC. Use a semi-colon (;) symbol as the multi-value separator.

18.12.  Recipient: The name of the recipient(s) of the Document. Use a semi-colon (;) symbol as the multi-value separator.

18.13.  Custodian or Non-Custodian Data Source: The name of the custodian from whom the Document was drawn, and the names of any other custodians who had duplicate copies of the Document.

18.14.  MD5 Hash Value: as defined.

18.15.  Contains Redactions: This will be a binary "Yes/No" code applying where the whole or part of a Document has been redacted.

18.16.  Reason for Redaction or reason for being withheld: This will identify the reason for the redaction or withholding a document using the following labels, as applicable:

18.16.1.  Legal advice privilege (if applicable);

18.16.2.  Irrelevance and confidentiality;

18.16.3.   Litigation privilege;

18.16.4.   Without prejudice privilege; and

18.16.5.   Common interest privilege.

**F.    Excluded Documents**

19.   Temporary internet files, cookies and irrelevant gif files (i.e. company logos) are to be excluded from searches and discovery (to the extent possible).

**G.    Withholding Disclosure**

20.   Nothing in this Protocol will prevent a Party from withholding Documents from production on the basis of any applicable Bermuda law.

21.   If a claim of privilege is asserted over a portion of a Document only, that portion will be redacted and the Document produced.

22.   The redacted section/s of a Document are to be identified as such either by being blacked out or by otherwise being marked as having been redacted and stating the reason for the redaction in the List of Documents.

**H.    List of Documents**

23.   The following information shall be provided in any Data Room Index to the extent that this information is reasonably available:

23.1.   Document ID;

23.2.   Parent document ID;

23.3.   Last modified date;

23.4.   Date created;

23.5.   Email sent date;

23.6.   Conversion ID;

23.7.   Title/subject/description;

23.8.   Document type: (i.e. .pdf, .xls, .msg etc.);

23.9.   Sender/Author;

23.10.  Recipient;

23.11.  Contains redactions; and

23.12.  Reason for redaction.

24.   The Data Room Index will be ordered by family group, with attachments listed below parent documents.

25.   In respect of attachments to Documents, the above paragraph shall apply and attachments must be listed as separate Documents.

26.   The Data Room Index will be provided in an excel spreadsheet format (.xls) or such other format as may be agreed by the Parties.

## I.    Form of Production

27.   Unless otherwise agreed, production by the Parties is to be given via a "load file" which meets the requirements of this protocol.

## J.    Translation

28.   Where a document uploaded to the Data Room is not in the English language, the disclosing Party shall obtain a certified English translation thereof and an electronic copy of such translation shall be uploaded by the disclosing Party to the Data Room.  The English translation shall be uploaded to the Data Room together with the source document, which shall be cross-referenced and/or linked to the translation.

29.   In the event that any Party wishes to rely on a document which is not in the English language and a certified English translation is not available, that Party shall request, and the disclosing Party shall procure and provide a certified English translation of the document, an electronic copy of which shall be uploaded to the Data Room as soon as practicable.  The costs of any such translations shall be borne by the disclosing Party but shall ultimately be costs in the proceedings.

**K.    Variation**

30.    This protocol may be varied by agreement of the Parties in writing or by order of Court.

# APPENDIX 3

## Categories of Defendant Discovery pursuant to paragraph 2 of this Order

*Unless otherwise defined, all capitalised terms have the same meaning ascribed to them in the Proxy. "Documents" shall have the same meaning ascribed to it in Appendix 2.*

In this Appendix 3, headings are for convenience only and shall not affect the interpretation or construction of this Appendix, and the following definitions apply:

The following definitions shall apply herein:

a.  **Go-Shop Parties** means any of the 34 parties contacted for the purpose of the "go shop" process, referred to in the Proxy, including their respective Representatives (each a **"Go-Shop Party"**).

b.  **Investor Group Parties** means the following: the Buyer Parties, Sixth Street, the Sixth Street Filing Parties, JCF, and the CEO Filing Party, including their respective Representatives (each an **"Investor Group Party"**).

c.  **Key Parties** means the persons referred to in paragraph 1 (including its sub-paragraphs) of this Appendix 3, including their respective Representatives (each a **"Key Party"**).

d.  **Potential Purchaser** means Party A, the Go-Shop Parties, and any other party that was approached for the purposes of, expressed any interest in, or submitted any proposal to acquire the Company (whether solicited or not), including their respective Representatives.

e.  **Recused Directors** means Dominic Silvester, Orla Gregory and James Carey, including their respective representatives (each a **"Recused Director"**).

f.  **Representatives** means, in respect of a person of legal entity, that person or legal entity's representatives, management, officers, employees, agents, legal or other advisors, subsidiaries or affiliates.

### The Company, the Board and their advisors

1    Documents produced by, provided to or received from Goldman Sachs or its Representatives or affiliates (the **"Financial Advisor"**) relating to the Transactions, any proposed other transaction, or any strategic opportunity for the Company or its shares, which includes the matters set out in the Proxy (including but not limited to the Financial Advisor's fairness

opinion dated 29 July 2024 (**"Fairness Opinion"**)), including Documents passing between the Financial Advisor and the following parties or their Representatives:

1.1    The Company's Board or any of its constituent members from time to time, including but not limited to any Recused Director;

1.2    The Company;

1.3    The Company's investors, including those who were approached to, but ultimately did not, rollover their equity interests as part of the Transactions;

1.4    Any Investor Group Party;

1.5    CPPIB;

1.6    The Preferred Equity Investor;

1.7    Liberty Strategic Capital LP;

1.8    Any Potential Purchaser; and/or

1.9    Any financing source for a Potential Purchaser, Investor Group Party, or Reinvesting Shareholder.

2    Documents relating to (i) the Company's decision to not form a committee to consider and negotiate the Transactions (ii) the recusal of any member of the Board for any purposes relating to the Transactions, including but not limited to any of the Recused Directors and (iii) the suitability or independence of any non-recused member of the Board for any purposes relating to the Transactions.

3    Documents relating to the decision to retain Hogan Lovells as US legal counsel, Conyers as Bermuda legal counsel, Paul, Weiss as additional US legal counsel and engage the Financial Advisor as financial advisor, in connection with the Transactions, including Documents relating to any other legal or financial advisors considered but not appointed.

4    Documents relating to the Transactions, any proposed other transaction, or any strategic opportunity for the Company or its shares, which includes the matters set out in the Proxy,

produced by, provided to, received from, concerning, or passing between any of the Key Parties.

5    Documents (including all prior versions and drafts) in relation to the negotiation of the Transactions (and related Documents), including analysis or projections prepared by or for the Company, any member(s) of the Board (or their Representatives), the Financial Advisor, or any Key Party.

6    Documents produced by, provided to, received from or communicated between employees, directors, officers, management or consultants of the Company relating to the production and calculation of any analysis or projections sent to (or intended to be sent to) the Financial Advisor and/or any member of the Board and any other sets of projections in existence (including, for the avoidance of doubt, in respect of the Fairness Opinion) including drafts or relating to discussions of any such Documents.

**Buyer Parties, Reinvesting Shareholders, financiers, and potential purchasers**

7    Documents produced by, provided to or received from any Key Party in relation to the Transactions or any proposed other transaction, or any strategic opportunity for the Company or its shares, which includes the matters set out in the Proxy (including, but not limited to, Documents relating to or disclosed in connection with due diligence on the Company, all management projections, budgets, models or reports, all prior versions and drafts of such Documents, and Documents prepared in connection with the Transactions and all Documents relevant to the negotiation of the same).

8    Documents produced by, provided to or received from any Key Party, or any of their actual, potential or prospective sources of financing, relating to the financing (whether debt finance or equity capital contributions) of the Transactions, any proposed other transaction, or any strategic opportunity for the Company or its shares, which includes the matters set out in the Proxy.

**Corporate and financial documents**

Minutes and agendas of Board meetings and any supporting documentation, board packs, and any other Documents prepared for Board meetings of the Company (including meetings of any subset of the Board or non-recused directors).

9        Monthly management accounts for the Company.

10       Consolidated and unconsolidated quarterly accounts for the Company.

11       Monthly and/or quarterly financials for the Company including, where available, budgets, profit and loss statements, balance sheets, cash flow statements and any accompanying notes, commentary, reports or business plans.

12       Documents provided to the Bermuda Monetary Authority, including but not limited to periodic statutory financial statements and statutory financial returns, opinions of the Company's loss reserve specialist, alternative capital schedules, and Documents containing any analysis of or otherwise pertaining to the Company's solvency requirements and target capital level.

13       Documents relating to the value of investments or supporting the values of investments, loans and other receivables and liability of the Company.

14       Documents relating to the value of any real estate holdings of the Company including but not limited to, valuations, lease agreements with tenants, investment plans or proposals.

15       Documents relating to the expiry timeline and/or value of patents owned or licensed by the Company.

16       Documents relating to the assessment of the credit rating of the Company and its reinsurers.

17       Documents relating to the reserve policy of the Company.

18       Documents relating to the company's capital position and solvency ratio, including analysis of the impact on Company performance metrics.

19       Documentation of any off-balance sheet or non-operating assets and liabilities of the Company, including pension and foreign exchange liabilities.

20       Documents relating to the value of, or the Company's equity stake in, any subsidiary entities or affiliates, and any actual or potential transactions involving the transfer of assets, liabilities, or capital among the Company and its subsidiaries or affiliates.

21    Advice or analysis relating to corporation tax, withholding tax or other tax prepared by or for the Company's management.

**Projections and valuations**

22    Financial projections, forecasts, valuations, budgets, reports and models and supporting documentation, including final versions, any draft versions, and Documents discussing:

    22.1    Internal forecasts, budgets, projections, reports and models including source data and any supporting documentation, including as to the Company's reported, economic, adjusted, target, or potential return on equity, including any comparison to competitors or industry benchmarks;

    22.2    External forecasts, budgets, projections, reports and models relating to the Company's long-term plans including any supporting documentation;

    22.3    Any minutes or other Documents relating to the Company's projections (for the avoidance of doubt including but not limited to those Documents previously produced by, provided to, or communicated between employees of the Company in the production and calculation of the projections sent to the Financial Adviser and any other sets of projections in existence);

    22.4    Valuations or models of the Company (or any part of it, and whether for financial reporting, tax or investment appraisal purposes or otherwise) prepared by or for the Company, including any accompanying or supporting Documents provided to or obtained from any financial adviser in relation to any such valuation, including as to the effect of any applicable interest rate or discount rate applicable to the Company and its assets and liabilities; and

    22.5    Documents relating to the calculation, analysis, comparison, or reconciliation of GAAP book value, regulatory book value, and/or any other economic or adjusted book value of the Company (including the Management Adjusted Book Value and any prior versions or drafts).

23    Documents relating to the application or effect of any accounting treatments, standards, or regulatory requirements on any valuation model of the Company as referred to in paragraph 22 above.

24    Analyst, third party market and industry reports relevant to the Company and/or the markets in which the Company operates, including any Communications with and Documents produced by, provided to or received from any such analyst, third party and/or industry member.

**Operations and strategy**

25    Internal Documents relating to market share and commission broken down by business segment, including those relating to the consideration of competition in the Company's markets, and the impact of competitor exits, or changes in risk appetite, on the market.

26    Documents relating to the Company's industry positioning and public perception, including any communications with journalists, and including as relates to the Company's coverage by industry and market analysts and any discussion of the potential impact of analyst coverage on the Company or its share price.

27    Documents relating to any other potential acquisition of the Company or any part of it considered by the Company's management or Board or any member of the Board.

28    Documents relating to returns, risk management, and allocation of the Company's investable assets, including any scenario analyses, potential alternative approaches to investment management, or comparison to competitors or industry benchmarks.

29    Documents relating to any actual or potential capital transactions, including any discussions or analysis of such transactions, and any comparisons against alternative uses of capital.

30    Documents relating to the Company's claims management and loss reserve performance, including any comparison to competitors or industry benchmarks.

31    Documents relating to any loss portfolio transfer, adverse development cover or other transaction involving the provision of insurance or reinsurance coverage or transfer of risk on a portfolio of liabilities and/or assets presented to, considered or consummated by the Company or its affiliates.

14

32    Documents relating to any actual or potential alternative strategic plans for the Company, including any low-capital or sidecar strategies, strategic partnerships, or the generation of asset management fees.

33    Agreements with the Company's suppliers and clients and any related Documents.

34    Documents relating to the Company's post-Transactions plan, including all valuation and analysis, relevant to any potential relisting or IPO of the Company anywhere in the world, and whether or not the potential relisting or IPO was or may ultimately not be pursued.

35    Documents relating to the potential benefits, risks, and comparative differences for the Company of operating as a publicly traded or private company.

**Shares and shareholders**

36    The number, terms and class of shares issued by the Company and any changes thereto, and the terms and conditions of any outstanding share options and Documents relating to any potential dividends or stock buybacks.

37    Documents produced by, provided to, received from or passing between the Company and/or any of its shareholders in relation to the Transactions, including shareholders' interests and incentives including, without limitation, Documents in relation to the exercise of shareholders' voting rights or voting agreements, or objections, including all written objections to and correspondence regarding the Transactions received by the Company and Documents responding to, discussing, analyzing or commenting on the feedback or other communications received from the shareholders.

38    Documents relating to any actual or potential significant transactions of the Company's shares, including shares accumulated by the members of the Board, or any Investor Group Party prior to and/or in anticipation of the Transactions.

39    Documents produced by, provided to, received from or communicated between directors, management or consultants, advisors or officers of the Company in relation to the market price, potential future market price, or value of the shares of the Company as well as whether the Company's market price was believed to have reflected the Company's intrinsic value.

40    Documents relating to material non-public information in relation to the value of the Company or its shares.

**APPENDIX 4**

**Categories of Plaintiff Discovery pursuant to paragraph 7 of this Order**

*Unless otherwise defined, all capitalised terms have the same meaning ascribed to them in the Proxy. "Documents" shall have the same meaning ascribed to it in Appendix 2.*

1    A schedule setting out the full history of the Plaintiffs' sale and purchase of shares of the Company in the 2-year period ending on the Valuation Date.

2    Any valuations or valuation analyses of the Company or the Company's shares that the Plaintiffs prepared, reviewed or considered for the purposes of the merger.

3    All Documents provided to, reviewed or considered by the Plaintiffs' investment committees, if applicable, for their consideration of the merger.

1

IN THE SUPREME COURT OF BERMUDA
CIVIL JURISDICTION
COMMERCIAL COURT
2024 : Nos. 333 and 334

IN THE MATTER OF THE AGREEMENT AND PLAN OF MERGER BY AND AMONG ENSTAR GROUP LIMITED, ELK BIDO LIMITED, ELK MERGER SUB LIMITED, DEER LTD. AND DEER MERGER SUB LTD. DATED AS OF 29 JULY 2024

AND IN THE MATTER OF A PROPOSES STATUTORY MERGER AGREEMENT BY AND AMONG DEER LTD., DEER MERGER SUB LTD. AND ENSTAR GROUP LIMITED

AND IN THE MATTER OF A PROPOSED STATUTORY MERGER AGREEMENT BY AND AMONG DEER LTD. AND ENSTAR GROUP LIMITED

AND IN THE MATTER OF A PROPOSED STATUTORY MERGER AGREEMEMT BY AND AMONG ELK BIDCO LIMITED, ELK MERGER SUB LIMITED AND ENSTAR GROUP LIMITED

AND IN THE MATTER OF SECTION 106 OF THE COMPANIES ACT 1981

BETWEEN:



(1)  FOURWORLD GLOBAL OPPORTUNITIES FUND, LTD
(2)  FOURWORLD EVENT OPPORTUNITIES, LP
(acting through its general partner FOURWORLD CAPITAL, LLC)
(3)  FOURWORLD SPECIAL OPPORTUNITIES FUNDS, LLC
(4)  FW DEEP VALUE OPPORTUNITIES FUND I, LLC
(5)  CORBIN ERISA OPPORTUNITY FUND, LTD.

<u>Plaintiffs (No. 333)</u>

HARSPRING CAPITAL, LP
(acting through its general partner HARSPRING CAPITAL ADVISORS, LLC)

<u>Plaintiff (No. 334)</u>

and

ENSTAR GROUP LIMITED

<u>Defendant</u>

_____

SUMMONS FOR DIRECTIONS

_____



TROTT & DUNCAN LIMITED
17A Brunswick Street
Hamilton HM 10

Attorneys for the Plaintiffs

DBDKC-22644-001

# IN THE SUPREME COURT OF BERMUDA
## CIVIL JURISDICTION
## COMMERCIAL COURT
### 2024 : Nos. 333 and 334

**IN THE MATTER OF THE AGREEMENT AND PLAN OF MERGER BY AND AMONG ENSTAR GROUP LIMITED, ELK BIDO LIMITED, ELK MERGER SUB LIMITED, DEER LTD. AND DEER MERGER SUB LTD. DATED AS OF 29 JULY 2024**

**AND IN THE MATTER OF A PROPOSES STATUTORY MERGER AGREEMENT BY AND AMONG DEER LTD., DEER MERGER SUB LTD. AND ENSTAR GROUP LIMITED**

**AND IN THE MATTER OF A PROPOSED STATUTORY MERGER AGREEMENT BY AND AMONG DEER LTD. AND ENSTAR GROUP LIMITED**

**AND IN THE MATTER OF A PROPOSED STATUTORY MERGER AGREEMEMT BY AND AMONG ELK BIDCO LIMITED, ELK MERGER SUB LIMITED AND ENSTAR GROUP LIMITED**

**AND IN THE MATTER OF SECTION 106 OF THE COMPANIES ACT 1981**

**BETWEEN:**

(1) **FOURWORLD GLOBAL OPPORTUNITIES FUND, LTD**
(2) **FOURWORLD EVENT OPPORTUNITIES, LP**
(acting through its general partner FOURWORLD CAPITAL, LLC)
(3) **FOURWORLD SPECIAL OPPORTUNITIES FUNDS, LLC**
(4) **FW DEEP VALUE OPPORTUNITIES FUND I, LLC**
(5) **CORBIN ERISA OPPORTUNITY FUND, LTD.**

**Plaintiffs (No. 333)**

**HARSPRING CAPITAL, LP**
(acting through its general partner HARSPRING CAPITAL ADVISORS, LLC)

**Plaintiff (No. 334)**

**and**

**ENSTAR GROUP LIMITED**

**Defendant**

---

### [CONSENT] ORDER FOR DIRECTIONS

---

15904813.1

**UPON** the Plaintiffs' Originating Summonses dated 21 November 2024 seeking a fair value appraisal of their shares pursuant to s.106(6) of the Companies Act

**AND UPON** the Plaintiffs' Summons for Directions dated 7 March 2025 (**Summons for Directions**), and the draft directions order annexed to that Summons for Directions

[**AND UPON** the parties agreeing by consent the directions for the Summons for Directions]

**IT IS HEREBY ORDERED THAT:**

1. The Defendant shall provide its proposed amendments to the Plaintiffs' draft directions order annexed to the Summons for Directions, on or before **[+14 days from date of order]**.

2. In respect of any disputed matters arising in relation to the draft directions order:

   (a) The parties shall have leave to adduce expert evidence;

   (b) The Plaintiffs shall on or before **[+14 days from date of paragraph 1]**:

      (i) provide their proposed amendments to the Defendant's revised draft directions order provided in accordance with paragraph 1 above; and

      (ii) file and serve any evidence they wish to rely upon at the hearing of the Summons for Directions (the **Directions Hearing**);

   (c) The Defendant shall file and serve any evidence in response to the Plaintiffs' evidence provided in accordance with paragraph 2(b)(ii) above, on or before **[+14 days from paragraph 2(b)]**; and

   (d) The Plaintiffs shall file and serve any evidence in response to the Defendant's evidence provided in accordance with paragraph 2(c), on or before **[+14 days from paragraph 2(c)]**.

3. The parties shall file and serve their respective skeleton arguments for the Directions Hearing no later than **7 days** prior to Directions Hearing.

4. The Plaintiffs shall file and serve hearing bundles, including consolidated authorities bundles, no later than **5 days** prior to the Directions Hearing.

5. The Directions Hearing shall be listed for a two day remote hearing, on the first available dates convenient to the Court after 1 June 2025.

15904813.1

6.  Liberty to apply.

7.  Costs in the cause.

**Dated**            March 2025

| |
|---|
| **THE HONOURABLE CHIEF JUSTICE / PUISNE JUDGE**<br><br>**SUPREME COURT OF BERMUDA** |

We, TROTT & DUNCAN LIMITED, Attorneys for the Plaintiffs, hereby consent to an order being made in the above terms.

_____

**TROTT & DUNCAN LIMITED**

We, CONYERS DILL & PEARMAN, Attorneys for the Defendant, hereby consent to an order being made in the above terms.

_____

**CONYERS DILL & PEARMAN**

15904813.1

**IN THE SUPREME COURT OF BERMUDA**
**CIVIL JURISDICTION**
**COMMERCIAL COURT**
**2024 : Nos. 333 and 334**

**IN THE MATTER OF THE AGREEMENT AND PLAN OF MERGER BY AND AMONG ENSTAR GROUP LIMITED, ELK BIDO LIMITED, ELK MERGER SUB LIMITED, DEER LTD. AND DEER MERGER SUB LTD. DATED AS OF 29 JULY 2024**

**AND IN THE MATTER OF A PROPOSES STATUTORY MERGER AGREEMENT BY AND AMONG DEER LTD., DEER MERGER SUB LTD. AND ENSTAR GROUP LIMITED**

**AND IN THE MATTER OF A PROPOSED STATUTORY MERGER AGREEMENT BY AND AMONG DEER LTD. AND ENSTAR GROUP LIMITED**

**AND IN THE MATTER OF A PROPOSED STATUTORY MERGER AGREEMEMT BY AND AMONG ELK BIDCO LIMITED, ELK MERGER SUB LIMITED AND ENSTAR GROUP LIMITED**

**AND IN THE MATTER OF SECTION 106 OF THE COMPANIES ACT 1981**

**BETWEEN:**

**(1)  FOURWORLD GLOBAL OPPORTUNITIES FUND, LTD**
**(2)  FOURWORLD EVENT OPPORTUNITIES, LP**
**(acting through its general partner FOURWORLD CAPITAL, LLC)**
**(3)  FOURWORLD SPECIAL OPPORTUNITIES FUNDS, LLC**
**(4)  FW DEEP VALUE OPPORTUNITIES FUND I, LLC**
**(5)  CORBIN ERISA OPPORTUNITY FUND, LTD.**

**<u>Plaintiffs (No. 333)</u>**

**HARSPRING CAPITAL, LP**
**(acting through its general partner HARSPRING CAPITAL ADVISORS, LLC)**

**<u>Plaintiff (No. 334)</u>**

**and**

**ENSTAR GROUP LIMITED**

**<u>Defendant</u>**

---

**SUMMONS FOR DIRECTIONS**

---

**TROTT & DUNCAN LIMITED**
**17A Brunswick Street**
**Hamilton HM 10**

**Attorneys for the Plaintiffs**

**DBDKC-22644-001**