# Exhibit 17

# [2017 (2) CILR 585]

## IN THE MATTER OF QIHOO 360 TECHNOLOGY COMPANY LIMITED

## QIHOO 360 TECHNOLOGY COMPANY LIMITED v. MASO CAPITAL INVESTMENTS LIMITED, BLACKWELL PARTNERS LLC—SERIES A and CROWN MANAGED ACCOUNTS SPC (on behalf of CROWN/MASO SEGREGATED PORTFOLIO)

C.A. (Martin, Newman and Morrison, JJ.A.) October 9th, 2017

*Companies — arrangements and reconstructions — dissenting shareholders — fair value of shares — if company's approach to discovery inconsistent and cavalier, affidavit verifying discovery not conclusive*

*Companies — arrangements and reconstructions — dissenting shareholders — fair value of shares — appointment of forensic expert to conduct audit of company's IT systems exceptional — ordered following company's cavalier attitude to and failure to comply with discovery orders — under inherent jurisdiction or GCR O.24, r. 20(1)*

A company applied in the Grand Court for the determination of the fair value of dissenting shareholders' shares pursuant to s.238 of the Companies Law (2016 Revision).

Following a merger, the company and its dissenting shareholders failed to agree a fair value for the dissenting shareholders' shares. An order was made by consent giving directions to the parties in preparation for the final hearing. The company was to open an electronic data room, accessible to the parties and their advisers, consultants and experts, and to upload to it all documents and other materials in its possession, custody or power which were relevant to the determination of the fair value of the shares. The company and the dissenting shareholders had leave separately to instruct an expert witness as to the fair value of the shares.

The dissenting shareholders subsequently issued a summons seeking specific discovery of documents and information (listed in Schedule A to the summons) that it alleged were in the possession, custody or power of the company and which had not been disclosed when requested by the dissenting shareholders' expert, including valuations, long-term forecasts, tax analysis, internal communications, documents held by its attorneys

("the Skadden emails") and correspondence with its financial adviser, J.P. Morgan. The dissenting shareholders also sought orders that the company prepare and serve a list of all relevant documents, and that the company and the dissenting shareholders jointly appoint an independent forensic technology expert to conduct an independent review of the company's discovery.

The Grand Court (Mangatal, J.) found the company to have approached its discovery obligations in a cavalier and inconsistent manner. It ordered the company to take all steps necessary to preserve its electronic devices and all data that might be relevant to the proceedings; to give specific discovery of all correspondence with J.P. Morgan regarding J.P. Morgan's refusal to provide documentation and of the Skadden emails in their native format; to prepare and serve a list of all relevant documents; and that the company and the dissenting shareholders would jointly appoint an independent forensic technology expert to conduct an audit of the company's IT systems (that decision is reported at 2017 (2) CILR 43).

The company sought leave to appeal against the order on the grounds that (a) the judge erred in law in failing properly to apply the test for specific discovery in GCR O.24, r.8; (b) the judge was wrong in law to treat the company's verifying affidavit as not conclusive; and (c) the judge was wrong in law to regard the appointment of an independent forensic technology expert as a remedy available under GCR O.24, r.7.

**Held,** refusing leave to appeal:

(1) The judge's decision on specific discovery was well reasoned and within the range of conclusions open to her. She stated that although in ordinary cases of discovery relevance was not a matter of opinion but was determined by the pleaded issues, in a s.238 application the sole issue was fair value. The discovery exercise was central to the proper determination of value and experts had a special role to play. The judge accepted that an expert had to express his views as to relevance with independence and not allow the instructing party or its attorneys to dictate relevance, but it would be highly speculative for her to decide on the interlocutory application, and without cross-examination, that the view as to relevance expressed by the dissenting shareholders' expert was not his own opinion and considered view as to what was relevant for his assessment and necessary to complete his work. The request had to be viewed against the backdrop of repeated requests by the expert's firm. The judge ultimately concluded that the court was not in a position to second-guess or sift through his assertion of relevance. The applicant would not be granted leave to appeal against this decision (paras. 14–15).

(2) Nor could the judge's approach to the issue of the conclusivity of the company's verifying affidavits be validly criticized. There were clearly grounds on which the judge was entitled to conclude that, despite the company's assertions to the contrary, complete discovery had not been given. The judge was also correct to recognize that there were exceptions to the general rule that an affidavit verifying discovery was conclusive. In

ordinary litigation, allegations of suppression of documents could be relevant not only to discovery but also to the substantive issues in the litigation, which should not be decided at an interlocutory stage. It was also the case that in ordinary litigation an absence of discovery could be dealt with by drawing adverse inferences against the party refusing to make full discovery. The rationale of the conclusivity presumption did not apply in the special circumstances of a s.238 application. In a s.238 application, the sole task of the court was to determine the fair value of shares, for which it required full information. If the information was lacking, the court would not prejudge any substantive issue by ordering disclosure. The absence of information could not be dealt with by drawing adverse inferences. In the present case, having identified inconsistencies and problems with the company's discovery, the judge had been fully entitled to order further discovery (paras. 18–20).

(3) It could not be said that the Grand Court had no jurisdiction to order an IT audit. The present case was exceptional not only because of the central importance of discovery in s.238 proceedings and the role of the company in that process but also because of the company's inconsistent and cavalier approach to discovery. An order for a forensic audit was necessary to avoid a denial of justice to the dissenting shareholders and to permit the court to determine the fair value of their shares. Although the order was intrusive, it was justified in this case. The court did not have power under GCR O.24, r.7 to order a forensic audit by a third party expert but the court had power under its inherent jurisdiction to ensure that its orders were observed. It was this inherent jurisdiction that the judge exercised, given the insufficiency of discovery made under previous orders. Although the judge did not rely on it, the order for a forensic audit could have been made pursuant to GCR O.24, r.20(1) which provided that where the court had made an order for discovery which had not been complied with, the court had a wide discretion to make such order as it thought just. There was a clear jurisdictional basis for the order made. The judge had ample grounds for concluding that a forensic audit was the only practical way to ensure that the company complied with its discovery obligations. Leave to appeal would not be granted (paras. 23–25).

(4) The court drew attention to the possibility of abuse of the autonomy that was of necessity to be given to experts in s.238 proceedings. There was a danger that the liberty given to experts to define what was relevant to value could be abused or even used to put pressure on a company to agree an inflated value for dissenters' shares rather than accept the wholesale disruption of an external inspection of its physical and electronic records. An order for the appointment of a forensic expert would not be appropriate in every s.238 application. It should be regarded as an exceptional remedy, not accepted practice in s.238 applications (para. 27).

**Cases cited:**
(1) *Bancredit Cayman Ltd., In re*, 2009 CILR 578, referred to.

(2) *British Assn. of Glass Bottle Manufacturers Ltd.* v. *Nettlefold*, [1912] A.C. 709; (1912), 81 L.J.K.B. 1121; 107 L.T. 529, followed.
(3) *Dyxnet Hldgs. Ltd.* v. *Current Ventures II Ltd.*, 2015 (1) CILR 174, referred to.
(4) *Integra Group, In re*, 2016 (1) CILR 192, followed.
(5) *Lonrho plc* v. *Fayed (No. 3)*, [1993] T.L.R. 347, referred to.
(6) *Mueller Europe Ltd.* v. *Central Roofing (South Wales) Ltd.*, [2012] EWHC 3417 (TCC), referred to.
(7) *Shanda Games Ltd.*, *In re*, Grand Ct., Cause No. FSD 14 of 2016, April 25th, 2017, unreported, referred to.

**Legislation construed:**
Companies Law (2016 Revision), s.238:
"(1) A member of a constituent company incorporated under this Law shall be entitled to payment of the fair value of his shares upon dissenting from a merger or consolidation.

. . .

(9) If the company and a dissenting member fail . . . to agree on the price to be paid for the shares owed by the member . . .
   (a) the company shall . . . filed a petition with the Court for a determination of the fair value of the shares of all dissenting members . . ."

Grand Court Rules 1995 (Revised), O.24, r.7:
"(1) Subject to rule 8, the Court may at any time, on the application of any party to a cause or matter, make an order requiring any other party to make an affidavit stating whether any document specified . . . is, or has at any time been in his possession, custody or power . . ."
O.24, r.8: The relevant terms of this rule are set out at para. 10.
O.24, r.20(1): The relevant terms of this sub-rule are set out at para. 25.
*M. Heal, J. Elliott* and *D. Vekaria* for the applicant;
*R. Levy, Q.C., N. Dunne* and *R. Bell* for the respondents.

1  **MARTIN, J.A.,** delivering the judgment of the court: On August 31st, 2017, we refused the applicant company leave to appeal against an order ("the order") dated July 27th, 2017 of Mangatal, J. (that judgment is reported at 2017 (2) CILR 43). These are our reasons for that decision.

2  The order was made in the context of a petition brought by the company under s.238 of the Companies Law (2016 Revision). That section entitles members of certain Cayman companies who dissent from a merger or consolidation to be paid the fair value of their shares. In default of agreement, the fair value is to be determined by the court. The respondents are members of the company who have dissented from a merger of the company. They are referred to in these reasons as "the dissenting shareholders."

588

Case 1:25-cv-02700-RA-SDA    Document 54    Filed 09/22/25    Page 6 of 19
Case 1:25-cv-02700-RA-SDA    Document 30-2    Filed 04/25    Page 6 of 19    PageID #:1035

C.A.                                                       IN RE QIHOO 360 TECHNOLOGY

3    Proceedings under s.238 present two particular difficulties to the courts. First, all or nearly all of the financial information necessary to enable the court to determine the value of a company's business, and hence of its shares, will inevitably be held by the company itself. The proper conduct of the valuation exercise will accordingly require that the company make adequate disclosure of that information. Secondly, although the task of determining the value is one for the court alone, the court will not usually be equipped to derive a value from the financial information without expert assistance. The consequent importance of the expert evidence means that the court must have confidence that the valuations proposed are based on sufficient information; and that in turn means that the experts will often have to be given a substantial degree of autonomy in determining what information is needed for their valuations. Although care must be taken to ensure that this autonomy is not abused (a point to which we return at the end of these reasons), in general we agree with the statement of Jones, J. in ) that "the experts are the best judge of what information is or is not relevant for their purposes."

4    In the present case, these two difficulties were initially addressed by the making of a consent order (dated October 25th, 2016), which in relevant part was in the following terms:

"IT IS ORDERED that:

1. The Petitioner shall, by 4.00 pm on 1 November 2016 (Cayman Islands time), open an electronic data room (the 'Data Room').

2. The Data Room shall be accessible to each of the parties and the parties' respective advisors, consultants and experts for inspection of the documents contained therein each upon the entry into [a confidentiality agreement].

3. . . .

4. By 4.00 pm on 18 November 2016 (Cayman Islands time), the Petitioner shall upload to the Data Room all documents (of whatsoever description, whether electronic, hardcopy or any other format) and communications (whether by email or otherwise) and other materials which are or have been in their respective possession, custody or power and which are relevant to the determination of the fair value of the shares in the Petitioner as at 30 March 2016 (the 'Valuation Date').

5. Provided that such documents are within the possession, custody or power of the Petitioner, paragraph 4 shall include for the avoidance of doubt the following categories, namely all documents and communications (including, without limitation, emails):

Case 1:25-cv-02700-RA-SDA   Document 54   Filed 09/27/25   Page 7 of 19
Case 1:25-cv-02700-RA-SDA   Document 30-4   Filed 04/25   Page 7 of 19   PageID #:1036

THE CAYMAN ISLANDS LAW REPORTS                    2017 (2) CILR

   (a) previously provided to or obtained from J.P. Morgan Securities (Asia Pacific) Limited or its affiliates (the 'Financial Adviser') in relation to the fair value opinion, including those passing between the Financial Adviser and:
   
   (i) the independent directors or Special Committee of the Petitioner; and
   
   (ii) the Petitioner's other directors, management, employees, counsel and/or advisers; and
   
   (iii) the bidding consortium,
   
   for the purposes of compiling the fair value opinions; and/or
   
   (b) previously provided to or obtained from the Petitioner's financiers (whether to or from any of the persons mentioned in 5(a) above) for the purposes of securing finance for the merger transaction (including but not limited to all management forecasts provided to the same); and/or
   
   (c) previously provided to or obtained from the bidding consortium or former members thereof (whether provided to or from any of the persons mentioned in 5(a) or (b) above) or passing between such persons for the purposes of undertaking due diligence on the Petitioner (including but not limited to all management forecasts provided to the same).

6. . . .

7. The (a) Petitioner and (b) Dissenting Shareholders shall each have leave to separately instruct an expert witness in the field of valuation in order to opine upon the fair value of the shares in the Petitioner as a going concern at the Valuation Date (both such experts together, the 'Experts'). The Experts shall be appointed by no later than 1 November 2016, and on that date each of the Petitioner and the Dissenting Shareholders should advise the other in writing of the identities and email addresses of the respective Experts so appointed.

8. The Petitioner shall upload to the Data Room any additional documents, materials, communications (whether by email or otherwise) or information requested by either expert for the purpose of preparing their own opinion within 14 days of receipt of such a request, unless otherwise agreed or directed by order of the Court, and such request for information of either Expert shall be made prior to the date 21 days before the exchange of expert reports, or any such other date as mutually agreed by the parties. For the avoidance of doubt, if the Experts so request, this may include documents, materials or information produced after the Valuation Date, and such requests may be made from the date of the upload of documents to

the Data Room pursuant to paragraph 4 above. Any such request from or response to an Expert shall be copied by email to the Expert for the other party to the email addresses notified in paragraph 7.

9. The Petitioner shall procure that appropriate members of its management team be available to meet with both Experts together, in person or by telephone or by way of video link, such meetings to be scheduled to take place at a mutually convenient place and time for the purpose of providing information and answering queries which are relevant to the preparation of the Experts' respective opinions . . ."

The consent order then went on to provide for the exchange of experts' reports, for a meeting between the experts, for the provision of a joint memorandum of the experts identifying areas of agreement and disagreement, for the provision of supplemental reports and for the holding of a case management conference after exchange of supplemental reports.

5   The consent order was subsequently amended by further order dated December 21st, 2016. The amendments are not relevant to the issues on this application.

6   On March 3rd, 2017, the dissenting shareholders issued a summons for relief in terms of a draft order attached to it. In essence, the draft order provided for preservation of electronic devices and data; for specific discovery "pursuant to Order 24, rule 7 of the Grand Court Rules [and to] paragraphs 4, 5 and 8 of the [consent order]" of documents listed in a schedule containing 44 categories of document, and the appointment of a forensic expert to conduct a search in the company's IT systems and on its electronic devices for documents containing certain keywords. The 44 categories of document were summarized by the judge at para. 28 of her judgment as being documents and communications related to the 2025 projections; documents and communications to and from, or in the possession of, J.P. Morgan; documents and communications to or from the company's financiers; meeting file notes; documents and communications to and from the Buyer Group; internal employee communications, documentation and analysis; Skadden emails; and tax analysis.

7   It was this summons that led to the making of the order, which is in the following terms:

"It is ordered that

1. The Company shall forthwith take all steps necessary to preserve all computers, servers, network systems, cloud storage, laptops, back-up tapes, archives, handheld electronic devices or other means of transmitting or receiving or storing data ('Electronic Devices') and all or any data in the Company's possession, custody or power which may be relevant to these proceedings which is held or stored

on or by Electronic Devices or similar means in any jurisdiction whatsoever until the conclusion of the cause or further Order of the Court.

2. The Company shall, in the manner hereinafter appearing, give specific discovery pursuant to Order 24, rule 7 of the Grand Court Rules, of (a) all correspondence between the Company and J.P. Morgan Securities (Asia Pacific) Limited ('JP Morgan') regarding JP Morgan's refusal to provide documentation; and (b) all emails from Skadden, Arps, Meagher & Flom LLP in their native format (the actual electronic email with any attachments).

3. The Company shall prepare and serve a list of documents by 21 August 2017, such list to identify all relevant documents including of any electronic file type (and for the avoidance of doubt such documents must include inter alia (whether in hard copy or electronic form on any Electronic Device wherever they may be) memoranda, graphic files, office based documents, drafts, notes of meetings and discussions, including telephone conversations and e-mails (including attachments) or other data sent to or from any e-mail address used by any of the directors, officers or employees or anyone else on its behalf, which relate in any way to the determination of the fair value of the shares in the Company as at the Valuation Date (as defined in the Order for Directions dated 25 October 2016 (the 'First Directions Order')) ('Documents') which are or have been in the possession, custody or power of the Company (the 'List').

4. The List shall be verified by an affidavit sworn by a director of the Company and such director shall attend in person at the trial of the cause to be cross-examined unless the director's attendance is not required by the written agreement of the Dissenters or further Order of the Court.

5. Within 7 days following the provision of the List, the Dissenters and the Company shall designate specific key words to be used to search all Electronic Devices used by or available to the Company and its directors, officers or employees or anyone else on the Company's behalf for the Documents (the 'Keywords').

6. Subject to the provision of appropriate confidentiality undertakings (which, in the event that there is no agreement, the Court shall determine such terms), the Company and the Dissenters shall jointly appoint an independent forensic technology expert (the 'Forensic Expert') to conduct an audit of the Company's information technology systems and all Electronic Devices used by or available to the Company and its directors, officers or employees or anyone else on the Company's behalf for documents (including but not limited to any documents and/or information in Schedule A to the Summons,

Case 1:25-cv-02700-RA-SDA    Document 30-27    Filed 04/14/25    Page 10 of 19
Case 1:25-cv-02700-RA-SDA    Document 60-4    Filed 02/27/25    Page 12 of 19    PageID #: 1039

C.A.                                                           IN RE QIHOO 360 TECHNOLOGY

save for paragraph 40 of Schedule A to the Summons) containing the Keywords (the 'Forensic Audit').

7. The Forensic Expert shall be a person with considerable experience of conducting forensic examination of electronic sources and the appointment shall be approved in advance by agreement of the parties, failing which the Court shall determine the identity of the Forensic Expert on the application of any of the parties.

8. The Company shall provide all such assistance and access as requested by the Forensic Expert, including but not limited to providing access to the Company's information technology systems and all Electronic Devices referred to in paragraph 6 above and to allow the Forensic Expert to take forensic copies and/or image any emails (including attachments) and/or other electronic Documents.

9. The Forensic Expert shall report to the Court and the Dissenters' Cayman Islands attorneys ('Walkers') on a weekly basis, such report to contain details of the progress of the Forensic Audit, including but not limited to what has been searched, the Keywords used, the results of the Forensic Audit, the assistance and access provided by the Company pursuant to paragraph 8 above and any impediments to the Forensic Audit

10. The Forensic Expert shall provide all results of the Forensic Audit to the Company's Cayman Islands attorneys ('Harneys') on a rolling basis.

11. Harneys shall review the documents obtained from the Search for privilege and shall cause all non-privileged documents to be uploaded to the Data Room (as defined in the First Directions Order) within 3 days of receipt from the Forensic Expert.

12. The Forensic Expert shall give notice to the Court, Walkers and Harneys when the Search has been completed.

13. The time for exchange of experts' reports in accordance with paragraph 11 of the First Directions Order be extended to the date falling four weeks after either the final document has been uploaded to the Data Room pursuant to paragraph 11 above or the Forensic Expert has given notice pursuant to paragraph 12 above, whichever is later."

8    It can be seen that this order has four elements: (a) an order for preservation of electronic devices and data (para. 1); (b) an order for specific discovery of two categories of documents, including emails from Skadden, Arps in native format (para. 2); (c) an order for service of a verified list of documents (paras. 3 and 4); and (d) the appointment of an

expert to conduct a search of the company's IT systems and electronic devices for documents containing certain key words (the rest of the order).

9   The company challenges each of these elements, although elements (a) and (d) are dealt with together. It does so on three grounds: that the judge erred in law by failing properly to apply the test for specific discovery set out in O.24, r.8; that she was wrong in law to treat the company's verifying affidavit as not conclusive; and that she was wrong in law to regard the appointment of an independent forensic technology expert as a remedy available under O.24, r.7. We deal with these grounds in turn.

**Ground 1: specific discovery**

10   Specific discovery is dealt with by O.24, r.7 of the Grand Court Rules. Order 24, r.8 provides so far as relevant that on the hearing of an application under r.7 the court "shall in any case refuse to make such an order if and so far as it is of the opinion that discovery is not necessary either for disposing fairly of the cause or matter or for saving costs."

11   The judge largely rejected the dissenting shareholders' application for specific discovery. At para. 107 of the judgment, she said that—

> "save for the correspondence regarding J.P. Morgan's refusal to provide documentation, and the Skadden documents, in my judgment the dissenters have not satisfied the standard required for the court to order the specific discovery sought in para. 2 of the summons and as set out in Schedule A. This is because they have not demonstrated objectively the existence of these specific documents or categories of documents."

12   In relation to the two categories of documents in respect of which she did order specific discovery, her reasoning was as follows. As to the J.P. Morgan correspondence, she said at para. 103 of the judgment that—

> "in order to properly understand the context of J.P. Morgan's letter of April 7th, 2017, which has been disclosed, it does seem to me that the correspondence between the company and J.P. Morgan's refusal to provide documentation should be discovered. This is in my view relevant, necessary and proportionate."

As to the Skadden emails, she referred at para. 104 to the reason given by the dissenting shareholders for asking for the documents in native format, namely that the versions disclosed were in PDF format and only if the emails were uploaded in their native format would the experts be able to see the attachments. At para. 105 she rejected the company's assertion that the Skadden emails were not in its power, possession or custody on the grounds that, since Skadden were the company's former attorneys, the company was entitled to seek the documents from its attorneys. She then set out as follows two reasons quoted as to Skadden's stance:

"'It is not protocol to provide 'native' files, especially not to an adversarial party in litigation, due to various reasons:

(1) If the documents are provided in their native format, there is no way to place identifying markers on them (e.g. bates stamping is not possible), so there is no way to maintain appropriate control over the documents and what is being claimed or discarded as part of the production set.

(2) Additionally, when documents are provided in their native format, all of the information related to the documents, (i.e. the forensics) are inevitably provided, including but not limited to each time it was edited, saved, opened, what edits were made, and the author of the edits. Such information could potentially be privileged and cannot be removed from the documents. We do not provide the forensics unless ordered to do so by a court.'"

Finally, at para. 106, the judge said this:

"However, in my judgment, any question of privilege attaching would be the privilege of the client, the company, to waive, and I therefore accept Mr. Levy, Q.C.'s submission that the company ought to be able to compel Skadden to hand over the documents for uploading to the data room in their native form. In my judgment discovery of these documents is relevant, reasonable, necessary and proportionate."

13   The company complained that, having regard to the evidence filed on behalf of the company, there was no proper foundation for the judge's conclusion that an order for specific discovery was reasonable, proportionate or necessary. The only possible basis for that view was a statement by the expert engaged by the dissenting shareholders, James Nicholson, in a letter dated March 10th, 2017, that the information and documents set out in the schedule to the dissenting shareholders' summons (which included the J.P. Morgan and Skadden documents) was "relevant to my assessment of fair value as at the Valuation Date." But, in the words of para. 15 of the company's written submissions:

"the learned Judge also failed to take account or any proper account of the fact that the [dissenting shareholders] had not said why specific discovery of such documents was necessary for the fair disposal of the proceedings or how their perceived deficiencies in [the company's] discovery are preventing their expert from preparing his report. Nor did they say how they are relevant to the question of fair value."

14   The judge dealt with this issue extensively between paras. 77–89 of her judgment. She stated that although in ordinary cases of discovery relevance was not a matter of opinion but was determined by the pleaded

595

issues, in a s.238 petition the sole issue was fair value. The discovery exercise was absolutely central to the proper determination of the value, and experts had a special role to play. She accepted that an expert must express his views as to relevance with independence, and must not allow the instructing party or its attorneys to dictate relevance, but she held at para. 85 that it would be highly speculative for her to come to the view on this interlocutory application, without cross-examination, that the view expressed in Mr. Nicholson's letter was not his own opinion and considered view of what was relevant for his assessment, and what was needed to complete his work. She considered the company's submission that it was not enough for Mr. Nicholson simply to state that the documents were relevant, but held that the matter had to be viewed against the backdrop of the repeated requests made by Mr. Nicholson's firm. She considered also the relevance of the fact that the company's expert had indicated that he was able to complete his report without the additional documents, but said that that did not have the effect of convincing her that Mr. Nicholson was being unreasonable in requesting to see the documents and to obtain the information. She pointed out that experts may differ in approach and also as to the degree of detail or information required in order to give a valuation. Ultimately, she concluded at para. 89 that the court was "not in a position to second-guess or to sift through Mr. Nicholson's assertion of relevance."

15 In our view, the judge's reasoning on this aspect of the matter is clear, cogent and persuasive, and her conclusion eminently within the range of conclusions open to her. We do not consider that this ground raises any realistic possibility of challenge to her decision.

**Ground 2: verifying affidavits conclusive**

16 The foundation of this ground of appeal is the assertion that affidavits verifying discovery are ordinarily conclusive. The company relied in particular upon *Lonrho plc* v. *Fayed (No. 3)* (5), a decision of the Court of Appeal of England and Wales, in which Stuart-Smith, L.J. gave the leading judgment. The relevant part of the report is as follows ([1993] T.L.R. at 348):

> "His Lordship concluded that on whatever ground the order for a further affidavit was made, whether because of some admission by the deponent or the belief of the opposite party that other documents existed, the deponent's oath was conclusive; it could not be contravened by a further contentious affidavit and could not be the subject of cross-examination . . .
>
> The reasons for the rule were not far to seek. In the great majority of cases where it was alleged that one party or the other had suppressed documents, that issue would be crucially relevant to the issues in the

trial and could only be properly determined after the judge at trial had heard all the evidence. To try the issue at an interlocutory stage could involve injustice to both sides."

17   The judge dealt with this aspect of the case between paras. 92–102 of her judgment. She started by accepting the company's submission that the verifying affidavits sworn on the company's behalf would normally be conclusive as to whether or not the company had in its custody, possession or power any relevant documents other than those disclosed. She said, however, that they would not be conclusive if there had been an insufficiency of discovery which could be established from (a) the pleadings, the list, the affidavit, or documents referred to in them; (b) any other source that constituted an admission of the existence of discoverable documents not previously disclosed; and (c) an apparent exclusion of documents from discovery under a misconception. She said that what had caused her concern was the company's approach to the discovery process, which had been in instances somewhat careless and cavalier, resulting in incomplete and ineffective discovery. There were areas where the company had given inconsistent responses to requests, examples of which she identified; and she remarked that some of the variations in the responses were hard to reconcile without full or complete discovery. She referred to instances where the company had claimed not to have certain categories of documents, but had subsequently disclosed them. One of those instances related to 431 documents concerning the company's quarterly budgets, which the company uploaded after the issue of the summons, having previously asserted that it did not create quarterly budgets. In para. 102, she said this:

"In my judgment, the company has not misunderstood the case or misconceptualized it. What it is saying is that a lot of categories of information do not exist and never have existed in document form, which the dissenters say is incredulous and incapable of belief. The position taken by the company may well be strange. By itself, that is not sufficient for the dissenters to discharge their burden of demonstrating objectively that the documents exist. However, in light of the company's inconsistent positions, coupled with its cavalier approach to previous aspects of the discovery process, in my judgment there has been an insufficiency of discovery. If anything, the company may have misconceptualized the discovery process. This insufficiency has been established, based on the specific facts, as well as the surrounding circumstances. It is such that I cannot say that I find the company's statements that it has given complete and full disclosure reliable. I make a distinction between credibility and reliability, because I am not saying that there has been deliberate concealment or deletion, but rather that the discovery process has not been handled with the care required in order for the court to ensure that its

orders are carried out and that the discovery process is carried out fairly."

18   Again, we do not think that the judge's approach to this aspect of the matter can be validly criticized. There clearly were grounds on which she was entitled to conclude that, despite the company's assertions to the contrary, complete disclosure had not been given. She was right also to recognize that there were exceptions to the general rule that an affidavit verifying discovery is conclusive. This has been clear in England and Wales since at least 1912: see *British Assn. of Glass Bottle Manufacturers Ltd.* v. *Nettlefold* (2) where Viscount Haldane said this ([1912] A.C. at 714):

> "But while it is true that as a general rule you cannot go behind the affidavit in the absence of admissions in that or some other document, the rule is qualified where the basis on which the affidavit of documents has been made turns out to have been wrong. If the party making the affidavit has misconceived his case, so that the Court is practically certain that if he had conceived it properly, and had acted upon a proper view of the law, he would have disclosed further documents, then the Court can refuse to recognise an affidavit as conclusive, and order a further affidavit."

19   It is, in our view, also important to recognize that the rationale of the conclusivity presumption does not apply in the special circumstances of a s.238 petition. As identified in *Lonrho* v. *Fayed (No. 3)* (5), the rationale is that allegations of suppression of documents are capable of being relevant not only to discovery but to the substantive issues in the litigation. That was obviously the case in *Lonrho* v. *Fayed* itself, where the issue was what was the ultimate source of funds for the purchase of House of Fraser and the object of the specific discovery application was to establish that the asserted source of funds was a fabrication. In such circumstances, it is obviously unsatisfactory that a substantive issue should be decided at an interlocutory stage. It is also the case that, in ordinary litigation, an absence of discovery can be dealt with by the drawing of adverse inferences: if the court is satisfied that a document that must exist has not been disclosed, the court may, if appropriate, conclude that its contents are harmful to the interests of the party failing to disclose it. In the case of a s.238 petition, however, neither of these considerations applies. The sole task of the court is to determine the fair value of the dissenters' shares. To do that, it needs full information. If that information is lacking in some material respect, the court is not prejudging any substantive issue by ordering its disclosure. Nor can the absence of information be dealt with by drawing adverse inferences: the court needs to know what the information is, and concluding that it has been deliberately withheld does not help the court identify its contents.

20   In the present case, having identified inconsistencies and problems with the company's discovery, the judge was fully entitled to order further disclosure. There is no real prospect of this ground of appeal succeeding.

**Ground 3: no jurisdiction to order an IT audit**

21   This ground is based partly on the assertion that appointing an expert to conduct or supervise discovery undermines the principle of conclusivity, and we have already stated our views on that topic. However, the company goes further, and contends that the order for a forensic audit, requiring the company to preserve all its electronic data and devices and submit them to examination by an external expert, is outside the powers of the court under its discovery jurisdiction and its inherent jurisdiction. The company submits that the order—

> "is a highly intrusive form of injunctive relief akin to an Anton Piller order but without the safeguard of a supervising solicitor. Relief of that kind was unjustified and wholly inappropriate in this case and would not be granted in reliance solely on specific discovery rules in any Commonwealth jurisdiction."

22   The judge dealt with this issue at paras. 108–115 of her judgment. She quoted from Hollander, *Documentary Evidence*, 12th ed. (2015), including the following passage (para. 8.18, at 146):

> "It is obvious that an order requiring a party to give access to his opponent to enable disclosure to be effected is an exceptional remedy and gives rise to serious issues which need addressing. Thus in *Nucleus Information Systems v Palmer* Lewison J was told that the applicant did not accept that the other party had given proper disclosure of the relevant contents of his home computer, and sought an order that he should have access to the computer in order to search through his lawyers. The judge refused direct access to the computer, pointing out that it raised ECHR and privilege issues.
>
> In *Mueller Europe Ltd v Central Roofing (South Wales) Ltd* the issue was lack of the relevant expertise rather than deliberate failure. It had become apparent that the relevant individual from the defendant did not have the expertise to perform a meaningful search for back-up tapes, which had been previously ordered. Coulson J held that he had power to order that the search be carried out by a suitably qualified IT consultant on behalf of that party in order to ensure that the orders of the court were effectively complied with . . .
>
> From this line of cases, it is apparent that the court has power to order inspection of a computer by an expert, or that disclosure be given in whole or part by an expert rather than the party, but that this is an exceptional order which will only be given when the particular

circumstances justify it, and normally after there has been a failure to comply with disclosure orders."

23   The judge then said that the court had inherent jurisdiction to order discovery by means of a forensic audit. That would be in keeping with the overriding objective of dealing with cases justly, and in a way that was proportionate to the amount of money involved, the importance of the case, and the complexity of the issues. The case was exceptional, not only because of the central importance of discovery in s.238 proceedings and the role of the company in that process, but also because of the company's inconsistent and cavalier approach to discovery. The case was analogous to the *Mueller Europe Ltd.* v. *Central Roofing (South Wales) Ltd.* (6) case, where there was a lack of expertise in carrying out the discovery process. An order for a forensic audit was necessary to avoid a denial of justice to the dissenting shareholders and to permit the court to appraise the fair value of the dissenting shareholders' shares. Although the order was undoubtedly intrusive, it was justified in this case.

24   As we have indicated, part of the company's challenge to this part of the order was based on the assertion that it went far beyond specific discovery as contemplated by O.24, r.7—which, so the company said, was the jurisdiction invoked by the dissenting shareholders' summons. We agree that r.7 would not, on its own, justify an order for the disclosure exercise to be conducted by a third party expert. However, the dissenting shareholders' summons was also expressly intended to procure compliance with defined paragraphs of the consent order, which they contended—and the judge plainly accepted—had not been complied with by the company. The court has an inherent jurisdiction to ensure that its orders are observed, and it was that jurisdiction that the judge exercised, as her references to the inherent jurisdiction (para. 110) and the insufficiency of discovery under previous orders (para. 112) demonstrate. The company relied on cases concerned with the court's inherent jurisdiction to order security for costs, such as *Dyxnet Hldgs. Ltd.* v. *Current Ventures II Ltd.* (3) and *In re Bancredit Cayman Ltd.* (1), to demonstrate that the exercise of the inherent jurisdiction, in the words of Lord Scott of Foscote in the latter case (2009 CILR 578, at para. 9) "is subject to what has become the settled practice of the court"; and from that base it was contended that the court cannot simply invent orders that are otherwise unknown to the laws of these Islands and which are highly and unjustifiably intrusive (at para. 30)—

"the discretion must be exercised not merely in a generally judicial manner, but in a manner which accords with the settled practice of the court, as circumscribed or extended by primary or secondary legislation."

600

25  Although the judge did not rely on it, there was in fact an available basis in the Grand Court Rules for the order she made. Order 24, r.20(1) provides as follows:

> "Where the Court has made an order for discovery (either of documents or by way of oral examination) against any party and such party fails to comply, the Court may make such order as it thinks just, including, in particular, an order that the action be dismissed or, as the case may be order that the defence be struck out and final judgment entered accordingly."

This power not only in terms gives a wide discretion as to the orders that may be made, but extends to striking out the case of the defaulting party. The inherent jurisdiction of the court to deal with deficiencies in discovery, to the extent that it is necessary to invoke it, cannot be less wide. On either basis, there was a clear jurisdictional basis for the order the judge made. She had ample grounds for concluding that a forensic audit was the only practical way of ensuring that the company complied with its disclosure obligations. She recognized that the order was intrusive and exceptional, and put in place protections for the company—in particular the provision in para. 11 preserving privilege. There are in our judgment no realistic grounds for believing that a challenge to this part of the order could succeed on appeal and we do not regard the exceptional nature of the order as giving rise to a point of general importance sufficient to justify an appeal.

26  According to a note made by the company of the judge's reasons for refusing leave to appeal, she said that she doubted whether an appeal would have a real prospect of success because it involved a pure question of discretion and also involved an exercise of her discretion in relation to case management issues. In this, as in her decision generally, we consider that the judge was plainly correct. She had a sound jurisdictional basis for the order she made, identified the correct considerations, and reached a decision that is clearly within the bounds of her discretion. An appeal against the decision would have no reasonable prospect of success.

27  As presaged in para. 3 of these reasons, we come back to the possibility of abuse of the autonomy that is of necessity to be given to experts in s.238 proceedings. In para. 63 of her judgment, the judge recorded a submission by leading counsel for the company "that s.238 fair value claims must not be allowed to become a *carte blanche* for dissenters to conduct a 'drains up' inspection of the entire business, regardless of relevance to fair value." We think there is a danger that the liberty given to the experts to define what is relevant to value could be abused, and even used to put pressure on a company to agree an inflated value for dissenters' shares rather than accept the wholesale disruption of an external inspection of its physical and electronic records. At para. 114 of

her judgment, the judge said that she wished to make it clear that she was not at all holding that an order for appointment of a forensic expert would be appropriate in every s.238 proceeding; and again she was right to do so. It is, however, observable that such orders have been made in at least two cases—this one, and *In re Shanda Games Ltd.* (7) (although in the latter case the order was made by consent)—and we are concerned that they may become accepted practice. We stress that they are to be regarded as exceptional remedies, not common currency in s.238 petitions.

**Leave to appeal refused.**

*Harneys* for the applicant; *Walkers* for the respondents.

———————————